# 23-624

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

PINE MANAGEMENT, INC.,

*Plaintiff-Counter-Defendant-Appellant,*

—against—

COLONY INSURANCE COMPANY,

*Defendant-Counter-Claimant-Appellee.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## APPENDIX
## VOLUME I OF III
## (Pages A-1 to A-271)

---

AMANDA GRINER
FRANK M. MISITI
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Attorneys for Defendant-Counter-
  Claimant-Appellee*

DENNIS J. NOLAN
JOHN M. LEONARD
ANDERSON KILL P.C.
1251 Avenue of the Americas,
  42nd Floor
New York, New York 10020
(212) 278-1000

*Attorneys for Plaintiff-Counter-
  Defendant-Appellant*

# TABLE OF CONTENTS

PAGE

District Docket Court Entries ........................................... A-1

Complaint and Jury Trial Demand, dated March 24, 2022 ............... A-8

    Exhibit 1 to Complaint—
    Argo Pro Policy ................................................ A-21

    Exhibit 2 to Complaint—
    Verified Complaint, dated July 26, 2019
    (*Schneider, et al. v. Pine Management, Inc. et al.*)................. A-50

Defendant's Answer, Affirmative Defenses and Counterclaims,
    dated May 31, 2022........................................... A-117

    Exhibit A to Answer—
    Letter from Mitchell J. Geller to Bob G. Goldberg,
    dated July 17, 2018 .......................................... A-136

    Exhibit B to Answer—
    Argo Pro Policy .............................................. A-151

Plaintiff's Answer to Counterclaims, dated June 21, 2022 ............. A-180

Stipulation, dated August 5, 2022 ................................... A-195

Defendant's Notice of Motion for Judgment on Pleadings,
    dated August 9, 2022 ......................................... A-197

Declaration of M. Paul Gorfinkel, for Defendant, in Support
    of Motion for Judgment on Pleadings, dated August 9, 2022 ...... A-198

    Exhibit A to Gorfinkel Declaration—
    Letter from Mitchell J. Geller to Bob G. Goldberg,
    dated July 17, 2018 .......................................... A-199

ii

PAGE

Defendant's Memorandum of Law in Support of Motion for Judgment
on Pleadings, dated August 9, 2022 ............................. A-212

Plaintiff's Memorandum of Law in Opposition to Motion
for Judgment on Pleadings, dated August 30, 2022 .............. A-238

Declaration of Dennis J. Nolan, for Plaintiff, in Opposition to Motion
for Judgment on Pleadings, dated August 30, 2022 .............. A-268

Exhibit A to Nolan Declaration—
Verified Complaint, dated July 26, 2019
(*Schneider, et al. v. Pine Management, Inc. et al.*) ............... A-272

Exhibit A-1 to Nolan Declaration—
Letter from Mitchell J. Geller to Bob G. Goldberg,
dated July 17, 2018 ........................................... A-339

Exhibit A-2 to Nolan Declaration—
Letter from Howard S. Koh to Mitchell J. Geller,
dated August 3, 2018 ......................................... A-354

Exhibit A-3 to Nolan Declaration—
Letter from Mitchell J. Geller to Howard S. Koh,
dated August 22, 2018 ........................................ A-358

Exhibit A-4 to Nolan Declaration—
Letter from Howard S. Koh to Mitchell J. Geller,
dated August 31, 2018 ........................................ A-377

Exhibit A-5 to Nolan Declaration—
Letter from Mitchell J. Geller to Howard S. Koh,
dated September 21, 2018 ...................................... A-381

Exhibit A-6 to Nolan Declaration—
Letter from Howard S. Koh to Mitchell J. Geller,
dated September 28, 2018 ...................................... A-386

Exhibit A-7 to Nolan Declaration—
Letter from Mitchell J. Geller to Howard S. Koh,
dated November 20, 2018 ...................................... A-389

iii

PAGE

Exhibit A-8 to Nolan Declaration—
Letter from Howard S. Koh to Mitchell J. Geller,
dated December 7, 2018 .......................................... A-397

Exhibit A-9 to Nolan Declaration—
Operating Agreement of Rudel Realty LLC,
dated October 17, 1996 .......................................... A-401

Exhibit A-10 to Nolan Declaration—
Operating Agreement of Marni Realty LLC,
dated October 17, 1996 .......................................... A-413

Exhibit A-11 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Jeruth Realty LLC ........................................... A-425

Exhibit A-12 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of JHJ Realty LLC .............................................. A-462

Exhibit A-13 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Bar-Mar Realty LLC .......................................... A-497

Exhibit A-14 to Nolan Declaration—
Second Amended and Restated Operating Agreement
of Bren-El Realty LLC ........................................... A-530

Exhibit A-15 to Nolan Declaration—
Second Amended and Restated Operating Agreement
of Sir Realty LLC ............................................... A-565

Exhibit A-16 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Marc Realty LLC ............................................. A-600

Exhibit A-17 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of RIS Realty LLC .............................................. A-635

iv

PAGE

Exhibit A-18 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Zizi Realty LLC .............................................. A-674

Exhibit A-19 to Nolan Declaration—
Email from Bob G. Goldberg to Marc Schneider,
dated February 19, 2018 ......................................... A-712

Exhibit A-20 to Nolan Declaration—
Email from Brenda Rohlman to Marc Schneider,
dated March 3, 2018 ............................................ A-716

Exhibit B to Nolan Declaration—
Argo Pro Policy ................................................ A-719

Defendant's Reply Memorandum of Law in Further Support
of Motion for Judgment on Pleadings, dated September 6, 2022 ... A-748

Memorandum Opinion and Order of the Honorable Mary Kay
Vyskocil, dated March 20, 2023 .................................. A-761

Entry of Judgment, dated March 21, 2023 ........................... A-771

Notice of Appeal, dated April 17, 2023.............................. A-782

# A-1

**Query**     **Reports**     **Utilities**     **Help**     **Log Out**

CLOSED,APPEAL,CASREF,ECF

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22-cv-02407-MKV

| | |
|---|---|
| Pine Management, Inc. v. Colony Insurance Company | Date Filed: 03/24/2022 |
| Assigned to: Judge Mary Kay Vyskocil | Date Terminated: 03/21/2023 |
| Referred to: Magistrate Judge Barbara C. Moses (Settlement) | Jury Demand: Both |
| Demand: $1,000,000 | Nature of Suit: 110 Insurance |
| Cause: 28:1332 Diversity Action | Jurisdiction: Diversity |

**Plaintiff**

**Pine Management, Inc.**                    represented by    **John Mark Leonard**
Anderson Kill P.C. (N.Y.)
1251 Avenue of the Americas
New York, NY 10020
(212)-278-1025
Email: jleonard@andersonkill.com
*ATTORNEY TO BE NOTICED*

**Regan Erica Samson**
Anderson Kill PC
1251 6th Avenue
Ste Floor 42
New York, NY 10020
212-278-1000
Email: rsamson@andersonkill.com
*ATTORNEY TO BE NOTICED*

**Dennis Joseph Nolan**
Anderson Kill P.C. (N.Y.)
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1000
Fax: (212) 278-1733
Email: dnolan@andersonkill.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Colony Insurance Company**                    represented by    **Amanda R. Griner**
Rivkin Radler LLP (Uniondale)
926 RXR Plaza
Uniondale, NY 11556
516-357-3000
Fax: 516-357-3333
Email: amanda.gurman@rivkin.com

**A-2**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**M. Paul Gorfinkel**
Rivkin Radler LLP
926 RXR Plaza
Uniondale, NY 11556-0926
516-357-3000
Email: paul.gorfinkel@rivkin.com
*ATTORNEY TO BE NOTICED*

**Frank Michael Misiti**
Rivkin Radler, LLP
926 Rexcorp Plaza
Uniondale, NY 11556
(516)357-3000
Fax: (516)357-3333
Email: frank.misiti@rivkin.com
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Colony Insurance Company**          represented by  **Frank Michael Misiti**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Pine Management, Inc.**             represented by  **John Mark Leonard**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Regan Erica Samson**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Dennis Joseph Nolan**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Colony Insurance Company**          represented by  **Frank Michael Misiti**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Pine Management, Inc.**             represented by  **John Mark Leonard**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Regan Erica Samson**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Dennis Joseph Nolan**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/24/2022 | 1 | COMPLAINT against Colony Insurance Company. (Filing Fee $ 402.00, Receipt Number ANYSDC-25910023)Document filed by Pine Management, Inc.. (Attachments: # 1 Exhibit Ex. 1 - Policy, # 2 Exhibit Ex. 2 - Schneider Complaint).(Nolan, Dennis) (Entered: 03/24/2022) |
| 03/24/2022 | 2 | CIVIL COVER SHEET filed..(Nolan, Dennis) (Entered: 03/24/2022) |
| 03/24/2022 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Colony Insurance Company, re: 1 Complaint. Document filed by Pine Management, Inc...(Nolan, Dennis) (Entered: 03/24/2022) |
| 03/25/2022 | 4 | NOTICE OF APPEARANCE by Dennis Joseph Nolan on behalf of Pine Management, Inc...(Nolan, Dennis) (Entered: 03/25/2022) |
| 03/25/2022 | 5 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Pine Management, Inc...(Nolan, Dennis) (Entered: 03/25/2022) |
| 03/25/2022 | 6 | NOTICE OF APPEARANCE by Regan Erica Samson on behalf of Pine Management, Inc...(Samson, Regan) (Entered: 03/25/2022) |
| 03/25/2022 | 7 | NOTICE OF APPEARANCE by John Mark Leonard on behalf of Pine Management, Inc... (Leonard, John) (Entered: 03/25/2022) |
| 03/25/2022 | | ***NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Dennis Joseph Nolan. The following case opening statistical information was erroneously selected/entered: Cause of Action code 05:8705; Dollar Demand $1,000,000,000;. The following correction(s) have been made to your case entry: the Cause of Action code has been modified to 28:1332; the Dollar Demand has been modified to $1,000,000;. (pc) (Entered: 03/25/2022) |
| 03/25/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Mary Kay Vyskocil. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 03/25/2022) |
| 03/25/2022 | | Magistrate Judge James L. Cott is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 03/25/2022) |
| 03/25/2022 | | Case Designated ECF. (pc) (Entered: 03/25/2022) |
| 03/25/2022 | 8 | ELECTRONIC SUMMONS ISSUED as to Colony Insurance Company..(pc) (Entered: |

**A-4**

4/25/23, 10:21 AM                                        SDNY CM/ECF NextGen Version 1.6

| | | |
|---|---|---|
| | | 03/25/2022) |
| 05/31/2022 | 9 | WAIVER OF SERVICE RETURNED EXECUTED. Colony Insurance Company waiver sent on 3/30/2022, answer due 5/31/2022. Document filed by Pine Management, Inc... (Nolan, Dennis) (Entered: 05/31/2022) |
| 05/31/2022 | 10 | **FILING ERROR - DEFICIENT DOCKET ENTRY - (SEE DOCUMENT #11)** ANSWER to 1 Complaint., COUNTERCLAIM against Pine Management, Inc.. Document filed by Colony Insurance Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Misiti, Frank) Modified on 6/1/2022 (lb). (Entered: 05/31/2022) |
| 06/01/2022 | 11 | ANSWER to 1 Complaint., COUNTERCLAIM against Pine Management, Inc.. Document filed by Colony Insurance Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Misiti, Frank) (Entered: 06/01/2022) |
| 06/07/2022 | 12 | NOTICE OF APPEARANCE by M. Paul Gorfinkel on behalf of Colony Insurance Company..(Gorfinkel, M.) (Entered: 06/07/2022) |
| 06/21/2022 | 13 | ANSWER to 11 Counterclaim. Document filed by Pine Management, Inc...(Nolan, Dennis) (Entered: 06/21/2022) |
| 06/22/2022 | 14 | NOTICE OF INITIAL PRETRIAL CONFERENCE: Initial Conference set for 7/26/2022 at 12:00 PM in Courtroom 18C, 500 Pearl Street, New York, NY 10007 before Judge Mary Kay Vyskocil. (Signed by Judge Mary Kay Vyskocil on 6/22/2022) (tg) (Entered: 06/22/2022) |
| 06/30/2022 | 15 | NOTICE OF APPEARANCE by Amanda Rae Griner on behalf of Colony Insurance Company..(Griner, Amanda) (Entered: 06/30/2022) |
| 07/19/2022 | 16 | JOINT LETTER addressed to Judge Mary Kay Vyskocil from Dennis J. Nolan & M. Paul Gorfinkel dated 7/19/2022 Document filed by Pine Management, Inc.. (Attachments: # 1 Exhibit Proposed Case Management Plan).(Nolan, Dennis) (Entered: 07/19/2022) |
| 07/26/2022 | | Minute Entry for proceedings held before Judge Mary Kay Vyskocil: Initial Pretrial Conference held on 7/26/2022. (rz) (Entered: 07/26/2022) |
| 07/26/2022 | 17 | ORDER OF REFERENCE TO A MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Settlement. Referred to Magistrate Judge James L. Cott. SO ORDERED. (Signed by Judge Mary Kay Vyskocil on 7/26/2022) (ks) (Entered: 07/26/2022) |
| 07/26/2022 | 18 | CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial. 28 U.S.C. § 636(c). This case is to be tried to a jury. At the initial pretrial conference, the parties advised the Court that initial disclosures had already been served. At the initial pretrial conference, the Court advised the parties that, absent exceptional circumstances, the Court will not further extend the fact discovery cut-off. The parties are free to set their own interim discovery deadlines so long as all fact discovery is complete by November 16, 2022. Deposition due by 11/16/2022. Fact Discovery due by 11/16/2022. Expert Discovery due by 1/13/2023. Status Conference set for 11/1/2022 at 11:00 AM in Courtroom 18C, 500 Pearl Street, New York, NY 10007 before Judge Mary Kay Vyskocil. Counsel for the parties have conferred and their present best estimate of the length of trial is: 3-4 days. (Signed by Judge Mary Kay Vyskocil on 7/26/2022) (ks) (Entered: 07/26/2022) |
| 07/26/2022 | 19 | SCHEDULING ORDER: The Court held an initial pretrial conference on July 26, 2022. Counsel for all parties were in attendance. At the conference, Defendant informed the Court that it intended to file a motion for judgment on the pleadings. Accordingly, IT IS HEREBY ORDERED that any motion for judgment on the pleadings shall be filed no later |

| | | |
|---|---|---|
| | | than August 9, 2022. Plaintiff's opposition is due August 30, 2022. Any reply is due September 6, 2022. SO ORDERED. (Signed by Judge Mary Kay Vyskocil on 7/26/2022) Motions due by 8/9/2022. Responses due by 8/30/2022 Replies due by 9/6/2022. (ks) (Entered: 07/26/2022) |
| 07/28/2022 | | Magistrate Judge Barbara C. Moses is so redesignated. (aea) (Entered: 07/28/2022) |
| 07/28/2022 | 20 | AMENDED ORDER OF REFERENCE TO A MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Settlement. Referred to Magistrate Judge Barbara C. Moses. SO ORDERED. (Signed by Judge Mary Kay Vyskocil on 7/28/2022) (ks) (Entered: 07/28/2022) |
| 08/08/2022 | 21 | PROPOSED STIPULATION AND ORDER. Document filed by Colony Insurance Company..(Gorfinkel, M.) (Entered: 08/08/2022) |
| 08/09/2022 | 22 | ORDER SCHEDULING SETTLEMENT CONFERENCE: A settlement conference is scheduled before Magistrate Judge Barbara Moses on September 7, 2022, at 2:15 p.m., in Courtroom 20A, 500 Pearl Street, New York, NY 10007. This is an in-person proceeding. Counsel and parties are advised to consult the Chief Judge's current entry protocols, available at https://nysd.uscourts.gov/covid-19-coronavirus, in advance of the conference, as further set forth. Settlement Conference set for 9/7/2022 at 02:15 PM in Courtroom 20A, 500 Pearl Street, New York, NY 10007 before Magistrate Judge Barbara C. Moses. (Signed by Magistrate Judge Barbara C. Moses on 8/9/2022) (mml) (Entered: 08/09/2022) |
| 08/09/2022 | 23 | MOTION for Judgment *on the Pleadings*. Document filed by Colony Insurance Company.. (Gorfinkel, M.) (Entered: 08/09/2022) |
| 08/09/2022 | 24 | DECLARATION of M. Paul Gorfinkel in Support re: 23 MOTION for Judgment *on the Pleadings*.. Document filed by Colony Insurance Company. (Attachments: # 1 Exhibit A). (Gorfinkel, M.) (Entered: 08/09/2022) |
| 08/09/2022 | 25 | MEMORANDUM OF LAW in Support re: 23 MOTION for Judgment *on the Pleadings*. . Document filed by Colony Insurance Company..(Gorfinkel, M.) (Entered: 08/09/2022) |
| 08/30/2022 | 26 | MEMORANDUM OF LAW in Opposition re: 23 MOTION for Judgment *on the Pleadings*. . Document filed by Pine Management, Inc...(Nolan, Dennis) (Entered: 08/30/2022) |
| 08/30/2022 | 27 | DECLARATION of Dennis J. Nolan in Opposition re: 23 MOTION for Judgment *on the Pleadings*.. Document filed by Pine Management, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit A-1, # 3 Exhibit A-2, # 4 Exhibit A-3, # 5 Exhibit A-4, # 6 Exhibit A-5, # 7 Exhibit A-6, # 8 Exhibit A-7, # 9 Exhibit A-8, # 10 Exhibit A-9, # 11 Exhibit A-10, # 12 Exhibit A-11, # 13 Exhibit A-12, # 14 Exhibit A-13, # 15 Exhibit A-14, # 16 Exhibit A-15, # 17 Exhibit A-16, # 18 Exhibit A-17, # 19 Exhibit A-18, # 20 Exhibit A-19, # 21 Exhibit A-20, # 22 Exhibit B).(Nolan, Dennis) (Entered: 08/30/2022) |
| 09/06/2022 | 28 | FIRST REPLY MEMORANDUM OF LAW in Support re: 23 MOTION for Judgment *on the Pleadings*. . Document filed by Colony Insurance Company..(Gorfinkel, M.) (Entered: 09/06/2022) |
| 09/07/2022 | 29 | ORDER: With the consent of the parties, the settlement conference scheduled for September 7, 2022 is hereby ADJOURNED sine die. The parties may contact the Court to reschedule a settlement conference after the decision on the pending motion for judgment on the pleadings. (Signed by Magistrate Judge Barbara C. Moses on 9/7/2022) (rro) (Entered: 09/07/2022) |
| 10/25/2022 | 30 | JOINT LETTER addressed to Judge Mary Kay Vyskocil from Dennis J. Nolan & M. Paul Gorfinkel dated 10/25/2022 re: Status of Case. Document filed by Pine Management, Inc... |

| | | (Nolan, Dennis) (Entered: 10/25/2022) |
|---|---|---|
| 10/31/2022 | 31 | LETTER addressed to Judge Mary Kay Vyskocil from M. Paul Gorkinkel dated October 28, 2022 re: Item for Status Conference and Permission to file Motion to Dismiss Demand for fees. Document filed by Colony Insurance Company..(Gorfinkel, M.) (Entered: 10/31/2022) |
| 10/31/2022 | 32 | SCHEDULING ORDER: The Status Conference scheduled for November 1, 2022 at 11:00 AM is ADJOURNED to November 15, 2022 at 11:00 AM. SO ORDERED. Status Conference set for 11/15/2022 at 11:00 AM before Judge Mary Kay Vyskocil. (Signed by Judge Mary Kay Vyskocil on 10/31/2022) (tg) (Entered: 10/31/2022) |
| 10/31/2022 | 33 | LETTER addressed to Judge Mary Kay Vyskocil from Dennis J. Nolan dated 10/31/2022 re: in Opposition to Request for Permission to file Motion to Dismiss Demand for Fees filed at ECF No. 31. Document filed by Pine Management, Inc...(Nolan, Dennis) (Entered: 10/31/2022) |
| 11/01/2022 | 34 | JOINT LETTER MOTION for Extension of Time to Complete Discovery *Joint Letter Motion for Extension of the Deadline for Further Discovery* addressed to Judge Mary Kay Vyskocil from M. Paul Gorfinkel, Esq. dated November 1, 2022. Document filed by Colony Insurance Company..(Gorfinkel, M.) (Entered: 11/01/2022) |
| 11/15/2022 | | Minute Entry for proceedings held before Judge Mary Kay Vyskocil: Status Conference held on 11/15/2022. (rz) (Entered: 11/15/2022) |
| 11/15/2022 | 35 | ORDER granting 34 Letter Motion for Extension of Time to Complete Discovery. As discussed at the November 15, 2022 Status Conference, the deadline for all discovery is extended to January 13, 2023. SO ORDERED. Discovery due by 1/13/2023. (Signed by Judge Mary Kay Vyskocil on 11/15/2022) (tg) (Entered: 11/15/2022) |
| 03/20/2023 | 36 | MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS re: 23 MOTION for Judgment *on the Pleadings*. filed by Colony Insurance Company. For the foregoing reasons, the motion for judgment on the pleadings is GRANTED. The Clerk of Court is respectfully requested to enter judgment for Colony dismissing the case, terminate docket entry 23, and close this case. SO ORDERED. (Signed by Judge Mary Kay Vyskocil on 3/20/2023) (tg) Transmission to Orders and Judgments Clerk for processing. (Entered: 03/20/2023) |
| 03/21/2023 | 37 | CLERK'S JUDGMENT re: 36 Memorandum & Opinion in favor of Colony Insurance Company against Pine Management, Inc. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Memorandum Opinion and Order dated March 20, 2023, Defendant's motion for judgment on the pleadings is GRANTED. Judgment is entered for Colony dismissing the case; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 3/21/2023) (Attachments: # 1 Appeal Package) (km) (Entered: 03/21/2023) |
| 04/17/2023 | 38 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL -** NOTICE OF APPEAL. Document filed by Pine Management, Inc.. Filing fee $ 505.00, receipt number ANYSDC-27616216. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit A Copy of Order, # 2 Exhibit B Copy of Judgment). (Nolan, Dennis) Modified on 4/17/2023 (tp). (Entered: 04/17/2023) |
| 04/17/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Dennis Nolan to RE-FILE Document No. 38 Notice of Appeal. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type Notice of Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct** |

**A-7**

| | | |
|---|---|---|
| | | **named filer/filers - select the correct order/judgment being appealed - Do Not Pay The Appeal Fee Again. (tp)** (Entered: 04/17/2023) |
| 04/17/2023 | 39 | NOTICE OF APPEAL from 36 Memorandum & Opinion,, 37 Clerk's Judgment,,. Document filed by Pine Management, Inc.. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit A Copy of Order, # 2 Exhibit B Copy of Judgment).(Nolan, Dennis) (Entered: 04/17/2023) |
| 04/17/2023 | | Appeal Fee Paid electronically via Pay.gov: for 39 Notice of Appeal,. Filing fee $ 505.00. Pay.gov receipt number ANYSDC-27616216, paid on 4/17/2023. (tp) (Entered: 04/17/2023) |
| 04/17/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 39 Notice of Appeal.(tp) (Entered: 04/17/2023) |
| 04/17/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 39 Notice of Appeal, filed by Pine Management, Inc. were transmitted to the U.S. Court of Appeals. (tp) (Entered: 04/17/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/25/2023 10:20:45 | | |
| **PACER Login:** | teamrpacc | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-02407-MKV |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

**A-8**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PINE MANAGEMENT, INC., | Civil Action No. _____ |
| Plaintiff, | |
| vs. | **COMPLAINT AND JURY TRIAL DEMAND** |
| COLONY INSURANCE COMPANY, | |
| Defendant. | |

## COMPLAINT

Plaintiff Pine Management, Inc. ("Pine"), by its undersigned counsel, as and for its complaint against Defendant Colony Insurance Company ("Argo"), alleges as follows:

## PRELIMINARY STATEMENT

1. This action arises out of Argo's breach of the terms of an insurance policy, Real Estate Developers PROtect Professional Liability Insurance Policy No. RE4202378-0 with a policy period from August 1, 2018 to December 1, 2019 (the "Policy"), that it sold to Pine, and Argo's failure and refusal to honor its obligations under that policy.

2. Pine is a family owned and operated business focused on managing, developing and acquiring rental apartment buildings.

3. Argo sold Pine broad professional liability insurance intended to protect Pine's business from allegations of professional negligence.

4. Indeed, Argo markets itself as providing "broad, customizable" coverage, "effective solutions" and "favorable outcomes" for policyholders.

5. Allegations of professional liability against Pine first arose during policy period of the Policy when Jerome Schneider, on behalf of ten New York limited liability companies, each of which holds one or two real estate parcels as their assets, (the "Schneider

Group" or the "LLCs"), filed a summons and complaint in Supreme Court, New York County against Pine (the "Schneider Action").

6.      Because the allegations in the Schneider Action triggered Argo's duty to defend under the Policy, Pine timely tendered the Schneider Action to Argo for defense, seeking the "effective solutions" and "favorable outcomes" that Argo had touted.  But Argo abandoned Pine and left Pine to defend itself against the meritless – but covered – claims.

7.      Argo's insurance coverage denial and refusal to defend Pine contradicts the plain language of the Policy, Pine's reasonable expectation of insurance coverage, and the nature of the allegations.

8.      Argo's wrongful denial has forced Pine to undertake the defense of the underlying action and to incur significant, and still ongoing, attorneys' fees and litigation costs, as well as to prosecute this action to obtain the insurance coverage that Pine paid for and that Argo owes under the Policy.

9.      Accordingly, Pine requests that judgment be entered in its favor, granting: (a) a declaration that Argo must defend Pine under the Policy; (b) reimbursement of all fees, costs, and damages that Pine has incurred and will incur as a result of Argo's breach of the Policy and (c) Pine's fees and costs necessary in prosecuting this action, as well as other consequential damages premised on Argo's breach of the covenant of good faith and fair dealing implied in the Policy.

## **PARTIES**

10.      Plaintiff Pine is a New York corporation with a principal place of business at 78 Manhattan Avenue, New York, New York 10025.

11.      Upon information and belief, Defendant Argo is a Virginia corporation with a principal place of business at 8720 Stony Point Parkway, Suite 400, Richmond, Virginia 23235.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332(a)(2).  The amount in controversy exceeds $75,000, exclusive of interest and costs,

and there is complete diversity of citizenship between Pine, which is a citizen of New York, and

Argo, which is a citizen of Virginia and Texas.

13.     Venue is proper in this Court under 28 U.S.C. § 1391.   Argo has sufficient

minimum contacts with the State of New York and a substantial part of the events giving rise to

the claim took place and are taking place in this District, including that Argo's Senior E&O

Technical Claims Specialist who denied the claim is located at Argo's office in New York, New

York.

## FACTUAL BACKGROUND

### A.  The Argo Policy

14.     Argo sold Pine the Policy, a copy of which is attached as Exhibit 1, which

had a policy period from August 1, 2018 to December 1, 2019 (the "Policy Period").

**15.**     The Policy provides insurance coverage for allegations of wrongful acts

against Pine, and it obligates Argo to defend Pine against such claims.  The Policy's relevant

Insuring Agreement states that Argo

> agrees to pay on behalf of the **Insured**,[1] **Loss** in excess of the Deductible
> amount and up to the Limits of Liability shown in Item 4 of the
> Declarations; provided that such **Loss** results from a **Claim** first made and
> reported in writing during the **Policy Period** or Extended reporting Period,
> if applicable, arising out of a **Wrongful Act** committed before the end of
> the **Policy Period** and on or after the Retroactive Date…

*See* Policy, Ex. 1 at Insuring Agreements, p. 1 of 18.

---

[1] All bolded terms are defined and also bolded in the Policy.

16.     The Policy defines a **Claim** as, in part, "a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading" or "a written demand received by any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations" which "aris[es] from a **Wrongful Act**." *See* Policy, Ex. 1 at Definitions, p. 4 of 18.

17.     **Wrongful Act** means "any actual or alleged act, error, omission or breach of duty by any **Insured** in the rendering of or failure to render **Real Estate Development Services.**" *See* Policy, Ex. 1 at Definitions, p. 9 of 18.

18.     In relevant part, **Real Estate Development Services** includes "services performed by or on behalf of any **Insured** in the course of improvement of real property acquired by the **Insured**, whether alone or as a part of a partnership, joint venture, syndication, or other arrangement" such as "asset management, property management, development consulting… with respect to both acquired and non-acquired property."  *See* Policy, Ex. 1 at Definitions, p. 7-8 of 18; Declarations Item 3, p. 1 of 2.

19.     The Policy contains a "Professional Services Endorsement" purporting to amend the definition of "**Professional Services**, within Section III – Definitions" to include "providing asset management, property management, development consulting, and those services as defined in the Real Estate Developers PROtect? Professional Liability Insurance with Cyber Coverage Form, with respect to both acquired and non-acquired properties as well as owned and non-owned properties."  *See* Policy, Ex. 1 at "Professional Services Endorsement."

20.     The Policy does not contain a corresponding definition for "Professional Services" within Section III – Definitions.  *See generally* Policy, Ex. 1 at Section III – Definitions.

**A-12**

21.     A Policy exclusion purports to exclude from coverage "any **Claim**...arising out of a **Wrongful Act**...occurring prior to the **Policy Period** if, prior to the effective date of the first <u>Architects & Engineers Professional Liability Insurance Policy</u> issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the **Policy Period**...any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**, violated a disciplinary rule, or engaged in professional misconduct." *See* Policy, Ex. 1 at Section IV - Exclusions, ¶ A (emphasis added).

22.     The Policy is not an Architects & Engineers Professional Liability Insurance Policy, but rather a Real Estate Developers PROtect Professional Liability Insurance with Cyber Coverage Declarations policy.

23.     Pine has never purchased from Argo an Architects & Engineers Professional Liability Insurance Policy.

24.     By the express language of the Policy written and sold by Argo to Pine, Exclusion A is inapplicable.

25.     The Policy's Retroactive Date is March 1, 2016. *See* Policy, Ex. 1 at Declarations Item 8, p. 2 of 2.[2]

26.     The Policy defines Loss to mean "a monetary judgment or settlement that an **Insured** becomes legally obligated to pay as a result of a **Claim**" and includes **Defense Costs**, **Rectification Costs**, and pre and post judgment interest on the entire amount of any judgment which accrues after entry of judgment. *See* Policy, Ex. 1 at Definitions, p. 5 of 18.

---

[2] A Policy endorsement alters the Retroactive Date to August 1, 2018 for certain types of coverage that are not applicable. *See* Policy, Ex. 1 at Retroactive Date for Specific Coverage Endorsement, p. 1 of 1.  Argo initially denied coverage for the claim relying on the August 1, 2018 Retroactive Date, but withdrew its denial premised on the later Retroactive Date.

27.     Pine has paid all premiums due under the Policy, complied with all conditions precedent to coverage under the Policy and satisfied all obligations to the extent that they have not been waived or abrogated by Argo's conduct, omissions or actions.

**B.   The Schneider Action**

28.     On July 26, 2019, the Schneider Group filed the Schneider Action in the Supreme Court, New York County against Pine where it is currently pending as Index No. 654303/2019.

29.     The Complaint in the Schneider Action (the "Schneider Complaint") alleges direct and derivative causes of action arising out of Pine's management of the LLCs for breach of contract, breach of fiduciary duty, the inspection of books and records and an accounting.  A copy of the Schneider Complaint is attached as Exhibit 2.

30.     The Schneider Complaint seeks injunctive relief, declaratory relief, and damages.  *See* Schneider Complaint, Ex. 2, at Prayer for Judgment.

31.     The Schneider Complaint alleges that Pine engaged in wrongful acts when providing property management services to the various Schneider Group limited liability companies.  *See* Schneider Complaint, Ex. 2, at ¶¶ 1, 3, 5, 14, 391.

32.     The Schneider Complaint alleges, among other things, that Pine, as "property manager" engaged in self-dealing transactions, such as the payment of "management fees" and "construction management fees" from the LLCs to itself, in violation of operating agreements between Pine and various LLCs and without approval from the Schneider Group. *See* Schneider Complaint, Ex. 2, at ¶¶ 1, 3, 5, 14, 391.

33.     The Schneider Complaint further alleges, among other things, that Pine prevented the Schneider Group from exercising their rights as members of the LLCs, specifically by setting distributions, deciding on capital improvements, setting cash reverses for properties

owned by the LLCs and approving certain loans of the LLCs without approval of a majority interest of the members of each LLC.  *See* Schneider Complaint, Ex. 2, at ¶¶ 2, 4, 271.

34.     The Schneider Complaint alleges, among other things, that Pine failed to produce documents reflecting the financial condition and affairs of the LLCs pursuant to the Schneider Group's inspection rights under Limited Liability Company Law §§ 1102(a) and (b).  *See* Schneider Complaint, Ex. 2, at ¶¶ 3, 394-415.

### C.  Argo's Wrongful Denial of Coverage

35.     The Schneider Complaint was filed within the Policy Period.

36.     The Schneider Complaint alleges that Pine, as 'property manager' committed wrongful acts in violation of operating agreements between Pine and various LLCs and without approval from the Schneider Group.  See Schneider Complaint, Ex. 2, at ¶¶ 1, 3, 5, 14, 391.

37.     The Policy expressly insures allegations of wrongful acts alleged to have been committed in Pine's capacity as a property manager.  *See* Policy, Ex. 1, at Declarations Item 3; Insuring Agreements A.1.

38.     The allegations of the Schneider Complaint fit squarely within the Policy's coverage grant.

39.     No Policy exclusion applies to exclude coverage.

40.     Prior to the Policy Period, filing of the Schneider Action, Pine had received no demand for monetary, non-monetary, or injunctive relief from the Schneider Group.

41.     Indeed, prior to the filing of the Schneider Complaint, the Schneider Group explicitly represented to Pine that it wished to avoid costly litigation.

42.     Because of the Schneider Group's representations, Pine had no reasonable basis to believe that it had committed a Wrongful Act that would lead to a Claim prior to the Policy period or the Retroactive Date.

43.     It was not until after the Policy's inception that a Claim was made against Pine.

44.     Wrongful Acts alleged in the Schneider Complaint arising out of Pine's property management services occurred on or after the Policy's Retroactive Date.

45.     On or about July 29, 2019, Pine immediately provided notice of the Schneider Action to Argo.

46.     In correspondence dated August 20, 2019, Argo denied coverage under the Policy, citing the Policy's Prior Wrongful Act Exclusion, and contending an alleged Claim made prior to the Policy's inception was potential grounds for denying coverage.

47.     The Policy's Prior Wrongful Act Exclusion is wholly inapplicable to the facts alleged in the Schneider Complaint.

48.     Argo's denial of its coverage obligations to Pine under the Policy have no basis in the facts, the law, or the Policy.

49.     Argo continues to deny its duties to defend and indemnify Pine in the Schneider Action.

50.     Pine has incurred costs and continues to incur costs litigating and defending the Schneider Action.

51.     Pine has been harmed and will continue to be harmed by Argo's wrongful conduct.

52.     Pine has complied with all obligations and conditions precedent to coverage under the Policy.

53.     There is no justification or legally sound reason for Argo's denial of coverage.

<div align="center">

**COUNT I**
**Declaratory Judgment**

</div>

54.     Pine repeats, realleges, and incorporates all of the allegations set forth in paragraphs 1 – 53 above, as if fully set forth herein.

55.     The Policy constitutes a valid and binding contract between Pine and Argo, the terms and conditions of which were triggered by the Schneider Complaint.

56.     Argo is obligated to defend Pine against the Schneider Action.

57.     Pine has performed all of its duties in full compliance with the terms and conditions of the Policy, and satisfied all obligations to the extent that they have not been waived or abrogated by Argo's conduct, omissions or actions.

58.     Argo has failed to satisfy its coverage obligations to Pine under the Policy.

59.     Pine's claim is not excluded under the Policy, and the Policy's Prior Wrongful Act Exclusion and Manager Exclusion do not bar coverage of the Schneider Complaint and is otherwise inapplicable.

60.     Pine has suffered and continues to suffer damages as a result of Argo's failure to satisfy its coverage obligations under the Policy.

61.     By reason of the foregoing, an actual and justiciable controversy exists between Pine and Argo with respect to Argo's duties and obligations to Pine under the Policy.

62.     Pine therefore seeks a judicial determination by this Court that Argo must defend and indemnify Pine under the Policy for the allegations of the Schneider Complaint.  Such a determination is necessary and appropriate at this time under the circumstances alleged.

63.     Pine further is entitled to a judicial declaration from this Court that Pine is entitled to all fees, including attorneys' fees, and costs of this action (including pre- and post-judgment interest) under the applicable law as consequential damages.

<u>**COUNT II**</u>
<u>**For Breach of Contract**</u>

64.     Pine repeats, realleges, and incorporates all of the allegations set forth in paragraphs 1 - 63 above, as if fully set forth herein.

65.     The Policy constitutes a valid and binding insurance contract.

66.     Pine has complied with all conditions precedent to coverage under the Policy, and satisfied all obligations to the extent that they have not been waived or abrogated by Argo's conduct, omissions or actions.

67.     Pine's claim is not excluded under the Policy, and the Policy's Prior Wrongful Act Exclusion and Manager Exclusion do not bar coverage of the Schneider Complaint and is otherwise inapplicable.

68.     All insurance premiums due under the Policy have been paid.

69.     Pine is rightfully entitled to a defense in the Schneider Action.

70.     Argo is obligated to defend and indemnify Pine in the Schneider Action.

71.     Argo has refused to honor its obligations under the Policy to Pine, and therefore has breached its obligations under the Policy.

72.     The Policy contains an implied promise that Argo would deal fairly and in good faith with Pine and would do nothing to injure, frustrate, or interfere with Pine's rights to receive the benefits of the Policy.

73.     The covenant of good faith and fair dealing obligates Argo to refrain from taking any action which would deprive Pine of the benefits of the contract, to cause undue hardship or harm to Pine.

74.     Argo, through its wrongful conduct and baseless denial of coverage, also has breached the Policy's covenant of good faith and fair dealing, implicit in the contract of insurance between Pine and Argo.

75.     It is wrongful conduct and a violation of the duty of good faith and fair dealing to require a policyholder to spend significant resources to get an insurance company to pay covered claims. This also violates Argo's representations to policyholders and the public at large.

76.     The consequential damages Pine is suffering and will continue to suffer, including paying a substantial portion of the policy limits in defense costs, were within the contemplation of the parties herein at the time the Policy was sold, as natural probable results of a breach of contract and were intended to be avoided and prevented by timely payment of the coverage owed under the Policy.  Argo promotes itself as providing "broad, customizable" coverage, "effective solutions" and "favorable outcomes" for policyholders.

77.     Argo knows that policyholders have to engage in the litigation process, hire counsel and incur substantial costs to match the formidable resources of Argo where covered claims are denied and policyholders are left to defend themselves.  Argo undoubtedly knows that as a natural probable result of a breach of the Policy, Pine would be compelled to incur litigation

fees and costs to enforce its insurance coverage rights for a claim that is covered under the terms of the Policy.

78.     Argo's breach of the Policy has caused Pine to suffer actual, consequential and special losses in a substantial amount that is accruing.  As a direct and proximate result of Argo's breach of the Policy, Pine continues to suffer damages, in an amount to be determined at trial, including but not limited to attorneys' fees and costs, loss of funds, expenses, pre- and post-judgment interest, and other damages.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Pine requests that this Court:

1.     Enter a judicial declaration on Count I that Argo has a duty to defend and indemnify Pine under the Policy for all losses suffered as a result of the Schneider Action;

2.     Enter judgment on Count II in favor of Pine and against Argo for actual and consequential damages for breach of contract in an amount to be determined at trial; and

3.     On all Counts:

    a.   Attorneys' fees;

    b.   Costs;

    c.   Compensatory Damages;

    d.   Consequential Damages;

    e.   Pre- and Post-Judgment Interest; and

    f.   Any and all such further relief as this Court deems just and proper.

<div align="center">

**JURY TRIAL DEMAND**

</div>

Pine hereby demands trial by jury of any and all issues so triable.

Dated:   March 24, 2022
       New York, New York

 

/s/ Dennis J. Nolan
Dennis J. Nolan (N.Y. bar no: 4462107)
John M. Leonard, Esq. (N.Y. bar no.: 5296488)
Regan E. Samson, Esq. (N.Y. bar no. 5884119)
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, New York  10020
Telephone:  (212) 278-1000
dnolan@andersonkill.com
jleonard@andersonkill.com
rsamson@andersonkill.com

*Attorneys for Plaintiff*
*Pine Management, Inc.*

# EXHIBIT 1



# Real Estate Developers PROtect℠
# Professional Liability Insurance with Cyber Coverage Declarations

### NOTICE: THIS IS CLAIMS MADE AND REPORTED COVERAGE.
### PLEASE READ THE POLICY CAREFULLY.

| **Insurer:** Colony Insurance Company<br>8720 Stony Point Parkway, Suite 400<br>Richmond, VA  23235 | **Producer**: Swett & Crawford<br>50 California St, Suite 2000<br>San Francisco, CA  94111 |
|---|---|

| **Policy Number:** RE4202378-0 |
|---|

| Renewal of Policy Number: Newline |
|---|

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS AND CONDITIONS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

ITEM 1.     **NAMED INSURED** (Name and Mailing Address):
Pine Management Inc
78 Manhattan Avenue
New York, NY  10025

ITEM 2.     **POLICY PERIOD:**     (a)  Inception Date:  08/01/2018     (b) Expiration Date: 12/01/2019
Both dates at 12:01 a.m. at the Named Insured's Mailing Address shown  in ITEM 1 above.

ITEM 3.     **COVERED REAL ESTATE DEVELOPMENT SERVICE**

providing asset management, property management, development consulting, and those services as defined in the   Real Estate Developers PROtect? Professional Liability Insurance with Cyber Coverage Form, with respect to both acquired and non-acquired p

ITEM 4.     **LIMIT OF LIABILITY AND DEDUCTIBLE:** INSURING AGREEMENTS

| Limit of Liability:<br>Each **Claim** | Limit of Liability:<br>Aggregate for all **Claims** | Deductible:<br>Each **Claim** | Deductible:<br>Aggregate |
|---|---|---|---|
| $1,000,000 | $1,000,000 | $25,000 | $N/A |

ITEM 5.     **LIMITS OF LIABILITY AND DEDUCTIBLES:**  SUPPLEMENTAL EXPENSES

| Expense Event | Limit of Liability: Each **Expense Event** | Limit of Liability: Aggregate | Deductible: Each **Expense Event** |
|---|---|---|---|
| **Crisis Management Expenses** | $100,000 | $100,000 | $0 |
| Appearance at Proceedings | $10,000 | $50,000 | $0 |
| **Disciplinary Proceedings** | $25,000 | $100,000 | $0 |
| Subpoena Assistance | $15,000 | $25,000 | $0 |
| ADA,FHA and OSHA Legal Expense Reimbursement | $25,000 | $25,000 | $0 |
| Supplementary **Cleanup Costs** Coverage | $25,000 | $25,000 | $0 |

ITEM 6.     **PREMIUM:** $33,168

ITEM 7.     **EXTENDED REPORTING PERIOD OPTION(S):**

          12 months at 100% of Full Annual Premium          24 months at 185% of Full Annual Premium
          36 months at 200% of Full Annual Premium          48 months at 225% of Full Annual Premium
          60 months at 250% of Full Annual Premium          72 months at 275% of Full Annual Premium

ITEM 8.     **RETROACTIVE DATE:** 3/1/2016

ITEM 9.     **NOTICE TO THE INSURER:**

| CLAIMS OR POTENTIAL CLAIMS SEND TO: | ALL OTHER NOTICES SEND TO: |
|---|---|
| ARGO PRO US | ARGO PRO US |
| Professional Liability - Claims 413 W. 14th Street New York, NY  10014 855-225-7204 Argoproclaims@argogroupus.com | Professional Liability - Underwriting 413 W. 14th Street New York, NY  10014 |

ITEM 10.   **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:**

          Please see Schedule of Forms and Endorsements, DECSCH, for a complete list of forms.

**THESE DECLARATIONS, TOGETHER WITH THE PROFESSIONAL LIABILITY POLICY COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

DECSCH-0117                                                                                                   Page 1

# SCHEDULE OF FORMS AND ENDORSEMENTS

Insured:  Pine Management Inc
Policy Number:  RE4202378-0

Forms and Endorsements applying to and made part of this policy at the time of issuance:

| NUMBER | TITLE |
|---|---|
| PRRE1000DEC-0517 | Real Estate Developers PROTect Professional Liability Policy Declarations |
| DECSCH-0117 | Schedule Of Forms And Endorsements |
| PRRE1001-0617 | Real Estate Developers PROTect Professional Liability Policy |
| U094-0415 | Service Of Suit |
| PR2006-0117 | Professional Services Endorsement |
| PR2017-0117 | Retroactive Date For Specific Coverage |
| ILP001-0104 | U.S. Treasury Department's Office Of Foreign Assets Control (OFAC) Advisory |
| PrivacyNotice-0415 | Privacy Policy |
| SIGCIC-1013 | Signature Page |

# Real Estate Developers PROtect<sup>SM</sup> Professional Liability Insurance with Cyber Coverage

**THIS IS CLAIMS MADE AND REPORTED COVERAGE.**
**PLEASE READ THIS POLICY CAREFULLY.**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Words and phrases that appear in bold are defined and may be used in the singular or plural, as appropriate; please refer to Section III – Definitions.

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the **Insurer**, and subject to all of the terms and conditions of this policy (including **all** endorsements hereto), the **Insurer** agrees with the **Insured** to provide insurance as stated in this policy.

## SECTION I - COVERAGES

A.  Insuring Agreements:

1.  Professional Liability

    The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended reporting Period, if applicable, arising out of a **Wrongful Act** committed before the end of the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

2.  Cyber Liability

    The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended Reporting Period, if applicable, arising out of a **Privacy Breach**, **Security Event** or **Social Engineering Incident** taking place before the end of the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

3.  Contractors Pollution Liability

    The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended reporting Period, if applicable, arising out of a **Pollution Incident** first discovered during the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

B.  Supplemental Payments

    These supplemental payments will be paid up to the amount shown in Item 5 of the Declarations and in addition to the applicable Limit of Liability shown in Item 4 of the Declarations.

1.  **Crisis Management Expenses**

    The **Insurer** will reimburse the **Insureds**, in excess of the applicable Deductible shown in Item 5 of the Declarations, **Crisis Management Expenses** resulting directly from any **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident** that takes place during the **Policy Period**.

2.  Appearance at Proceedings

The **Insurer** will pay for loss of earnings for the **Insured's** attendance, at the **Insurer's** written request, at a trial, hearing, arbitration or mediation proceeding involving a **Claim** against any **Insured**.  The maximum amount the **Insurer** will pay for any one or series of trials, hearings, mediation or arbitration proceedings arising out of the same **Claim** will not exceed $500 per individual **Insured** for each day, or part thereof.

3.  **Disciplinary Proceedings**

a.  If, during the **Policy Period**, a **Disciplinary Proceeding** is first brought against any **Insured**, the **Insurer** will reimburse the **Insureds** for reasonable and necessary legal fees and expenses that the **Insured** incurs in the defense of such matter. Such legal fees and expenses do not include any fines, penalties or restitution paid by the **Insured** as part of or to resolve a **Disciplinary Proceeding**.

b.  The **Insurer** will have no duty to defend the **Insured** in any such **Disciplinary Proceeding**.

c.  Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

4.  Subpoena Assistance

a.  If, during the **Policy Period**, an **Insured** first receives a subpoena for documents or testimony arising out of **Real Estate Development Services** performed by any **Insured**, and the **Insured** requests the **Insurer's** assistance in responding to such subpoena, the **Insurer** will reimburse the **Insured** for reasonable and necessary: legal fees and expenses incurred to provide the **Insured** advice regarding the production of documents; costs incurred by the **Insured** to produce any documents in response to the subpoena; and legal fees and expenses to prepare the **Insured** for sworn testimony and to represent the **Insured** at the **Insured's** depositions;

provided that:

(1) the subpoena arises out of a lawsuit to which the **Insured's** are not a party; and

(2) the **Insureds** have not been engaged to provide advice or testimony in connection with the lawsuit and the **Insureds** have not provided such advice or testimony in the past.

b.  The **Insurer** has no duty to defend the **Insured** in connection with any such subpoena assistance.  Compliance with a subpoena will not be considered a **Claim** or **Disciplinary Proceeding** under the policy and the coverage for any Subpoena Assistance is limited to that provided under this section.

c.  Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

5.  ADA, FHA and OSHA Legal Expense Reimbursement

The **Insurer** will reimburse the **Insured** for legal fees and expenses up to the amount shown in Item 5 of the Declarations per **Policy Period** in responding to each regulatory or administrative action brought directly against the **Insured** by a government agency under the Americans with Disabilities Act of 1990 (ADA), the Fair Housing Act (FHA) or the Occupational Safety and Health Act (OSHA) provided that regulatory or administrative action:

a.  is first commenced during the **Policy Period**; and

b.  arises out of the performance of **Real Estate Development Services** rendered on or after the Retroactive Date shown in Item 8 of the Declarations.

After the **Insurer** has paid up to the amount shown in Item 5 of the Declarations under this provision, any additional amounts the **Insurer** agrees to pay will be treated as **Defense Costs** and will be subject to the deductible for the **Policy Period** in which the action was first commenced.

The **Insurer** will not be responsible for the payment of any fines or penalties assessed.

Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

## SECTION II – LIMITS OF LIABILITY AND DEDUCTIBLE

A.  Limits of Liability: Insuring Agreements A.1 Professional Liability, A.2 Cyber Liability and A.3 Pollution Liability

1.  Limit of Liability, each **Claim** under Insuring Agreements A.1, A.2 and A.3:  The most the **Insurer** will pay for any **Loss** for each **Claim** covered by this policy under Insuring Agreements A.1,  A.2 and A.3 is the amount shown for Limit of Liability in Item 4 of the Declarations.

2.  Limit of Liability, aggregate for all **Claims** under Insuring Agreements A.1, A.2 and A.3: The most the **Insurer** will pay for all **Loss** for **all Claims** in the Aggregate covered by this policy under Insuring Agreements A.1,  A.2 and A.3 is the amount shown in Item 4 of the Declarations.

3.  **Defense Costs** are part of and not in addition to the Limits of Liability.  Payment of **Defense Costs** by the **Insurer** will reduce, and may exhaust, the Limits of Liability.

B.  Limits of Liability: Supplementary Coverages

Supplemental payments under Insuring Agreement B will be paid in addition to the policy Aggregate Limit of Liability shown in Item 4 of the Declarations.

1.  Limits of Liability: **Crisis Management Expenses** – The most this **Insurer** will pay for costs for **Crisis Management Expenses** covered under Insuring Agreement B.1 of this policy during the **Policy Period** from each **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident** and **in** the Aggregate are the amounts shown for **Crisis Management Expenses** in Item 5 of the Declarations.

2.  Limits of Liability: Appearance at Proceedings: The most the **Insurer** will pay for costs for each such Appearance at a proceeding and in the Aggregate under Insuring Agreement B.2 during the **Policy Period** are the amounts shown in Item 5 of the Declarations.

3.  Limits of Liability: Each **Disciplinary Proceeding**: The most the **Insurer** will pay for costs for each such **Disciplinary Proceeding** and in the Aggregate under Insuring Agreement B.3 during the **Policy Period** are the amounts shown in Item 5 of the Declarations.

4.  Limits of Liability: Subpoena Assistance: The most the **Insurer** will pay for costs for each such subpoena and in the Aggregate under Insuring Agreement B.4 of this policy are the amounts shown in Item 5 of the Declarations.

5.  Limits of Liability: ADA, FHA and OSHA Legal Expense Reimbursement: The most the **Insurer** will pay for costs for ADA, FHA and OSHA Legal Expense Reimbursement under Insuring Agreement B.5 during the **Policy Period** is the amount shown in Item 5 of the Declarations.

6.  Limits of Liability: Supplementary **Cleanup Costs** Coverage: The most the **Insurer** will pay for costs for Supplementary **Cleanup Costs** Coverage Insuring Agreement B.6 during the **Policy Period** is the amount shown in Item 5 of the Declarations.

C.  Deductible

1.  Regarding the coverage provided by this policy under Insuring Agreements A.1 Professional Liability, A.2, Cyber Liability, and A.3. Pollution Liability, the Each Claim Deductible shown in Item 4 of the Declarations applies to each **Claim** and will be paid by the **Insured** as a condition precedent to payment of any **Loss** by the **Insurer**.  The **Insured** must pay the applicable deductible for each **Claim** within 30 days of the **Insurer's** written request regardless of the number of **Claims** covered by this policy. Any Aggregate Deductible amount shown in Item 4 of the Declarations is the most the **Insured** will pay as a deductible for all **Claims** covered by this policy.

2. Regarding the coverage provided by this policy under Insuring Agreement B. Supplemental Coverages, the Each **Expense Event** Deductible shown in Item 5 of the Declarations applies respectively to each **Crisis Management Expense**, Appearance at Proceeding, **Disciplinary Proceeding**, Subpoena, ADA, FHA, OSHA Legal Expense or Supplementary **Cleanup Costs** Coverage event and will be paid by the **Insured** as a condition precedent to payment of any **Loss** by the **Insurer**. The **Insured** must pay the applicable deductible for each **Claim** within 30 days of the **Insurer's** written request regardless of the number of **Claims** covered by this policy. Any Aggregate Deductible amount shown in Item 4 of the Declarations is the most the **Insured** will pay for all **Claims** covered by this policy.

3. The **Insured's** Deductible obligation for each **Claim** will be reduced by 50%, subject to a maximum aggregate reduction of all Deductibles for all **Claims** of $25,000 if the **Insurer** agrees and the **Insured** consents to the final settlement of a **Claim** during a voluntary mediation. This reduction does not apply to any **Claim** resolved through court-mandated mediation or voluntary or involuntary arbitration.

## SECTION III - DEFINITIONS

A. **Bodily Injury** means physical injury, sickness, disease or death of any person, and any resulting mental injury, mental anguish, emotional distress, suffering, shock, or humiliation.

B. **Claim** means any of the following arising from a **Wrongful Act**:

1. a written demand received by any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations;

2. a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

3. the institution of an arbitration, mediation, or other alternate dispute resolution proceeding against any **Insured**; or

4. as respects Insuring Agreement A.2, a **Privacy Regulatory Action**.

C. **Cleanup Costs** means expenses incurred in the investigation, evaluation, monitoring, testing, removal, containment, treatment, response, disposal, remediation, detoxification or neutralization of smoke, soot, fumes, acids, alkalis, toxic chemicals, asbestos, liquids or gases, waste materials or other irritants, contaminants or pollutants as a direct result of a **Pollution Incident**. Except as provided in Extensions of Coverage 1 Emergency Remediation Costs, coverage for **Cleanup Costs** under this Policy is conditioned upon prior approval of the **Insurer**.

**Cleanup Costs** do not include any expenses detailed in the preceding paragraph incurred after the cleanup is deemed to be complete upon final approval from the supervising governmental authority.

D. **Crisis Management Expenses** means reasonable and necessary expenses, including legal fees, approved by the **Insurer** in its sole discretion, to engage a public relations firm after an **Insured's Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**.

E. **Defense Costs** means:

1. reasonable and necessary fees, costs and expenses charged by any lawyer consented to or designated by the **Insurer** to defend any **Insured** against a **Claim**;

2. all other reasonable and necessary fees, costs and expenses resulting from the investigation, discovery, defense, settlement or appeal of a **Claim** as authorized by the **Insurer**; and

3. the cost of a bond or appeal bond, required as a result of a **Claim**, including bonds to release attachments, but only for bond amounts not exceeding the applicable Limit of Liability; however, the **Insurer** has no obligation to apply for, guarantee or furnish any such bond.

**Defense Costs** do not include the remuneration, salaries, overhead, fees or expenses of either the **Insured's** or the **Insurer's** regular employees or officials or any fees or expenses incurred prior to the time that a **Claim** is first made against any **Insured** and reported to the **Insurer**. **Defense Costs** will be paid first and will reduce, and may exhaust, the Limits of Liability shown in Items 4 and 5 of the Declarations.

F.  **Disciplinary Proceeding** means a proceeding before a disciplinary board or similar entity or official to determine violations of disciplinary rules or rules of professional conduct, professional misconduct or other matters relating to licensing and discipline. **Disciplinary Proceeding** does not include charges, investigations or actions filed with a regulatory agency or official, including, without limitation, the Securities and Exchange Commission, the U.S. Patent & Trademark Office or the Internal Revenue Service.

G.  **Expense Event** means any appearance at a proceeding, **Disciplinary Proceeding**, subpoena, regulatory or administrative action, or corporate reputation damage or Supplementary **Cleanup Costs** event that triggers coverage under Insuring Agreements B.1, B2, B.3, B.4, or B.5.

H.  **Information Custodian** means any third party that possesses **Non-public Personal Information** or **Proprietary Business Information** on behalf of the **Named Insured** and which is required to maintain the confidentiality and integrity of that information by a written contract with the **Named Insured**.

I   **Information System** means any electronic device, electronic and paper storage media, as well as any communications networks, including cloud or other multi-tenant storage models.

J.  **Insured** means:

1.  the **Named Insured** and any **Subsidiary**;

2.  any past, present or future owner, principal, officer, director, partner, stockholder, shareholder, member, manager or employee of the **Named Insured** or any **Subsidiary** for **Real Estate Development Services** rendered on behalf of the **Named Insured** or any **Subsidiary**;

3.  the estate, heirs, executors, administrators, assigns and legal representatives of each of the **Insureds** in the event of the **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this policy;

4.  any **Insured's** legal spouse, including any natural person qualifying as a domestic partner under the provisions of any applicable state, federal or local law in the United States, but only with respect to **Loss** resulting from **Real Estate Development Services** of the **Named Insured**;

5.  all joint ventures entered into, but only for liability arising out of **Real Estate Development Services** performed by any **Insured** as a participant in a joint venture project; or,

6.  any employee, intern, volunteer or independent contractor of the **Named Insured** or any **Subsidiary**, but only as respects **Real Estate Development Services** rendered on behalf of the **Named Insured** or **Subsidiary**.

K.  **Insurer** means the insurance company issuing this policy as shown in the Declarations.

L.  **Loss** means a monetary judgment or settlement that an **Insured** becomes legally obligated to pay as a result of a **Claim**, including punitive or exemplary damages where insurable under applicable law.

1.  **Loss** includes:

a.  **Defense Costs**; and

b.  **Rectification Costs**; and

c.  pre and post judgement interest on the entire amount of any judgment which accrues after the entry of the judgment and before the **Insurer** has paid or tendered or deposited in the Court that part of the judgment that does not exceed the policy limit.

d.  As regards the coverage provided under SECTION I – COVERAGES, Insuring Agreement A.2

Cyber Liability, **Loss** includes the following for which an **Insured** becomes legally obligated to pay as the result of a **Claim** to which this insurance applies:

(1) **Regulatory Fines And Penalties** if, and to the extent that, such amounts are insurable under the law of the jurisdiction most favorable to the insurability of such **Regulatory Fines And Penalties** provided such jurisdiction has a substantial relationship to the relevant **Insureds**, the **Insurer**, or the **Claim**; and

(2) **Regulatory Restitution**.

e. As regards coverage provided under SECTION I – COVERAGES, Insuring Agreement A.3. Contractor Pollution Liability, **Loss** includes **Cleanup Costs** for which the **Insured** becomes legally obligated to pay as the result of a **Claim** for which this insurance applies.

2. **Loss** does not include:

a. any fines, penalties, taxes or sanctions, whether imposed by law or otherwise (except as provided above with respect to punitive or exemplary damages or **Regulatory Fines and Penalties**);

b. the return, reduction or restitution of fees or expenses (except as provided above with respect to **Regulatory Restitution**);

c. amounts which are uninsurable under applicable law; or

d. the cost of complying with any injunctive, declaratory or administrative relief.

M. **Named Insured** means the person or entity designated in Item 1 of the Declarations and any **Predecessor** of such entity.

N. **Non-public Personal Information** means any of the following information, if not already publicly available:

1. social security number, driver's license or government issued identification number;

2. credit, debit, bank, credit union or brokerage account numbers, balances or account histories;

3. telephone numbers or telephone records;

4. medical records, health insurance identification numbers or other protected health information; or

5. any other non-public information that can be used to identify that individual as specified by a **Privacy Regulation**.

O. **Personal Injury Offense** means:

1. false arrest, humiliation, mental anguish, emotional distress, unlawful detention, false imprisonment, wrongful entry, eviction or other invasion of private occupancy, abusive litigation, abuse of process or malicious prosecution;

2. the publication or utterance of a libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of any individual's right to privacy; or

3. misrepresentation in advertising, infringement of copyright, trademark, service mark, trade dress or trade name.

P. **Policy Period** means the period from the inception date of this policy to the expiration date of this policy, as shown in Item 2 of the Declarations, or its earlier termination date, if any.

Any extension of the **Policy Period** will not result in an increase or reinstatement of the Limit of Liability.

Q. **Pollution Incident** means an alleged or actual discharge, dispersal, release, seepage, migration or escape of smoke, soot, fumes, acids, alkalis, toxic chemicals, asbestos, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any

watercourse or body of water taking place on or after the Retroactive Date, if any, shown in the Declarations:

    1.    arising from a **Wrongful Act**, or

    2.    occurring at any location at which the **Insured** is performing **Real Estate Development Services** <<this added with the intent to provide contractors pollution coverage>>

that causes **Bodily Injury**, **Property Damage** or financial loss.

R.  **Potential Claim** means:

    1.  any **Wrongful Act** which might reasonably be expected to give rise to a **Claim** against any **Insured** under the policy;

    2.  any breach of duty to a client or third party, which has not resulted in a **Claim** against any of the **Insureds**; or

    3.  receipt of notice of a **Disciplinary Proceeding** or subpoena.

S.  **Predecessor** means an individual or entity engaged in **Real Estate Development Services** whose financial assets and liabilities the **Named Insured** is the majority successor in interest.

T.  **Privacy Breach** means any of the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

    1.  the alleged unauthorized alteration, collection, copying, disclosure, dissemination or viewing of **Non-public Personal Information** or **Proprietary Business Information** in any form, from any source, because of an Insured's failure to protect such information from unauthorized access or unauthorized use;

    2.  the alleged accidental release or loss of **Non-public Personal Information** or **Proprietary Business Information**;

    3.  the alleged wrongful collection, use or sale of **Non-public Personal Information** in any form; and

    4.  an **Insured's** alleged failure to correct the **Non-public Personal Information** of a third party that is stored on the **Named Insured's Information System** once notified by the affected individual or that individual's legal counsel.

**Privacy Breach** includes the **Named Insured's** vicarious liability for the privacy breach of **Non-public Personal Information** or **Proprietary Business Information** in the care, custody and control of an **Information Custodian** to whom the **Named Insured** entrusted that information.

U.  **Privacy Regulation** means any current or future statute or regulation applying to the collection, dissemination or storage of **Non-public Personal Information** promulgated by a **Privacy Regulator** including, but not limited to, state breach notice laws, HIPAA, the Hi-Tech Act, the Federal Trade Commission (FTC) Red Flag rules, Gramm-Leach Bliley or the European Union (EU) Data Protection Act.

V.  **Privacy Regulator** means any local, state or federal government of the United States, any provincial or federal government in Canada, the European Union or a member state of the European Union.

W.  **Privacy Regulatory Action** means the institution of an investigation, an administrative hearing or civil charges by a **Privacy Regulator** under a **Privacy Regulation** arising out of an actual or alleged **Privacy Breach**.

X.  **Real Estate Development Services** means the following services performed by or on behalf of any **Insured** in the course of improvement of real property acquired by the **Insured**, whether alone or as part of a partnership, joint venture, syndication, or other arrangement :

    1    the construction or renovation of buildings or other structures on such real property, including: conceptual land planning; requesting and securing zoning changes; performing

environmental studies; construction of horizontal infrastructure such as roads and utilities; property tear-down or re-development; creating capital expenditure projections; performing financial management and reporting; obtaining necessary capital, including giving market condition projections, promotion and advertising; determining surface and subsurface conditions; determining cultural and historic conditions; projecting LEED ratings; preparation, transmittal, and awarding of design and construction bid packages; management, coordination, and supervision of design and construction; and identification and obtaining of applicable permits, variances, consents, easements, and other rights;

2.   services performed while acting as a real estate agent, title agent, notary public, mortgage broker, property manager, construction manager, or general contractor, if performed as part of the services as a real estate developer for the same improvement of real property; and

3.   any other services identified as **Real Estate Development Services** listed in Item 3 of the Declarations.

It is further understood that, regarding the coverage provided in this policy under Insuring Agreement A.2, **Professional Service** includes **Technology Services**.

Y.   **Property Damage** means physical injury to tangible property, including all resulting loss of use of that property.

Z.   **Proprietary Business Information** means business records, customer lists, trade secrets or any other non-public information entrusted to an **Insured** under a written contract to protect its confidentiality.

AA   **Rectification Costs** means those expenses incurred by the **Insured** in excess of the deductible to rectify a design defect in any part of the construction works or engineering works for any project for which the **Insured** is responsible for both design and construction, providing:

1.   the **Insured** demonstrates that the actual and necessary costs and expenses arise out of the **Insured's** performance of **Real Estate Development Services**, and

2.   the **Insured** first sought recovery for any **Rectification Costs** from any Professional Liability Coverage that may apply to the entity responsible for the design defect.

BB   **Regulatory Fines And Penalties** means those sums any **Insured** is required to pay as part of the settlement or judgment of a **Privacy Regulatory Action** to which this insurance applies.

CC.   **Regulatory Restitution** means sums deposited into a fund for the purpose of providing compensation to individuals affected by a **Privacy Breach** as part of a settlement or judgment resulting from a **Privacy Regulatory Action**.

DD.   **Security Event** means any of the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

1.   the **Insured's** inadvertent transmission of malicious computer code to a third party;

2.   the failure to prevent the use of the **Named Insured's Information System** to harm a third party's **Information System** including the failure to prevent the use of the **Named Insured's Information System** to launch a denial of service attack;

3.   the inability of the **Named Insured** or third party to access the **Named Insured's Information System** due to the failure to prevent a denial of service attack, damage from malicious computer code, unauthorized access to or unauthorized use of the **Named Insured's Information System**; or

4.   the corruption, destruction or loss of electronic data held within the **Named Insured's Information System** as the direct result of malicious computer code, a denial of service attack or from unauthorized access to, or unauthorized use of, the **Named Insured's Information System**.

EE. **Social Engineering Incident** means the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

An **Insured** having transferred, paid or delivered funds or data as a direct result of a fraudulent written instruction, electronic instruction (including e-mail or web-based instruction) or telephone instruction which is intended to mislead an Insured through misrepresentation of a material fact that is relied upon in good faith by such **Insured**.

FF. **Subsidiary** means:

1. any entity in which more than 50% of the outstanding voting securities or voting rights representing the present right to vote for election of directors, officers, any **Insured**, or any equivalent executives, is owned or controlled by the **Named Insured**, either directly or indirectly on or before the effective date of this policy;

2. any entity after the effective date of this policy by reason of being created or acquired by the **Named Insured** after such date, if the gross revenues of the created or acquired entity for the prior year are equal to or greater than 50% of the annual gross revenues of the **Named Insured** as reflected in the **Named Insured's** most recent audited consolidated financial statement prior to such creation or acquisition; or

3. any entity after the effective date of this policy by reason of being created or acquired by the **Named Insured** after such date, other than as described in subsection 2. above, but such entity will be a **Subsidiary** only for either (i) a period of 30 days from the date such entity was created or acquired by the **Named Insured**; or (ii) until the end of the **Policy Period**, whichever occurs first.

Provided, however, that **Subsidiary** will not mean any entity which is a financial institution, including but not limited to any bank, insurance company, insurance agent/broker, securities broker/dealer, investment advisor, mutual fund or hedge fund.

**Subsidiary** also means any foundation or charitable trust controlled or directly sponsored by the **Named Insured**.

Provided, however, this policy will only apply to **Wrongful Acts** committed or allegedly committed after the effective date an entity becomes a **Subsidiary** and prior to the effective date such entity ceases to be a **Subsidiary**.

GG. **Technology Products** means computer or telecommunications hardware or software, or related electronic product that you develop, create, manufacture, distribute, license, lease or sell to your clients and for whom **Real Estate Development Services** are rendered.

HH. **Technology Services** means:

1. information technology consulting;

2. the administration, analysis, design, engineering, installation, integration, maintenance, management and programming of information systems or networks;

3. the analysis, development, delivery, design and support of business application software;

4. the design, hosting, maintenance, or programming of websites;

5. the distributing, installing, maintaining, marketing, selling and training in the use of electronic or computer related hardware or software; and

6. the assembly, design, development, distribution, installation, licensing, leasing, maintenance, manufacturing, ore repair of the **Insured's Technology Products**.

II. **Wrongful Act** means any actual or alleged act, error, omission or breach of duty by any **Insured** in the rendering of or failure to render **Real Estate Development Services**. **Wrongful Act** also means an actual or alleged **Personal Injury Offense** by any **Insured** in the rendering of or failure to render **Real Estate Development Services**.

SECTION IV - EXCLUSIONS

This policy does not apply to any **Claim** or **Expense Event**:

A. arising out of a **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident**, **Pollution Incident** or **Expense Event** occurring prior to the **Policy Period** if, prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the **Policy Period**:

   1. any **Insured** gave notice to any prior insurer of any such **Claim**, (including any **Potential Claim** that might lead to such **Claim**), **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**; or

   2. any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**, violated a disciplinary rule, or engaged in professional misconduct.

B. arising out of any actual or alleged intentional, criminal, dishonest, malicious or fraudulent act, error or omission by any **Insured**.

   This Exclusion does not apply to:

   1. any **Personal Injury Offense** that results from any **Insured's** rendering or failing to render **Real Estate Development Services**; or

   2. any of the **Insureds**, unless such intentional criminal, dishonest, malicious or fraudulent act, error or omission is established by a final adjudication of the **Claim** or a final adjudication in any judicial, administrative or alternative dispute resolution proceeding.

   For purposes of this Exclusion, no such act of one of the **Insureds** will be imputed to any of the **Insureds** who were not aware of and did not participate in such act.

C. arising out of any **Insured's** services or capacity as an officer, director, partner, owner, member, manager or employee of any corporation, partnership, association or any other business enterprise or charitable organization of any kind or nature other than:

   1. the **Named Insured**;

   2. any entity other than the **Named Insured**:
      a. that is managed, or controlled by any **Insured**;
      b. in which any **Insured**, individually or collectively, has an ownership interest in excess of 49%; or
      c. which wholly or partly owns, operates or manages the **Named Insured**.

D. arising out of any actual or alleged violation or breach by any **Insured** of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, Telephone Consumer Protection Act (TCPA), Securities Act of 1933, Securities Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act 18 USC Sections 1961 et seq., the Controlling the Assault of Non-Solicited Pornography and Marketing ACT (CAN-SPAM) of 2003, the Fair Credit Reporting Act (FCRA), Fair and Accurate Credit Transactions Act (FACTA), or amendments thereto of any of these, or any similar provision of any federal, state or local statute, regulation, ordinance or common law.

   This Exclusion does not apply if any **Insured** is deemed to be a fiduciary solely by reason of **Real Estate Development Services** rendered with respect to any employee benefit plan.

E. arising out of **Bodily Injury** or **Property Damage**.

   This Exclusion does not apply to **Bodily Injury** resulting from a **Personal Injury Offense** or to the extent that any such **Bodily Injury** or **Property Damage** results from any **Insured's** rendering of or failure to render **Real Estate Development Services**.

F. arising out of

1. any **Insured's** actual or alleged liability under any oral or written contract or agreement, including but not limited to express warranties or guarantees; or

2. any actual or alleged liability of others that any **Insured** assumes under any oral or written contract or agreement.

However, this exclusion will not apply to the **Insured's** liability that exists in the absence of such contract or agreement.

In a foreign jurisdiction where the **Insured's** liability to a client is predicated only on contractual liability, item F.1 of this Exclusion does not apply except to the extent that the **Insured** has agreed to pay consequential or liquidated damages.

This exclusion does not apply to liability assumed by the **Insured** in a client contract.

G. made by any **Insured** against any other **Insured**.

H. However, this exclusion does not apply to claims brought by investors who have ownership in the developed property on which a **claim** is brought against the **Insured**.

H. arising out of infringement of patent or misappropriation of trade secret, resulting in unfair competition or restraint of trade law, rule or regulation.

I. arising out of an actual or alleged violation of any anti-trust or price-fixing rule or regulation.

J. arising out of the design or manufacture of any goods or products which are sold or supplied by any **Insured** or by others under license from any **Insured**.  This exclusion does not apply to software sold or supplied by the **Insured** to its client in connection with the **Insured's** provision of other **Real Estate Development Services** for that client.

K. arising out of any **Insured's** employment obligations, decisions, practices or policies as an employer, including but not limited to any **Claim** under worker's compensation, unemployment compensation, employee benefits, or disability benefits law or similar laws.

L. arising out of any actual or alleged discrimination, humiliation, harassment or misconduct, including but not limited to that which is based on an individual's race, religion, color, gender, sexual orientation, national origin, age, disability, or marital status.   This exclusion does not apply to otherwise covered **Claims** brought under the Americans with Disabilities Act, the Fair Housing Act, or any similar state or local law or ordinance.

M. arising out of any actual or alleged failure to procure and/or maintain adequate insurance or bonds

However, this exclusion will not apply to the insured's services in the performance of property management.

N. arising out of any **Insured's** making any payment:

1. without prior receipt of an architect's certificate, where such certificate is required as a condition of payment, or

2. without prior receipt of appropriate waivers or releases of lien from the subcontractors involved, where work or materials have been provided by said subcontractors.

O. arising out of the actual or alleged theft, misappropriation, commingling, or conversion of any funds, monies, assets, or property.

P. arising out of the acquisition of property for resale or other arrangements to obtain monetary gain without making improvements to said property in the course of the Insured's Real Estate Development Services.

SECTION V – COVERAGE EXTENSIONS

1. EMERGENCY REMEDIATION COVERAGE

The **Insurer** will reimburse the **Insured** up to S250,000 for reasonable and necessary **Cleanup Costs** the **Insured** incurs to take immediate action without the prior consent of the **Insurer** in order to abate and/or respond to an imminent and substantial threat in connection with an actual or potential **Pollution Incident**, provided:

a. the **Pollution Incident** results from the **Insured's** performance of or failure to perform **Real Estate Development Services** taking place on or after the Retroactive Date; and

b. the **Pollution Incident** is first discovered by the **Insured** during the policy period and is reported to the **Insurer** in writing as soon as is possible after such discovery, but in any event no later than 10 business days after the **Insured** first discovers such **Pollution Incident**, or the end of the policy period, whichever is earliest.

The **Insurer** will only reimburse the **Insured** for **Cleanup Costs** under this Coverage Extension the **Insurer** deems reasonable and necessary to mitigate the **Pollution Incident** on an emergency basis.

The **Insured** must pay the deductible stated in the Declarations in connection with any payments the insurer makes under this subsection.

Covered **Cleanup Costs** incurred in excess of the S250,000 sublimit noted in this Section shall be treated in the same manner as other covered **Loss**. In any event, **Cleanup Costs** shall be part of, and not in addition to, the Limit of Liability of this Policy.

Any notice given to the **Insurer** under this subsection shall be deemed notice of a **Potential Claim**.

2. EXTENDED REPORTING PERIODS

In the event this policy is cancelled or non-renewed by either the **Named Insured** or the **Insurer**, an **Insured** is entitled to the extensions of coverage shown in this Section.

A. Automatic Extended Reporting Period

An Extended Reporting Period is automatically provided to the **Named Insured** without additional charge. This period starts at the end of the **Policy Period** and lasts for 60 days, or the date another policy for professional liability insurance applicable to the **Named Insured** takes effect, whichever occurs first.

1. There will be no entitlement to this Automatic Extended Reporting Period if cancellation or non-renewal is due to any **Insured's** non-payment of premium or deductible due, or failure to comply with the terms and conditions of the policy, or if the Policy was issued based upon a misrepresentation by any **Insured**.

2. This Automatic Extended Reporting Period will be subject to all the terms and conditions of this policy and will apply to **Claims** first made against any **Insured** and reported to the **Insurer** during the Automatic Extended Reporting Period and that arise out of any **Wrongful Act** that occurred or is alleged to have occurred subsequent to the Retroactive Date, if any, and before the end of the **Policy Period**.

3. The fact that the period during which **Claims** may be reported to the **Insurer** under this policy by way of this Automatic Extended Reporting Period does not in any way increase the Limits of Insurance of this policy.

4. If any other policy of insurance in effect would apply to any **Claims** first made against the **Insured** during the Automatic Extended Reporting Period, then coverage provided under this Automatic Extended Reporting Period will apply in excess of such other insurance.

B. An Optional Extended Reporting Period is available to the **Named Insured**, but only by an endorsement and for an extra premium charge as shown in Item **7** of the Declarations.

1. The **Named Insured** must give the **Insurer** a written request for the endorsement and pay any premium due within 60 days after the end of the **Policy Period**. The Optional Extended Reporting Period will not go into effect unless the **Named Insured** pays the additional premium promptly when due.

2. The Optional Extended Reporting Period is non-cancellable and starts upon the expiration of the **Policy Period**.

3. All premiums paid for the Optional Extended Reporting Period will be deemed fully earned and non-refundable as of the first day of the Optional Extended Reporting Period.

4. There will be no entitlement to this Optional Extended Reporting Period if cancellation or non-renewal is due to any **Insured's** non-payment of premium or deductible due, or failure to comply with the terms and conditions of the policy, or if the policy was issued based on a misrepresentation by any **Insured**.

5. This Optional Extended Reporting Period will be subject to all the terms and conditions of this policy and will apply to **Claims** first made against any **Insured** and reported to the **Insurer** during the Automatic Extended Reporting Period and that arise out of any **Wrongful Act** that occurred or is alleged to have occurred subsequent to the Retroactive Date, if any, and before the end of the **Policy Period**.

6. The fact that the period during which **Claims** may be reported to the **Insurer** under this extension does not in any way increase the Limits of Insurance of this policy.

C. Nonpracticing Extended Reporting Period

If, during this **Policy Period**, any **Insured** permanently and totally retires or otherwise voluntarily ceases the practice of providing the **Real Estate Development Services** insured by this policy, and has been insured by a Professional Liability Insurance policy issued by the **Insurer** for at least the 7 consecutive years immediately preceding, and the **Insured** is at least 55 years of age, the **Insurer** will, subject to the provisions of paragraphs A. and B. above, issue a Nonpracticing Extended Reporting Period endorsement.

1. This Nonpracticing Extended Reporting Period is provided until such **Insured** resumes the **Real Estate Development Services** insured by this policy, or until the death of such **Insured** in which case paragraph D.1 below, will apply.

2. No additional premium will be charged for this coverage, nor will any premium be refunded.

D. Death or Disability Extended Reporting Period

If during the **Policy Period,** any **Insured** dies from a cause other than suicide or becomes totally and permanently disabled, an extended reporting period is provided until the executor or administrator is discharged or until the disability ends. However, the Death or Disability Extended Reporting Period will never be longer than seven years from the date of death or disability. No additional premium will be charged for this coverage, nor will any premium be refunded.

1. In the event of death, the **Insured's** estate must, no later than 60 days after the end of this **Policy Period**, provide the **Insurer** with written notice that the extended reporting period is desired. This notice must include written proof of the date of death.

2. In the event the **Insured** becomes totally and permanently disabled, the **Insured** or the **Insured's** legal guardian must, no later than 60 days after the end of this **Policy Period**, provide the **Insurer** with written notice that the extended reporting period is desired. This notice must include written proof that the **Insured** is totally and permanently disabled, including the date the disability began, certified by the attending physician. The **Insured** agrees to submit to medical examination(s) by any physician(s) designated by the **Insurer**, if requested.

This extended reporting period is subject to the conditions set forth in paragraphs A. and B. above.

SECTION VI – GENERAL CONDITIONS

A. Defense, Settlement And Cooperation

1. The **Insurer** has the right and duty to defend any **Insured** against any **Claim**, even if the allegations of such **Claim** are groundless, false or fraudulent. The **Insurer** will designate, or, at the **Insurer's** sole discretion, approve counsel chosen by the **Insured** to defend the **Claim**. However, the **Insurer** has no duty to defend any **Insured** against any **Claim** to which this insurance does not apply.

   This policy has provisions whereby the **Insurer** will pay on the **Insured's** behalf certain costs incurred as a result of defending a **Disciplinary Proceeding** or responding to a subpoena for documents or testimony; however the **Insurer** has no duty to defend the **Insured** in any such **Disciplinary Proceeding** or in connection with any such subpoena assistance as shown in SECTION I – COVERAGES, B. Supplemental Payments, item 5. of this policy.

2. The **Insurer** has the right to make any investigation the **Insurer** deems necessary and, with the **Insured's** consent, make any settlement of any **Claim** covered by the terms of this policy.

3. The **Insured** will not, except at the **Insured's** own cost, make any payment, admit any liability, settle any **Claim**, assume any obligation or incur any expense, without the **Insurer's** prior written consent, such consent not to be unreasonably withheld.

4. If the applicable Limit of Liability shown in Items 4 and 5 of the Declarations are exhausted by the payment of **Loss**, then all of the **Insurer's** obligations under this policy will be completely fulfilled and exhausted, and the **Insurer** will have no further obligations of any kind or nature whatsoever under this policy. If the applicable Limit of Liability shown in the Declarations is exhausted prior to settlement or judgment of any **Claim**, the **Insurer** will have the right to withdraw from further investigation or defense by tendering control of such investigation or defense to the **Insured**, and the **Insured** agrees, as a condition to the issuance of this policy, to accept such tender.

5. The **Insured** must cooperate with the **Insurer** and assist the **Insurer** in investigating and defending any **Claim** or **Potential Claim** or investigating any event resulting in coverage under Insuring Agreement B: Supplemental Payments. Upon the **Insurer's** request, the **Insured** must submit to examination and interrogation by the **Insurer's** representatives, under oath if required, and the **Insured** must attend hearings, depositions and trials, and assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to the **Insurer's** representatives including investigating and coverage counsel, and meeting with such representatives for the purpose of investigating and defense, including the investigation of coverage issues or defense. The **Insured** must further cooperate with the **Insurer** and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment which the **Insured** may have.

B. Reporting And Notice

1. Reporting of **Claims**

   If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** is first made against any **Insured**, as a condition precedent to the **Insured's** right to coverage under this policy, the **Insured** must give the **Insurer** written notice of such **Claim** as soon as practicable, but in no event later than the later of 60 days after the expiration date or earlier termination date of this policy, or the expiration of any Extended Reporting Period, if applicable.

   Timely and sufficient notice of a **Claim** by one of the **Insureds** will be deemed timely and sufficient notice for all of the **Insureds** involved in the **Claim**. Such notice must give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act**; the identity of the **Insured** and all potential claimants involved; a description of the injury or damages

that resulted from such **Wrongful Act**; information on the time, place and nature of the **Wrongful Act**; and the manner in which the **Insured** first became aware of the **Claim**.

2. Reporting of **Potential Claims**

   If, during the **Policy Period**, any **Insured** first becomes aware of any **Potential Claim**, the **Insured** will give the **Insurer** written notice of such **Potential Claim** with full particulars as soon as practicable thereafter, but in any event before the end of the Policy Period. If such **Potential Claim** later becomes a **Claim** not otherwise excluded by this policy, such **Claim** will be treated as if the **Claim** had been first made during the **Policy Period**. Full particulars include, but are not limited to: a description of the **Potential Claim**; the identity of the **Insured** and all potential claimants involved; information on the time, place and nature of the **Potential Claim**; the manner in which the **Insured** first became aware of such **Potential Claim**; and the reasons the **Insured** believe the **Potential Claim** is likely to result in a **Claim**.

3. Notice regarding **Crisis Management Expenses**

   If, during the **Policy Period**, a **Wrongful Act, Privacy Breach, Security Event, Social Engineering Incident** or **Pollution Incident** occurs, then as a condition precedent to the **Insured's** right to coverage under this policy for **Crisis Management Expenses**, the **Insured** must give the **Insurer** written notice of such **Wrongful Act, Privacy Breach, Security Event** or **Social Engineering Incident** as soon as practicable, but in no event later than the expiration date or earlier termination date of this policy.

   Such notice must give full particulars of the **Wrongful Act, Privacy Breach, Security Event, Social Engineering Incident** or **Pollution Incident**, including, but not limited to: a description of the **Privacy Breach** or **Security Event**; the identity of the **Insured** and all potential claimants involved; and the manner in which the **Insured** first became aware of such **Wrongful Act, Privacy Breach, Security Event, Social Engineering Incident** or **Pollution Incident**.

4. Notice of **Disciplinary Proceedings** and Subpoenas

   If, during the **Policy Period**:

   a. a **Disciplinary Proceeding** is first initiated against any **Insured** and covered by SECTION I – COVERAGES, B. Supplemental Payments, 3. Disciplinary Proceedings; or,

   b. any **Insured** first receives a subpoena covered by SECTION I – COVERAGES, B. Supplemental Payments, 4. Subpoena Assistance;

   then as a condition precedent to the **Insured's** right to coverage under this policy, the **Insured** must give the **Insurer** written notice of such **Disciplinary Proceeding** or subpoena as soon as practicable, but in no event later than the end of the **Policy Period**.

   Such notice must give full particulars of the **Disciplinary Proceeding** or subpoena, including, but not limited to: a description of the **Disciplinary Proceeding** or subpoena; the identity of the **Insured** and all potential claimants involved; and the manner in which the **Insured** first became aware of such Disciplinary Proceeding or subpoena.

5. Notice required for Emergence Remediation Coverage

   If, during the **Policy Period**, a **Pollution Incident** occurs, then as a condition precedent to the **Insured's** right to coverage under this policy for Emergency Remediation Coverage for **Cleanup Costs** under SECTION IV – COVERAGE EXTENSIONS 1. Emergency Remediation Coverage, the **Insured** must immediately:

   a. record the specifics of the **Pollution Incident**, including how and when it took place, as well as details regarding the **Real Estate Development Service** provided;

   b. record a detailed description of the nature, scope and estimated amount of the **Cleanup Costs**; and

   c. notify the **Insurer** in writing as soon as practicable but in no event after the **Policy Period**.

6. Notices

All written notices required herein must be sent to the **Insurer** at the **Insurer's** physical address or e-mail address shown in Item 9 of the Declarations.

C.  Multiple Wrongful Acts, **Claims** or Claimants

Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single **Claim**. Each **Wrongful Act**, in a series of related **Wrongful Acts**, will be deemed to have occurred on the date of the first such **Wrongful Act.**

D.  Organizational Changes

1.  If, during the **Policy Period**:

a.  the **Named Insured** or any **Subsidiary** are merged with, consolidated into or acquired by or with another entity such that the **Named Insured** is not the surviving entity; or

b.  a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official is appointed for or with respect to the **Named Insured** or any **Subsidiary**; then

coverage under this policy will continue in full force and effect with respect to **Real Estate Development Services** rendered before such event, but coverage will cease with respect to **Real Estate Development Services** committed after such event. After any such event, this policy may not be canceled by the **Named Insured** and the entire premium for this policy will be deemed fully earned.

2.  If, during the **Policy Period**, the **Named Insured** or any **Subsidiary** merges, consolidates or acquires an entity whose gross revenues for the prior year are equal to or greater than 50% of the annual gross revenues of the **Named Insured** as reflected in the **Named Insured's** most recent consolidated financial statement prior to such merger, consolidation or acquisition, then no coverage will be afforded under this policy for any **Claim** involving such assets or entity unless the following conditions are met:

a.  The **Named Insured** provides written notice of such merger, consolidation creation, or acquisition to the **Insurer** within 60 days after the effective date of such merger, consolidation, creation or acquisition, or by the end of the **Policy Period**, whichever is earliest;

b.  The **Named Insured** provides the **Insurer** with such information as the **Insurer** may deem necessary;

c.  The **Named Insured** accepts any special terms, conditions, exclusions or additional premium charge as may be required; and

d.  The **Insurer**, at the **Insurer's** sole discretion, agrees to provide such coverage.

E.  Other Insurance

This insurance will apply only as excess of the applicable Deductible amount shown in Items 4 and 5 of the Declarations and the amount of any other valid and collectible insurance available to any **Insured** whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is specifically written as excess insurance over the Limits of Liability provided in this policy.

F.  Cancellation and Non-Renewal

1.  Cancellation

a.  The **Named Insured** may cancel this policy by mailing or delivering advance written notice to the **Insurer** at the **Insurer's** address shown in Item 9 of the Declarations, stating when cancellation will be effective. If the **Insured** cancels this policy, the **Insurer** will retain the customary short rate portion of the premium.

b.  The **Insurer** may cancel this policy by mailing written notice to the first **Named Insured** shown in Item 1 of the Declarations stating when, not less than 30 days thereafter (or such longer period of time as required by applicable law), such cancellation will be effective.

c.  However, if the **Insurer** cancels this policy because the **Named Insured** has failed to pay a premium or Deductible when due, the **Insurer** may cancel this policy by mailing written notice of cancellation to the first **Named Insured** shown in Item 1 of the Declarations stating when, not less than 10 days thereafter (or such longer period of time as required by applicable law), such cancellation will be effective.  Such notice will apply to all of the **Insureds**.  If cancelled by the **Insurer**, earned premium will be computed pro rata.

2.  Non-renewal

If the **Insurer** elects not to renew this policy, the **Insurer** will mail to the first **Named Insured** shown in Item 1 of the Declarations written notice of non-renewal at least 60 days prior to the expiration date of this policy.  If the notice is not given at least 60 days prior to the expiration date, the policy will continue in force until 60 days after the notice of intent not to renew is received by the **Insured**.

Notice of non-renewal will not be required if the **Named Insured** has obtained replacement coverage or have requested or agreed to non-renewal.

G.  Subrogation

In the event of any payment under this policy, the **Insurer** will be subrogated to all the **Insured's** rights of recovery against any person or organization; provided that the **Insurer** will not exercise any rights of subrogation against any of the **Insureds** who did not commit the wrongdoing.

The **Insured** will execute and deliver instruments, papers, and do whatever else is necessary to secure such rights, and do nothing to prejudice such rights.

Any amount recovered upon the exercise of such rights of subrogation will be applied as follows: first, to the repayment of expenses incurred in recovery by exercise of such subrogation rights; second, to **Loss** paid by the **Insured** in excess of the limits of liability; third, to **Loss** paid by the **Insurer**; fourth, to **Loss** paid by the **Insured** in excess of the deductible amount; and last, to the repayment of any deductible amount paid by the **Insured**.

Notwithstanding the above, the **Insurer** hereby waives such subrogation rights against any **Insured** under this policy, and also against any client of the **Insured**, to the extent that the **Insured** had, prior to any **Claim** or circumstance that might reasonably be expected to be the basis of a **Claim**, a written agreement to waive such rights, provided that prior to such writing no **Insured** had a basis to believe that any matter asserted in such **Claim** or circumstance might reasonably be expected to be the basis of a **Claim**. In no event will any **Insured** waive any of its rights of subrogation after it has become aware of any **Claim**, or any circumstances that may give rise to a **Claim**, against any **Insured**.

H.  Bankruptcy or Insolvency

Bankruptcy or insolvency of any **Insured** or of any **Insured's** estate will not relieve the **Insurer** of any of the **Insurer's** obligations or deprive the **Insurer** of any of the **Insurer's** rights under this policy.

I.  Policy Territory

This policy applies to **Wrongful Acts** occurring anywhere in the world where legally permissible; however, no coverage will be available under this policy for any **Claim** brought, or occurring in any country with which the United States of America does not have active diplomatic relations at the time such **Claim** is made.

All premiums, Limits of Liability, deductibles and other amounts under this policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or another element of **Loss** under this policy is stated in a currency other than United States Dollars, payment under this policy will be made in United States Dollars at the rate of

exchange on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

J.  Assignment

Neither this policy nor any **Insured's** interest in this policy may be assigned without the **Insurer's** written consent.

K.  Liberalization

If the **Insurer** adopts any revision to this form that would broaden coverage under this policy without additional premium at any time during the **Policy Period**, the broadened coverage will immediately apply to this policy, except that it will not apply to **Claims** that were first made against any **Insured** prior to the effective date of such revision.

L.  Policy Changes

Notice to or knowledge possessed by any broker or other person acting on the **Insured's** behalf will not effect a waiver or change in any part of this policy or prevent or estop the **Insurer** from asserting any right(s) under this policy.   This policy can only be altered, waived or changed by written endorsement or agreed to in writing by an authorized representative of the **Insurer**.

M.  Action Against the **Insurer**

No action can be brought against the **Insurer** unless, as a condition precedent, the **Insured** has fully complied with all the terms and conditions of this policy.  Nothing contained in this policy gives any person or organization the right to join the **Insurer** as a party to any **Claim** to determine the **Insured's** liability.

N.  Waiver

The **Insurer's** failure to insist on strict compliance with any of the terms or conditions of this policy or the failure to exercise any right or privilege will not operate or be construed as a waiver of any subsequent breach or a waiver of any other terms, conditions, privileges or rights.

O.  Representations

By accepting this policy, all **Insureds** agree that all statements made and information furnished to the **Insurer** are true, accurate and complete, and that this policy has been issued in reliance upon the truth and accuracy of those representations, subject to all of the terms and conditions of this policy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT

If service of process is to be made upon the Company by way of hand delivery or courier service, delivery should be made to the Company's principal place of business:

Claims Manager
  Colony Insurance Company,
  Colony Specialty Insurance Company, or
  Peleus Insurance Company
  8720 Stony Point Parkway, Suite 400
  Richmond, Virginia 23235

If service of process is to be made upon the Company by way of the U.S. Postal Service, the following mailing address should be used:

General Counsel
  Colony Insurance Company,
  Colony Specialty Insurance Company, or
  Peleus Insurance Company
  P.O. Box 469011
  San Antonio, Texas 78246

Where required by statute, regulation, or other regulatory directive, the Company appoints the Commissioner of Insurance, or other designee specified for that purpose, as its attorney for acceptance of service of all legal process in the state in any action or proceeding arising out of this insurance.

The Commissioner or other designee is requested to forward process to the Company as shown above, or if required in his/her particular state, to a designated resident agent for service of process.


ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

## A-44

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROFESSIONAL SERVICES ENDORSEMENT

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY COVERAGE

The definition of **Professional Services**, within SECTION III – DEFINITIONS, is amended by the addition of the following:

> providing asset management, property management, development consulting, and those services as defined in the  Real Estate Developers PROtect? Professional Liability Insurance with Cyber Coverage Form, with respect to both acquired and non-acquired properties as well as owned and non-owned properties

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RETROACTIVE DATE FOR SPECIFIC COVERAGE

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY COVERAGE

ITEM 8. Retroactive Date, as shown in the Declarations, is deleted and replaced with the following:

ITEM 8. RETROACTIVE DATE

| COVERAGE | RETROACTIVE DATE |
|---|---|
| **A. Real Estate Development services & General Construction services** | **8/1/2018** |

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics Traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC. this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# Privacy Policy

Argo Group US, Inc. ("Argo Group") recognizes the importance of maintaining the privacy of our customers and the confidentiality of each individual's nonpublic personal information, including Social Security numbers. We take seriously the responsibility that accompanies our collection of nonpublic personal information, including Social Security numbers. Accordingly, Argo's corporate policy is to protect the privacy and confidentiality of our consumers and their nonpublic personal information as required by law.

## Information Collection and Use

In order to conveniently and effectively provide and service the insurance products we sell, we may collect and use Social Security numbers and other nonpublic personal information. As such, this policy does not prohibit the collection or use of Social Security numbers and nonpublic personal information where legally authorized and/or required. This policy complies with the requirements of the Gramm-Leach-Bliley Act (GLBA) and applicable federal and state laws and regulations implementing the act. Such laws impose certain obligations upon third persons and organizations with which we share nonpublic personal information of our consumers, customers, former customers, or claimants. Accordingly, we prohibit the unauthorized disclosure of Social Security numbers and other protected nonpublic personal information, except as legally required or authorized.

## Information Sharing and Disclosure

Argo Group does not rent, sell or share your personally identifiable information with nonaffiliated third parties. Argo Group may, however, share personally identifiable information with third-party contractors. These third-party contractors are prohibited from using the information for purposes other than performing services for Argo Group. Argo Group may disclose your information to third parties when obligated to do so by law and to investigate, prevent, or take action regarding suspected or actual prohibited activities, including but not limited to fraud and situations involving the security of our operations and employees.

Finally, Argo Group may transfer information, including any personally identifiable information, to a successor entity in connection with a corporate merger, consolidation, sale of all or a portion of its assets, bankruptcy, or other corporate change.

## Security

In order to protect your nonpublic personal information, we limit access to nonpublic personal information by only allowing authorized personnel to have access to such information. Furthermore, we maintain physical, electronic and procedural security protections to safeguard the nonpublic personal information in our records. Documents that contain an individual's protected information are destroyed before disposal; this destruction process includes the shredding of print and disposable media and deletion of electronic media. Argo Group has security measures in place to protect the loss, misuse and alteration of the information under our control. Our hardware infrastructure is housed in a controlled access facility that restricts access to authorized individuals. The network infrastructure is protected by a firewall and traffic is monitored and logged both on the firewall and servers. Sensitive administrative activities are carried out over secure, encrypted links between our offices and hosting facility. Administrative

access is limited not only to authorized employees but also to specific remote administration protocols and IP addresses. All employees with access to personally identifiable information have been advised of Argo Group's security policies and practices. Argo Group will continue to conduct internal audits of its security systems and make all necessary enhancements to ensure the safety of the website and its users. No method of transmission over the Internet or method of electronic storage is 100% secure; therefore, while Argo Group uses commercially acceptable means to protect your information, we cannot guarantee absolute security.

Any Argo Group employee who becomes aware of the inappropriate use or disclosure of Social Security numbers and other protected nonpublic personal information is expected to immediately report such behavior to the General Counsel for further action.

**Corrected/Updated Information**

This policy applies to certain insureds of Argo Group, including but not limited to worker's compensation claimants.  If you have any questions about this Privacy Policy, please contact:

<div align="center">

General Counsel
Argo Group US, Inc.
P.O. Box 469011
San Antonio, Texas 78246
(210) 321-8400

</div>

*Note: Argo Group is the parent of Argonaut Insurance Company; Argonaut-Southwest Insurance Company; Argonaut-Midwest Insurance Company; Argonaut Great Central Insurance Company; Argonaut Limited Risk Insurance Company; ARIS Title Insurance Corporation; Select Markets Insurance Company; Colony Insurance Company; Colony Specialty Insurance Company; Peleus Insurance Company (fka Colony National Insurance Company); Rockwood Casualty Insurance Company; Somerset Casualty Insurance Company; Grocers Insurance Agency, Inc.; Central Insurance Management, Inc.; Alteris Insurance Services, Inc.; Trident Insurance Services, LLC; Commercial Deposit Insurance Agency, Inc.; Sonoma Risk Management, LLC; John Sutak Insurance Brokers, Inc.; Colony Management Services, Inc.; Argonaut Management Services, Inc.; and Argonaut Claims Management, LLC.  This Privacy Policy applies to all companies and business produced or underwritten within Argo Group.

# SIGNATURE PAGE

IN WITNESS WHEREOF, the company issuing this policy has caused this policy to be signed by its President and its Secretary and countersigned (if required) on the Declarations page by a duly authorized representative of the company. This endorsement is executed by the company stated in the Declarations.

Colony Insurance Company

**President**       **Secretary**

# EXHIBIT 2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 2 of 67    RECEIVED NYSCEF: 07/26/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JEROME SCHNEIDER, AS TRUSTEE OF THE JEROME
SCHNEIDER REVOCABLE TRUST, DATED JANUARY 18,
2013, INDIVIDUALLY, AND AS A MEMBER OF AND ON
BEHALF OF MARNI REALTY LLC AND RUDEL REALTY,
LLC, RUTH SCHNEIDER, AS TRUSTEE OF THE RUTH
SCHNEIDER REVOCABLE TRUST, DATED JANUARY 18,
2013, INDIVIDUALLY, AND AS A MEMBER OF AND ON
BEHALF OF MARNI REALTY LLC AND RUDEL REALTY,
LLC, RUTH SCHNEIDER, AS TRUSTEE OF THE JEROME
SCHNEIDER 2012 FAMILY TRUST, DATED DECEMBER 10,
2012, INDIVIDUALLY, AND AS A MEMBER OF AND ON
BEHALF OF ZIZI REALTY, LLC, JERUTH REALTY LLC,
MARC REALTY LLC, RIS REALTY LLC, BREN-EL REALTY
LLC, JHJ REALTY LLC AND SIR REALTY LLC,  JEROME
SCHNEIDER, AS TRUSTEE OF THE RUTH SCHNEIDER 2012
FAMILY TRUST, DATED DECEMBER 10, 2012,
INDIVIDUALLY, AND AS  A MEMBER OF AND ON
BEHALF OF ZIZI REALTY, LLC, JERUTH REALTY LLC,
MARC REALTY LLC, RIS REALTY LLC, BREN-EL REALTY
LLC, JHJ REALTY LLC AND SIR REALTY LLC, MARC
SCHNEIDER, INDIVIDUALLY, AND AS A MEMBER OF
AND ON BEHALF OF BAR-MAR REALTY LLC, MARC
REALTY LLC AND RIS REALTY LLC, MARNI SCHWARTZ,
INDIVIDUALLY, AND AS A MEMBER OF AND ON BEHALF
OF BAR-MAR REALTY LLC, MARC REALTY LLC AND RIS
REALTY LLC,

|                          |   |
|--------------------------|---|
| Index. No. _____   |   |

**VERIFIED COMPLAINT**

PLAINTIFFS,

- AGAINST -

PINE MANAGEMENT, INC., LLOYD J. PINE, AS TRUSTEE
OF THE HAROLD PINE 2009 FAMILY TRUST, BRENDA
ROHLMAN, AS TRUSTEE OF THE HAROLD PINE 2009
FAMILY TRUST, ZIZI REALTY, LLC, JERUTH REALTY
LLC, BAR-MAR REALTY LLC, MARC REALTY LLC, RIS
REALTY LLC, BREN-EL REALTY LLC, JHJ REALTY LLC,
SIR REALTY LLC, MARNI REALTY LLC AND RUDEL
REALTY LLC,

DEFENDANTS.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Jerome Schneider, as Trustee of the Jerome Schneider Revocable Trust, dated

January 18, 2013, individually, and as a member of and on behalf of Marni Realty LLC and

Rudel Realty LLC, Ruth Schneider, as Trustee of the Ruth Schneider Revocable Trust, dated

January 18, 2013, individually, and as a member of and on behalf of Marni Realty LLC and

Rudel Realty LLC, Ruth Schneider, as Trustee of the Jerome Schneider 2012 Family Trust, dated

December 10, 2012, individually, and as a member of and on behalf of Zizi Realty, LLC, Jeruth

Realty LLC, Marc Realty LLC, RIS Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Sir

Realty LLC, Jerome Schneider, as Trustee of the Ruth Schneider 2012 Family Trust, dated

December 10, 2012, individually, and as a member of and on behalf of Zizi Realty, LLC, Jeruth

Realty LLC, Marc Realty LLC, RIS Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Sir

Realty LLC, Marc Schneider, individually, and as a member of and on behalf of Bar-Mar Realty

LLC, Marc Realty LLC and RIS Realty LLC, and Marni Schwartz, individually, and as a

member of and on behalf of Bar-Mar Realty LLC, Marc Realty LLC and RIS Realty LLC, by

their attorneys, Holland & Knight LLP, for their Complaint against Pine Management, Inc.,

Lloyd J. Pine, as Trustee of the Harold Pine 2009 Family Trust, Brenda Rohlman, as Trustee of

the Harold Pine 2009 Family Trust, Zizi Realty, LLC, Jeruth Realty LLC, Bar-Mar Realty LLC,

Marc Realty LLC, RIS Realty LLC, Bren-El Realty LLC, JHJ Realty LLC, Sir Realty LLC,

Marni Realty LLC and Rudel Realty LLC, allege as follows:

## OVERVIEW

1.     This action arises out of the management by defendant Pine Management, Inc.

("Pine Management") of ten (10) New York limited liability companies named as nominal

defendants (the "LLCs"). As shown below, Pine Management: (a) has breached provisions of

the governing Operating Agreements; (b) has breached its fiduciary duty as Manager to the

Plaintiffs and has not acted in good faith; (c) has failed to disclose material facts and key

INDEX NO. 654303/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 4 of 67  RECEIVED NYSCEF: 07/26/2019

documents concerning the management and operations of the LLCs to the Plaintiffs; (d) has

engaged in self-dealing transactions such as the payment of "management fees" and

"construction management fees" from the LLCs to itself in violation of the governing Operating

Agreements and without approval from the Plaintiffs; and (e) has been involved in related party

transactions and approved loans to certain of the limited liability companies from members of the

limited liability companies or persons or entities affiliated with Pine Management without

authorization from, or an affirmative vote of, a majority in interest of the Members of such

LLCs.

2.     Pine Management and individuals associated or affiliated with Pine Management

have kept the Plaintiffs "in the dark" concerning certain key facts and documents concerning

Pine Management's management of the LLCs, have oppressed the Plaintiffs and have done

everything in their power to entrench themselves and their affiliates and to exclude the Plaintiffs

from exercising their rights as Members of the LLCs, in many of which the Plaintiffs collectively

have a 50% interest.

3.     The Complaint contains direct claims as well as derivative claims brought by

Plaintiffs as Members of the LLCs against Pine Management concerning its management of

these LLCs. The Complaint asserts, *inter alia*, causes of action against Pine Management for: (a)

breaches of the governing Operating Agreements; (b) breach of fiduciary duties; (c) inspection

of books and records under the terms of the Operating Agreements and Limited Liability

Company Law ("LLCL") § 1102; (d) an accounting; and (e) declaratory judgments.

4.     The Complaint also seeks injunctive relief against Pine Management and the

Harold Pine 2009 Family Trust from acting unilaterally in violation of the governing Operating

Agreements of the respective LLCs.   Specifically, this action seeks to enjoin Pine Management

3

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 5 of 67    RECEIVED NYSCEF: 07/26/2019

(in the case of all the LLCs) and the Harold Pine 2009 Family Trust (in the case of Marni Realty LLC and Rudel Realty LLC) from taking the following actions without the approval of a majority in interest of the Members of each of the LLCs: (1) approval of capital improvements for the individual property owned by the respective limited liability company; (2) setting of reserves for the individual property owned by the respective limited liability company; (3) deciding on the amount of distributions from the respective limited liability company to the Members; and (4) approval of loans to the respective limited liability company.

5.     The Complaint also seeks a declaratory judgment declaring that Pine Management cannot pay itself "management fees," "construction management fees" or any other "compensation" in its role as Manager, "property manager" or in any other capacity from the revenues of the respective LLCs without the approval of a majority in interest of the Members of each of the LLCs, taking into account that Members affiliated with or having an interest in Pine Management cannot vote on such matter.

6.     Pursuant to eight of the governing Operating Agreements of the LLCs, Pine Management was appointed as the Manager. Section 8.3 of the Operating Agreements of eight of the LLCs provides that "[t]he Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; *provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company shall be made by the affirmative vote of a majority in interest of the Members.*"(Emphasis added).

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2          Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 6 of 67
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

7.      Pine Management has taken a very restrictive view of the term "outside the ordinary course of business."  By an e-mail dated February 19, 2018, Pine Management's counsel stated that "The *only limitation provided in these agreements* is that decisions to finance or refinance any real estate owned by an LLC, acquire new or additional real estate, or sell any real estate owned by a LLC requires the affirmative vote of a majority in interest of the voting members or the affected LLC." (Emphasis added).  Pine Management's position has no factual or legal basis since the phrase "including, but not limited to" has an expansive meaning and is not limited to the items that follow such phrase.

8.      Decisions which are "outside the ordinary course of business" in the case of these LLCs and therefore "require the affirmative vote of a majority in interest of the Members" (more than 50% of the Members) include the following: (1) capital improvements that are not required for health or safety purposes; (2) setting of cash reserves that are a departure from historical practices of the LLCs or that are in excess of what is required for day to day operations; and (3) a material change in the historical practice of significant distributions to the Members of each of the LLCs.

9.      The historical practice of these LLCs was to distribute most of the available cash generated by the properties owned by the LLCs to their Members and to maintain a reasonable amount of cash reserves.  Commencing in or about 2012 and continuing through the present, Pine Management departed from historical practice by dramatically increasing the amount of cash reserves and capital improvements or renovations (by millions of dollars) without consulting and obtaining the approval of a majority in interest of the Members of the LLCs.

10.     The dramatic increase of cash reserves and capital improvements, together with the dramatic decrease in distributions, is contrary to the historical practice for the LLCs and thus,

5

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 7 of 67     RECEIVED NYSCEF: 07/26/2019

"outside the ordinary course of business." Nonetheless, Pine Management has refused to let the Plaintiffs participate in these matters that are "outside the ordinary course of business" and thus have to be approved by the affirmative vote of a majority in interest of the Members. Instead, Pine Management, without any legal basis, has unilaterally decided that these matters are solely within its decision-making authority.

11.     In addition to being significantly contrary to historical practice of the LLCs, the amounts proposed by Pine Management for the amount of each building's reserve accounts are unreasonable and far in excess of what is necessary for day to day operations. Indeed, the average cash position for the years 2012-2016 is about 327% higher than the average cash position for the years 2000-2005 and the cash position at the end of the year 2017 is about 393% higher than it was in 2000.

12.     Distributions from the LLCs to the Plaintiffs, which were approximately $497,000 in 2011, decreased to approximately $94,000 in 2018 – an 81% reduction. The amount of distributions received by a Member is a matter of crucial importance to the Members of the LLCs. Pine Management has no authority to unilaterally change the historical practice of significant distributions to the Members. As a result, the decision to dramatically change the historical practice of significant distributions is a matter "outside the ordinary course of business" in the case of these LLCs and therefore requires the vote of the Plaintiffs.

13.     Another egregious example of Pine Management's breach of the Operating Agreements and breach of the LLCL is its approval of loans to certain of the LLCs. During the period September 2015 to June 2019, Pine Management approved loans in the total amount of $7,960,000 to certain of the LLCs by Members of the LLCs or persons affiliated with Pine Management. These loans were outside the ordinary course of business and needed to be

approved by the affirmative vote of a majority in interest of the Members pursuant to the governing Operating Agreements as well as LLCL § 402(c)(2). Pine Management never consulted with or sought the approval of the Plaintiffs for these loans. These loans were not approved by the affirmative vote of a majority in interest of the Members of the respective limited liability company. On information and belief, the interest rates on these loans were above market.

14.     This action also is necessitated by Pine Management's failure to comply with the provisions of the governing Operating Agreements and the rules prohibiting a Manager from unilaterally paying fees to itself. None of the Operating Agreements of the LLCs expressly authorize the payment of fees or compensation to the Manager. Indeed, the Operating Agreements state only that "[t]he Company's initial Manager [Manager] shall be Pine Management, Inc." and that "Pine Management, Inc. *may be paid for services rendered in its role as property manager pursuant to a separate agreement with the Company.*" (Emphasis added). No separate agreement with Pine Management as a "property manager" was ever approved or executed. Moreover, any such "separate agreement" would require the "affirmative vote of a majority in interest of the Members" and Members of the LLCs that are affiliated with or have an interest in Pine Management, such as Thomas Rohlman, Pine Management's Chief Executive Officer, or Brenda Rohlman, an officer or employee at Pine Management, Harold Pine or his trusts, would not be able to vote on such "separate agreement" because they are "interested" or "affiliated" with Pine Management within the meaning of LLCL § 411.

15.     Furthermore, the Operating Agreements specifically provide that "*the guaranteed payments and other compensation of the Manager, if any,* shall be paid in such manner as shall be fixed from time to time *by a majority in interest of the Members*" or the "Class A Members"

7

in those situations where there are "Class A Members." (Emphasis added). This provision, in and of itself, further shows that the Members did not agree that Pine Management would receive "compensation" for its services as the Manager or "property manager."

16.     Although no "separate agreement" was ever submitted to the Plaintiffs, Pine Management – without the approval of the Plaintiffs – has paid "management fees" and "construction management fees" to itself which exceed $2.4 million for the years 2012 through the first six months of 2019.   Given that Pine Management has no authority under the LLCL or the governing Operating Agreements to fix its own compensation, the payment of such unauthorized fees constitutes a breach of the Operating Agreements and a breach of its fiduciary duties to the Plaintiffs and must be paid back to the LLCs.

17.     Significantly, Plaintiffs, by their counsel Holland & Knight LLP ("Holland & Knight"), have attempted to resolve this dispute without commencing an action.  Commencing in July 2018 and continuing through December 2018, Holland & Knight sent letters detailing the claims in this action to Meister Seelig & Fine LLP ("Meister Seelig"), Pine Management's counsel.

18.     On information and belief, Meister Selig also is counsel to Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust and the Sydell Pine 2009 Family Trust.

19.     Holland & Knight's letters set forth the legal basis for each of the Plaintiffs' direct and derivative claims against Pine Management.  In particular, Holland & Knight's July 17, 2018 letter discussed in great detail, with citation to controlling New York cases, Plaintiffs' claims for breaches of the Operating Agreements, breaches of fiduciary duties, Plaintiffs' inspection rights and their entitlement to an accounting.  A copy of Holland & Knight's July 17, 2018 letter to

8

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM            INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 10 of 67
                                                            RECEIVED NYSCEF: 07/26/2019

Meister Seelig is annexed hereto as Exhibit 1; a copy of Meister Seelig's August 3, 2018 letter to

Holland & Knight is annexed hereto as Exhibit 2; a copy of Holland & Knight's August 22, 2018

letter to Meister Seelig is annexed hereto as Exhibit 3; a copy of Meister Seelig's August 31,

2018 letter to Holland & Knight is annexed hereto as Exhibit 4; a copy of Holland & Knight's

September 21, 2018 letter to Meister Seelig is annexed hereto as Exhibit 5; a copy of Meister

Seelig's September 28, 2018 letter to Holland & Knight is annexed hereto as Exhibit 6; a copy of

Holland & Knight's November 20, 2018 letter to Meister Seelig is annexed hereto as Exhibit 7;

and a copy of Meister Seelig's December 7, 2018 letter to Holland & Knight is annexed hereto as

Exhibit 8.

20.    Meister Seelig's August 3, 2018 letter did not address any of the issues or the

claims set forth in Holland & Knight's July 17, 2018 letter other than to say that "those claims

are rejected in their entirety." *See* Exhibit 2.

21.    Although Pine Management's counsel produced some documents in response to

Holland & Knight's letters, Pine Management -- without any legal basis – rejected Plaintiffs'

claims, including their claim for an accounting, refused to change its unilateral practices, refused

to permit Plaintiffs to exercise their fundamental right to participate in the management of the

LLCs to the extent such matters were "outside the ordinary course of business" and continues to

pay itself "management fees" and "construction management fees" that have not been approved

by the Plaintiffs or set forth in a separate written agreement approved by the Members of the

LLCs.

22.    Notwithstanding Plaintiffs' foregoing rights, Pine Management has breached and

continues to breach the governing Operating Agreements of the LLCs and their fiduciary duties

as Manager of eight of the LLCs and de facto Manager of two of the LLCs by: (1) preventing the

9

**A-60**

Plaintiffs from voting on matters "outside the ordinary course of business" and matters fundamental to the operation of the LLCs, including, but not limited to, setting of distributions to the Members of the LLCs, deciding on capital improvements, setting of cash reserves for the properties owned by the LLCs, and approving loans to certain of the LLCs; (2) engaging in self-dealing transactions, such as the payment of "management fees" and "construction management fees" to itself, without the approval of the Plaintiffs; and (3) preventing the Plaintiffs from inspecting the books and records of the LLCs.   In short, Pine Management has deprived the Plaintiffs of their bargained-for rights to control or vote on fundamental aspects of the LLCs. These actions have irreparably harmed the Plaintiffs.

## THE PARTIES

23.     Jerome Schneider is the Trustee of the Jerome Schneider Revocable Trust, dated January 18, 2013 (the "Jerome Schneider Revocable Trust").

24.     Ruth Schneider is the Trustee of the Ruth Schneider Revocable Trust, dated January 18, 2013 (the "Ruth Schneider Revocable Trust").

25.     Ruth Schneider is the Trustee of the Jerome Schneider 2012 Family Trust, dated December 10, 2012 (the "Jerome Schneider Family Trust").

26.     Jerome Schneider is the Trustee of the Ruth Schneider 2012 Family Trust, dated December 10, 2012 (the "Ruth Schneider Family Trust").

27.     The Jerome Schneider Revocable Trust has a 25% interest in Marni Realty LLC.

28.     The Jerome Schneider Revocable Trust has a 25% interest in Rudel Realty LLC.

29.     The Ruth Schneider Revocable Trust has a 25% interest in Marni Realty LLC.

30.     The Ruth Schneider Revocable Trust has a 25% interest in Rudel Realty LLC.

31.     The Jerome Schneider Family Trust has a 15% interest in Zizi Realty LLC, consisting of a .15% Class A interest and a 14.85% Class B interest.

10

**A-61**

32.    The Jerome Schneider Family Trust has a 25% interest in Jeruth Realty LLC, consisting of a .25% Class A interest and a 24.75% Class B interest.

33.    The Jerome Schneider Family Trust has a 16.665% interest in Marc Realty LLC.

34.    The Jerome Schneider Family Trust has a 12% interest in RIS Realty LLC.

35.    The Jerome Schneider Family Trust has a 12.5% interest in Bren-El Realty LLC, consisting of a .125% Class A interest and a 12.375% Class B interest.

36.    The Jerome Schneider Family Trust has a 16.665% interest in JHJ Realty LLC, consisting of a .165% Class A interest and a 16.5% Class B interest.

37.    The Jerome Schneider Family Trust has a 12.5% interest in Sir Realty LLC, consisting of a .125% Class A interest and a 12.375% Class B interest.

38.    The Ruth Schneider Family Trust has a 15% interest in Zizi Realty LLC, consisting of a .15% Class A interest and a 14.85% Class B interest.

39.    The Ruth Schneider Family Trust has a 25% interest in Jeruth Realty LLC, consisting of a .25% Class A interest and a 24.75% Class B interest.

40.    The Ruth Schneider Family Trust has a 16.665% interest in Marc Realty LLC.

41.    The Ruth Schneider Family Trust has a 12% interest in RIS Realty LLC.

42.    The Ruth Schneider Family Trust has a 12.5% interest in Bren-El Realty LLC, consisting of a .125% Class A interest and a 12.375% Class B interest.

43.    The Ruth Schneider Family Trust has a 16.665% interest in JHJ Realty LLC, consisting of a .165% Class A interest and a 16.5% Class B interest.

44.    The Ruth Schneider Family Trust has a 12.5% interest in Sir Realty LLC, consisting of a .125% Class A interest and a 12.375% Class B interest.

45.    Plaintiff Marc Schneider is an individual residing in Bedford Corners, New York.

11

**A-62**

46. Marc Schneider has a 12.5% interest in Bar-Mar Realty LLC.

47. Marc Schneider has a 8.33% interest in Marc Realty LLC.

48. Marc Schneider has a 13% interest in RIS Realty LLC.

49. Plaintiff Marni Schwartz is an individual residing in Armonk, New York.

50. Marni Schwartz has a 12.5% interest in Bar-Mar Realty LLC.

51. Marni Schwartz has a 8.34% interest in Marc Realty LLC.

52. Marni Schwartz has a 13% interest in RIS Realty LLC.

53. Plaintiffs collectively have a 50% interest in Marni Realty LLC, Rudel Realty LLC, Jeruth Realty LLC, Marc Realty LLC and RIS Realty LLC.

54. Plaintiffs collectively have a 25% interest in Bar-Mar Realty LLC, Bren-El Realty LLC and Sir Realty LLC.

55. Plaintiffs collectively have a 30% interest in Zizi Realty LLC.

56. Plaintiffs collectively have a 33.33% interest in JHJ Realty LLC.

57. On information and belief, Defendant Pine Management is a New York corporation with its principal place of business at 78 Manhattan Avenue, New York, New York 10025.

58. On information and belief, Defendants Lloyd J. Pine and Brenda Rohlman are Trustees of the Harold Pine 2009 Family Trust, which has interests in certain of the LLCs that are the subject of this action.

59. On information and belief, the address of the Harold Pine 2009 Family Trust is c/o Lloyd Pine, Haves, Pine & Seligman, 140 East 45th Street, 16th Floor, New York, New York 10017.

12

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019

NYSCEF DOC. NO. 2    Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 14 of 67    RECEIVED NYSCEF: 07/26/2019

60.    Pursuant to the applicable Operating Agreements, Pine Management is the initial Manager of Bar-Mar Realty LLC, JHJ Realty LLC, RIS Realty LLC and Marc Realty LLC and the Manager of Jeruth Realty LLC, Zizi Realty LLC, Bren-El Realty LLC and Sir Realty LLC.

61.    Pine Management is the de facto Manager of Rudel Realty LLC and Marni Realty LLC.

62.    On information and belief, Harold Pine, Lloyd Pine, Thomas Rohlman and Brenda Rohlman are officers, directors, employees or otherwise have a direct or indirect interest in Pine Management.

63.    On information and belief, Thomas Rohlman is and has been the Chief Executive Officer of Pine Management since at least 2011.

64.    On information and belief, Jason Rohlman and Daniel Rohlman are and have been Vice Presidents of Pine Management since at least 2016.

65.    On information and belief, Harold Pine, the Harold Pine 2009 Family Trust or the Sydell Pine 2009 Family Trust has an interest in certain of the LLCs which are the subject of this action.

66.    Specifically, on information and belief, the Harold Pine 2009 Family Trust has a 50% interest in Marni Realty LLC and Rudel Realty LLC.  In addition, on information and belief, Harold Pine or the Harold Pine 2009 Family Trust has: a 30% interest in Zizi Realty LLC, consisting of a .30% Class A interest and a 29.70% Class B interest;  a 10% interest in Jeruth Realty LLC, consisting of a .10% Class A interest and a 9.90% Class B interest; a 33.34% interest in Bar-Mar Realty LLC; a 33.34% interest in Marc Realty LLC; a 12% interest in RIS Realty LLC; a 50% interest in Bren-El Realty LLC, consisting of a .5% Class A interest and a

13

49.50% Class B interest; and a 33.34% interest in JILJ Realty LLC, consisting of a .34% Class A interest and a 33% Class B interest.

67.     On information and belief, Thomas Rohlman, the Chief Executive Officer of Pine Management, has a 5% interest in Zizi Realty LLC, consisting of a .05% Class A interest and a 4.95% Class B interest, and a 10% interest in Jeruth Realty LLC, consisting of a .10% Class A interest and a 9.90% Class B interest.

68.     On information and belief, Brenda Rohlman, an officer or employee of Pine Management, has a 5% interest in Zizi Realty LLC, consisting of a .05% Class A interest and a 4.95% Class B interest, a 10% interest in Jeruth Realty LLC, consisting of a .10% Class A interest and a 9.90% Class B interest, a 20.83% interest in Bar-Mar Realty LLC, an 8.33% interest in Marc Realty LLC and a 13% interest in RIS Realty LLC.

69.     On information and belief, the Sydell Pine 2009 Family Trust has a 25% interest in Bren-El Realty LLC, consisting of a .25% Class A interest and a 24.75% Class B interest, and a 75% interest in SIR Realty LLC, consisting of a .75% Class A interest and a 74.25% Class B interest.

70.     On information and belief, Lloyd Pine has a 30% interest in Zizi Realty LLC, consisting of a .30% Class A interest and a 29.70% Class B interest, a 20% interest in Jeruth Realty LLC, consisting of a .20% Class A interest and a 19.80% Class B interest, an 8.33% interest in Marc Realty LLC, a 13% interest in RIS Realty LLC, and a 20.83% interest in Bar-Mar Realty LLC.

71.     Nominal Defendant Rudel Realty LLC ("Rudel Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78

14

Manhattan Ave., New York, New York 10025. A copy of the Operating Agreement, dated October 17, 1996, of Rudel Realty is annexed hereto as Exhibit 9.

72.     Nominal Defendant Marni Realty LLC ("Marni Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78 Manhattan Ave., New York, New York 10025. A copy of the Operating Agreement, dated October 17, 1996, of Marni Realty is annexed hereto as Exhibit 10.

73.     Nominal Defendant Jeruth Realty LLC ("Jeruth Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78 Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of Operating Agreement, made as of August 1, 2012, of Jeruth Realty is annexed hereto as Exhibit 11.

74.     Nominal Defendant JHJ Realty LLC ("JHJ Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78 Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of Operating Agreement, made as of October 1, 2011, of JHJ Realty is annexed hereto as Exhibit 12.

75.     Nominal Defendant Bar-Mar Realty LLC ("Bar-Mar Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78 Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of Operating Agreement, made as of July 27, 2011, of Bar-Mar Realty is annexed hereto as Exhibit 13.

76.     Nominal Defendant Bren-El Realty LLC ("Bren-El Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 17 of 67   RECEIVED NYSCEF: 07/26/2019

Manhattan Ave., New York, New York 10025. A copy of the Second Amended and Restated

Operating Agreement, made as of August 1, 2012, of Bren-El Realty is annexed hereto as

Exhibit 14.

77.     Nominal Defendant Sir Realty LLC ("Sir Realty") is a New York limited liability

company with its principal place of business at c/o Pine Management, Inc., 78 Manhattan Ave.,

New York, New York 10025. A copy of the Second Amended and Restated Operating

Agreement, made as of August 1, 2012, of Sir Realty is annexed hereto as Exhibit 15.

78.     Nominal Defendant Marc Realty LLC ("Marc Realty") is a New York limited

liability company with its principal place of business at c/o Pine Management, Inc., 78

Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of

Operating Agreement, made as of July 27, 2011, of Marc Realty is annexed hereto as Exhibit 16.

79.     Nominal Defendant RIS Realty LLC ("RIS Realty") is a New York limited

liability company with its principal place of business at c/o Pine Management, Inc., 78

Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of

Operating Agreement, made as of July 27, 2011, of RIS Realty is annexed hereto as Exhibit 17.

80.     Nominal Defendant Zizi Realty LLC ("Zizi Realty") is a New York limited

liability company with its principal place of business at c/o Pine Management, Inc., 78

Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of

Operating Agreement, made as of November 1, 2012, of Zizi Realty is annexed hereto as Exhibit

18.

## JURISDICTION AND VENUE

81.     This Court has personal jurisdiction over the defendants pursuant to CPLR §§ 301

and 302 because the defendants are New York corporations, New York limited liability

companies or trusts where at least one of the trustees is a resident of New York.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2          Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 18 of 67   RECEIVED NYSCEF: 07/26/2019

82.      Venue in this Court is proper pursuant to CPLR § 501 because the governing
Operating Agreements of the eight LLCs other than Marni Realty and Rudel Realty provide that
"Any proceedings brought by any Member relating to this Agreement shall be held exclusively
in Federal or State courts sitting in New York." (*See* Exhibits 11-18, § 20.6). Venue in this
Court is proper pursuant to CPLR § 501 because the governing Operating Agreements for Marni
Realty and Rudel Realty provide that "Any suit involving any dispute or matter arising under this
Agreement may only be brought in a United States District Court located in the State of New
York or any New York State court having jurisdiction over the subject matter of the dispute. . ."
(*See* Exhibits 9-10, § 15.8). In addition, venue in New York County is appropriate under CPLR
§ 503 because (a) the defendants are New York corporations or New York limited liability
companies whose principal office is located in New York County and (b) one of the trustees of
the trust named as a defendant is a resident of New York.

## FACTS

83.      Each of the ten LLCs has an executed Operating Agreement that identifies the
Members and the initial Manager or Manager where one was appointed.

84.      The terms of the Operating Agreements determine the rules applicable to the
rights and operations of the LLCs.

85.      The Operating Agreements also govern the relationships among Members and the
powers, obligations and authority of the Members and Manager.

86.      The primary asset of each of Marc Realty, Jeruth Realty, Marni Realty, Rudel
Realty, Sir Realty, Bren-El Realty, RIS Realty and Bar-Mar Realty is a single residential
building in Manhattan, with apartments (units) ranging from seven (7) units to fifteen (15).

87.      The primary asset of each of JHJ Realty and Zizi Realty are two apartment
buildings, with apartments (units) ranging from thirty (30) units to sixty-six (66) units.

17

Case 1:22-cv-02407 Document 1-2 Filed 03/24/22 Page 19 of 67

88.    Zizi Realty has 66 units, JHJ Realty has 30 units, Marc Realty has 15 units, each of Jeruth Realty, Marni Realty, Rudel Realty, Sir Realty and RIS Realty has 10 units, Bren-El Realty has 7 units and Bar-Mar Realty has 14 units.

I.    **Relevant Provisions Of The 2011 and 2012 Operating Agreements**

89.    Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and Marc Realty are governed by Operating Agreements that were amended in 2011 or 2012. (*See* Exhibits 11-18).

90.    The attorneys for Pine Management drafted the Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and Marc Realty.

91.    The Plaintiffs were not represented by counsel in connection with the execution of the Operating Agreements for these eight (8) LLCs.

92.    The terms of the Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and Marc Realty are virtually identical. (*See* Exhibits 11-18).

93.    Certain of the Operating Agreements have Class A and Class B membership interest (*see* Exhibits 11, 12, 14, 15 and 18) while others have one form of class interest (*see* Exhibits 9-10, 13, 16 and 17).

A.    **Appointment of Pine Management As Initial Manager And Provisions Showing That the Members Did Not Agree That Pine Management Would Be Paid For Its Services As Manager Or "Property Manager"**

94.    Section 8.1(c) of the Operating Agreements for Bar-Mar Realty, RIS Realty, JHJ Realty and Marc Realty states:

> The Company's *initial Manager* shall be Pine Management Inc.
> Pine Management, Inc. *may be paid for services rendered in its*

**18**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 20 of 67    RECEIVED NYSCEF: 07/26/2019

> *role as property manager pursuant to a separate agreement with*
> *the Company.* (Emphasis added).

95.    Section 8.1(c) of the Operating Agreements for Zizi Realty, Jeruth Realty, Bren-

El Realty and Sir Realty states:

> The Company's *Manager* shall be Pine Management Inc. Pine
> Management, Inc. *may be paid for services rendered in its role as*
> *property manager pursuant to a separate agreement with the*
> *Company.* (Emphasis added).

96.    No separate agreement with Pine Management as a "property manager" was ever

approved by the Members of each of these eight LLCs.

97.    Furthermore, Section 8.10 of the 2011 and 2012 Operating Agreements of these

eight LLCs provide that "*the guaranteed payments and other compensation of the Manager, if*

*any,* shall be paid in such manner as shall be fixed from time to time *by a majority in interest of*

*the Members*" or the "Class A Members"   in those situations where there are "Class A

Members." (Emphasis added).

98.    The Members of these eight LLCs did not agree that Pine Management would

receive "compensation" or fees for its services as the Manager or "property manager."

**B.    Plaintiff's Fundamental Rights Concerning The Management Of These Eight LLCs**

99.    Section 8.3 of the Operating Agreements for each of these eight LLCs, which

enumerates the powers of the Manager, provides as follows:

> The Manager shall be responsible for supervision and general
> management of the business and day-to-day operations of the
> Company in the ordinary course of business; *provided, however,*
> *that decisions which are outside the ordinary course of business,*
> *including but not limited to decisions to finance or refinance any*
> *real estate owned by the Company, acquire new or additional real*
> *estate, or sell any real estate owned by the Company shall be made*
> *by the affirmative vote of a majority in interest of the Members.*
> (Emphasis added).

**C.    Pine Management's Fiduciary Duties As Manager Of These Eight LLCs**

19

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2       Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 21 of 67

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

100.   Section 17.2 of the Operating Agreements of each of these eight LLCs entitled "Indemnification" states that "Notwithstanding anything otherwise contained to the contrary, *no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members*." (Emphasis added).

101.   None of the Operating Agreements of these eight LLCs provides for indemnification for Pine Management in the event of an action brought by the Members of the LLCs against Pine Management.

**D.   Member's Right To Inspect Books and Records of These Eight LLCs**

102.   Section 14.1 of the Operating Agreements of these eight LLCs provides:

> The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. *Each Member*, Manager or their duly authorized representative *shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.* (Emphasis added).

103.   The Member's inspection rights to examine the "Company's books and records" under Section 14.1 of the Operating Agreements of these eight LLCs are broader than the inspection rights under LLCL § 1102(a) and includes all types of documents with respect to the LLCs.

**E.   Additional Provisions In The Operating Agreements Of These Eight LLCs**

104.   Section 19 of each of the Operating Agreements for these eight LLCs provides that it "may be amended only by the affirmative vote of a majority in interest of the Members" or "the Class A Members."

105.   Section 20 of each of the Operating Agreements for these eight LLCs states that "it shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York" and that "any proceedings

20

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 2 Case 1:22-cv-02407 Document 1-2 Filed 03/24/22 Page 22 of 67 RECEIVED NYSCEF: 07/26/2019

brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York."

II.     **Relevant Provisions Of The 1996 Operating Agreements**

106.    Rudel Realty and Marni Realty are governed by the 1996 Operating Agreements. (*See* Exhibits 9-10).

107.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust collectively have a 50% interest in Rudel Realty and Marni Realty.

108.    The Harold Pine 2009 Family Trust has the remaining 50% interest in Rudel Realty and Marni Realty.

109.    Section 5.1, entitled "Management by Members," of the 1996 Operating Agreements states:

> *The business and affairs of the Company shall be managed by the Members.* The Members shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Members under the LLCL. (Emphasis added).

110.    Although the 1996 Operating Agreements did not appoint Pine Management as the "Manager," Pine Management has acted as the de facto Manager of Marni Realty and Rudel Realty since at least 1997.

111.    By acting as the de facto Manager of Marni Realty and Rudel Realty, Pine Management owes a fiduciary duty to the Members of these two LLCs to, among other things, operate such LLCs in good faith and fairness, to avoid self-dealing and to make full disclosure of all material facts.

112.    The 1996 Operating Agreements contain no provision for payment of any fees or compensation to a "Manager" or a "property manager."

21

113.    Section 9, entitled "Distributions," of the 1996 Operating Agreements states:

> Distributions shall be made to the Members at the times and in the
> aggregate amounts determined by the Members. Such distributions
> shall be allocated among the members in the same proportion as
> the allocation of profits and losses.

114.    Section 15.4, entitled "Complete Agreement," of the 1996 Operating Agreements
states that "[T]his Agreement constitutes the complete and exclusive statement of the agreement
along with the members with respect to the subject matter thereof" and that "this Agreement may
not be amended without the written consent of the Members including two-thirds (2/3rds) or
more of the percentages then held by Members."

115.    The 1996 Operating Agreements of Rudel Realty and Marni Realty LLC contain
no provision (a) that deals with a "deadlock" between the Members or (b) to resolve disputes
between the Members or between the Member and the Manager.

116.    The 1996 Operating Agreements of Rudel Realty and Marni Realty do not
provide for indemnification for Pine Management in the event of an action brought by the
Members of such LLCs against Pine Management.

### III.    Pine Management's Failed Attempt To Make Pine Management The Manager Of Certain Of The LLCs In Perpetuity

117.    On or about January 17, 2018, Pine Management attempted to amend the
Operating Agreements of Marni Realty and Rudel Realty LLC's to include a provision that "any
Manager may be removed at any time, with or without cause, *by the unanimous vote of the
members if the Manager hereunder is Pine Management, Inc., Harold Pine, any descendant of
Harold and Sydell Pine, or any spouse of any such descendant.*" (Emphasis added).

118.    The clear purpose of such an amendment was to prevent the Plaintiffs from
removing Pine Management, Harold Pine or any descendant of Harold and Sydell Pine or any

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

spouse thereof, including Harold Pine, Thomas Rohlman, Brenda Rohlman, Daniel Rohlman, Jason Rohlman, Ilyse Rohlman and Lloyd Pine, from management of these LLCs.

119. The purpose of such provision was to make Pine Management the Manager of these LLCs in perpetuity.

120. The inclusion of such a provision would not only further entrench Pine Management in the management of these LLC's but would have prevented the Plaintiffs from ever removing Pine Management as the Manager of these LLCs.

121. The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, which collectively have a 50% interest in Rudel Realty and Marni Realty, did not consent to the proposed amendment to these Operating Agreements.

### FIRST CAUSE OF ACTION AGAINST PINE MANAGEMENT FOR BREACHES OF THE OPERATING AGREEMENTS OF ZIZI REALTY LLC, JERUTH REALTY LLC, BAR-MAR REALTY LLC, MARC REALTY LLC, RIS REALTY LLC, BREN-EL REALTY LLC, JHJ REALTY LLC AND SIR REALTY LLC

122. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-105 inclusive, as if set forth herein.

123. The Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty and Sir Realty are valid, binding and enforceable agreements.

124. Plaintiffs have performed all of their obligations under the Operating Agreements of these eight LLCs.

### A. Pine Management's Breaches Of Section 8.3 of the Operating Agreements

125. Section 8.3 of the Operating Agreements of these eight LLCs provides:

> [t]he Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; provided, *however, that decisions which are outside the ordinary course of business,*

23

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2     Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 25 of 67
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

*including but not limited to decisions to finance or refinance any
real estate owned by the Company, acquire new or additional real
estate, or sell any real estate owned by the Company shall be made
by the affirmative vote of a majority in interest of the Members.*
(Emphasis added).

126.    Pine Management has breached Section 8.3 in four separate respects: (a) approval
of capital improvements for the individual property owned by the respective limited liability
company; (b) setting of reserves for the individual property owned by the respective limited
liability company; (c) deciding on the amount of distributions from the respective limited
liability company to the members; and (d) approval of loans to the respective limited liability
company.

127.    Each of these four items in paragraph 126 are "outside the ordinary course of
business" and therefore require an "affirmative vote of a majority in interest of the Members."

128.    Pine Management has taken a very restrictive view of the term "outside the
ordinary course of business."

129.    By an e-mail dated February 19, 2018 to Marc Schneider, one of the Plaintiffs,
Meister Seelig, Pine Management's counsel, stated that "The *only limitation provided in these
agreements* is that decisions to finance or refinance any real estate owned by an LLC, acquire
new or additional real estate, or sell any real estate owned by a LLC requires the affirmative vote
of a majority in interest of the voting members or the affected LLC." (Emphasis added). A copy
of Meister Seelig's February 19, 2018 e-mail is annexed hereto as Exhibit 19.

130.    Pine Management's restrictive view of the phrase "outside the ordinary course of
business" has no factual or legal basis since the phrase "including, but not limited to" has an
expansive meaning and *is not limited to the items that follow such phrase.*

24

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 26 of 67    RECEIVED NYSCEF: 07/26/2019

131.    Since 2011, Pine Management has used this restrictive view of the term "outside the ordinary course of business" to deprive Plaintiffs of their bargained-for rights with respect to fundamental matters affecting these eight LLCs.

132.    Commencing in or about 2012 and continuing through the present, Pine Management departed from historical practice by dramatically increasing the amount of cash reserves and capital improvements or renovations for the properties owned by the LLCs and dramatically reducing distributions to the Members without consulting and obtaining the approval of a majority in interest of the Members of the LLCs.

133.    Pine Management refused to let the Plaintiffs participate in these matters that are "outside the ordinary course of business" and thus had to be approved by the affirmative vote of a majority in interest of the Members.

134.    Instead, Pine Management, without any legal basis, unilaterally decided that these matters are solely within its decision-making authority.

135.    Holland & Knight's July 17, 2018 letter advised Pine Management that the four items in paragraph 126 are "outside the ordinary course of business" and therefore require an "affirmative vote of a majority in interest of the Members." *See* Exhibit 1, pp. 5, 8-10.

136.    This July 17, 2018 letter also stated that Pine Management had no authority to pay itself fees or compensation from these eight LLCs. *See* Exhibit 1, pp. 5-8.

137.    On information and belief, the total rental income of the properties owned by these eight LLCs was $2,979,716 in 2012.

138.    On information and belief, the total rental income of the properties owned by these eight LLCs was $3,504,724 in 2018.

25

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM        INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407  Document 1-2  Filed 03/24/22  Page 27 of 67 RECEIVED NYSCEF: 07/26/2019

139.    On information and belief, the total rental income of the properties owned by these eight LLCs increased by 17.6% from 2012 to 2018.

(a)    **Capital Improvements**

140.    Capital improvements, except for amounts required for routine maintenance or for the safety of the property of each LLC, are matters "outside the ordinary course of business."

141.    Accordingly, the approval of such capital improvements requires the affirmative vote of a majority in interest of the Members of these eight LLCs.

142.    The amount of capital improvements has a direct effect on the amount of distributions to the Members of the LLCs.

143.    The amount of capital improvements of the eight LLCs dramatically increased by millions of dollars from 2012 to 2018.

144.    On information and belief, the amount of capital improvements for these eight LLCs was $565,676 in 2012.

145.    On information and belief, the amount of capital improvements for these eight LLCs was $371,619 in 2013.

146.    On information and belief, the amount of capital improvements for these eight LLCs was $744,126 in 2014

147.    On information and belief, the amount of capital improvements for these eight LLCs was $1,565,303 in 2015.

148.    On information and belief, the amount of capital improvements for these eight LLCs was approximately $2,350,598 million in 2016.

149.    On information and belief, the amount of capital improvements for these eight LLCs was approximately $3,156,494 million in 2017.

26

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 28 of 67   RECEIVED NYSCEF: 07/26/2019

150.    On information and belief, the amount of capital improvements for these eight LLCs was $4,171,839 in 2018:

151.    On information and belief, the amount of capital improvements for these eight LLCs was $619,360 for the first six months of 2019.

152.    The "capital improvements" figures referenced in paragraphs 144 through 151 appear in the line item "Repairs and Replacements" in Pine Management's Summary of Receipts and Disbursements for these eight LLCs.

153.    On information and belief, the amount of monies spent annually on capital improvements for these eight LLCs increased by approximately 637% from 2012 to 2018.

154.    On information and belief, in addition to the direct capital improvements that appear in the line item "Repairs and Replacements" in Pine Management's Summary of Receipts and Disbursements for these eight LLCs, there was a dramatic increase in "soft costs" for these LLCs, which further reduced the amount of income to these LLCs and the distributions to the Members of these LLCs.

155.    "Professional Fees" is a "soft cost" that is included in Pine Management's Summary of Receipts and Disbursements for these eight LLCs.

156.    The amount of "Professional Fees" dramatically increased for these eight LLCs during the period 2012 through June 2019 as listed below:

        2012    7,455
        2013    9,573
        2014    6,695
        2015    62,353
        2016    187,920
        2017    240,554
        2018    209,988
        2019    29,943 (first six months)

27

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 2 Case 1:22-cv-02407 Document 1-2 Filed 03/24/22 Page 29 of 67 RECEIVED NYSCEF: 07/26/2019

157. On information and belief, the annual amount of "Professional Fees" for these eight LLCs increased by 2,717% from 2012 through 2018.

158. Pine Management has no authority to unilaterally increase capital improvements without the affirmative vote of a majority in interest of the Members, including the Plaintiffs, of these eight LLCs.

159. Pine Management neither sought nor obtained the approval of the Plaintiffs in connection with the capital improvements, including any associated "soft costs," of these eight LLCs for the period 2012 to 2019.

**(b)** **Cash Reserves For The Properties Owned By The LLCs**

160. The historical practice of these eight LLCs was to distribute most of the available cash generated by the properties owned by the LLCs to their Members.

161. The setting of the amount of cash reserves is "outside the ordinary course of business" and thus requires the approval of an affirmative vote of a majority in interest of the Members of these eight LLCs.

162. The setting of cash reserves has a direct effect on the amount of distributions to the Members of these eight LLCs.

163. When the Plaintiffs asked Pine Management about the basis for the dramatic increase in cash reserves, Brenda Rohlman of Pine Management stated in her March 3, 2018 e-mail that "over 35 years, Pine Management Inc. has developed guidelines as to how much money to hold in each building's reserve accounts." A copy of this March 3, 2018 e-mail is annexed hereto as Exhibit 20.

164. Pine Management never produced these "guidelines" that were purportedly developed over a 35-year period.

28

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2     Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 30 of 67

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

165.   Meister Seelig's December 7, 2018 letter to Holland & Knight stated that "Pine Management's current general 'guidelines' for setting reserves for the property owned by each LLC are as follows: $200,000 baseline per building plus an additional $7,500 per unit." (*See* Exhibit 8, p. 1).

166.   Pine Management's "current general 'guidelines'" for setting cash reserves is dramatically different from the historical practice of setting cash reserves for the properties owned by these eight LLCs.

167.   The historical practice of these eight LLCs was to maintain a reasonable amount of cash reserves.

168.   The average cash position for the years 2012-2016 is about 379% higher than the average cash position for the years 2000-2005.

169.   The 379% increase represents the percentage increase of average end of year cash balances for Zizi Realty, Jeruth Realty, Marc Realty, RIS Realty and JHJ Realty. It does not include Bren-El Realty, Sir Realty or Bar Mar Realty since the Plaintiffs did not have an interest in those LLCs until 2010.

170.   Pine Management has refused to let the Plaintiffs participate in these matters that are "outside the ordinary course of business" and thus have to be approved by the affirmative vote of a majority in interest of the Members of these eight LLCs.

171.   Instead, Pine Management, without any legal basis, has unilaterally decided that these matters are solely within its decision-making authority.

172.   In addition to being significantly contrary to historical practice of these eight LLCs, the amounts proposed by Pine Management for the amount of each building's reserve accounts are unreasonable and far in excess of what is necessary for day to day operations.

29

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. 2    Case 1:22-cv-02407 · Document 1-2 · Filed 03/24/22 · Page 31 of 67    RECEIVED NYSCEF: 07/26/2019

173.    The cash position at the end of the year 2017 is about 430% higher than it was in 2000.

**(c)    Distributions To The Plaintiffs From These Eight LLCs**

174.    Distributions from these eight LLCs to the Plaintiffs were approximately $427,824 in 2011.

175.    Distributions from these eight LLCs to the Plaintiffs were approximately $217,500 in 2012.

176.    Distributions from these eight LLCs to the Plaintiffs were approximately $314,100 in 2013.

177.    Distributions from these eight LLCs to the Plaintiffs were approximately $235,600 in 2014.

178.    Distributions from these eight LLCs to the Plaintiffs were approximately $144,100 in 2015.

179.    Distributions from these eight LLCs to the Plaintiffs were approximately $115,200 in 2016.

180.    Distributions from these eight LLCs to the Plaintiffs were approximately $80,200 in 2017.

181.    Distributions from these eight LLCs to the Plaintiffs were approximately $70,200 in 2018.

182.    Distributions from these eight LLCs to the Plaintiffs were approximately $27,600 for the first six months of 2019.

183.    Distributions from these eight LLCs to the Plaintiffs decreased by approximately 84% from 2011 to 2018.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 32 of 67   RECEIVED NYSCEF: 07/26/2019

184.   The amount of distributions received by a Member is a matter of crucial importance to the Members of the LLCs.

185.   Pine Management has no authority to unilaterally change the historical practice of significant distributions to the Members.

186.   As a result, the decision to dramatically change the historical practice of significant distributions is a matter "outside the ordinary course of business" in the case of these eight LLCs and therefore requires the affirmative vote of a majority in interest of the Members of these eight LLCs, including the Plaintiffs.

### (d)   Loans To The LLCs

187.   On information and belief, during the period September 2015 to June 2019, Pine Management approved $7,960,000 of loans to certain of the LLCs by Members of such LLCs or persons or entities affiliated with or have an interest in Pine Management.

188.   On information and belief, the current outstanding balance of the loans is $7,810,000 because a loan of $150,000 to JHJ Realty has been repaid.

189.   No documentation concerning these loans was provided by Pine Management to the Plaintiffs when these loans were approved by and entered into by Pine Management.

190.   Documentation concerning these loans was provided to the Plaintiffs for the first time by Meister Seelig's December 7, 2018 letter to Holland & Knight in response to Holland & Knight's request for documents relating to loans to the LLCs.

191.   On information and belief, the breakdown of these loans in the total amount of $7,960,000 is as follows:

> $4,400,000 to Zizi Realty
> $2,850,000 to JHJ Realty
> $ 260,000 to Sir Realty
> $ 175,000 to Marc Realty
> $ 275,000 to Bar-Mar Realty

31

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 33 of 67    RECEIVED NYSCEF: 07/26/2019

192.    On information and belief, each of these loans has an interest rate of 6% per year, provides for a balloon payment and has a maturity ranging from two (2) years to ten (10) years.

193.    These loans were outside the "ordinary course of business" and needed to be approved by the affirmative vote of a majority in interest of the Members of Zizi Realty, JIIJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty pursuant to the governing Operating Agreements as well as LLCL § 402(c)(2).

194.    Pine Management never consulted with or sought the approval of the Plaintiffs for the entering into of these loans.

195.    These loans were not approved by the affirmative vote of a majority in interest of the Members of the respective limited liability company.

196.    On information and belief, the interest rates on these loans were above market.

197.    Plaintiffs have sustained and continue to sustain damages by reason of Pine Management's breaches of Section 8.3 of the Operating Agreements of these eight LLCs.

**B.    Pine Management's Unauthorized Payment Of "Management Fees" And "Construction Management Fees" To Itself**

198.    In addition, Pine Management has paid itself and continues to pay itself "management fees" and "construction management fees" from these eight LLCs.

199.    Plaintiffs have not approved the payment of "management fees" to Pine Management from these eight LLCs.

200.    Plaintiffs have not approved the payment of "construction management fees" to Pine Management from these eight LLCs.

201.    Plaintiffs have sustained and continue to sustain damages by reason of Pine Management's payment of unauthorized "management fees" and "construction management fees" from these eight LLCs to Pine Management.

202.     By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial for Pine Management's breaches of the Operating Agreements of these eight LLCs, including, but not limited to the breaches of Section 8.3.

### SECOND CAUSE OF ACTION AGAINST PINE MANAGEMENT AND THE TRUSTEES OF THE HAROLD PINE 2009 FAMILY TRUST FOR BREACH OF THE OPERATING AGREEMENTS OF MARNI REALTY LLC AND RUDEL REALTY LLC

203.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-88, inclusive, and paragraphs 106-121, inclusive, as if set forth herein.

204.     The 1996 Operating Agreements of Rudel Realty and Marni Realty are valid, binding and enforceable agreements.

205.     Plaintiffs Jerome Schneider Revocable Trust and Ruth Schneider Revocable Trust have performed all of their obligations required by the Operating Agreements of Rudel Realty and Marni Realty.

206.     Section 5.1 of the Rudel Realty and Marni Realty Operating Agreements, entitled "Management by Members" states:

> *The business and affairs of the Company shall be managed by the Members.* The Members shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Members under the LLCL. (Emphasis added).

207.     Section 5.1, in clear and unambiguous language, provides that the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, which have an aggregate 50% interest in Rudel Realty and Marni Realty, have the right to "co-manage" the "business and affairs" of Rudel Realty and Marni Realty.

208.     Despite the fact that the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have the right to "co-manage" these entities under Section 5.1 of the

33

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019

NYSCEF DOC. NO. 2      Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 35 of 67   RECEIVED NYSCEF: 07/26/2019

1996 Operating Agreement, Pine Management has made decisions concerning Rudel Realty and Marni Realty without consulting and obtaining the approval of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust.

209.    Specifically, Pine Management has determined the amount of capital improvements, set cash reserves for the properties owned by such entities and decided on the amount of distributions to the Members of these two LLCs.

210.    On information and belief, the total rental income of the properties owned by these two LLCs was $482,038 in 2012.

211.    On information and belief, the total rental income of the properties owned by these two LLCs was $549,055 in 2018.

212.    On information and belief, the total rental income of the properties owned by these two LLCs increased by 13.9% from 2012 to 2018.

(a)    **Capital Improvements**

213.    The amount of capital improvements has a direct effect on the amount of distributions to the Members of these two LLCs.

214.    The amount of capital improvements of Marni Realty and Rudel Realty dramatically increased from 2012 through the first six months of 2019.

215.    On information and belief, the amount of capital improvements of these two LLCs was $13,441 in 2012.

216.    On information and belief, the amount of capital improvements of these two LLCs was $8,437 in 2013.

217.    On information and belief, the amount of capital improvements of these two LLCs was $86,961 in 2014.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019

NYSCEF DOC. NO. 2    Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 36 of 67    RECEIVED NYSCEF: 07/26/2019

218. On information and belief, the amount of capital improvements of these two LLCs was $46,362 in 2015.

219. On information and belief, the amount of capital improvements of these two LLCs was $242,036 in 2016.

220. On information and belief, the amount of capital improvements of these two LLCs was $385,012 in 2017.

221. On information and belief, the amount of capital improvements of these two LLCs was $257,869 in 2018.

222. On information and belief, the amount of capital improvements of these two LLCs was $47,582 for the first six months of 2019.

223. The "capital improvements" figures referenced in paragraphs 215 through 222 appear in the line item "Repairs and Replacements" in Pine Management's Summary of Receipts and Disbursements for these two LLCs.

224. On information and belief, the amount of monies spent annually on capital improvements for these two LLCs increased by approximately 1,818% from 2012 to 2018.

225. On information and belief, in addition to the direct capital improvements that appear in the line item "Repairs and Replacements" in Pine Management's Summary of Receipts and Disbursements for these two LLCs, there was a dramatic increase in "soft costs" for these LLCs, which further reduced the amount of income to these LLCs and the distributions to the Members of these LLCs.

226. "Professional Fees" is a "soft cost" that is included in Pine Management's Summary of Receipts and Disbursements for these two LLCs.

35

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019

NYSCEF DOC. NO. 2    Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 37 of 67   RECEIVED NYSCEF: 07/26/2019

227.    The amount of "Professional Fees" dramatically increased for these two LLCs during the period 2012 through June 2019 as listed below:

| | |
|---|---|
| 2012 | 549 |
| 2013 | 949 |
| 2014 | 470 |
| 2015 | 370 |
| 2016 | 13,854 |
| 2017 | 31,355 |
| 2018 | 24.377 |
| 2019 | 5,739 (first six months) |

228.    On information and belief, the annual amount of "Professional Fees" for these two LLCs increased by 4,339% from 2012 through 2018.

229.    Pine Management has no authority to unilaterally increase capital improvements without the approval of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, which collectively has a 50% interest in Marni Realty and Rudel Realty.

230.    Pine Management neither sought nor obtained the approval of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust in connection with the capital improvements, including any associated "soft costs," of these two LLCs for the period 2012 to 2019.

**(b)     Cash Reserves For The Properties Owned By These Two LLCs**

231.    The historical practice of these two LLCs was to distribute most of the available cash generated by the properties owned by the LLCs to their Members.

232.    The setting of cash reserves has a direct effect on the amount of distributions to the Members of these two LLCs.

233.    When the Plaintiffs asked Pine Management about the basis for the dramatic increase in cash reserves, Brenda Rohlman of Pine Management stated in her March 3, 2018 e-

36

**A-87**

mail that "over 35 years, Pine Management Inc. has developed guidelines as to how much money to hold in each building's reserve accounts." *See* Exhibit 20.

234.   Pine Management never produced these "guidelines" that were purportedly developed over a 35-year period.

235.   Meister Seelig's December 7, 2018 letter to Holland & Knight stated that "Pine Management's current general 'guidelines' for setting reserves for the property owned by each LLC are as follows: $200,000 baseline per building plus an additional $7,500 per unit." (*See* Exhibit 8, p. 1).

236.   Pine Management's "current general 'guidelines'" for setting cash reserves is dramatically different from the historical practice of setting cash reserves for the properties owned by these two LLCs.

237.   The historical practice of these two LLCs was to maintain a reasonable amount of cash reserves.

238.   The average cash position for the years 2012-2016 is about 395% higher than the average cash position for the years 2000-2005.

239.   Pine Management has refused to let the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust participate in the setting of cash reserves for the two properties owned by these two LLCs.

240.   Instead, Pine Management, without any legal basis, has unilaterally decided that these matters are solely within its decision-making authority.

241.   In addition to being significantly contrary to historical practice of these two LLCs, the amounts proposed by Pine Management for the amount of each building's reserve accounts are unreasonable and far in excess of what is necessary for day to day operations.

37

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019

NYSCEF DOC. NO. 2    Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 39 of 67    RECEIVED NYSCEF: 07/26/2019

242.    The cash position at the end of the year 2017 is about 243% higher than it was in 2000.

**(c)    Distributions To The Jerome Schneider Revocable Trust
And The Ruth Schneider Revocable Trust From These Two LLCs**

243.    Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $69,200 in 2011.

244.    Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $62,500 in 2012.

245.    Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $118,400 in 2013.

246.    Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $79,000 in 2014.

247.    Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $39,000 in 2015.

248.    Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $54,000 in 2016.

249.    Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $44,000 in 2017.

250.    Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $24,000 in 2018.

251.    Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were $4,000 for the first six months of 2019.

252.    Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust decreased by approximately 65% from 2011 to 2018.

38

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019

NYSCEF DOC. NO. 2          Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 40 of 67          RECEIVED NYSCEF: 07/26/2019

253.    The amount of distributions received by a Member is a matter of crucial importance to the Members of these two LLCs.

254.    Pine Management has no authority to unilaterally change the historical practice of significant distributions to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust without consulting with and obtaining their approval.

**(d)      Pine Management's Unauthorized Payment Of "Management Fees" And "Construction Management Fees" To Itself**

255.    In addition, Pine Management has paid itself and continues to pay itself "management fees" and "construction management fees" from Rudel Realty and Marni Realty.

256.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have not approved the payment of "management fees" to Pine Management from Marni Realty and Rudel Realty.

257.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have not approved the payment of "construction management fees" to Pine Management from Marni Realty and Rudel Realty.

258.    Holland & Knight's July 17, 2018 letter advised Pine Management and the other Members of Rudel Realty and Marni Realty that Pine Management could not unilaterally make decisions concerning the amount of capital improvements, cash reserves for the properties and the amount of the distributions to the Members without the approval of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust. (*See* Exhibit 1)

259.    Holland & Knight's July 17, 2018 letter also stated that Pine Management had no authority to pay itself fees or compensation from Rudel Realty or Marni Realty. (*See* Exhibit 1).

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 41 of 67  RECEIVED NYSCEF: 07/26/2019

260.    The August 3, 2018 letter of Meister Seelig, Pine Management's counsel, stated that "those claims [of Plaintiffs set forth in Holland & Knight's July 17, 2018 letter] are rejected in their entirety." (*See* Exhibit 2).

261.    Subsequent letters from Holland & Knight to Pine Management's counsel repeated the position that the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have the right to co-manage Rudel Realty and Marni Realty.

262.    Despite Holland & Knight's letters, Pine Management has refused to change its position that Pine Management can unilaterally manage Rudel Realty and Marni Realty.

263.    Pine Management has breached Section 5.1 of the Operating Agreements of Rudel Realty and Marni Realty.

264.    On information and belief, Lloyd J. Pine and Brenda Rohlman, the Trustees of the Harold Pine 2009 Family Trust – which has the other 50% interest in Marni Realty and Rudel Realty – agree with the positions taken by Pine Management in the case of Marni Realty and Rudel Realty.

265.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have sustained and continue to sustain damages by reason of Pine Management's breach of Section 5.1 of the 1996 Operating Agreements.

266.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have sustained and continue to sustain damages by reason of the tacit acceptance by Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, of Pine Management's breach of Section 5.1 of the 1996 Operating Agreements.

267.    The decision of Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, (a) to accept Pine Management's position that Pine Management can

40

**A-91**

unilaterally manage Rudel Realty and Marni Realty and (b) to refuse to permit the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust to co-manage Rudel Realty and Marni Realty, constitutes a breach of Section 5.1 of the 1996 Operating Agreement.

268.   By reason of the foregoing, the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust are entitled to damages for breaches by Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, of the Operating Agreements of Marni Realty and Rudel Realty in an amount to be determined at trial.

**THIRD CAUSE OF ACTION FOR A PRELIMINARY AND PERMANENT INJUNCTION ENJOINING PINE MANAGEMENT FROM TAKING ACTION WITH REGARD TO FUNDAMENTAL MATTERS OUTSIDE THE ORDINARY COURSE OF BUSINESS WITHOUT OBTAINING THE AFFIRMATIVE VOTE OF THE MAJORITY IN INTEREST OF THE MEMBERS OF ZIZI REALTY LLC, JERUTH REALTY LLC, BAR-MAR REALTY LLC, MARC REALTY LLC, RIS REALTY LLC, BREN-EL REALTY LLC, JHJ REALTY LLC AND SIR REALTY LLC**

269.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-105, inclusive, and 122-202 inclusive, as if set forth herein.

270.   Plaintiffs' contractual rights under Section 8.3 of the Operating Agreements of these eight LLCs are unique and valuable rights.

271.   Plaintiffs' contractual rights under Section 8.3 are required to enforce and protect their rights as Members of these eight LLCs.

272.   Pine Management has prevented the Plaintiffs from exercising their bargained for rights to vote upon matters fundamental to these eight LLCs, including (a) distributions to the members from the LLCs; (b) capital improvements to the properties owned by the LLCs; (c) setting of reserves for the properties owned by the LLCs; and (d) loans made to the eight LLCs.

273.   Pine Management has deprived Plaintiffs of their voting power and decision-making rights as to fundamental matters involving these eight LLCs.

41

**A-92**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019

NYSCEF DOC. NO. 2          Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 43 of 67          RECEIVED NYSCEF: 07/26/2019

274.    The loss of the bargained for rights to vote on fundamental matters affecting these eight LLCs has caused and continues to cause irreparable harm to the Plaintiffs.

275.    Plaintiffs have no adequate remedy at law for Pine Management's breaches of Section 8.3 of the Operating Agreements of these eight LLCs.

276.    Plaintiffs' unique and valuable right to vote upon fundamental matters affecting these eight LLCs is not compensable in money damages.

277.    Money damages are not adequate because control and management of these eight LLCs is at stake.

278.    Such bargained-for contractual rights in the management of a limited liability company can be specifically enforced because the loss of such unique rights is not quantifiable and constitutes irreparable injury.

279.    Plaintiffs have performed all of their obligations required by the Operating Agreements of these eight LLCs and as Members of such LLCs.

280.    Absent injunctive relief, Pine Management will continue to unilaterally make decisions as to fundamental matters affecting these eight LLCs without the required participation and vote of the Plaintiffs.

281.    By reason of the foregoing, Plaintiffs are entitled to a preliminary and permanent injunction enjoining Pine Management from taking any actions "outside the ordinary course of business" of these eight LLCs without the affirmative vote of a majority in interest of the Members of these eight LLCs, including, but not limited to, the following actions: (a) approval of capital improvements for the individual property owned by the respective LLC; (b) setting of reserves for the individual property owned by the respective LLC; (c) deciding on the amount of

42

A-93

distributions from the respective LLC to the Members; and (d) approval of loans to the respective LLC.

**FOURTH CAUSE OF ACTION FOR A PRELIMINARY AND PERMANENT INJUNCTION ENJOINING PINE MANAGEMENT AND LLOYD J. PINE AND BRENDA ROHLMAN, THE TRUSTEES OF THE HAROLD PINE 2009 FAMILY TRUST, FROM TAKING ACTION WITH REGARD TO THE MANAGEMENT OF MARNI REALTY LLC AND RUDEL REALTY LLC WITHOUT THE APPROVAL OF THE JEROME SCHNEIDER REVOCABLE TRUST AND THE RUTH SCHNEIDER REVOCABLE TRUST**

282.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-88, inclusive, paragraphs 106-121, inclusive, and paragraphs 203-266 as if set forth herein.

283.   Section 5.1 of the 1996 Operating Agreements of Marni Realty and Rudel Realty provides that "[t]he business and affairs of the Company shall be managed by the Members."

284.   Under Section 5.1, the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, which have an aggregate 50% interest in Rudel Realty and Marni Realty, have the right to "co-manage" the "business and affairs" of Rudel Realty and Marni Realty.

285.   The contractual rights under Section 5.1 of the Operating Agreements of these two LLCs are unique and valuable rights.

286.   The contractual rights under Section 5.1 are required to enforce and protect the rights of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, as Members of these two LLCs.

287.   Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, have prevented the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust from exercising their bargained for rights to co-manage Marni Realty and Rudel Realty.

43

A-94

288.    The loss of the bargained for rights to co-manage Marni Realty and Rudel Realty has caused and continues to cause  irreparable harm to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust.

289.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have no adequate remedy at law for the breach by Pine Management's and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, of Section 5.1 of the Operating Agreements of these two LLCs.

290.    Money damages are not adequate because control and management of Marni Realty and Rudel Realty are at stake.

291.    Such bargained-for contractual rights to co-manage a limited liability company can be specifically enforced because the loss of such unique rights is not quantifiable and constitutes irreparable injury.

292.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have performed all of their obligations required by the Operating Agreements of these two LLCs and as Members of such LLCs.

293.    Absent injunctive relief, Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, will continue to unilaterally manage these two LLCs without the required participation and vote of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust.

294.    By reason of the foregoing, the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust are entitled to a preliminary and permanent injunction enjoining Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, from taking any actions with respect to the management of Marni Realty and

44

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 2    Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 46 of 67

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

Rudel Realty without the consent of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, including, but not limited to, the following actions: (a) payment of "management fees," "construction management fees," or any compensation to Pine Management as Manager, "property manager" or in any other capacity; (b) capital improvements for the individual property owned by the respective limited liability company; (c) setting of reserves for the individual property owned by the respective limited liability company; (d) the amount of distributions from the respective limited liability company to the Members; and (e) loans to the respective limited liability company.

**FIFTH CAUSE OF ACTION FOR A DECLARATORY JUDGMENT THAT PINE MANAGEMENT CANNOT TAKE ACTION WITH REGARD TO MATTERS OUTSIDE THE ORDINARY COURSE OF BUSINESS WITHOUT OBTAINING THE AFFIRMATIVE VOTE OF THE MAJORITY IN INTEREST OF THE MEMBERS OF ZIZI REALTY, LLC, JERUTH REALTY LLC, BAR-MAR REALTY LLC, MARC REALTY LLC, RIS REALTY LLC, BREN-EL REALTY LLC, JHJ REALTY LLC AND SIR REALTY LLC**

295.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-105, inclusive, paragraphs 122-202, inclusive, and paragraphs 269-281, inclusive, as if set forth herein.

296.    There is a real dispute between Plaintiffs and Pine Management involving substantial legal interests in these eight LLCs for which a declaration of rights will have some practical effect.

297.    An actual justiciable controversy exists with respect to Plaintiff's rights under Section 8.3 of the Operating Agreements of these eight LLCs.

298.    The actual justiciable controversy involves substantial legal interests.

299.    A declaratory judgment will serve the useful purpose of clarifying and settling the legal relations in issue between the parties.

45

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-02407  Document 1-2  Filed 03/24/22  Page 47 of 67  RECEIVED NYSCEF: 07/26/2019

300.    The substantial controversy between the parties having adverse interests is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

301.    Plaintiffs will be irreparably harmed if, among other things, their rights and entitlement to relief under Section 8.3 of the Operating Agreements of these eight LLCs are not established and enforced.

302.    Plaintiffs have no adequate remedy at law.

303.    By reason of the foregoing, Plaintiffs are entitled to a judgment declaring that "decisions outside the ordinary course of business" under Section 8.3 of the Operating Agreements, which requires the affirmative vote of a majority in interest of the Members of these eight LLCs, include the following fundamental matters:  (a) distributions to the Members from these LLCs; (b) capital improvements to the properties owned by these LLCs; (c) setting of reserves for the properties owned by the LLCs; and (d) loans made to these LLCs.

### SIXTH CAUSE OF ACTION DERIVATIVELY ON BEHALF OF EACH OF THE TEN LLCs AGAINST PINE MANAGEMENT FOR UNAUTHORIZED PAYMENT OF "MANAGEMENT FEES" AND "CONSTRUCTION MANAGEMENT FEES" AND UNAUTHORIZED LOANS

304.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-268, inclusive, as if set forth herein.

305.    Plaintiffs bring this cause of action derivatively as a Member of each of the ten LLCs against Pine Management.

306.    Pine Management is the Manager of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty and Sir Realty.

307.    Pine Management is the de facto Manager of Marni Realty and Rudel Realty.

308.    None of the Operating Agreements of the LLCs expressly authorize the payment of fees or compensation to Pine Management as the Manager or in any other capacity.

46

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM        INDEX NO. 654303/2019

NYSCEF DOC. NO. 2        Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 48 of 67   RECEIVED NYSCEF: 07/26/2019

309.    The Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty and Sir Realty state that "[t]he Company's initial Manager [Manager] shall be Pine Management, Inc." and that "Pine Management, Inc. *may be paid for services rendered in its role as property manager pursuant to a separate agreement with the Company.*" (Emphasis added).

310.    No separate agreement with Pine Management as a "property manager" was ever approved or executed by the Members of the LLCs.

311.    Meister Seelig's December 7, 2018 letter confirmed that "there is no separate written agreement between the respective LLCs and Pine Management for services rendered as property manager." *See* Exhibit 8, p. 1.

312.    Any such "separate agreement" would require the "affirmative vote of a majority in interest of the Members."

313.    Members of the LLCs that are affiliated with Pine Management such as Harold Pine or his trusts, Thomas Rohlman or Brenda Rohlman, would not be able to vote on such "separate agreement" because they are "interested" or "affiliated" within Pine Management within the meaning of LLCL § 411.

314.    Furthermore, Section 8.10 of the Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty and Sir Realty provide that "*the guaranteed payments and other compensation of the Manager, if any,* shall be paid in such manner as shall be fixed from time to time *by a majority in interest of the Members*" or the "Class A Members" in those situations where there are "Class A Members." (Emphasis added).

47

315.    The Operating Agreements of these eight LLCs do not define "guaranteed payments" or otherwise explain the term "guaranteed payments."

316.    Section 8.10 further shows that the Members of these eight LLCs did not agree that Pine Management would receive "compensation" for its services as the Manager or "property manager."

317.    The 1996 Operating Agreements of Marni Realty and Rudel Realty contain no provision for payment of any fees or compensation to a "Manager" or a "property manager."

318.    The 1996 Operating Agreements of Marni Realty and Rudel Realty do not expressly provide for compensation to Pine Management as the "Manager," "property manager," or in any other capacity.

319.    As the Manager of the ten LLCs, Pine Management owed a duty of undivided and undiluted loyalty to the Members of these LLCs, barring not only self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty.

320.    Pine Management – without the approval of the Plaintiffs – has paid "management fees" and "construction management fees" from the ten LLCs to itself, which exceed $2.4 million for the years 2012 through June 30, 2019.

321.    On information and belief, Pine Management was paid approximately $1,959,789 in "management fees" from the ten LLCs for the years 2012 through June 30, 2019.

322.    On information and belief, the breakdown of these "management fees" in the total amount of $1,959,789 by year is as follows:

| | |
|---|---|
| 2012 | 219,660 |
| 2013 | 239,886 |
| 2014 | 256,336 |
| 2015 | 280,164 |

48

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 50 of 67          RECEIVED NYSCEF: 07/26/2019

| | |
|---|---|
| 2016 | 273,033 |
| 2017 | 272,465 |
| 2018 | 280,078 |
| 2019 | 138,176 (first six months) |

323.    On information and belief, Pine Management was paid approximately $537,330 in "construction management fees" from the ten LLCs for the years 2012 through June 30, 2019.

324.    On information and belief, the breakdown of these "construction management fees" in the total amount of $537,330 by year is as follows:

| | |
|---|---|
| 2012 | 20,000 |
| 2013 | 20,000 |
| 2014 | 45,632 |
| 2015 | 55,000 |
| 2016 | 92,371 |
| 2017 | 160,289 |
| 2018 | 25,270 |
| 2019 | 118,768 (first six months) |

325.    On information and belief, the "construction management fees" for 2018 are substantially understated.

326.    Prior to March 13, 2019, Plaintiffs had no knowledge concerning the specifics of the "construction management fee."

327.    Prior to March 13, 2019, Plaintiffs were not aware that the "construction management fee" was paid to Pine Management.

328.    Prior to March 13, 2019, Plaintiffs were not aware of the percentage of the "construction management fee."

329.    On March 13, 2019, Pine Management disclosed for the first time that the "construction management fee" was at the rate of 7.5% of construction "hard costs" and that it was paid to Pine Management.

330.    Pine Management has no authority under the LLCL or the governing Operating Agreements of the LLCs to fix its own compensation or to pay itself "management fees,"

49

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 51 of 67   RECEIVED NYSCEF: 07/26/2019

"construction management fees" or any other fees as "Manager," "property manager," or in any other capacity.

331.    Plaintiffs never approved the payment of "management fees," "construction management fees" or any other fees to Pine Management as "Manager," "property manager," or in any other capacity.

332.    Members who are affiliated with or have an interest in Pine Management cannot vote on "management fees" or "construction management fees" to be paid to Pine Management because such action would constitute self-dealing.

333.    By reason of the foregoing, Pine Management cannot be paid "management fees" or "construction management fees" or any compensation for its services unless approved by a vote of more than 50% of the disinterested Members of the LLCs.

334.    Since the Plaintiffs never voted on or approved the payment of "management fees," "construction management fees" or any other "compensation" to Pine Management, Pine Management has no right to receive such "fees" or "compensation" from the ten LLCs.

335.    Pine Management continues to pay itself "management fees" and "construction management fees" from the ten LLCs without the approval of the Plaintiffs.

336.    Each of the ten LLCs has sustained and continue to sustain damages by reason of Pine Management's unauthorized payment of "management fees" and "construction management fees" to itself.

337.    As noted, Holland & Knight's July 17, 2018 letter stated that Pine Management had no authority to pay itself fees or compensation from the ten LLCs. *See* Exhibit 1.

338.    Meister Selig's August 3, 2018 letter stated that "those claims [of Plaintiffs set forth in Holland & Knight's July 17, 2018 letter] are rejected in their entirety." *See* Exhibit 2.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2        Case 1:22-cv-02407    Document 1-2    Filed 03/24/22    Page 52 of 67
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Thus, Pine Management and the other members of the LLCs affiliated with or having an interest in Pine Management have rejected this derivative claim.

339.    Without conceding that a demand is required in the particular circumstances of this claim, Plaintiffs are excused from making a demand because Pine Management is the entity charged with self-dealing and improperly paying itself "management fees" and "construction management fees" and certain Members of the LLCs are affiliated with or have an interest in Pine Management.

340.    Accordingly, even if a demand were required, any such demand on the Members of the LLCs to institute this derivative claim would be futile.

341.    By reason of the foregoing, the LLCs are entitled to damages against Pine Management, in an amount to be determined at trial, arising from the payment of "management fees" and "construction management fees" to Pine Management from the ten LLCs.

342.    By reason of the foregoing, Pine Management is required to pay to the ten LLCs the amount of the "management fees" and "construction management fees" the ten LLCs paid to Pine Management for the last six years.

343.    On information and belief, during the period September 2015 to June 2019, Pine Management approved $7,960,000 of loans to Zizi Realty, JHJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty.

344.    On information and belief, the persons or entities that made these loans to Zizi Realty, JHJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty are affiliated with or have an interest in Pine Management.

345.    On information and belief, the current outstanding balance on these loans is $7,810,000 because a loan of $150,000 to JHJ Realty was repaid.

51

**A-102**
INDEX NO. 654303/2019

NYSCEF DOC. NO. 2        Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 53 of 67   RECEIVED NYSCEF: 07/26/2019

346.    On information and belief, at least $554,129 of interest has been paid to the persons or entities who made the loans to such LLCs.

347.    No documentation concerning these loans was provided by Pine Management to Plaintiffs when these loans were approved by Pine Management.

348.    These loans were "outside the ordinary course of business" and needed to be approved by the affirmative vote of a majority in interest of the Members of Zizi Realty, JHJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty pursuant to the governing Operating Agreements as well as LLCL § 402(c)(2).

349.    Pine Management never consulted with or sought the approval of the Plaintiffs for entering into these loans.

350.    These loans were not approved by the affirmative vote of a majority in interest of the Members of the respective limited liability company.

351.    On information and belief, the interest rates on these loans were above market.

352.    By reason of the foregoing, the respective LLCs are entitled to damages against Pine Management in an amount to be determined at trial arising from Pine Management's failure to obtain approval of these loans by the affirmative vote of a majority in interest of the Members of Zizi Realty, JHJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty.

**SEVENTH CAUSE OF ACTION FOR A DECLARATORY JUDGMENT**

353.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-268, inclusive, and paragraphs 304-352, inclusive, as if set forth herein.

354.    Pine Management has no authority under the LLCL or the governing Operating Agreements of the ten LLCs to fix its own compensation or to pay itself "management fees," "construction management fees" or any other fees as "Manager," "property manager," or in any other capacity.

52

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019
Case 1:22-cv-02407 Document 1-2 Filed 03/24/22 Page 54 of 67

355. Plaintiffs never approved the payment of "management fees," "construction management fees" or any other fees to Pine Management as "Manager," "property manager," or in any other capacity.

356. Pine Management cannot be paid "management fees" or "construction management fees" or any compensation for its services unless approved by a vote of more than 50% of the disinterested Members of the ten LLCs.

357. As noted, Holland & Knight's July 17, 2018 letter stated that Pine Management had no authority to pay itself fees or compensation from the ten LLCs. *See* Exhibit 1.

358. As noted, Meister Selig's August 3, 2018 letter stated that "those claims [of Plaintiffs set forth in Holland & Knight's July 17, 2018 letter] are rejected in their entirety." *See* Exhibit 2. Thus, Pine Management and the other members of the LLCs affiliated with or having an interest in Pine Management have rejected Plaintiffs' position that Pine Management cannot pay itself "management fees" and "construction management fees."

359. On information and belief, Pine Management is of the view that it can continue to pay itself "management fees" and "construction management fees" from the ten LLCs without obtaining the vote of more than 50% of the disinterested Members of the ten LLCs.

360. Holland & Knight's July 17, 2018 letter also states that "the Pine/Rohlman Group cannot vote on the 'separate agreement' with Pine as the 'property manager' because they are 'interested' or 'affiliated' with Pine and thus cannot vote on their own agreement." *See* Exhibit 1, p. 6.

361. As noted, Meister Seelig's December 7, 2018 letter concedes that "there is no separate written agreement between the respective LLCs and Pine Management for services rendered as property manager." *See* Exhibit 6.

**A-104**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. 2 Case 1:22-cv-02407 Document 1-2 Filed 03/24/22 Page 55 of 67 RECEIVED NYSCEF: 07/26/2019

362. On information and belief, Pine Management is of the view that persons "interested" or "affiliated" with Pine Management can vote on an agreement between Pine Management and Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty, Rudel Realty and Marni Realty.

363. A member of a limited liability company is "interested" in the transaction if he or she is an officer or director of another corporation or entity involved in the transaction.

364. A member of a limited liability company is "interested" in the transaction when that member receives a direct financial benefit from the transaction that is different from the benefit received generally by all members of such limited liability company.

365. A member of a limited liability company is "interested" in the transaction even though that member has no personal interest in the transaction where the member is controlled by a director or other person who has an interest in the transaction.

366. Thomas Rohlman, as the Chief Executive Officer of Pine Management, is "interested" in a transaction between these ten LLCs and Pine Management and thus cannot vote as a Member on such transaction.

367. Brenda Rohlman, as an officer or employee of Pine Management, is "interested" in a transaction between these ten LLCs and Pine Management and thus cannot vote as a Member on such transaction.

368. On information and belief, the Harold Pine 2009 Family Trust and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, has an interest or is affiliated with Pine Management and thus cannot vote as a Member on a transaction between these ten LLCs and Pine Management.

54

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1.22-cv-02407   Document 1-2   Filed 03/24/22   Page 56 of 67   RECEIVED NYSCEF: 07/26/2019

369.    On information and belief, the Sydell Pine 2009 Family Trust, and its Trustees, has an interest or is affiliated with Pine Management and thus cannot vote as a Member on a transaction between these ten LLCs and Pine Management.

370.    By reason of the foregoing, Thomas Rohlman, Brenda Rohlman, individually or as Trustees of the Harold Pine 2009 Family Trust, and the Sydell Pine 2009 Family Trust, and its Trustees, are or may be "interested" in a transaction between these ten LLCs and Pine Management and thus cannot vote as a Member on such transaction.

371.    There is a real dispute between Plaintiffs and Pine Management involving substantial legal interests in these ten LLCs for which a declaration of rights will have some practical effect.

372.    An actual justiciable controversy exists with respect to the Members of these ten LLCs as to who can vote on a proposed agreement between these LLCs and Pine Management.

373.    The actual justiciable controversy involves substantial legal interests.

374.    A declaratory judgment will serve the useful purpose of clarifying and settling the legal relations in issue between the parties.

375.    The substantial controversy between the parties having adverse interests is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

376.    Plaintiffs will be irreparably harmed if, among other things, their rights and entitlement to relief as Members of these ten LLCs are not established and enforced.

377.    Plaintiffs have no adequate remedy at law.

378.    By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment declaring that Pine Management cannot pay itself "management fees," "construction management fees" or any other "compensation" in its role as Manager, "property manager" or in

55

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 57 of 67    RECEIVED NYSCEF: 07/26/2019

any other capacity from the revenues of the respective LLCs without the approval of a majority in interest of the Members of each of the ten LLCs, taking into account that Members affiliated with or having an interest in Pine Management cannot vote on a transaction involving these ten LLCs and Pine Management.

### EIGHTH CAUSE OF ACTION FOR BREACH
### OF FIDUCIARY DUTY AGAINST PINE MANAGEMENT

379.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-378, inclusive, as if set forth herein.

380.    Pine Management, as the appointed Manager of eight of the LLCs, owes a fiduciary duty to those Plaintiffs that are non-managing Members of these LLCs.

381.    Pine Management, as the de facto Manager of Marni Realty and Rudel Realty, owes a fiduciary duty to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, the non-managing Members of these LLCs.

382.    LLCL § 409(a) provides that a "manager shall perform his or her duties as a manager, including his or her duties as a member of any class of managers, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances."

383.    Under New York law, this fiduciary duty is a duty of undivided and undiluted loyalty, which requires the Manager to operate the limited liability company in good faith and fairness, to avoid self-dealing and to make full disclosure of all material facts.

384.    The Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty and Sir Realty expressly recognize the fiduciary duty owed by Pine Management to the Members.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2          Case 1:22-cv-02407  Document 1-2  Filed 03/24/22   Page 58 of 67
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

385. Section 17.2 of the Operating Agreements of these eight LLCs states that "[n]otwithstanding anything otherwise herein contained to the contrary, *no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.*" (Emphasis added).

386. Under New York law, a manager of a limited liability company can be held liable for breach of fiduciary duty where it commits acts that are contrary or inconsistent with his "duty of undivided and undiluted loyalty," fails to disclose material facts, or engages in misconduct or self-dealing.

387. A Manager cannot use his power to benefit himself at the expense of the LLC.

388. A Manager of an LLC is bound by LLCL § 411, which addresses conflicts of interest by an LLC decision maker.

389. Limited Liability Company Law § 411 disallows a transaction between a limited liability company and one or more of its managers, or with another business entity in which one or more of its managers has a substantial financial interest.

390. Pine Management has breached its duty of full disclosure to the Plaintiffs by failing to provide material information to the Plaintiffs.

391. Pine Management's breaches of fiduciary duty arise from its failure to comply with the provisions of the governing Operating Agreements, the payment of "management fees" and "construction management fees" from the ten LLCs to Pine Management without the requisite approvals by the Members of the LLCs, its failure to disclose almost $8 million of loans to certain of the LLCs that they approved on behalf of the respective LLCs, its failure to obtain the requisite approvals for such loans under the governing Operating Agreements as well as

57

**A-108**

LLCL § 402(c)(2), its failure to abide by conflict of interest rules and its failure to produce documents requested by the Plaintiffs.

392.     As a result of Pine Management's breaches of fiduciary duties, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial.

393.     By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial for Pine Management's breaches of fiduciary duty.

### NINTH CAUSE OF ACTION FOR INSPECTION OF BOOKS AND RECORDS UNDER LIMITED LIABILITY COMPANY LAW AND THE OPERATING AGREEMENTS OF THE LLCs

394.     Plaintiffs repeat and reallege allegations in paragraphs 1-393, inclusive, as if set forth herein.

395.     As set forth above, Plaintiffs are members of Zizi Realty LLC, Jeruth Realty LLC, Bar-Mar Realty LLC, Marc Realty LLC, RIS Realty LLC, Bren-El Realty LLC, JHJ Realty LLC, Sir Realty LLC, Marni Realty LLC and Rudel Realty LLC.

396.     Section 1102(a) of the LLCL provides that each domestic limited liability company is required to maintain the records identified in Section 1102(a)(1)-(5), inclusive.

397.     Section 1102(a)(5) of the LLCL provides that a domestic limited liability company "shall maintain" a "copy of the limited liability company's federal, state and local income tax or information returns and reports, if any, for the three most recent fiscal years."

398.     Section 1102(b) of the LLCL grants inspection rights to a member of a domestic limited liability company.  Specifically, Section 1102(b) provides:

> Any member may, subject to reasonable standards as may be set
> forth in, or pursuant to, the operating agreement, inspect and copy
> at his or her own expense, for any purpose reasonably related to
> the member's interest as a member, the records referred to in
> subdivision (a) of this section, any financial statements maintained
> by the limited liability company for the three most recent fiscal

58

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 60 of 67   RECEIVED NYSCEF: 07/26/2019

years *and other information regarding the affairs of the limited liability company as is just and reasonable.* (Emphasis added).

399.     The Operating Agreements of the LLCs also require the respective limited liability company to maintain specific records.

400.     Section 14.1 of the Operating Agreement for the LLCs other than Marni Realty and Rudel Realty provides:

> The manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. *Each Member, Manager or their duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.* (Emphasis added).

401.     These inspection rights are broader than those provided in LLCL §§ 1102(a) and (b) and includes all types of documents with respect to the LLCs.

402.     Section 5.1 of the 1996 Operating Agreements of Marni Realty and Rudel Realty provides that "the business and affairs of the Company shall be managed by the Members."

403.     As a result of Section 5.1, the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, owning an aggregate 50% interest in Marni Realty and Rudel Realty, have the right to review all documents relating to these limited liability companies, in addition to their inspection rights under the LLCL.

404.     These inspection rights are broader than those provided in LLCL §§ 1102(a) and (b) and includes all types of documents with respect to these two LLCs.

405.     Prior to July 17, 2018, Plaintiffs requested that Pine Management transmit documents relating to the LLCs on a regular and periodic basis.

406.     Pine Management did not transmit documents relating to the LLCs on a regular and periodic basis to the Plaintiffs.

59

407.   On many occasions, Pine Management produced documents only after one or more of the Plaintiffs requested such documents.

408.   At other times, Pine Management refused to produce the requested documents. For example, by an e-mail, dated March 3, 2018, Brenda Rohlman of Pine Management refused the Plaintiffs' "request for capital expenditures over the past five years for each apartment in the buildings you and your family has a membership interest in," stating that "Pine Management Inc. is not spending the time to go backwards over the past five years to complete this list." *See* Exhibit 18.

409.   By a letter dated July 17, 2018 to Meister Seelig (*see* Exhibit 1 hereto), Holland & Knight, on behalf of the Plaintiffs, requested that Pine Management produce the following documents relating to the LLCs for the last six (6) years (2012-2018):

> (1) the "separate agreement" between the respective limited liability company and Pine Management for services rendered as the "property manager" and any amendments thereto and documents constituting the approval of such "separate agreement;"

> (2) documents showing monies paid to Pine Management as the "Manager" of the respective limited liability company and the approval of monies paid or to be paid to the Manager;

> (3) documents showing monies paid to Pine Management as the "Property Manager" of the respective limited liability company, the approval of monies paid or to be paid to the Property Manager and the basis and methodology for the calculation of the "management fee" and "construction management fee;"

> (4) documents showing the "financial condition" of the limited liability company, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals and General Ledgers;

> (5) documents showing the basis for the calculations for the amount of distributions to the members of the limited liability company;

60

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM  INDEX NO. 654303/2019
NYSCEF DOC. NO. 2  Case 1:22-cv-02407  Document 1-2  Filed 03/24/22  Page 62 of 67  RECEIVED NYSCEF: 07/26/2019

(6) documents showing the capital improvements to the property and payments relating to such capital improvements;

(7) documents relating to or constituting the basis or methodology on which the Manager or Property Manager is setting reserves for the underlying property, including Pine Management's "guidelines," if any, for such reserve accounts;

(8) documents constituting or relating to renovations to the apartments at the property;

(9) documents concerning or related to payments by the respective limited liability company to persons or entities related or affiliated with Pine Management; and

(10) Written consents, if any, reflecting actions taken by the Manager or Members of the LLC's.

410. On or about October 25, 2018, Pine Management produced three (3) boxes of documents for Plaintiffs to inspect at the offices of Meister Seelig & Fein, 125 Park Avenue, 7th Floor, New York, New York 10017.

411. Although Pine Management produced some responsive documents, it did not produce documents responsive to many of the ten categories of documents listed in Holland & Knight's July 17, 2018 letter.

412. By a letter, dated November 20, 2018 to Meister Seelig, Holland & Knight set forth the many deficiencies in Pine Management's document production on October 25, 2018.

413. Although Pine Management produced some additional documents after November 20, 2018, Pine Management has not produced many of the documents listed in Holland & Knight's November 20, 2018 letter.

414. Pine Management's refusal to produce the requested documents reflects Pine Management's continued tactic of keeping the Plaintiffs "in the dark."

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 2    Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 63 of 67

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

415. By reason of §1102(b) of the Limited Liability Company Law and the applicable sections in the Operating Agreements of the LLCs, Plaintiffs have a statutory and contractual right to inspect the books and records of the limited liability companies of which they are Members.

416. By reason of the foregoing, Plaintiffs are entitled to an order directing that Pine Management produce all documents reflecting the financial condition and affairs of each of the LLCs for the last six years, including, but not limited, to: (1) financial statements and tax returns for the last six (6) years; and (2) all documents relating to (a) capital improvements for each of the properties owned by the LLCs, including invoices and supporting documentation for such capital improvements, (b) the setting of cash reserves for each of the properties owned by the LLCs, (c) payments of monies by the LLCs to Pine Management or any affiliate, entity or person related to Pine Management and (d) loans made to the LLCs, including the approval of such loans.

**TENTH CAUSE OF ACTION FOR AN ACCOUNTING OF THE LLCs**

417. Plaintiffs repeat and reallege allegations in paragraphs 1-416, inclusive, as if set forth herein.

418. As noted, Plaintiffs are members of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty Sir Realty, Marni Realty and Rudel Realty.

419. A fiduciary relationship exists between the Manager of a limited liability company and the Members of such limited liability company.

420. Pine Management, as the Manager of Zizi Realty LLC, Jeruth Realty LLC, Bar-Mar Realty LLC, Marc Realty LLC, RIS Realty LLC, Bren-El Realty LLC, JHJ Realty LLC, and Sir Realty LLC, owes a fiduciary duty to the Plaintiffs in their capacity as Members of the LLCs.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. 2
Case 1:22-cv-02407 Document 1-2 Filed 03/24/22 Page 64 of 67
RECEIVED NYSCEF: 07/26/2019

421. Pine Management, as the de facto Manager of Marni Realty and Rudel Realty, owes a fiduciary duty to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust in their capacity as Members of such limited liability companies.

422. Under New York law, a member of a limited liability company has the right to an equitable accounting.

423. Plaintiffs have no adequate remedy at law.

424. By their counsel's August 3, 2018 letter, Pine Management rejected Plaintiffs' claims, including their claim for an accounting. (*See* Exhibit 2).

425. In any event, Plaintiffs are excused from making a demand because Pine Management is the party charged with breaching its contractual duties and fiduciary duties to the Plaintiffs and certain members of the LLCs are affiliated with or have an interest in Pine Management.

426. Plaintiffs, as members of the LLCs, are entitled to an accounting of the LLCs.

427. By reason of the foregoing, Plaintiffs are entitled to an accounting of each of the LLCs for the period July 26, 2013 through the present.

WHEREFORE, Plaintiffs respectfully demand judgment as follows:

(1) On the First Cause of Action, awarding Plaintiffs money damages in an amount to be determined at trial, together with prejudgment interest, against Pine Management arising from Pine Management's breaches of the Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and Marc Realty;

(2) On the Second Cause of Action, awarding the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust money damages in an amount to be determined at trial, together with prejudgment interest, against Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, of the Operating Agreements of Marni Realty and Rudel Realty;

(3) On the Third Cause of Action, a preliminary and permanent injunction enjoining Pine Management from taking any actions "outside the ordinary course of business" without the affirmative vote of a majority in interest of the Members of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and Marc Realty, including, but not

63

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2

limited to, the following actions: (a) approval of capital improvements for the individual property owned by the respective LLC; (b) setting of reserves for the individual property owned by the respective LLC; (c) deciding on the amount of distributions from the respective LLC to the Members; and (d) approval of loans to the respective LLC;

(4)     On the Fourth Cause of Action, a preliminary and permanent injunction enjoining Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, from taking any actions with respect to the management of Marni Realty and Rudel Realty without the consent of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, including, but not limited to, the following actions: (a) payment of "management fees," "construction management fees," or any compensation to Pine Management as Manager, "property manager" or in any other capacity; (b) capital improvements for the individual property owned by the respective limited liability company; (c) setting of reserves for the individual property owned by the respective limited liability company; (d) the amount of distributions from the respective limited liability company to the Members; and (e) loans to the respective limited liability company;

(5)     On the Fifth Cause of Action, a judgment declaring that "decisions outside the ordinary course of business" under Section 8.3 of the Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and Marc Realty, which requires the affirmative vote of a majority in interest of the Members of these eight LLCs, include the following fundamental matters: (a) distributions to the Members from these LLCs; (b) capital improvements to the properties owned by these LLCs; (c) setting of reserves for the properties owned by the LLCs; and (d) loans made to these LLCs;

(6)     On the Sixth Cause of Action, awarding money damages in an amount to be determined at trial, together with prejudgment interest, in favor of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty, Marc Realty, Marni Realty and Rudel Realty and against Pine Management arising from (a) the payment of "management fees" and "construction management fees" from these ten LLCs to Pine Management and (b) Pine Management's failure to obtain approval of certain loans by the affirmative vote of a majority in interest of the Members of Zizi Realty, JHJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty;

(7)     On the Seventh Cause of Action, a judgment declaring that Pine Management cannot pay itself "management fees," "construction management fees" or any other "compensation" in its role as Manager, "property manager" or in any other capacity from the revenues of the respective LLCs without the approval of a majority in interest of the Members of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty, Marc Realty, Marni Realty and Rudel Realty, taking into account that Members affiliated with or having an interest in Pine Management cannot vote on a transaction involving these ten LLCs and Pine Management;

(8)     On the Eighth Cause of Action, awarding Plaintiffs money damages in an amount to be determined at trial, together with prejudgment interest, against Pine Management arising from Pine Management's breaches of fiduciary duty;

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 2     Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 66 of 67   RECEIVED NYSCEF: 07/26/2019

(9)     On the Ninth Cause of Action, an order directing that Plaintiffs be permitted to inspect all documents reflecting the financial condition and affairs of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty, Marc Realty, Marni Realty and Rudel Realty for the last six years, including, but not limited, to: (1) financial statements and tax returns; and (2) documents relating to (a) capital improvements for each of the properties owned by the LLCs, (b) the setting of cash reserves for each of the properties owned by the LLCs, (c) payments of monies to Pine Management or any affiliate, entity or person related to Pine Management and (d) loans made to the LLCs, including the approval of such loans;

(10)     On the Tenth Cause of Action, a Judgment directing that Plaintiffs are entitled to an accounting of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty, Marc Realty, Marni Realty and Rudel Realty for the last six years;

(11)     On all of the Causes of Action, awarding the Plaintiffs and the derivative plaintiffs their costs and expenses, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
       July 26, 2019

                         HOLLAND & KNIGHT LLP
                         *Attorneys for Plaintiffs*

                         By: *Mitchell J. Geller*
                             Mitchell J. Geller

                         31 West 52nd Street
                         New York, New York 10019
                         (212) 513-3200
                         mitchell.geller@hklaw.com

#69360221_v1

65

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 2        Case 1:22-cv-02407   Document 1-2   Filed 03/24/22   Page 67 of 67        RECEIVED NYSCEF: 07/26/2019

## VERIFICATION

STATE OF NEW YORK        )

                                            : ss.:

COUNTY OF WESTCHESTER        )

MARC SCHNEIDER, being duly sworn, deposes and says:

I am one of the Plaintiffs named in the foregoing Verified Complaint. I have read the foregoing Verified Complaint and know the contents thereof. The same is true according to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters I believe them to be true. My knowledge and the grounds of my belief also are based on various documents, including the documents that are annexed as exhibits to the Verified Complaint.

MARC SCHNEIDER

Sworn to before me this
26th day of July 2019

Notary Public

RITA ROSS
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01RO6303032
Qualified in Westchester County
Commission Expires May 12, 2022

#69321368_v1

**A-117**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PINE MANAGEMENT, INC., | Civil Action No.1:22-cv-02407 |
| Plaintiff, | |
| vs. | **ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** |
| COLONY INSURANCE COMPANY, | |
| Defendant. | |

Defendant Colony Insurance Company (hereafter referred to as "Argo"), by its attorneys Rivkin Radler LLP, hereby answers the complaint against it as follows:

## PRELIMINARY STATEMENT

1.      Admits that it entered into an insurance policy (the "Policy") with plaintiff Pine Management, Inc. ("Pine"), but denies that it breached the terms of the Policy, and denies that it failed and refused to honor its obligations under the Policy.

2.      Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 2.

3.      Admits that Argo and Pine entered into a contract of liability insurance, the terms of which speak for themselves, and otherwise denies the allegations in Paragraph 3.

4.      Denies knowledge and information as to whether Argo has used the alleged phrases in certain of its promotional materials, and otherwise denies the allegations in Paragraph 4.

5.      Denies that allegations of professional liability against Pine first arose during the period of the Policy, and otherwise denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 5.

6.      Denies the allegations of Paragraph 6, except admits that Pine tendered the Schneider action to Argo.

7.      Denies the allegations of Paragraph 7.

8.      Denies the allegations of Paragraph 8.

9.      Denies that Pine is entitled to the judgment which it demands in Paragraph 9, and otherwise refers all issues of law to the Court.

## PARTIES

10.      Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 10.

11.      Admit the allegations of Paragraph 11.

## JURISDICTION AND VENUE

12.      Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and refers all questions of law to the Court.

13.      Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 13, and refers all questions of law to the Court.

## FACTUAL BACKGROUND

**A.      The Argo Policy**

14.      Admit that Argo and Pine entered into a contract of liability insurance which had an effective period from August 1, 2018 to December 1, 2019, but denies the allegations of Paragraph 14 to the extent Exhibit 1 differs from the actual terms of the Policy.

15.     Admits that the quoted portion of the Policy is correct, and otherwise denies the allegations of Paragraph 15 to the extent that these allegations differ from the actual terms of the Policy.

16.     Admits that the quoted portion of the Policy is correct, and otherwise denies the allegations of Paragraph 16 to the extent that these allegations differ from the actual terms of the Policy.

17.     Admits that the quoted portion of the Policy is correct, and otherwise denies the allegations of Paragraph 17 to the extent that these allegations differ from the actual terms of the Policy.

18.     Admits that the quoted portion of the Policy is correct, and otherwise denies the allegations of Paragraph 18 to the extent that these allegations differ from the actual terms of the Policy.

19.     Admits that the quoted portion of the Policy is correct, and otherwise denies the allegations of Paragraph 19 to the extent that these allegations differ from the actual terms of the Policy.

20.     Denies the allegations of Paragraph 20 to the extent that these allegations differ from the actual terms of the Policy.

21.     Admits that the quoted portion of the Policy is correct, and otherwise denies the allegations of Paragraph 21 to the extent that these allegations differ from the actual terms of the Policy.

22.     With respect to the allegations of Paragraph 22, states that the terms of the Policy speak for themselves.

23.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 23.

24.     Denies the allegations of Paragraph 24.

25.     Admits the allegations of Paragraph 25.

26.     Admits that the quoted portion of the Policy is correct, and otherwise denies the allegations of Paragraph 26 to the extent that these allegations differ from the actual terms of the Policy.

27.     Denies the allegations in Paragraph 27.

**B.      The Schneider Action**

28.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 28.

29.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 29.

30.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 30.

31.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 31.

32.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 32.

33.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 33.

34.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 34.

C.      **Argo's Wrongful Denial of Coverage**

35.      Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 35.

36.      Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 36.

37.      Denies the allegations of Paragraph 37, and refers all questions of law to the Court.

38.      Denies the allegations of Paragraph 38, and refers all questions of law to the Court.

39.      Denies the allegations of Paragraph 39, and refers all questions of law to the Court.

40.      Denies the allegations of Paragraph 40.

41.      Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 41.

42.      Denies the allegations in Paragraph 42.

43.      Denies the allegations in Paragraph 43.

44.      Denies the allegations in Paragraph 44.

45.      Admits the allegations in Paragraph 45, except denies knowledge and information sufficient to form a belief as to whether notice was provided "immediately."

46.      Admits that it prepared and sent to Pine correspondence dated August 20, 2019, but denies the allegations of Paragraph 46 to the extent that they differ from, or do not cite all of, the contents of the letter of August 20, 2019.

47.      Denies the allegations of Paragraph 47.

48.     Denies the allegations of Paragraph 48.

49.     With respect to the allegations of Paragraph 49, admits that Argo continues to deny that Argo has any duty to defend or indemnify Pine.

50.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 50.

51.     Denies the allegations of Paragraph 51.

52.     Denies the allegations of Paragraph 52.

53.     Denies the allegations of Paragraph 53.

<u>**COUNT I**</u>

<u>**Declaratory Judgment**</u>

54.     Argo repeats its answers to Paragraph 1 through 53.

55.     Denies the allegations of Paragraph 55.

56.     Denies the allegations of Paragraph 56.

57.     Denies the allegations of Paragraph 57.

58.     Denies the allegations of Paragraph 58.

59.     Denies the allegations of Paragraph 59.

60.     Denies the allegations of Paragraph 60.

61.     With respect to the allegations of Paragraph 61, refers all questions of law to the Court.

62.     Admits that Pine is seeking a judicial determination, and denies the remaining allegations of Paragraph 62.

63.     Denies the allegations of Paragraph 63.

**COUNT II**

**For Breach of Contract**

64.      Argo repeats its answers to Paragraphs 1 through 63.

65.      Admits the allegations of Paragraph 65.

66.      Denies the allegations of Paragraph 66.

67.      Denies the allegations of Paragraph 67.

68.      Admits the allegations of Paragraph 68.

69.      Denies the allegations of Paragraph 69.

70.      Denies the allegations of Paragraph 70.

71.      Denies the allegations of Paragraph 71.

72.      Paragraph 72 contains conclusions of law, and Argo refers all questions of law to the Court.

73.      Paragraph 73 contains conclusions of law, and Argo refers all questions of law to the Court.

74.      Denies the allegations of Paragraph 74.

75.      Denies the allegations of Paragraph 75.

76.      Denies the allegations of Paragraph 76, except denies knowledge and information as to whether it has used the alleged phrases in certain of its promotional materials.

77.      Denies the allegations of Paragraph 77.

78.      Denies the allegations of Paragraph 78.

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**
**Failure to State Cause of Action**

79.      Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE
### Failure to Satisfy Conditions

80.     Plaintiff's claims against Defendants are barred to the extent that Plaintiff has

failed to satisfy the obligations, covenants, and conditions precedent and subsequent required

under the Policy.

### THIRD AFFIRMATIVE DEFENSE
### Terms and Conditions of the Policy

81.     Plaintiff's claims against Defendants contained in the Complaint are barred, in

whole or in part, by the terms, conditions, agreements, exclusions, definitions, limitations, and/or

endorsements contained in the Policy.

### FOURTH AFFIRMATIVE DEFENSE
### Deductibles and Limits

82,     In the event it is determined that coverage exists under the Policy for any part of

Plaintiff's claims contained in the Complaint, recovery is limited by all deductibles and limits in

the Policy.

### FIFTH AFFIRMATIVE DEFENSE
### Waiver

83.     Plaintiff's claims and requests for relief against Defendants contained in the

Complaint are barred in whole or in part by the doctrine of waiver.

### SIXTH AFFIRMATIVE DEFENSE
### Laches

84.     Plaintiff's claims against Defendants contained in the Complaint are barred, in

whole or in part, by the doctrine of laches.

<div align="center">

**SEVENTH AFFIRMATIVE DEFENSE**
**Failure to Mitigate**

</div>

85.    Plaintiff's recovery from Defendants is barred to the extent that Plaintiff has

failed to mitigate its damages.

<div align="center">

**EIGHTH AFFIRMATIVE DEFENSE**
**No Wrongful Act on or after Retroactive Date**

</div>

86.    SECTION I – COVERAGES, A. Insuring Agreements, of the Policy provides that

coverage will exist, subject to all the other terms of the Policy, for loss

> …arising out of a **Wrongful Act** committed before the end of the
> **Policy Period** and on or after the Retroactive Date, if any, shown
> in Item 8 of the Declarations.

87.    The Retroactive Date applicable to property management services is March 1,

2016.

88.    Pursuant to SECTION III – DEFINITIONS, Section II,

> **Wrongful Act** means any actual or alleged act, error, omission or
> breach of duty by any **Insured** in the rendering of or failure to
> render **Real Estate Development Services**…

89.    Pursuant to SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful

Acts, **Claims** or Claimants,

> Two or more **Claims** arising out of a single **Wrongful Act**, or any
> series of related **Wrongful Acts**, will be considered a single
> **Claim**.  Each wrongful act, in a series of related **Wrongful Acts**,
> will be deemed to have occurred on the date of the first such
> **Wrongful Act**.

90.    A letter from Holland & Knight to Pine, dated July 17, 2018 (hereafter, "the H&K

Letter") (attached hereto as Exhibit A), alleges that wrongful acts were committed prior to the

retroactive date of March 1, 2016.  All of the Wrongful Acts alleged in the H&K letter were

related.  Therefore, all of the wrongful acts allegedly committed by Pine will be deemed to have

<div align="center">

9

</div>

occurred prior to the retroactive date of March 1, 2016.  Therefore, coverage under the Policy

does not exist.

<div align="center">

**NINTH AFFIRMATIVE DEFENSE**
**Prior Knowledge of Wrongful Act Exclusion**

</div>

91.     Pursuant to SECTION IV – EXCLUSIONS, Section A, the Policy does not apply

to any claim:

> ……arising out of a **Wrongful Act**… occurring prior to the **Policy Period** if, prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy[1] issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the **Policy Period**:…
>
> 2.  Any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**…

92.     The H&K Letter provided Pine with a reasonable basis to believe, prior to the

effective date of the Policy, that it had committed a Wrongful Act, which includes an "alleged"

act, error, omission or breach of duty.

93.     Pursuant to SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful

Acts, **Claims** or Claimants,

> Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single **Claim**.  Each wrongful act, in a series of related **Wrongful Acts**, will be deemed to have occurred on the date of the first such **Wrongful Act**.

94.     All of the Wrongful Acts alleged in the H&K letter were related.  Therefore, Pine

will be deemed to have had a reasonable basis to believe, prior to the effective date of the Policy,

that it had committed all of the Wrongful Acts.

---

[1] Should read "Real Estate Developers PROtect Professional Liability Insurance Policy."

95.     Therefore, coverage under the Policy does not exist.

**TENTH AFFIRMATIVE DEFENSE**
**Claim Before the Policy Period**

96.     Pursuant to SECTION I – COVERAGES, A. Insuring Agreements of the Policy, subject to all the other terms of the Policy, the Policy covers loss that

> …results from a **Claim** first made and reported in writing during the **Policy Period** or Extended Reporting Period, if applicable…

97.     Pursuant to SECTION III – DEFINITIONS, B.  a "**Claim**" means

> a written demand received by any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitation.

98.     The H&K Letter is a Claim.  It was not first made during the policy period.

99.     Pursuant to SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful Acts, two or more Claims arising out of a single Wrongful Act, or any series of related Wrongful Acts, will be considered a single Claim.  All of the Wrongful Acts alleged in the H&K letter were related.  Therefore, there is a single claim against Pine, and it was not first made during the policy period.  Therefore, coverage under the Policy does not exist.

**ELEVENTH AFFIRMATIVE DEFENSE**
**Manager Exclusion**

100.    Pursuant to SECTION IV – EXCLUSIONS, Section C, of the Policy, there is no coverage for a Claim

> …arising out of any **Insured's** services or capacity as a[]…manager…of any corporation, partnership, association, or any other business enterprise…

101.    The claims against Pine arise out of its services or capacity as a manager of a business enterprise.  Therefore, there is no duty to indemnify Pine for any damages arising out of its services as a manager.

### TWELFTH AFFIRMATIVE DEFENSE
**Breach of Contract Exclusion**

102.    Pursuant to SECTION IV – EXCLUSIONS, Section F of the Policy, there is no coverage for

> …any **Insured's** actual or alleged liability under any oral or
> written contract or agreement, including but not limited to express
> warranties or guarantees…

> However, this exclusion will not apply to the **Insured's** liability
> that exists in the absence of such contract or agreement.

103.    The claims against Pine arise under oral or written contracts or agreements.

Pine's liability would not exist absent such contracts or agreements.  Therefore, there is no duty

to indemnify Pine for any damages arising out of breach of contract or agreement.

### THIRTEENTH AFFIRMATIVE DEFENSE
**Dishonesty Exclusion**

104.    Pursuant to SECTION IV – EXCLUSIONS, Section O of the Policy,  there is no coverage

> …arising out of the actual or alleged theft, misappropriation,
> comingling, or conversion of any funds, monies, assets, or
> property.

105.    There is no coverage for the Schneider Action, in whole or in part, based upon

this exclusion.

### FOURTEENTH AFFIRMATIVE DEFENSE
**Late Notice**

106.    Pursuant to SECTION VI – GENERAL CONDITIONS, Section B of the Policy,

> … as a condition precedent to the **Insured's** right to coverage
> under this policy, the **Insured** must give the **Insurer** written notice
> of such **Claim** as soon as practicable…

107.    There is no coverage for the Schneider Action to the extent Pine failed to comply with this condition of coverage.

## COUNTERCLAIMS

### PARTIES

108.    Upon information and belief, plaintiff Pine is a New York corporation with its principal place of business at 78 Manhattan Avenue, New York, New York 10025.

109.    Defendant Argo is a Virginia corporation with its principal place of business at 8720 Stony Point Parkway, Suite 400, Richmond, Virginia 23235.

### JURISDICTION AND VENUE

110.    This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332(a)(2). The amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Pine, which is a citizen of New York, and Argo, which is a citizen of Virginia.

111.    Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the counterclaims took place in this District.

### ALLEGATIONS COMMON TO ALL COUNTERCLAIMS

112.    Argo and Pine entered into a liability insurance contract entitled Real Estate Developers PROtect Professional Liability Insurance Policy No. RE4202378-0, with an effective period from August 1, 2018 to December 1, 2019 (the "Policy"). The Policy provided insurance coverage to Pine in accordance with all of its terms, conditions, exclusions, definitions and limitations. A true and correct copy of the Policy is attached as Exhibit B.

113.    On or about July 26, 2019, a lawsuit entitled *Schneider, et al. v. Pine Management, Inc., et al*. ("the Schneider Action"), was commenced against Pine and others in the Supreme Court of the State of New York, New York County.

114.    Pine tendered the Schneider Action to Argo for defense and indemnity under the Policy.

115.    The Schneider Action does not trigger any coverage obligations of Argo under the Policy. Therefore, Argo has disclaimed any obligation of defense and indemnity for the Schneider Action under the Policy.

## FIRST COUNTERCLAIM
### No Wrongful Act on or after Retroactive Date

116.    SECTION I – COVERAGES, A., Insuring Agreements, of the Policy provides that coverage will exist, subject to all the other terms of the Policy, for loss

> …arising out of a **Wrongful Act** committed before the end of the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

117.    The Retroactive Date applicable to property management services is March 1, 2016.

118.    Pursuant to SECTION III – DEFINITIONS, Section II,

> **Wrongful Act** means any actual or alleged act, error, omission or breach of duty by any **Insured** in the rendering of or failure to render **Real Estate Development Services**…

119.    Pursuant to SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful Acts, **Claims** or Claimants,

> Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single **Claim**.  Each wrongful act, in a series of related **Wrongful Acts**, will be deemed to have occurred on the date of the first such **Wrongful Act**.

120.     A letter from Holland & Knight to Pine, dated July 17, 2018 (hereafter, "the H&K Letter") (attached hereto as Exhibit A), alleges that wrongful acts were committed prior to the retroactive date of March 1, 2016.  All of the Wrongful Acts alleged in the H&K letter were related.  Therefore, all of the wrongful acts allegedly committed by Pine will be deemed to have occurred prior to the retroactive date of March 1, 2016.  Therefore, coverage under the Policy for the Schneider Action does not exist.

121.     Argo is entitled to a declaration that it owes Pine no obligation of coverage in connection with the Schneider Action.

## SECOND COUNTERCLAIM
### Prior Knowledge of Wrongful Act Exclusion

122.     Pursuant to SECTION IV – EXCLUSIONS, Section A, the Policy does not apply to any claim:

> ……arising out of a **Wrongful Act**… occurring prior to the **Policy Period** if, prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy[2] issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the **Policy Period**:…
>
> 2.  Any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**…

123.     The H&K Letter provided Pine with a reasonable basis to believe, prior to the effective date of the Policy, that it had committed a Wrongful Act, which includes an "alleged" act, error, omission or breach of duty.

124.     Pursuant to SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful Acts, **Claims** or Claimants,

> Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single

---

[2] Should read "Real Estate Developers PROtect Professional Liability Insurance Policy."

> **Claim**.  Each wrongful act, in a series of related **Wrongful Acts**,
> will be deemed to have occurred on the date of the first such
> **Wrongful Act**.

125.     All of the Wrongful Acts alleged in the H&K letter were related.  Therefore, Pine

will be deemed to have had a reasonable basis to believe, prior to the effective date of the Policy,

that it had committed all of the Wrongful Acts.

126.     Therefore, there is no coverage for the Schneider Action under the Policy.

127.     Argo is entitled to a declaration that it owes Pine no obligation of coverage in

connection with the Schneider Action.

### THIRD COUNTERCLAIM
### Claim Before the Policy Period

128.     Pursuant to SECTION I – COVERAGES, A. Insuring Agreements of the Policy,

subject to all the other terms of the Policy, the Policy covers loss that

> …results from a **Claim** first made and reported in writing during
> the **Policy Period** or Extended Reporting Period, if applicable…

129.     Pursuant to SECTION III – DEFINITIONS, B.  a "**Claim**" means

> a written demand received by any **Insured** for monetary, non-
> monetary or injunctive relief, including a written demand that the
> **Insured** toll or waive a statute of limitation.

130.     The H&K Letter is a claim.  It was not first made during the policy period.

131.     Pursuant to SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful

Acts, two or more Claims arising out of a single Wrongful Act, or any series of related Wrongful

Acts, will be considered a single Claim.  All of the Wrongful Acts alleged in the H&K letter

were related.  Therefore, there is a single claim against Pine, and it was not first made during the

policy period.  Therefore, coverage under the Policy for the Schneider Action does not exist.

132.    Argo is entitled to a declaration that it owes Pine no obligation of coverage in connection with the Schneider Action.

**FOURTH COUNTERERCLAIM**
**Reformation Based on Mutual Mistake**

133.    Upon information and belief, Pine is a family owned and operated business focused on managing, developing and acquiring rental apartment buildings.

134.    Upon information and belief, Pine is not in the business of architecture or engineering.

135.    Upon information and belief, Pine had no reason to purchase an Architects & Engineers Professional Liability Insurance Policy. If it were to do so, it would be a mistake on its part.

136.    Argo understood that Pine is in the business of managing, developing and acquiring rental apartment buildings.

137.    Argo understood that Pine is not in the business of architecture or engineering.

138.    Argo had no reason to enter into an Architects & Engineers Professional Liability Insurance Policy with Pine.  If it were to do so, it would be a mistake on Argo's part.

139.    Pine and Argo entered into the Policy, which is a Real Estate Developers Professional Liability Insurance Policy.  Neither Argo nor Pine intended to enter into an Architects & Engineers Professional Liability Insurance Policy, and indeed, they did not enter into an Architects & Engineers Professional Liability Insurance Policy.  Any reference to an Architects & Engineers Professional Liability Insurance Policy in the Policy would be a mutual mistake.

140.    SECTION IV – EXCLUSIONS, Section A, of the Policy provides that it does not apply to any claim:

……arising out of a **Wrongful Act**… occurring prior to the **Policy Period** if, prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the **Policy Period.**

141.     The reference to an "Architects & Engineers Professional Liability Insurance Policy" was a mutual mistake on the part of both Pine and Argo.  Neither party intended the Policy to include that phrase.  Both parties intended that it read "Real Estate Developers PROtect Professional Liability Insurance Policy," or something substantially identical to that.

142.     This Court should reform the Policy to replace the aforesaid reference to an "Architects & Engineers Professional Liability Insurance Policy" to read "Real Estate Developers PROtect Professional Liability Insurance Policy," or something substantially identical to that.

**WHEREFORE**, Argo respectfully requests that this Court enter judgment:

A.     Dismissing the Complaint with prejudice;

B.     Declaring that Argo has no obligation of coverage to Pine, in whole or in part, in connection with the Schneider Lawsuit;

C.     Reforming the Policy to replace the reference to an "Architects & Engineers Professional Liability Insurance Policy" to read "Real Estate Developers PROtect Professional Liability Insurance Policy," or something substantially identical to that;

D.      Granting such other relief as seems just to this Court.

Dated:  May 31, 2022
Uniondale, New York

RIVKIN RADLER LLP


By:    *M. Paul Gorfinkel*
M. Paul Gorfinkel
Frank M. Misiti
926 RXR Plaza
Uniondale, New York 11572
Telephone: (516) 357-3000
paul.gorfinkel@rivkin.com
frank.misiti@rivkin.com

*Attorneys for Defendant*
*Colony Insurance Company*

**EXHIBIT A**

**A-137**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

Case 1:22-cv-02407-MKV   Document 11-1   Filed 06/01/22   Page 2 of 15

NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 07/26/2019

# Exhibit 1

**A-138**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 11-1    Filed 06/01/22    Page 3 of 15    INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Mitchell J. Geller
(212) 513-3483
mitchell.geller@hklaw.com

BY OVERNIGHT COURIER AND E-MAIL

July 17, 2018

Bob G. Goldberg, Esq.
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, New York 10017

Re: Interests of Schneider/Schwartz Group in Limited Liability Companies

Dear Mr. Goldberg:

We represent Jerome Schneider, Ruth Schneider, Marc Schneider, Marni Schwartz, the Jerome Schneider 2012 Family Trust dated December 10, 2012 ("Jerome Schneider Trust") and the Ruth Schneider 2012 Family Trust dated December 10, 2012 ("Ruth Schneider Trust")(collectively the "Schneider/Schwartz Group) in connection with their respective interests in Rudel Realty LLC, Marni Realty LLC, RJS Realty LLC, Marc Realty LLC, Bar-Mar Realty LLC, SIR Realty LLC, Jeruth Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Zizi Realty LLC (collectively "LLC's"), each a New York limited liability company.

The purpose of this letter is to advise you of claims by the Schneider/Schwartz Group against Pine Management, Inc. ("Pine") and those affiliated with Pine arising from Pine's management of the LLC's. As shown below, our examination of the 1996 Operating Agreements of Rudel Realty LLC and Marni Realty LLC ("1996 Operating Agreement"), the 2011 Amended and Restated Operating Agreements for the other eight LLC's ("2011 Amended Operating Agreement") and the relevant documents, including various e-mails and documents reflecting the revenue and expenses of the underlying properties held by the LLC's, [arguably] show, among other things, that: (a) Pine has breached its fiduciary duty to the Schneider/Schwartz Group and has not acted in good faith; (b) Pine has breached provisions of the governing Operating Agreements; (c) Pine has failed to disclose material facts to the Schneider/Schwartz Group; (d) Pine has been involved in related party transactions; and (e) Pine has failed to provide key documents concerning the management and operations of the LLC's to the Schneider/Schwartz Group.

Indeed, the facts demonstrate that Pine and individuals associated or affiliated with Pine have kept the Schneider/Schwartz Group "in the dark" concerning certain key facts and documents concerning Pine's management of the LLC's, has oppressed the Schneider/Schwartz Group and

Anchorage | Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Houston | Jacksonville | Lakeland
Los Angeles | Miami | New York | Orlando | Portland | San Francisco | Stamford | Tallahassee | Tampa | Tysons
Washington, D.C. | West Palm Beach

**A-139**

Bob G. Goldberg, Esq.
July 17, 2018
Page 2

has done everything in their power to entrench themselves and to exclude the Schneider/Schwartz Group from exercising their rights as members of the LLC's, in many of which they have a 50% interest.

Nothing better exemplifies Pine's attempt to oppress the Schneider/Schwartz Group and to entrench Pine's management of the LLC's than their attempt to amend the operating agreements to include a provision that "any Manager may be removed at any time, with or without cause, *by the unanimous vote of the members if the Manager hereunder is Pine Management, Inc., Harold Pine, any descendant of Harold and Sydell Pine, or any spouse of any such descendant.*" (Emphasis added). The sole and clear purpose of such an amendment is to prevent the Schneider/Schwartz Group from removing Pine, Harold Pine or any descendant of Harold and Sydell Pine or any spouse thereof, including Harold Pine, Brenda Rohlman, Daniel Rohlman, Jason Rohlman, Ilyse Rohlman, Lloyd Pine and Tom Rohlman (the "Pine/Rohlman Group"), from management of the LLC's. In short, the only purpose of such provision was to make Pine the Manager of the LLC's in perpetuity. Given the serious issues arising from Pine's management of the LLC's described below, the inclusion of such a provision would not only further entrench Pine in the management of the LLC's but result in further exclusion of the Schneider/Schwartz Group in the LLC's.

Before we address Pine's breaches of the Operating Agreements, Pine's breaches of fiduciary duty and Pine's self-dealing, we believe that it is instructive to set forth certain key principles that govern the management of limited liability companies. We include this detailed examination of New York law on a member's claims against a manager or managing member and a member's rights under the New York Limited Liability Company Law ("LLCL") to expedite your analysis of our clients' claims and to bring about a mutually satisfactory resolution of these claims without having to commence litigation that would be costly to all parties involved. At the very least, based on the detailed exposition of New York law, the facts and the issues, there are many serious issues arising from Pine's management of the LLC's and such claims should survive a motion to dismiss and a motion for summary judgment.

## I. Principles Applicable To The Management Of A Limited Liability Company And Claims Against The Manager

The LLCL governs limited liability companies formed under New York law. The terms of the operating agreement determine the rules applicable to the rights, management and operations of that limited liability company. *See Matter of 1545 Ocean Avenue, LLC*, 72 A.D.3d 121, 128 (2d Dep't 2010). The operating agreement also governs the relationships among members and the powers and authority of the members and manager. *See LNYC Loft, LLC v. Hudson Opportunity Fund I, LLC*, 154 A.D.3d 109 (1st Dep't 2017). Where an operating agreement does not address certain topics, a limited liability company is bound by the default requirements set forth in the LLCL. *1545 Ocean Avenue*, 72 A.D.3d at 129; *Manitaras v. Beusman*, 56 A.D.3d 735, 736 (2d Dep't 2008).

**A-140**

Bob G. Goldberg, Esq.
July 17, 2018
Page 3

A.    Claims Against Manager or Managing Member For Breach of Fiduciary Duty

LLCL § 409 (a), which imposes a statutory fiduciary duty on managers of limited liability companies, provides:

> A manager shall perform his or her duties as a manager, including his or her duties as a member of any class of managers, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

Under New York law, a manager or a managing member of a limited liability company owes a fiduciary duty to the non-managing members of such entity. *See, e.g., DeBenedictis v. Malta,* 140 A.D.3d 438 (1st Dep't 2016); *Pokoik v. Pokoik,* 115 A.D.3d 428, 429-432 (1st Dep't 2014). This fiduciary duty is a "duty of undivided and undiluted loyalty" and "is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum v. Birnbaum,* 73 N.Y.2d 461, 466 (1989). A manager also owes a member a "fiduciary duty to make full disclosure of all material facts." *Salm v. Feldstein,* 20 A.D.3d 469, 470 (2d Dep't 2005).

In *Bookhamer v. I. Karten-Bermaha Textiles Co., L.L.C.* 52 A.D.3d 246, 246 (1st Dep't 2008), the Appellate Division, citing *Birnbaum v. Birnbaum,* stated that the fiduciary duty required the 50% managing member "to operate the company in good faith and fairness, to avoid self-dealing and to make full disclosure of all material facts." *See also Nathanson v. Nathanson,* 20 A.D.3d 403, 404 (2d Dep't 2005) (allegations that manager engaged in self-dealing sufficient to state a cause of action for breach of fiduciary duty); *Sherman v. Mulerman,* 58 Misc.3d 1211(A) (Sup. Ct. Kings Co., Jan. 18, 2018) (allegations of defendant's self-dealing and freezing plaintiff out of decision making process sustained).

The 2011 Amended Operating Agreement of eight of the LLC's expressly recognizes the fiduciary duty owed by the Manager to the Members. Indeed, Section 17.2 states that "[n]otwithstanding anything otherwise herein contained to the contrary, *no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.*" (Emphasis added).

In short, under New York law, a manager or managing member of a limited liability company can be held liable for breach of fiduciary duty where it commits acts that are contrary or inconsistent with his "duty of undivided and undiluted loyalty," fails to disclose material facts, or engages in misconduct or self-dealing.

B.    Conflicts Of Interest Under The LLCL

A manager of an LLC is bound by LLCL § 411, which addresses conflicts of interest by an LLC decision maker. *See Tzolis v Wolff,* 39 A.D.3d 138, 145-46 (1st Dep't 2007) ("Limited

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 3          RECEIVED NYSCEF: 07/26/2019

Case 1:22-cv-02407-MKV   Document 11-1   Filed 06/01/22   Page 6 of 15

Bob G. Goldberg, Esq.
July 17, 2018
Page 4

Liability Company Law § 411 disallows a transaction between a limited liability company and one or more of its managers, or with another business entity in which one or more of its managers has a substantial financial interest."), *aff'd*, 10 N.Y.3d 100 (2008).

C. Member's Inspection Rights Under LLCL

    LLCL § 1102(b) grants inspection rights to a member of a New York limited liability company:

> Any member may, subject to reasonable standards as may be set forth in, or pursuant to, the operating agreement, inspect and copy at his or her own expense, for any purpose reasonably related to the member's interest as a member, the records referred to in subdivision (a) of this section, *any financial statements* maintained by the limited liability company for the three most recent fiscal years *and other information regarding the affairs of the limited liability company as is just and reasonable*. (Emphasis added).

    Under LLCL § 1102(b), a court can direct the manager of the limited liability company to provide "any financial statements maintained by the limited liability company for the three most recent fiscal years" and "other information regarding the affairs of the limited liability company as is just and reasonable."

    We note that Section 14.1 of the 2011 Amended Operating Agreement for eight (8) of the LLC's provides:

> The manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. *Each Member*, Manager or their duly authorized representative *shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.* (Emphasis added).

    Thus, the inspection rights to examine the "Company's books and records" under Section 14.1 of the 2011 Amended Operating Agreement are broader than the inspection rights under LLCL § 1102(a) and includes all types of documents with respect to the LLC's. The courts have uniformly enforced a member's inspection rights under LLCL § 1102(b) and the governing operating agreement. *See, e.g., Sachs v. Adeli*, 26 A.D.3d 52, 55-57 (1st Dep't 2005); *Greenberg v. Falco Construction Corp.*, 29 Misc.3d 1202(A), 2010 WL 3781279, *7 (Sup. Ct. Kings Co. Sept. 29, 2010).

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 5 Case 1:22-cv-02407-MKV Document 11-1 Filed 06/01/22 Page 7 of 15 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 5

D.    Claim For An Accounting

New York law holds that a member of a limited liability company has the right to an equitable accounting under common law. *See Gottlieb v. Northriver Trading Co LLC*, 58 A.D.3d 550, 551 (1st Dep't 2009); *East Quogue Jet LLC v. East Quogue Members, LLC*, 50 A.D.3d 1089, 1091 (2d Dep't 2008); *Gallagher v. Crotty*, 2017 WL 3314241, \*\*2, 4 (Sup. Ct. New York Co., Aug. 3, 2017).

## II.    Schneider/Schwartz Group's Claims Against Pine

We now address the Schneider/Schwartz Group's claims against Pine arising from Pine's management of the LLC's.  These claims broadly fall into four categories:

(1)    Pine's management of eight of the LLC's without obtaining the written approval of the Schneider/Schwartz Group of the "agreement" with the "property manager" and Pine's management of  Marni Realty LLC and Rudel Realty LLC when the 1996 Operating Agreement (Section 5.1) provides that that "the business and affairs of the Company shall be managed by the Members." This claim also includes Pine's payment of fees to itself without obtaining the approval of the Schneider/Schwartz Group and Pines' self-dealing;

(2)    Pine's making of decisions which are outside the "ordinary course of business" and therefore require the approval of the Schneider/Schwartz Group such as (a) the setting of cash reserves that are a departure from historical practices of the LLC's or that are in excess of what is required for day to day operations, (b) the making of capital improvements that are not required for health or safety purposes and (c) the incurring of loans relating to the buildings owned by the LLC's;

(3)    Pine's decision to substantially reduce the distributions from the LLC's to the members without the approval of the Schneider/Schwartz Group, which reduction is a material change in the historical practice of significant distributions to the members of each of the LLC's; and

(4)    Pine's failure to produce certain documents requested by the Schneider/Schwartz Group or to provide explanations of amounts appearing in documents produced.

A.    Pine's Management Of Eight Of The LLC's Without Obtaining
The Approval Of The Schneider/Schwartz Group Of The
"Agreement" With The "Property Manager"

Section 8.1(c) of the 2011 Amended Operating Agreements states as follows:

The Company's *initial manager* shall be Pine Management Inc. Pine Management, Inc. *may be paid for services rendered in* its *role as*

**A-143**

Bob G. Goldberg, Esq.
July 17, 2018
Page 6

> *property manager pursuant to a separate agreement with the Company.*" (Emphasis added).

Although the members of each of the eight limited liability companies that adopted the 2011 Amended Operating Agreement agreed that Pine would be the "initial" Manager of each such entity, the "separate agreement with the property manager" is not annexed to each 2011 Amended Operating Agreement. Significantly, our clients advise us that they have never seen the "separate agreement" with the Pine as "property manager" and certainly never approved the "separate agreement."

Moreover, the "separate agreement" with Pine as "property manager" requires the "affirmative vote of a majority in interest of the Members." In addition, the Pine/Rohlman Group cannot vote on the "separate agreement" with Pine as the "property manager" because they are "interested" or "affiliated" with Pine and thus cannot vote on their own agreement. Here, the Schneider/Schwartz Group was never presented with a copy of the "separate agreement" with the "property manager," and thus was not and is not aware of the terms of such "separate agreement," including, but not limited to, the terms of compensation paid to Pine as the "property manager." As a result, the Schneider/Schwartz Group would have the power to disallow or terminate the "separate agreement" with Pine as the "Property Manager" if in fact such an agreement had been executed. See LLCL § 411.

Particularly instructive is *Tzolis v. Wolff*, 39 A.D.3d 138, 145-146 (1st Dep't 2007), *aff'd*, 10 N.Y.3d 100 (2008), where the First Department sustained claims by minority members of a limited liability company, holding:

> *In any event, regardless of whether a majority, two-thirds, or a unanimous vote was required, Limited Liability Company Law § 411 disallows a transaction between a limited liability company and one or more of its managers, or with another business entity in which one or more of its managers has a substantial financial interest.* Therefore, plaintiffs have alleged a viable cause of action which the documentary evidence does not refute. (Emphasis added).

The same result was reached in *Meyer v. Montauk U.S.A., LLC*, 2017 WL 6387947 (Sup. Ct. Suffolk Co., May 9, 2017). There, the manager asserted that he had authority under the operating agreement to approve an agreement with the limited liability company under which he assigned certain revenues from a licensing agreement to himself. The Supreme Court rejected the manager's contentions and deemed the licensing agreement void, invalid and of no force and effect. *Id.* at **5-6.

The foregoing cases show that courts will closely scrutinize contracts between a limited liability company and a business entity in which its manager has an interest and that such contracts will be disallowed. Simply put, the Pine/Rohlman Group or Pine itself cannot approve the "separate agreement" with Pine as the "property manager." Given Pine's utter failure to produce

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 9                                                                    RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 7

the "separate agreement" and Pine's failure to submit the "separate agreement" to the Schneider/Schwartz Group, let alone obtain its approval, the "separate agreement" with Pine has no validity.

In the case of Marni Realty LLC and Rudel Realty LLC, the 1996 Operating Agreement does not appoint Pine Management as the "Manager" or as the "Property Manager." Assuming that Pine Management has been *de facto* serving as the "Manager" and the "Property Manager" for these two entities for the last several years, the Jerome Schneider Trust and the Ruth Schneider Trust (that collectively own 50%), under Section 5.1 of the 1996 Operating Agreement, have the right to "co-manage" these entities. As a result, Pine has no entitlement to serve as the "Manager" or the "Property Manager" and Marni Realty LLC and Rudel Realty LLC.

    (1)    Pine Has No Authority To Pay Itself Fees Without
              The Approval of the Schneider/Schwartz Group

Furthermore, Pine has no authority to pay itself fees without the approval of the Schneider/Schwartz Group, who has a 50% interest in five of the LLC's, a 25% interest in three of the LLC's, and a 33% interest and a 30% interest in the remaining two LLC's. The "Summary of Receipts and Disbursements 12/31/17" produced by Pine for the LLC's indicate that Pine is paid a "management fee" and a "construction management fee." The "Building P&Ls" indicate that "Total Management Fees" of $622,742 were paid to Pine in 2017 for the LLC's excluding Bar- Mar Realty, LLC.

Suffice it to say, Pine has no authority under the 2011 Amended Operating Agreement to fix its own compensation. Indeed, Section 8.10 of the 2011 Amended Operating Agreement, in clear and unambiguous language, indicates that the "the guaranteed payments and other compensation of the Manager, if any," must be approved "by the affirmative vote of a majority in interest of the Members." Thus, Pine cannot receive any "compensation" for its services unless approved by the vote of more than 50% of the members of the limited liability companies, without taking into the vote of the "interested" members. Given that the Schneider/Schwartz Group has never voted on the "compensation" of Pine, let alone approved such "compensation," Pine has no right to receive fees for its services in connection with its management of the LLC's.

This conclusion equally applies to the 1996 Operating Agreement of Marni Realty LLC and Rudel Realty LLC which contain no provision for the compensation of Pine or any other member involved in managing such entities. Given that Section 5.01 of the 1996 Operating Agreement provides that that "the business and affairs of the Company shall be managed by the Members," the "Members" of Marni Realty LLC and Rudel Realty LLC must approve any compensation paid to a "Manager."

Furthermore, Pine has no authority under the LLCL to fix its own compensation. *See Bookhamer v. I. Karten -Bermaha Textiles, Co. L.L.C.*, 2007 WL 6787899 (Sup. Ct. New York Co. Mar. 29, 2007), *aff'd,* 52 A.D.3d 246 (1st Dep't 2008) (rejecting defendant's claim that his 50% stake in the company gave him authority to fix his compensation, and finding that § 411(b)

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM       INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 11-1   Filed 06/01/22   Page 10 of 15   RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 8

"require[d] the issue of compensation to have been decided by a majority of the members of Bermaha, and not by defendant alone.").

B.   Pine's Making of Decisions Outside The "Ordinary
     Course of Business" Without Obtaining The
     Approval Of The Schneider/Schwartz Group

Section 8.3 of the 2011 Amended Operating Agreement provides that "[t]he Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; *provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company shall be made by the affirmative vote of a majority in interest of the Members.*"(Emphasis added).

By an e-mail dated February 19, 2018 to Marc Schneider, you stated that "The *only limitation provided in these agreements* is that decisions to finance or refinance any real estate owned by an LLC, acquire new or additional real estate, or sell any real estate owned by a LLC requires the affirmative vote of a majority in interest of the voting members or the affected LLC." (Emphasis added). However, your statement is contrary to the phrase "including, but not limited to" in Section 8.3, which are *not* words of limitation.

Equally significant, judicial authority uniformly holds that the phrase "including, but not limited to," has an expansive meaning and is not limited to the items that follow such phrase. *See e.g., Pierre v Providence Washington Ins. Co.*, 99 N.Y.2d 222, 236 (2002) ("includes, but is not limited to" constituted "nonexclusive definition"); *Doniger v Rye Psych. Hosp. Center, Inc.*, 122 A.D.2d 873, 877 (2d Dep't 1986), *lv denied,* 68 N.Y.2d 611 (1986) (use of phrase "including but not limited to" negated inference that parties intended to exclude other examples, and examples following phrase were "illustrative only and do not limit the broad scope of the terms employed"); *see also In re Worldcom, Inc.*, 2007 WL 162782, *6 (S.D.N.Y., Jan. 18, 2007) (phrase "including without limitation" means that following list is not exhaustive; *Fernandez v. Zoni Language Centers, Inc.*, 15-cv-6066 (PKC), 2016 WL 2903274. *6 (S.D.N.Y. May 18, 2016) (same).

Thus, your position that "outside the ordinary course of business" is "limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company" has no factual or legal basis.

Decisions that are "outside the ordinary course of business" in the case of these LLC's and therefore "require the affirmative vote of a majority in interest of the Members" (more than 50% of the Members) include the following: (1) capital improvements that are not required for health or safety purposes; (2) setting of cash reserves that are a departure from historical practices of the LLC's or that are in excess of what is required for day to day operations; and (3) a material change in the historical practice of significant distributions to the members of each of the LLC's. We

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 11-1    Filed 06/01/22    Page 11 of 15
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 9

understand that there has been a dramatic increase in the amount of reserves and capital improvements or renovations for each of the properties owned by the LLC's.

In *Unisys Corp. v. Hercules Inc.*, 224 A.D.2d 365, 368 (1st Dep't 1996), the Appellate Division held that "something which is done as a matter of corporate historical practice is, as a matter of law, done 'in the ordinary course of business.'" Black's Law Dictionary (10th ed. 2014) similarly defines "course of business" as "the normal routine in managing a trade or business." Thus, historical practice is a key indicator of "ordinary course of business." There is no dispute as to the historical practice of these LLC's. The dramatic increase of cash reserves and capital improvements, together with the dramatic decrease in distributions, is contrary to the historical practice for the LLC's and thus, "outside the ordinary course of business."

Nonetheless, Pine has refused to let the Schneider/Schwartz Group participate in these matters that are "outside the ordinary course of business" and thus have to be approved by the affirmative vote of a majority in interest of the Members. Instead, Pine, without any legal basis, has unilaterally decided that these matters are solely within its decision-making authority.

As an example, the Schneider/Schwartz Group discovered in June 2018 that JHJ Realty LLC incurred loans in the total amount of $800,000, which loans were made by the Pine/Rohlman Group. Even based on your incorrect reading of Section 8.3 of the 2011 Amended Operating Agreements, these loans were outside the ordinary course of business and had to be approved by the affirmative vote of a majority in interest of the Members. Pine never sought the approval of the Schneider/Schwartz Group and we are unaware of any approval of such loans by the affirmative vote of a majority in interest of the Members of JHJ Realty LLC.

In addition to being significantly contrary to historical practice of the LLC's, the figures proposed by Pine for the amount of each building's reserve accounts appear to be excessive and unreasonable and far in excess of what is necessary for day to day operations. We understand that the average cash position for the years 2012-2016 is about 327% higher than the average cash position for the years 2000-2005 and that the cash position at the end of the year 2017 is about 393% higher than it was in 2000.

Although Brenda Rohlman's March 3, 2018 e-mail states that "over 35 years, Pine Management Inc. has developed guidelines as to how much money to hold in each building's reserve accounts," Pine has never produced these "guidelines."

C.  Pine's Decision To Substantially Reduce The Distributions
    From The LLC's To The Members Without The Approval
    Of The Schneider/Schwartz Group

We understand that distributions from the LLC's have been dramatically reduced. Indeed, it is our understanding that distributions from the LLC's, which were approximately $500,000 in 2011, decreased to approximately $125,000 in 2017. As noted, a material change in the historical practice of significant distributions to the members of each of the LLC's is a decision that is

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO.     Case 1:22-cv-02407-MKV     Document 11-1     Filed 06/01/22     Page 12 of 15
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 10

"outside the ordinary course of business" in the case of these LLC's and therefore "requires the affirmative vote of a majority in interest of the Members" (more than 50% of the Members).

It cannot be disputed that the amount of distributions received by a member is a matter of crucial importance to the members of the LLC's. Pine has no authority to unilaterally change the historical practice of significant distributions to the members. As a result, the decision to dramatically change the historical practice of significant distributions is a matter "outside the ordinary course of business" in the case of these LLC's and therefore requires the vote of the Schneider/Schwartz Group.

In the case of the 1996 Operating Agreement of Marni Realty LLC and Rudel Realty LLC, Pine has no authority to dramatically decrease the amount of distributions to the members. Inasmuch as the management of these two limited liability companies is vested in the two members pursuant to Section 5.01 of the 1996 Operating Agreement, the "Members" of Marni Realty LLC and Rudel Realty LLC (not Pine) must decide the issue of distributions.

D.    Pines' Failure To Produce Documents Requested By The
      Schneider/Schwartz Group Or To Provide Explanations
      Of Figures Appearing In Documents Produced

Section 14.1 of the 2011 Amended Operating Agreement for eight (8) of the LLC's provides:

> The manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative *shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.*

As noted, the inspection rights to examine the "Company's books and records" under Section 14.1 of the 2011 Amended Operating Agreement is broader than the inspection rights under LLCL § 1102(a). The member's "right to examine the Company's books and records" includes documents such as tax returns, financial statements, key contracts, ledgers and other documents concerning the financial condition of the limited liability company and the underlying property, including, but not limited to: (a) documents concerning capital improvements; (b) documents relating to or constituting the basis on which the Manager or Property Manager is setting reserves for the underlying property; (c) documents relating to payments to the Manager or Property Manager, and payments, if any, to related or affiliated parties of the Manager or Property Manager and (d) documents concerning or relating to loans to or by the limited liability company.

Based on the inspection rights of the Schneider/Schwartz Group as a member of the 8 LLC's under LLCL § 1102(a) and (b) and Section 14.1 of the 2011 Amended Operating

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO.  Case 1:22-cv-02407-MKV   Document 11-1   Filed 06/01/22   Page 13 of 15   RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 11

Agreement, we, on behalf of the Schneider/Schwartz Group, request that Pine produce the following documents for the last six (6) years (2012-2018):

(1) the "separate agreement" between the respective limited liability company and Pine Management for services rendered as the "property manager" and any amendments thereto and documents constituting the approval of such "separate agreement;"

(2) documents showing monies paid to Pine Management as the "Manager" of the respective limited liability company and the approval of monies paid or to be paid to the Manager;

(3) documents showing monies paid to Pine Management as the "Property Manager" of the respective limited liability company, the approval of monies paid or to be paid to the Property Manager and the basis and methodology for the calculation of the "management fee" and "construction management fee;"

(4) documents showing the "financial condition" of the limited liability company, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals and General Ledgers;

(5) documents showing the basis for the calculations for the amount of distributions to the members of the limited liability company;

(6) documents showing the capital improvements to the property and payments relating to such capital improvements;

(7) documents relating to or constituting the basis or methodology on which the Manager or Property Manager is setting reserves for the underlying property, including Pine Management's "guidelines," if any, for such reserve accounts:

(8) documents constituting or relating to renovations to the apartments at the property;

(9) documents concerning or related to payments by the respective limited liability company to persons or entities related or affiliated with Pine Management; and

(10) Written consents, if any, reflecting actions taken by the Manager or Members of the LLC's.

A-149

Bob G. Goldberg, Esq.
July 17, 2018
Page 12

    We, on behalf of Marni Realty LLC and Rudel Realty, LLC, request the same documents for these entities based on the provision that Section 5.1 of the 1996 Operating Agreement provides that "the business and affairs of the Company shall be managed by the Members" and the inspection rights under LLCL § 1102(a) and (b). At the very least, the "default provisions" of the LLCL apply where, as here, these Operating Agreements are "silent" on the issue.

    The Schneider/Schwartz Group has requested a number of the foregoing documents. Pine has refused to produce certain requested documents. For example, Brenda Rohlman's March 3, 2018 e-mail refused the Schneider/Schwartz Group's "request for capital expenditures over the past five years for each apartment in the buildings you and your family has a membership interest in," stating "Pine Management Inc. is not spending the time to go backwards over the past five years to complete this list." Surely, the Schneider/Schwartz Group is entitled to this information which materially affects their interests in the LLC's. Surely, the Schneider/Schwartz Group is entitled to information concerning the "Management Fee" and the "Construction Management Fees" referenced in the "Summary of Receipts and Disbursements" of each of the LLC's and the methodology used to arrive at such fees.

    Surely, the Schneider/Schwartz Group is entitled to information concerning any loans to the LLC's, including, but not limited to, loans made to the LLC's by members of such LLC's, including the Pine/Rohlman Group. In particular, the Schneider/Schwartz Group is entitled to advance notification and approval of such loans.

    Pine's refusal to produce the requested documentation is contrary to its fiduciary duty to provide material facts to the members of the LLC's.

    We also note that Pine does not produce documents on a regular or timely basis to the Schneider/Schwartz Group. Rather, Pine produces certain documents in reaction to a request from the Schneider/Schwartz Group. A perfect example of Pine's release of information and documents "after the fact" is Pine's production of documents relating to the $800,000 of loans incurred during the period November 15, 2016 through December 1, 2017 by JHJ Realty LLC *after* Jerome Schneider sent an e-mail, dated June 13, 2018, to Tom Rohlman.[1]

    "A manager's failure to provide access to books and records where an applicable state statute allows inspection can constitute a breach of fiduciary duty." *Estrada v. Dugow*, 2016 WL 7017412, *8 (S.D.N.Y. Nov. 30, 2016). If Pine refuses to permit the Schneider/Schwartz Group or its representatives to examine and make copies of the foregoing documents, the Schneider/Schwartz Group can commence an action, which will include a cause of action for inspection of the books and records of the LLC's (*see Sachs v. Adeli*, 26 A.D.3d at 55-57, *Neumann v. Cenpark Realty, LLC*, 2012 WL 10007764, **6-7 (Sup. Ct. N.Y. Co. Apr. 18, 2012), as well as a cause of action for an accounting. *See Gottlieb v. Northriver Trading Co LLC*, 58 A.D.3d at 551.

---

[1] The Notes comprising the $800,000 of loans are dated November 15, 2016, December 13, 2016, October 4, 2017 and December 1, 2017. The Harold Pine 2009 Family Trust is the lender on each of the Notes.

**A-150**

Bob G. Goldberg, Esq.
July 17, 2018
Page 13

           *                       *                      *

The foregoing presentation demonstrates, among other things that: (a) Pine has breached its fiduciary duty to the Schneider/Schwartz Group and has not acted in good faith; (b) Pine has breached provisions of the governing Operating Agreements; (c) Pine has failed to disclose material facts to the Schneider/Schwartz Group; (d) Pine has been involved in related party transactions; and (e) Pine has failed to provide key documents concerning the management and operations of the LLC's to the Schneider/Schwartz Group. In short, Pine (and the Pine/Rohlman Group) have taken actions that have prevented the Schneider/Schwartz Group from exercising their rights as members under the 2011 Amended Operating Agreements, the 1996 Operating Agreement and the LLCL.

In view of the foregoing, we suggest that a meeting be scheduled to resolve the Schneider/Schwartz Group's concerns. We believe that a mutually satisfactory resolution of the issues is preferable to a costly and unnecessary litigation.

Sincerely,

*Mitchell J. Geller*

Mitchell J. Geller

cc: Jerome Schneider
    Ruth Schneider
    Marc Schneider
    Marni Schwartz
    Lance Myers, Esq.

#58894569_v1

**EXHIBIT B**



# Real Estate Developers PROtect℠
# Professional Liability Insurance with Cyber Coverage Declarations

**NOTICE: THIS IS CLAIMS MADE AND REPORTED COVERAGE. PLEASE READ THE POLICY CAREFULLY.**

| **Insurer:** Colony Insurance Company<br>8720 Stony Point Parkway, Suite 400<br>Richmond, VA  23235 | **Producer:** Swett & Crawford<br>50 California St, Suite 2000<br>San Francisco, CA  94111 |
|---|---|
| **Policy Number:** RE4202378-0 | |
| Renewal of Policy Number: Newline | |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS AND CONDITIONS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

ITEM 1.   **NAMED INSURED** (Name and Mailing Address):
Pine Management Inc
78 Manhattan Avenue
New York, NY  10025

ITEM 2.   **POLICY PERIOD:**   (a) Inception Date:  08/01/2018   (b) Expiration Date: 12/01/2019
Both dates at 12:01 a.m. at the Named Insured's Mailing Address shown  in ITEM 1 above.

ITEM 3.   **COVERED REAL ESTATE DEVELOPMENT SERVICE**
providing asset management, property management, development consulting, and those services as defined in the Real Estate Developers PROtect Professional Liability Insurance with Cyber Coverage Form, with respect to both acquired and non-acquired properties as well as owned and non-owned properties

ITEM 4.   **LIMIT OF LIABILITY AND DEDUCTIBLE:** INSURING AGREEMENTS

| Limit of Liability:<br>Each **Claim** | Limit of Liability:<br>Aggregate for all **Claims** | Deductible:<br>Each **Claim** | Deductible:<br>Aggregate |
|---|---|---|---|
| $1,000,000 | $1,000,000 | $25,000 | $N/A |

ITEM 5.    **LIMITS OF LIABILITY AND DEDUCTIBLES:** SUPPLEMENTAL EXPENSES

| **Expense Event** | Limit of Liability: Each **Expense Event** | Limit of Liability: Aggregate | Deductible: Each **Expense Event** |
|---|---|---|---|
| **Crisis Management Expenses** | $100,000 | $100,000 | $0 |
| Appearance at Proceedings | $10,000 | $50,000 | $0 |
| **Disciplinary Proceedings** | $25,000 | $100,000 | $0 |
| Subpoena Assistance | $15,000 | $25,000 | $0 |
| ADA,FHA and OSHA Legal Expense Reimbursement | $25,000 | $25,000 | $0 |
| Supplementary **Cleanup Costs** Coverage | $25,000 | $25,000 | $0 |

ITEM 6.    **PREMIUM:** $33,168

ITEM 7.    **EXTENDED REPORTING PERIOD OPTION(S):**

12 months at 100% of Full Annual Premium        24 months at 185% of Full Annual Premium

36 months at 200% of Full Annual Premium        48 months at 225% of Full Annual Premium

60 months at 250% of Full Annual Premium        72 months at 275% of Full Annual Premium

ITEM 8.    **RETROACTIVE DATE:** 3/1/2016

ITEM 9.    **NOTICE TO THE INSURER:**

| CLAIMS OR POTENTIAL CLAIMS SEND TO: | ALL OTHER NOTICES SEND TO: |
|---|---|
| ARGO PRO US Professional Liability - Claims 413 W. 14th Street New York, NY  10014 855-225-7204 Argoproclaims@argogroupus.com | ARGO PRO US Professional Liability - Underwriting 413 W. 14th Street New York, NY  10014 |

ITEM 10.  **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:**

Please see Schedule of Forms and Endorsements, DECSCH, for a complete list of forms.

**THESE DECLARATIONS, TOGETHER WITH THE PROFESSIONAL LIABILITY POLICY COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

DECSCH-0117                                                                                    Page 1

# SCHEDULE OF FORMS AND ENDORSEMENTS

Insured:  Pine Management Inc
Policy Number:  RE4202378-0

Forms and Endorsements applying to and made part of this policy at the time of issuance:

| NUMBER | TITLE |
|---|---|
| PRRE1000DEC-0517 | Real Estate Developers PROTect Professional Liability Policy Declarations |
| DECSCH-0117 | Schedule Of Forms And Endorsements |
| PRRE1001-0617 | Real Estate Developers PROTect Professional Liability Policy |
| U094-0415 | Service Of Suit |
| PR2006-0117 | Professional Services Endorsement |
| PR2017-0117 | Retroactive Date For Specific Coverage |
| ILP001-0104 | U.S. Treasury Department's Office Of Foreign Assets Control (OFAC) Advisory |
| PrivacyNotice-0415 | Privacy Policy |
| SIGCIC-1013 | Signature Page |

# Real Estate Developers PROtect<sup>℠</sup> Professional Liability Insurance with Cyber Coverage

**THIS IS CLAIMS MADE AND REPORTED COVERAGE.
PLEASE READ THIS POLICY CAREFULLY.**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Words and phrases that appear in bold are defined and may be used in the singular or plural, as appropriate; please refer to Section III – Definitions.

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the **Insurer**, and subject to all of the terms and conditions of this policy (including all endorsements hereto), the **Insurer** agrees with the **Insured** to provide insurance as stated in this policy.

SECTION I - COVERAGES

A.  Insuring Agreements:

1.  Professional Liability

    The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended reporting Period, if applicable, arising out of a **Wrongful Act** committed before the end of the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

2.  Cyber Liability

    The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended Reporting Period, if applicable, arising out of a **Privacy Breach**, **Security Event** or **Social Engineering Incident** taking place before the end of the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

3.  Contractors Pollution Liability

    The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended reporting Period, if applicable, arising out of a **Pollution Incident** first discovered during the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

B.  Supplemental Payments

    These supplemental payments will be paid up to the amount shown in Item 5 of the Declarations and in addition to the applicable Limit of Liability shown in Item 4 of the Declarations.

1.  **Crisis Management Expenses**

    The **Insurer** will reimburse the **Insureds**, in excess of the applicable Deductible shown in Item 5 of the Declarations, **Crisis Management Expenses** resulting directly from any **Wrongful Act, Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident** that takes place during the **Policy Period**.

2. Appearance at Proceedings

The **Insurer** will pay for loss of earnings for the **Insured's** attendance, at the **Insurer's** written request, at a trial, hearing, arbitration or mediation proceeding involving a **Claim** against any **Insured**. The maximum amount the **Insurer** will pay for any one or series of trials, hearings, mediation or arbitration proceedings arising out of the same **Claim** will not exceed $500 per individual **Insured** for each day, or part thereof.

3. **Disciplinary Proceedings**

a. If, during the **Policy Period**, a **Disciplinary Proceeding** is first brought against any **Insured**, the **Insurer** will reimburse the **Insureds** for reasonable and necessary legal fees and expenses that the **Insured** incurs in the defense of such matter. Such legal fees and expenses do not include any fines, penalties or restitution paid by the **Insured** as part of or to resolve a **Disciplinary Proceeding**.

b. The **Insurer** will have no duty to defend the **Insured** in any such **Disciplinary Proceeding**.

c. Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

4. Subpoena Assistance

a. If, during the **Policy Period**, an **Insured** first receives a subpoena for documents or testimony arising out of **Real Estate Development Services** performed by any **Insured**, and the **Insured** requests the **Insurer's** assistance in responding to such subpoena, the **Insurer** will reimburse the **Insured** for reasonable and necessary: legal fees and expenses incurred to provide the **Insured** advice regarding the production of documents; costs incurred by the **Insured** to produce any documents in response to the subpoena; and legal fees and expenses to prepare the **Insured** for sworn testimony and to represent the **Insured** at the **Insured's** depositions;

provided that:

(1) the subpoena arises out of a lawsuit to which the **Insured's** are not a party; and

(2) the **Insureds** have not been engaged to provide advice or testimony in connection with the lawsuit and the **Insureds** have not provided such advice or testimony in the past.

b. The **Insurer** has no duty to defend the **Insured** in connection with any such subpoena assistance. Compliance with a subpoena will not be considered a **Claim** or **Disciplinary Proceeding** under the policy and the coverage for any Subpoena Assistance is limited to that provided under this section.

c. Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

5. ADA, FHA and OSHA Legal Expense Reimbursement

The **Insurer** will reimburse the **Insured** for legal fees and expenses up to the amount shown in Item 5 of the Declarations per **Policy Period** in responding to each regulatory or administrative action brought directly against the **Insured** by a government agency under the Americans with Disabilities Act of 1990 (ADA), the Fair Housing Act (FHA) or the Occupational Safety and Health Act (OSHA) provided that the regulatory or administrative action:

a. is first commenced during the **Policy Period**; and

b. arises out of the performance of **Real Estate Development Services** rendered on or after the Retroactive Date shown in Item 8 of the Declarations.

After the **Insurer** has paid up to the amount shown in Item 5 of the Declarations under this provision, any additional amounts the **Insurer** agrees to pay will be treated as **Defense Costs** and will be subject to the deductible for the **Policy Period** in which the action was first commenced.

The **Insurer** will not be responsible for the payment of any fines or penalties assessed.

Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.


SECTION II – LIMITS OF LIABILITY AND DEDUCTIBLE

A.  Limits of Liability: Insuring Agreements A.1 Professional Liability, A.2 Cyber Liability and A.3 Pollution Liability

1.  Limit of Liability, each **Claim** under Insuring Agreements A.1, A.2 and A.3:  The most the **Insurer** will pay for any **Loss** for each **Claim** covered by this policy under Insuring Agreements A.1,  A.2 and A.3 is the amount shown for Limit of Liability in Item 4 of the Declarations.

2.  Limit of Liability, aggregate for all **Claims** under Insuring Agreements A.1, A.2 and A.3: The most the **Insurer** will pay for all **Loss** for all **Claims** in the Aggregate covered by this policy under Insuring Agreements A.1,  A.2 and A.3 is the amount shown in Item 4 of the Declarations.

3.  **Defense Costs** are part of and not in addition to the Limits of Liability.  Payment of **Defense Costs** by the **Insurer** will reduce, and may exhaust, the Limits of Liability.

B.  Limits of Liability: Supplementary Coverages

Supplemental payments under Insuring Agreement B will be paid in addition to the policy Aggregate Limit of Liability shown in Item 4 of the Declarations.

1.  Limits of Liability: **Crisis Management Expenses** – The most this **Insurer** will pay for costs for **Crisis Management Expenses** covered under Insuring Agreement B.1 of this policy during the **Policy Period** from each **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident** and in the Aggregate are the amounts shown for **Crisis Management Expenses** in Item 5 of the Declarations.

2.  Limits of Liability: Appearance at Proceedings: The most the **Insurer** will pay for costs for each such Appearance at a proceeding and in the Aggregate under Insuring Agreement B.2 during the **Policy Period** are the amounts shown in Item 5 of the Declarations.

3.  Limits of Liability: Each **Disciplinary Proceeding**: The most the **Insurer** will pay for costs for each such **Disciplinary Proceeding** and in the Aggregate under Insuring Agreement B.3 during the **Policy Period** are the amounts shown in Item 5 of the Declarations.

4.  Limits of Liability: Subpoena Assistance: The most the **Insurer** will pay for costs for each such subpoena and in the Aggregate under Insuring Agreement B.4 of this policy are the amounts shown in Item 5 of the Declarations.

5.  Limits of Liability: ADA, FHA and OSHA Legal Expense Reimbursement: The most the **Insurer** will pay for costs for ADA, FHA and OSHA Legal Expense Reimbursement under Insuring Agreement B.5 during the **Policy Period** is the amount shown in Item 5 of the Declarations.

6.  Limits of Liability: Supplementary **Cleanup Costs** Coverage: The most the **Insurer** will pay for costs for Supplementary **Cleanup Costs** Coverage Insuring Agreement B.6 during the **Policy Period** is the amount shown in Item 5 of the Declarations.

C.   Deductible

1.  Regarding the coverage provided by this policy under Insuring Agreements A.1 Professional Liability, A.2, Cyber Liability, and A.3. Pollution Liability, the Each Claim Deductible shown in Item 4 of the Declarations applies to each **Claim** and will be paid by the **Insured** as a condition precedent to payment of any **Loss** by the **Insurer**.  The **Insured** must pay the applicable deductible for each **Claim** within 30 days of the **Insurer's** written request regardless of the number of **Claims** covered by this policy. Any Aggregate Deductible amount shown in Item 4 of the Declarations is the most the **Insured** will pay as a deductible for all **Claims** covered by this policy.

2. Regarding the coverage provided by this policy under Insuring Agreement B. Supplemental Coverages, the Each **Expense Event** Deductible shown in Item 5 of the Declarations applies respectively to each **Crisis Management Expense**, Appearance at Proceeding, **Disciplinary Proceeding**, Subpoena, ADA, FHA, OSHA Legal Expense or Supplementary **Cleanup Costs** Coverage event and will be paid by the **Insured** as a condition precedent to payment of any **Loss** by the **Insurer**. The **Insured** must pay the applicable deductible for each **Claim** within 30 days of the **Insurer's** written request regardless of the number of **Claims** covered by this policy. Any Aggregate Deductible amount shown in Item 4 of the Declarations is the most the **Insured** will pay for all **Claims** covered by this policy.

3. The **Insured's** Deductible obligation for each **Claim** will be reduced by 50%, subject to a maximum aggregate reduction of all Deductibles for all **Claims** of $25,000 if the **Insurer** agrees and the **Insured** consents to the final settlement of a **Claim** during a voluntary mediation. This reduction does not apply to any **Claim** resolved through court-mandated mediation or voluntary or involuntary arbitration.


SECTION III - DEFINITIONS

A. **Bodily Injury** means physical injury, sickness, disease or death of any person, and any resulting mental injury, mental anguish, emotional distress, suffering, shock, or humiliation.

B. **Claim** means any of the following arising from a **Wrongful Act**:

1. a written demand received by any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations;

2. a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

3. the institution of an arbitration, mediation, or other alternate dispute resolution proceeding against any **Insured**; or

4. as respects Insuring Agreement A.2, a **Privacy Regulatory Action**.

C. **Cleanup Costs** means expenses incurred in the investigation, evaluation, monitoring, testing, removal, containment, treatment, response, disposal, remediation, detoxification or neutralization of smoke, soot, fumes, acids, alkalis, toxic chemicals, asbestos, liquids or gases, waste materials or other irritants, contaminants or pollutants as a direct result of a **Pollution Incident**. Except as provided in Extensions of Coverage 1 Emergency Remediation Costs, coverage for **Cleanup Costs** under this Policy is conditioned upon prior approval of the **Insurer**.

**Cleanup Costs** do not include any expenses detailed in the preceding paragraph incurred after the cleanup is deemed to be complete upon final approval from the supervising governmental authority.

D. **Crisis Management Expenses** means reasonable and necessary expenses, including legal fees, approved by the **Insurer** in its sole discretion, to engage a public relations firm after an **Insured's Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**.

E. **Defense Costs** means:

1. reasonable and necessary fees, costs and expenses charged by any lawyer consented to or designated by the **Insurer** to defend any **Insured** against a **Claim**;

2. all other reasonable and necessary fees, costs and expenses resulting from the investigation, discovery, defense, settlement or appeal of a **Claim** as authorized by the **Insurer**; and

3. the cost of a bond or appeal bond, required as a result of a **Claim**, including bonds to release attachments, but only for bond amounts not exceeding the applicable Limit of Liability; however, the **Insurer** has no obligation to apply for, guarantee or furnish any such bond.

**Defense Costs** do not include the remuneration, salaries, overhead, fees or expenses of either the **Insured's** or the **Insurer's** regular employees or officials or any fees or expenses incurred prior to the time that a **Claim** is first made against any **Insured** and reported to the **Insurer**. **Defense Costs** will be paid first and will reduce, and may exhaust, the Limits of Liability shown in Items 4 and 5 of the Declarations.

F. **Disciplinary Proceeding** means a proceeding before a disciplinary board or similar entity or official to determine violations of disciplinary rules or rules of professional conduct, professional misconduct or other matters relating to licensing and discipline. **Disciplinary Proceeding** does not include charges, investigations or actions filed with a regulatory agency or official, including, without limitation, the Securities and Exchange Commission, the U.S. Patent & Trademark Office or the Internal Revenue Service.

G. **Expense Event** means any appearance at a proceeding, **Disciplinary Proceeding**, subpoena, regulatory or administrative action, or corporate reputation damage or Supplementary **Cleanup Costs** event that triggers coverage under Insuring Agreements B.1, B2, B.3, B.4, or B.5.

H. **Information Custodian** means any third party that possesses **Non-public Personal Information** or **Proprietary Business Information** on behalf of the **Named Insured** and which is required to maintain the confidentiality and integrity of that information by a written contract with the **Named Insured**.

I  **Information System** means any electronic device, electronic and paper storage media, as well as any communications networks, including cloud or other multi-tenant storage models.

J. **Insured** means:

1. the **Named Insured** and any **Subsidiary**;

2. any past,  present or future owner, principal, officer, director, partner, stockholder, shareholder, member, manager or employee of the **Named Insured** or any **Subsidiary** for **Real Estate Development Services** rendered on behalf of the **Named Insured** or any **Subsidiary**;

3. the estate, heirs, executors, administrators, assigns and legal representatives of each of the **Insureds** in the event of the **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this policy;

4. any **Insured's** legal spouse, including any natural person qualifying as a domestic partner under the provisions of any applicable state, federal or local law in the United States, but only with respect to **Loss**  resulting from  **Real Estate Development Services** of the **Named Insured**;

5. all joint ventures entered into, but only for liability arising out of **Real Estate Development Services** performed by any **Insured** as a participant in a joint venture project; or,

6. any employee, intern, volunteer or independent contractor of the **Named Insured** or any **Subsidiary**, but only as respects **Real Estate Development Services** rendered on behalf of the **Named Insured** or **Subsidiary**.

K.  **Insurer** means the insurance company issuing this policy as shown in the Declarations.

L. **Loss** means a monetary judgment or settlement that an **Insured** becomes legally obligated to pay as a result of a **Claim**, including punitive or exemplary damages where insurable under applicable law.

1. **Loss** includes:

   a. **Defense Costs**; and

   b. **Rectification Costs**; and

   c. pre and post judgement interest on the entire amount of any judgment which accrues after the entry of the judgment and before the **Insurer** has paid or tendered or deposited in the Court that part of the judgment that does not exceed the policy limit.

   d. As regards the coverage provided under SECTION I – COVERAGES, Insuring Agreement A.2

Cyber Liability, **Loss** includes the following for which an **Insured** becomes legally obligated to pay as the result of a **Claim** to which this insurance applies:

(1) **Regulatory Fines And Penalties** if, and to the extent that, such amounts are insurable under the law of the jurisdiction most favorable to the insurability of such **Regulatory Fines And Penalties** provided such jurisdiction has a substantial relationship to the relevant **Insureds**, the **Insurer**, or the **Claim**; and

(2) **Regulatory Restitution**.

e. As regards coverage provided under SECTION I – COVERAGES, Insuring Agreement A.3. Contractor Pollution Liability, **Loss** includes **Cleanup Costs** for which the **Insured** becomes legally obligated to pay as the result of a **Claim** for which this insurance applies.

2. **Loss** does not include:

a. any fines, penalties, taxes or sanctions, whether imposed by law or otherwise (except as provided above with respect to punitive or exemplary damages or **Regulatory Fines and Penalties**);

b. the return, reduction or restitution of fees or expenses (except as provided above with respect to **Regulatory Restitution**);

c. amounts which are uninsurable under applicable law; or

d. the cost of complying with any injunctive, declaratory or administrative relief.

M. **Named Insured** means the person or entity designated in Item 1 of the Declarations and any **Predecessor** of such entity.

N. **Non-public Personal Information** means any of the following information, if not already publicly available:

1. social security number, driver's license or government issued identification number;

2. credit, debit, bank, credit union or brokerage account numbers, balances or account histories;

3. telephone numbers or telephone records;

4. medical records, health insurance identification numbers or other protected health information; or

5. any other non-public information that can be used to identify that individual as specified by a **Privacy Regulation**.

O. **Personal Injury Offense** means:

1. false arrest, humiliation, mental anguish, emotional distress, unlawful detention, false imprisonment, wrongful entry, eviction or other invasion of private occupancy, abusive litigation, abuse of process or malicious prosecution;

2. the publication or utterance of a libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of any individual's right to privacy; or

3. misrepresentation in advertising, infringement of copyright, trademark, service mark, trade dress or trade name.

P. **Policy Period** means the period from the inception date of this policy to the expiration date of this policy, as shown in Item 2 of the Declarations, or its earlier termination date, if any.

Any extension of the **Policy Period** will not result in an increase or reinstatement of the Limit of Liability.

Q. **Pollution Incident** means an alleged or actual discharge, dispersal, release, seepage, migration or escape of smoke, soot, fumes, acids, alkalis, toxic chemicals, asbestos, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any

watercourse or body of water taking place on or after the Retroactive Date, if any, shown in the Declarations:

1.   arising from a **Wrongful Act**, or

2.   occurring at any location at which the **Insured** is performing **Real Estate Development Services** <<this added with the intent to provide contractors pollution coverage>>

that causes **Bodily Injury**, **Property Damage** or financial loss.

R.  **Potential Claim** means:

1.   any **Wrongful Act** which might reasonably be expected to give rise to a **Claim** against any **Insured** under the policy;

2.   any breach of duty to a client or third party, which has not resulted in a **Claim** against any of the **Insureds**; or

3.   receipt of notice of a **Disciplinary Proceeding** or subpoena.

S.  **Predecessor** means an individual or entity engaged in **Real Estate Development Services** whose financial assets and liabilities the **Named Insured** is the majority successor in interest.

T.  **Privacy Breach** means any of the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

1.   the alleged unauthorized alteration, collection, copying, disclosure, dissemination or viewing of **Non-public Personal Information** or **Proprietary Business Information** in any form, from any source, because of an Insured's failure to protect such information from unauthorized access or unauthorized use;

2.   the alleged accidental release or loss of **Non-public Personal Information** or **Proprietary Business Information**;

3.   the alleged wrongful collection, use or sale of **Non-public Personal Information** in any form; and

4.   an **Insured's** alleged failure to correct the **Non-public Personal Information** of a third party that is stored on the **Named Insured's Information System** once notified by the affected individual or that individual's legal counsel.

**Privacy Breach** includes the **Named Insured's** vicarious liability for the privacy breach of **Non-public Personal Information** or **Proprietary Business Information** in the care, custody and control of an **Information Custodian** to whom the **Named Insured** entrusted that information.

U.  **Privacy Regulation** means any current or future statute or regulation applying to the collection, dissemination or storage of **Non-public Personal Information** promulgated by a **Privacy Regulator** including, but not limited to, state breach notice laws, HIPAA, the Hi-Tech Act, the Federal Trade Commission (FTC) Red Flag rules, Gramm-Leach Bliley or the European Union (EU) Data Protection Act.

V.  **Privacy Regulator** means any local, state or federal government of the United States, any provincial or federal government in Canada, the European Union or a member state of the European Union.

W.  **Privacy Regulatory Action** means the institution of an investigation, an administrative hearing or civil charges by a **Privacy Regulator** under a **Privacy Regulation** arising out of an actual or alleged **Privacy Breach**.

X.  **Real Estate Development Services** means the following services performed by or on behalf of any **Insured** in the course of improvement of real property acquired by the **Insured**, whether alone or as part of a partnership, joint venture, syndication, or other arrangement :

1   the construction or renovation of buildings or other structures on such real property, including: conceptual land planning; requesting and securing zoning changes; performing

environmental studies; construction of horizontal infrastructure such as roads and utilities; property tear-down or re-development; creating capital expenditure projections; performing financial management and reporting; obtaining necessary capital, including giving market condition projections, promotion and advertising; determining surface and subsurface conditions; determining cultural and historic conditions; projecting LEED ratings; preparation, transmittal, and awarding of design and construction bid packages; management, coordination, and supervision of design and construction; and identification and obtaining of applicable permits, variances, consents, easements, and other rights;

2. services performed while acting as a real estate agent, title agent, notary public, mortgage broker, property manager, construction manager, or general contractor, if performed as part of the services as a real estate developer for the same improvement of real property; and

3. any other services identified as **Real Estate Development Services** listed in Item 3 of the Declarations.

It is further understood that, regarding the coverage provided in this policy under Insuring Agreement A.2, **Professional Service** includes **Technology Services**.

Y. **Property Damage** means physical injury to tangible property, including all resulting loss of use of that property.

Z. **Proprietary Business Information** means business records, customer lists, trade secrets or any other non-public information entrusted to an **Insured** under a written contract to protect its confidentiality.

AA **Rectification Costs** means those expenses incurred by the **Insured** in excess of the deductible to rectify a design defect in any part of the construction works or engineering works for any project for which the **Insured** is responsible for both design and construction, providing:

1. the **Insured** demonstrates that the actual and necessary costs and expenses arise out of the **Insured's** performance of **Real Estate Development Services**, and

2. the **Insured** first sought recovery for any **Rectification Costs** from any Professional Liability Coverage that may apply to the entity responsible for the design defect.

BB **Regulatory Fines And Penalties** means those sums any **Insured** is required to pay as part of the settlement or judgment of a **Privacy Regulatory Action** to which this insurance applies.

CC. **Regulatory Restitution** means sums deposited into a fund for the purpose of providing compensation to individuals affected by a **Privacy Breach** as part of a settlement or judgment resulting from a **Privacy Regulatory Action**.

DD. **Security Event** means any of the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

1. the **Insured's** inadvertent transmission of malicious computer code to a third party;

2. the failure to prevent the use of the **Named Insured's Information System** to harm a third party's **Information System** including the failure to prevent the use of the **Named Insured's Information System** to launch a denial of service attack;

3. the inability of the **Named Insured** or third party to access the **Named Insured's Information System** due to the failure to prevent a denial of service attack, damage from malicious computer code, unauthorized access to or unauthorized use of the **Named Insured's Information System**; or

4. the corruption, destruction or loss of electronic data held within the **Named Insured's Information System** as the direct result of malicious computer code, a denial of service attack or from unauthorized access to, or unauthorized use of, the **Named Insured's Information System.**

EE. **Social Engineering Incident** means the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

An **Insured** having transferred, paid or delivered funds or data as a direct result of a fraudulent written instruction, electronic instruction (including e-mail or web-based instruction) or telephone instruction which is intended to mislead an Insured through misrepresentation of a material fact that is relied upon in good faith by such **Insured**.

FF. **Subsidiary** means:

1. any entity in which more than 50% of the outstanding voting securities or voting rights representing the present right to vote for election of directors, officers, any **Insured**, or any equivalent executives, is owned or controlled by the **Named Insured**, either directly or indirectly on or before the effective date of this policy;

2. any entity after the effective date of this policy by reason of being created or acquired by the **Named Insured** after such date, if the gross revenues of the created or acquired entity for the prior year are equal to or greater than 50% of the annual gross revenues of the **Named Insured** as reflected in the **Named Insured's** most recent audited consolidated financial statement prior to such creation or acquisition; or

3. any entity after the effective date of this policy by reason of being created or acquired by the **Named Insured** after such date, other than as described in subsection 2. above, but such entity will be a **Subsidiary** only for either (i) a period of 30 days from the date such entity was created or acquired by the **Named Insured**; or (ii) until the end of the **Policy Period**, whichever occurs first.

Provided, however, that **Subsidiary** will not mean any entity which is a financial institution, including but not limited to any bank, insurance company, insurance agent/broker, securities broker/dealer, investment advisor, mutual fund or hedge fund.

**Subsidiary** also means any foundation or charitable trust controlled or directly sponsored by the **Named Insured**.

Provided, however, this policy will only apply to **Wrongful Acts** committed or allegedly committed after the effective date an entity becomes a **Subsidiary** and prior to the effective date such entity ceases to be a **Subsidiary**.

GG. **Technology Products** means computer or telecommunications hardware or software, or related electronic product that you develop, create, manufacture, distribute, license, lease or sell to your clients and for whom **Real Estate Development Services** are rendered.

HH. **Technology Services** means:

1. information technology consulting;

2. the administration, analysis, design, engineering, installation, integration, maintenance, management and programming of information systems or networks;

3. the analysis, development, delivery, design and support of business application software;

4. the design, hosting, maintenance, or programming of websites;

5. the distributing, installing, maintaining, marketing, selling and training in the use of electronic or computer related hardware or software; and

6. the assembly, design, development, distribution, installation, licensing, leasing, maintenance, manufacturing, ore repair of the **Insured's Technology Products**.

II. **Wrongful Act** means any actual or alleged act, error, omission or breach of duty by any **Insured** in the rendering of or failure to render **Real Estate Development Services**. **Wrongful Act** also means an actual or alleged **Personal Injury Offense** by any **Insured** in the rendering of or failure to render **Real Estate Development Services**.

SECTION IV - EXCLUSIONS

This policy does not apply to any **Claim** or **Expense Event**:

A. arising out of a **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident**, **Pollution Incident**  or **Expense Event** occurring prior to the **Policy Period** if, prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the **Policy Period**:

   1. any **Insured** gave notice to any prior insurer of any such **Claim**, (including any **Potential Claim** that might lead to such **Claim**), **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**; or

   2. any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**, violated a disciplinary rule, or engaged in professional misconduct.

B. arising out of any actual or alleged intentional, criminal, dishonest, malicious or fraudulent act, error or omission by any **Insured**.

This Exclusion does not apply to:

   1. any **Personal Injury Offense** that results from any **Insured's** rendering or failing to render **Real Estate Development Services**; or

   2. any of the **Insureds**, unless such intentional criminal, dishonest, malicious or fraudulent act, error or omission is established by a final adjudication of the **Claim** or a final adjudication in any judicial, administrative or alternative dispute resolution proceeding.

For purposes of this Exclusion, no such act of one of the **Insureds** will be imputed to any of the **Insureds** who were not aware of and did not participate in such act.

C. arising out of any **Insured's** services or capacity as an officer, director, partner, owner, member, manager or employee of any corporation, partnership, association or any other business enterprise or charitable organization of any kind or nature other than:

   1. the **Named Insured;**

   2. any entity other than the **Named Insured**:
      a. that is managed, or controlled by any **Insured**;
      b. in which any **Insured**, individually or collectively, has an ownership interest in excess of 49%; or
      c. which wholly or partly owns, operates or manages the **Named Insured**.

D. arising out of any actual or alleged violation or breach by any **Insured** of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, Telephone Consumer Protection Act (TCPA), Securities Act of 1933, Securities Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act 18 USC Sections 1961 et seq., the Controlling the Assault of Non-Solicited Pornography and Marketing ACT (CAN-SPAM) of 2003, the Fair Credit Reporting Act (FCRA), Fair and Accurate Credit Transactions Act (FACTA),  or amendments thereto of any of these, or any similar provision of any federal, state or local statute, regulation, ordinance or common law.

This Exclusion does not apply if any **Insured** is deemed to be a fiduciary solely by reason of **Real Estate Development Services** rendered with respect to any employee benefit plan.

E. arising out of **Bodily Injury** or **Property Damage**.

This Exclusion does not apply to **Bodily Injury** resulting from a **Personal Injury Offense** or to the extent that any such **Bodily Injury** or **Property Damage** results from any **Insured's** rendering of or failure to render **Real Estate Development Services**.

F. arising out of

1. any **Insured's** actual or alleged liability under any oral or written contract or agreement, including but not limited to express warranties or guarantees; or

2. any actual or alleged liability of others that any **Insured** assumes under any oral or written contract or agreement.

However, this exclusion will not apply to the **Insured's** liability that exists in the absence of such contract or agreement.

In a foreign jurisdiction where the **Insured's** liability to a client is predicated only on contractual liability, item F.1 of this Exclusion does not apply except to the extent that the **Insured** has agreed to pay consequential or liquidated damages.

This exclusion does not apply to liability assumed by the **Insured** in a client contract.

G. made by any **Insured** against any other **Insured**.

H. However, this exclusion does not apply to claims brought by investors who have ownership in the developed property on which a **claim** is brought against the **Insured.**

H. arising out of infringement of patent or misappropriation of trade secret, resulting in unfair competition or restraint of trade law, rule or regulation.

I. arising out of an actual or alleged violation of any anti-trust or price-fixing rule or regulation.

J. arising out of the design or manufacture of any goods or products which are sold or supplied by any **Insured** or by others under license from any **Insured**.  This exclusion does not apply to software sold or supplied by the **Insured** to its client in connection with the **Insured's** provision of other **Real Estate Development Services** for that client.

K. arising out of any **Insured's** employment obligations, decisions, practices or policies as an employer, including but not limited to any **Claim** under worker's compensation, unemployment compensation, employee benefits, or disability benefits law or similar laws.

L. arising out of any actual or alleged discrimination, humiliation, harassment or misconduct, including but not limited to that which is based on an individual's race, religion, color, gender, sexual orientation, national origin, age, disability, or marital status.  This exclusion does not apply to otherwise covered **Claims** brought under the Americans with Disabilities Act, the Fair Housing Act, or any similar state or local law or ordinance.

M. arising out of any actual or alleged failure to procure and/or maintain adequate insurance or bonds

However, this exclusion will not apply to the insured's services in the performance of property management.

N. arising out of any **Insured's** making any payment:

1. without prior receipt of an architect's certificate, where such certificate is required as a condition of payment, or

2. without prior receipt of appropriate waivers or releases of lien from the subcontractors involved, where work or materials have been provided by said subcontractors.

O. arising out of the actual or alleged theft, misappropriation, commingling, or conversion of any funds, monies, assets, or property.

P. arising out of the acquisition of property for resale or other arrangements to obtain monetary gain without making improvements to said property in the course of the Insured's Real Estate Development Services.

SECTION V – COVERAGE EXTENSIONS

1. EMERGENCY REMEDIATION COVERAGE

The **Insurer** will reimburse the **Insured** up to $250,000 for reasonable and necessary **Cleanup Costs** the **Insured** incurs to take immediate action without the prior consent of the **Insurer** in order to abate and/or respond to an imminent and substantial threat in connection with an actual or potential **Pollution Incident**, provided:

a. the **Pollution Incident** results from the **Insured's** performance of or failure to perform **Real Estate Services** taking place on or after the Retroactive Date; and

b. the **Pollution Incident** is first discovered by the **Insured** during the policy period and is reported to the **Insurer** in writing as soon as is possible after such discovery, but in any event no later than 10 business days after the **Insured** first discovers such **Pollution Incident**, or the end of the policy period, whichever is earliest.

The **Insurer** will only reimburse the **Insured** for **Cleanup Costs** under this Coverage Extension the **Insurer** deems reasonable and necessary to mitigate the **Pollution Incident** on an emergency basis.

The **Insured** must pay the deductible stated in the Declarations in connection with any payments the insurer makes under this subsection.

Covered **Cleanup Costs** incurred in excess of the $250,000 sublimit noted in this Section shall be treated in the same manner as other covered **Loss**. In any event, **Cleanup Costs** shall be part of, and not in addition to, the Limit of Liability of this Policy.

Any notice given to the **Insurer** under this subsection shall be deemed notice of a **Potential Claim**.

2. EXTENDED REPORTING PERIODS

In the event this policy is cancelled or non-renewed by either the **Named Insured** or the **Insurer**, an **Insured** is entitled to the extensions of coverage shown in this Section.

A. Automatic Extended Reporting Period

An Extended Reporting Period is automatically provided to the **Named Insured** without additional charge. This period starts at the end of the **Policy Period** and lasts for 60 days, or the date another policy for professional liability insurance applicable to the **Named Insured** takes effect, whichever occurs first.

1. There will be no entitlement to this Automatic Extended Reporting Period if cancellation or non-renewal is due to any **Insured's** non-payment of premium or deductible due, or failure to comply with the terms and conditions of the policy, or if the Policy was issued based upon a misrepresentation by any **Insured**.

2. This Automatic Extended Reporting Period will be subject to all the terms and conditions of this policy and will apply to **Claims** first made against any **Insured** and reported to the **Insurer** during the Automatic Extended Reporting Period and that arise out of any **Wrongful Act** that occurred or is alleged to have occurred subsequent to the Retroactive Date, if any, and before the end of the **Policy Period**.

3. The fact that the period during which **Claims** may be reported to the **Insurer** under this policy by way of this Automatic Extended Reporting Period does not in any way increase the Limits of Insurance of this policy.

4. If any other policy of insurance in effect would apply to any **Claims** first made against the **Insured** during the Automatic Extended Reporting Period, then coverage provided under this Automatic Extended Reporting Period will apply in excess of such other insurance.

B. An Optional Extended Reporting Period is available to the **Named Insured**, but only by an endorsement and for an extra premium charge as shown in Item 7 of the Declarations.

1. The **Named Insured** must give the **Insurer** a written request for the endorsement and pay any premium due within 60 days after the end of the **Policy Period**.  The Optional Extended Reporting Period will not go into effect unless the **Named Insured** pays the additional premium promptly when due.

2. The Optional Extended Reporting Period is non-cancellable and starts upon the expiration of the **Policy Period**.

3. All premiums paid for the Optional Extended Reporting Period will be deemed fully earned and non-refundable as of the first day of the Optional Extended Reporting Period.

4. There will be no entitlement to this Optional Extended Reporting Period if cancellation or non-renewal is due to any **Insured's** non-payment of premium or deductible due, or failure to comply with the terms and conditions of the policy, or if the policy was issued based on a misrepresentation by any **Insured**.

5. This Optional Extended Reporting Period will be subject to all the terms and conditions of this policy and will apply to **Claims** first made against any **Insured** and reported to the **Insurer** during the Automatic Extended Reporting Period and that arise out of any **Wrongful Act** that occurred or is alleged to have occurred subsequent to the Retroactive Date, if any, and before the end of the **Policy Period**.

6. The fact that the period during which **Claims** may be reported to the **Insurer** under this extension does not in any way increase the Limits of Insurance of this policy.

C. Nonpracticing Extended Reporting Period

If, during this **Policy Period**, any **Insured** permanently and totally retires or otherwise voluntarily ceases the practice of providing the **Real Estate Development Services** insured by this policy, and has been insured by a Professional Liability Insurance policy issued by the **Insurer** for at least the 7 consecutive years immediately preceding, and the **Insured** is at least 55 years of age, the **Insurer** will, subject to the provisions of paragraphs A. and B. above, issue a Nonpracticing Extended Reporting Period endorsement.

1. This Nonpracticing Extended Reporting Period is provided until such **Insured** resumes the **Real Estate Development Services** insured by this policy, or until the death of such **Insured** in which case paragraph D.1 below, will apply.

2. No additional premium will be charged for this coverage, nor will any premium be refunded.

D. Death or Disability Extended Reporting Period

If during the **Policy Period,** any **Insured** dies from a cause other than suicide or becomes totally and permanently disabled, an extended reporting period is provided until the executor or administrator is discharged or until the disability ends.  However, the Death or Disability Extended Reporting Period will never be longer than seven years from the date of death or disability. No additional premium will be charged for this coverage, nor will any premium be refunded.

1. In the event of death, the **Insured's** estate must, no later than 60 days after the end of this **Policy Period**, provide the **Insurer** with written notice that the extended reporting period is desired.  This notice must include written proof of the date of death.

2. In the event the **Insured** becomes totally and permanently disabled, the **Insured** or the **Insured's** legal guardian must, no later than 60 days after the end of this **Policy Period**, provide the **Insurer** with written notice that the extended reporting period is desired. This notice must include written proof that the **Insured** is totally and permanently disabled, including the date the disability began, certified by the attending physician.  The **Insured** agrees to submit to medical examination(s) by any physician(s) designated by the **Insurer**, if requested.

This extended reporting period is subject to the conditions set forth in paragraphs A. and B. above.

SECTION VI – GENERAL CONDITIONS

A. Defense, Settlement And Cooperation

1. The **Insurer** has the right and duty to defend any **Insured** against any **Claim**, even if the allegations of such **Claim** are groundless, false or fraudulent. The **Insurer** will designate, or, at the **Insurer's** sole discretion, approve counsel chosen by the **Insured** to defend the **Claim**. However, the **Insurer** has no duty to defend any **Insured** against any **Claim** to which this insurance does not apply.

   This policy has provisions whereby the **Insurer** will pay on the **Insured's** behalf certain costs incurred as a result of defending a **Disciplinary Proceeding** or responding to a subpoena for documents or testimony; however the **Insurer** has no duty to defend the **Insured** in any such **Disciplinary Proceeding** or in connection with any such subpoena assistance as shown in SECTION I – COVERAGES, B. Supplemental Payments, item 5. of this policy.

2. The **Insurer** has the right to make any investigation the **Insurer** deems necessary and, with the **Insured's** consent, make any settlement of any **Claim** covered by the terms of this policy.

3. The **Insured** will not, except at the **Insured's** own cost, make any payment, admit any liability, settle any **Claim**, assume any obligation or incur any expense, without the **Insurer's** prior written consent, such consent not to be unreasonably withheld.

4. If the applicable Limit of Liability shown in Items 4 and 5 of the Declarations are exhausted by the payment of **Loss**, then all of the **Insurer's** obligations under this policy will be completely fulfilled and exhausted, and the **Insurer** will have no further obligations of any kind or nature whatsoever under this policy. If the applicable Limit of Liability shown in the Declarations is exhausted prior to settlement or judgment of any **Claim**, the **Insurer** will have the right to withdraw from further investigation or defense by tendering control of such investigation or defense to the **Insured**, and the **Insured** agrees, as a condition to the issuance of this policy, to accept such tender.

5. The **Insured** must cooperate with the **Insurer** and assist the **Insurer** in investigating and defending any **Claim** or **Potential Claim** or investigating any event resulting in coverage under Insuring Agreement B: Supplemental Payments. Upon the **Insurer's** request, the **Insured** must submit to examination and interrogation by the **Insurer's** representatives, under oath if required, and the **Insured** must attend hearings, depositions and trials, and assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to the **Insurer's** representatives including investigating and coverage counsel, and meeting with such representatives for the purpose of investigating and defense, including the investigation of coverage issues or defense. The **Insured** must further cooperate with the **Insurer** and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment which the **Insured** may have.

B. Reporting And Notice

1. Reporting of **Claims**

   If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** is first made against any **Insured**, as a condition precedent to the **Insured's** right to coverage under this policy, the **Insured** must give the **Insurer** written notice of such **Claim** as soon as practicable, but in no event later than the later of 60 days after the expiration date or earlier termination date of this policy, or the expiration of any Extended Reporting Period, if applicable.

   Timely and sufficient notice of a **Claim** by one of the **Insureds** will be deemed timely and sufficient notice for all of the **Insureds** involved in the **Claim**. Such notice must give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act**; the identity of the **Insured** and all potential claimants involved; a description of the injury or damages

that resulted from such **Wrongful Act**; information on the time, place and nature of the **Wrongful Act**; and the manner in which the **Insured** first became aware of the **Claim**.

2. Reporting of **Potential Claims**

    If, during the **Policy Period**, any **Insured** first becomes aware of any **Potential Claim**, the **Insured** will give the **Insurer** written notice of such **Potential Claim** with full particulars as soon as practicable thereafter, but in any event before the end of the Policy Period. If such **Potential Claim** later becomes a **Claim** not otherwise excluded by this policy, such **Claim** will be treated as if the **Claim** had been first made during the **Policy Period**. Full particulars include, but are not limited to: a description of the **Potential Claim**; the identity of the **Insured** and all potential claimants involved; information on the time, place and nature of the **Potential Claim**; the manner in which the **Insured** first became aware of such **Potential Claim**; and the reasons the **Insured** believe the **Potential Claim** is likely to result in a **Claim**.

3. Notice regarding **Crisis Management Expenses**

    If, during the **Policy Period,** a **Wrongful Act, Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident** occurs, then as a condition precedent to the **Insured's** right to coverage under this policy for **Crisis Management Expenses**, the **Insured** must give the **Insurer** written notice of such **Wrongful Act, Privacy Breach**, **Security Event** or **Social Engineering Incident** as soon as practicable, but in no event later than the expiration date or earlier termination date of this policy.

    Such notice must give full particulars of the **Wrongful Act, Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**, including, but not limited to: a description of the **Privacy Breach** or **Security Event**; the identity of the **Insured** and all potential claimants involved; and the manner in which the **Insured** first became aware of such **Wrongful Act, Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**.

4. Notice of **Disciplinary Proceedings** and Subpoenas

    If, during the **Policy Period**:

    a. a **Disciplinary Proceeding** is first initiated against any **Insured** and covered by SECTION I – COVERAGES, B. Supplemental Payments, 3. Disciplinary Proceedings; or,

    b. any **Insured** first receives a subpoena covered by SECTION I – COVERAGES, B. Supplemental Payments, 4. Subpoena Assistance;

    then as a condition precedent to the **Insured's** right to coverage under this policy, the **Insured** must give the **Insurer** written notice of such **Disciplinary Proceeding** or subpoena as soon as practicable, but in no event later than the end of the **Policy Period**.

    Such notice must give full particulars of the **Disciplinary Proceeding** or subpoena, including, but not limited to: a description of the **Disciplinary Proceeding** or subpoena; the identity of the **Insured** and all potential claimants involved; and the manner in which the **Insured** first became aware of such Disciplinary Proceeding or subpoena.

5. Notice required for Emergence Remediation Coverage

    If, during the **Policy Period**, a **Pollution Incident** occurs, then as a condition precedent to the **Insured's** right to coverage under this policy for Emergency Remediation Coverage for **Cleanup Costs** under SECTION IV – COVERAGE EXTENSIONS 1. Emergency Remediation Coverage, the **Insured** must immediately:

    a. record the specifics of the **Pollution Incident**, including how and when it took place, as well as details regarding the **Real Estate Development Service** provided;

    b. record a detailed description of the nature, scope and estimated amount of the **Cleanup Costs**; and

    c. notify the **Insurer** in writing as soon as practicable but in no event after the **Policy Period**.

6.  Notices

All written notices required herein must be sent to the **Insurer** at the **Insurer's** physical address or e-mail address shown in Item 9 of the Declarations.

C.   Multiple Wrongful Acts, **Claims** or Claimants

Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single **Claim**.  Each **Wrongful Act**, in a series of related **Wrongful Acts**, will be deemed to have occurred on the date of the first such **Wrongful Act.**

D.  Organizational Changes

1.  If, during the **Policy Period**:

a.  the **Named Insured** or any **Subsidiary** are merged with, consolidated into or acquired by or with another entity such that the **Named Insured** is not the surviving entity; or

b.  a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official is appointed for or with respect to the **Named Insured** or any **Subsidiary**; then

coverage under this policy will continue in full force and effect with respect to **Real Estate Development Services** rendered before such event, but coverage will cease with respect to **Real Estate Development Services** committed after such event.  After any such event, this policy may not be canceled by the **Named Insured** and the entire premium for this policy will be deemed fully earned.

2.  If, during the **Policy Period**, the **Named Insured** or any **Subsidiary** merges, consolidates or acquires an entity whose gross revenues for the prior year are equal to or greater than 50% of the annual gross revenues of the **Named Insured** as reflected in the **Named Insured's** most recent consolidated financial statement prior to such merger, consolidation or acquisition, then no coverage will be afforded under this policy for any **Claim** involving such assets or entity unless the following conditions are met:

a.  The **Named Insured** provides written notice of such merger, consolidation creation, or acquisition to the **Insurer** within 60 days after the effective date of such merger, consolidation, creation or acquisition, or by the end of the **Policy Period**, whichever is earliest;

b.  The **Named Insured** provides the **Insurer** with such information as the **Insurer** may deem necessary;

c.  The **Named Insured** accepts any special terms, conditions, exclusions or additional premium charge as may be required; and

d.  The **Insurer**, at the **Insurer's** sole discretion, agrees to provide such coverage.

E.  Other Insurance

This insurance will apply only as excess of the applicable Deductible amount shown in Items 4 and 5 of the Declarations and the amount of any other valid and collectible insurance available to any **Insured** whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is specifically written as excess insurance over the Limits of Liability provided in this policy.

F.  Cancellation and Non-Renewal

1.  Cancellation

a.  The **Named Insured** may cancel this policy by mailing or delivering advance written notice to the **Insurer** at the **Insurer's** address shown in Item 9 of the Declarations, stating when cancellation will be effective.  If the **Insured** cancels this policy, the **Insurer** will retain the customary short rate portion of the premium.

b. The **Insurer** may cancel this policy by mailing written notice to the first **Named Insured** shown in Item 1 of the Declarations stating when, not less than 30 days thereafter (or such longer period of time as required by applicable law), such cancellation will be effective.

c. However, if the **Insurer** cancels this policy because the **Named Insured** has failed to pay a premium or Deductible when due, the **Insurer** may cancel this policy by mailing written notice of cancellation to the first **Named Insured** shown in Item 1 of the Declarations stating when, not less than 10 days thereafter (or such longer period of time as required by applicable law), such cancellation will be effective. Such notice will apply to all of the **Insureds**. If cancelled by the **Insurer**, earned premium will be computed pro rata.

2. Non-renewal

If the **Insurer** elects not to renew this policy, the **Insurer** will mail to the first **Named Insured** shown in Item 1 of the Declarations written notice of non-renewal at least 60 days prior to the expiration date of this policy. If the notice is not given at least 60 days prior to the expiration date, the policy will continue in force until 60 days after the notice of intent not to renew is received by the **Insured**.

Notice of non-renewal will not be required if the **Named Insured** has obtained replacement coverage or have requested or agreed to non-renewal.

G. Subrogation

In the event of any payment under this policy, the **Insurer** will be subrogated to all the **Insured's** rights of recovery against any person or organization; provided that the **Insurer** will not exercise any rights of subrogation against any of the **Insureds** who did not commit the wrongdoing.

The **Insured** will execute and deliver instruments, papers, and do whatever else is necessary to secure such rights, and do nothing to prejudice such rights.

Any amount recovered upon the exercise of such rights of subrogation will be applied as follows: first, to the repayment of expenses incurred in recovery by exercise of such subrogation rights; second, to **Loss** paid by the **Insured** in excess of the limits of liability; third, to **Loss** paid by the **Insurer**; fourth, to **Loss** paid by the **Insured** in excess of the deductible amount; and last, to the repayment of any deductible amount paid by the **Insured**.

Notwithstanding the above, the **Insurer** hereby waives such subrogation rights against any **Insured** under this policy, and also against any client of the **Insured,** to the extent that the **Insured** had, prior to any **Claim** or circumstance that might reasonably be expected to be the basis of a **Claim**, a written agreement to waive such rights, provided that prior to such writing no **Insured** had a basis to believe that any matter asserted in such **Claim** or circumstance might reasonably be expected to be the basis of a **Claim**. In no event will any **Insured** waive any of its rights of subrogation after it has become aware of any **Claim**, or any circumstances that may give rise to a **Claim**, against any **Insured**.

H. Bankruptcy or Insolvency

Bankruptcy or insolvency of any **Insured** or of any **Insured's** estate will not relieve the **Insurer** of any of the **Insurer's** obligations or deprive the **Insurer** of any of the **Insurer's** rights under this policy.

I. Policy Territory

This policy applies to **Wrongful Acts** occurring anywhere in the world where legally permissible; however, no coverage will be available under this policy for any **Claim** brought, or occurring in any country with which the United States of America does not have active diplomatic relations at the time such **Claim** is made.

All premiums, Limits of Liability, deductibles and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this policy is stated in a currency other than United States Dollars, payment under this policy will be made in United States Dollars at the rate of

exchange on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

J.   Assignment

Neither this policy nor any **Insured's** interest in this policy may be assigned without the **Insurer's** written consent.

K.   Liberalization

If the **Insurer** adopts any revision to this form that would broaden coverage under this policy without additional premium at any time during the **Policy Period**, the broadened coverage will immediately apply to this policy, except that it will not apply to **Claims** that were first made against any **Insured** prior to the effective date of such revision.

L.   Policy Changes

Notice to or knowledge possessed by any broker or other person acting on the **Insured's** behalf will not effect a waiver or change in any part of this policy or prevent or estop the **Insurer** from asserting any right(s) under this policy.   This policy can only be altered, waived or changed by written endorsement or agreed to in writing by an authorized representative of the **Insurer**.

M.   Action Against the **Insurer**

No action can be brought against the **Insurer** unless, as a condition precedent, the **Insured** has fully complied with all the terms and conditions of this policy.   Nothing contained in this policy gives any person or organization the right to join the **Insurer** as a party to any **Claim** to determine the **Insured's** liability.

N.   Waiver

The **Insurer's** failure to insist on strict compliance with any of the terms or conditions of this policy or the failure to exercise any right or privilege will not operate or be construed as a waiver of any subsequent breach or a waiver of any other terms, conditions, privileges or rights.

O.   Representations

By accepting this policy, all **Insureds** agree that all statements made and information furnished to the **Insurer** are true, accurate and complete, and that this policy has been issued in reliance upon the truth and accuracy of those representations, subject to all of the terms and conditions of this policy.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT

If service of process is to be made upon the Company by way of hand delivery or courier service, delivery should be made to the Company's principal place of business:

Claims Manager
  Colony Insurance Company,
  Colony Specialty Insurance Company, or
  Peleus Insurance Company
  8720 Stony Point Parkway, Suite 400
  Richmond, Virginia 23235

If service of process is to be made upon the Company by way of the U.S. Postal Service, the following mailing address should be used:

General Counsel
  Colony Insurance Company,
  Colony Specialty Insurance Company, or
  Peleus Insurance Company
  P.O. Box 469011
  San Antonio, Texas 78246

Where required by statute, regulation, or other regulatory directive, the Company appoints the Commissioner of Insurance, or other designee specified for that purpose, as its attorney for acceptance of service of all legal process in the state in any action or proceeding arising out of this insurance.

The Commissioner or other designee is requested to forward process to the Company as shown above, or if required in his/her particular state, to a designated resident agent for service of process.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROFESSIONAL SERVICES ENDORSEMENT

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY COVERAGE

The definition of **Professional Services**, within SECTION III – DEFINITIONS, is amended by the addition of the following:

> providing asset management, property management, development consulting, and those services as defined in the  Real Estate Developers PROtect Professional Liability Insurance with Cyber Coverage Form, with respect to both acquired and non-acquired properties as well as owned and non-owned properties

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# RETROACTIVE DATE FOR SPECIFIC COVERAGE

This endorsement modifies insurance provided under the following:

    PROFESSIONAL LIABILITY COVERAGE

ITEM 8. Retroactive Date, as shown in the Declarations, is deleted and replaced with the following:

ITEM 8. RETROACTIVE DATE

| COVERAGE | RETROACTIVE DATE |
|---|---|
| **A. Real Estate Development services & General Construction services** | **8/1/2018** |

    ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# Privacy Policy

Argo Group US, Inc. ("Argo Group") recognizes the importance of maintaining the privacy of our customers and the confidentiality of each individual's nonpublic personal information, including Social Security numbers. We take seriously the responsibility that accompanies our collection of nonpublic personal information, including Social Security numbers. Accordingly, Argo's corporate policy is to protect the privacy and confidentiality of our consumers and their nonpublic personal information as required by law.

## Information Collection and Use

In order to conveniently and effectively provide and service the insurance products we sell, we may collect and use Social Security numbers and other nonpublic personal information. As such, this policy does not prohibit the collection or use of Social Security numbers and nonpublic personal information where legally authorized and/or required. This policy complies with the requirements of the Gramm-Leach-Bliley Act (GLBA) and applicable federal and state laws and regulations implementing the act. Such laws impose certain obligations upon third persons and organizations with which we share nonpublic personal information of our consumers, customers, former customers, or claimants. Accordingly, we prohibit the unauthorized disclosure of Social Security numbers and other protected nonpublic personal information, except as legally required or authorized.

## Information Sharing and Disclosure

Argo Group does not rent, sell or share your personally identifiable information with nonaffiliated third parties. Argo Group may, however, share personally identifiable information with third-party contractors. These third-party contractors are prohibited from using the information for purposes other than performing services for Argo Group. Argo Group may disclose your information to third parties when obligated to do so by law and to investigate, prevent, or take action regarding suspected or actual prohibited activities, including but not limited to fraud and situations involving the security of our operations and employees.

Finally, Argo Group may transfer information, including any personally identifiable information, to a successor entity in connection with a corporate merger, consolidation, sale of all or a portion of its assets, bankruptcy, or other corporate change.

## Security

In order to protect your nonpublic personal information, we limit access to nonpublic personal information by only allowing authorized personnel to have access to such information. Furthermore, we maintain physical, electronic and procedural security protections to safeguard the nonpublic personal information in our records. Documents that contain an individual's protected information are destroyed before disposal; this destruction process includes the shredding of print and disposable media and deletion of electronic media. Argo Group has security measures in place to protect the loss, misuse and alteration of the information under our control. Our hardware infrastructure is housed in a controlled access facility that restricts access to authorized individuals. The network infrastructure is protected by a firewall and traffic is monitored and logged both on the firewall and servers. Sensitive administrative activities are carried out over secure, encrypted links between our offices and hosting facility. Administrative

access is limited not only to authorized employees but also to specific remote administration protocols and IP addresses. All employees with access to personally identifiable information have been advised of Argo Group's security policies and practices. Argo Group will continue to conduct internal audits of its security systems and make all necessary enhancements to ensure the safety of the website and its users. No method of transmission over the Internet or method of electronic storage is 100% secure; therefore, while Argo Group uses commercially acceptable means to protect your information, we cannot guarantee absolute security.

Any Argo Group employee who becomes aware of the inappropriate use or disclosure of Social Security numbers and other protected nonpublic personal information is expected to immediately report such behavior to the General Counsel for further action.

**Corrected/Updated Information**

This policy applies to certain insureds of Argo Group, including but not limited to worker's compensation claimants.  If you have any questions about this Privacy Policy, please contact:

General Counsel
Argo Group US, Inc.
P.O. Box 469011
San Antonio, Texas 78246
(210) 321-8400

*Note: Argo Group is the parent of Argonaut Insurance Company; Argonaut-Southwest Insurance Company; Argonaut-Midwest Insurance Company; Argonaut Great Central Insurance Company; Argonaut Limited Risk Insurance Company; ARIS Title Insurance Corporation; Select Markets Insurance Company; Colony Insurance Company; Colony Specialty Insurance Company; Peleus Insurance Company (fka Colony National Insurance Company); Rockwood Casualty Insurance Company; Somerset Casualty Insurance Company; Grocers Insurance Agency, Inc.; Central Insurance Management, Inc.; Alteris Insurance Services, Inc.; Trident Insurance Services, LLC; Commercial Deposit Insurance Agency, Inc.; Sonoma Risk Management, LLC; John Sutak Insurance Brokers, Inc.; Colony Management Services, Inc.; Argonaut Management Services, Inc.; and Argonaut Claims Management, LLC.  This Privacy Policy applies to all companies and business produced or underwritten within Argo Group.

# SIGNATURE PAGE

IN WITNESS WHEREOF, the company issuing this policy has caused this policy to be signed by its President and its Secretary and countersigned (if required) on the Declarations page by a duly authorized representative of the company. This endorsement is executed by the company stated in the Declarations.

Colony Insurance Company

**President**                    **Secretary**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| PINE MANAGEMENT, INC., | Civil Action No. 22-cv-02407-MKV |
| Plaintiff, | |
| vs. | |
| COLONY INSURANCE COMPANY, | |
| Defendant. | |

**PLAINTIFF/COUNTER-DEFENDANT PINE MANAGEMENT, INC.'S**
**REPLY TO DEFENDANT/COUNTER-PLAINTIFF COLONY**
**INSURANCE COMPANY'S COUNTERCLAIMS**

Plaintiff/Counter-Defendant Pine Management, Inc. ("Pine"), by undersigned

counsel, hereby files its Reply to Defendant/Counter-Plaintiff Colony Insurance

Company's ("Argo") Counterclaims (the "Counterclaims"), as follows:

**REPLY TO COUNTERCLAIMS**

**PARTIES**

**108.**     **Upon information and belief, plaintiff Pine is a New York**
**corporation with its principal place of business at 78 Manhattan Avenue, New York,**
**New York 10025.**

**RESPONSE:** Pine admits the allegation contained in paragraph 108.

**109.**     **Defendant Argo is a Virginia corporation with its principal place**
**of business at 8720 Stony Point Parkway, Suite 400, Richmond, Virginia 23235.**

**RESPONSE:** Pine admits the allegation contained in paragraph 109.

**JURISDICTION AND VENUE**

**110.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332(a)(2). The amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Pine, which is a citizen of New York, and Argo, which is a citizen of Virginia.**

**RESPONSE:** Pine states that the allegations in this paragraph state legal conclusions to which no response is required.  To the extent that a response is required, Pine does not dispute that this Court has subject matter jurisdiction over this action.

**111.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the counterclaims took place in this District.**

**RESPONSE:** Pine states that the allegations in this paragraph state legal conclusions to which no response is required.  To the extent that a response is required, Pine does not dispute that this case is properly designated for this Venue because a substantial part of the events giving rise to the counterclaims took place in this District.

**ALLEGATIONS COMMON TO ALL COUNTERCLAIMS**

**112.     Argo and Pine entered into a liability insurance contract entitled Real Estate Developers PROtect Professional Liability Insurance Policy No. RE4202378-0, with an effective period from August 1, 2018 to December 1, 2019 (the "Policy"). The Policy provided insurance coverage to Pine in accordance with all of its terms, conditions, exclusions, definitions and limitations. A true and correct copy of the Policy is attached as Exhibit B.**

**RESPONSE:** Pine admits that Argo sold Pine a Real Estate Developers PROtect Professional Liability Insurance Policy No. RE4202378-0 for the policy period of August 1, 2018, to December 1, 2019 (the "Policy"). Pine further admits that a copy of the Policy is attached as Exhibit B to Argo's Counterclaims, and that the Policy provides insurance

coverage to Pine in accordance with its terms, conditions, definitions, and limitations. Pine

states that the Policy speaks for itself and denies the allegations in this paragraph to the

extent that they are inconsistent with the terms of the Policy.

113.     On or about July 26, 2019, a lawsuit entitled *Schneider, et al. v. Pine Management, Inc., et al.* ("the Schneider Action"), was commenced against Pine and others in the Supreme Court of the State of New York, New York County.

RESPONSE: Pine admits the allegation contained in paragraph 113.

114.     Pine tendered the Schneider Action to Argo for defense and indemnity under the Policy.

RESPONSE: Pine admits the allegation contained in paragraph 114.

115.   The Schneider Action does not trigger any coverage obligations of Argo under the Policy. Therefore, Argo has disclaimed any obligation of defense and indemnity for the Schneider Action under the Policy.

RESPONSE: Pine states that the allegations in this paragraph state legal

conclusions to which no response is required. To the extent that a response is required,

Pine admits that Argo refused to pay Pine's defense costs and otherwise denied insurance

coverage for the Schneider Action, and otherwise denies the allegations contained in

paragraph 115.

**FIRST COUNTERCLAIM**
**No Wrongful Act on or after Retroactive Date**

116.     SECTION I – COVERAGES, A., Insuring Agreements, of the Policy provides that coverage will exist, subject to all the other terms of the Policy, for loss

> …arising out of a **Wrongful Act** committed before the end
> of the **Policy Period** and on or after the Retroactive Date, if
> any, shown in Item 8 of the Declarations.

3

**RESPONSE:** Pine states that SECTION I – COVERAGES, A., Insuring Agreements of the Policy speaks for itself, and denies the allegations in this paragraph to the extent that they are inconsistent with the terms of the Policy.

> **117.** **The Retroactive Date applicable to property management services is March 1, 2016.**

**RESPONSE:** Pine states that the Policy speaks for itself, and denies the allegations in this paragraph to the extent that they are inconsistent with the terms of the Policy.

> **118.** **Pursuant to SECTION III – DEFINITIONS, Section II,**
>> **Wrongful Act** means any actual or alleged act, error, omission or breach of duty by any **Insured** in the rendering of or failure to render **Real Estate Development Services**…

**RESPONSE:** Pine states that SECTION III – DEFINITIONS, Section II of the Policy speaks for itself, and denies the allegations in this paragraph to the extent that they are inconsistent with the terms of the Policy.

> **119.** **Pursuant to SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful Acts,** Claims **or Claimants,**
>> Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single **Claim**. Each wrongful act, in a series of related **Wrongful Acts**, will be deemed to have occurred on the date of the first such **Wrongful Act**.

**RESPONSE:** Pine states that SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful Acts, Claims or Claimants of the Policy speaks for itself, and denies the allegations in this paragraph to the extent that they are inconsistent with the terms of the Policy.

4

120.    A letter from Holland & Knight to Pine, dated July 17, 2018 (hereafter, "the H&K Letter") (attached hereto as Exhibit A), alleges that wrongful acts were committed prior to the retroactive date of March 1, 2016. All of the Wrongful Acts alleged in the H&K letter were related. Therefore, all of the wrongful acts allegedly committed by Pine will be deemed to have occurred prior to the retroactive date of March 1, 2016. Therefore, coverage under the Policy for the Schneider Action does not exist.

RESPONSE:  Pine denies Argo's characterization of the letter from Holland & Knight (the "H&K Letter") and states that the H&K Letter speaks for itself. Pine further states that the allegations in this paragraph call for legal conclusions to which no response is required. To the extent a response is required, Pine denies the allegations contained in paragraph 120.

121.    Argo is entitled to a declaration that it owes Pine no obligation of coverage in connection with the Schneider Action.

RESPONSE:  Pine states that the allegation in this paragraph states a legal conclusion to which no response is required. To the extent that a response is required, Pine denies the allegation contained in paragraph 121.

SECOND COUNTERCLAIM
Prior Knowledge of Wrongful Act Exclusion

122.    Pursuant to SECTION IV – EXCLUSIONS, Section A, the Policy does not apply to any claim:

> ……arising out of a **Wrongful Act**… occurring prior to the **Policy Period** if, prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the **Policy Period**:…
>
> 2. Any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**…

5

**RESPONSE:** Pine states that SECTION VI – EXCLUSIONS, Section A of the Policy speaks for itself, and denies the allegations in this paragraph to the extent that they are inconsistent with the terms of the Policy. Pine also denies Argo's assertion in footnote 2 that SECTION IV – EXCLUSIONS, Section A, "[s]hould read, 'Real Estate Developers PROtect Professional Liability Policy'", on the basis that it calls for a legal conclusion, as asserted in Argo's Fourth Counterclaim.

**123.     The H&K Letter provided Pine with a reasonable basis to believe, prior to the effective date of the Policy, that it had committed a Wrongful Act, which includes an "alleged" act, error, omission or breach of duty.**

**RESPONSE:**  Pine denies Argo's characterization of the H&K Letter and states that the H&K Letter speaks for itself. Pine further states that the allegation in this paragraph calls for a legal conclusion to which no response is required. To the extent a response is required, Pine denies the allegation contained in paragraph 123.

**124.     Pursuant to SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful Acts,** Claims **or Claimants,**

> Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single **Claim**. Each wrongful act, in a series of related **Wrongful Acts**, will be deemed to have occurred on the date of the first such **Wrongful Act**.

**RESPONSE:** Pine states that SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful Acts, Claims or Claimants of the Policy speaks for itself, and denies the allegations in this paragraph to the extent that they are inconsistent with the terms of the Policy.

**125.**      **All of the Wrongful Acts alleged in the H&K letter were related. Therefore, Pine will be deemed to have had a reasonable basis to believe, prior to the effective date of the Policy, that it had committed all of the Wrongful Acts.**

**RESPONSE:**  Pine denies Argo's characterization of the H&K Letter and states that the H&K Letter speaks for itself. Pine further states that the allegations in this paragraph call for legal conclusions to which no response is required. To the extent a response is required, Pine denies the allegations contained in paragraph 125.

**126.**      **Therefore, there is no coverage for the Schneider Action under the Policy.**

**RESPONSE:**  Pine states that the allegation in this paragraph states a legal conclusion to which no response is required. To the extent that a response is required, Pine denies the allegation contained in paragraph 126.

**127.**      **Argo is entitled to a declaration that it owes Pine no obligation of coverage in connection with the Schneider Action.**

**RESPONSE:**  Pine states that the allegation in this paragraph states a legal conclusion to which no response is required. To the extent that a response is required, Pine denies the allegation contained in paragraph 127.

**THIRD COUNTERCLAIM**
**Claim Before the Policy Period**

**128.**      **Pursuant to SECTION I – COVERAGES, A. Insuring Agreements of the Policy, subject to all the other terms of the Policy, the Policy covers loss that**

> …results from a **Claim** first made and reported in writing during the **Policy Period** or Extended Reporting Period, if applicable…

**RESPONSE:**  Pine states that SECTION I – COVERAGES, A. Insuring

Agreements of the Policy speaks for itself, and denies the allegations in this paragraph to the extent that they are inconsistent with the terms of the Policy.

**129.      Pursuant to SECTION III – DEFINITIONS, B. a "Claim" means**

> a written demand received by any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitation.

**RESPONSE:** Pine states that SECTION III – DEFINITIONS, B. of the Policy speaks for itself, and denies the allegations in this paragraph to the extent that they are inconsistent with the terms of the Policy.

**130.      The H&K Letter is a claim. It was not first made during the policy period.**

**RESPONSE:** Pine states that the H&K Letter speaks for itself and that the allegations in this paragraph state legal conclusions to which no response is required. To the extent that a response is required, Pine denies the allegations contained in paragraph 130.

**131.      Pursuant to SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful Acts, two or more Claims arising out of a single Wrongful Act, or any series of related Wrongful Acts, will be considered a single Claim. All of the Wrongful Acts alleged in the H&K letter were related. Therefore, there is a single claim against Pine, and it was not first made during the policy period. Therefore, coverage under the Policy for the Schneider Action does not exist.**

**RESPONSE:** Pine states that the H&K Letter and SECTION VI – GENERAL CONDITIONS, C. Multiple Wrongful Acts of the Policy speak for themselves and denies Argo's characterization of the H&K Letter. Pine further states that the allegations in this paragraph call for legal conclusions to which no response is required. To the extent a

8

response is required, Pine denies the allegations contained in paragraph 131.

**132.      Argo is entitled to a declaration that it owes Pine no obligation of coverage in connection with the Schneider Action.**

**RESPONSE:** Pine states that the allegation in this paragraph states a legal conclusion to which no response is required. To the extent that a response is required, Pine denies the allegation contained in paragraph 132.

## FOURTH COUNTERCLAIM
### Reformation Based on Mutual Mistake

**133.      Upon information and belief, Pine is a family owned and operated business focused on managing, developing, and acquiring rental apartment buildings.**

**RESPONSE:** Pine admits that it is a family owned and operated business that focuses, in part, on managing, developing, and acquiring rental apartment buildings.

**134.      Upon information and belief, Pine is not in the business of architecture or engineering.**

**RESPONSE:** Pine admits the allegation contained in paragraph 134.

**135.      Upon information and belief, Pine had no reason to purchase an Architects & Engineers Professional Liability Insurance Policy. If it were to do so, it would be a mistake on its part.**

**RESPONSE:** Pine states that the allegations in this paragraph state legal conclusions to which no response is required. To the extent that a response is required, Pine denies the allegations contained in paragraph 135.

**136.      Argo understood that Pine is in the business of managing, developing and acquiring rental apartment buildings.**

**RESPONSE:** Pine is without knowledge or information sufficient to form a belief

as to the truth of the allegation about what Argo understood.

**137.        Argo understood that Pine is not in the business of architecture or engineering.**

**RESPONSE:** Pine is without knowledge or information sufficient to form a belief

as to the truth of the allegation about what Argo understood.

**138.        Argo had no reason to enter into an Architects & Engineers Professional Liability Insurance Policy with Pine. If it were to do so, it would be a mistake on Argo's part.**

**RESPONSE:** Pine is without knowledge or information sufficient to form a belief

as to the truth of the allegation about Argo's reasoning.  Pine also states that the allegations

in this paragraph state legal conclusions to which no response is required. To the extent

that a response is required, Pine denies the allegations contained in paragraph 138.

**139.        Pine and Argo entered into the Policy, which is a Real Estate Developers Professional Liability Insurance Policy. Neither Argo nor Pine intended to enter into an Architects & Engineers Professional Liability Insurance Policy, and indeed, they did not enter into an Architects & Engineers Professional Liability Insurance Policy. Any reference to an Architects & Engineers Professional Liability Insurance Policy in the Policy would be a mutual mistake.**

**RESPONSE:** Pine states that the Policy speaks for itself and that the allegations

in this paragraph state legal conclusions to which no response is required. To the extent

that a response is required, Pine denies the allegations contained in paragraph 139.

**140.        SECTION IV – EXCLUSIONS, Section A, of the Policy provides that it does not apply to any claim:**

> ……arising out of a **Wrongful Act**… occurring prior to the **Policy Period** if, prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the

Policy Period.

**RESPONSE:** Pine states that SECTION IV – EXCLUSIONS, Section A of the Policy speaks for itself, and denies the allegations in this paragraph to the extent that they are inconsistent with the terms of the Policy.

**141.      The reference to an "Architects & Engineers Professional Liability Insurance Policy" was a mutual mistake on the part of both Pine and Argo. Neither party intended the Policy to include that phrase. Both parties intended that it read "Real Estate Developers PROtect Professional Liability Insurance Policy," or something substantially identical to that.**

**RESPONSE:** Pine states that the allegations in this paragraph state legal conclusions to which no response is required. To the extent that a response is required, Pine denies the allegations contained in paragraph 141.

**142.      This Court should reform the Policy to replace the aforesaid reference to an "Architects & Engineers Professional Liability Insurance Policy" to read "Real Estate Developers PROtect Professional Liability Insurance Policy," or something substantially identical to that.**

**RESPONSE:** Pine states that the allegation in this paragraph states a legal conclusion to which no response is required. To the extent that a response is required, Pine denies the allegation contained in paragraph 142.

## DENIAL OF MATTERS NOT SPECIFICALLY ADMITTED

Pine denies all allegations in the Counterclaims that are not expressly admitted.

## AFFIRMATIVE DEFENSES

By not stating an Affirmative Defense, Pine does not waive the right to assert it later. By stating the following Affirmative Defenses, Pine does not admit that it bears the burden of proof on any of the issues raised by such defenses. Rather, Argo bears the

11

burden of proving the applicability of any exclusion or coverage limitation in its insurance policy or any prejudice because of any alleged failure of Pine to comply with a condition precedent in the policies.

Pine reserves the right to amend this Reply to Counterclaims to include any additional defense that may be revealed or become applicable based on information obtained during further investigation or discovery in this action.

### FIRST AFFIRMATIVE DEFENSE

The Counterclaims fail, in whole or in part, to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by the doctrines of ratification, waiver, laches and/or estoppel.

### THIRD AFFIRMATIVE DEFENSE

The Counterclaims are barred by Argo's material breach of the terms and conditions of its insurance policy at issue.

### FOURTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by Argo's unclean hands and unreasonable interpretations of the insurance terms cited in its Counterclaims.

### FIFTH AFFIRMATIVE DEFENSE

The Counterclaims are barred because Pine fully complied with any and all conditions precedent to coverage, as well as by the other provisions, terms and conditions

of the policy.

### SIXTH AFFIRMATIVE DEFENSE

The Counterclaims are barred due to Argo's breach of the implied covenant of good faith and fair dealing, and/or by Argo's bad faith conduct.

### SEVENTH AFFIRMATIVE DEFENSE

To the extent that Pine reasonably expected coverage for the claims at issue, such expectations must be honored, and are enforceable in favor of insurance coverage for Pine.

### EIGHTH AFFIRMATIVE DEFENSE

To the extent any provision in the Policy and application of the Policy is ambiguous, it must be interpreted in favor of Pine and against Argo.

### NINTH AFFIRMATIVE DEFENSE

Argo's claims are barred by the doctrines of unconscionability and unjust enrichment.

### TENTH AFFIRMATIVE DEFENSE

Argo's claims are barred due to Argo's failure to properly and timely advise Pine of its coverage position and failure to reserve rights properly and timely thereto.

**WHEREFORE**, Plaintiff/Counter-Defendant Pine Management, Inc., having fully replied and set forth its Affirmative Defenses to Defendant Colony Insurance Company's Counterclaims, demands that:

(a)        judgment be entered in its favor and against Colony Insurance Company on its Answer and Counterclaims;

(b)      the costs of this action, including attorneys' fees and costs, and pre-judgment and post-judgment interest, be assessed against Argo; and

(c)      the Court grant such other and further relief as it may deem just and proper.

Dated: June 21, 2022
New York, New York

By:   /s/ Dennis J. Nolan
      Dennis J. Nolan, Esq. (No. 4462107)
      John M. Leonard, Esq. (No. 5296488)
      Regan E. Samson, Esq. (No. 5884119)
      **ANDERSON KILL, P.C.**
      1251 Avenue of the Americas
      New York, New York 10020
      Telephone: (212) 278-1000
      dnolan@andersonkill.com
      jleonard@andersonkill.com
      rsamson@andersonkill.com

      *Attorneys for Plaintiff*
      *Pine Management, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of June 2022, a true and correct copy of the foregoing, Plaintiff/Counter-Defendant Pine Management, Inc.'s Reply to Defendant/Counter-Plaintiff Colony Insurance Company's Counterclaims, was served on all counsel of record via this Court's CMECF filing system.

/s/ Dennis J. Nolan

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PINE MANAGEMENT, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>COLONY INSURANCE COMPANY,<br><br>Defendant. | Civil Action No.1:22-cv-02407<br><br><br>**STIPULATION** |

It is hereby stipulated between plaintiff Pine Management, Inc. ("Pine") and defendant Colony Insurance Company ("Colony") as follows:

1.      The complaint in this action (ECF 1) attaches, as Exhibit 2, the complaint in *Schneider, et al. v. Pine Management, Inc. et al*., No. 654303/2019 (Sup. Ct. New York Cty.) ("the Schneider Complaint").

2.      The Schneider Complaint itself contains twenty exhibits as attachments.  The copy of the Schneider Complaint that is attached as Exhibit 2 to the complaint in this action does not include the exhibits to the Schneider Complaint.

3.      The parties stipulate that Exhibit 2 to the complaint in this action shall be deemed to include the exhibits that were attached to the original Schneider Complaint.

   **THE REMAINDER OF THIS PAGE IS BLANK.**

Dated:  August 5, 2022


ANDERSON KILL P.C.                    RIVKIN RADLER LLP

*Dennis J. Nolan*                        *M. Paul Gorfinkel*

_____               _____
Dennis J. Nolan, Esq.                 M. Paul Gorfinkel, Esq.
1251 Avenue of the Americas           926 RXR Plaza
New York, NY 10020                    Uniondale, NY 11556
Tel.: (212) 278-1000                  Tel: (516) 357-3000
Fax: (212) 278-1733                   Fax: (516) 357-3333
dnolan@andersonkill.com               paul.gorfinkel@rivkin.com

5932626.v2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PINE MANAGEMENT, INC.,

                        Plaintiff,

    vs.

COLONY INSURANCE COMPANY,

                        Defendant.

Civil Action No.1:22-cv-02407
(MKV)


**NOTICE OF MOTION**

       PLEASE TAKE NOTICE that Defendant, Colony Insurance Company, hereby moves the

Court, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the

pleadings.  In support of this Motion, Colony relies on the attached Memorandum of Law, and

Declaration.  Any opposition is due by August 30, 2022.  The motion will be returnable at a date

to be set by the Court.

Dated: Uniondale, New York
       August 9, 2022

                        RIVKIN RADLER LLP

                        *M. Paul Gorfinkel*

                        M. Paul Gorfinkel, Esq.
                        Amanda Griner, Esq.
                        926 RXR Plaza
                        Uniondale, NY 11556
                        Tel: (516)  357-3000
                        Fax: (516) 357-3333
                        paul.gorfinkel@rivkin.com
                        amanda.griner@rivkin.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PINE MANAGEMENT, INC., | Civil Action No.1:22-cv-02407 (MKV) |
| Plaintiff, | |
| vs. | |
| COLONY INSURANCE COMPANY, | **DECLARATION** |
| Defendant. | |

       M. PAUL GORFINKEL, an attorney duly admitted to practice before this Court, declares as follows under penalty of perjury:

       1.     I am Senior Counsel of the firm, Rivkin Radler LLP, counsel for Defendant Colony Insurance Company in this case.

       2.     I make this Declaration in support of Colony's Motion for judgment on the pleadings.

       3.     Attached as Exhibit A is a true copy of a letter dated July 17, 2018, from Mitchell Geller of the firm Holland & Knight to Bob Goldberg of the firm Meister Seelig & Fein, which was attached as Exhibit 1 to the Schneider Complaint.

Dated: Uniondale, New York
      August 9, 2022

                       *M. Paul Gorfinkel*
                       M. PAUL GORFINKEL
                       M. Paul Gorfinkel, Esq. (MPG 2069)
                       paul.gorfinkel@rivkin.com
                       926 RXR Plaza
                       Uniondale, New York 11556-0926
                       Phone: (516) 357-3000
                       Fax: (516) 357-3333

# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Mitchell J. Geller
(212) 513-3483
mitchell.geller@hklaw.com

BY OVERNIGHT COURIER AND E-MAIL

July 17, 2018

Bob G. Goldberg, Esq.
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, New York 10017

Re: Interests of Schneider/Schwartz Group in Limited Liability Companies

Dear Mr. Goldberg:

We represent Jerome Schneider, Ruth Schneider, Marc Schneider, Marni Schwartz, the Jerome Schneider 2012 Family Trust dated December 10, 2012 ("Jerome Schneider Trust") and the Ruth Schneider 2012 Family Trust dated December 10, 2012 ("Ruth Schneider Trust")(collectively the "Schneider/Schwartz Group") in connection with their respective interests in Rudel Realty LLC, Marni Realty LLC, RIS Realty LLC, Marc Realty LLC, Bar-Mar Realty LLC, SIR Realty LLC, Jeruth Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Zizi Realty LLC (collectively "LLC's"), each a New York limited liability company.

The purpose of this letter is to advise you of claims by the Schneider/Schwartz Group against Pine Management, Inc. ("Pine") and those affiliated with Pine arising from Pine's management of the LLC's. As shown below, our examination of the 1996 Operating Agreements of Rudel Realty LLC and Marni Realty LLC ("1996 Operating Agreement"), the 2011 Amended and Restated Operating Agreements for the other eight LLC's ("2011 Amended Operating Agreement") and the relevant documents, including various e-mails and documents reflecting the revenue and expenses of the underlying properties held by the LLC's, [arguably] show, among other things, that: (a) Pine has breached its fiduciary duty to the Schneider/Schwartz Group and has not acted in good faith; (b) Pine has breached provisions of the governing Operating Agreements; (c) Pine has failed to disclose material facts to the Schneider/Schwartz Group; (d) Pine has been involved in related party transactions; and (e) Pine has failed to provide key documents concerning the management and operations of the LLC's to the Schneider/Schwartz Group.

Indeed, the facts demonstrate that Pine and individuals associated or affiliated with Pine have kept the Schneider/Schwartz Group "in the dark" concerning certain key facts and documents concerning Pine's management of the LLC's, has oppressed the Schneider/Schwartz Group and

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 24-1   Filed 08/09/22   Page 2 of 13   RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 2

has done everything in their power to entrench themselves and to exclude the Schneider/Schwartz Group from exercising their rights as members of the LLC's, in many of which they have a 50% interest.

Nothing better exemplifies Pine's attempt to oppress the Schneider/Schwartz Group and to entrench Pine's management of the LLC's than their attempt to amend the operating agreements to include a provision that "any Manager may be removed at any time, with or without cause, *by the unanimous vote of the members if the Manager hereunder is Pine Management, Inc., Harold Pine, any descendant of Harold and Sydell Pine, or any spouse of any such descendant.*" (Emphasis added). The sole and clear purpose of such an amendment is to prevent the Schneider/Schwartz Group from removing Pine, or any descendant of Harold and Sydell Pine or any spouse thereof, including Harold Pine, Brenda Rohlman, Daniel Rohlman, Jason Rohlman, Ilyse Rohlman, Lloyd Pine and Tom Rohlman (the "Pine/Rohlman Group"), from management of the LLC's. In short, the only purpose of such provision was to make Pine the Manager of the LLC's in perpetuity. Given the serious issues arising from Pine's management of the LLC's described below, the inclusion of such a provision would not only further entrench Pine in the management of the LLC's but result in further exclusion of the Schneider/Schwartz Group in the LLC's.

Before we address Pine's breaches of the Operating Agreements, Pine's breaches of fiduciary duty and Pine's self-dealing, we believe that it is instructive to set forth certain key principles that govern the management of limited liability companies. We include this detailed examination of New York law on a member's claims against a manager or managing member and a member's rights under the New York Limited Liability Company Law ("LLCL") to expedite your analysis of our clients' claims and to bring about a mutually satisfactory resolution of these claims without having to commence litigation that would be costly to all parties involved. At the very least, based on the detailed exposition of New York law, the facts and the issues, there are many serious issues arising from Pine's management of the LLC's and such claims should survive a motion to dismiss and a motion for summary judgment.

## I. Principles Applicable To The Management Of A Limited Liability Company And Claims Against The Manager

The LLCL governs limited liability companies formed under New York law. The terms of the operating agreement determine the rules applicable to the rights, management and operations of that limited liability company. *See Matter of 1545 Ocean Avenue, LLC*, 72 A.D.3d 121, 128 (2d Dep't 2010). The operating agreement also governs the relationships among members and the powers and authority of the members and manager. *See LNYC Loft, LLC v. Hudson Opportunity Fund I, LLC*, 154 A.D.3d 109 (1st Dep't 2017). Where an operating agreement does not address certain topics, a limited liability company is bound by the default requirements set forth in the LLCL. *1545 Ocean Avenue*, 72 A.D.3d at 129; *Manitaras v. Beusman*, 56 A.D.3d 735, 736 (2d Dep't 2008).

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 24-1   Filed 08/09/22   Page 3 of 13 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 3

A.    Claims Against Manager or Managing Member For Breach of Fiduciary Duty

LLCL § 409 (a), which imposes a statutory fiduciary duty on managers of limited liability companies, provides:

> A manager shall perform his or her duties as a manager, including his or her duties as a member of any class of managers, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

Under New York law, a manager or a managing member of a limited liability company owes a fiduciary duty to the non-managing members of such entity. *See, e.g., DeBenedictis v. Malta,* 140 A.D.3d 438 (1st Dep't 2016); *Pokoik v. Pokoik,* 115 A.D.3d 428, 429-432 (1st Dep't 2014). This fiduciary duty is a "duty of undivided and undiluted loyalty" and "is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum v. Birnbaum,* 73 N.Y.2d 461, 466 (1989). A manager also owes a member a "fiduciary duty to make full disclosure of all material facts." *Salm v. Feldstein,* 20 A.D.3d 469, 470 (2d Dep't 2005).

In *Bookhamer v. I. Karten-Bermaha Textiles Co., L.L.C.* 52 A.D.3d 246, 246 (1st Dep't 2008), the Appellate Division, citing *Birnbaum v. Birnbaum,* stated that the fiduciary duty required the 50% managing member "to operate the company in good faith and fairness, to avoid self-dealing and to make full disclosure of all material facts." *See also Nathanson v. Nathanson,* 20 A.D.3d 403, 404 (2d Dep't 2005) (allegations that manager engaged in self-dealing sufficient to state a cause of action for breach of fiduciary duty); *Sherman v. Mulerman,* 58 Misc.3d 1211(A) (Sup. Ct. Kings Co., Jan. 18, 2018) (allegations of defendant's self-dealing and freezing plaintiff out of decision making process sustained).

The 2011 Amended Operating Agreement of eight of the LLC's expressly recognizes the fiduciary duty owed by the Manager to the Members. Indeed, Section 17.2 states that "[n]otwithstanding anything otherwise herein contained to the contrary, *no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.*" (Emphasis added).

In short, under New York law, a manager or managing member of a limited liability company can be held liable for breach of fiduciary duty where it commits acts that are contrary or inconsistent with his "duty of undivided and undiluted loyalty," fails to disclose material facts, or engages in misconduct or self-dealing.

B.    Conflicts Of Interest Under The LLCL

A manager of an LLC is bound by LLCL § 411, which addresses conflicts of interest by an LLC decision maker. *See Tzolis v Wolff,* 39 A.D.3d 138, 145-46 (1st Dep't 2007) ("Limited

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 24-1   Filed 08/09/22   Page 4 of 13 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 4

Liability Company Law § 411 disallows a transaction between a limited liability company and one or more of its managers, or with another business entity in which one or more of its managers has a substantial financial interest."), *aff'd*, 10 N.Y.3d 100 (2008).

C. Member's Inspection Rights Under LLCL

LLCL § 1102(b) grants inspection rights to a member of a New York limited liability company:

> Any member may, subject to reasonable standards as may be set forth in, or pursuant to, the operating agreement, inspect and copy at his or her own expense, for any purpose reasonably related to the member's interest as a member, the records referred to in subdivision (a) of this section, *any financial statements* maintained by the limited liability company for the three most recent fiscal years *and other information regarding the affairs of the limited liability company as is just and reasonable*. (Emphasis added).

Under LLCL § 1102(b), a court can direct the manager of the limited liability company to provide "any financial statements maintained by the limited liability company for the three most recent fiscal years" and "other information regarding the affairs of the limited liability company as is just and reasonable."

We note that Section 14.1 of the 2011 Amended Operating Agreement for eight (8) of the LLC's provides:

> The manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. *Each Member*, Manager or their duly authorized representative *shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.* (Emphasis added).

Thus, the inspection rights to examine the "Company's books and records" under Section 14.1 of the 2011 Amended Operating Agreement are broader than the inspection rights under LLCL § 1102(a) and includes all types of documents with respect to the LLC's. The courts have uniformly enforced a member's inspection rights under LLCL § 1102(b) and the governing operating agreement. *See, e.g., Sachs v. Adeli*, 26 A.D.3d 52, 55-57 (1st Dep't 2005); *Greenberg v. Falco Construction Corp.*, 29 Misc.3d 1202(A), 2010 WL 3781279, *7 (Sup. Ct. Kings Co. Sept. 29, 2010).

NYSCEF DOC. NO.Case 1:22-cv-02407-MKV   Document 24-1   Filed 08/09/22   Page 5 of 13RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 5

D.    Claim For An Accounting

New York law holds that a member of a limited liability company has the right to an equitable accounting under common law. *See Gottlieb v. Northriver Trading Co LLC*, 58 A.D.3d 550, 551 (1st Dep't 2009); *East Quogue Jet LLC v. East Quogue Members, LLC*, 50 A.D.3d 1089, 1091 (2d Dep't 2008); *Gallagher v. Crotty*, 2017 WL 3314241, **2, 4 (Sup. Ct. New York Co., Aug, 3, 2017).

## II.    Schneider/Schwartz Group's Claims Against Pine

We now address the Schneider/Schwartz Group's claims against Pine arising from Pine's management of the LLC's. These claims broadly fall into four categories:

(1)    Pine's management of eight of the LLC's without obtaining the written approval of the Schneider/Schwartz Group of the "agreement" with the "property manager" and Pine's management of Marni Realty LLC and Rudel Realty LLC when the 1996 Operating Agreement (Section 5.1) provides that that "the business and affairs of the Company shall be managed by the Members." This claim also includes Pine's payment of fees to itself without obtaining the approval of the Schneider/Schwartz Group and Pines' self-dealing;

(2)    Pine's making of decisions which are outside the "ordinary course of business" and therefore require the approval of the Schneider/Schwartz Group such as (a) the setting of cash reserves that are a departure from historical practices of the LLC's or that are in excess of what is required for day to day operations, (b) the making of capital improvements that are not required for health or safety purposes and (c) the incurring of loans relating to the buildings owned by the LLC's;

(3)    Pine's decision to substantially reduce the distributions from the LLC's to the members without the approval of the Schneider/Schwartz Group, which reduction is a material change in the historical practice of significant distributions to the members of each of the LLC's; and

(4)    Pine's failure to produce certain documents requested by the Schneider/Schwartz Group or to provide explanations of amounts appearing in documents produced.

A.    Pine's Management Of Eight Of The LLC's Without Obtaining
The Approval Of The Schneider/Schwartz Group Of The
"Agreement" With The "Property Manager"

Section 8.1(c) of the 2011 Amended Operating Agreements states as follows:

The Company's *initial manager* shall be Pine Management Inc. Pine Management, Inc. *may be paid for services rendered in its role as*

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 24-1   Filed 08/09/22   Page 6 of 13 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 6

*property manager pursuant to a separate agreement with the Company.*" (Emphasis added).

Although the members of each of the eight limited liability companies that adopted the 2011 Amended Operating Agreement agreed that Pine would be the "initial" Manager of each such entity, the "separate agreement with the property manager" is not annexed to each 2011 Amended Operating Agreement. Significantly, our clients advise us that they have never seen the "separate agreement" with the Pine as "property manager" and certainly never approved the "separate agreement."

Moreover, the "separate agreement" with Pine as "property manager" requires the "affirmative vote of a majority in interest of the Members." In addition, the Pine/Rohlman Group cannot vote on the "separate agreement" with Pine as the "property manager" because they are "interested" or "affiliated" with Pine and thus cannot vote on their own agreement. Here, the Schneider/Schwartz Group was never presented with a copy of the "separate agreement" with the "property manager," and thus was not and is not aware of the terms of such "separate agreement," including, but not limited to, the terms of compensation paid to Pine as the "property manager." As a result, the Schneider/Schwartz Group would have the power to disallow or terminate the "separate agreement" with Pine as the "Property Manager" if in fact such an agreement had been executed. See LLCL § 411.

Particularly instructive is *Tzolis v. Wolff*, 39 A.D.3d 138, 145-146 (1st Dep't 2007), *aff'd*, 10 N.Y.3d 100 (2008), where the First Department sustained claims by minority members of a limited liability company, holding:

> *In any event, regardless of whether a majority, two-thirds, or a unanimous vote was required, Limited Liability Company Law § 411 disallows a transaction between a limited liability company and one or more of its managers, or with another business entity in which one or more of its managers has a substantial financial interest. Therefore, plaintiffs have alleged a viable cause of action which the documentary evidence does not refute.* (Emphasis added).

The same result was reached in *Meyer v. Montauk U.S.A., LLC*, 2017 WL 6387947 (Sup. Ct. Suffolk Co., May 9, 2017). There, the manager asserted that he had authority under the operating agreement to approve an agreement with the limited liability company under which he assigned certain revenues from a licensing agreement to himself. The Supreme Court rejected the manager's contentions and deemed the licensing agreement void, invalid and of no force and effect. *Id.* at \*\*5-6.

The foregoing cases show that courts will closely scrutinize contracts between a limited liability company and a business entity in which its manager has an interest and that such contracts will be disallowed. Simply put, the Pine/Rohlman Group or Pine itself cannot approve the "separate agreement" with Pine as the "property manager." Given Pine's utter failure to produce

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV  Document 24-1  Filed 08/09/22  Page 7 of 13 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 7

the "separate agreement" and Pine's failure to submit the "separate agreement" to the Schneider/Schwartz Group, let alone obtain its approval, the "separate agreement" with Pine has no validity.

In the case of Marni Realty LLC and Rudel Realty LLC, the 1996 Operating Agreement does not appoint Pine Management as the "Manager" or as the "Property Manager." Assuming that Pine Management has been *de facto* serving as the "Manager" and the "Property Manager" for these two entities for the last several years, the Jerome Schneider Trust and the Ruth Schneider Trust (that collectively own 50%), under Section 5.1 of the 1996 Operating Agreement, have the right to "co-manage" these entities. As a result, Pine has no entitlement to serve as the "Manager" or the "Property Manager" and Marni Realty LLC and Rudel Realty LLC.

(1) Pine Has No Authority To Pay Itself Fees Without
   The Approval of the Schneider/Schwartz Group__

Furthermore, Pine has no authority to pay itself fees without the approval of the Schneider/Schwartz Group, who has a 50% interest in five of the LLC's, a 25% interest in three of the LLC's, and a 33% interest and a 30% interest in the remaining two LLC's. The "Summary of Receipts and Disbursements 12/31/17" produced by Pine for the LLC's indicate that Pine is paid a "management fee" and a "construction management fee." The "Building P&Ls" indicate that "Total Management Fees" of $622,742 were paid to Pine in 2017 for the LLC's excluding Bar- Mar Realty, LLC.

Suffice it to say, Pine has no authority under the 2011 Amended Operating Agreement to fix its own compensation. Indeed, Section 8.10 of the 2011 Amended Operating Agreement, in clear and unambiguous language, indicates that the "the guaranteed payments and other compensation of the Manager, if any," must be approved "by the affirmative vote of a majority in interest of the Members." Thus, Pine cannot receive any "compensation" for its services unless approved by the vote of more than 50% of the members of the limited liability companies, without taking into the vote of the "interested" members. Given that the Schneider/Schwartz Group has never voted on the "compensation" of Pine, let alone approved such "compensation," Pine has no right to receive fees for its services in connection with its management of the LLC's.

This conclusion equally applies to the 1996 Operating Agreement of Marni Realty LLC and Rudel Realty LLC which contain no provision for the compensation of Pine or any other member involved in managing such entities. Given that Section 5.01 of the 1996 Operating Agreement provides that that "the business and affairs of the Company shall be managed by the Members," the "Members" of Marni Realty LLC and Rudel Realty LLC must approve any compensation paid to a "Manager."

Furthermore, Pine has no authority under the LLCL to fix its own compensation. *See Bookhamer v. I. Karten -Bermaha Textiles, Co. L.L.C.*, 2007 WL 6787899 (Sup. Ct. New York Co. Mar. 29, 2007), *aff'd*, 52 A.D.3d 246 (1st Dep't 2008) (rejecting defendant's claim that his 50% stake in the company gave him authority to fix his compensation, and finding that § 411(b)

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 24-1   Filed 08/09/22   Page 8 of 13 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 8

"require[d] the issue of compensation to have been decided by a majority of the members of Bernaha, and not by defendant alone.").

B.   Pine's Making of Decisions Outside The "Ordinary
     Course of Business" Without Obtaining The
     Approval Of The Schneider/Schwartz Group

      Section 8.3 of the 2011 Amended Operating Agreement provides that "[t]he Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; *provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company shall be made by the affirmative vote of a majority in interest of the Members.*"(Emphasis added).

      By an e-mail dated February 19, 2018 to Marc Schneider, you stated that "The *only limitation provided in these agreements* is that decisions to finance or refinance any real estate owned by an LLC, acquire new or additional real estate, or sell any real estate owned by a LLC requires the affirmative vote of a majority in interest of the voting members or the affected LLC." (Emphasis added). However, your statement is contrary to the phrase "including, but not limited to" in Section 8.3, which are <u>not</u> words of limitation.

      Equally significant, judicial authority uniformly holds that the phrase "including, but not limited to," has an expansive meaning and is not limited to the items that follow such phrase. *See e.g., Pierre v Providence Washington Ins. Co.*, 99 N.Y.2d 222, 236 (2002) ("includes, but is not limited to" constituted "nonexclusive definition"); *Doniger v Rye Psych. Hosp. Center, Inc.*, 122 A.D.2d 873, 877 (2d Dep't 1986), *lv denied*, 68 N.Y.2d 611 (1986) (use of phrase "including but not limited to" negated inference that parties intended to exclude other examples, and examples following phrase were "illustrative only and do not limit the broad scope of the terms employed"); *see also In re Worldcom, Inc.*, 2007 WL 162782, *6 (S.D.N.Y., Jan. 18, 2007) (phrase "including without limitation" means that following list is not exhaustive); *Fernandez v. Zoni Language Centers, Inc.*, 15-cv-6066 (PKC), 2016 WL 2903274. *6 (S.D.N.Y. May 18, 2016) (same).

      Thus, your position that "outside the ordinary course of business" is "limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company" has no factual or legal basis.

      Decisions that are "outside the ordinary course of business" in the case of these LLC's and therefore "require the affirmative vote of a majority in interest of the Members" (more than 50% of the Members) include the following: (1) capital improvements that are not required for health or safety purposes; (2) setting of cash reserves that are a departure from historical practices of the LLC's or that are in excess of what is required for day to day operations; and (3) a material change in the historical practice of significant distributions to the members of each of the LLC's. We

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 24-1    Filed 08/09/22    Page 9 of 13 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 9

understand that there has been a dramatic increase in the amount of reserves and capital improvements or renovations for each of the properties owned by the LLC's.

In *Unisys Corp. v. Hercules Inc,*, 224 A.D.2d 365, 368 (1st Dep't 1996), the Appellate Division held that "something which is done as a matter of corporate historical practice is, as a matter of law, done 'in the ordinary course of business.'" Black's Law Dictionary (10th ed. 2014) similarly defines "course of business" as "the normal routine in managing a trade or business." Thus, historical practice is a key indicator of "ordinary course of business." There is no dispute as to the historical practice of these LLC's. The dramatic increase of cash reserves and capital improvements, together with the dramatic decrease in distributions, is contrary to the historical practice for the LLC's and thus, "outside the ordinary course of business."

Nonetheless, Pine has refused to let the Schneider/Schwartz Group participate in these matters that are "outside the ordinary course of business" and thus have to be approved by the affirmative vote of a majority in interest of the Members. Instead, Pine, without any legal basis, has unilaterally decided that these matters are solely within its decision-making authority.

As an example, the Schneider/Schwartz Group discovered in June 2018 that JHJ Realty LLC incurred loans in the total amount of $800,000, which loans were made by the Pine/Rohlman Group. Even based on your incorrect reading of Section 8.3 of the 2011 Amended Operating Agreements, these loans were outside the ordinary course of business and had to be approved by the affirmative vote of a majority in interest of the Members. Pine never sought the approval of the Schneider/Schwartz Group and we are unaware of any approval of such loans by the affirmative vote of a majority in interest of the Members of JHJ Realty LLC.

In addition to being significantly contrary to historical practice of the LLC's, the figures proposed by Pine for the amount of each building's reserve accounts appear to be excessive and unreasonable and far in excess of what is necessary for day to day operations. We understand that the average cash position for the years 2012-2016 is about 327% higher than the average cash position for the years 2000-2005 and that the cash position at the end of the year 2017 is about 393% higher than it was in 2000.

Although Brenda Rohlman's March 3, 2018 e-mail states that "over 35 years, Pine Management Inc. has developed guidelines as to how much money to hold in each building's reserve accounts," Pine has never produced these "guidelines."

C.   Pine's Decision To Substantially Reduce The Distributions
     From The LLC's To The Members Without The Approval
     Of The Schneider/Schwartz Group

We understand that distributions from the LLC's have been dramatically reduced. Indeed, it is our understanding that distributions from the LLC's, which were approximately $500,000 in 2011, decreased to approximately $125,000 in 2017. As noted, a material change in the historical practice of significant distributions to the members of each of the LLC's is a decision that is

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 24-1   Filed 08/09/22   Page 10 of 13 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 10

"outside the ordinary course of business" in the case of these LLC's and therefore "requires the affirmative vote of a majority in interest of the Members" (more than 50% of the Members).

It cannot be disputed that the amount of distributions received by a member is a matter of crucial importance to the members of the LLC's. Pine has no authority to unilaterally change the historical practice of significant distributions to the members. As a result, the decision to dramatically change the historical practice of significant distributions is a matter "outside the ordinary course of business" in the case of these LLC's and therefore requires the vote of the Schneider/Schwartz Group.

In the case of the 1996 Operating Agreement of Marni Realty LLC and Rudel Realty LLC, Pine has no authority to dramatically decrease the amount of distributions to the members. Inasmuch as the management of these two limited liability companies is vested in the two members pursuant to Section 5.01 of the 1996 Operating Agreement, the "Members" of Marni Realty LLC and Rudel Realty LLC (not Pine) must decide the issue of distributions.

D.    Pines' Failure To Produce Documents Requested By The
      Schneider/Schwartz Group Or To Provide Explanations
      Of Figures Appearing In Documents Produced_____

Section 14.1 of the 2011 Amended Operating Agreement for eight (8) of the LLC's provides:

> The manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative *shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.*

As noted, the inspection rights to examine the "Company's books and records" under Section 14.1 of the 2011 Amended Operating Agreement is broader than the inspection rights under LLCL § 1102(a). The member's "right to examine the Company's books and records" includes documents such as tax returns, financial statements, key contracts, ledgers and other documents concerning the financial condition of the limited liability company and the underlying property, including, but not limited to: (a) documents concerning capital improvements; (b) documents relating to or constituting the basis on which the Manager or Property Manager is setting reserves for the underlying property; (c) documents relating to payments to the Manager or Property Manager, and payments, if any, to related or affiliated parties of the Manager or Property Manager and (d) documents concerning or relating to loans to or by the limited liability company.

Based on the inspection rights of the Schneider/Schwartz Group as a member of the 8 LLC's under LLCL § 1102(a) and (b) and Section 14.1 of the 2011 Amended Operating

Agreement, we, on behalf of the Schneider/Schwartz Group, request that Pine produce the following documents for the last six (6) years (2012-2018):

(1) the "separate agreement" between the respective limited liability company and Pine Management for services rendered as the "property manager" and any amendments thereto and documents constituting the approval of such "separate agreement;"

(2) documents showing monies paid to Pine Management as the "Manager" of the respective limited liability company and the approval of monies paid or to be paid to the Manager;

(3) documents showing monies paid to Pine Management as the "Property Manager" of the respective limited liability company, the approval of monies paid or to be paid to the Property Manager and the basis and methodology for the calculation of the "management fee" and "construction management fee;"

(4) documents showing the "financial condition" of the limited liability company, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals and General Ledgers;

(5) documents showing the basis for the calculations for the amount of distributions to the members of the limited liability company;

(6) documents showing the capital improvements to the property and payments relating to such capital improvements;

(7) documents relating to or constituting the basis or methodology on which the Manager or Property Manager is setting reserves for the underlying property, including Pine Management's "guidelines," if any, for such reserve accounts:

(8) documents constituting or relating to renovations to the apartments at the property;

(9) documents concerning or related to payments by the respective limited liability company to persons or entities related or affiliated with Pine Management; and

(10) Written consents, if any, reflecting actions taken by the Manager or Members of the LLC's.

Bob G. Goldberg, Esq.
July 17, 2018
Page 12

We, on behalf of Marni Realty LLC and Rudel Realty, LLC, request the same documents for these entities based on the provision that Section 5.1 of the 1996 Operating Agreement provides that "the business and affairs of the Company shall be managed by the Members" and the inspection rights under LLCL § 1102(a) and (b). At the very least, the "default provisions" of the LLCL apply where, as here, these Operating Agreements are "silent" on the issue.

The Schneider/Schwartz Group has requested a number of the foregoing documents. Pine has refused to produce certain requested documents. For example, Brenda Rohlman's March 3, 2018 e-mail refused the Schneider/Schwartz Group's "request for capital expenditures over the past five years for each apartment in the buildings you and your family has a membership interest in," stating "Pine Management Inc. is not spending the time to go backwards over the past five years to complete this list." Surely, the Schneider/Schwartz Group is entitled to this information which materially affects their interests in the LLC's. Surely, the Schneider/Schwartz Group is entitled to information concerning the "Management Fee" and the "Construction Management Fees" referenced in the "Summary of Receipts and Disbursements" of each of the LLC's" and the methodology used to arrive at such fees.

Surely, the Schneider/Schwartz Group is entitled to information concerning any loans to the LLC's, including, but not limited to, loans made to the LLC's by members of such LLC's, including the Pine/Rohlman Group. In particular, the Schneider/Schwartz Group is entitled to advance notification and approval of such loans.

Pine's refusal to produce the requested documentation is contrary to its fiduciary duty to provide material facts to the members of the LLC's.

We also note that Pine does not produce documents on a regular or timely basis to the Schneider/Schwartz Group. Rather, Pine produces certain documents in reaction to a request from the Schneider/Schwartz Group. A perfect example of Pine's release of information and documents "after the fact" is Pine's production of documents relating to the $800,000 of loans incurred during the period November 15, 2016 through December 1, 2017 by JHJ Realty LLC *after* Jerome Schneider sent an e-mail, dated June 13, 2018, to Tom Rohlman.[1]

"A manager's failure to provide access to books and records where an applicable state statute allows inspection can constitute a breach of fiduciary duty." *Estrada v. Dugow*, 2016 WL 7017412, *8 (S.D.N.Y. Nov. 30, 2016). If Pine refuses to permit the Schneider/Schwartz Group or its representatives to examine and make copies of the foregoing documents, the Schneider/Schwartz Group can commence an action, which will include a cause of action for inspection of the books and records of the LLC's (*see Sachs v. Adeli*, 26 A.D.3d at 55-57, *Neumann v. Cenpark Realty, LLC*, 2012 WL 10007764, **6-7 (Sup. Ct. N.Y. Co. Apr. 18, 2012), as well as a cause of action for an accounting. *See Gottlieb v. Northriver Trading Co LLC*, 58 A.D.3d at 551.

---

[1] The Notes comprising the $800,000 of loans are dated November 15, 2016, December 13, 2016, October 4, 2017 and December 1, 2017. The Harold Pine 2009 Family Trust is the lender on each of the Notes.

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 24-1   Filed 08/09/22   Page 13 of 13 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 13

\*                               \*                               \*

The foregoing presentation demonstrates, among other things that: (a) Pine has breached its fiduciary duty to the Schneider/Schwartz Group and has not acted in good faith; (b) Pine has breached provisions of the governing Operating Agreements; (c) Pine has failed to disclose material facts to the Schneider/Schwartz Group; (d) Pine has been involved in related party transactions; and (e) Pine has failed to provide key documents concerning the management and operations of the LLC's to the Schneider/Schwartz Group. In short, Pine (and the Pine/Rohlman Group) have taken actions that have prevented the Schneider/Schwartz Group from exercising their rights as members under the 2011 Amended Operating Agreements, the 1996 Operating Agreement and the LLCL.

In view of the foregoing, we suggest that a meeting be scheduled to resolve the Schneider/Schwartz Group's concerns. We believe that a mutually satisfactory resolution of the issues is preferable to a costly and unnecessary litigation.

Sincerely,

Mitchell J. Geller

cc: Jerome Schneider
    Ruth Schneider
    Marc Schneider
    Marni Schwartz
    Lance Myers, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 ----------------------------------------------------------------X

PINE MANAGEMENT, INC.,                              Docket No.: 22-cv-02407 (MKV)

                              Plaintiff(s),

                  -against-

COLONY INSURANCE COMPANY,

                              Defendant(s).
 ----------------------------------------------------------------X


### DEFENDANT'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION FOR JUDGMENT
### <u>ON THE PLEADINGS</u>

RIVKIN RADLER LLP

M. Paul Gorfinkel, Esq. (MPG 2069)
paul.gorfinkel@rivkin.com
Amanda R. Griner, Esq. (ARG 7625)
amanda.griner@rivkin.com
926 RXR Plaza
Uniondale, New York 11556-0926
Phone: (516) 357-3000
Fax: (516) 357-3333

Attorneys for Defendant
Colony Insurance Company

Dated:  Uniondale, New York
          August 9, 2022

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

OVERVIEW ............................................................................................................... 1

THE H&K LETTER IS PART OF THE PLEADINGS HEREIN .............................. 2

FACTS ........................................................................................................................ 2

PERTINENT POLICY PROVISIONS ...................................................................... 4

LEGAL ANALYSIS ................................................................................................... 6

STANDARDS FOR A MOTION FOR JUDGMENT ON THE PLEADINGS ........... 6

    I.     FIRST DISPOSITIVE COVERAGE DEFENSE:  CLAIM
          PRIOR TO THE POLICY PERIOD ....................................................... 8

    II.    SECOND DISPOSITIVE COVERAGE DEFENSE:  PRIOR
          KNOWLEDGE OF WRONGFUL ACT ............................................... 12

    III.   THIRD DISPOSITIVE COVERAGE DEFENSE: "WRONGFUL
          ACTS"  PRIOR TO THE RETROACTIVE DATE ............................. 16

    IV.   NO DUTY TO INDEMNIFY ................................................................ 21

CONCLUSION ......................................................................................................... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................6, 7

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................6

*EAD Metallurgical, Inc. v. Aetna Cas. & Sur. Co.*,
    905 F.2d 8 (2d Cir. 1990)......................................................................21

*Freydl v. Meringolo*,
    2010 WL 3026578 (S.D.N.Y. 2010)......................................................7

*Glascoff v. OneBeacon Midwest Ins. Co.*,
    2014 U.S. Dist. LEXIS 64858 (S.D.N.Y. 2014)...................................20

*Greenburgh Eleven Union Free School District v. National Union Fire Ins. Co.*,
    304 A.D.2d 334, 758 N.Y.S.2d 291 (1st Dep't 2003) .........................19

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009).....................................................................7

*Hayden v. Paterson*,
    594 F.3d 150 (2d Cir. 2010)...................................................................6

*Liberty Ins. Underwriters v. Corpina Piergrossi Overzat & Klar*,
    78 A.D.3d 602, 913 N.Y.S.2d 31 (1st Dep't 2010) .............................14

*Lively v. WAFRA Inv. Advisory Grp., Inc.*,
    6 F.4th 293 (2d Cir. 2021) .....................................................................6

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020).....................................................................6

*McCabe v. St. Paul Fire & Marine Ins. Co.*,
    79 A.D.3d 1612, 914 N.Y.S.2d 814 (4th Dep't 2010).........................10

*National Union Fire Ins. Co. v. Ambassador Group*,
    691 F. Supp. 618 (E.D.N.Y. 1988) ......................................................20

*Nomura Holding America v. Federal Ins. Co.*,
    629 Fed. Appx. 38 (2nd Cir. 2015).......................................................19

*North River Ins. Co. v. Leifer*,
    2022 U.S. Dist. LEXIS 75134 (S.D.N.Y. April 25, 2022) .............................................6, 7, 14

*Quanta Lines Ins. Co. v. Investors Capital Corp.*,
    2009 U.S. Dist. LEXIS 117689 (S.D.N.Y. 2009) ....................................................................13

*Sarikaputar v. Veratip Corp.*,
    371 F. Supp. 3d 101 (S.D.N.Y. 2019).......................................................................................7

*Schneider, et al. v. Pine Management, Inc. et al.*,
    No. 654303/2019 (Sup. Ct. New York Cty.) (complaint, Exhibit 2)........................................3

*Seneca Insurance Co. v. Kemper Ins. Co.*,
    133 Fed. Appx. 770 (2d Cir. 2005), (S.D.N.Y. 2004) ......................................................10, 18

*Weaver v. Axis Surplus Ins. Co.*,
    639 Fed. Appx. 764 (2d Cir. 2016), (E.D.N.Y. 2014) ........................................................9, 10

*Zahler v. Twin City Fire Ins. Co.*,
    2006 U.S. Dist. LEXIS 14263 (S.D.N.Y. 2006) ....................................................................19

**Other Authorities**

Federal Rule of Civil Procedure 10(c) ..........................................................................................1

Federal Rule of Civil Procedure 12(c) ......................................................................................1, 6

Federal Rule of Civil Procedure 12(b)(6) .....................................................................................6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

PINE MANAGEMENT, INC.,                              Docket No.: 22-cv-02407 (MKV)

                                    Plaintiff(s),
                -against-

COLONY INSURANCE COMPANY,

                                    Defendant(s).
-------------------------------------------------------------------X

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR JUDGMENT
ON THE PLEADINGS**

Defendant, Colony Insurance Company ("Colony") respectfully submits this

memorandum of law in support of its motion, pursuant to Federal Rule of Civil Procedure 12(c),

for judgment on the pleadings.

**OVERVIEW**

This is an action on an insurance contract.  Plaintiff Pine Management, Inc. ("Pine") is

seeking coverage from defendant Colony Insurance Company ("Colony"), under a professional

liability insurance policy, for an underlying lawsuit ("the Schneider Action") against Pine.

This action places at issue both the duties to defend and to indemnify.  Colony will

demonstrate that, based solely upon the complaint in the Schneider Action and the exhibits

attached thereto ("the Schneider Complaint"),[1] the Schneider Action falls entirely outside the

scope of coverage provided by the Colony policy.  Accordingly, Colony is entitled to judgment

on the pleadings, dismissing this case with prejudice.

---

[1] Pursuant to Federal Rule of Civil Procedure 10(c), "A copy of a written instrument that is an exhibit to a pleading
is part of the pleading for all purposes."

**THE H&K LETTER IS PART OF THE PLEADINGS HEREIN**

The complaint in this action (ECF 1) attaches, as Exhibit 2, the Schneider Complaint, without exhibits.  The Schneider Complaint itself, as originally filed in state court, contains twenty exhibits as attachments.

The parties have stipulated (ECF 21) that Exhibit 2 to the complaint in this action shall be deemed to include the exhibits that were attached to the original Schneider Complaint.

Submitted herewith is a Declaration which attaches a letter dated July 17, 2018 ("the H&K Letter").  The H&K Letter was Exhibit 1 to the Schneider Complaint (see ¶ 19 thereof).

Therefore, Colony respectfully submits that this Court should consider the H&K Letter to be part of the Schneider Complaint, when adjudicating whether the Schneider Complaint states a Claim within the scope of coverage.

**FACTS**

Pine acquires, manages and develops rental apartment buildings that are held by various limited liability corporations ("LLC's") (complaint[2] ¶¶ 2,5).  Pine and Colony entered into a claims-made liability insurance contract, designated as Real Estate Developers PROtect Professional Liability Insurance Policy No. RE4202378-0, for the Policy Period of August 1, 2018 to December 1, 2019 (the "Policy"; complaint, Exhibit 1), with Policy limits of $1 million per Claim and in the aggregate (with defense costs within limits).  The Retroactive Date on the Policy is March 1, 2016.  The Policy provides insurance coverage to Pine and various individual insureds, subject to all of its terms, conditions, and exclusions, for Claims of professional liability in connection with "Real Estate Development Services."[3]

---

[2] References to "complaint" refer to the complaint in this action.
[3] For purposes of this motion, Colony does not dispute that the Schneider Action alleges Real Estate Development Services.

On July 26, 2019, Jerome Schneider, on behalf of the members of ten LLC's holding real estate parcels as assets, filed the Schneider Action in the Supreme Court of the State of New York against Pine and others, with the caption *Schneider, et al. v. Pine Management, Inc. et al.*, No. 654303/2019 (Sup. Ct. New York Cty.) (complaint, Exhibit 2).  The Schneider Complaint sets forth ten causes of action in 65 pages and 427 paragraphs, not including exhibits.  Those causes of action include breach of contract, breach of fiduciary duty, the inspection of books and records and an accounting.  Specifically, the Schneider Complaint alleges, among other things, that Pine purportedly paid itself management fees without approval, prevented the members from voting on matters involving substantial expenditures of money and that required member approval, and failed to produce documents reflecting the financial condition and affairs of the LLC's.  The Schneider Complaint seeks injunctive relief, declaratory relief, and damages.

Exhibit 1 to the Schneider Complaint is a letter from Mitchell Geller of the firm Holland & Knight, dated July 17, 2018, to Bob Goldberg of the firm Meister Seelig & Fein ("the H&K Letter").  This letter sets the stage for the Schneider action, setting forth the claims that will be made therein and demanding relief from Pine.  It is to be noted that this letter pre-dated the inception date of the Colony policy by two weeks.

Pine provided notice of the Schneider Action to Colony and sought insurance coverage under the Policy (complaint ¶ 45).  Colony carefully analyzed the legal and factual issues that were raised by the Schneider Action, and determined that the allegations of the complaint fell entirely outside the scope of the coverage that was provided by the Policy.  Accordingly, on August 20, 2019, Colony disclaimed any obligation of defense and indemnity to Pine for the Schneider Action (complaint ¶ 46).

In the pages that follow, Colony will demonstrate as a matter of law that, based entirely on the Schneider Complaint and the exhibits thereto, the Policy does not cover the Schneider Action. This is true based on three independently meritorious coverage defenses, each of which is sufficient to defeat Pine's claims for coverage, and which cumulatively leave no doubt that Colony is entitled to judgment on the pleadings. Those three defenses are:

1. The H&K Letter is a "Claim" prior to the policy period.

2. Pine was aware, prior to the policy period, that it had committed "Wrongful Acts."

3. The "Wrongful Acts" are deemed all to have been committed prior to the Retroactive Date.

### PERTINENT POLICY PROVISIONS

The Colony policy is a professional liability insurance policy for real estate developers. The pertinent insuring agreement, in Section I – Coverages, provides that:

> The Insurer agrees to pay on behalf of the Insured, Loss in excess of the Deductible amount and up to the Limits of Liability shown in item 4 of the Declarations; provided that such Loss results from a Claim first made and reported in writing during the Policy Period or Extended reporting Period, if applicable, arising out of a Wrongful Act committed before the end of the Policy Period and on or after the Retroactive Date, if any, shown in item 8 of the Declarations.

In other words, two things are necessary in order to trigger coverage: (1) a Claim which is first made and reported during the policy period or the extended reporting period, and (2) a Wrongful Act committed between the Retroactive Date and the end of the policy period. If both of these requirements are not satisfied, there can be no coverage.

In Section II - Limits of Liability and Deductible, the Colony policy provides that:

> Defense Costs are part of and not in addition to the Limit of Liability. Payment of Defense Costs by the Insurer will reduce, and may exhaust, the Limits of Liability.

4

**A-220**

Certain definitions, from Section III – Definitions, are pertinent.  A "Wrongful Act" means:

> … any actual or alleged act, error, omission, or breach of duty by any Insured in the rendering or of failure to render Real Estate Development Services…

"Real Estate Development Services" means:

> … the following services performed by or on behalf of any Insured in the course of improvement of real property acquired by the Insured, whether alone or as part of a partnership, joint venture, syndication, or other arrangement:…
>
> 2.  services performed while acting as a real estate agent, title agent, notary republic, mortgage broker, property manager, construction manager, or general contractor, if performed as part of the services as a real estate developer for the same improvement of real property…

For purposes of this motion, Colony does not dispute that Pine was engaged in "Real Estate Development Services."

A "Claim":

> … means any of the following arising from a Wrongful Act:
>
> 1.  a written demand received by any Insured for monetary, non-monetary or injunctive relief, including a written demand that the Insured toll or waive a statute of limitations…

Finally, in Section VI – General Conditions, the policy provides, under the heading "Multiple Wrongful Acts, Claims or Claimants":

> Two or more Claims arising out of a single Wrongful Act, or any series of related Wrongful Acts, will be considered a single Claim. Each Wrongful Act, in a series of related Wrongful Acts, will be deemed to have occurred on the date of the first such Wrongful Act.

Additional pertinent policy provisions will be set forth below at the appropriate juncture.

## LEGAL ANALYSIS

## STANDARDS FOR A MOTION FOR JUDGMENT ON THE PLEADINGS

Motions for judgment on the pleadings are not granted cavalierly, but as a decision from this District less than four months ago demonstrates, a court will not hesitate to grant such a motion when a case very similar to the case at bar comes before it. *North River Ins. Co. v. Leifer,* 2022 U.S. Dist. LEXIS 75134 (S.D.N.Y. April 25, 2022). Like the case before this Court, *Leifer* was an action for insurance coverage under a professional liability policy, and as will be shown below, the court granted judgment on the pleadings to the insurer in the *Leifer* case on precisely one of the three grounds that Colony urges herein.

When deciding a Rule 12(c) motion for judgment on the pleadings, the Court applies the same standard that is applicable to a Rule 12(b)(6) motion to dismiss. *See Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020); *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021). Like a motion under Rule 12(b)(6), a motion under Rule 12(c) may be filed before discovery is complete. *See* Fed. R. Civ. P. 12(c); *Lively*, 6 F.4th at 301.

"To survive a Rule 12(c) motion, [the plaintiff's] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*.

In assessing whether the Complaint plausibly pleads a cause of action, the Court is required to accept the material facts alleged in the complaint as true and draw all reasonable

inferences in favor of the plaintiff. *Iqbal*, 556 U.S. at 678. However, "that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (*quoting Iqbal*, 556 U.S. at 678); *see also Sarikaputar v. Veratip Corp.*, 371 F. Supp. 3d 101, 104 (S.D.N.Y. 2019). Similarly, the court need not defer to sweeping, unsupported conclusions made on information and belief, in evaluating the sufficiency of the complaint. *See Freydl v. Meringolo*, 2010 WL 3026578, at *4 (S.D.N.Y. 2010). Further, "on a 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Sarikaputar*, 371 F. Supp. 3d at 104 (internal quotations omitted).

Colony will show that the complaint in this action fails to state a claim which is plausible on its face. Even accepting all of the allegations in that complaint as true, and drawing all reasonable inferences in favor of the plaintiff, that complaint fails, as a matter of law, to state a claim that plausibly suggests that Pine is entitled to relief. That is because the Schneider Complaint fails to state a Claim that is even plausibly within the scope of the coverage of the Policy. See *Leifer, infra.* Colony therefore respectfully requests that this Court enter judgment on the pleadings in its favor.

## I.

## FIRST DISPOSITIVE COVERAGE DEFENSE:  CLAIM PRIOR TO THE POLICY PERIOD

It was shown above that coverage under the Colony policy can exist only if a Claim is first made and reported during the policy period or the extended reporting period.  That is to say, in this case, there can be no coverage for a Claim that was first made before the policy incepted on August 1, 2018.

In this case, the H&K Letter was forwarded to Pine, by overnight courier and email, on July 17, 2018.  That Letter meets the definition of a "Claim."  Therefore, there is no coverage.

To begin with, Mitchell Geller, the author of the H&K Letter, characterized his own letter as constituting "claims."  The following appears on page 2 (emphasis added):

> We include this detailed examination of New York law on a
> member's **claims** against a manager or managing member and a
> member's rights under the New York Limited Liability Company
> Law ("LLCL") to expedite your analysis of our clients' **claims**
> and to bring about a mutually satisfactory resolution of these
> **claims** without having to commence litigation that would be
> costly to all parties involved [emphasis added].

In fact, the H&K Letter refers to the allegations therein as "claims" on no fewer than seven occasions.

A "**Claim**" under the policy is

> a written demand received by any **Insured** for monetary, non-
> monetary or injunctive relief, including a written demand that the
> **Insured** toll or waive a statute of limitation.

The H&K Letter is indubitably a "Claim."  That is so because:

1.      The H&K Letter contains a Claim for an accounting (heading "D" on page 5 and item 4 of the list on page 11).  This a demand for non-monetary relief.  Alternatively, the only reason that the Schneider plaintiffs would demand an accounting is to make a Claim for monetary relief.

2.      The H&K Letter contains a demand for the payment of fees.  See, for example, the allegations that (i) "total management fees" in the amount of $622,742 were paid to Pine in 2017, that (ii) "Pine cannot receive any compensation for its services unless approved by [a] vote," and that (iii) "Pine has no right to receive fees for its services in connection with its management of the LLC's" (page 7).  This is tantamount to a demand for monetary relief.

3.      The H&K Letter includes numerous demands that Pine produce several categories of documents.  See, for example, the list of 10 categories of documents that are demanded on page 11, in clause (e) on page 13, and the allegation that "Pine's refusal to produce the requested documentation is contrary to its fiduciary duty to provide material facts to the members of the LLC's" (page 12).  This is a demand for non-monetary and/or injunctive relief.

4.      The H&K Letter "suggest[s] that a meeting be scheduled to resolve the Schneider/Schwartz Group's concerns" (page 13).  A request for a meeting at which money will be demanded constitutes a Claim.

5.      The H&K Letter states that its goals include to resolve the dispute "without having to commence litigation that would be costly to all parties involved" (page 2).  It threatens that "if Pine refuses to permit the Schneider/Schwartz Group or its representatives to examine and make copies of the foregoing documents, the Schneider/Schwartz Group can commence an action" (page 12).  Further, the H&K Letter suggests that a mutually satisfactory resolution of the issues "is preferable to a costly and unnecessary litigation" (page 13).

Those portions of the H&K Letter that (1) ask for an accounting, (2) demand the payment of fees, (3) demand production of documents, (4) request a meeting, and (5) suggest the possibility of litigation, are each sufficient to justify the characterization of the H&K Letter as a "Claim," and their aggregate effect is more than sufficient to justify such a characterization.

The decision by the Second Circuit in *Weaver v. Axis Surplus Ins. Co.,* 639 Fed. Appx. 764 (2d Cir. 2016), *aff'g* 2014 U.S. Dist. LEXIS 154746 (E.D.N.Y. 2014), is instructive.  In *Weaver*, the Attorney General of Maryland had sent a letter to the insured, demanding that it produce certain documents and that it cease all offers and sales of a business opportunity.  The letter stated that if the insured did not comply, the Attorney General may proceed with "more

formal legal action." Dist. Ct. Op. at 7. The Second Circuit ruled that the letter, particularly the

threat of "more formal legal action," was a "demand" (undefined in the policy):

> This was sufficient to make the November 2007 Letter a "demand"
> because it set forth the Division's request under a claim of right,
> including its entitlement to the documents identified therein, and
> put [the insured] on notice of the legal consequences of any failure
> to comply.

639 Fed. Appx. at 766. To the same effect is the Appellate Division's ruling in *McCabe v. St.*

*Paul Fire & Marine Ins. Co.,* 79 A.D.3d 1612, 1614, 914 N.Y.S.2d 814, 816 (4th Dep't 2010):

> Plaintiffs' January 2, 2007 letter to Fretz constitutes a claim
> against Fretz under the terms of the policy [citation omitted].
> Although plaintiffs did not specifically request monetary damages
> in that letter, they demanded that Fretz rectify their problem.

In *Seneca Insurance Co. v. Kemper Ins. Co.,* 133 Fed. Appx. 770 (2d Cir. 2005), *aff'g*

2004 U.S. Dist. LEXIS 9159 (S.D.N.Y. 2004)*,* the claimant sent the insured a letter requesting a

meeting. The district court wrote (p. 6) that

> although counsel did not specifically state that the purpose of the
> meeting was to demand money damages or other relief, the
> implication is that counsel requested the meeting for this
> reason….Based on these facts, the letter constitutes a written
> demand…Accordingly, the…letter is a 'claim.'

Here, too, the H&K Letter expressly requested non-monetary relief, and "the implication

is that counsel requested the meeting for this reason" – that is, to demand monetary relief. It

states that "Pine cannot receive any compensation for its services unless approved by [a] vote,"

and as in *Seneca,* the clear implication is that the LLC's are demanding that money back. The

*Seneca* decision also held a threat to "proceed accordingly" (referring to litigation) was an

element in establishing that a letter was a "claim." Based on these cases, the H&K Letter is a

"Claim," and it was made prior to the Colony policy period.

And there is no question that the allegations in the H&K Letter are the predicate of the

Schneider Action.  On page 1 of the H&K Letter, Mr. Geller summarizes the Schneider/Schwartz

claim as follows:

> (a) Pine has breached its fiduciary duty to the Schneider/Schwartz
> Group and has not acted in good faith; (b) Pine has breached
> provisions of the governing Operating Agreements; (c) Pine has
> failed to disclose materials facts to the Schneider/Schwartz Group;
> (d) Pine has been involved in related party transactions; and (e)
> Pine has failed to provide key documents concerning the
> management and operation of the LLC's to the
> Schneider/Schwartz Group.

Paragraph 1 of the Schneider Complaint summarizes the allegations against Pine as

follows:

> (a) has breached provisions of the governing Operating
> Agreements; (b) has breached its fiduciary duty as Manager to the
> Plaintiffs and has not acted in good faith; (c) has failed to disclose
> material facts and key documents concerning the management and
> operations of the LLCs to the Plaintiffs; (d) has engaged in self-
> dealing transactions such as the payment of "management fees"
> and "construction management fees" from the LLCs to itself in
> violation of the governing Operating Agreements and without
> approval from the Plaintiffs; and (e) has been involved in related
> party transactions and approved loans to certain of the limited
> liability companies from members of the limited liability
> companies or persons or entities affiliated with Pine Management
> without authorization from, or an affirmative vote of, a majority in
> interest of the Members of such LLCs.

Four of the five allegations in the summary of the allegations in the Schneider Lawsuit

are very similar, and in some instances are almost verbatim, to the summary of the "Claims" in

the H&K Letter.  And while the remaining allegations in the Schneider Lawsuit (that is, that Pine

has engaged in self-dealing transactions such as the payment of "management fees" and

"construction management fees" to itself) is not listed as one of the categories of "Claims" in the

H&K Letter, it was certainly alleged in the H&K Letter.  Namely, the section heading on page 7

of the H&K Letter reads "Pine Has No Authority to Pay Itself Fees Without The Approval of the

Schneider/Schwartz Group," and that section expressly charges that "Pine is paid a 'management fee' and a 'construction management fee.'"  In fact, ¶ 19 of the Schneider Complaint states that the H&K Letter, and subsequent letters from Holland & Knight, set forth the legal basis for the claims in the Schneider Action.

In light of the above, it is clear that the allegations of the H&K Letter are essentially indistinguishable from those in the Schneider Action.

As such, the H&K Letter of July 17, 2018 is a "Claim," made against Pine prior to the Colony policy period of August 1, 2018 to December 1, 2019.  The Schneider Action is not covered.

## II.

### SECOND DISPOSITIVE COVERAGE DEFENSE:  PRIOR KNOWLEDGE OF WRONGFUL ACT

Pursuant to SECTION IV – EXCLUSIONS, Section A, the Colony Policy does not apply to any Claim:

> A.……arising out of a **Wrongful Act**… occurring prior to the **Policy Period** if, prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy[4] issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the **Policy Period**:…
>
> 2. Any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**…

The first professional liability insurance policy issued by Colony to Pine incepted on August 1, 2018.  Prior to that date, Pine "had a reasonable basis to believe that [it] had committed a Wrongful Act."  In fact, Pine had more than a mere "reasonable basis" to believe

---

[4] Should read "Real Estate Developers PROtect Professional Liability Insurance Policy."

that.  It had absolutely certainty that it had committed a Wrongful Act.  This being so, coverage

for the Schneider Action is excluded.

As was quoted above, the Colony policy defines "Wrongful Act" as (with emphasis

added):

> … any actual or *alleged* act, error, omission, or breach of duty by
> any Insured in the rendering or of failure to render Real Estate
> Development Services…

Any *allegation* that Pine committed an "act, error, omission or breach of duty… in the rendering

or of failure to render Real Estate Development Services," no matter its veracity or merit, is

defined by the Colony policy as a Wrongful Act.  For ease of reference, this exclusion will be

referred to below as the "Prior Knowledge Exclusion."

With this in mind, the applicability of the Prior Knowledge Exclusion is obvious.  The

H&K Letter, which is an exhibit to the Schneider Complaint and hence is a part of that complaint

for all purposes, is dated two weeks prior to the inception of the Colony policy.  That letter

contains, at a minimum, numerous allegations of *alleged* acts, errors, omissions, or breaches of

duty by Pine.  Whether or not those allegations have merit, the H&K Letter provided Pine with a

reasonable basis to believe, prior to the effective date of the Policy, that it had committed a

Wrongful Act, which includes an "alleged" act, error, omission or breach of duty.

An allegation of an "act, error, omission or breach of duty" need not have merit in order

to be a Wrongful Act.  In *Quanta Lines Ins. Co. v. Investors Capital Corp.,* 2009 U.S. Dist.

LEXIS 117689 (S.D.N.Y. 2009), the definition of "claim" included "an actual or alleged

wrongful act."  In that case, a letter accused the insured of a wrongful act, but it was

subsequently withdrawn because it included a factual error.  The court nevertheless concluded

13

that the erroneous letter was a "claim" because even though it was factually inaccurate and would not be sustained, it set forth an "alleged," albeit non-meritorious, wrongful act.

Colony is aware that, in order for this exclusion to apply, New York courts require a policyholder to have both objective and subjective knowledge that it committed a Wrongful Act. *Liberty Ins. Underwriters v. Corpina Piergrossi Overzat & Klar,* 78 A.D.3d 602, 913 N.Y.S.2d 31 (1st Dep't 2010). But that test is plainly satisfied here. Pine cannot deny that, in view of the H&K Letter, it had both objective and subjective knowledge that it had committed an *alleged* "act, error, omission or breach of duty… in the rendering or of failure to render Real Estate Development Services." And in addition, that Letter contains a threat to commence litigation, which establishes subjective knowledge as a matter of law. And objectively, the only possible reading of the H&K Letter is that Pine had committed alleged acts, errors, omissions or breaches of duty in its Real Estate Development Services. Regardless of whether those allegations in the H&K Letter are meritorious, and regardless of whether Pine objectively or subjectively believed that it had *actually* committed those acts, Pine knew, both subjectively and objectively, that it had been charged with "alleged" acts, errors, omissions, or breaches of duty.

Less than four months ago, in *Leifer*, *supra*, this District granted judgment on the pleadings on this precise issue. In that case, prior to the period of his professional liability policy, the insured attorney had failed to serve an answer on behalf of his client. A default judgment was taken against the client. The client filed a legal malpractice suit against the insured attorney while the policy was in effect, and the insured sought coverage under the policy for the suit.

The insurer disclaimed coverage based on the Prior Knowledge Exclusion, given that the insured knew, before the policy incepted, that he had committed malpractice. The insurer then

14

commenced a coverage action, and moved for judgment on the pleadings on the ground of this exclusion.

As to the subjective test, the insured argued that he did not subjectively anticipate being sued, due to his friendship with his client.  The court rejected that argument:

> … the subjective test does not require the insured to believe that a claim is likely [quoting *Quanta Lines*, *supra*].  This prong simply requires that the insured know the facts underlying the eventual malpractice claim.

Likewise, the insured argued that he did not objectively anticipate the suit, because his client had refused to retain him for the purpose of interposing an answer.  This district rejected this argument as well.

> The question in this case is whether a reasonable attorney would have thought that these facts *could* give rise to a malpractice claim [citing *Quanta Lines,* supra]….a reasonable attorney would certainly anticipate that if no answer was filed at all, there would be some possibility of a future malpractice claim…

(Emphasis in original).  This District held that the Prior Knowledge Exclusion applied as a matter of law, and granted the motion for judgment on the pleadings.

It is plain that, upon its receipt of the H&K Letter, Pine was aware, both objectively and subjectively, that it had committed a "Wrongful Act" as the term is defined in the Policy. Accordingly, the Prior Knowledge Exclusion is applicable, and precludes coverage for Pine in connection with the Schneider Action.  As in *Leifer,* Colony is entitled to judgment on the pleadings.

### III.

### THIRD DISPOSITIVE COVERAGE DEFENSE: "WRONGFUL ACTS" PRIOR TO THE RETROACTIVE DATE

It was noted above that one requirement of coverage is that a Wrongful Act must have been committed between the Retroactive Date and the end of the policy period. In the context of the Colony policy, this means that coverage is possible only if a Wrongful Act was committed between March 1, 2016 (the Retroactive Date) and December 1, 2019 (the end of the policy period. There is no coverage for any Wrongful Act committed before March 1, 2016.

It was also noted above that, pursuant to the Colony policy, that

> Each Wrongful Act, in a series of related Wrongful Acts, will be deemed to have occurred on the date of the first such Wrongful Act.

Thus: *if even a single related Wrongful Act was committed prior to March 1, 2016, then there is no coverage for any related Wrongful Act, even if it was committed after March 1, 2016.*

Let us now turn to the facts of this case, and in particular, the allegations in the Schneider Complaint. That Complaint contains multiple allegations of Wrongful Acts committed prior to March 1, 2016, all in the course of Pine's Real Estate Development Services. The following allegations appear in the Schneider Complaint:

1. According to ¶ 13, an "egregious example of Pine Management's breach of the Operating Agreements" is that "during the period September 2015 to June 2019, Pine Management approved loans" "outside the ordinary course of business."

2. It is alleged in ¶ 16 that "Pine Management - without the approval of the Plaintiffs - has paid management fees and construction management fees to itself which exceed $2.4 million for the years 2012 through the first six months of 2019."

3. ¶ 132 alleges that "Commencing in or about 2012 and continuing through the present," Pine dramatically increased cash reserves, dramatically reduced distributions to Members, etc., without appropriate approval.

4. According to ¶159, "Pine neither sought nor obtained the approval of the Plaintiffs in connection with the capital improvements" between 2012 and 2019.

5.      ¶¶ 174 – 183 show the alleged 84% decrease in distributions to Members of the LLC's between 2012 and 2018.

6.      ¶ 187 alleges that "during the period between September 2015 to June 2019, Pine Management approved $7,960,000 of loans" to certain of the LLC's, but according to ¶189, no documentation concerning these loans was provided by Pine to plaintiffs.

7.      ¶ 230 alleges that "Pine Management neither sought nor obtained approval" for a 4,339% increase in capital improvements between 2012 and 2019.

8.      According to ¶ 320, "without the approval of plaintiffs," Pine paid itself "management fees" and "construction management fees" in excess of $2.4 million for the years 2012 through 2019.

9.      ¶ 343 alleges that Pine Management improperly approved almost $8 million of loans between September 2015 and June 2019.

There are many other such allegations.  Suffice it to say that the Schneider Complaint is replete with allegations of Wrongful Acts prior to the Retroactive Date.

The fact that the Schneider Complaint also contains allegations of Wrongful Acts after the Retroactive Date cannot salvage coverage for Pine.  As is noted above, the Colony policy contains a provision, standard in professional liability claims made policies, that (1) any series of related Wrongful Acts will be considered a single Claim, and (2) each Wrongful Act, in a series of related Wrongful Acts, will be deemed to have occurred on the date of the first such Wrongful Act.

All of the Wrongful Acts that are alleged in the Schneider Complaint are "related."  They all arose out of Pine's alleged wrongful conduct in providing Real Estate Development Services.  The Schneider Complaint treats them largely cumulatively and as a unit.  The allegations by all of the ten LLC's are similar, and arise out of the same series of related "Wrongful Acts".  Thus, the alleged Wrongful Acts are all "related," and it follows that every Wrongful Act, regardless of

17

**A-233**

when it was allegedly committed, will be deemed to have occurred on the date of the first Wrongful Act.  And that date was well before the Retroactive Date.

New York courts have found claims to be "related" even when their connection was more attenuated than the connection between the various Wrongful Acts that are alleged in the Schneider Complaint.

A particularly good illustration of this rule emerges from the Second Circuit's decision in *Seneca Insurance Co. v. Kemper Ins. Co., supra,* 133 Fed. Appx. 770 (2d Cir. 2005), *aff'g* 2004 U.S. Dist. LEXIS 9159 (S.D.N.Y. 2004).  In that case, two unrelated plaintiffs, Michael Gallagher and JES Properties, each sought to organize a horse show, but USA Equestrian denied them permission to do so because of "mileage conflicts."  Gallagher's counsel wrote to USA Equestrian, claiming an antitrust violation.  The letter was dated July 6, 2001, at a time that USA Equestrian was covered by a policy issued by Seneca Insurance Company.  A similar letter on behalf of both Gallagher and JES, and then a lawsuit on behalf of both plaintiffs, followed, but the second letter and the lawsuit were dated only *after* the Seneca policy expired.

The Seneca policy had language similar to that of the Colony policy before this Court, in that interrelated Wrongful Acts were deemed to be one claim, made on the date that the first such claim was made.  Thus, if the Gallagher and JES claims were interrelated, they would both be deemed to have been made during the Seneca policy period, even though the JES claim, considered on its own, clearly post-dated that policy.

The Second Circuit found that the claims were interrelated.  The trial court decision by the Southern District of New York, which the Second Circuit affirmed "for the reasons stated by the District Court," held that (p. 5)

> the Gallagher Claim and the JES Claim arise from, at minimum,
> Interrelated Wrongful Acts because they share a sufficient factual

> nexus.  Thus, the Gallagher Claim and the JES Claim are deemed
> to be one claim.  This one claim was first made against USA
> Equestrian on July 6, 2001, the date of the Gallagher Claim…

The Southern District, in its opinion that was adopted by the Second Circuit, recognized

(p. 7) that Gallagher and JES had no business connection, that Gallagher and JES submitted

applications for shows on different dates and in different locations, and that USA Equestrian's

denial of Gallagher's and JES's respective applications were separate and distinct transactions.

But that did not matter.  Since the underlying claims shared a factual nexus, they were

interrelated.  All the more so here, where all the plaintiffs share a business and familial

connection, where all of their Claims are asserted in the same lawsuit (i.e. the Schneider Action),

and where all of their Claims indubitably have the same "factual nexus," their Claims are related,

and all must be deemed to have occurred prior to Colony's policy period.

The Second Circuit ruled, in *Nomura Holding America v. Federal Ins. Co.,* 629 Fed.

Appx. 38, 39 (2nd Cir. 2015), that the relevant inquiry is:

> …whether the underlying claims are based upon, arising from, or
> in consequence of the same or related facts, circumstances,
> situations, transactions or events or the same or related series of
> facts, circumstances, situations, transactions or events…

The Schneider Complaint surely satisfies the *Nomura Holding* test.

In *Greenburgh Eleven Union Free School District v. National Union Fire Ins. Co.,* 304

A.D.2d 334, 758 N.Y.S.2d 291 (1st Dep't 2003), separate lawsuits brought by different school

employees, but arising out of the same "disturbances" at a public school, were held to be related.

And in *Zahler v. Twin City Fire Ins. Co.,* 2006 U.S. Dist. LEXIS 14263 (S.D.N.Y. 2006),

a securities fraud complaint was served on the insured during the Twin City policy period, and an

ERISA complaint was served on it after the policy expired.  Securities fraud and ERISA are very

different kinds of claims, but since they both were predicated upon similar facts, they were

deemed to constitute one claim, made during the Twin City policy period.

It can be seen that a general commonality of facts is all that is required in order to make

multiple Wrongful Acts "related."  By contrast, only if claims or Wrongful Acts have very

different factual geneses will they be held not to be "related."  In *Glascoff v. OneBeacon Midwest*

*Ins. Co.,* 2014 U.S. Dist. LEXIS 64858 (S.D.N.Y. 2014), two suits were found not to be related

because one focused on the insured's deficient policies, internal controls, and practices, whereas

the other focused on its inducing investors to make a bad investment.  There was no similarity of

facts between those claims.  In *National Union Fire Ins. Co. v. Ambassador Group,* 691 F. Supp.

618 (E.D.N.Y. 1988), four suits were held not to be interrelated, since they involved the distinct

claims of (1) failing to disclose information, (2) inducement to sell insurance policies in reliance

on false financial statements, and (3 and 4) negligent mismanagement of two separate companies.

Again, the factual nexus was absent.

But in the case at bar, all of the Wrongful Acts against Pine are related.  The ten LLC's

are treated collectively, not individually; indeed, ¶ 1 of the Schneider Complaint refers to them

as mere "nominal defendants."  The various LLC "Operating Agreements" are fungible, and are

treated as a unit.  See, e.g., ¶ 14 ("Pine Management's failure to comply with the provisions of

the governing Operating Agreements"); ¶ 92 ("The terms of the Operating Agreements of [eight

of the LCC's] are virtually identical"); ¶ 306 ("Pine Management is the Manager of [eight of the

LLC's]").

The Wrongful Acts against Pine all spring from similar facts, namely, they arose from

Pine's alleged wrongful conduct in providing Real Estate Development Services.  All of the

Wrongful Acts are asserted in the same complaint, and the Schneider Complaint treats them all

as related.  The Wrongful Acts all center on allegedly unauthorized fees, allegedly unauthorized

capital expenditures and loans, inadequate distributions to the LLC's, etc.  And, in all cases, they

span the time period from 2012 (four years before the Retroactive Date) to 2019.  Thus, they

must all be deemed to have been committed prior to the Retroactive Date of the Colony policy.

No Wrongful Act was committed on or after the Retroactive Date  of the Colony policy.

There is no coverage under that policy.

## IV.

### NO DUTY TO INDEMNIFY

The analysis set forth above has focused on the absence of Colony's duty to defend and

indeed, it may be that Pine's defense costs will exceed the limit of Colony's policy, rendering

consideration of the duty to indemnify moot.  In any event, a finding by this Court that Colony

has no duty to defend will also compel the conclusion that Colony has no duty to indemnify.

> Initially we note that the duty to defend is broader than the duty to
> indemnify. Thus, it is unnecessary to engage in a separate analysis
> of [the insurer's] independent claim that it has no duty to indemnify
> apart from both insurers' claims that they have no obligation to
> defend.

*EAD Metallurgical, Inc. v. Aetna Cas. & Sur. Co.*, 905 F.2d 8, 11 (2d Cir. 1990).  Colony has no

duty, of either defense or indemnity, to Pine.

## <u>CONCLUSION</u>

For three independent and sufficient reasons, all based solely on the Schneider Complaint

and its exhibits, the Colony policy does not cover the Schneider Action.  Those reasons are:

- The Claim was made prior to the policy period

- Pine had prior knowledge of the Wrongful Acts before the policy incepted

- The alleged Wrongful Acts occurred prior to the Colony policy's Retroactive

  Date

Colony respectfully submits that it is entitled to judgment on the pleadings, and it asks this Court to enter judgment in its favor:

1. Dismissing the complaint with prejudice;

2. As requested in Colony's Counterclaims, declaring that Colony has no obligation of coverage to Pine, in whole or in part, in connection with the Schneider Action; and

3. Granting such other and further relief as seems appropriate to the Court.

Respectfully submitted,

RIVKIN RADLER LLP

By: _*M. Paul Gorfinkel*_____

M. Paul Gorfinkel, Esq. (MPG 2069)
paul.gorfinkel@rivkin.com
Amanda R. Griner, Esq. (ARG 7625)
amanda.griner@rivkin.com
926 RXR Plaza
Uniondale, New York 11556-0926
Phone: (516) 357-3000
Fax: (516) 357-3333

Attorneys for Defendant
Colony Insurance Company

Dated: Uniondale, New York
        August 9, 2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PINE MANAGEMENT, INC.,                              Docket No.: 22-cv-02407 (MKV)

                              Plaintiff,

        -against-

COLONY INSURANCE COMPANY,

                              Defendant.

**PLAINTIFF PINE MANAGEMENT, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Dated: August 30, 2022              **ANDERSON KILL P.C.**
                                    Dennis J. Nolan, Esq.
                                    John M. Leonard, Esq.
                                    Regan Samson, Esq.
                                    1251 Avenue of the Americas
                                    New York, NY 10020
                                    Tel.: (212) 278-1000
                                    Fax: (212) 278-1733

                                    *Attorneys for Plaintiff Pine Management, Inc.*

docs-100516138.1

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................... 1

LEGAL ANALYSIS............................................................................................ 2

I.     STANDARD.............................................................................................. 2

II.    THE DUTY TO DEFEND IS EXCEEDINGLY BROAD UNDER NEW YORK LAW ..... 4

III.   THE H&K LETTER DOES NOT CONSTITUTE A CLAIM UNDER THE TERMS OF THE POLICY ......................................................................................... 5

IV.   THERE WAS NO REASONABLE BASIS TO BELIEVE, PRIOR TO THE POLICY EFFECTIVE DATE, THAT PINE HAD COMMITTED A WRONGFUL ACT.................. 9

       A.    Colony Bears a Heavy Burden to Establish Exclusion A.2's Applicability ............. 10

       B.    Colony Misinterprets Exclusion A.2, Which Precludes Coverage Where Pine Reasonably Believes it Had Committed a Wrongful Act, Not Where Pine Reasonably Believes a Party "Alleged" that Pine Had Committed a Wrongful Act.................................................................................................. 11

       C.    Colony Cannot Establish As a Matter of Law That Pine Knew the Relevant Facts Prior to the Policy's Effective Date or That a Reasonable Real Estate Developer With Pine's Knowledge Would Expect Such Facts to be the Basis of a Claim ....... 14

V.    THE WRONGFUL ACTS ALLEGED IN THE UNDERLYING COMPLAINT TRIGGER COLONY'S DUTY TO DEFEND ...................................................................... 22

VI.   THIS IS A DUTY TO DEFEND CASE; HENCE, COLONY'S FINAL POINT IS MOOT .................................................................................................................. 25

CONCLUSION.................................................................................................... 25

docs-100516138.1

## TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*In re Ambassador Grp., Inc. Litig.*,
   830 F. Supp. 147 (E.D.N.Y. 1993) .........................................................................8, 9

*Andy Warhol Found. for the Visual Arts, Inc. v. Fed. Ins. Co.*,
   189 F.3d 208 (2d Cir. 1999).................................................................................13

*Atlantis Mgmt. Grp. II LLC v. Nabe*,
   No. 651598/2017, 2018 WL 4698008 (N.Y. Sup. Ct, N.Y. Cnty. Oct. 1, 2018),
   *aff'd*, 177 A.D.3d 542 (1st Dep't 2019).................................................................6

*Auto. Ins. Co. of Hartford v. Cook*,
   7 N.Y.3d 131 (2006) ......................................................................................4, 20

*Bailey v. Pataki*,
   No. 08-CIV-8563 (JSR), 2010 WL 234995 (S.D.N.Y. Jan. 19, 2010)..........................3

*Bank of New York v. First Millennium, Inc.*,
   607 F.3d 905 (2d Cir. 2010)................................................................................3

*Belt Painting Corp. v. TIG Ins. Co.*,
   100 N.Y.2d 377 (2003) ..............................................................................10, 13

*Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles and Kaufman, LLP*,
   No. 01 CV 3844(SJ), 2006 WL 2135782 (E.D.N.Y. July 28, 2006) ..........................19

*Coregis Insurance Co. v. Goldstein*,
   32 F. Supp. 2d 508 (D. Conn. 1998).....................................................................20

*Enel Green Power N. Am., Inc. v. Geronimo Energy, LLC*,
   No. 18-CV-5882 (AJN), 2019 WL 4805659 (S.D.N.Y. Sept. 30, 2019) ......................3

*Evanston Ins. Co. v. GAB Bus. Servs., Inc.*,
   132 A.D.2d 180 (1st Dep't 1987) ..........................................................................9

*Exec. Risk Indem. Inc. v. Pepper Hamilton LLP*,
   56 A.D.3d 196 (1st Dep't 2008), *aff'd as modified*, 13 N.Y.3d 313 (2009)................15

*Fitzpatrick v. Am. Honda Motor Co.*,
   78 N.Y.2d 61 (1991) ......................................................................................4, 5

*Gil Enters., Inc. v. Delvy*,
   79 F.3d 241 (2d Cir. 1996)..................................................................................7

*Great Am. Ins. Co. v. AIG Specialty Ins. Co.*,
   No. 20-cv-4596 (DLC), 2021 WL 1268450 (S.D.N.Y. April 6, 2021) .......................12

ii

*Great Am. Ins. Co. v. Houlihan Lawrence, Inc.*,
    449 F.Supp.3d 354 (S.D.N.Y. 2020)..................................................................................10

*Hartford Steam Boiler Grp., Inc. v. SVB Underwriting, Ltd.*,
    No. 3:04CV2127 SRU, 2011 WL 1899392 (D. Conn. May 19, 2011) ......................9, 15, 20, 21

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
    309 F.3d 76 (2d Cir. 2002)...............................................................................................13

*Juster Assocs. v. City of Rutland, Vt.*,
    901 F.2d 266 (2d Cir. 1990).................................................................................................3

*Lend Lease (U.S.) Constr. LMB Inc. v. Zurich Am. Ins. Co.*,
    136 A.D.3d 52 (1st Dep't 2015), *aff'd on other grounds*, 28 N.Y.3d 675 (2017)........................5

*Liberty Ins. Underwriters, Inc. v. Corpina Piergrossi Overzat & Klar LLP*,
    78 A.D.3d 602 (1st Dep't 2010) ....................................................................... *passim*

*Madonna v. United States*,
    878 F.2d 62 (2d Cir. 1989)...................................................................................................3

*McCabe v. St. Paul Fire and Marine Insurance Co.*,
    79 A.D.3d 1612 (4th Dep't 2010) .......................................................................................7

*Napoli, Kaiser & Bern, LLP v. Westport Ins. Corp.*,
    295 F. Supp.2d 335 (S.D.N.Y. 2003)...............................................................................10

*National Specialty Insurance Co. v. National Union Fire Insurance Co.*,
    No. 6:10-826-TMC, 2012 WL 1825370 (D.S.C. May 18, 2012) .................................20

*North River Insurance Co. v. Leifer*,
    No. 21-CV-7775 (VEC), 2022 WL 1210847 (S.D.N.Y. Apr. 25, 2022)..............................16, 18

*OneBeacon Insurance Co. v. T. Wade Welch & Associates*,
    841 F.3d 669 (5th Cir. 2016) ......................................................................................13, 14

*Pacific Emps. Ins. Co. v. Saint Francis Care Inc.*,
    729 F. App'x 129 (2d Cir. 2018) .....................................................................................25

*Purcigliotti v. Risk Enter. Mgmt., Ltd.*,
    240 A.D.2d 205 (1st Dep't. 1997) .....................................................................................9

*Quanta Lines Insurance Co. v. Investors Capital Corp.*,
    No. 06-CV-4624 (PKL), 2009 WL 4884096 (S.D.N.Y. Dec. 17, 2009) ...................................19

*Schlather, Stumbar, Parks & Salk, LLP v. One Beacon Insurance Co.*,
    No. 5:10-CV-0167, 2011 WL 6756971 (N.D.N.Y. Dec. 22, 2011) .......................................21, 25

*Seaboard Sur. Co. v. Gillette Co.*,
    64 N.Y.2d 304 (1984) .............................................................................................4, 10, 25

docs-100516138.1

*Seneca Insurance Co. v. Kemper Insurance Co.*,
    No. 02 Civ. 10088(PKL), 2004 WL 1145830 (S.D.N.Y. May 21, 2004), *aff'd*,
    133 F. App'x 770 (2d Cir 2005) ...................................................................................8

*Suez Treatment Solutions, Inc. v. ACE Am. Ins. Co.*,
    No. 20-CV-06082 (MKV), 2022 WL 954601 (S.D.N.Y. Mar. 30, 2022) ..............................2, 22

*Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*,
    98 N.Y.2d 435 (2002) ...................................................................................4

*U.S. Fid. & Guar. Co. v. Exec. Ins. Co.*,
    893 F.2d 517 (2d Cir. 1990) .........................................................................16

*Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    25 N.Y.3d 675 (2015) .................................................................................13

*Weaver v. Axis Surplus Insurance Co.*,
    639 F. App'x 764 (2d Cir. 2016) ....................................................................7

*Wojchowski v. Daines*,
    498 F.3d 99 (2d Cir. 2007) ...........................................................................12

*Zavodnick v. National Liab. & Fire Ins. Co.*,
    No. 17-4762, 2019 WL 1003157 (E.D. Pa. Mar. 1, 2019) .........................................19

*Zuckerman v. City of New York*,
    49 N.Y.2d 557 (1980) ...................................................................................5

*Zyskind v. FaceCake Mktg. Techs., Inc.*,
    110 A.D.3d 444 (1st Dep't 2013) ...................................................................6

**Statutes**

Federal Rule of Civil Procedure 12(b)(6) ...............................................................3

Federal Rule of Civil Procedure 12(c) ...............................................................2, 3, 4

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, et al., *Fed. Practice & Procedure*, § 1367
    (3d ed. 1998) ...........................................................................................3

docs-100516138.1

**PRELIMINARY STATEMENT**

Colony seeks judgment on the pleadings on its duty to defend, where underlying liability has not been established and the underlying pleading potentially gives rise to a covered claim.

On or about July 26, 2019, Pine was served with a complaint in a New York state court action, styled *Schneider et al. v. Pine Management, Inc., et al.* (the "Schneider Action").  Pine provided notice of the complaint (the "Schneider Complaint") to Colony under a Real Estate Developers PROtect Professional Liability Insurance policy, effective for the period of August 1, 2018 to December 1, 2019 (the "Policy").   Merely twenty days later, Colony denied coverage in full, despite the exceedingly broad duty to defend.  Colony refused to take up the defense, not even until the Schneider Action resolved (at which point Colony could seek recoupment) or until Colony could obtain a declaratory judgment that the Policy unequivocally did not cover the Schneider Action.  Instead, Pine has been forced to pay three years of defense fees and costs, which now exceed the $1 Million Policy limits.  Colony unjustifiably denied coverage and refused to defend.  The Policy is a "claims made" policy, and the Schneider Complaint was filed and reported within the Policy period.  As a result, Colony has a duty to defend Pine.

Despite the law and the facts counseling otherwise, Colony seeks a judgment on the pleadings that it has no duty to defend Pine.  Its Motion rests on several fallacies.  First, despite Colony's attempts otherwise, the July 2018 letter from the Schneider Group's counsel (the "H&K Letter") is not a Claim, as defined by the Policy.  It does not contain a specific demand for relief, certainly not one that can be defended, settled, and paid.  Colony can glean neither the thought process nor the intent of the attorneys who drafted the H&K Letter.  Without its feigned clairvoyance, Colony cannot show that the H&K Letter was a Claim before Policy inception.

Additionally, Colony has no basis to apply a "prior knowledge" exclusion.  Pine had no reasonable basis to believe that it had committed a Wrongful Act (as defined in the Policy) prior

to the Policy's effective date. Colony misreads the Policy language, and the allegations in the

Schneider Complaint (including its attachments), and New York law contradict the premise of

Colony's argument, because Pine could have had neither a subjective nor an objective belief that

it had committed a Wrongful Act prior to the Policy period; at a minimum, there are factual

issues that preclude judgment. Further, even though the Schneider Complaint alleges Wrongful

Acts committed both before and after the Policy's Retroactive Date, those alleged "acts" are so

varied so as to be unrelated. In particular, the Schneider Complaint alleges separate claims post-

Retroactive Date that are not linked to any prior Wrongful Acts alleged in the Schneider

Complaint. Under New York's exceedingly broad duty to defend law, this is all that is necessary

to trigger a defense under the Policy.

  Finally, Colony's contention that it has no duty to indemnify Pine is a red herring meant

to muddy the waters of the issues in this litigation. Pine seeks a duty to defend. Colony cannot

invoke a more lenient standard applicable to any duty to indemnify. Under the exceedingly

broad standard on an insurance company's duty to defend, there is no doubt – and certainly no

doubt at this point in the proceedings – that the duty to defend has been triggered.

  Colony's Motion amounts to little more than procedural foot dragging and has no merit.

For the reasons set forth below, the Motion should be denied in its entirety.

## **LEGAL ANALYSIS**

**I.**  **STANDARD**

  As this Court has acknowledged, a Federal Rule of Civil Procedure 12(c) motion for

judgment on the pleadings is "an unusual procedural posture for a duty to defend case." *Suez*

*Treatment Solutions, Inc. v. ACE Am. Ins. Co.*, No. 20-CV-06082 (MKV), 2022 WL 954601, at

*1 (S.D.N.Y. Mar. 30, 2022).

2

Rule 12(c) motions "are subject to the same standard applicable to Rule 12(b)(6) motions to dismiss." *Enel Green Power N. Am., Inc. v. Geronimo Energy, LLC*, No. 18-CV-5882 (AJN), 2019 WL 4805659, at *5 (S.D.N.Y. Sept. 30, 2019).  In evaluating a Rule 12(c) motion, the court must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party.  *Madonna v. United States*, 878 F.2d 62, 65 (2d Cir. 1989).  "Thus, we will accept all factual allegations in the [pleading sought to be dismissed] as true and draw all reasonable inferences in favor of the [non-movant]."  *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (additional quotation marks omitted).  "The factual allegations of the non-moving party are assumed to be true and all reasonable inferences drawn in that party's favor."  *Bailey v. Pataki*, No. 08-CIV-8563 (JSR), 2010 WL 234995, at *1 (S.D.N.Y. Jan. 19, 2010).  As a leading treatise explains:

> A Rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties and a judgment on the merits can be achieved by focusing on the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the district court will take judicial notice. The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court.

5C Charles Alan Wright & Arthur R. Miller, et al., *Fed. Practice & Procedure*, § 1367 (3d ed. 1998) (footnotes omitted); *accord Juster Assocs. v. City of Rutland, Vt.,* 901 F.2d 266, 269 (2d Cir. 1990).  Thus, "[i]n considering motions under Federal Rule 12(c), district courts frequently indicate that a party moving for a judgment on the pleadings impliedly admits the truth of its adversary's allegations and the falsity of its own assertions that have been denied by that adversary."  Fed. Prac. & Proc. § 1370.  Because "hasty or imprudent use of this summary

3

procedure…violates the policy in favor of ensuring…a full and fair hearing on the merits of [a] claim or defense," federal courts are "unwilling to grant a motion under Rule 12(c) unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." Fed. Prac. & Proc. § 1368.

Colony does not challenge Pine's allegation that the Schneider Complaint is a Claim. Rather, Colony moves on its Counterclaims, each of which Pine has denied, representing that, as a matter of law, it is entitled to judgment. In doing so, Colony improperly seeks to have all inferences from Pine's complaint, its own counterclaims, and the Schneider Complaint and the exhibits thereto, including the H&K Letter, drawn in its favor. When considered in light of the proper standard and within the context of the broad duty to defend, Colony is not entitled to judgment on the pleadings.

## II.    THE DUTY TO DEFEND IS EXCEEDINGLY BROAD UNDER NEW YORK LAW

An insurance company's duty to defend is broader than its duty to indemnify. *Seaboard Sur. Co. v. Gillette Co*., 64 N.Y.2d 304, 310 (1984). This duty is exceedingly broad, and is triggered whenever the allegations of an underlying complaint suggest even "a reasonable possibility of coverage." *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006). If any of the claims alleged against a policyholder arguably fall within a policy's coverage, the insurance company must defend the entire action. *Town of Massena v. Healthcare Underwriters Mut. Ins. Co*., 98 N.Y.2d 435, 443 (2002).

New York adheres to the four corners rule, under which an insurance company may not look beyond the four corners of the underlying complaint and the insurance policy to deny its duty to defend. *Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 66 (1991). But an insurance company also must defend when it has knowledge of facts outside the underlying complaint that

suggest a reasonable possibility of coverage. *Fitzpatrick*, 78 N.Y.2d at 67. So while the four

corners rule restrains the insurance company's ability to deny coverage by looking beyond the

pleadings, it does not constrict the policyholder's ability to obtain coverage by introducing facts

beyond the pleadings. *See Fitzpatrick*, 78 N.Y.2d at 67-68.

### III.   THE H&K LETTER DOES NOT CONSTITUTE A CLAIM UNDER THE TERMS OF THE POLICY

Words in insurance policies must be interpreted according to their plain and ordinary

meaning, but only to the extent that they are not defined within the policy. *See Lend Lease*

*(U.S.) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 136 A.D.3d 52, 56 (1st Dep't 2015), *aff'd on*

*other grounds*, 28 N.Y.3d 675 (2017). Ignoring this principle, Colony attempts to rewrite the

Policy definition of "Claim" to encompass the obviously colloquial term "claim" used in the

H&K letter. Motion at 8 ("In fact, the H&K Letter refers to the allegations as 'claims' on no

fewer than seven occasions."). That the H&K Letter vernacularly refers to "claims" has no

bearing on whether or not the H&K Letter constitutes a "Claim" as defined in the Policy.

Colony's specious argument to the contrary is wrong and should be disregarded.

Colony's interpretation of the H&K Letter relies entirely on innuendo and supposition in

an attempt to shoehorn the H&K Letter into the Policy definition of "Claim."[1] But Colony

cannot rewrite the H&K Letter to ascribe to it new meaning absent from the letter as written.[2]

*See Zuckerman v. City of New York*, 49 N.Y.2d 557, 563 (1980) (speculation of attorney without

---

[1] Aside from a civil proceeding commenced by service", the Policy defines "Claim" to mean "a written demand received by any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations" arising from a Wrongful Act. Policy, Ex. B to the Declaration of Dennis J. Nolan, dated August 30, 2022 (the "Nolan Decl."), submitted herewith, at Definitions, III.B.

[2] The conditional language of the Motion lays bare Colony's baseless attempt to transform the H&K Letter to suit the language of the Policy. *See* Motion at 8 – 9 ("The only reason the Schneider plaintiffs would demand an accounting..."; "[t]his is tantamount to a demand for monetary relief"; "[a] request for a meeting at which money will be demanded constitutes a claim.") (emphasis added)  Despite Colony's efforts, it cannot assign itself omniscient knowledge of the intent of the H&K Letter beyond what is clear from the face of the document. And the face of the document is devoid of any allegation or assertion that would constitute a Claim under the Policy.

personal knowledge of matter at issue lacks evidentiary value and is unavailing.)  The H&K

Letter speaks for itself, and it lacks any demand that would constitute a Claim under the Policy.

First, the H&K Letter does not contain a "Claim" for an accounting.  *See* Motion at 8.  At

most, the H&K Letter asserts that under New York law an LLC may have the right to an

equitable accounting.  Nolan Decl., Ex. A-1 (the "H&K Letter"), at 5.[3]  It does not demand an

accounting; it simply recites a point of law, and requests to review documents showing Pine's

financial condition,[4] "and the furnishing of an annual balance sheet and profit and loss statement

are not the same as an accounting."  *Zyskind v. FaceCake Mktg. Techs., Inc.*, 110 A.D.3d 444,

447 (1st Dep't 2013).  Nor do the H&K Letter's requests for documents constitute a demand for

non-monetary relief.  These requests list documents that the Schneider Group wished to inspect

pursuant to LLC law and the operating agreements between the parties.  H&K Letter at 11.  And

New York law distinguishes between a request for access to books and records, as the Schneider

Group requested here, and a demand for an equitable accounting.  *See Zyskind*, 110 A.D.3d at

446; *Atlantis Mgmt. Grp. II LLC v. Nabe,* No. 651598/2017, 2018 WL 4698008, at *3 (N.Y. Sup.

Ct, N.Y. Cnty. Oct. 1, 2018), *aff'd*, 177 A.D.3d 542 (1st Dep't 2019) (distinguishing between

right to examine books and records and common law right to an equitable accounting).

Second, the H&K Letter does not demand the payment of fees.  Like Colony's

misrepresentation of a purported demand for an accounting.  While the H&K Letter outlines

possible theories under which Pine would not be entitled to fees for its services, it explicitly

stops short of demanding repayment of such fees.  *See* H&K Letter at 7.

---

[3] Pursuant to the parties' stipulation deeming the exhibits attached to the original Schneider Complaint part of Ex. 2 to Pine's complaint here, as referenced in the Motion at 2, Pine attaches the Schneider Complaint to the Nolan Decl. at Exhibit A, and the exhibits thereto to the Nolan Decl. at Ex. A-1 to Ex. A-20.

[4] The H&K Letter requests "documents showing the 'financial condition' of the limited liability company, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals, and General Ledgers."  H&K Letter at 11.

6

Finally, Colony's fourth and fifth points show the Schneider Group's efforts to avoid a Claim at all costs.  Motion at 9.  Contrary to Colony's conclusory assertion, rather than constituting a Claim under the Policy, these points emphasize that the Schneider Group went out of their way to avoid a Claim at all costs.  The Schneider Group requested a meeting "to resolve [their] concerns", and sought to resolve the differences between the parties amicably rather than commencing "a costly and <u>unnecessary</u> litigation."  H&K Letter at 13 (emphasis added).

Colony's reliance on inapposite caselaw does not bolster its position.  *Weaver v. Axis Surplus Insurance Co.*, 639 F. App'x 764, 764 (2d Cir. 2016), involved receipt of a letter from the Maryland Attorney General's Office, threatening legal action for non-compliance with a demand for documents.  First, a letter demanding documents by a state Attorney General pursuant to a specific statute that authorizes an investigation far exceeds in severity a request by members of an LLC to peruse documents pursuant to an operating agreement.  Moreover, the Attorney General in *Weaver* threatened more formal legal action for plaintiff's failure to comply.  Here, the Schneider Group explicitly stated their goal to avoid litigation with Pine.  H&K Letter at 13.  The H&K Letter uses precatory language[5] to mitigate any perceived threat, and such language is insufficient to constitute a demand.  *See Gil Enters., Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996) (precatory and ambiguous statements did "not rise to the level of a demand, because they objectively failed to put [Plaintiff] on notice of the drastic legal repercussions that could result from noncompliance.").

Equally unavailing is Colony's reliance on *McCabe v. St. Paul Fire and Marine Insurance Co.*, 79 A.D.3d 1612, 1612 (4th Dep't 2010).  Unlike in *McCabe*, the Schneider Group made no demand that Pine rectify their problem.  Rather, they offered a viable alternative to such

---

[5] "[W]e suggest that a meeting be scheduled to resolve the Schneider/Schwartz Group's concerns.  We believe that a mutually satisfactory resolution of the issues is preferable to a costly and unnecessary litigation."  H&K Letter at 13.

a demand – a meeting to resolve the Schneider Group' concerns without resorting to litigation. H&K Letter at 13.  The various requests prior to the meeting request are a predicate to the Schneider Group's ultimate goal – to hash out a "mutually satisfactory resolution" of any perceived issues.

For these same reasons, Colony's reliance on *Seneca Insurance Co. v. Kemper Insurance Co.*, No. 02 Civ. 10088(PKL), 2004 WL 1145830 (S.D.N.Y. May 21, 2004), *aff'd*, 133 F. App'x 770 (2d Cir 2005) lacks merit.  There, the underlying plaintiff had received a letter alleging violation of both state and federal statutes and actual direct damages.  The Court used those allegations to find that the purpose of the request for a meeting in the letter was to demand money damages.  The H&K Letter stops far short of this threshold.  It does not make a demand for actual direct damages.  Nor does it imply that money will be demanded at the requested meeting.  Colony's assertion that the Schneider Group requested a meeting "at which money will be demanded" is rank supposition.  But it also drives a stake into Colony's position – it is an admission that a demand had not been made yet, and would not be, at a minimum, until any meeting.  The implications proposed by Colony have no basis in the plain language of the H&K Letter itself.  The H&K Letter requests a meeting to find a mutually satisfactory resolution to the issues perceived by the Schneider Group.  H&K Letter at 13.  Because what that "mutually satisfactory resolution" could entail goes unstated in the H&K Letter, the Court cannot accept Colony's implication as true.  After all, it may be that the "mutually satisfactory resolution" that the Schneider Group envisioned was more input on decisions, while affirming Pine's right to management fees.

Colony overlooks case law emphasizing that a specific demand for relief is necessary to constitute a claim.  *In re Ambassador Grp., Inc. Litig.*, 830 F. Supp. 147, 155 (E.D.N.Y. 1993).

8

While a claim may be something other than an actual lawsuit, it must be more than a contention that wrongdoing has occurred or the mere threat of a future lawsuit.  *Id*.  "[A] claim must relate to an assertion of legally cognizable damage, and must be a type of demand that can be defended, settled and paid by the insurer."  *Evanston Ins. Co. v. GAB Bus. Servs., Inc.*, 132 A.D.2d 180, 185 (1st Dep't 1987); *Purcigliotti v. Risk Enter. Mgmt., Ltd.*, 240 A.D.2d 205, 205-206 (1st Dep't. 1997) ("claim" means "an assertion of legally cognizable damage, and must be a type of demand that can be defended, settled and paid by the insurer.").  And "there is a difference between expecting litigation—believing that it is likely occur—and knowing that litigation is within the realm of possibility."  *Hartford Steam Boiler Grp., Inc. v. SVB Underwriting, Ltd.*, No. 3:04CV2127 SRU, 2011 WL 1899392, at *10 (D. Conn. May 19, 2011).

The Schneider Group made no demand against Pine in the H&K Letter that could be defended, settled, or paid by Colony.  Instead, it made vague assertions about points of law and offered a meeting between the parties to address the issues to their mutual benefit.  The H&K Letter represents a means to an end for the Schneider Group, with the end being a non-contentious and "mutually satisfactory" resolution.  The face of the H&K Letter makes that clear.  The H&K Letter is not a claim made prior to the Policy period, and no amount of retroactive third-party semantics on Colony's part can change that fact.

## IV.  THERE WAS NO REASONABLE BASIS TO BELIEVE, PRIOR TO THE POLICY EFFECTIVE DATE, THAT PINE HAD COMMITTED A WRONGFUL ACT

Colony's next effort to avoid its duty to defend, because of Exclusion A.2, a "prior knowledge" exclusion, is equally flawed.  According to Colony, Pine "had absolute certainty that it had committed a Wrongful Act" prior to the Policy's effective date, and, therefore, Exclusion A.2 applies.  Motion at p. 13.  Colony, however, fails to satisfy its high burden to show that Exclusion A.2 unequivocally bars coverage here.  Not only does Colony misinterpret Exclusion

9

A.2, it again puts too much stock in the H&K Letter.  In doing so, it overlooks issues of fact with respect to "objective knowledge" that preclude judgment as a matter of law.

> **A.** **Colony Bears a Heavy Burden to Establish Exclusion A.2's Applicability**

In order to avoid its duty to defend Pine based on Exclusion A.2, Colony must meet the high burden of establishing that the Schneider Claim falls "solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation." *Seaboard Sur. Co.*, 64 N.Y.2d at 311-312 (quotation omitted); *Napoli, Kaiser & Bern, LLP v. Westport Ins. Corp.*, 295 F. Supp.2d 335, 338 (S.D.N.Y. 2003) (quoting *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 174 (1997) (complaint must cast pleadings wholly within policy exclusions for insurance company to avoid coverage)).

Accordingly, courts recognize that "[a]n insurer seeking to avoid its duty to defend bears a heavy burden, which, in practice, is rarely met." *Great Am. Ins. Co. v. Houlihan Lawrence, Inc.*, 449 F.Supp.3d 354, 365 (S.D.N.Y. 2020) (citing *Hotel Des Artistes, Inc. v. Transamerica Ins. Co.*, No. 93 Civ. 4563 (SS), 1994 WL 263429, at *3 (S.D.N.Y. June 13, 1994) (emphasis added)). Insurance companies, not policyholders, bear the burden of proving that exclusionary provisions bar coverage.  *Seaboard Sur. Co.*, 64 N.Y.2d at 311.  And under New York law, exclusionary provisions must be construed strictly and narrowly, with any ambiguity resolved against the insurance company.  *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003). Accordingly, New York courts repeatedly have refused to extend exclusions by interpretation or implication.  *Seaboard Sur. Co.*, 64 N.Y.2d at 311.

10

**B.      Colony Misinterprets Exclusion A.2, Which Precludes Coverage Where Pine Reasonably Believes it Had Committed a Wrongful Act, Not Where Pine Reasonably Believes a Party "Alleged" that Pine Had Committed a Wrongful Act**

What triggers a "prior knowledge" exclusion and what the policyholder knew is quite nuanced, as the patchwork of cases demonstrates.  Under New York law, courts examine whether the policyholder might have known subjectively of facts that could give rise to a claim and whether a reasonable person would have expected that those facts would give rise to a claim. *See Liberty Ins. Underwriters, Inc. v. Corpina Piergrossi Overzat & Klar LLP*, 78 A.D.3d 602, 604 (1st Dep't 2010).  As always, though, the analysis begins with the policy language.

Colony correctly states that Exclusion A.2 bars coverage for any Claim of which, prior to the Policy effective date, Pine "had a reasonable basis to believe that [it] had committed a Wrongful Act."  Motion at p. 12.  However, Colony then applies a distorted meaning of this language.  Relying on its quoted portion of Exclusion A.2, and the Policy's inclusion of "alleged" acts, errors, omissions, or breaches of duty in the definition of "Wrongful Act", Colony proclaims that Exclusion A.2 applies, because "Pine knew, subjectively and objectively, that it had been charged with 'alleged' acts, errors, omissions, or breaches of duty" in the H&K Letter.  Motion at p. 14.  In other words, according to Colony, because the H&K Letter <u>alleged</u> that Pine <u>had committed</u> a Wrongful Act, Pine should have expected that a Claim would manifest.  Colony's contorted application of Exclusion A.2 results from its brushing aside of the remainder of the exclusion.  When read as a whole, Exclusion A.2, precludes claims where Pine had a reasonable basis to believe that it actually "had committed" some wrongdoing, not claims where it had a reasonable basis to believe it had been "charged with" some wrongdoing, prior to the Policy's effective date.  Exclusion A.2, in its entirety, reads:

> "Any Insured had a reasonable basis to believe that the Insured had <u>committed a Wrongful Act, violated a disciplinary rule, or engaged in professional misconduct</u>.

Policy, Nolan Decl., Ex. B, at Section IV – EXCLUSIONS, §A.2 (emphasis added).  Colony ignores the significance of the additional wording.  First, the word "had" modifies each of the three verbs in the sentence – committed, violated, and engaged – to make them past perfect tense.  Second, the last two categories of wrongdoing that could give rise to a Claim – the violation of a disciplinary rule or some professional misconduct – do not rest on a reasonable belief of an "allegation" of wrongdoing, but a reasonable belief of "actual" wrongdoing.  The canons of construction dictate that the meaning of a particular term in a clause must be read and considered in relation to the other words with which it is grouped.  *See Wojchowski v. Daines*, 498 F.3d 99, 108 fn. 8 (2d Cir. 2007) ("The traditional canon of construction, *noscitur a sociis*, dictates that words grouped in a list should be given related meaning.").  Therefore, only claims where Pine reasonably believed it committed an alleged act are precluded by Exclusion A.2.

Elsewhere in the Policy, Colony acknowledged the distinction between Wrongful Acts that Pine <u>actually</u> committed and those it "allegedly" committed.  In the Policy's Definitions, in seeking to limit coverage for a Subsidiary, Colony stated that "this policy will only apply to <u>Wrongful Acts committed or allegedly committed</u>….") (emphasis added).  Nolan Decl., Ex. B, at Section III – DEFINITIONS, §FF.  Had Colony intended for Exclusion A.2 to preclude coverage for Pine's knowledge of Wrongful Acts it "allegedly committed", it would have inserted those words after "committed" within the exclusion.  Colony's omission of those key words from Exclusion A.2 reveals its true intent.  *See Great Am. Ins. Co. v. AIG Specialty Ins. Co.*, No.  20-cv-4596 (DLC), 2021 WL 1268450, at *4 (S.D.N.Y. April 6, 2021) (in the duty to defend context, and in considering a subsidiary coverage limitation, as in §III.FF of the Policy here, the District Court noted that the "presence of the term 'related acts' elsewhere in the AIG Policies

12

makes its absence in the subsidiary limitation noteworthy.").  Accepting Colony's reading of Exclusion A.2 would extend by implication the exclusion that Colony itself wrote into the Policy – a result forbidden by New York law.  *Belt Painting Corp.*, 100 N.Y.2d at 383.

The plain language of Exclusion A.2 undermines Colony's reading of the Policy.  But at a minimum, Pine's interpretation of Exclusion A.2 is reasonable.  This creates an ambiguity in the Policy language, because under New York law "ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002); *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680 (2015) (a policy is ambiguous when it "fails to disclose its purpose and the parties' intent..., or where its terms are subject to more than one reasonable interpretation.").   Such an ambiguity created by Colony must be resolved in Pine's favor.  *See Andy Warhol Found. for the Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999) ("the ambiguities in the policy ordinarily are construed in favor of coverage and against the insurer, because as the drafter of the policy the insurer is responsible for the ambiguity").

A court found identical exclusionary language ambiguous, albeit for a different reason.  In *OneBeacon Insurance Co. v. T. Wade Welch & Associates,* 841 F.3d 669 (5th Cir. 2016), an insurance company denied coverage for a legal malpractice action, arguing that, because the law firm had been sanctioned for discovery misconduct prior to policy inception, it had a reasonable basis to believe that it had committed a wrongful act.  The Fifth Circuit declined to enforce the exclusion as written, finding that a literal reading would render coverage illusory. It affirmed the District Court's denial of summary judgment: "The district court could not apply the literal

policy language because of the extreme overbreadth of the wrongful act definition used in the exclusion: 'any actual or alleged act, error, omission or breach of duty arising out of the rendering or the failure to render professional legal services.' On its face, this covers every single thing an attorney does or does not do, wrongful or not.  As written, then, the exclusion renders the coverage illusory and is facially absurd." *OneBeacon*, 841 F.3d at 676-677.

Therefore, Colony's strained reading of Exclusion A.2 should be disregarded.

**C.      Colony Cannot Establish As a Matter of Law That Pine Knew the Relevant Facts Prior to the Policy's Effective Date or That a Reasonable Real Estate Developer With Pine's Knowledge Would Expect Such Facts to be the Basis of a Claim**

Colony's reliance on the H&K Letter as the sole predicate for applying Exclusion A.2 fails to satisfy either subjective or objective "prior knowledge" as a matter of law, which precludes entry of judgment.

When analyzing the applicability of a "prior knowledge" exclusion, New York courts utilize a two pronged, subjective-objective test.  *See Corpina*, 78 A.D.3d at 604.  The Court "must first consider the subjective knowledge of the insured and then the objective understanding of a reasonable [insured] with that knowledge." *Id.* (citation omitted).  Because the "prior knowledge" clause lies in an exclusion, the "first prong requires [Colony] to show [Pine's] knowledge of the relevant facts prior to the policy's effective date, and the second requires [Colony] to show that a reasonable insured might expect such facts to be the basis of a claim." *Id.* at 604-05.

Colony's argument that the H&K Letter gave Pine subjective knowledge that it had been charged with Wrongful Acts falls short of establishing the first prong of the analysis, given Colony's flawed reading of Exclusion A.2.  Colony does not explain how the H&K Letter could

provide Pine with a reasonable basis to believe it actually had committed an alleged wrongdoing; hence, the argument on the "prior knowledge" exclusion ought to be rejected on this basis alone.

Assuming, however, that the Court accepts Colony's interpretation of Exclusion A.2, and that Pine's knowledge of the H&K Letter satisfies the subjective prong of the analysis, Colony's attempted application of Exclusion A.2 to the Schneider Action still fails. Colony simply declares that "objectively, the only possible reading of the H&K Letter is that Pine had committed alleged acts, errors, omissions, or breaches of duty in its Real Estate Development Services." Motion at 14. Case law is clear that "even if the evidence establishes as a matter of law that the insured has formed a subjective belief that a suit may ensue based upon some ... misconduct, that does not alone establish the existence of objective facts which would support the conclusion of a reasonable professional that the insured will be subjected to professional liability claims." *Exec. Risk Indem. Inc. v. Pepper Hamilton LLP*, 56 A.D.3d 196, 202 (1st Dep't 2008), *aff'd as modified*, 13 N.Y.3d 313 (2009).

Colony again overinflates the language in the H&K Letter, and makes no legitimate effort to demonstrate how, under the full circumstances, a reasonable policyholder providing asset and property management services would expect that the facts as known by Pine two weeks prior to the Policy effective date, would manifest in a claim. Colony's token effort to satisfy its burden falls far short. Mere knowledge of "some consequences" of an act "is inconsequential... knowledge of the banality that actions have consequences" does not satisfy the objective standard of the "prior knowledge" test. *Corpina*, 78 A.D.3d at 607; s*ee also*, *Hartford Steam Boiler*, 2011 WL 1899392, at *10 (although "benefit of hindsight makes it easy to speculate" that policyholder should have anticipated litigation, "there is a difference between expecting litigation—believing that it is likely to occur—and knowing that litigation is within the realm of

possibility", and knowledge only of possibility of litigation was not enough for insurance

company to avoid coverage).

Instead, Colony overlooks several important facts in play that impact a "reasonable

person's" belief.  First, the Schneider Group made clear in the H&K Letter that they intended to

avoid "unnecessary" litigation and reach a "mutually" beneficial resolution of their concerns.

H&K Letter at 13.  Second, Pine had engaged, and was consulting with, its counsel who drafted

the agreements to assist with responding to requests from the Schneider Group in early 2018 that

Pine make changes to certain aspects of the management and operation of the LLC's.  Nolan

Decl., Ex. A-19.  Pine's counsel not only stated that nothing needed to change (*Id.*), he deemed

the accusations in the H&K Letter "baseless".  Nolan Decl., Ex. A-2 at 1.  In particular, Pine's

counsel, expressly stated that Pine had "never participated in an unlawful related party

transaction and ha[d] historically responded to requests for documents and information

promptly."  *Id.*  Third, Pine's counsel needed to inquire about what the Schneider Group was

"hoping to achieve" or to obtain "some clarity as to [the] objective" at a meeting.  *Id.*, at 2.

Pine's reliance on counsel's opinion is important.[6]  Fourth, the members of the LLC's and Pine

are family members, and one would expect to resolve differences amicably.[7]  Nolan Decl., Ex.

A- 20.  This is consistent with the Schneider Groups' counsel's suggestion for a meeting to

resolve the "concerns" and that a "mutually satisfactory resolution of the issues is preferable to

---

[6] To the extent that Colony attempts to seize on that Pine's counsel's reference to "express threats of litigation", in the context of limiting communications between represented individuals, that is not dispositive on whether a party might actually expect a claim to result.  This does not constitutes an admission on behalf of Pine.  Statements made in defense of underlying disputes should not be construed as an admission against the interest of the policyholder.  *See U.S. Fid. & Guar. Co. v. Exec. Ins. Co.,* 893 F.2d 517, 519 (2d Cir. 1990) (insurance company could not use policyholder's denial in Answer as admission that he was not covered under the insurance policy).  That is particularly true given the context of counsel's statement.

[7] In *North River Insurance Co. v. Leifer,* No. 21-CV-7775 (VEC), 2022 WL 1210847 (S.D.N.Y. Apr. 25, 2022), Judge Caproni discounted the friendship between the attorney and his client when considering the subjective prong, but did not address the importance of a relationship with respect to the objective prong.  *Leifer,* 2022 WL 1210847, at *2-3.

16

costly and unnecessary litigation."  Fifth, the operating agreements, signed by a representative of the Schneider Group, granted Pine broad discretion in its duties as manager and narrowly limited any liability to the Members.  Specifically, Pine was entitled to exercise its business judgment in managing the LLC's business, operations and affairs, and its liability was limited for any mistakes of fact or judgment or doing any act or failing to do any act "[u]nless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision."  Nolan Decl., Ex. A-11, at ¶ 8.4.  Nowhere in the H&K Letter does counsel for the Schneider Group allege misconduct approaching that level; hence, a reasonable person would not believe a claim would be forthcoming where a basis for liability had not been asserted.  Sixth, Pine was not obligated to provide the books and records to the Members.  Instead, the members had a right to examine the books and records "at reasonable times upon reasonable prior notice." Nolan Decl., Ex. A-11, at ¶ 14.1.  Despite the hyperbole in the H&K Letter, Pine's counsel viewed it at most as the Schneider Group's exercise of a right to inspect on notice.  Nolan Decl., Ex. A-2, at 1.  And Pine had already supplied such documents (Nolan Decl., Ex. A-20), and expressed its intent to continue to do so.  Nolan Decl., Exs. A-2, A-4, and A-6.  Legally and factually, then, under these facts and circumstances at the time of the H&K Letter, and in the subsequent two weeks before the Policy effective date, it is reasonable for one to think that that providing the books and records and addressing the Scheider Group's "concerns" at a forthcoming meeting, would not result in litigation.  Perhaps in the weeks and months after Policy inception, when the letter-writing campaign heated up, and the Schneider Group complained about missing documents and upped their rhetoric, a reasonable person might think that the Schneider Group might actually assert a claim.  Nolan Decl., Ex. A-3, at 9 (stating that "the [Schneider Group] is ready, willing and able to commence an action" and using the

17

word "demand" for the first time); Ex. A-7 (referring to missing documents).  But that is not the case when based on the H&K Letter sent immediately prior to the Policy effective date.

In light of this, the three cases Colony cites to justify its application of Exclusion A.2 clearly are inapposite.  Colony's primary case, *North River Insurance Co. v. Leifer*, No. 21-CV-7775 (VEC), 2022 WL 1210847 (S.D.N.Y. Apr. 25, 2022), is not, as Colony submits, precisely on point.  There, an attorney failed to file an answer, ultimately resulting in a default judgment against a client, which the attorney failed to disclose on its subsequent insurance application.  A year later, during the policy period, the client sent a letter to the attorney asserting that he had a potential claim, and shortly thereafter, commenced a malpractice action.  Unlike Colony, after originally agreeing to defend the policyholder, the insurance company sought a declaration that it had no duty to defend or indemnify.  The Honorable Judge Caproni held that judgment on the pleadings was warranted, finding no issue of fact, particularly with respect to the objective prong.  Critical to Judge Caproni's determination was that "failing to file an answer is *prima facie* evidence of negligence"; therefore, "a reasonable attorney would certainly anticipate that if no answer was filed at all, there would be some possibility of a future malpractice claim, especially because a default judgment had been entered…and the [policyholder] had been chastised for…the[] failure to adequately oppose the motion for default judgment."  *Leifer*, 2022 WL 1210847, at *4.  The facts here do not rise to such an extreme level, where an operating agreement provides the manager with discretion, and there is a question as to what constitutes "ordinary course".  And the H&K Letter lacked any demand, and was accompanied by a familial relationship, Pine's provision of documents and agreement to permit further inspection of the books and records, and the Schneider Group's expressed desire to resolve "concerns" through a

18

"mutually" agreeable resolution in order to avoid "unnecessary" litigation.  There is a basis for a reasonable entity in Pine's position to believe that a Claim would not result.

Quanta Lines Insurance Co. v. Investors Capital Corp., No. 06-CV-4624 (PKL), 2009 WL 4884096 (S.D.N.Y. Dec. 17, 2009), also is inapposite.  First, the court was considering a summary judgment motion, where, unlike here, the parties had the opportunity to take discovery on the knowledge issue.  Quanta Lines, 2009 WL 4884096, at *6.  Finally, important to the court's conclusion was the fact that the policyholder's in-house counsel, upon receipt of letter accusing the policyholder of wrongdoing, checked boxes indicating that the letter should be entered on a bordereaux for reporting to the insurance company and added the letter and subsequent complaint to a FINRA-required employee termination form.  Id. at *18.  Moreover, the court found persuasive that the in-house attorney had received not only the letter, but a Securities Division inquiry and Summary and Final cease and desist orders.  The checking of the boxes, the updated of the termination form, and the collective communications were sufficient to hold that a reasonable attorney might believe that a claim could be made.[8]  Id. at *17.

Finally, Colony cites Corpina, 78 A.D.3d 602, wherein the First Department affirmed a trial court decision denying summary judgment to the insurance company, because a fact question existed as to whether attorneys who had missed a deadline for filing an administrative claim had a reasonable basis to foresee that a former client would file a malpractice claim.[9]  At a

---

[8] The cases Colony cites analyze what a reasonable attorney might believe in considering if a claim was foreseeable. However, the foreseeability of a claim against a non-attorneys in the context of a familial relationship is radically distinct.  See Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles and Kaufman, LLP, No. 01 CV 3844(SJ), 2006 WL 2135782, at *12-13 (E.D.N.Y. July 28, 2006) (recognizing that attorneys, as "officer[s] of the court", are held to the "highest standards"); Zavodnick v. National Liab. & Fire Ins. Co., No. 17-4762, 2019 WL 1003157, at *8 (E.D. Pa. Mar. 1, 2019) (distinguishing an attorney's objective knowledge from that of a hospital that "did not yet portend litigation").  Even given the high standard applied to an attorney, the Zavodnick court held that a written decision resulting in financial damage with the attorney solely to blame may not be dispositive as to a reasonably anticipated claim.  Id. at *7.

[9] In Corpina, the insurance company was defending its policyholder, recognizing that its defense obligations had been triggered.  Corpina, 78 A.D.3d at 608.  Thus, the court reached its conclusion without having to rule on the

minimum, given the allegations in the instant Complaint, Pine's denials of Colony's

counterclaims, and the numerous factual issues presented, this case is akin to *Corpina* and others

where courts found a question of fact as to what a "reasonable person" might believe under the

particular circumstances.  For example, in *Coregis Insurance Co. v. Goldstein*, 32 F. Supp. 2d

508, 510 (D. Conn. 1998), the policyholder attorney missed the statute of limitations, despite

client reminders of the need to file a lawsuit, and the client threatening "appropriate action" if a

lawsuit had not been filed.  *Id*.  The court cited a number of facts precluding summary judgment,

including the attorney's claimed lack of knowledge of the statute of limitations.  The court also

noted that many of the cases cited by the insurance company – like those cited by Colony–

"[were] distinguishable because they involved situations where there were much clearer

indications that a lawsuit might be initiated."  *Id.* at 513.

Similarly, in *National Specialty Insurance Co. v. National Union Fire Insurance Co.*, No.

6:10-826-TMC, 2012 WL 1825370 (D.S.C. May 18, 2012) the court held that fact issues

precluded summary judgment where the policyholder insurance agent negligently failed to

procure insurance requested by a client, and was instructed, but failed, to provide notice to his

E&O insurance company.  The court declined to take the question of reasonableness away from

the jury on the "pivotal issue is whether a reasonable insurance agent with this knowledge would

believe these facts could constitute a claim."  *Id*. at *3.

Also, the court in *Hartford Steam Boiler*, *supra*, addressed various lawsuits against the

policyholder, who was responsible for inspecting a boiler that exploded, killing five people.

Although the policyholder had retained an expert, received various requests for inspection

reports and threats to pursue reimbursement, as well as had knowledge that the boiler was being

---

insurance company's exceedingly broad duty to defend.  Here, Pine is not seeking indemnity, but a defense.
Whether it has suffered an indemnifiable loss is not at issue.  Pine's defense obligations have been triggered because
there is a reasonable possibility of coverage under the Policy.  *Cook*, 7 N.Y.3d at 137.

preserved, tested and inspected, the court held that there was a genuine dispute of fact, and it could not be concluded that the objective prong was satisfied.  The court noted that the policyholder had hired an attorney to evaluate the potential liability, who concluded that it was unlikely that the policyholder would be sued.  2011 WL 1899392, at *9.  As the court explained: "The benefit of hindsight makes it easy to speculate that, because [the policyholder] eventually was sued by several different plaintiffs, [it] should have anticipated the litigation against it.  Yet there is a difference between expecting litigation, believing that it is likely to occur, and knowing that litigation is within the realm of possibility. Although perhaps [the policyholder] should have known litigation was possible, [it] has not demonstrated that [it] reasonably should have expected it as of [the effective date].  *Id*. at *10.

These cases highlights that even under extreme facts not present here, many courts have found a fact question precluding judgment for an insurance company.  Colony's argument also ignores that the broad duty to defend applies even when an insurance company invokes a "prior knowledge" exclusion.  In *Schlather, Stumbar, Parks & Salk, LLP v. One Beacon Insurance Co.*, No. 5:10-CV-0167 (NPM/DEP), 2011 WL 6756971 (N.D.N.Y. Dec. 22, 2011), the court found that a prior knowledge provision applied to foreclose indemnity from the policyholder.  Critically, the found that because the four corners of the underlying complaint alleged a potentially covered loss, the insurance company was obligated to <u>defend</u> its policyholder, even though it was eventually determined that it did not have to <u>indemnify</u> its policyholder.  *Schlather,* 2011 WL 6756971, at *10-12.  "Thus, in disclaiming coverage before it was concluded as a matter of law that it had no duty to defend or indemnify Plaintiffs…Defendant breached its duty to defend Plaintiffs."  *Id.* at *12.  *Schlather* applies here.  The Schneider Action is unresolved, and the allegations of the Schneider Complaint and its attachments, demonstrate

21

that there is a possibility of coverage.  Therefore, Exclusion A.2 does not absolve Colony of its

duty to defend Pine.

**V.      THE WRONGFUL ACTS ALLEGED IN THE UNDERLYING COMPLAINT TRIGGER COLONY'S DUTY TO DEFEND**

Colony's final argument – that the Schneider Complaint alleges Wrongful Acts prior to

the March 1, 2016, Retroactive Date – also falls flat.  Colony cherry-picks from the Schneider

Complaint allegations of purported wrongful conduct occurring between 2012 and 2019 or later.

Then, relying on Condition C, Colony deems them all part of a series of related Wrongful Acts

that occurred on the date of the first Wrongful Act, which predates the Retroactive Date.   As

such, Colony contends that coverage is foreclosed under the Policy.  But, as Colony concedes,

the Schneider Complaint clearly alleges Wrongful Acts after the Retroactive Date, and contrary

to Colony's unsound efforts to lump them together, are not "related."

Colony's contention ignores the reality that this is a duty to defend case, and that "[i]t is

hornbook law that if the underlying action is *arguably* covered by an insurer's policy, the insurer

has a duty defend."  *Suez Treatment Solutions, Inc.*, 2022 WL 954601, at *6 (emphasis in

original) (citations omitted).   "In other words, if there is any possibility of coverage, *i.e.*, issues

of fact regarding whether a claim is within the scope of coverage or an exclusion bars coverage,

the insurer owes a duty to defend."  *Id.* (citation omitted).

Colony admits that "the Schneider Complaint also contains allegations of Wrongful Acts

after the Retroactive Date."  Motion at p. 17.  And this is evident from the flip side of Colony's

argument that the Schneider Complaint alleges acts "commencing in or about 2012 and

continuing through the present [Pine] departed from historical practice by dramatically

increasing the amount of cash reserves and capital improvements or renovations (by millions of

dollars) without consulting and obtaining the approval of the members of the LLCs", or that

"[d]uring the period of September 2015 to June 2019, [Pine] approved loans … to certain of the LLCs by Members of the LLCs or persons affiliated with [Pine]."  Motion at 16 -17.

Faced with these allegations and its own admission, Colony's meager attempt to avoid its duty to defend fails.  Colony declares that the Wrongful Acts alleged in the Schneider Complaint are "related" because "[t]hey all arose out of Pine's alleged wrongful conduct in providing Real Estate Development Services."  But viewing a "relatedness" so broadly would swallow whole any possible coverage for a claim.  For example, a claim alleging a Wrongful Act with respect to "property management" would be related to a claim that alleged a Wrongful Act with respect to "development services", because both are types of "Real Estate Development Services."  *See*, Nolan Decl.. Ex. B, at Declaration, Item 3, and "Professional Services Endorsement."  Arguing that all types of misconduct are related because they involve the provision of "Real Estate Development Services" would rule out any possibility of an unrelated claim.

Colony also pronounces that the Wrongful Acts are related because the Schneider Complaint "treats them largely and cumulatively as a unit" and that "the allegations by all ten of the LLC's are similar…."  Motion at p. 17.  Colony misses the fact that this is a thematic filament, and that other allegations in the Schneider Complaint contradict that amalgamation.  Each of the LLC's stands on its own, with a separate operating agreement (Schneider Complaint at ¶ 83) that relates to different primary assets (*i.e.*, buildings with a different numbers of units) (I*d*. at ¶¶86 - 88).  This is important with respect to the Schneider Group's allegations that Pine unreasonable increased cash reserves and reduced distributions.  As stated by Pine's counsel, reserves are set for the property owned by each LLC, and those "can vary based on a variety of conditions, including, but not limited to, market conditions, the physical condition of the property, the need or desirability for capital improvements, debt maturity dates, etc."  Nolan

Decl., Ex. A-8.  Similarly, "[d]istributions are a relative function of revenue, expenses, reserve

balances, debt, etc." *Id.*  Therefore, decisions made as to reserves and distributions were done on

a granular property-by-property – and at times on a unit-by-unit – basis based on the specific

needs of the building or unit at issue.  And each of these decisions was made annually, based on

current information.  Pine's actions with regards to one particular entity – and on a year-by-year

basis – are thus entirely divorced from those undertaken as to another entity.

Accordingly, the trier of fact in the Schneider Action might determine that if Pine

committed any Wrongful Act, it was committed after the Retroactive Date.  For example, the

trier of fact could determine that the cash reserves set between 2012-2016 were, in fact,

reasonable, but were unreasonable after the Retroactive Date, or that distributions prior to the

Retroactive Date were proper, while those after the Retroactive Date deviated from historical

practices or were improper.  Similarly, the Schneider Complaint alleges that loans were made to

the LLC's beginning in September 2015, and because they purportedly were outside the ordinary

course, each needed approval.  Schneider Complaint, Nolan Decl., Ex. A, at ¶¶ 126-127.  Each

loan transaction was separate, and it may be found that the loan made prior to the Retroactive

Date was within the ordinary course, while those after the Retroactive Date might not have been.

Further, Colony fails to appreciate that the Schneider Complaint alleges the following

Wrongful Acts that are not tethered to any other alleged pre-Retroactive Date Wrongful Act:

- "On or about January 17, 2018, Pine attempted to amend the Operating Agreements of Marni Realty and Rudell Realty" to allow Pine to act as manager in perpetuity. (Schneider Complaint at ¶ 117).

- With respect to the Ninth Cause of Action regarding the inspection of the books and records of the LLC's, the Schneider Group states that prior to July 2018, Pine sent requested books and records upon request, albeit irregularly.  (Schneider Complaint at ¶ 394-407).  But the only specific allegation of Pine ever refusing to provide records or to permit inspection of documents is to March 3, 2018, well after the Retroactive Date.  (Schneider Complaint at ¶ 408).

24

These standalone allegations could support a breach of the operating agreements or breach of a fiduciary duty, and, are sufficient themselves to trigger Colony's duty to defend. Thus, Colony's denial is, at a minimum, premature. *Schlather,* 2011 WL 6756971 at *10–12.

## VI.    THIS IS A DUTY TO DEFEND CASE; COLONY'S FINAL POINT IS MOOT

Pine seeks to enforce Colony's duty to defend. Colony's final point, that it has no duty to indemnify Pine, is misplaced and irrelevant for purposes of this litigation. Motion at 21. Colony is attempting to muddy the issue before this Court by introducing a separate legal theory with a much more lenient standard than the duty to defend. *Seaboard Sur. Co.*, 64 N.Y.2d at 310. But it has no place in this Motion, given that Pine's defense costs have exhausted the Policy limits and that liability in the Schneider Action has not been established. *See Pac. Emps. Ins. Co. v. Saint Francis Care Inc.*, 729 F. App'x 129, 130 (2d Cir. 2018) (recognizing that it is often premature to address the duty to indemnify because it is based on facts established at trial and theory under which judgment is actually entered) (internal quotes and citations omitted).

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny Colony's Motion in its entirety and grant such other and further relief as the Court deems just and proper.

**ANDERSON KILL P.C.**

*/s/ Dennis J. Nolan*
Dennis J. Nolan, Esq.
John M. Leonard, Esq.
Regan Samson, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel.: (212) 278-1000
Fax: (212) 278-1733
dnolan@andersonkill.com
jleonard@andersonkill.com
rsamson@andersonkill.com
*Attorneys for Plaintiff Pine Management, Inc.*

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PINE MANAGEMENT, INC.,

Plaintiff,

- against -

COLONY INSURANCE COMPANY,

Defendants.

Case No.: 22-CV-02407 (MKV)

**DECLARATION OF DENNIS J. NOLAN, ESQ. IN SUPPORT OF PLAINTIFF PINE
MANAGEMENT, INC'S OPPOSITION TO DEFEDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS**

I, DENNIS J. NOLAN, ESQ., declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am an attorney at Anderson Kill P.C., counsel for Plaintiff Pine Management,
Inc. ("Pine") in the above-captioned action.  As such, I am fully familiar with the facts and
circumstances of this matter.

2.      I submit this Declaration in support of Pine's Opposition to Defendant Colony
Insurance Company's ("Colony") Motion for Judgment on the Pleadings.

3.      Attached as **Exhibit A** is a true and correct copy of the Verified Complaint filed
in the Supreme Court of the State of New York, County of New York, on July 26, 2019,
captioned *Schneider et al. v. Pine Management, Inc., et al.*, Index No. 654303/2019 (the
"Schneider Complaint").

4.      Attached as **Exhibit A-1** is a true and correct copy the letter dated July 17, 2019
from Mitchell J. Geller of Holland & Knight LLP ("Mr. Geller") to Bob G. Goldberg, Esq. of
Meister Seelig & Fein LLP ("Mr. Goldberg"), attached as Exhibit 1 to the Schneider Complaint.

5.      Attached as **Exhibit A-2** is a true and correct copy the letter dated August 3, 2018
from Mr. Goldberg to Mr. Geller, attached as Exhibit 2 to the Schneider Complaint.

6.     Attached as **Exhibit A-3** is a true and correct copy the letter dated August 22, 2018 from Mr. Geller to Howard S. Koh, Esq. of Meister Seelig & Fein LLP ("Mr. Koh"), attached as Exhibit 4 to the Schneider Complaint.

7.     Attached as **Exhibit A-4** is a true and correct copy the letter dated August 31, 2018 from Mr. Koh to Mr. Geller, attached as Exhibit 4 to the Schneider Complaint.

8.     Attached as **Exhibit A-5** is a true and correct copy the letter dated September 21, 2018 from Mr. Geller to Mr. Koh, attached as Exhibit 5 to the Schneider Complaint.

9.     Attached as **Exhibit A-6** is a true and correct copy the letter dated September 28, 2018 from Mr. Koh to Mr. Geller, attached as Exhibit 6 to the Schneider Complaint.

10.     Attached as **Exhibit A-7** is a true and correct copy the letter dated November 20, 2018 from Mr. Geller to Mr. Koh, attached as Exhibit 7 to the Schneider Complaint.

11.     Attached as **Exhibit A-8** is a true and correct copy the letter dated December 7, 2018 from Mr. Koh to Mr. Geller, attached as Exhibit 8 to the Schneider Complaint.

12.     Attached as **Exhibit A-9** is a true and correct copy the Operating Agreement of Rudel Realty LLC executed on October 17, 1996, attached as Exhibit 9 to the Schneider Complaint.

13.     Attached as **Exhibit A-10** is a true and correct copy the Operating Agreement of Marni Realty LLC executed on October 17, 1996 attached as Exhibit 10 to the Schneider Complaint.

14.     Attached as **Exhibit A-11** is a true and correct copy the Amendment and Restatement of Operating Agreement of Jeruth Realty LLC, attached as Exhibit 11 to the Schneider Complaint.

15.      Attached as **<u>Exhibit A-12</u>** is a true and correct copy the Amendment and Restatement of Operating Agreement of JHJ Realty LLC, attached as Exhibit 12 to the Schneider Complaint.

16.      Attached as **<u>Exhibit A-13</u>** is a true and correct copy the Amendment and Restatement of Operating Agreement of Bar-Mar Realty LLC, attached as Exhibit 13 to the Schneider Complaint.

17.      Attached as **<u>Exhibit A-14</u>** is a true and correct copy the Second Amendment and Restated of Operating Agreement of Bren-El Realty LLC, attached as Exhibit 14 to the Schneider Complaint.

18.      Attached as **<u>Exhibit A-15</u>** is a true and correct copy the Second Amendment and Restated of Operating Agreement of Sir Realty LLC, attached as Exhibit 15 to the Schneider Complaint.

19.      Attached as **<u>Exhibit A-16</u>** is a true and correct copy the Amendment and Restatement of Operating Agreement of Marc Realty LLC, attached as Exhibit 16 to the Schneider Complaint.

20.      Attached as **<u>Exhibit A-17</u>** is a true and correct copy the Amendment and Restatement of Operating Agreement of Ris Realty LLC, attached as Exhibit 17 to the Schneider Complaint.

21.      Attached as **<u>Exhibit A-18</u>** is a true and correct copy the Amendment and Restatement of Operating Agreement of Zizi Realty LLC, attached as Exhibit 18 to the Schneider Complaint.

22.      Attached as **<u>Exhibit A-19</u>** is a true and correct copy the email dated February 19, 2018 from Mr. Goldberg to Marc Schneider, attached as Exhibit 19 to the Schneider Complaint.

3

23.     Attached as **Exhibit A-20** is a true and correct copy of the email dated March 3, 2018 from Brenda Rohlman to March Schneider, Jerome N. Schneider, and Marni Schwartz, attached as Exhibit 20 to the Schneider Complaint.

24.     Attached as **Exhibit B** is a true and correct copy of Argo Pro Real Estate Developers PROtect℠ Professional Liability Insurance with Cyber Coverage Policy Number RE4202378-0 for the Policy Period of 08/01/2018 – 12/01/2019 sold by Colony to Pine.

25.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:     New York, New York
           August 30, 2022

_____
Dennis J. Nolan, Esq.

docs-100516013.1