# 23-624

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

PINE MANAGEMENT, INC.,

*Plaintiff-Counter-Defendant-Appellant,*

—against—

COLONY INSURANCE COMPANY,

*Defendant-Counter-Claimant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME II OF III
## (Pages A-272 to A-529)

AMANDA GRINER
FRANK M. MISITI
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Attorneys for Defendant-Counter-
Claimant-Appellee*

DENNIS J. NOLAN
JOHN M. LEONARD
ANDERSON KILL P.C.
1251 Avenue of the Americas,
42nd Floor
New York, New York 10020
(212) 278-1000

*Attorneys for Plaintiff-Counter-
Defendant-Appellant*

# TABLE OF CONTENTS

PAGE

District Docket Court Entries ........................................... A-1

Complaint and Jury Trial Demand, dated March 24, 2022 ............... A-8

    Exhibit 1 to Complaint—
    Argo Pro Policy ................................................ A-21

    Exhibit 2 to Complaint—
    Verified Complaint, dated July 26, 2019
    (*Schneider, et al. v. Pine Management, Inc. et al.*) .................. A-50

Defendant's Answer, Affirmative Defenses and Counterclaims,
    dated May 31, 2022 ........................................... A-117

    Exhibit A to Answer—
    Letter from Mitchell J. Geller to Bob G. Goldberg,
    dated July 17, 2018 .......................................... A-136

    Exhibit B to Answer—
    Argo Pro Policy ............................................... A-151

Plaintiff's Answer to Counterclaims, dated June 21, 2022 ............. A-180

Stipulation, dated August 5, 2022 .................................... A-195

Defendant's Notice of Motion for Judgment on Pleadings,
    dated August 9, 2022 ......................................... A-197

Declaration of M. Paul Gorfinkel, for Defendant, in Support
    of Motion for Judgment on Pleadings, dated August 9, 2022 ...... A-198

    Exhibit A to Gorfinkel Declaration—
    Letter from Mitchell J. Geller to Bob G. Goldberg,
    dated July 17, 2018 .......................................... A-199

ii

PAGE

Defendant's Memorandum of Law in Support of Motion for Judgment
on Pleadings, dated August 9, 2022 ............................. A-212

Plaintiff's Memorandum of Law in Opposition to Motion
for Judgment on Pleadings, dated August 30, 2022 ............... A-238

Declaration of Dennis J. Nolan, for Plaintiff, in Opposition to Motion
for Judgment on Pleadings, dated August 30, 2022 ............... A-268

Exhibit A to Nolan Declaration—
Verified Complaint, dated July 26, 2019
(*Schneider, et al. v. Pine Management, Inc. et al.*) ................ A-272

Exhibit A-1 to Nolan Declaration—
Letter from Mitchell J. Geller to Bob G. Goldberg,
dated July 17, 2018 ................................................. A-339

Exhibit A-2 to Nolan Declaration—
Letter from Howard S. Koh to Mitchell J. Geller,
dated August 3, 2018 ............................................ A-354

Exhibit A-3 to Nolan Declaration—
Letter from Mitchell J. Geller to Howard S. Koh,
dated August 22, 2018 ........................................... A-358

Exhibit A-4 to Nolan Declaration—
Letter from Howard S. Koh to Mitchell J. Geller,
dated August 31, 2018 ........................................... A-377

Exhibit A-5 to Nolan Declaration—
Letter from Mitchell J. Geller to Howard S. Koh,
dated September 21, 2018 ......................................... A-381

Exhibit A-6 to Nolan Declaration—
Letter from Howard S. Koh to Mitchell J. Geller,
dated September 28, 2018 ......................................... A-386

Exhibit A-7 to Nolan Declaration—
Letter from Mitchell J. Geller to Howard S. Koh,
dated November 20, 2018 ......................................... A-389

iii

PAGE

Exhibit A-8 to Nolan Declaration—
Letter from Howard S. Koh to Mitchell J. Geller,
dated December 7, 2018.......................................... A-397

Exhibit A-9 to Nolan Declaration—
Operating Agreement of Rudel Realty LLC,
dated October 17, 1996 .......................................... A-401

Exhibit A-10 to Nolan Declaration—
Operating Agreement of Marni Realty LLC,
dated October 17, 1996 .......................................... A-413

Exhibit A-11 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Jeruth Realty LLC ............................................ A-425

Exhibit A-12 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of JHJ Realty LLC............................................... A-462

Exhibit A-13 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Bar-Mar Realty LLC .......................................... A-497

Exhibit A-14 to Nolan Declaration—
Second Amended and Restated Operating Agreement
of Bren-El Realty LLC........................................... A-530

Exhibit A-15 to Nolan Declaration—
Second Amended and Restated Operating Agreement
of Sir Realty LLC ............................................... A-565

Exhibit A-16 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Marc Realty LLC ............................................. A-600

Exhibit A-17 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of RIS Realty LLC.............................................. A-635

iv

PAGE

Exhibit A-18 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Zizi Realty LLC .............................................. A-674

Exhibit A-19 to Nolan Declaration—
Email from Bob G. Goldberg to Marc Schneider,
dated February 19, 2018 ........................................ A-712

Exhibit A-20 to Nolan Declaration—
Email from Brenda Rohlman to Marc Schneider,
dated March 3, 2018 ........................................... A-716

Exhibit B to Nolan Declaration—
Argo Pro Policy ............................................... A-719

Defendant's Reply Memorandum of Law in Further Support
of Motion for Judgment on Pleadings, dated September 6, 2022 ... A-748

Memorandum Opinion and Order of the Honorable Mary Kay
Vyskocil, dated March 20, 2023 ................................. A-761

Entry of Judgment, dated March 21, 2023 ........................... A-771

Notice of Appeal, dated April 17, 2023............................. A-782

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2 INDEX NO. 654303/2019

Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 2 of 67

RECEIVED NYSCEF: 07/26/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JEROME SCHNEIDER, AS TRUSTEE OF THE JEROME
SCHNEIDER REVOCABLE TRUST, DATED JANUARY 18,
2013, INDIVIDUALLY, AND AS A MEMBER OF AND ON
BEHALF OF MARNI REALTY LLC AND RUDEL REALTY,
LLC, RUTH SCHNEIDER, AS TRUSTEE OF THE RUTH
SCHNEIDER REVOCABLE TRUST, DATED JANUARY 18,
2013, INDIVIDUALLY, AND AS A MEMBER OF AND ON
BEHALF OF MARNI REALTY LLC AND RUDEL REALTY,
LLC, RUTH SCHNEIDER, AS TRUSTEE OF THE JEROME
SCHNEIDER 2012 FAMILY TRUST, DATED DECEMBER 10,
2012, INDIVIDUALLY, AND AS A MEMBER OF AND ON
BEHALF OF ZIZI REALTY, LLC, JERUTH REALTY LLC,
MARC REALTY LLC, RIS REALTY LLC, BREN-EL REALTY
LLC, JHJ REALTY LLC AND SIR REALTY LLC, JEROME
SCHNEIDER, AS TRUSTEE OF THE RUTH SCHNEIDER 2012
FAMILY TRUST, DATED DECEMBER 10, 2012,
INDIVIDUALLY, AND AS A MEMBER OF AND ON
BEHALF OF ZIZI REALTY, LLC, JERUTH REALTY LLC,
MARC REALTY LLC, RIS REALTY LLC, BREN-EL REALTY
LLC, JHJ REALTY LLC AND SIR REALTY LLC, MARC
SCHNEIDER, INDIVIDUALLY, AND AS A MEMBER OF
AND ON BEHALF OF BAR-MAR REALTY LLC, MARC
REALTY LLC AND RIS REALTY LLC, MARNI SCHWARTZ,
INDIVIDUALLY, AND AS A MEMBER OF AND ON BEHALF
OF BAR-MAR REALTY LLC, MARC REALTY LLC AND RIS
REALTY LLC,

              PLAINTIFFS,

       - AGAINST -

PINE MANAGEMENT, INC., LLOYD J. PINE, AS TRUSTEE
OF THE HAROLD PINE 2009 FAMILY TRUST, BRENDA
ROHLMAN, AS TRUSTEE OF THE HAROLD PINE 2009
FAMILY TRUST, ZIZI REALTY, LLC, JERUTH REALTY
LLC, BAR-MAR REALTY LLC, MARC REALTY LLC, RIS
REALTY LLC, BREN-EL REALTY LLC, JHJ REALTY LLC,
SIR REALTY LLC, MARNI REALTY LLC AND RUDEL
REALTY LLC,

             DEFENDANTS.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. _____

**VERIFIED COMPLAINT**

Plaintiffs Jerome Schneider, as Trustee of the Jerome Schneider Revocable Trust, dated January 18, 2013, individually, and as a member of and on behalf of Marni Realty LLC and Rudel Realty LLC, Ruth Schneider, as Trustee of the Ruth Schneider Revocable Trust, dated January 18, 2013, individually, and as a member of and on behalf of Marni Realty LLC and Rudel Realty LLC, Ruth Schneider, as Trustee of the Jerome Schneider 2012 Family Trust, dated December 10, 2012, individually, and as a member of and on behalf of Zizi Realty, LLC, Jeruth Realty LLC, Marc Realty LLC, RIS Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Sir Realty LLC, Jerome Schneider, as Trustee of the Ruth Schneider 2012 Family Trust, dated December 10, 2012, individually, and as a member of and on behalf of Zizi Realty, LLC, Jeruth Realty LLC, Marc Realty LLC, RIS Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Sir Realty LLC, Marc Schneider, individually, and as a member of and on behalf of Bar-Mar Realty LLC, Marc Realty LLC and RIS Realty LLC, and Marni Schwartz, individually, and as a member of and on behalf of Bar-Mar Realty LLC, Marc Realty LLC and RIS Realty LLC, by their attorneys, Holland & Knight LLP, for their Complaint against Pine Management, Inc., Lloyd J. Pine, as Trustee of the Harold Pine 2009 Family Trust, Brenda Rohlman, as Trustee of the Harold Pine 2009 Family Trust, Zizi Realty, LLC, Jeruth Realty LLC, Bar-Mar Realty LLC, Marc Realty LLC, RIS Realty LLC, Bren-El Realty LLC, JHJ Realty LLC, Sir Realty LLC, Marni Realty LLC and Rudel Realty LLC, allege as follows:

## OVERVIEW

1.     This action arises out of the management by defendant Pine Management, Inc. ("Pine Management") of ten (10) New York limited liability companies named as nominal defendants (the "LLCs"). As shown below, Pine Management: (a) has breached provisions of the governing Operating Agreements; (b) has breached its fiduciary duty as Manager to the Plaintiffs and has not acted in good faith; (c) has failed to disclose material facts and key

2

INDEX NO. 654303/2019
NYSCEF DOC. NO. 2 Case 1:22-cv-02407-MKV  Document 27-1  Filed 08/30/22   Page 4 of 67 RECEIVED NYSCEF: 07/26/2019

documents concerning the management and operations of the LLCs to the Plaintiffs; (d) has engaged in self-dealing transactions such as the payment of "management fees" and "construction management fees" from the LLCs to itself in violation of the governing Operating Agreements and without approval from the Plaintiffs; and (e) has been involved in related party transactions and approved loans to certain of the limited liability companies from members of the limited liability companies or persons or entities affiliated with Pine Management without authorization from, or an affirmative vote of, a majority in interest of the Members of such LLCs.

2.      Pine Management and individuals associated or affiliated with Pine Management have kept the Plaintiffs "in the dark" concerning certain key facts and documents concerning Pine Management's management of the LLCs, have oppressed the Plaintiffs and have done everything in their power to entrench themselves and their affiliates and to exclude the Plaintiffs from exercising their rights as Members of the LLCs, in many of which the Plaintiffs collectively have a 50% interest.

3.      The Complaint contains direct claims as well as derivative claims brought by Plaintiffs as Members of the LLCs against Pine Management concerning its management of these LLCs. The Complaint asserts, *inter alia*, causes of action against Pine Management for: (a) breaches of the governing Operating Agreements; (b) breach of fiduciary duties; (c) inspection of books and records under the terms of the Operating Agreements and Limited Liability Company Law ("LLCL") § 1102; (d) an accounting; and (e) declaratory judgments.

4.      The Complaint also seeks injunctive relief against Pine Management and the Harold Pine 2009 Family Trust from acting unilaterally in violation of the governing Operating Agreements of the respective LLCs. Specifically, this action seeks to enjoin Pine Management

3

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 2    Case 1:22-cv-02407-MKV    Document 27-1    Filed 08/30/22    Page 5 of 67

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

(in the case of all the LLCs) and the Harold Pine 2009 Family Trust (in the case of Marni Realty LLC and Rudel Realty LLC) from taking the following actions without the approval of a majority in interest of the Members of each of the LLCs: (1) approval of capital improvements for the individual property owned by the respective limited liability company; (2) setting of reserves for the individual property owned by the respective limited liability company; (3) deciding on the amount of distributions from the respective limited liability company to the Members; and (4) approval of loans to the respective limited liability company.

5.     The Complaint also seeks a declaratory judgment declaring that Pine Management cannot pay itself "management fees," "construction management fees" or any other "compensation" in its role as Manager, "property manager" or in any other capacity from the revenues of the respective LLCs without the approval of a majority in interest of the Members of each of the LLCs, taking into account that Members affiliated with or having an interest in Pine Management cannot vote on such matter.

6.     Pursuant to eight of the governing Operating Agreements of the LLCs, Pine Management was appointed as the Manager.  Section 8.3 of the Operating Agreements of eight of the LLCs provides that "[t]he Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; *provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company shall be made by the affirmative vote of a majority in interest of the Members.*"(Emphasis added).

4

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM      INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 6 of 67   RECEIVED NYSCEF: 07/26/2019

7.      Pine Management has taken a very restrictive view of the term "outside the ordinary course of business." By an e-mail dated February 19, 2018, Pine Management's counsel stated that "The *only limitation provided in these agreements* is that decisions to finance or refinance any real estate owned by an LLC, acquire new or additional real estate, or sell any real estate owned by a LLC requires the affirmative vote of a majority in interest of the voting members or the affected LLC." (Emphasis added). Pine Management's position has no factual or legal basis since the phrase "including, but not limited to" has an expansive meaning and is not limited to the items that follow such phrase.

8.      Decisions which are "outside the ordinary course of business" in the case of these LLCs and therefore "require the affirmative vote of a majority in interest of the Members" (more than 50% of the Members) include the following: (1) capital improvements that are not required for health or safety purposes; (2) setting of cash reserves that are a departure from historical practices of the LLCs or that are in excess of what is required for day to day operations; and (3) a material change in the historical practice of significant distributions to the Members of each of the LLCs.

9.      The historical practice of these LLCs was to distribute most of the available cash generated by the properties owned by the LLCs to their Members and to maintain a reasonable amount of cash reserves. Commencing in or about 2012 and continuing through the present, Pine Management departed from historical practice by dramatically increasing the amount of cash reserves and capital improvements or renovations (by millions of dollars) without consulting and obtaining the approval of a majority in interest of the Members of the LLCs.

10.     The dramatic increase of cash reserves and capital improvements, together with the dramatic decrease in distributions, is contrary to the historical practice for the LLCs and thus,

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2
Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 7 of 67
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

"outside the ordinary course of business." Nonetheless, Pine Management has refused to let the Plaintiffs participate in these matters that are "outside the ordinary course of business" and thus have to be approved by the affirmative vote of a majority in interest of the Members. Instead, Pine Management, without any legal basis, has unilaterally decided that these matters are solely within its decision-making authority.

11.     In addition to being significantly contrary to historical practice of the LLCs, the amounts proposed by Pine Management for the amount of each building's reserve accounts are unreasonable and far in excess of what is necessary for day to day operations. Indeed, the average cash position for the years 2012-2016 is about 327% higher than the average cash position for the years 2000-2005 and the cash position at the end of the year 2017 is about 393% higher than it was in 2000.

12.     Distributions from the LLCs to the Plaintiffs, which were approximately $497,000 in 2011, decreased to approximately $94,000 in 2018 – an 81% reduction. The amount of distributions received by a Member is a matter of crucial importance to the Members of the LLCs. Pine Management has no authority to unilaterally change the historical practice of significant distributions to the Members. As a result, the decision to dramatically change the historical practice of significant distributions is a matter "outside the ordinary course of business" in the case of these LLCs and therefore requires the vote of the Plaintiffs.

13.     Another egregious example of Pine Management's breach of the Operating Agreements and breach of the LLCL is its approval of loans to certain of the LLCs. During the period September 2015 to June 2019, Pine Management approved loans in the total amount of $7,960,000 to certain of the LLCs by Members of the LLCs or persons affiliated with Pine Management. These loans were outside the ordinary course of business and needed to be

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM                INDEX NO. 654303/2019
NYSCEF DOC. NO. 2  Case 1:22-cv-02407-MKV  Document 27-1  Filed 08/30/22  Page 8 of 67  RECEIVED NYSCEF: 07/26/2019

approved by the affirmative vote of a majority in interest of the Members pursuant to the

governing Operating Agreements as well as LLCL § 402(c)(2). Pine Management never

consulted with or sought the approval of the Plaintiffs for these loans. These loans were not

approved by the affirmative vote of a majority in interest of the Members of the respective

limited liability company. On information and belief, the interest rates on these loans were

above market.

14.     This action also is necessitated by Pine Management's failure to comply with the

provisions of the governing Operating Agreements and the rules prohibiting a Manager from

unilaterally paying fees to itself. None of the Operating Agreements of the LLCs expressly

authorize the payment of fees or compensation to the Manager. Indeed, the Operating

Agreements state only that "[t]he Company's initial Manager [Manager] shall be Pine

Management, Inc." and that "Pine Management, Inc. *may be paid for services rendered in its

role as property manager pursuant to a separate agreement with the Company.*" (Emphasis

added). No separate agreement with Pine Management as a "property manager" was ever

approved or executed. Moreover, any such "separate agreement" would require the "affirmative

vote of a majority in interest of the Members" and Members of the LLCs that are affiliated with

or have an interest in Pine Management, such as Thomas Rohlman, Pine Management's Chief

Executive Officer, or Brenda Rohlman, an officer or employee at Pine Management, Harold Pine

or his trusts, would not be able to vote on such "separate agreement" because they are

"interested" or "affiliated" with Pine Management within the meaning of LLCL § 411.

15.     Furthermore, the Operating Agreements specifically provide that "*the guaranteed

payments and other compensation of the Manager, if any,* shall be paid in such manner as shall

be fixed from time to time *by a majority in interest of the Members*" or the "Class A Members"

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM     INDEX NO. 654303/2019
NYSCEF DOC. NO. 2   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 9 of 67   RECEIVED NYSCEF: 07/26/2019

in those situations where there are "Class A Members." (Emphasis added). This provision, in and of itself, further shows that the Members did not agree that Pine Management would receive "compensation" for its services as the Manager or "property manager."

16.    Although no "separate agreement" was ever submitted to the Plaintiffs, Pine Management – without the approval of the Plaintiffs – has paid "management fees" and "construction management fees" to itself which exceed $2.4 million for the years 2012 through the first six months of 2019.   Given that Pine Management has no authority under the LLCL or the governing Operating Agreements to fix its own compensation, the payment of such unauthorized fees constitutes a breach of the Operating Agreements and a breach of its fiduciary duties to the Plaintiffs and must be paid back to the LLCs.

17.    Significantly, Plaintiffs, by their counsel Holland & Knight LLP ("Holland & Knight"), have attempted to resolve this dispute without commencing an action.  Commencing in July 2018 and continuing through December 2018, Holland & Knight sent letters detailing the claims in this action to Meister Seelig & Fine LLP ("Meister Seelig"), Pine Management's counsel.

18.    On information and belief, Meister Selig also is counsel to Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust and the Sydell Pine 2009 Family Trust.

19.    Holland & Knight's letters set forth the legal basis for each of the Plaintiffs' direct and derivative claims against Pine Management.  In particular, Holland & Knight's July 17, 2018 letter discussed in great detail, with citation to controlling New York cases, Plaintiffs' claims for breaches of the Operating Agreements, breaches of fiduciary duties, Plaintiffs' inspection rights and their entitlement to an accounting.  A copy of Holland & Knight's July 17, 2018 letter to

8

**A-281**

Meister Seelig is annexed hereto as <u>Exhibit 1</u>; a copy of Meister Seelig's August 3, 2018 letter to Holland & Knight is annexed hereto as <u>Exhibit 2</u>; a copy of Holland & Knight's August 22, 2018 letter to Meister Seelig is annexed hereto as <u>Exhibit 3</u>; a copy of Meister Seelig's August 31, 2018 letter to Holland & Knight is annexed hereto as <u>Exhibit 4</u>; a copy of Holland & Knight's September 21, 2018 letter to Meister Seelig is annexed hereto as <u>Exhibit 5</u>; a copy of Meister Seelig's September 28, 2018 letter to Holland & Knight is annexed hereto as <u>Exhibit 6</u>; a copy of Holland & Knight's November 20, 2018 letter to Meister Seelig is annexed hereto as <u>Exhibit 7</u>; and a copy of Meister Seelig's December 7, 2018 letter to Holland & Knight is annexed hereto as <u>Exhibit 8</u>.

20.     Meister Seelig's August 3, 2018 letter did not address any of the issues or the claims set forth in Holland & Knight's July 17, 2018 letter other than to say that "those claims are rejected in their entirety." *See* <u>Exhibit 2</u>.

21.     Although Pine Management's counsel produced some documents in response to Holland & Knight's letters, Pine Management -- without any legal basis – rejected Plaintiffs' claims, including their claim for an accounting, refused to change its unilateral practices, refused to permit Plaintiffs to exercise their fundamental right to participate in the management of the LLCs to the extent such matters were "outside the ordinary course of business" and continues to pay itself "management fees" and "construction management fees" that have not been approved by the Plaintiffs or set forth in a separate written agreement approved by the Members of the LLCs.

22.     Notwithstanding Plaintiffs' foregoing rights, Pine Management has breached and continues to breach the governing Operating Agreements of the LLCs and their fiduciary duties as Manager of eight of the LLCs and de facto Manager of two of the LLCs by: (1) preventing the

9

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 11 of 67   RECEIVED NYSCEF: 07/26/2019

Plaintiffs from voting on matters "outside the ordinary course of business" and matters fundamental to the operation of the LLCs, including, but not limited to, setting of distributions to the Members of the LLCs, deciding on capital improvements, setting of cash reserves for the properties owned by the LLCs, and approving loans to certain of the LLCs; (2) engaging in self-dealing transactions, such as the payment of "management fees" and "construction management fees" to itself, without the approval of the Plaintiffs; and (3) preventing the Plaintiffs from inspecting the books and records of the LLCs.   In short, Pine Management has deprived the Plaintiffs of their bargained-for rights to control or vote on fundamental aspects of the LLCs. These actions have irreparably harmed the Plaintiffs.

## THE PARTIES

23.     Jerome Schneider is the Trustee of the Jerome Schneider Revocable Trust, dated January 18, 2013 (the "Jerome Schneider Revocable Trust").

24.     Ruth Schneider is the Trustee of the Ruth Schneider Revocable Trust, dated January 18, 2013 (the "Ruth Schneider Revocable Trust").

25.     Ruth Schneider is the Trustee of the Jerome Schneider 2012 Family Trust, dated December 10, 2012 (the "Jerome Schneider Family Trust").

26.     Jerome Schneider is the Trustee of the Ruth Schneider 2012 Family Trust, dated December 10, 2012 (the "Ruth Schneider Family Trust").

27.     The Jerome Schneider Revocable Trust has a 25% interest in Marni Realty LLC.

28.     The Jerome Schneider Revocable Trust has a 25% interest in Rudel Realty LLC.

29.     The Ruth Schneider Revocable Trust has a 25% interest in Marni Realty LLC.

30.     The Ruth Schneider Revocable Trust has a 25% interest in Rudel Realty LLC.

31.     The Jerome Schneider Family Trust has a 15% interest in Zizi Realty LLC, consisting of a .15% Class A interest and a 14.85% Class B interest.

10

A-283

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 12 of 67

RECEIVED NYSCEF: 07/26/2019

32.     The Jerome Schneider Family Trust has a 25% interest in Jeruth Realty LLC, consisting of a .25% Class A interest and a 24.75% Class B interest.

33.     The Jerome Schneider Family Trust has a 16.665% interest in Marc Realty LLC.

34.     The Jerome Schneider Family Trust has a 12% interest in RIS Realty LLC.

35.     The Jerome Schneider Family Trust has a 12.5% interest in Bren-El Realty LLC, consisting of a .125% Class A interest and a 12.375% Class B interest.

36.     The Jerome Schneider Family Trust has a 16.665% interest in JHJ Realty LLC, consisting of a .165% Class A interest and a 16.5% Class B interest.

37.     The Jerome Schneider Family Trust has a 12.5% interest in Sir Realty LLC, consisting of a .125% Class A interest and a 12.375% Class B interest.

38.     The Ruth Schneider Family Trust has a 15% interest in Zizi Realty LLC, consisting of a .15% Class A interest and a 14.85% Class B interest.

39.     The Ruth Schneider Family Trust has a 25% interest in Jeruth Realty LLC, consisting of a .25% Class A interest and a 24.75% Class B interest.

40.     The Ruth Schneider Family Trust has a 16.665% interest in Marc Realty LLC.

41.     The Ruth Schneider Family Trust has a 12% interest in RIS Realty LLC.

42.     The Ruth Schneider Family Trust has a 12.5% interest in Bren-El Realty LLC, consisting of a .125% Class A interest and a 12.375% Class B interest.

43.     The Ruth Schneider Family Trust has a 16.665% interest in JHJ Realty LLC, consisting of a .165% Class A interest and a 16.5% Class B interest.

44.     The Ruth Schneider Family Trust has a 12.5% interest in Sir Realty LLC, consisting of a .125% Class A interest and a 12.375% Class B interest.

45.     Plaintiff Marc Schneider is an individual residing in Bedford Corners, New York.

11

**A-284**

INDEX NO. 654303/2019

NYSCEF DOC. NO. 2    Case 1:22-cv-02407-MKV    Document 27-1    Filed 08/30/22    Page 13 of 67
RECEIVED NYSCEF: 07/26/2019

46.     Marc Schneider has a 12.5% interest in Bar-Mar Realty LLC.

47.     Marc Schneider has a 8.33% interest in Marc Realty LLC.

48.     Marc Schneider has a 13% interest in RIS Realty LLC.

49.     Plaintiff Marni Schwartz is an individual residing in Armonk, New York.

50.     Marni Schwartz has a 12.5% interest in Bar-Mar Realty LLC.

51.     Marni Schwartz has a 8.34% interest in Marc Realty LLC.

52.     Marni Schwartz has a 13% interest in RIS Realty LLC.

53.     Plaintiffs collectively have a 50% interest in Marni Realty LLC, Rudel Realty LLC, Jeruth Realty LLC, Marc Realty LLC and RIS Realty LLC.

54.     Plaintiffs collectively have a 25% interest in Bar-Mar Realty LLC, Bren-El Realty LLC and Sir Realty LLC.

55.     Plaintiffs collectively have a 30% interest in Zizi Realty LLC.

56.     Plaintiffs collectively have a 33.33% interest in JHJ Realty LLC.

57.     On information and belief, Defendant Pine Management is a New York corporation with its principal place of business at 78 Manhattan Avenue, New York, New York 10025.

58.     On information and belief, Defendants Lloyd J. Pine and Brenda Rohlman are Trustees of the Harold Pine 2009 Family Trust, which has interests in certain of the LLCs that are the subject of this action.

59.     On information and belief, the address of the Harold Pine 2009 Family Trust is c/o Lloyd Pine, Haves, Pine & Seligman, 140 East 45th Street, 16th Floor, New York, New York 10017.

12

**A-285**

60.     Pursuant to the applicable Operating Agreements, Pine Management is the initial Manager of Bar-Mar Realty LLC, JHJ Realty LLC, RIS Realty LLC and Marc Realty LLC and the Manager of Jeruth Realty LLC, Zizi Realty LLC, Bren-El Realty LLC and Sir Realty LLC.

61.     Pine Management is the de facto Manager of Rudel Realty LLC and Marni Realty LLC.

62.     On information and belief, Harold Pine, Lloyd Pine, Thomas Rohlman and Brenda Rohlman are officers, directors, employees or otherwise have a direct or indirect interest in Pine Management.

63.     On information and belief, Thomas Rohlman is and has been the Chief Executive Officer of Pine Management since at least 2011.

64.     On information and belief, Jason Rohlman and Daniel Rohlman are and have been Vice Presidents of Pine Management since at least 2016.

65.     On information and belief, Harold Pine, the Harold Pine 2009 Family Trust or the Sydell Pine 2009 Family Trust has an interest in certain of the LLCs which are the subject of this action.

66.     Specifically, on information and belief, the Harold Pine 2009 Family Trust has a 50% interest in Marni Realty LLC and Rudel Realty LLC.  In addition, on information and belief, Harold Pine or the Harold Pine 2009 Family Trust has: a 30% interest in Zizi Realty LLC, consisting of a .30% Class A interest and a 29.70% Class B interest;  a 10% interest in Jeruth Realty LLC, consisting of a .10% Class A interest and a 9.90% Class B interest; a 33.34% interest in Bar-Mar Realty LLC; a 33.34% interest in Marc Realty LLC; a 12% interest in RIS Realty LLC; a 50% interest in Bren-El Realty LLC, consisting of a .5% Class A interest and a

13

**A-286**

49.50% Class B interest; and a 33.34% interest in JIIJ Realty LLC, consisting of a .34% Class A interest and a 33% Class B interest.

67.     On information and belief, Thomas Rohlman, the Chief Executive Officer of Pine Management, has a 5% interest in Zizi Realty LLC, consisting of a .05% Class A interest and a 4.95% Class B interest, and a 10% interest in Jeruth Realty LLC, consisting of a .10% Class A interest and a 9.90% Class B interest.

68.     On information and belief, Brenda Rohlman, an officer or employee of Pine Management, has a 5% interest in Zizi Realty LLC, consisting of a .05% Class A interest and a 4.95% Class B interest, a 10% interest in Jeruth Realty LLC, consisting of a .10% Class A interest and a 9.90% Class B interest, a 20.83% interest in Bar-Mar Realty LLC, an 8.33% interest in Marc Realty LLC and a 13% interest in RIS Realty LLC.

69.     On information and belief, the Sydell Pine 2009 Family Trust has a 25% interest in Bren-El Realty LLC, consisting of a .25% Class A interest and a 24.75% Class B interest, and a 75% interest in SIR Realty LLC, consisting of a .75% Class A interest and a 74.25% Class B interest.

70.     On information and belief, Lloyd Pine has a 30% interest in Zizi Realty LLC, consisting of a .30% Class A interest and a 29.70% Class B interest, a 20% interest in Jeruth Realty LLC, consisting of a .20% Class A interest and a 19.80% Class B interest, an 8.33% interest in Marc Realty LLC, a 13% interest in RIS Realty LLC, and a 20.83% interest in Bar-Mar Realty LLC.

71.     Nominal Defendant Rudel Realty LLC ("Rudel Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78

14

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.  Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 16 of 67
RECEIVED NYSCEF: 07/26/2019

Manhattan Ave., New York, New York 10025. A copy of the Operating Agreement, dated

October 17, 1996, of Rudel Realty is annexed hereto as Exhibit 9.

72.    Nominal Defendant Marni Realty LLC ("Marni Realty") is a New York limited

liability company with its principal place of business at c/o Pine Management, Inc., 78

Manhattan Ave., New York, New York 10025. A copy of the Operating Agreement, dated

October 17, 1996, of Marni Realty is annexed hereto as Exhibit 10.

73.    Nominal Defendant Jeruth Realty LLC ("Jeruth Realty") is a New York limited

liability company with its principal place of business at c/o Pine Management, Inc., 78

Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of

Operating Agreement, made as of August 1, 2012, of Jeruth Realty is annexed hereto as Exhibit

11.

74.    Nominal Defendant JHJ Realty LLC ("JHJ Realty") is a New York limited

liability company with its principal place of business at c/o Pine Management, Inc., 78

Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of

Operating Agreement, made as of October 1, 2011, of JHJ Realty is annexed hereto as Exhibit

12.

75.    Nominal Defendant Bar-Mar Realty LLC ("Bar-Mar Realty") is a New York

limited liability company with its principal place of business at c/o Pine Management, Inc., 78

Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of

Operating Agreement, made as of July 27, 2011, of Bar-Mar Realty is annexed hereto as Exhibit

13.

76.    Nominal Defendant Bren-El Realty LLC ("Bren-El Realty") is a New York

limited liability company with its principal place of business at c/o Pine Management, Inc., 78

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 17 of 67   RECEIVED NYSCEF: 07/26/2019

Manhattan Ave., New York, New York 10025. A copy of the Second Amended and Restated Operating Agreement, made as of August 1, 2012, of Bren-El Realty is annexed hereto as Exhibit 14.

77.     Nominal Defendant Sir Realty LLC ("Sir Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78 Manhattan Ave., New York, New York 10025. A copy of the Second Amended and Restated Operating Agreement, made as of August 1, 2012, of Sir Realty is annexed hereto as Exhibit 15.

78.     Nominal Defendant Marc Realty LLC ("Marc Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78 Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of Operating Agreement, made as of July 27, 2011, of Marc Realty is annexed hereto as Exhibit 16.

79.     Nominal Defendant RIS Realty LLC ("RIS Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78 Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of Operating Agreement, made as of July 27, 2011, of RIS Realty is annexed hereto as Exhibit 17.

80.     Nominal Defendant Zizi Realty LLC ("Zizi Realty") is a New York limited liability company with its principal place of business at c/o Pine Management, Inc., 78 Manhattan Ave., New York, New York 10025. A copy of the Amendment and Restatement of Operating Agreement, made as of November 1, 2012, of Zizi Realty is annexed hereto as Exhibit 18.

## JURISDICTION AND VENUE

81.     This Court has personal jurisdiction over the defendants pursuant to CPLR §§ 301 and 302 because the defendants are New York corporations, New York limited liability companies or trusts where at least one of the trustees is a resident of New York.

16

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 18 of 67
RECEIVED NYSCEF: 07/26/2019

82.   Venue in this Court is proper pursuant to CPLR § 501 because the governing Operating Agreements of the eight LLCs other than Marni Realty and Rudel Realty provide that "Any proceedings brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York." (*See* Exhibits 11-18, § 20.6).  Venue in this Court is proper pursuant to CPLR § 501 because the governing Operating Agreements for Marni Realty and Rudel Realty provide that "Any suit involving any dispute or matter arising under this Agreement may only be brought in a United States District Court located in the State of New York or any New York State court having jurisdiction over the subject matter of the dispute. . ." (*See* Exhibits 9-10, § 15.8).  In addition, venue in New York County is appropriate under CPLR § 503 because (a) the defendants are New York corporations or New York limited liability companies whose principal office is located in New York County and (b) one of the trustees of the trust named as a defendant is a resident of New York.

## FACTS

83.   Each of the ten LLCs has an executed Operating Agreement that identifies the Members and the initial Manager or Manager where one was appointed.

84.   The terms of the Operating Agreements determine the rules applicable to the rights and operations of the LLCs.

85.   The Operating Agreements also govern the relationships among Members and the powers, obligations and authority of the Members and Manager.

86.   The primary asset of each of Marc Realty, Jeruth Realty, Marni Realty, Rudel Realty, Sir Realty, Bren-El Realty, RIS Realty and Bar-Mar Realty is a single residential building in Manhattan, with apartments (units) ranging from seven (7) units to fifteen (15).

87.   The primary asset of each of JHJ Realty and Zizi Realty are two apartment buildings, with apartments (units) ranging from thirty (30) units to sixty-six (66) units.

17

88.      Zizi Realty has 66 units, JHJ Realty has 30 units, Marc Realty has 15 units, each

of Jeruth Realty, Marni Realty, Rudel Realty, Sir Realty and RIS Realty has 10 units, Bren-El

Realty has 7 units and Bar-Mar Realty has 14 units.

**I.      Relevant Provisions Of The 2011 and 2012 Operating Agreements**

89.      Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ

Realty, Sir Realty and Marc Realty are governed by Operating Agreements that were amended in

2011 or 2012. (*See* Exhibits 11-18).

90.      The attorneys for Pine Management drafted the Operating Agreements of Zizi

Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and

Marc Realty.

91.      The Plaintiffs were not represented by counsel in connection with the execution of

the Operating Agreements for these eight (8) LLCs.

92.      The terms of the Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar

Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and Marc Realty are virtually

identical. (*See* Exhibits 11-18).

93.      Certain of the Operating Agreements have Class A and Class B membership

interest (*see* Exhibits 11, 12, 14, 15 and 18) while others have one form of class interest (*see*

Exhibits 9-10, 13, 16 and 17).

**A.      Appointment of Pine Management As Initial Manager And Provisions Showing
That the Members Did Not Agree That Pine Management Would Be Paid For Its
Services As Manager Or "Property Manager"**

94.      Section 8.1(c) of the Operating Agreements for Bar-Mar Realty, RIS Realty, JHJ

Realty and Marc Realty states:

> The Company's *initial Manager* shall be Pine Management Inc.
> Pine Management, Inc. *may be paid for services rendered in its*

**18**

**A-291**

> *role as property manager pursuant to a separate agreement with*
> *the Company.* (Emphasis added).

95.     Section 8.1(c) of the Operating Agreements for Zizi Realty, Jeruth Realty, Bren-

El Realty and Sir Realty states:

> The Company's *Manager* shall be Pine Management Inc. Pine
> Management, Inc. *may be paid for services rendered in its role as*
> *property manager pursuant to a separate agreement with the*
> *Company.* (Emphasis added).

96.     No separate agreement with Pine Management as a "property manager" was ever

approved by the Members of each of these eight LLCs.

97.     Furthermore, Section 8.10 of the 2011 and 2012 Operating Agreements of these

eight LLCs provide that "*the guaranteed payments and other compensation of the Manager, if*

*any,* shall be paid in such manner as shall be fixed from time to time *by a majority in interest of*

*the Members*" or the "Class A Members"  in those situations where there are "Class A

Members." (Emphasis added).

98.     The Members of these eight LLCs did not agree that Pine Management would

receive "compensation" or fees for its services as the Manager or "property manager."

**B.     Plaintiff's Fundamental Rights Concerning The Management Of These Eight LLCs**

99.     Section 8.3 of the Operating Agreements for each of these eight LLCs, which

enumerates the powers of the Manager, provides as follows:

> The Manager shall be responsible for supervision and general
> management of the business and day-to-day operations of the
> Company in the ordinary course of business; *provided, however,*
> *that decisions which are outside the ordinary course of business,*
> *including but not limited to decisions to finance or refinance any*
> *real estate owned by the Company, acquire new or additional real*
> *estate, or sell any real estate owned by the Company shall be made*
> *by the affirmative vote of a majority in interest of the Members.*
> (Emphasis added).

**C.     Pine Management's Fiduciary Duties As Manager Of These Eight LLCs**

19

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-1    Filed 08/30/22    Page 21 of 67    RECEIVED NYSCEF: 07/26/2019

100.    Section 17.2 of the Operating Agreements of each of these eight LLCs entitled "Indemnification" states that "Notwithstanding anything otherwise contained to the contrary, *no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members*." (Emphasis added).

101.    None of the Operating Agreements of these eight LLCs provides for indemnification for Pine Management in the event of an action brought by the Members of the LLCs against Pine Management.

**D.    Member's Right To Inspect Books and Records of These Eight LLCs**

102.    Section 14.1 of the Operating Agreements of these eight LLCs provides:

> The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. *Each Member*, Manager or their duly authorized representative *shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.* (Emphasis added).

103.    The Member's inspection rights to examine the "Company's books and records" under Section 14.1 of the Operating Agreements of these eight LLCs are broader than the inspection rights under LLCL § 1102(a) and includes all types of documents with respect to the LLCs.

**E.    Additional Provisions In The Operating Agreements Of These Eight LLCs**

104.    Section 19 of each of the Operating Agreements for these eight LLCs provides that it "may be amended only by the affirmative vote of a majority in interest of the Members" or "the Class A Members."

105.    Section 20 of each of the Operating Agreements for these eight LLCs states that "it shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York" and that "any proceedings

20

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM | INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-1 Filed 08/30/22 Page 22 of 67 RECEIVED NYSCEF: 07/26/2019

brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York."

## II.     Relevant Provisions Of The 1996 Operating Agreements

106.    Rudel Realty and Marni Realty are governed by the 1996 Operating Agreements. (*See* Exhibits 9-10).

107.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust collectively have a 50% interest in Rudel Realty and Marni Realty.

108.    The Harold Pine 2009 Family Trust has the remaining 50% interest in Rudel Realty and Marni Realty.

109.    Section 5.1, entitled "Management by Members," of the 1996 Operating Agreements states:

> *The business and affairs of the Company shall be managed by the Members.* The Members shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Members under the LLCL. (Emphasis added).

110.    Although the 1996 Operating Agreements did not appoint Pine Management as the "Manager," Pine Management has acted as the de facto Manager of Marni Realty and Rudel Realty since at least 1997.

111.    By acting as the de facto Manager of Marni Realty and Rudel Realty, Pine Management owes a fiduciary duty to the Members of these two LLCs to, among other things, operate such LLCs in good faith and fairness, to avoid self-dealing and to make full disclosure of all material facts.

112.    The 1996 Operating Agreements contain no provision for payment of any fees or compensation to a "Manager" or a "property manager."

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 23 of 67

RECEIVED NYSCEF: 07/26/2019

113.   Section 9, entitled "Distributions," of the 1996 Operating Agreements states:

> Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Members. Such distributions shall be allocated among the members in the same proportion as the allocation of profits and losses.

114.   Section 15.4, entitled "Complete Agreement," of the 1996 Operating Agreements states that "[T]his Agreement constitutes the complete and exclusive statement of the agreement along with the members with respect to the subject matter thereof" and that "this Agreement may not be amended without the written consent of the Members including two-thirds (2/3rds) or more of the percentages then held by Members."

115.   The 1996 Operating Agreements of Rudel Realty and Marni Realty LLC contain no provision (a) that deals with a "deadlock" between the Members or (b) to resolve disputes between the Members or between the Member and the Manager.

116.   The 1996 Operating Agreements of Rudel Realty and Marni Realty do not provide for indemnification for Pine Management in the event of an action brought by the Members of such LLCs against Pine Management.

**III.   Pine Management's Failed Attempt To Make Pine Management The Manager Of Certain Of The LLCs In Perpetuity**

117.   On or about January 17, 2018, Pine Management attempted to amend the Operating Agreements of Marni Realty and Rudel Realty LLC's to include a provision that "any Manager may be removed at any time, with or without cause, *by the unanimous vote of the members if the Manager hereunder is Pine Management, Inc., Harold Pine, any descendant of Harold and Sydell Pine, or any spouse of any such descendant.*" (Emphasis added).

118.   The clear purpose of such an amendment was to prevent the Plaintiffs from removing Pine Management, Harold Pine or any descendant of Harold and Sydell Pine or any

22

A-295

spouse thereof, including Harold Pine, Thomas Rohlman, Brenda Rohlman, Daniel Rohlman, Jason Rohlman, Ilyse Rohlman and Lloyd Pine, from management of these LLCs.

119.    The purpose of such provision was to make Pine Management the Manager of these LLCs in perpetuity.

120.    The inclusion of such a provision would not only further entrench Pine Management in the management of these LLC's but would have prevented the Plaintiffs from ever removing Pine Management as the Manager of these LLCs.

121.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, which collectively have a 50% interest in Rudel Realty and Marni Realty, did not consent to the proposed amendment to these Operating Agreements.

### FIRST CAUSE OF ACTION AGAINST PINE MANAGEMENT FOR BREACHES OF THE OPERATING AGREEMENTS OF ZIZI REALTY LLC, JERUTH REALTY LLC, BAR-MAR REALTY LLC, MARC REALTY LLC, RIS REALTY LLC, BREN-EL REALTY LLC, JHJ REALTY LLC AND SIR REALTY LLC

122.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-105 inclusive, as if set forth herein.

123.    The Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty and Sir Realty are valid, binding and enforceable agreements.

124.    Plaintiffs have performed all of their obligations under the Operating Agreements of these eight LLCs.

### A.    Pine Management's Breaches Of Section 8.3 of the Operating Agreements

125.    Section 8.3 of the Operating Agreements of these eight LLCs provides:

> [t]he Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; provided, *however, that decisions which are outside the ordinary course of business,*

23

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM                INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 25 of 67
                                                                            RECEIVED NYSCEF: 07/26/2019

*including but not limited to decisions to finance or refinance any
real estate owned by the Company, acquire new or additional real
estate, or sell any real estate owned by the Company shall be made
by the affirmative vote of a majority in interest of the Members.*
(Emphasis added).

126.   Pine Management has breached Section 8.3 in four separate respects: (a) approval
of capital improvements for the individual property owned by the respective limited liability
company; (b) setting of reserves for the individual property owned by the respective limited
liability company; (c) deciding on the amount of distributions from the respective limited
liability company to the members; and (d) approval of loans to the respective limited liability
company.

127.   Each of these four items in paragraph 126 are "outside the ordinary course of
business" and therefore require an "affirmative vote of a majority in interest of the Members."

128.   Pine Management has taken a very restrictive view of the term "outside the
ordinary course of business."

129.   By an e-mail dated February 19, 2018 to Marc Schneider, one of the Plaintiffs,
Meister Seelig, Pine Management's counsel, stated that "The *only limitation provided in these
agreements* is that decisions to finance or refinance any real estate owned by an LLC, acquire
new or additional real estate, or sell any real estate owned by a LLC requires the affirmative vote
of a majority in interest of the voting members or the affected LLC." (Emphasis added). A copy
of Meister Seelig's February 19, 2018 e-mail is annexed hereto as Exhibit 19.

130.   Pine Management's restrictive view of the phrase "outside the ordinary course of
business" has no factual or legal basis since the phrase "including, but not limited to" has an
expansive meaning and *is not limited to* the items that follow such phrase.

24

**A-297**

131.    Since 2011, Pine Management has used this restrictive view of the term "outside the ordinary course of business" to deprive Plaintiffs of their bargained-for rights with respect to fundamental matters affecting these eight LLCs.

132.    Commencing in or about 2012 and continuing through the present, Pine Management departed from historical practice by dramatically increasing the amount of cash reserves and capital improvements or renovations for the properties owned by the LLCs and dramatically reducing distributions to the Members without consulting and obtaining the approval of a majority in interest of the Members of the LLCs.

133.    Pine Management refused to let the Plaintiffs participate in these matters that are "outside the ordinary course of business" and thus had to be approved by the affirmative vote of a majority in interest of the Members.

134.    Instead, Pine Management, without any legal basis, unilaterally decided that these matters are solely within its decision-making authority.

135.    Holland & Knight's July 17, 2018 letter advised Pine Management that the four items in paragraph 126 are "outside the ordinary course of business" and therefore require an "affirmative vote of a majority in interest of the Members." *See* Exhibit 1, pp. 5, 8-10.

136.    This July 17, 2018 letter also stated that Pine Management had no authority to pay itself fees or compensation from these eight LLCs. *See* Exhibit 1, pp. 5-8.

137.    On information and belief, the total rental income of the properties owned by these eight LLCs was $2,979,716 in 2012.

138.    On information and belief, the total rental income of the properties owned by these eight LLCs was $3,504,724 in 2018.

25

**A-298**

139.    On information and belief, the total rental income of the properties owned by these eight LLCs increased by 17.6% from 2012 to 2018.

(a)    **Capital Improvements**

140.    Capital improvements, except for amounts required for routine maintenance or for the safety of the property of each LLC, are matters "outside the ordinary course of business."

141.    Accordingly, the approval of such capital improvements requires the affirmative vote of a majority in interest of the Members of these eight LLCs.

142.    The amount of capital improvements has a direct effect on the amount of distributions to the Members of the LLCs.

143.    The amount of capital improvements of the eight LLCs dramatically increased by millions of dollars from 2012 to 2018.

144.    On information and belief, the amount of capital improvements for these eight LLCs was $565,676 in 2012.

145.    On information and belief, the amount of capital improvements for these eight LLCs was $371,619 in 2013.

146.    On information and belief, the amount of capital improvements for these eight LLCs was $744,126 in 2014

147.    On information and belief, the amount of capital improvements for these eight LLCs was $1,565,303 in 2015.

148.    On information and belief, the amount of capital improvements for these eight LLCs was approximately $2,350,598 million in 2016.

149.    On information and belief, the amount of capital improvements for these eight LLCs was approximately $3,156,494 million in 2017.

26

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019

NYSCEF DOC. NO. 2   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 28 of 67
RECEIVED NYSCEF: 07/26/2019

150. On information and belief, the amount of capital improvements for these eight LLCs was $4,171,839 in 2018:

151. On information and belief, the amount of capital improvements for these eight LLCs was $619,360 for the first six months of 2019.

152. The "capital improvements" figures referenced in paragraphs 144 through 151 appear in the line item "Repairs and Replacements" in Pine Management's Summary of Receipts and Disbursements for these eight LLCs.

153. On information and belief, the amount of monies spent annually on capital improvements for these eight LLCs increased by approximately 637% from 2012 to 2018.

154. On information and belief, in addition to the direct capital improvements that appear in the line item "Repairs and Replacements" in Pine Management's Summary of Receipts and Disbursements for these eight LLCs, there was a dramatic increase in "soft costs" for these LLCs, which further reduced the amount of income to these LLCs and the distributions to the Members of these LLCs.

155. "Professional Fees" is a "soft cost" that is included in Pine Management's Summary of Receipts and Disbursements for these eight LLCs.

156. The amount of "Professional Fees" dramatically increased for these eight LLCs during the period 2012 through June 2019 as listed below:

| 2012 | 7,455 |
|------|-------|
| 2013 | 9,573 |
| 2014 | 6,695 |
| 2015 | 62,353 |
| 2016 | 187,920 |
| 2017 | 240,554 |
| 2018 | 209,988 |
| 2019 | 29,943 (first six months) |

27

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. ~~Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22~~   ~~Page 29 of 67~~
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

157.    On information and belief, the annual amount of "Professional Fees" for these eight LLCs increased by 2,717% from 2012 through 2018.

158.    Pine Management has no authority to unilaterally increase capital improvements without the affirmative vote of a majority in interest of the Members, including the Plaintiffs, of these eight LLCs.

159.    Pine Management neither sought nor obtained the approval of the Plaintiffs in connection with the capital improvements, including any associated "soft costs," of these eight LLCs for the period 2012 to 2019.

**(b)    Cash Reserves For The Properties Owned By The LLCs**

160.    The historical practice of these eight LLCs was to distribute most of the available cash generated by the properties owned by the LLCs to their Members.

161.    The setting of the amount of cash reserves is "outside the ordinary course of business" and thus requires the approval of an affirmative vote of a majority in interest of the Members of these eight LLCs.

162.    The setting of cash reserves has a direct effect on the amount of distributions to the Members of these eight LLCs.

163.    When the Plaintiffs asked Pine Management about the basis for the dramatic increase in cash reserves, Brenda Rohlman of Pine Management stated in her March 3, 2018 e-mail that "over 35 years, Pine Management Inc. has developed guidelines as to how much money to hold in each building's reserve accounts." A copy of this March 3, 2018 e-mail is annexed hereto as Exhibit 20.

164.    Pine Management never produced these "guidelines" that were purportedly developed over a 35-year period.

**A-301**

165. Meister Seelig's December 7, 2018 letter to Holland & Knight stated that "Pine Management's current general 'guidelines' for setting reserves for the property owned by each LLC are as follows: $200,000 baseline per building plus an additional $7,500 per unit." (*See* Exhibit 8, p. 1).

166. Pine Management's "current general 'guidelines'" for setting cash reserves is dramatically different from the historical practice of setting cash reserves for the properties owned by these eight LLCs.

167. The historical practice of these eight LLCs was to maintain a reasonable amount of cash reserves.

168. The average cash position for the years 2012-2016 is about 379% higher than the average cash position for the years 2000-2005.

169. The 379% increase represents the percentage increase of average end of year cash balances for Zizi Realty, Jeruth Realty, Marc Realty, RIS Realty and JHJ Realty. It does not include Bren-El Realty, Sir Realty or Bar Mar Realty since the Plaintiffs did not have an interest in those LLCs until 2010.

170. Pine Management has refused to let the Plaintiffs participate in these matters that are "outside the ordinary course of business" and thus have to be approved by the affirmative vote of a majority in interest of the Members of these eight LLCs.

171. Instead, Pine Management, without any legal basis, has unilaterally decided that these matters are solely within its decision-making authority.

172. In addition to being significantly contrary to historical practice of these eight LLCs, the amounts proposed by Pine Management for the amount of each building's reserve accounts are unreasonable and far in excess of what is necessary for day to day operations.

29

A-302

173.    The cash position at the end of the year 2017 is about 430% higher than it was in 2000.

**(c)    Distributions To The Plaintiffs From These Eight LLCs**

174.    Distributions from these eight LLCs to the Plaintiffs were approximately $427,824 in 2011.

175.    Distributions from these eight LLCs to the Plaintiffs were approximately $217,500 in 2012.

176.    Distributions from these eight LLCs to the Plaintiffs were approximately $314,100 in 2013.

177.    Distributions from these eight LLCs to the Plaintiffs were approximately $235,600 in 2014.

178.    Distributions from these eight LLCs to the Plaintiffs were approximately $144,100 in 2015.

179.    Distributions from these eight LLCs to the Plaintiffs were approximately $115,200 in 2016.

180.    Distributions from these eight LLCs to the Plaintiffs were approximately $80,200 in 2017.

181.    Distributions from these eight LLCs to the Plaintiffs were approximately $70,200 in 2018.

182.    Distributions from these eight LLCs to the Plaintiffs were approximately $27,600 for the first six months of 2019.

183.    Distributions from these eight LLCs to the Plaintiffs decreased by approximately 84% from 2011 to 2018.

30

**A-303**

184.   The amount of distributions received by a Member is a matter of crucial importance to the Members of the LLCs.

185.   Pine Management has no authority to unilaterally change the historical practice of significant distributions to the Members.

186.   As a result, the decision to dramatically change the historical practice of significant distributions is a matter "outside the ordinary course of business" in the case of these eight LLCs and therefore requires the affirmative vote of a majority in interest of the Members of these eight LLCs, including the Plaintiffs.

(d)   **Loans To The LLCs**

187.   On information and belief, during the period September 2015 to June 2019, Pine Management approved $7,960,000 of loans to certain of the LLCs by Members of such LLCs or persons or entities affiliated with or have an interest in Pine Management.

188.   On information and belief, the current outstanding balance of the loans is $7,810,000 because a loan of $150,000 to JHJ Realty has been repaid.

189.   No documentation concerning these loans was provided by Pine Management to the Plaintiffs when these loans were approved by and entered into by Pine Management.

190.   Documentation concerning these loans was provided to the Plaintiffs for the first time by Meister Seelig's December 7, 2018 letter to Holland & Knight in response to Holland & Knight's request for documents relating to loans to the LLCs.

191.   On information and belief, the breakdown of these loans in the total amount of $7,960,000 is as follows:

> $4,400,000 to Zizi Realty
> $2,850,000 to JHJ Realty
> $ 260,000 to Sir Realty
> $ 175,000 to Marc Realty
> $ 275,000 to Bar-Mar Realty

31

192.   On information and belief, each of these loans has an interest rate of 6% per year, provides for a balloon payment and has a maturity ranging from two (2) years to ten (10) years.

193.   These loans were outside the "ordinary course of business" and needed to be approved by the affirmative vote of a majority in interest of the Members of Zizi Realty, JIIJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty pursuant to the governing Operating Agreements as well as LLCL § 402(c)(2).

194.   Pine Management never consulted with or sought the approval of the Plaintiffs for the entering into of these loans.

195.   These loans were not approved by the affirmative vote of a majority in interest of the Members of the respective limited liability company.

196.   On information and belief, the interest rates on these loans were above market.

197.   Plaintiffs have sustained and continue to sustain damages by reason of Pine Management's breaches of Section 8.3 of the Operating Agreements of these eight LLCs.

**B.     Pine Management's Unauthorized Payment Of "Management Fees" And "Construction Management Fees" To Itself**

198.   In addition, Pine Management has paid itself and continues to pay itself "management fees" and "construction management fees" from these eight LLCs.

199.   Plaintiffs have not approved the payment of "management fees" to Pine Management from these eight LLCs.

200.   Plaintiffs have not approved the payment of "construction management fees" to Pine Management from these eight LLCs.

201.   Plaintiffs have sustained and continue to sustain damages by reason of Pine Management's payment of unauthorized "management fees" and "construction management fees" from these eight LLCs to Pine Management.

32

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM   INDEX NO. 654303/2019
NYSCEF DOC. NO. 2   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 34 of 67   RECEIVED NYSCEF: 07/26/2019

202.   By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial for Pine Management's breaches of the Operating Agreements of these eight LLCs, including, but not limited to the breaches of Section 8.3.

### SECOND CAUSE OF ACTION AGAINST PINE MANAGEMENT AND THE TRUSTEES OF THE HAROLD PINE 2009 FAMILY TRUST FOR BREACH OF THE OPERATING AGREEMENTS OF MARNI REALTY LLC AND RUDEL REALTY LLC

203.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-88, inclusive, and paragraphs 106-121, inclusive, as if set forth herein.

204.   The 1996 Operating Agreements of Rudel Realty and Marni Realty are valid, binding and enforceable agreements.

205.   Plaintiffs Jerome Schneider Revocable Trust and Ruth Schneider Revocable Trust have performed all of their obligations required by the Operating Agreements of Rudel Realty and Marni Realty.

206.   Section 5.1 of the Rudel Realty and Marni Realty Operating Agreements, entitled "Management by Members" states:

> *The business and affairs of the Company shall be managed by the Members.* The Members shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Members under the LLCL. (Emphasis added).

207.   Section 5.1, in clear and unambiguous language, provides that the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, which have an aggregate 50% interest in Rudel Realty and Marni Realty, have the right to "co-manage" the "business and affairs" of Rudel Realty and Marni Realty.

208.   Despite the fact that the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have the right to "co-manage" these entities under Section 5.1 of the

33

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM        INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 35 of 67
                                                          RECEIVED NYSCEF: 07/26/2019

1996 Operating Agreement, Pine Management has made decisions concerning Rudel Realty and Marni Realty without consulting and obtaining the approval of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust.

209.   Specifically, Pine Management has determined the amount of capital improvements, set cash reserves for the properties owned by such entities and decided on the amount of distributions to the Members of these two LLCs.

210.   On information and belief, the total rental income of the properties owned by these two LLCs was $482,038 in 2012.

211.   On information and belief, the total rental income of the properties owned by these two LLCs was $549,055 in 2018.

212.   On information and belief, the total rental income of the properties owned by these two LLCs increased by 13.9% from 2012 to 2018.

(a)   **Capital Improvements**

213.   The amount of capital improvements has a direct effect on the amount of distributions to the Members of these two LLCs.

214.   The amount of capital improvements of Marni Realty and Rudel Realty dramatically increased from 2012 through the first six months of 2019.

215.   On information and belief, the amount of capital improvements of these two LLCs was $13,441 in 2012.

216.   On information and belief, the amount of capital improvements of these two LLCs was $8,437 in 2013.

217.   On information and belief, the amount of capital improvements of these two LLCs was $86,961 in 2014.

34

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 36 of 67   RECEIVED NYSCEF: 07/26/2019

218.    On information and belief, the amount of capital improvements of these two LLCs was $46,362 in 2015.

219.    On information and belief, the amount of capital improvements of these two LLCs was $242,036 in 2016.

220.    On information and belief, the amount of capital improvements of these two LLCs was $385,012 in 2017.

221.    On information and belief, the amount of capital improvements of these two LLCs was $257,869 in 2018.

222.    On information and belief, the amount of capital improvements of these two LLCs was $47,582 for the first six months of 2019.

223.    The "capital improvements" figures referenced in paragraphs 215 through 222 appear in the line item "Repairs and Replacements" in Pine Management's Summary of Receipts and Disbursements for these two LLCs.

224.    On information and belief, the amount of monies spent annually on capital improvements for these two LLCs increased by approximately 1,818% from 2012 to 2018.

225.    On information and belief, in addition to the direct capital improvements that appear in the line item "Repairs and Replacements" in Pine Management's Summary of Receipts and Disbursements for these two LLCs, there was a dramatic increase in "soft costs" for these LLCs, which further reduced the amount of income to these LLCs and the distributions to the Members of these LLCs.

226.    "Professional Fees" is a "soft cost" that is included in Pine Management's Summary of Receipts and Disbursements for these two LLCs.

35

**A-308**
FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 37 of 67

227.   The amount of "Professional Fees" dramatically increased for these two LLCs during the period 2012 through June 2019 as listed below:

| | |
|---|---|
| 2012 | 549 |
| 2013 | 949 |
| 2014 | 470 |
| 2015 | 370 |
| 2016 | 13,854 |
| 2017 | 31,355 |
| 2018 | 24,377 |
| 2019 | 5,739 (first six months) |

228.   On information and belief, the annual amount of "Professional Fees" for these two LLCs increased by 4,339% from 2012 through 2018.

229.   Pine Management has no authority to unilaterally increase capital improvements without the approval of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, which collectively has a 50% interest in Marni Realty and Rudel Realty.

230.   Pine Management neither sought nor obtained the approval of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust in connection with the capital improvements, including any associated "soft costs," of these two LLCs for the period 2012 to 2019.

**(b)      Cash Reserves For The Properties Owned By These Two LLCs**

231.   The historical practice of these two LLCs was to distribute most of the available cash generated by the properties owned by the LLCs to their Members.

232.   The setting of cash reserves has a direct effect on the amount of distributions to the Members of these two LLCs.

233.   When the Plaintiffs asked Pine Management about the basis for the dramatic increase in cash reserves, Brenda Rohlman of Pine Management stated in her March 3, 2018 e-

36

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2 Case 1:22-cv-02407-MKV Document 27-1 Filed 08/30/22 Page 38 of 67
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

mail that "over 35 years, Pine Management Inc. has developed guidelines as to how much money to hold in each building's reserve accounts." *See* Exhibit 20.

234.   Pine Management never produced these "guidelines" that were purportedly developed over a 35-year period.

235.   Meister Seelig's December 7, 2018 letter to Holland & Knight stated that "Pine Management's current general 'guidelines' for setting reserves for the property owned by each LLC are as follows: $200,000 baseline per building plus an additional $7,500 per unit." (*See* Exhibit 8, p. 1).

236.   Pine Management's "current general 'guidelines'" for setting cash reserves is dramatically different from the historical practice of setting cash reserves for the properties owned by these two LLCs.

237.   The historical practice of these two LLCs was to maintain a reasonable amount of cash reserves.

238.   The average cash position for the years 2012-2016 is about 395% higher than the average cash position for the years 2000-2005.

239.   Pine Management has refused to let the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust participate in the setting of cash reserves for the two properties owned by these two LLCs.

240.   Instead, Pine Management, without any legal basis, has unilaterally decided that these matters are solely within its decision-making authority.

241.   In addition to being significantly contrary to historical practice of these two LLCs, the amounts proposed by Pine Management for the amount of each building's reserve accounts are unreasonable and far in excess of what is necessary for day to day operations.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2  Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 39 of 67  RECEIVED NYSCEF: 07/26/2019

242.   The cash position at the end of the year 2017 is about 243% higher than it was in 2000.

**(c)    Distributions To The Jerome Schneider Revocable Trust
And The Ruth Schneider Revocable Trust From These Two LLCs**

243.   Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $69,200 in 2011.

244.   Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $62,500 in 2012.

245.   Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $118,400 in 2013.

246.   Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $79,000 in 2014.

247.   Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $39,000 in 2015.

248.   Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $54,000 in 2016.

249.   Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $44,000 in 2017.

250.   Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were approximately $24,000 in 2018.

251.   Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust were $4,000 for the first six months of 2019.

252.   Distributions from these two LLCs to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust decreased by approximately 65% from 2011 to 2018.

38

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. ___    Case 1:22-cv-02407-MKV    Document 27-1    Filed 08/30/22    Page 40 of 67    RECEIVED NYSCEF: 07/26/2019

253.    The amount of distributions received by a Member is a matter of crucial importance to the Members of these two LLCs.

254.    Pine Management has no authority to unilaterally change the historical practice of significant distributions to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust without consulting with and obtaining their approval.

**(d)    Pine Management's Unauthorized Payment Of "Management Fees" And "Construction Management Fees" To Itself**

255.    In addition, Pine Management has paid itself and continues to pay itself "management fees" and "construction management fees" from Rudel Realty and Marni Realty.

256.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have not approved the payment of "management fees" to Pine Management from Marni Realty and Rudel Realty.

257.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have not approved the payment of "construction management fees" to Pine Management from Marni Realty and Rudel Realty.

258.    Holland & Knight's July 17, 2018 letter advised Pine Management and the other Members of Rudel Realty and Marni Realty that Pine Management could not unilaterally make decisions concerning the amount of capital improvements, cash reserves for the properties and the amount of the distributions to the Members without the approval of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust. (*See* Exhibit 1)

259.    Holland & Knight's July 17, 2018 letter also stated that Pine Management had no authority to pay itself fees or compensation from Rudel Realty or Marni Realty. (*See* Exhibit 1).

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   RECEIVED NYSCEF: 07/26/2019
                                                                          Page 41 of 67

260. The August 3, 2018 letter of Meister Seelig, Pine Management's counsel, stated that "those claims [of Plaintiffs set forth in Holland & Knight's July 17, 2018 letter] are rejected in their entirety." (*See* Exhibit 2).

261. Subsequent letters from Holland & Knight to Pine Management's counsel repeated the position that the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have the right to co-manage Rudel Realty and Marni Realty.

262. Despite Holland & Knight's letters, Pine Management has refused to change its position that Pine Management can unilaterally manage Rudel Realty and Marni Realty.

263. Pine Management has breached Section 5.1 of the Operating Agreements of Rudel Realty and Marni Realty.

264. On information and belief, Lloyd J. Pine and Brenda Rohlman, the Trustees of the Harold Pine 2009 Family Trust – which has the other 50% interest in Marni Realty and Rudel Realty – agree with the positions taken by Pine Management in the case of Marni Realty and Rudel Realty.

265. The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have sustained and continue to sustain damages by reason of Pine Management's breach of Section 5.1 of the 1996 Operating Agreements.

266. The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have sustained and continue to sustain damages by reason of the tacit acceptance by Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, of Pine Management's breach of Section 5.1 of the 1996 Operating Agreements.

267. The decision of Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, (a) to accept Pine Management's position that Pine Management can

40

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019

NYSCEF DOC. NO. 2 Case 1:22-cv-02407-MKV Document 27-1 Filed 08/30/22 Page 42 of 67 RECEIVED NYSCEF: 07/26/2019

unilaterally manage Rudel Realty and Marni Realty and (b) to refuse to permit the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust to co-manage Rudel Realty and Marni Realty, constitutes a breach of Section 5.1 of the 1996 Operating Agreement.

268.     By reason of the foregoing, the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust are entitled to damages for breaches by Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, of the Operating Agreements of Marni Realty and Rudel Realty in an amount to be determined at trial.

**THIRD CAUSE OF ACTION FOR A PRELIMINARY AND PERMANENT INJUNCTION ENJOINING PINE MANAGEMENT FROM TAKING ACTION WITH REGARD TO FUNDAMENTAL MATTERS OUTSIDE THE ORDINARY COURSE OF BUSINESS WITHOUT OBTAINING THE AFFIRMATIVE VOTE OF THE MAJORITY IN INTEREST OF THE MEMBERS OF ZIZI REALTY LLC, JERUTH REALTY LLC, BAR-MAR REALTY LLC, MARC REALTY LLC, RIS REALTY LLC, BREN-EL REALTY LLC, JHJ REALTY LLC AND SIR REALTY LLC**

269.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-105, inclusive, and 122-202 inclusive, as if set forth herein.

270.     Plaintiffs' contractual rights under Section 8.3 of the Operating Agreements of these eight LLCs are unique and valuable rights.

271.     Plaintiffs' contractual rights under Section 8.3 are required to enforce and protect their rights as Members of these eight LLCs.

272.     Pine Management has prevented the Plaintiffs from exercising their bargained for rights to vote upon matters fundamental to these eight LLCs, including (a) distributions to the members from the LLCs; (b) capital improvements to the properties owned by the LLCs; (c) setting of reserves for the properties owned by the LLCs; and (d) loans made to the eight LLCs.

273.     Pine Management has deprived Plaintiffs of their voting power and decision-making rights as to fundamental matters involving these eight LLCs.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM        INDEX NO. 654303/2019
NYSCEF DOC. NO. 2   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 43 of 67   RECEIVED NYSCEF: 07/26/2019

274.    The loss of the bargained for rights to vote on fundamental matters affecting these eight LLCs has caused and continues to cause irreparable harm to the Plaintiffs.

275.    Plaintiffs have no adequate remedy at law for Pine Management's breaches of Section 8.3 of the Operating Agreements of these eight LLCs.

276.    Plaintiffs' unique and valuable right to vote upon fundamental matters affecting these eight LLCs is not compensable in money damages.

277.    Money damages are not adequate because control and management of these eight LLCs is at stake.

278.    Such bargained-for contractual rights in the management of a limited liability company can be specifically enforced because the loss of such unique rights is not quantifiable and constitutes irreparable injury.

279.    Plaintiffs have performed all of their obligations required by the Operating Agreements of these eight LLCs and as Members of such LLCs.

280.    Absent injunctive relief, Pine Management will continue to unilaterally make decisions as to fundamental matters affecting these eight LLCs without the required participation and vote of the Plaintiffs.

281.    By reason of the foregoing, Plaintiffs are entitled to a preliminary and permanent injunction enjoining Pine Management from taking any actions "outside the ordinary course of business" of these eight LLCs without the affirmative vote of a majority in interest of the Members of these eight LLCs, including, but not limited to, the following actions: (a) approval of capital improvements for the individual property owned by the respective LLC; (b) setting of reserves for the individual property owned by the respective LLC; (c) deciding on the amount of

42

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2 Case 1:22-cv-02407-MKV Document 27-1 Filed 08/30/22 Page 44 of 67
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

distributions from the respective LLC to the Members; and (d) approval of loans to the respective LLC.

**FOURTH CAUSE OF ACTION FOR A PRELIMINARY AND PERMANENT INJUNCTION ENJOINING PINE MANAGEMENT AND LLOYD J. PINE AND BRENDA ROHLMAN, THE TRUSTEES OF THE HAROLD PINE 2009 FAMILY TRUST, FROM TAKING ACTION WITH REGARD TO THE MANAGEMENT OF MARNI REALTY LLC AND RUDEL REALTY LLC WITHOUT THE APPROVAL OF THE JEROME SCHNEIDER REVOCABLE TRUST AND THE RUTH SCHNEIDER REVOCABLE TRUST**

282. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-88, inclusive, paragraphs 106-121, inclusive, and paragraphs 203-266 as if set forth herein.

283. Section 5.1 of the 1996 Operating Agreements of Marni Realty and Rudel Realty provides that "[t]he business and affairs of the Company shall be managed by the Members."

284. Under Section 5.1, the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, which have an aggregate 50% interest in Rudel Realty and Marni Realty, have the right to "co-manage" the "business and affairs" of Rudel Realty and Marni Realty.

285. The contractual rights under Section 5.1 of the Operating Agreements of these two LLCs are unique and valuable rights.

286. The contractual rights under Section 5.1 are required to enforce and protect the rights of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, as Members of these two LLCs.

287. Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, have prevented the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust from exercising their bargained for rights to co-manage Marni Realty and Rudel Realty.

43

288.    The loss of the bargained for rights to co-manage Marni Realty and Rudel Realty has caused and continues to cause  irreparable harm to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust.

289.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have no adequate remedy at law for the breach by Pine Management's and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, of Section 5.1 of the Operating Agreements of these two LLCs.

290.    Money damages are not adequate because control and management of Marni Realty and Rudel Realty are at stake.

291.    Such bargained-for contractual rights to co-manage a limited liability company can be specifically enforced because the loss of such unique rights is not quantifiable and constitutes irreparable injury.

292.    The Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust have performed all of their obligations required by the Operating Agreements of these two LLCs and as Members of such LLCs.

293.    Absent injunctive relief, Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, will continue to unilaterally manage these two LLCs without the required participation and vote of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust.

294.    By reason of the foregoing, the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust are entitled to a preliminary and permanent injunction enjoining Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, from taking any actions with respect to the management of Marni Realty and

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2    Case 1:22-cv-02407-MKV    Document 27-1    Filed 08/30/22    Page 46 of 67    INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Rudel Realty without the consent of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, including, but not limited to, the following actions: (a) payment of "management fees," "construction management fees," or any compensation to Pine Management as Manager, "property manager" or in any other capacity; (b) capital improvements for the individual property owned by the respective limited liability company; (c) setting of reserves for the individual property owned by the respective limited liability company; (d) the amount of distributions from the respective limited liability company to the Members; and (e) loans to the respective limited liability company.

### FIFTH CAUSE OF ACTION FOR A DECLARATORY JUDGMENT THAT PINE MANAGEMENT CANNOT TAKE ACTION WITH REGARD TO MATTERS OUTSIDE THE ORDINARY COURSE OF BUSINESS WITHOUT OBTAINING THE AFFIRMATIVE VOTE OF THE MAJORITY IN INTEREST OF THE MEMBERS OF ZIZI REALTY, LLC, JERUTH REALTY LLC, BAR-MAR REALTY LLC, MARC REALTY LLC, RIS REALTY LLC, BREN-EL REALTY LLC, JHJ REALTY LLC AND SIR REALTY LLC

295.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-105, inclusive, paragraphs 122-202, inclusive, and paragraphs 269-281, inclusive, as if set forth herein.

296.    There is a real dispute between Plaintiffs and Pine Management involving substantial legal interests in these eight LLCs for which a declaration of rights will have some practical effect.

297.    An actual justiciable controversy exists with respect to Plaintiff's rights under Section 8.3 of the Operating Agreements of these eight LLCs.

298.    The actual justiciable controversy involves substantial legal interests.

299.    A declaratory judgment will serve the useful purpose of clarifying and settling the legal relations in issue between the parties.

45

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM        INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 47 of 67 RECEIVED NYSCEF: 07/26/2019

300.    The substantial controversy between the parties having adverse interests is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

301.    Plaintiffs will be irreparably harmed if, among other things, their rights and entitlement to relief under Section 8.3 of the Operating Agreements of these eight LLCs are not established and enforced.

302.    Plaintiffs have no adequate remedy at law.

303.    By reason of the foregoing, Plaintiffs are entitled to a judgment declaring that "decisions outside the ordinary course of business" under Section 8.3 of the Operating Agreements, which requires the affirmative vote of a majority in interest of the Members of these eight LLCs, include the following fundamental matters:  (a) distributions to the Members from these LLCs;  (b) capital improvements to the properties owned by these LLCs;  (c) setting of reserves for the properties owned by the LLCs; and (d) loans made to these LLCs.

**SIXTH CAUSE OF ACTION DERIVATIVELY ON BEHALF OF EACH
OF THE TEN LLCs AGAINST PINE MANAGEMENT FOR UNAUTHORIZED
PAYMENT OF "MANAGEMENT FEES" AND "CONSTRUCTION
MANAGEMENT FEES" AND UNAUTHORIZED LOANS**

304.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-268, inclusive, as if set forth herein.

305.    Plaintiffs bring this cause of action derivatively as a Member of each of the ten LLCs against Pine Management.

306.    Pine Management is the Manager of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty and Sir Realty.

307.    Pine Management is the de facto Manager of Marni Realty and Rudel Realty.

308.    None of the Operating Agreements of the LLCs expressly authorize the payment of fees or compensation to Pine Management as the Manager or in any other capacity.

46

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-1    Filed 08/30/22    Page 48 of 67
                                                           RECEIVED NYSCEF: 07/26/2019

309.    The Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc

Realty, RIS Realty, Bren-El Realty, JHJ Realty and Sir Realty state that "[t]he Company's initial

Manager [Manager] shall be Pine Management, Inc." and that "Pine Management, Inc. *may be*

*paid for services rendered in its role as property manager pursuant to a separate agreement with*

*the Company*." (Emphasis added).

310.    No separate agreement with Pine Management as a "property manager" was ever

approved or executed by the Members of the LLCs.

311.    Meister Seelig's December 7, 2018 letter confirmed that "there is no separate

written agreement between the respective LLCs and Pine Management for services rendered as

property manager." *See* Exhibit 8, p. 1.

312.    Any such "separate agreement" would require the "affirmative vote of a majority

in interest of the Members."

313.    Members of the LLCs that are affiliated with Pine Management such as Harold

Pine or his trusts, Thomas Rohlman or Brenda Rohlman, would not be able to vote on such

"separate agreement" because they are "interested" or "affiliated" within Pine Management

within the meaning of LLCL § 411.

314.    Furthermore, Section 8.10 of the Operating Agreements of Zizi Realty, Jeruth

Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty and Sir Realty

provide that "*the guaranteed payments and other compensation of the Manager, if any,* shall be

paid in such manner as shall be fixed from time to time *by a majority in interest of the Members*"

or the "Class A Members" in those situations where there are "Class A Members." (Emphasis

added).

47

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-1    Filed 08/30/22    Page 49 of 67    RECEIVED NYSCEF: 07/26/2019

315.    The Operating Agreements of these eight LLCs do not define "guaranteed payments" or otherwise explain the term "guaranteed payments."

316.    Section 8.10 further shows that the Members of these eight LLCs did not agree that Pine Management would receive "compensation" for its services as the Manager or "property manager."

317.    The 1996 Operating Agreements of Marni Realty and Rudel Realty contain no provision for payment of any fees or compensation to a "Manager" or a "property manager."

318.    The 1996 Operating Agreements of Marni Realty and Rudel Realty do not expressly provide for compensation to Pine Management as the "Manager," "property manager," or in any other capacity.

319.    As the Manager of the ten LLCs, Pine Management owed a duty of undivided and undiluted loyalty to the Members of these LLCs, barring not only self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty.

320.    Pine Management – without the approval of the Plaintiffs – has paid "management fees" and "construction management fees" from the ten LLCs to itself, which exceed $2.4 million for the years 2012 through June 30, 2019.

321.    On information and belief, Pine Management was paid approximately $1,959,789 in "management fees" from the ten LLCs for the years 2012 through June 30, 2019.

322.    On information and belief, the breakdown of these "management fees" in the total amount of $1,959,789 by year is as follows:

| | |
|------|---------|
| 2012 | 219,660 |
| 2013 | 239,886 |
| 2014 | 256,336 |
| 2015 | 280,164 |

48

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 2   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 50 of 67   RECEIVED NYSCEF: 07/26/2019

<pre>
2016   273,033
2017   272,465
2018   280,078
2019   138,176 (first six months)
</pre>

323.   On information and belief, Pine Management was paid approximately $537,330 in "construction management fees" from the ten LLCs for the years 2012 through June 30, 2019.

324.   On information and belief, the breakdown of these "construction management fees" in the total amount of $537,330 by year is as follows:

<pre>
2012   20,000
2013   20,000
2014   45,632
2015   55,000
2016   92,371
2017   160,289
2018   25,270
2019   118,768 (first six months)
</pre>

325.   On information and belief, the "construction management fees" for 2018 are substantially understated.

326.   Prior to March 13, 2019, Plaintiffs had no knowledge concerning the specifics of the "construction management fee."

327.   Prior to March 13, 2019, Plaintiffs were not aware that the "construction management fee" was paid to Pine Management.

328.   Prior to March 13, 2019, Plaintiffs were not aware of the percentage of the "construction management fee."

329.   On March 13, 2019, Pine Management disclosed for the first time that the "construction management fee" was at the rate of 7.5% of construction "hard costs" and that it was paid to Pine Management.

330.   Pine Management has no authority under the LLCL or the governing Operating Agreements of the LLCs to fix its own compensation or to pay itself "management fees,"

49

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 2  Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 51 of 67   RECEIVED NYSCEF: 07/26/2019

"construction management fees" or any other fees as "Manager," "property manager," or in any other capacity.

331.    Plaintiffs never approved the payment of "management fees," "construction management fees" or any other fees to Pine Management as "Manager," "property manager," or in any other capacity.

332.    Members who are affiliated with or have an interest in Pine Management cannot vote on "management fees" or "construction management fees" to be paid to Pine Management because such action would constitute self-dealing.

333.    By reason of the foregoing, Pine Management cannot be paid "management fees" or "construction management fees" or any compensation for its services unless approved by a vote of more than 50% of the disinterested Members of the LLCs.

334.    Since the Plaintiffs never voted on or approved the payment of "management fees," "construction management fees" or any other "compensation" to Pine Management, Pine Management has no right to receive such "fees" or "compensation" from the ten LLCs.

335.    Pine Management continues to pay itself "management fees" and "construction management fees" from the ten LLCs without the approval of the Plaintiffs.

336.    Each of the ten LLCs has sustained and continue to sustain damages by reason of Pine Management's unauthorized payment of "management fees" and "construction management fees" to itself.

337.    As noted, Holland & Knight's July 17, 2018 letter stated that Pine Management had no authority to pay itself fees or compensation from the ten LLCs. *See* Exhibit 1.

338.    Meister Selig's August 3, 2018 letter stated that "those claims [of Plaintiffs set forth in Holland & Knight's July 17, 2018 letter] are rejected in their entirety." *See* Exhibit 2.

50

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-1 Filed 08/30/22 Page 52 of 67

RECEIVED NYSCEF: 07/26/2019

Thus, Pine Management and the other members of the LLCs affiliated with or having an interest in Pine Management have rejected this derivative claim.

339. Without conceding that a demand is required in the particular circumstances of this claim, Plaintiffs are excused from making a demand because Pine Management is the entity charged with self-dealing and improperly paying itself "management fees" and "construction management fees" and certain Members of the LLCs are affiliated with or have an interest in Pine Management.

340. Accordingly, even if a demand were required, any such demand on the Members of the LLCs to institute this derivative claim would be futile.

341. By reason of the foregoing, the LLCs are entitled to damages against Pine Management, in an amount to be determined at trial, arising from the payment of "management fees" and "construction management fees" to Pine Management from the ten LLCs.

342. By reason of the foregoing, Pine Management is required to pay to the ten LLCs the amount of the "management fees" and "construction management fees" the ten LLCs paid to Pine Management for the last six years.

343. On information and belief, during the period September 2015 to June 2019, Pine Management approved $7,960,000 of loans to Zizi Realty, JHJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty.

344. On information and belief, the persons or entities that made these loans to Zizi Realty, JHJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty are affiliated with or have an interest in Pine Management.

345. On information and belief, the current outstanding balance on these loans is $7,810,000 because a loan of $150,000 to JHJ Realty was repaid.

51

**A-324**

346.    On information and belief, at least $554,129 of interest has been paid to the persons or entities who made the loans to such LLCs.

347.    No documentation concerning these loans was provided by Pine Management to Plaintiffs when these loans were approved by Pine Management.

348.    These loans were "outside the ordinary course of business" and needed to be approved by the affirmative vote of a majority in interest of the Members of Zizi Realty, JHJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty pursuant to the governing Operating Agreements as well as LLCL § 402(c)(2).

349.    Pine Management never consulted with or sought the approval of the Plaintiffs for entering into these loans.

350.    These loans were not approved by the affirmative vote of a majority in interest of the Members of the respective limited liability company.

351.    On information and belief, the interest rates on these loans were above market.

352.    By reason of the foregoing, the respective LLCs are entitled to damages against Pine Management in an amount to be determined at trial arising from Pine Management's failure to obtain approval of these loans by the affirmative vote of a majority in interest of the Members of Zizi Realty, JHJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty.

**SEVENTH CAUSE OF ACTION FOR A DECLARATORY JUDGMENT**

353.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-268, inclusive, and paragraphs 304-352, inclusive, as if set forth herein.

354.    Pine Management has no authority under the LLCL or the governing Operating Agreements of the ten LLCs to fix its own compensation or to pay itself "management fees," "construction management fees" or any other fees as "Manager," "property manager," or in any other capacity.

52

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 2   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 54 of 67

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

355.   Plaintiffs never approved the payment of "management fees," "construction management fees" or any other fees to Pine Management as "Manager," "property manager," or in any other capacity.

356.   Pine Management cannot be paid "management fees" or "construction management fees" or any compensation for its services unless approved by a vote of more than 50% of the disinterested Members of the ten LLCs.

357.   As noted, Holland & Knight's July 17, 2018 letter stated that Pine Management had no authority to pay itself fees or compensation from the ten LLCs. *See* Exhibit 1.

358.   As noted, Meister Selig's August 3, 2018 letter stated that "those claims [of Plaintiffs set forth in Holland & Knight's July 17, 2018 letter] are rejected in their entirety." *See* Exhibit 2. Thus, Pine Management and the other members of the LLCs affiliated with or having an interest in Pine Management have rejected Plaintiffs' position that Pine Management cannot pay itself "management fees" and "construction management fees."

359.   On information and belief, Pine Management is of the view that it can continue to pay itself "management fees" and "construction management fees" from the ten LLCs without obtaining the vote of more than 50% of the disinterested Members of the ten LLCs.

360.   Holland & Knight's July 17, 2018 letter also states that "the Pine/Rohlman Group cannot vote on the 'separate agreement' with Pine as the 'property manager' because they are 'interested' or 'affiliated' with Pine and thus cannot vote on their own agreement." *See* Exhibit 1, p. 6.

361.   As noted, Meister Seelig's December 7, 2018 letter concedes that "there is no separate written agreement between the respective LLCs and Pine Management for services rendered as property manager." *See* Exhibit 6.

**A-326**

362. On information and belief, Pine Management is of the view that persons "interested" or "affiliated" with Pine Management can vote on an agreement between Pine Management and Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty, Rudel Realty and Marni Realty.

363. A member of a limited liability company is "interested" in the transaction if he or she is an officer or director of another corporation or entity involved in the transaction.

364. A member of a limited liability company is "interested" in the transaction when that member receives a direct financial benefit from the transaction that is different from the benefit received generally by all members of such limited liability company.

365. A member of a limited liability company is "interested" in the transaction even though that member has no personal interest in the transaction where the member is controlled by a director or other person who has an interest in the transaction.

366. Thomas Rohlman, as the Chief Executive Officer of Pine Management, is "interested" in a transaction between these ten LLCs and Pine Management and thus cannot vote as a Member on such transaction.

367. Brenda Rohlman, as an officer or employee of Pine Management, is "interested" in a transaction between these ten LLCs and Pine Management and thus cannot vote as a Member on such transaction.

368. On information and belief, the Harold Pine 2009 Family Trust and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, has an interest or is affiliated with Pine Management and thus cannot vote as a Member on a transaction between these ten LLCs and Pine Management.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 56 of 67
                                                           RECEIVED NYSCEF: 07/26/2019

369.    On information and belief, the Sydell Pine 2009 Family Trust, and its Trustees, has an interest or is affiliated with Pine Management and thus cannot vote as a Member on a transaction between these ten LLCs and Pine Management.

370.    By reason of the foregoing, Thomas Rohlman, Brenda Rohlman, individually or as Trustees of the Harold Pine 2009 Family Trust, and the Sydell Pine 2009 Family Trust, and its Trustees, are or may be "interested" in a transaction between these ten LLCs and Pine Management and thus cannot vote as a Member on such transaction.

371.    There is a real dispute between Plaintiffs and Pine Management involving substantial legal interests in these ten LLCs for which a declaration of rights will have some practical effect.

372.    An actual justiciable controversy exists with respect to the Members of these ten LLCs as to who can vote on a proposed agreement between these LLCs and Pine Management.

373.    The actual justiciable controversy involves substantial legal interests.

374.    A declaratory judgment will serve the useful purpose of clarifying and settling the legal relations in issue between the parties.

375.    The substantial controversy between the parties having adverse interests is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

376.    Plaintiffs will be irreparably harmed if, among other things, their rights and entitlement to relief as Members of these ten LLCs are not established and enforced.

377.    Plaintiffs have no adequate remedy at law.

378.    By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment declaring that Pine Management cannot pay itself "management fees," "construction management fees" or any other "compensation" in its role as Manager, "property manager" or in

55

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 2 Case 1:22-cv-02407-MKV Document 27-1 Filed 08/30/22 Page 57 of 67 RECEIVED NYSCEF: 07/26/2019

any other capacity from the revenues of the respective LLCs without the approval of a majority in interest of the Members of each of the ten LLCs, taking into account that Members affiliated with or having an interest in Pine Management cannot vote on a transaction involving these ten LLCs and Pine Management.

### EIGHTH CAUSE OF ACTION FOR BREACH
### OF FIDUCIARY DUTY AGAINST PINE MANAGEMENT

379. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-378, inclusive, as if set forth herein.

380. Pine Management, as the appointed Manager of eight of the LLCs, owes a fiduciary duty to those Plaintiffs that are non-managing Members of these LLCs.

381. Pine Management, as the de facto Manager of Marni Realty and Rudel Realty, owes a fiduciary duty to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, the non-managing Members of these LLCs.

382. LLCL § 409(a) provides that a "manager shall perform his or her duties as a manager, including his or her duties as a member of any class of managers, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances."

383. Under New York law, this fiduciary duty is a duty of undivided and undiluted loyalty. which requires the Manager to operate the limited liability company in good faith and fairness, to avoid self-dealing and to make full disclosure of all material facts.

384. The Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty and Sir Realty expressly recognize the fiduciary duty owed by Pine Management to the Members.

56

385.    Section 17.2 of the Operating Agreements of these eight LLCs states that "[n]otwithstanding anything otherwise herein contained to the contrary, *no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.*" (Emphasis added).

386.    Under New York law, a manager of a limited liability company can be held liable for breach of fiduciary duty where it commits acts that are contrary or inconsistent with his "duty of undivided and undiluted loyalty," fails to disclose material facts, or engages in misconduct or self-dealing.

387.    A Manager cannot use his power to benefit himself at the expense of the LLC.

388.    A Manager of an LLC is bound by LLCL § 411, which addresses conflicts of interest by an LLC decision maker.

389.    Limited Liability Company Law § 411 disallows a transaction between a limited liability company and one or more of its managers, or with another business entity in which one or more of its managers has a substantial financial interest.

390.    Pine Management has breached its duty of full disclosure to the Plaintiffs by failing to provide material information to the Plaintiffs.

391.    Pine Management's breaches of fiduciary duty arise from its failure to comply with the provisions of the governing Operating Agreements, the payment of "management fees" and "construction management fees" from the ten LLCs to Pine Management without the requisite approvals by the Members of the LLCs, its failure to disclose almost $8 million of loans to certain of the LLCs that they approved on behalf of the respective LLCs, its failure to obtain the requisite approvals for such loans under the governing Operating Agreements as well as

57

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22    RECEIVED NYSCEF: 07/26/2019

LLCL § 402(c)(2), its failure to abide by conflict of interest rules and its failure to produce documents requested by the Plaintiffs.

392.    As a result of Pine Management's breaches of fiduciary duties, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial.

393.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial for Pine Management's breaches of fiduciary duty.

## NINTH CAUSE OF ACTION FOR INSPECTION OF BOOKS AND RECORDS UNDER LIMITED LIABILITY COMPANY LAW AND THE OPERATING AGREEMENTS OF THE LLCs

394.    Plaintiffs repeat and reallege allegations in paragraphs 1-393, inclusive, as if set forth herein.

395.    As set forth above, Plaintiffs are members of Zizi Realty LLC, Jeruth Realty LLC, Bar-Mar Realty LLC, Marc Realty LLC, RIS Realty LLC, Bren-El Realty LLC, JHJ Realty LLC, Sir Realty LLC, Marni Realty LLC and Rudel Realty LLC.

396.    Section 1102(a) of the LLCL provides that each domestic limited liability company is required to maintain the records identified in Section 1102(a)(1)-(5), inclusive.

397.    Section 1102(a)(5) of the LLCL provides that a domestic limited liability company "shall maintain" a "copy of the limited liability company's federal, state and local income tax or information returns and reports, if any, for the three most recent fiscal years."

398.    Section 1102(b) of the LLCL grants inspection rights to a member of a domestic limited liability company. Specifically, Section 1102(b) provides:

> Any member may, subject to reasonable standards as may be set forth in, or pursuant to, the operating agreement, inspect and copy at his or her own expense, for any purpose reasonably related to the member's interest as a member, the records referred to in subdivision (a) of this section, any financial statements maintained by the limited liability company for the three most recent fiscal

58

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM       INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 60 of 67
                                                                          RECEIVED NYSCEF: 07/26/2019

> years *and other information regarding the affairs of the limited
> liability company as is just and reasonable.* (Emphasis added).

399.    The Operating Agreements of the LLCs also require the respective limited

liability company to maintain specific records.

400.    Section 14.1 of the Operating Agreement for the LLCs other than Marni Realty

and Rudel Realty provides:

> The manager shall keep or cause to be kept complete and accurate
> books with respect to the Company's business. The Company's
> books at all times shall be maintained at the Company's principal
> office. *Each Member, Manager or their duly authorized
> representative shall have the right to examine the Company's
> books and records at reasonable times upon reasonable prior
> notice to the Company.* (Emphasis added).

401.    These inspection rights are broader than those provided in LLCL §§ 1102(a) and

(b) and includes all types of documents with respect to the LLCs.

402.    Section 5.1 of the 1996 Operating Agreements of Marni Realty and Rudel Realty

provides that "the business and affairs of the Company shall be managed by the Members."

403.    As a result of Section 5.1, the Jerome Schneider Revocable Trust and the Ruth

Schneider Revocable Trust, owning an aggregate 50% interest in Marni Realty and Rudel Realty,

have the right to review all documents relating to these limited liability companies, in addition to

their inspection rights under the LLCL.

404.    These inspection rights are broader than those provided in LLCL §§ 1102(a) and

(b) and includes all types of documents with respect to these two LLCs.

405.    Prior to July 17, 2018, Plaintiffs requested that Pine Management transmit

documents relating to the LLCs on a regular and periodic basis.

406.    Pine Management did not transmit documents relating to the LLCs on a regular

and periodic basis to the Plaintiffs.

59

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.     Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 61 of 67   RECEIVED NYSCEF: 07/26/2019

407.    On many occasions, Pine Management produced documents only after one or more of the Plaintiffs requested such documents.

408.    At other times, Pine Management refused to produce the requested documents. For example, by an e-mail, dated March 3, 2018, Brenda Rohlman of Pine Management refused the Plaintiffs' "request for capital expenditures over the past five years for each apartment in the buildings you and your family has a membership interest in," stating that "Pine Management Inc. is not spending the time to go backwards over the past five years to complete this list." *See* Exhibit 18.

409.    By a letter dated July 17, 2018 to Meister Seelig (*see* Exhibit 1 hereto), Holland & Knight, on behalf of the Plaintiffs, requested that Pine Management produce the following documents relating to the LLCs for the last six (6) years (2012-2018):

    (1) the "separate agreement" between the respective limited liability company and Pine Management for services rendered as the "property manager" and any amendments thereto and documents constituting the approval of such "separate agreement;"

    (2) documents showing monies paid to Pine Management as the "Manager" of the respective limited liability company and the approval of monies paid or to be paid to the Manager;

    (3) documents showing monies paid to Pine Management as the "Property Manager" of the respective limited liability company, the approval of monies paid or to be paid to the Property Manager and the basis and methodology for the calculation of the "management fee" and "construction management fee;"

    (4) documents showing the "financial condition" of the limited liability company, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals and General Ledgers;

    (5) documents showing the basis for the calculations for the amount of distributions to the members of the limited liability company;

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM       INDEX NO. 654303/2019
NYSCEF DOC. NO. 2   Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 62 of 67   RECEIVED NYSCEF: 07/26/2019

(6)   documents showing the capital improvements to the property and payments relating to such capital improvements;

(7)   documents relating to or constituting the basis or methodology on which the Manager or Property Manager is setting reserves for the underlying property, including Pine Management's "guidelines," if any, for such reserve accounts;

(8)   documents constituting or relating to renovations to the apartments at the property;

(9)   documents concerning or related to payments by the respective limited liability company to persons or entities related or affiliated with Pine Management; and

(10)   Written consents, if any, reflecting actions taken by the Manager or Members of the LLC's.

410.   On or about October 25, 2018, Pine Management produced three (3) boxes of documents for Plaintiffs to inspect at the offices of Meister Seelig & Fein, 125 Park Avenue, 7th Floor, New York, New York 10017.

411.   Although Pine Management produced some responsive documents, it did not produce documents responsive to many of the ten categories of documents listed in Holland & Knight's July 17, 2018 letter.

412.   By a letter, dated November 20, 2018 to Meister Seelig, Holland & Knight set forth the many deficiencies in Pine Management's document production on October 25, 2018.

413.   Although Pine Management produced some additional documents after November 20, 2018, Pine Management has not produced many of the documents listed in Holland & Knight's November 20, 2018 letter.

414.   Pine Management's refusal to produce the requested documents reflects Pine Management's continued tactic of keeping the Plaintiffs "in the dark."

61

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-1 Filed 08/30/22 Page 63 of 67 RECEIVED NYSCEF: 07/26/2019

415. By reason of §1102(b) of the Limited Liability Company Law and the applicable sections in the Operating Agreements of the LLCs, Plaintiffs have a statutory and contractual right to inspect the books and records of the limited liability companies of which they are Members.

416. By reason of the foregoing, Plaintiffs are entitled to an order directing that Pine Management produce all documents reflecting the financial condition and affairs of each of the LLCs for the last six years, including, but not limited, to: (1) financial statements and tax returns for the last six (6) years; and (2) all documents relating to (a) capital improvements for each of the properties owned by the LLCs, including invoices and supporting documentation for such capital improvements, (b) the setting of cash reserves for each of the properties owned by the LLCs, (c) payments of monies by the LLCs to Pine Management or any affiliate, entity or person related to Pine Management and (d) loans made to the LLCs, including the approval of such loans.

**TENTH CAUSE OF ACTION FOR AN ACCOUNTING OF THE LLCs**

417. Plaintiffs repeat and reallege allegations in paragraphs 1-416, inclusive, as if set forth herein.

418. As noted, Plaintiffs are members of Zizi Realty, Jeruth Realty, Bar-Mar Realty, Marc Realty, RIS Realty, Bren-El Realty, JHJ Realty Sir Realty, Marni Realty and Rudel Realty.

419. A fiduciary relationship exists between the Manager of a limited liability company and the Members of such limited liability company.

420. Pine Management, as the Manager of Zizi Realty LLC, Jeruth Realty LLC, Bar-Mar Realty LLC, Marc Realty LLC, RIS Realty LLC, Bren-El Realty LLC, JHJ Realty LLC, and Sir Realty LLC, owes a fiduciary duty to the Plaintiffs in their capacity as Members of the LLCs.

62

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-1   Filed 08/30/22   Page 64 of 67
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

421.   Pine Management, as the de facto Manager of Marni Realty and Rudel Realty, owes a fiduciary duty to the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust in their capacity as Members of such limited liability companies.

422.   Under New York law, a member of a limited liability company has the right to an equitable accounting.

423.   Plaintiffs have no adequate remedy at law.

424.   By their counsel's August 3, 2018 letter, Pine Management rejected Plaintiffs' claims, including their claim for an accounting. (*See* Exhibit 2).

425.   In any event, Plaintiffs are excused from making a demand because Pine Management is the party charged with breaching its contractual duties and fiduciary duties to the Plaintiffs and certain members of the LLCs are affiliated with or have an interest in Pine Management.

426.   Plaintiffs, as members of the LLCs, are entitled to an accounting of the LLCs.

427.   By reason of the foregoing, Plaintiffs are entitled to an accounting of each of the LLCs for the period July 26, 2013 through the present.

WHEREFORE, Plaintiffs respectfully demand judgment as follows:

(1)   On the First Cause of Action, awarding Plaintiffs money damages in an amount to be determined at trial, together with prejudgment interest, against Pine Management arising from Pine Management's breaches of the Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and Marc Realty;

(2)   On the Second Cause of Action, awarding the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust money damages in an amount to be determined at trial, together with prejudgment interest, against Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, of the Operating Agreements of Marni Realty and Rudel Realty;

(3)   On the Third Cause of Action, a preliminary and permanent injunction enjoining Pine Management from taking any actions "outside the ordinary course of business" without the affirmative vote of a majority in interest of the Members of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and Marc Realty, including, but not

63

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO.     Case 1:22-cv-02407-MKV    Document 27-1    Filed 08/30/22    Page 65 of 67

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

limited to, the following actions: (a) approval of capital improvements for the individual property owned by the respective LLC; (b) setting of reserves for the individual property owned by the respective LLC; (c) deciding on the amount of distributions from the respective LLC to the Members; and (d) approval of loans to the respective LLC;

(4)     On the Fourth Cause of Action, a preliminary and permanent injunction enjoining Pine Management and Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine 2009 Family Trust, from taking any actions with respect to the management of Marni Realty and Rudel Realty without the consent of the Jerome Schneider Revocable Trust and the Ruth Schneider Revocable Trust, including, but not limited to, the following actions: (a) payment of "management fees," "construction management fees," or any compensation to Pine Management as Manager, "property manager" or in any other capacity; (b) capital improvements for the individual property owned by the respective limited liability company; (c) setting of reserves for the individual property owned by the respective limited liability company; (d) the amount of distributions from the respective limited liability company to the Members; and (e) loans to the respective limited liability company;

(5)     On the Fifth Cause of Action, a judgment declaring that "decisions outside the ordinary course of business" under Section 8.3 of the Operating Agreements of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty and Marc Realty, which requires the affirmative vote of a majority in interest of the Members of these eight LLCs, include the following fundamental matters:  (a) distributions to the Members from these LLCs; (b) capital improvements to the properties owned by these LLCs; (c) setting of reserves for the properties owned by the LLCs; and (d) loans made to these LLCs;

(6)     On the Sixth Cause of Action, awarding money damages in an amount to be determined at trial, together with prejudgment interest, in favor of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty, Marc Realty, Marni Realty and Rudel Realty and against Pine Management arising from (a) the payment of "management fees" and "construction management fees" from these ten LLCs to Pine Management and (b) Pine Management's failure to obtain approval of certain loans by the affirmative vote of a majority in interest of the Members of Zizi Realty, JHJ Realty, Sir Realty, Marc Realty and Bar-Mar Realty;

(7)     On the Seventh Cause of Action, a judgment declaring that Pine Management cannot pay itself "management fees," "construction management fees" or any other "compensation" in its role as Manager, "property manager" or in any other capacity from the revenues of the respective LLCs without the approval of a majority in interest of the Members of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty, Marc Realty, Marni Realty and Rudel Realty, taking into account that Members affiliated with or having an interest in Pine Management cannot vote on a transaction involving these ten LLCs and Pine Management;

(8)     On the Eighth Cause of Action, awarding Plaintiffs money damages in an amount to be determined at trial, together with prejudgment interest, against Pine Management arising from Pine Management's breaches of fiduciary duty;

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-1 Filed 08/30/22 Page 66 of 67

(9)     On the Ninth Cause of Action, an order directing that Plaintiffs be permitted to inspect all documents reflecting the financial condition and affairs of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty, Marc Realty, Marni Realty and Rudel Realty for the last six years, including, but not limited, to: (1) financial statements and tax returns; and (2) documents relating to (a) capital improvements for each of the properties owned by the LLCs, (b) the setting of cash reserves for each of the properties owned by the LLCs, (c) payments of monies to Pine Management or any affiliate, entity or person related to Pine Management and (d) loans made to the LLCs, including the approval of such loans;

(10)     On the Tenth Cause of Action, a Judgment directing that Plaintiffs are entitled to an accounting of Zizi Realty, Jeruth Realty, Bar-Mar Realty, RIS Realty, Bren-El Realty, JHJ Realty, Sir Realty, Marc Realty, Marni Realty and Rudel Realty for the last six years;

(11)     On all of the Causes of Action, awarding the Plaintiffs and the derivative plaintiffs their costs and expenses, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
        July 26, 2019

HOLLAND & KNIGHT LLP
*Attorneys for Plaintiffs*

By: *Mitchell J. Geller*
        Mitchell J. Geller

31 West 52nd Street
New York, New York 10019
(212) 513-3200
mitchell.geller@hklaw.com

#69360221_v1

65

## VERIFICATION

STATE OF NEW YORK          )
                          : ss.:
COUNTY OF WESTCHESTER      )

MARC SCHNEIDER, being duly sworn, deposes and says:

I am one of the Plaintiffs named in the foregoing Verified Complaint. I have read the foregoing Verified Complaint and know the contents thereof. The same is true according to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters I believe them to be true. My knowledge and the grounds of my belief also are based on various documents, including the documents that are annexed as exhibits to the Verified Complaint.

MARC SCHNEIDER

Sworn to before me this
26th day of July 2019

Notary Public

RITA ROSS
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01RO6303032
Qualified in Westchester County
Commission Expires May 12, 2022

#69321368_v1

# EXHIBIT A-1

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019

NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 07/26/2019

# Exhibit 1

**A-341**

Case 1:22-cv-02407-MKV   Document 27-2   Filed 08/30/22   Page 3 of 15
INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Mitchell J. Geller
(212) 513-3483
mitchell.geller@hklaw.com

BY OVERNIGHT COURIER AND E-MAIL

July 17, 2018

Bob G. Goldberg, Esq.
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, New York 10017

Re: Interests of Schneider/Schwartz Group in Limited Liability Companies

Dear Mr. Goldberg:

We represent Jerome Schneider, Ruth Schneider, Marc Schneider, Marni Schwartz, the Jerome Schneider 2012 Family Trust dated December 10, 2012 ("Jerome Schneider Trust") and the Ruth Schneider 2012 Family Trust dated December 10, 2012 ("Ruth Schneider Trust")(collectively the "Schneider/Schwartz Group") in connection with their respective interests in Rudel Realty LLC, Marni Realty LLC, RJS Realty LLC, Marc Realty LLC, Bar-Mar Realty LLC, SIR Realty LLC, Jeruth Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Zizi Realty LLC (collectively "LLC's"), each a New York limited liability company.

The purpose of this letter is to advise you of claims by the Schneider/Schwartz Group against Pine Management, Inc. ("Pine") and those affiliated with Pine arising from Pine's management of the LLC's. As shown below, our examination of the 1996 Operating Agreements of Rudel Realty LLC and Marni Realty LLC ("1996 Operating Agreement"), the 2011 Amended and Restated Operating Agreements for the other eight LLC's ("2011 Amended Operating Agreement") and the relevant documents, including various e-mails and documents reflecting the revenue and expenses of the underlying properties held by the LLC's, [arguably] show, among other things, that: (a) Pine has breached its fiduciary duty to the Schneider/Schwartz Group and has not acted in good faith; (b) Pine has breached provisions of the governing Operating Agreements; (c) Pine has failed to disclose material facts to the Schneider/Schwartz Group; (d) Pine has been involved in related party transactions; and (e) Pine has failed to provide key documents concerning the management and operations of the LLC's to the Schneider/Schwartz Group.

Indeed, the facts demonstrate that Pine and individuals associated or affiliated with Pine have kept the Schneider/Schwartz Group "in the dark" concerning certain key facts and documents concerning Pine's management of the LLC's, has oppressed the Schneider/Schwartz Group and

Anchorage | Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Houston | Jacksonville | Lakeland
Los Angeles | Miami | New York | Orlando | Portland | San Francisco | Stamford | Tallahassee | Tampa | Tysons
Washington, D.C. | West Palm Beach

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV   Document 27-2   Filed 08/30/22   Page 4 of 15   RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 2

has done everything in their power to entrench themselves and to exclude the Schneider/Schwartz Group from exercising their rights as members of the LLC's, in many of which they have a 50% interest.

Nothing better exemplifies Pine's attempt to oppress the Schneider/Schwartz Group and to entrench Pine's management of the LLC's than their attempt to amend the operating agreements to include a provision that "any Manager may be removed at any time, with or without cause, *by the unanimous vote of the members if the Manager hereunder is Pine Management, Inc., Harold Pine, any descendant of Harold and Sydell Pine, or any spouse of any such descendant."* (Emphasis added). The sole and clear purpose of such an amendment is to prevent the Schneider/Schwartz Group from removing Pine, Harold Pine or any descendant of Harold and Sydell Pine or any spouse thereof, including Harold Pine, Brenda Rohlman, Daniel Rohlman, Jason Rohlman, Ilyse Rohlman, Lloyd Pine and Tom Rohlman (the "Pine/Rohlman Group"), from management of the LLC's. In short, the only purpose of such provision was to make Pine the Manager of the LLC's in perpetuity. Given the serious issues arising from Pine's management of the LLC's described below, the inclusion of such a provision would not only further entrench Pine in the management of the LLC's but result in further exclusion of the Schneider/Schwartz Group in the LLC's.

Before we address Pine's breaches of the Operating Agreements, Pine's breaches of fiduciary duty and Pine's self-dealing, we believe that it is instructive to set forth certain key principles that govern the management of limited liability companies. We include this detailed examination of New York law on a member's claims against a manager or managing member and a member's rights under the New York Limited Liability Company Law ("LLCL") to expedite your analysis of our clients' claims and to bring about a mutually satisfactory resolution of these claims without having to commence litigation that would be costly to all parties involved. At the very least, based on the detailed exposition of New York law, the facts and the issues, there are many serious issues arising from Pine's management of the LLC's and such claims should survive a motion to dismiss and a motion for summary judgment.

## I. Principles Applicable To The Management Of A Limited Liability Company And Claims Against The Manager

The LLCL governs limited liability companies formed under New York law. The terms of the operating agreement determine the rules applicable to the rights, management and operations of that limited liability company. *See Matter of 1545 Ocean Avenue, LLC*, 72 A.D.3d 121, 128 (2d Dep't 2010). The operating agreement also governs the relationships among members and the powers and authority of the members and manager. *See LNYC Loft, LLC v. Hudson Opportunity Fund I, LLC*, 154 A.D.3d 109 (1st Dep't 2017). Where an operating agreement does not address certain topics, a limited liability company is bound by the default requirements set forth in the LLCL. *1545 Ocean Avenue*, 72 A.D.3d at 129; *Manitaras v. Beusman*, 56 A.D.3d 735, 736 (2d Dep't 2008).

**A-343**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-2 Filed 08/30/22 Page 5 of 15

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 3

A.   Claims Against Manager or Managing Member For Breach of Fiduciary Duty

LLCL § 409 (a), which imposes a statutory fiduciary duty on managers of limited liability companies, provides:

> A manager shall perform his or her duties as a manager, including his or her duties as a member of any class of managers, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

Under New York law, a manager or a managing member of a limited liability company owes a fiduciary duty to the non-managing members of such entity. *See, e.g., DeBenedictis v. Malta,* 140 A.D.3d 438 (1st Dep't 2016); *Pokoik v. Pokoik,* 115 A.D.3d 428, 429-432 (1st Dep't 2014). This fiduciary duty is a "duty of undivided and undiluted loyalty" and "is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum v. Birnbaum,* 73 N.Y.2d 461, 466 (1989). A manager also owes a member a "fiduciary duty to make full disclosure of all material facts." *Salm v. Feldstein,* 20 A.D.3d 469, 470 (2d Dep't 2005).

In *Bookhamer v. I. Karten-Bermaha Textiles Co., L.L.C.* 52 A.D.3d 246, 246 (1st Dep't 2008), the Appellate Division, citing *Birnbaum v. Birnbaum,* stated that the fiduciary duty required the 50% managing member "to operate the company in good faith and fairness, to avoid self-dealing and to make full disclosure of all material facts." *See also Nathanson v. Nathanson,* 20 A.D.3d 403, 404 (2d Dep't 2005) (allegations that manager engaged in self-dealing sufficient to state a cause of action for breach of fiduciary duty); *Sherman v. Mulerman,* 58 Misc.3d 1211(A) (Sup. Ct. Kings Co., Jan. 18, 2018) (allegations of defendant's self-dealing and freezing plaintiff out of decision making process sustained).

The 2011 Amended Operating Agreement of eight of the LLC's expressly recognizes the fiduciary duty owed by the Manager to the Members. Indeed, Section 17.2 states that "[n]otwithstanding anything otherwise herein contained to the contrary, *no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.*" (Emphasis added).

In short, under New York law, a manager or managing member of a limited liability company can be held liable for breach of fiduciary duty where it commits acts that are contrary or inconsistent with his "duty of undivided and undiluted loyalty," fails to disclose material facts, or engages in misconduct or self-dealing.

B.   Conflicts Of Interest Under The LLCL

A manager of an LLC is bound by LLCL § 411, which addresses conflicts of interest by an LLC decision maker. *See Tzolis v Wolff,* 39 A.D.3d 138, 145-46 (1st Dep't 2007) ("Limited

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-2    Filed 08/30/22    Page 6 of 15
                                                                   RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 4

Liability Company Law § 411 disallows a transaction between a limited liability company and one
or more of its managers, or with another business entity in which one or more of its managers has
a substantial financial interest."), *aff'd*, 10 N.Y.3d 100 (2008).

C.  Member's Inspection Rights Under LLCL

LLCL § 1102(b) grants inspection rights to a member of a New York limited liability
company:

> Any member may, subject to reasonable standards as may be set
> forth in, or pursuant to, the operating agreement, inspect and copy
> at his or her own expense, for any purpose reasonably related to the
> member's interest as a member, the records referred to in subdivision
> (a) of this section, *any financial statements* maintained by the
> limited liability company for the three most recent fiscal years *and
> other information regarding the affairs of the limited liability
> company as is just and reasonable.* (Emphasis added).

Under LLCL § 1102(b), a court can direct the manager of the limited liability company to
provide "any financial statements maintained by the limited liability company for the three most
recent fiscal years" and "other information regarding the affairs of the limited liability company
as is just and reasonable."

We note that Section 14.1 of the 2011 Amended Operating Agreement for eight (8) of the
LLC's provides:

> The manager shall keep or cause to be kept complete and accurate
> books with respect to the Company's business. The Company's
> books at all times shall be maintained at the Company's principal
> office. *Each Member*, Manager or their duly authorized
> representative *shall have the right to examine the Company's books
> and records at reasonable times upon reasonable prior notice to the
> Company.* (Emphasis added).

Thus, the inspection rights to examine the "Company's books and records" under Section
14.1 of the 2011 Amended Operating Agreement are broader than the inspection rights under
LLCL § 1102(a) and includes all types of documents with respect to the LLC's. The courts have
uniformly enforced a member's inspection rights under LLCL § 1102(b) and the governing
operating agreement. *See, e.g., Sachs v. Adeli*, 26 A.D.3d 52, 55-57 (1st Dep't 2005); *Greenberg
v. Falco Construction Corp.*, 29 Misc.3d 1202(A), 2010 WL 3781279, *7 (Sup. Ct. Kings Co.
Sept. 29, 2010).

**A-345**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-2 Filed 08/30/22 Page 7 of 15 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 5

D.    Claim For An Accounting

New York law holds that a member of a limited liability company has the right to an equitable accounting under common law. *See Gottlieb v. Northriver Trading Co LLC*, 58 A.D.3d 550, 551 (1st Dep't 2009); *East Quogue Jet LLC v. East Quogue Members, LLC*, 50 A.D.3d 1089, 1091 (2d Dep't 2008); *Gallagher v. Crotty*, 2017 WL 3314241, **2, 4 (Sup. Ct. New York Co., Aug. 3, 2017).

**II.   Schneider/Schwartz Group's Claims Against Pine**

We now address the Schneider/Schwartz Group's claims against Pine arising from Pine's management of the LLC's.  These claims broadly fall into four categories:

(1)    Pine's management of eight of the LLC's without obtaining the written approval of the Schneider/Schwartz Group of the "agreement" with the "property manager" and Pine's management of Marni Realty LLC and Rudel Realty LLC when the 1996 Operating Agreement (Section 5.1) provides that that "the business and affairs of the Company shall be managed by the Members." This claim also includes Pine's payment of fees to itself without obtaining the approval of the Schneider/Schwartz Group and Pines' self-dealing;

(2)    Pine's making of decisions which are outside the "ordinary course of business" and therefore require the approval of the Schneider/Schwartz Group such as (a) the setting of cash reserves that are a departure from historical practices of the LLC's or that are in excess of what is required for day to day operations, (b) the making of capital improvements that are not required for health or safety purposes and (c) the incurring of loans relating to the buildings owned by the LLC's;

(3)    Pine's decision to substantially reduce the distributions from the LLC's to the members without the approval of the Schneider/Schwartz Group, which reduction is a material change in the historical practice of significant distributions to the members of each of the LLC's; and

(4)    Pine's failure to produce certain documents requested by the Schneider/Schwartz Group or to provide explanations of amounts appearing in documents produced.

A.   Pine's Management Of Eight Of The LLC's Without Obtaining
The Approval Of The Schneider/Schwartz Group Of The
"Agreement" With The "Property Manager"_____

Section 8.1(c) of the 2011 Amended Operating Agreements states as follows:

The Company's *initial manager* shall be Pine Management Inc. Pine Management, Inc. *may be paid for services rendered in* its *role as*

**A-346**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-2   Filed 08/30/22   Page 8 of 15   RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 6

> *property manager pursuant to a separate agreement with the
> Company.*" (Emphasis added).

Although the members of each of the eight limited liability companies that adopted the 2011 Amended Operating Agreement agreed that Pine would be the "initial" Manager of each such entity, the "separate agreement with the property manager" is not annexed to each 2011 Amended Operating Agreement. Significantly, our clients advise us that they have never seen the "separate agreement" with the Pine as "property manager" and certainly never approved the "separate agreement."

Moreover, the "separate agreement" with Pine as "property manager" requires the "affirmative vote of a majority in interest of the Members." In addition, the Pine/Rohlman Group cannot vote on the "separate agreement" with Pine as the "property manager" because they are "interested" or "affiliated" with Pine and thus cannot vote on their own agreement. Here, the Schneider/Schwartz Group was never presented with a copy of the "separate agreement" with the "property manager," and thus was not and is not aware of the terms of such "separate agreement," including, but not limited to, the terms of compensation paid to Pine as the "property manager." As a result, the Schneider/Schwartz Group would have the power to disallow or terminate the "separate agreement" with Pine as the "Property Manager" if in fact such an agreement had been executed. See LLCL § 411.

Particularly instructive is *Tzolis v. Wolff*, 39 A.D.3d 138, 145-146 (1st Dep't 2007), *aff'd*, 10 N.Y.3d 100 (2008), where the First Department sustained claims by minority members of a limited liability company, holding:

> *In any event, regardless of whether a majority, two-thirds, or a
> unanimous vote was required, Limited Liability Company Law § 411
> disallows a transaction between a limited liability company and one
> or more of its managers, or with another business entity in which
> one or more of its managers has a substantial financial interest.*
> Therefore, plaintiffs have alleged a viable cause of action which the
> documentary evidence does not refute. (Emphasis added).

The same result was reached in *Meyer v. Montauk U.S.A., LLC*, 2017 WL 6387947 (Sup. Ct. Suffolk Co., May 9, 2017). There, the manager asserted that he had authority under the operating agreement to approve an agreement with the limited liability company under which he assigned certain revenues from a licensing agreement to himself. The Supreme Court rejected the manager's contentions and deemed the licensing agreement void, invalid and of no force and effect. *Id.* at **5-6.

The foregoing cases show that courts will closely scrutinize contracts between a limited liability company and a business entity in which its manager has an interest and that such contracts will be disallowed. Simply put, the Pine/Rohlman Group or Pine itself cannot approve the "separate agreement" with Pine as the "property manager." Given Pine's utter failure to produce

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 2    Case 1:22-cv-02407-MKV   Document 27-2   Filed 08/30/22   Page 9 of 15 RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 7

the "separate agreement" and Pine's failure to submit the "separate agreement" to the Schneider/Schwartz Group, let alone obtain its approval, the "separate agreement" with Pine has no validity.

In the case of Marni Realty LLC and Rudel Realty LLC, the 1996 Operating Agreement does not appoint Pine Management as the "Manager" or as the "Property Manager." Assuming that Pine Management has been *de facto* serving as the "Manager" and the "Property Manager" for these two entities for the last several years, the Jerome Schneider Trust and the Ruth Schneider Trust (that collectively own 50%), under Section 5.1 of the 1996 Operating Agreement, have the right to "co-manage" these entities. As a result, Pine has no entitlement to serve as the "Manager" or the "Property Manager" and Marni Realty LLC and Rudel Realty LLC.

(1)     Pine Has No Authority To Pay Itself Fees Without
        The Approval of the Schneider/Schwartz Group

Furthermore, Pine has no authority to pay itself fees without the approval of the Schneider/Schwartz Group, who has a 50% interest in five of the LLC's, a 25% interest in three of the LLC's, and a 33% interest and a 30% interest in the remaining two LLC's. The "Summary of Receipts and Disbursements 12/31/17" produced by Pine for the LLC's indicate that Pine is paid a "management fee" and a "construction management fee." The "Building P&Ls" indicate that "Total Management Fees" of $622,742 were paid to Pine in 2017 for the LLC's excluding Bar- Mar Realty, LLC.

Suffice it to say, Pine has no authority under the 2011 Amended Operating Agreement to fix its own compensation. Indeed, Section 8.10 of the 2011 Amended Operating Agreement, in clear and unambiguous language, indicates that the "the guaranteed payments and other compensation of the Manager, if any," must be approved "by the affirmative vote of a majority in interest of the Members." Thus, Pine cannot receive any "compensation" for its services unless approved by the vote of more than 50% of the members of the limited liability companies, without taking into the vote of the "interested" members. Given that the Schneider/Schwartz Group has never voted on the "compensation" of Pine, let alone approved such "compensation," Pine has no right to receive fees for its services in connection with its management of the LLC's.

This conclusion equally applies to the 1996 Operating Agreement of Marni Realty LLC and Rudel Realty LLC which contain no provision for the compensation of Pine or any other member involved in managing such entities. Given that Section 5.01 of the 1996 Operating Agreement provides that that "the business and affairs of the Company shall be managed by the Members," the "Members" of Marni Realty LLC and Rudel Realty LLC must approve any compensation paid to a "Manager."

Furthermore, Pine has no authority under the LLCL to fix its own compensation. *See Bookhamer v. I. Karten -Bermaha Textiles, Co. L.L.C.*, 2007 WL 6787899 (Sup. Ct. New York Co. Mar. 29, 2007), *aff'd,* 52 A.D.3d 246 (1st Dep't 2008) (rejecting defendant's claim that his 50% stake in the company gave him authority to fix his compensation, and finding that § 411(b)

**A-348**

Bob G. Goldberg, Esq.
July 17, 2018
Page 8

"require[d] the issue of compensation to have been decided by a majority of the members of Bermaha, and not by defendant alone.").

B.    Pine's Making of Decisions Outside The "Ordinary
        Course of Business" Without Obtaining The
        Approval Of The Schneider/Schwartz Group

     Section 8.3 of the 2011 Amended Operating Agreement provides that "[t]he Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; *provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company shall be made by the affirmative vote of a majority in interest of the Members.* "(Emphasis added).

     By an e-mail dated February 19, 2018 to Marc Schneider, you stated that "The *only limitation provided in these agreements* is that decisions to finance or refinance any real estate owned by an LLC, acquire new or additional real estate, or sell any real estate owned by a LLC requires the affirmative vote of a majority in interest of the voting members or the affected LLC." (Emphasis added). However, your statement is contrary to the phrase "including, but not limited to" in Section 8.3, which are <u>not</u> words of limitation.

     Equally significant, judicial authority uniformly holds that the phrase "including, but not limited to," has an expansive meaning and is not limited to the items that follow such phrase. *See e.g., Pierre v Providence Washington Ins. Co.*, 99 N.Y.2d 222, 236 (2002) ("includes, but is not limited to" constituted "nonexclusive definition"); *Doniger v Rye Psych. Hosp. Center, Inc.*, 122 A.D.2d 873, 877 (2d Dep't 1986), *lv denied*, 68 N.Y.2d 611 (1986) (use of phrase "including but not limited to" negated inference that parties intended to exclude other examples, and examples following phrase were "illustrative only and do not limit the broad scope of the terms employed"); *see also In re Worldcom, Inc.*, 2007 WL 162782, *6 (S.D.N.Y., Jan. 18, 2007) (phrase "including without limitation" means that following list is not exhaustive); *Fernandez v. Zoni Language Centers, Inc.*, 15-cv-6066 (PKC), 2016 WL 2903274. *6 (S.D.N.Y. May 18, 2016) (same).

     Thus, your position that "outside the ordinary course of business" is "limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company" has no factual or legal basis.

     Decisions that are "outside the ordinary course of business" in the case of these LLC's and therefore "require the affirmative vote of a majority in interest of the Members" (more than 50% of the Members) include the following: (1) capital improvements that are not required for health or safety purposes; (2) setting of cash reserves that are a departure from historical practices of the LLC's or that are in excess of what is required for day to day operations; and (3) a material change in the historical practice of significant distributions to the members of each of the LLC's. We

**A-349**

Bob G. Goldberg, Esq.
July 17, 2018
Page 9

understand that there has been a dramatic increase in the amount of reserves and capital improvements or renovations for each of the properties owned by the LLC's.

In *Unisys Corp. v. Hercules Inc.*, 224 A.D.2d 365, 368 (1st Dep't 1996), the Appellate Division held that "something which is done as a matter of corporate historical practice is, as a matter of law, done 'in the ordinary course of business.'" Black's Law Dictionary (10th ed. 2014) similarly defines "course of business" as "the normal routine in managing a trade or business." Thus, historical practice is a key indicator of "ordinary course of business." There is no dispute as to the historical practice of these LLC's. The dramatic increase of cash reserves and capital improvements, together with the dramatic decrease in distributions, is contrary to the historical practice for the LLC's and thus, "outside the ordinary course of business."

Nonetheless, Pine has refused to let the Schneider/Schwartz Group participate in these matters that are "outside the ordinary course of business" and thus have to be approved by the affirmative vote of a majority in interest of the Members. Instead, Pine, without any legal basis, has unilaterally decided that these matters are solely within its decision-making authority.

As an example, the Schneider/Schwartz Group discovered in June 2018 that JHJ Realty LLC incurred loans in the total amount of $800,000, which loans were made by the Pine/Rohlman Group. Even based on your incorrect reading of Section 8.3 of the 2011 Amended Operating Agreements, these loans were outside the ordinary course of business and had to be approved by the affirmative vote of a majority in interest of the Members. Pine never sought the approval of the Schneider/Schwartz Group and we are unaware of any approval of such loans by the affirmative vote of a majority in interest of the Members of JHJ Realty LLC.

In addition to being significantly contrary to historical practice of the LLC's, the figures proposed by Pine for the amount of each building's reserve accounts appear to be excessive and unreasonable and far in excess of what is necessary for day to day operations. We understand that the average cash position for the years 2012-2016 is about 327% higher than the average cash position for the years 2000-2005 and that the cash position at the end of the year 2017 is about 393% higher than it was in 2000.

Although Brenda Rohlman's March 3, 2018 e-mail states that "over 35 years, Pine Management Inc. has developed guidelines as to how much money to hold in each building's reserve accounts," Pine has never produced these "guidelines."

C.  Pine's Decision To Substantially Reduce The Distributions
From The LLC's To The Members Without The Approval
Of The Schneider/Schwartz Group

We understand that distributions from the LLC's have been dramatically reduced. Indeed, it is our understanding that distributions from the LLC's, which were approximately $500,000 in 2011, decreased to approximately $125,000 in 2017. As noted, a material change in the historical practice of significant distributions to the members of each of the LLC's is a decision that is

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO.

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 10

"outside the ordinary course of business" in the case of these LLC's and therefore "requires the affirmative vote of a majority in interest of the Members" (more than 50% of the Members).

It cannot be disputed that the amount of distributions received by a member is a matter of crucial importance to the members of the LLC's. Pine has no authority to unilaterally change the historical practice of significant distributions to the members. As a result, the decision to dramatically change the historical practice of significant distributions is a matter "outside the ordinary course of business" in the case of these LLC's and therefore requires the vote of the Schneider/Schwartz Group.

In the case of the 1996 Operating Agreement of Marni Realty LLC and Rudel Realty LLC, Pine has no authority to dramatically decrease the amount of distributions to the members. Inasmuch as the management of these two limited liability companies is vested in the two members pursuant to Section 5.01 of the 1996 Operating Agreement, the "Members" of Marni Realty LLC and Rudel Realty LLC (not Pine) must decide the issue of distributions.

D.      Pines' Failure To Produce Documents Requested By The
        Schneider/Schwartz Group Or To Provide Explanations
        Of Figures Appearing In Documents Produced

Section 14.1 of the 2011 Amended Operating Agreement for eight (8) of the LLC's provides:

> The manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative *shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.*

As noted, the inspection rights to examine the "Company's books and records" under Section 14.1 of the 2011 Amended Operating Agreement is broader than the inspection rights under LLCL § 1102(a). The member's "right to examine the Company's books and records" includes documents such as tax returns, financial statements, key contracts, ledgers and other documents concerning the financial condition of the limited liability company and the underlying property, including, but not limited to: (a) documents concerning capital improvements; (b) documents relating to or constituting the basis on which the Manager or Property Manager is setting reserves for the underlying property; (c) documents relating to payments to the Manager or Property Manager, and payments, if any, to related or affiliated parties of the Manager or Property Manager and (d) documents concerning or relating to loans to or by the limited liability company.

Based on the inspection rights of the Schneider/Schwartz Group as a member of the 8 LLC's under LLCL § 1102(a) and (b) and Section 14.1 of the 2011 Amended Operating

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-2    Filed 08/30/22    Page 13 of 15
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 11

Agreement, we, on behalf of the Schneider/Schwartz Group, request that Pine produce the following documents for the last six (6) years (2012-2018):

    (1) the "separate agreement" between the respective limited liability company and Pine Management for services rendered as the "property manager" and any amendments thereto and documents constituting the approval of such "separate agreement;"

    (2) documents showing monies paid to Pine Management as the "Manager" of the respective limited liability company and the approval of monies paid or to be paid to the Manager;

    (3) documents showing monies paid to Pine Management as the "Property Manager" of the respective limited liability company, the approval of monies paid or to be paid to the Property Manager and the basis and methodology for the calculation of the "management fee" and "construction management fee;"

    (4) documents showing the "financial condition" of the limited liability company, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals and General Ledgers;

    (5) documents showing the basis for the calculations for the amount of distributions to the members of the limited liability company;

    (6) documents showing the capital improvements to the property and payments relating to such capital improvements;

    (7) documents relating to or constituting the basis or methodology on which the Manager or Property Manager is setting reserves for the underlying property, including Pine Management's "guidelines," if any, for such reserve accounts:

    (8) documents constituting or relating to renovations to the apartments at the property;

    (9) documents concerning or related to payments by the respective limited liability company to persons or entities related or affiliated with Pine Management; and

    (10) Written consents, if any, reflecting actions taken by the Manager or Members of the LLC's.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.     Case 1:22-cv-02407-MKV     Document 27-2     Filed 08/30/22     Page 14 of 15     RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 12

We, on behalf of Marni Realty LLC and Rudel Realty, LLC, request the same documents for these entities based on the provision that Section 5.1 of the 1996 Operating Agreement provides that "the business and affairs of the Company shall be managed by the Members" and the inspection rights under LLCL § 1102(a) and (b). At the very least, the "default provisions" of the LLCL apply where, as here, these Operating Agreements are "silent" on the issue.

The Schneider/Schwartz Group has requested a number of the foregoing documents. Pine has refused to produce certain requested documents. For example, Brenda Rohlman's March 3, 2018 e-mail refused the Schneider/Schwartz Group's "request for capital expenditures over the past five years for each apartment in the buildings you and your family has a membership interest in," stating "Pine Management Inc. is not spending the time to go backwards over the past five years to complete this list." Surely, the Schneider/Schwartz Group is entitled to this information which materially affects their interests in the LLC's. Surely, the Schneider/Schwartz Group is entitled to information concerning the "Management Fee" and the "Construction Management Fees" referenced in the "Summary of Receipts and Disbursements" of each of the LLC's and the methodology used to arrive at such fees.

Surely, the Schneider/Schwartz Group is entitled to information concerning any loans to the LLC's, including, but not limited to, loans made to the LLC's by members of such LLC's, including the Pine/Rohlman Group. In particular, the Schneider/Schwartz Group is entitled to advance notification and approval of such loans.

Pine's refusal to produce the requested documentation is contrary to its fiduciary duty to provide material facts to the members of the LLC's.

We also note that Pine does not produce documents on a regular or timely basis to the Schneider/Schwartz Group. Rather, Pine produces certain documents in reaction to a request from the Schneider/Schwartz Group. A perfect example of Pine's release of information and documents "after the fact" is Pine's production of documents relating to the $800,000 of loans incurred during the period November 15, 2016 through December 1, 2017 by JHJ Realty LLC *after* Jerome Schneider sent an e-mail, dated June 13, 2018, to Tom Rohlman.[1]

"A manager's failure to provide access to books and records where an applicable state statute allows inspection can constitute a breach of fiduciary duty." *Estrada v. Dugow*, 2016 WL 7017412, *8 (S.D.N.Y. Nov. 30, 2016). If Pine refuses to permit the Schneider/Schwartz Group or its representatives to examine and make copies of the foregoing documents, the Schneider/Schwartz Group can commence an action, which will include a cause of action for inspection of the books and records of the LLC's (*see Sachs v. Adeli*, 26 A.D.3d at 55-57, *Neumann v. Cenpark Realty, LLC*, 2012 WL 10007764, **6-7 (Sup. Ct. N.Y. Co. Apr. 18, 2012), as well as a cause of action for an accounting. *See Gottlieb v. Northriver Trading Co LLC*, 58 A.D.3d at 551.

---

[1] The Notes comprising the $800,000 of loans are dated November 15, 2016, December 13, 2016, October 4, 2017 and December 1, 2017. The Harold Pine 2009 Family Trust is the lender on each of the Notes.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM   INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-2   Filed 08/30/22   Page 15 of 15   RECEIVED NYSCEF: 07/26/2019

Bob G. Goldberg, Esq.
July 17, 2018
Page 13

          *                    *               *

     The foregoing presentation demonstrates, among other things that: (a) Pine has breached its fiduciary duty to the Schneider/Schwartz Group and has not acted in good faith; (b) Pine has breached provisions of the governing Operating Agreements; (c) Pine has failed to disclose material facts to the Schneider/Schwartz Group; (d) Pine has been involved in related party transactions; and (e) Pine has failed to provide key documents concerning the management and operations of the LLC's to the Schneider/Schwartz Group. In short, Pine (and the Pine/Rohlman Group) have taken actions that have prevented the Schneider/Schwartz Group from exercising their rights as members under the 2011 Amended Operating Agreements, the 1996 Operating Agreement and the LLCL.

     In view of the foregoing, we suggest that a meeting be scheduled to resolve the Schneider/Schwartz Group's concerns. We believe that a mutually satisfactory resolution of the issues is preferable to a costly and unnecessary litigation.

     Sincerely,

*Mitchell J. Geller*

Mitchell J. Geller

cc: Jerome Schneider
    Ruth Schneider
    Marc Schneider
    Marni Schwartz
    Lance Myers, Esq.

#58894569 v1

# EXHIBIT A-2

**A-355**

# Exhibit 2

**A-356**

# MSF

MEISTER SEELIG & FEIN LLP

ATTORNEYS AT LAW
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone (212) 655-3500
Facsimile (212) 655-3535
www.meisterseelig.com

Howard S. Koh
*Partner*
Direct (212) 655-3587
Fax (646) 539-3687
*hsk@msf-law.com*

August 3, 2018

## BY EMAIL AND FIRST CLASS MAIL

Mitchell J. Geller, Esq.
Holland & Knight LLP
31 West 52nd Street
New York, New York 10019

### Re:    *Interests of Schneider/Schwartz Group in Limited Liability Companies*

Dear Mr. Geller:

Your letter dated July 17, 2018 addressed to Bob Goldberg has been referred to me for response.

Your letter contains several baseless accusations against Pine Management, Inc. ("Pine Management"). Contrary to your allegations, Pine Management has not breached any duty owed to your clients or any of the provisions of the 2011 Amended Operating Agreement and the 1996 Operating Agreement (together the "Operating Agreements").[1] Similarly, Pine Management has disclosed all required information to your clients and has provided them with all required documents. Pine Management has also never participated in an unlawful related party transaction and has historically responded to requests for documents and information from your clients promptly.

Next, your letter purports to describe the principles of law applicable to the management of New York limited liability companies. Mr. Goldberg and I are familiar with New York's Limited Liability Company Law and the case law thereunder. Suffice it to say that we will draw our own conclusions concerning what the law provides and how it might be applied in various contexts.

Your letter then sets out, on page 5, four categories of claims that your clients contend they have against Pine Management. Those claims are rejected in their entirety.

On page 11, your letter lists ten categories of documents that you seek. Your clients are welcome to review the material that sections 14.1 of the 2011 Amended Operating Agreement and Limited Liability Company Law § 1102 permit you to review provided they comply with the provisions set forth in the 2011 Amended Operating Agreement and the statute.

---

[1] Defined term not defined herein has the same meaning as in your July 17, 2018 letter to Mr. Goldberg.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Case 1:22-cv-02407-MKV   Document 27-3   Filed 08/30/22   Page 4 of 4



MEISTER SEELIG & FEIN LLP

*Mitchell J. Geller, Esq.*
*August 3, 2018*
*Page 2*

At the end of your letter you request a meeting in which the parties can attempt to reach a "mutually satisfactory resolution" which you state is preferable to a "costly and unnecessary litigation". In principle, Pine Management does not object to scheduling a meeting, but before a meeting is scheduled, we would like to understand what your clients are hoping to achieve so that we can determine if a meeting will be productive. Until Pine Management gains some clarity as to your clients' objective any meeting is premature. Accordingly, please let us know your client's objective and then we can consider if a meeting will be productive.

On a final note, since you sent your letter, your clients have been communicating directly with officers of Pine Management. Given the express threats of litigation in your letter, please advise your clients that until further notice all communications they send to officers of Pine Management will be forwarded to me for response.

This letter is without waiver of any of our rights, remedies, claims, or defenses, each of which is expressly reserved.

Very truly yours,

Howard S. Koh

cc: Bob G. Goldberg, Esq.

# EXHIBIT A-3

A-359

# Exhibit 3

**A-360**

# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Mitchell J. Geller
(212) 513-3483
mitchell.geller@hklaw.com

BY E-MAIL AND OVERNIGHT COURIER

August 22, 2018

Howard S. Koh, Esq.
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, New York 10017

Re: Interests of Schneider/Schwartz Group in Limited Liability Companies

Dear Mr. Koh;

As you are aware, we represent Jerome Schneider, Ruth Schneider, Marc Schneider, Marni Schwartz, the Jerome Schneider 2012 Family Trust dated December 10, 2012 ("Jerome Schneider Trust") and the Ruth Schneider 2012 Family Trust dated December 10, 2012 ("Ruth Schneider Trust")(collectively the "Schneider/Schwartz Group") in connection with their respective interests in Rudel Realty LLC, Marni Realty LLC, RIS Realty LLC, Marc Realty LLC, Bar-Mar Realty LLC, SIR Realty LLC, Jeruth Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Zizi Realty LLC (collectively "LLC's"), each a New York limited liability company.

We have reviewed your letter, dated August 3, 2018 ("August 3 Letter"), in response to our July 17, 2018 letter ("July 17 Letter"). We disagree with the statements in your August 3 letter, including the statement that our July 17 Letter "contains baseless accusations against Pine Management, Inc. ('Pine Management')." Notably, the August 3 letter does not address any of the issues or the claims set forth in detail in our July 17 letter other than to say that "those claims are rejected in their entirety."

You do not dispute that Pine Management owes fiduciary duties to the Schneider/Schwartz Group. *See, e.g., DeBenedictis v. Malta*, 140 A.D.3d 438 (1st Dep't 2016); *Pokoik v. Pokoik*, 115 A.D.3d 428, 429-432 (1st Dep't 2014). The 2011 Amended and Restated Operating Agreement of eight of the LLC's ("2011 Amended Operating Agreement") expressly recognizes the fiduciary duty owed by the Manager to the Members. Indeed, Section 17.2 of the 2011 Amended Operating Agreement states that "[n]otwithstanding anything otherwise herein contained to the contrary, *no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.*" (Emphasis added).

Anchorage | Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Houston | Jacksonville | Lakeland
Los Angeles | Miami | New York | Orlando | Portland | San Francisco | Stamford | Tallahassee | Tampa | Tysons
Washington, D.C. | West Palm Beach

**A-361**

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3
Case 1:22-cv-02407-MKV   Document 27-4   Filed 08/30/22   Page 4 of 19
RECEIVED NYSCEF: 07/26/2019

Howard S. Koh, Esq.
August 22, 2018
Page 2

Your August 3 Letter also not question the settled principle that a manager or managing member of a limited liability company can be held liable for breach of fiduciary duty where the manager commits acts that are contrary or inconsistent with its "duty of undivided and undiluted loyalty," fails to disclose material facts, or engages in misconduct or self-dealing. *See. e.g., Bookhamer v. I. Karten-Bernaha Textiles Co., L.L.C.* 52 A.D.3d 246, 246 (1st Dep't 2008) (50% managing member obligated "to operate the company in good faith and fairness, to avoid self-dealing and to make full disclosure of all material facts").

Moreover, your August 3 Letter does not dispute that a manager of a limited liability company is bound by the conflict of interest rule set forth in Limited Liability Company Law ("LLCL") § 411 and that such statute "disallows a transaction between a limited liability company and one or more of its managers, or with another business entity in which one or more of its managers has a substantial financial interest." *See Tzolis v Wolff,* 39 A.D.3d 138, 145-46 (1st Dep't 2007), *aff'd,* 10 N.Y.3d 100 (2008).

Additionally, your August 3 Letter does not question the right of a member of a limited liability company to an equitable accounting under common law. *See Gottlieb v. Northriver Trading Co LLC,* 58 A.D.3d 550, 551 (1st Dep't 2009).

Your August 3 Letter also does not refute the judicial authority cited in our July 17 Letter that the phrase "including, but not limited to," in Section 8.3 of the 2011 Amended Operating Agreement has an <u>expansive meaning</u> and is not limited to the items that follow such phrase. *See e.g., Pierre v Providence Washington Ins. Co.,* 99 N.Y.2d 222, 236 (2002); *Fernandez v. Zoni Language Centers, Inc.,* 15-cv-6066 (PKC), 2016 WL 2903274. *6 (S.D.N.Y. May 18, 2016).* Thus, you have not even attempted to rebut our showing in the July 17 Letter that Bob Goldberg's statement in his February 19, 2018 e-mail to Marc Schneider that "outside the ordinary course of business" is "limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company" is contrary to cases interpreting the meaning of the phrase "including, but not limited to" and thus has no legal basis.

## A. The Schneider/Schwartz Group's Demand For
## Inspection Of The Books And Records Of The LLC's

With the foregoing principles in mind, we now turn to the Schneider/Schwartz Group's demand for inspection of the books and records of the LLC's set forth in our July 17 Letter.

Your August 3 Letter states that our July 17 Letter "lists ten categories of documents that you seek" and that "your clients are welcome to review the material that sections 14.1 of the 2011 Amended Operating Agreement and Limited Liability Company Law § 1102 permit you to review provided they comply with the provisions set forth in the 2011 Amended Operating Agreement and the statute."

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-4   Filed 08/30/22   Page 5 of 19 RECEIVED NYSCEF: 07/26/2019

Howard S. Koh, Esq.
August 22, 2018
Page 3

Section 14.1 of the 2011 Amended Operating Agreement provides that "[e]ach Member, Manager or their duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company." Thus, the 2011 Amended Operating Agreement contains no restrictions or limitations on the member's right to inspect the books and records of the limited liability company other than they must be inspected "at reasonable times upon reasonable prior notice to the Company."

Our July 17 Letter demonstrated the broad inspection rights under LLCL § 1102 and Section 14.1 of the 2011 Amended Operating Agreements for eight of the LLC's and the 1996 Operating Agreements of Rudel Realty LLC and Marni Realty LLC ("1996 Operating Agreement"). Our July 17 Letter also showed that the inspection rights to examine the "Company's books and records" under Section 14.1 of the 2011 Amended Operating Agreement is broader than the inspection rights under LLCL § 1102(a) and that the member's "right to examine the Company's books and records" includes documents such as tax returns, financial statements, key contracts, ledgers and other documents concerning the financial condition of the limited liability company and the underlying property, including, but not limited to: (a) documents concerning capital improvements; (b) documents relating to or constituting the basis on which the Manager or Property Manager is setting reserves for the underlying property; (c) documents relating to payments to the Manager or Property Manager, and payments, if any, to related or affiliated parties of the Manager or Property Manager and (d) documents concerning or relating to loans to or by the limited liability company.

Based on the inspection rights of the Schneider/Schwartz Group as a member of the eight LLC's under LLCL § 1102(a) and (b) and Section 14.1 of the 2011 Amended Operating Agreement, we, on behalf of the Schneider/Schwartz Group, demand that Pine Management permit the Schneider/Schwartz Group to inspect the following documents for the last six (6) years (2012-2018) and copy such documents at the Schneider/Schwartz Group's expense:

(1) the "separate agreement" between the respective limited liability company and Pine Management for services rendered as the "property manager" and any amendments thereto and documents constituting the approval of such "separate agreement;"

(2) documents showing monies paid to Pine Management as the "Manager" of the respective limited liability company and the approval of monies paid or to be paid to the Manager;

(3) documents showing monies paid to Pine Management as the "Property Manager" of the respective limited liability company, the approval of monies paid or to be paid to the Property Manager and the basis and methodology for the calculation of the "management fee" and "construction management fee;"

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-4   Filed 08/30/22   Page 6 of 19   RECEIVED NYSCEF: 07/26/2019

Howard S. Koh, Esq.
August 22, 2018
Page 4

(4) documents showing the "financial condition" of the limited liability company, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals and General Ledgers;

(5) documents showing the basis for the calculations for the amount of distributions to the members of the limited liability company;

(6) documents showing the capital improvements to the property and payments relating to such capital improvements;

(7) documents relating to or constituting the basis or methodology on which the Manager or Property Manager is setting reserves for the underlying property, including Pine Management's "guidelines," if any, for such reserve accounts:

(8) documents constituting or relating to renovations to the apartments at the property;

(9) documents concerning or related to payments by the respective limited liability company to persons or entities related or affiliated with Pine Management in any capacity.

(10) written consents, if any, reflecting actions taken by the Manager or Members of the LLC's.

We, on behalf of Marni Realty LLC and Rudel Realty, LLC, demand that Pine Management permit the Schneider/Schwartz Group to inspect and copy at the Schneider/Schwartz Group's expense the same documents for these entities for the last six (6) years (2012-2018) based on the provision that Section 5.1 of the 1996 Operating Agreement provides that "the business and affairs of the Company shall be managed by the Members" and the inspection rights under LLCL § 1102(a) and (b). In view of this provision, the "Members" have the right to review *all* of the documents of Marni Realty LLC and Rudel Realty, LLC.

**Each of the ten (10) categories of documents seek information that is clearly relevant to and reasonably relate to the Schneider/Schwartz Group's interests in the LLC's within the meaning of LLCL § 1102 (b).** For example, the Schneider/Schwartz Group is entitled to the "separate agreement" (if any) between the respective limited liability company and Pine Management for services rendered as the "property manager" and any amendments thereto and documents constituting the approval of such "separate agreement." (**Item 1**). These documents directly relate to the management of the LLC's and to the claim that Pine Management failed to obtain the written approval of the Schneider/Schwartz Group of the "agreement" with the "property manager."

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-4    Filed 08/30/22    Page 7 of 19 RECEIVED NYSCEF: 07/26/2019

Howard S. Koh, Esq.
August 22, 2018
Page 5

Similarly, Pine Management cannot dispute that the Schneider/Schwartz Group is entitled to "documents showing monies paid to Pine Management as the 'Manager' of the respective limited liability company and the approval of monies paid or to be paid to the Manager" (**Item 2**) as well as "documents showing monies paid to Pine Management as the 'Property Manager' of the respective limited liability company, the approval of monies paid or to be paid to the Property Manager and the basis and methodology for the calculation of the 'management fee' and 'construction management fee'" (**Item 3**). As our July 17 Letter pointed out, the "management fee" and the "construction management fee'" is referenced in the "Summary of Receipts and Disbursements" of each of the LLC's that Pine Management transmitted to the Schneider/Schwartz Group.

Suffice it to say, these documents directly relate to the management of the LLC's and to the claim that Pine Management has no authority to fix its own compensation or to pay itself fees without the approval of the Schneider/Schwartz Group, who has a 50% interest in five of the LLC's, a 25% interest in three of the LLC's, and a 33% interest and a 30% interest in the remaining two LLC's. Given that the "Building P&Ls" indicate that "Total Management Fees" of $622,742 were paid to Pine Management in 2017 alone for the LLC's excluding Bar-Mar Realty, LLC, the significance of this issue cannot be understated. Furthermore, given that Section 8.10 of the 2011 Amended Operating Agreement states that "the guaranteed payments and other compensation of the Manager, if any," must be approved "by the affirmative vote of a majority in interest of the Members, Pine Management cannot receive any "compensation" for its services unless approved by the vote of more than 50% of the members of the limited liability companies, without taking into account the vote of the "interested" members. *See Bookhamer v. I. Karten-Bermaha Textiles, Co. L.L.C.*, 2007 WL 6787899 (Sup. Ct. New York Co. Mar. 29, 2007), *aff'd*, 52 A.D.3d 246 (1st Dep't 2008) (rejecting defendant's claim that his 50% stake in the company gave him authority to fix his compensation, and finding that § 411(b) "require[d] the issue of compensation to have been decided by a majority of the members of Bermaha, and not by defendant alone.").

In addition, there can be no question that the Schneider/Schwartz Group is entitled to "documents showing the 'financial condition' of the limited liability company, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals and General Ledgers" (**Item 4**). Surely, the Schneider/Schwartz Group is entitled, among other things, to information concerning any loans to the LLC's, including, but not limited to, loans made to the LLC's by members of such LLC's, including the Pine/Rohlman Group.

The same is true of each of the other categories of documents requested above, which were requested in our July 17 Letter. There can be no dispute that the Schneider/Schwartz Group also is entitled to "documents showing the capital improvements to the property and payments relating to such capital improvements" (**Item 6**) and "documents constituting or relating to renovations to the apartments at the property" (**Item 8**). Such documents reflect the expenses paid by the LLC's, which, in turn, directly affect the monies available for distribution to the members of the LLC's.

Furthermore, "documents concerning or related to payments by the respective limited liability company to persons or entities related or affiliated with Pine Management" (**Item 9**) are

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM     INDEX NO. 654303/2019
NYSCEF DOC. NO. 3     Case 1:22-cv-02407-MKV   Document 27-4   Filed 08/30/22   Page 8 of 19     RECEIVED NYSCEF: 07/26/2019

Howard S. Koh, Esq.
August 22, 2018
Page 6

relevant to the issue of "interested transactions" between Pine Management and each of the LLC's and the ability. As our July 17 Letter pointed out, courts closely scrutinize contract between a limited liability company and a business entity in which its manager has an interest and whether such contracts will be disallowed under LLCL § 411.

Moreover, "documents relating to or constituting the basis or methodology on which the Manager or Property Manager is setting reserves for the underlying property, including Pine Management's 'guidelines,' if any, for such reserve accounts" (**Item** 7) is central to the management and operations of the LLC's and to the issue of monies available for distribution to the members of the LLC's. Surely, the Schneider/Schwartz Group is entitled to the "guidelines" referenced in Brenda Rohlman's March 3, 2018 e-mail, which states that "over 35 years, Pine Management Inc. has developed guidelines as to how much money to hold in each building's reserve accounts," As our July 17 Letter pointed out, in addition to being significantly contrary to historical practice of the LLC's, the figures proposed by Pine for the amount of each building's reserve accounts appear to be excessive and unreasonable and far in excess of what is necessary for day to day operations. We understand that the average cash position for the years 2012-2016 is about 327% higher than the average cash position for the years 2000-2005 and that the cash position at the end of the year 2017 is about 393% higher than it was in 2000.

Finally, "documents showing the basis for the calculations for the amount of distributions to the members of the limited liability company" (**Item 5**) is relevant to the issue of the dramatic reduction in distributions from the LLC's to its members since 2011. As our July 17 Letter pointed out, distributions from the LLC's to the Schneider/Schwartz Group decreased from approximately $500,000 in 2011 to approximately $125,000 in 2017. The amount of distributions received by a member is indisputably a matter of crucial importance to the members of the LLC's.

These documents also relate to the Schneider/Schwartz Group's claim that Pine Management is making decisions which are outside the "ordinary course of business" under Section 8.3 of the 2011 Amended Operating Agreement and therefore require the approval of the Schneider/Schwartz Group such as: (a) the decision to dramatically change the historical practice of significant distributions; (b) the setting of cash reserves that are a departure from historical practices of the LLC's or that are in excess of what is required for day to day operations; (c) the making of capital improvements that are not required for health or safety purposes and (d) the incurring of loans relating to the buildings owned by the LLC's;

In the case of the 1996 Operating Agreement of Marni Realty LLC and Rudel Realty LLC, which vests management of such entities in the two "Members," the "Members" of Marni Realty LLC and Rudel Realty LLC decide the issue of distributions and Pine Management has no authority to dramatically decrease the amount of distributions to the members. Moreover, the two "Members" also decide the setting of cash reserves and the making of capital improvements.

In sum, each of the ten (10) categories of documents: (a) reasonably relate to the Schneider/Schwartz Group's interest in the LLC's within the meaning of LLCL § 1102(b) and (b)

Howard S. Koh, Esq.
August 22, 2018
Page 7

constitute key documents relating to the management and operations of the LLC's and (c) relate to the serious issues arising from Pine Management's management of the LLC's.

Moreover, as demonstrated in our July 17 Letter, the courts have uniformly enforced a member's broad inspection rights under LLCL § 1102(b) to obtain "other information regarding the affairs of the limited liability company as is just and reasonable." *See, e.g., Sachs v. Adeli,* 26 A.D.3d 52, 55-57 (1st Dep't 2005).

Notably, in *Bookhamer v. I. Karten-Bermaha Textiles Co., L.L.C.,* No. 104164/2004, 2004 WL 7329683, *2 (Sup. Ct. New York Co. May 25, 2004), the Supreme Court granted petitioner's motion under LLCL § 1102(b) and directed that "respondent is directed to make available for inspection by petitioners and/or their agents, *the books and records enumerated in their counsel's demand letter, dated February 12 [13], 2004.*" (Emphasis added). The February 13, 2004 letter demanded a substantial number of documents relating to the limited liability company. *See* Petition, dated March 16, 2004, at ¶12, Items (1), (2) and (3) (a)-(r)). a copy of which is annexed hereto as **Exhibit 1**.

Equally compelling is *Gallagher v. Crotty,* No. 651498/2015, 2017 WL 3314241, **8-9 (Sup. Ct. New York Co. Aug. 3, 2017), where Justice Saliann Scarpulla granted plaintiff's motion for summary judgment for an inspection of the books and records under LLCL § 1102(b) and for an equitable accounting, stating:

> ORDERED *that defendants are directed to provide Gallagher with copies and reasonable access to all books and records* of: (1) Workforce Housing Advisors MM limited liability company; (2) Workforce Housing Advisors MM II limited liability company; (3) Sedgwick Avenue Renaissance Developers limited liability company; (4) Workforce Walton-Creston limited liability company; (5) Habitare Urbana Fund limited liability company; and (6) Creston Avenue Renaissance Developers limited liability company, to the extent such books and records relate to plaintiff's interest as a member, within 20 days of entry of this order; and it is further

> ORDERED and ADJUDGED that defendants are required to provide a full accounting of: (1) Workforce Housing Advisors MM limited liability company; (2) Workforce Housing Advisors MM II limited liability company; (3) Sedgwick Avenue Renaissance Developers limited liability company; (4) Workforce Walton-Creston limited liability company; (5) Habitare Urbana Fund limited liability company; and (6) Creston Avenue Renaissance Developers limited liability company, for the fiscal years 2013 - 2015, to the extent such books and records relate to plaintiff's interest as a member, *including, but not limited to, all records described in*

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 3

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

Case 1:22-cv-02407-MKV   Document 27-4   Filed 08/30/22   Page 10 of 19

Howard S. Koh, Esq.
August 22, 2018
Page 8

> *Limited Liability Company Law § 1102 (a), all records described in*
> *the operating agreement that governs the respective limited liability*
> *companies named herein as applied to each, and other information*
> *regarding the affairs of each limited liability company named*
> *herein,* within 60 day of entry of this order (Emphasis added).

To the same effect is *S&H Nadian, LLC v. MLK Associates LLC*, No. 652108/2015, 2016 WL 1222162, **2-3 (Sup. Ct. New York Co., Mar. 7, 2016), where the Supreme Court granted plaintiff's motion for summary judgment compelling defendants to produce the books and records of the subject limited liability companies and for an accounting of these entities, holding:[1]

> ADJUDGED and DECLARED that plaintiffs are entitled to
> a declaratory judgment against defendants MLK Associates LLC,
> Beach 84th St I LLC, Mendel Group Inc., Abe Mendel, and Steven
> Mendel declaring that *defendants must grant plaintiffs a full*
> *inspection of the books and records of the Beach 84th Street I LLC*
> *and MLK Associates LLC companies*; and it is further

> ORDERED that the branch of the motion that seeks a full
> accounting of Beach 84th St I LLC is granted; and it is further

> ORDERED that the branch of the motion that seeks a full
> accounting of MLK Associates LLC is granted. (Emphasis added).

*See also Kerin v Premium Pursuit Consulting Group, LLC*, No. 010302/2010, 30 Misc.3d 1210(A), 2010 WL 5573617 (Sup. Ct. Nassau Co. Dec. 10, 2010) ("Court directs Defendants, on or before January 7, 2011, to make available to Kerin and his counsel for inspection, and copying at Kerin's expense, all records relating to the Account from the day that it was opened through the date of inspection, including but not limited to account statements, checks, signatory cards and correspondence").

The foregoing cases, together with the detailed exposition of the justification for the inspection, conclusively demonstrate the Schneider/Schwartz Group's right to inspect the documents listed in Items 1-10 above and to an accounting of each of the LLC's.

              *                   *                    *

We demand that you contact us within the next ten (10) days to arrange a mutually convenient time for the inspection of the books and records of the LLC's. We also demand that you confirm that Pine Management will produce all of the documents that fall within Items 1-10 above. As an alternative to inspection, Pine Management can produce the documents requested

---

[1] The Supreme Court observed that the operating agreement (as here) contained no restrictions on plaintiffs' right to inspect the books and records. *Id.* at *2.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3Case 1:22-cv-02407-MKV Document 27-4 Filed 08/30/22 RECEIVED Page 11 of 19NYSCEF: 07/26/2019

INDEX NO. 654303/2019

Howard S. Koh, Esq.
August 22, 2018
Page 9

by Items 1-10 and the Schneider/Schwartz Group will pay the copying charges prior to receipt of the copies. In this respect, we request that Pine Management provide electronic copies of all documents to the extent available. If Pine Management chooses this alternative, Pine Management should identify any instances in which there are no documents responsive to a specific item.

If Pine Management refuses to comply with its obligations under the LLCL, common law and the Operating Agreements of the LLC's to permit the Schneider/Schwartz Group or its representatives to inspect and make copies (at the Schneider/Schwartz Group's expense) of the foregoing documents, the Schneider/Schwartz Group is ready, willing and able to commence an action, which will include a cause of action for inspection of the books and records of the LLC's as well as a cause of action for an accounting.

We suggest that a meeting be scheduled to resolve the Schneider/Schwartz Group's concerns <u>after</u> the inspection of such documents or the production of such documents and the review of such documents. As our July 17 Letter stated, we continue to believe that a mutually satisfactory resolution of the issues is preferable to a costly and unnecessary litigation.

Sincerely,

Mitchell J. Geller

cc: Jerome Schneider
Ruth Schneider
Marc Schneider
Marni Schwartz
Lance Myers, Esq.

#59852406_v1

A-369

# Exhibit 1

**A-370**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------x

In the Matter of the Application of
BERNICE BOOKHAMER and
MARCIA TOLEDANO                                    :    **Index. No.**
in their capacity as Executors of
the Estate of Julia Karten                         :

                              Petitioners,          :    **VERIFIED PETITION**

                                                    :

For a Judgment Under Article 78 of the Civil Practice :
and Rules compelling I. Karten - Bermaha
Textiles Co., L.L.C. to allow inspection of its Books :
and Records by Petitioners                          :

                                                    FILED
                                                    MAR. 17, 2004
                                                    NEW YORK
----against----                                     COUNTY CLERKS OFFICE

                                                    04104163

I. Karten - Bermaha Textiles Co., L.L.C.

                              Respondent.           :

-------------------------------------------------------------x

Bernice Bookhamer and Marcia Toledano ("Petitioners"), by their attorneys, Kaye

Scholer LLP, for their Petition against I. Karten - Bermaha Textiles Co., L.L.C. ("Bermaha"), a

New York Limited Liability Company, allege as follows:

## NATURE OF ACTION

1.     Petitioners Bernice Bookhamer and Marcia Toledano make this Petition in

their capacity as Executors of the Estate of Julia Karten, to compel production of specific

corporate records and documents of Bermaha for their inspection and copying, as demanded by

Petitioners on February 13, 2004.

Doc #30845677.WPD

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV   Document 27-4   Filed 08/30/22   Page 14 of 19
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

## THE PARTIES

2.      Petitioners Bernice Bookhamer and Marcia Toledano are the Executors of the Estate of Julia Karten. The decedent, who is the natural mother of Petitioners, was a member of I. Karten - Bermaha Textiles Co., L.L.C. from its formation until her passing.

3.      The Estate of Julia Karten has a significant financial interest in Bermaha. Since Bermaha's founding in 1995, the decedent had retained a 50% interest in the business.

4.      Respondent Bermaha is a New York limited liability company engaged in the business of wholesale distribution of woven textiles and off goods to the apparel fabric industry.

### FACTS PRECIPITATING PETITIONERS' DEMAND
### TO INSPECT THE BOOKS AND RECORDS OF BERMAHA

5.      Bermaha's predecessor, I. Karten d/b/a Bermaha Textiles Co., was founded over 50 years ago and was converted in February 1995 into Bermaha, a New York Limited Liability Company. From that time until their death, each spouse was a member of Bermaha and held a fifty percent financial interest in it. Isidore and Julia Karten had three children, Bernice Bookhamer, Marcia Toledano and Harold Karten.

6.      Isidore Karten died on April 19, 1999, a resident of New York and Rockland counties, and his will was admitted to probate by the Surrogate's Court of Rockland County. As directed by Isidore Karten's will, Harold Karten was bequeathed the decedent's fifty percent interest in Bermaha, a business in which he was actively involved prior to the death of Isidore Karten and currently oversees the day to day operations.

7.      Julia Karten died on October 5, 2002, a resident of New York and Rockland counties. Her will was admitted to probate by the Surrogate's Court of Rockland

**A-372**

County, and Letters Testamentary were duly issued to Petitioners Bernice Bookhamer and Marcia

Toledano appointing them Executors of the Estate of Julia Karten. The decedent's fifty percent

interest in Bermaha is presently an asset of the Estate.

### PETITIONERS' EXERCISE OF THEIR RIGHT
### TO INSPECT THE BOOKS AND RECORDS OF BERMAHA

8.    In July 2003, Petitioners retained the certified public accounting firm,

Berdon LLP, to assist Petitioners with an inspection of the books and records of Bermaha.

Shortly thereafter, by letter dated July 24, 2003, a copy of which is annexed hereto as Exhibit A,

Berdon LLP, at the direction of Petitioners, requested access to Bermaha's books and records at

its offices.

9.    By letter dated September 25, 2003, a copy of which is annexed hereto as

Exhibit B, counsel to Bermaha informed Petitioners' counsel that Bermaha had "voluntarily

agreed to allow Berdon LLP to perform an analysis of the books and records of Bermaha."

10.    Notwithstanding Bermaha's agreement to allow Petitioners' inspection of

its books and records, Bermaha never allowed Berdon LLP to inspect its books and records. By

letter dated October 17, 2003, a copy of which is annexed hereto as Exhibit C, Bermaha's

counsel informed Petitioners' counsel that it would not allow Petitioners to inspect Bermaha's

books and records.

11.    By letter dated February 13, 2004 sent via certified mail, a copy of which

is annexed hereto as Exhibit D, Petitioners in their capacity as Executors of the Estate of Julia

Karten, exercising their right as executors of the Estate of a Deceased Member of Bermaha in

accordance with NY LLC Law §§ 608 and 1102, demanded to examine specified books, papers

and records of Bermaha (the "Demand Letter").

A-373

12.     The demand letter requested the inspection of the following:

(1)    a copy of the Bermaha Operating Agreement, any amendments thereto and any amended and restated operating agreement;

(2)    a copy of Bermaha's federal, state and local income tax or information returns and reports for the three most recent fiscal years; and

(3)    any financial statements maintained by Bermaha for the three most recent fiscal years and other information regarding the affairs of Bermaha, including the following:

(a)    Copies of internal monthly financial statements prepared for Bermaha;

(c)    A copy of each general ledger;

(d)    Copies of monthly and annual journal entries posted to the general ledger;

(e)    Copies of monthly detailed schedules of aged accounts receivable and accounts payable;

(f)    Copies of monthly detailed schedules of inventory;

(g)    Sales journal;

(h)    Sales invoices;

(i)    Purchase journal;

(j)    Cash receipts journal;

(k)    Cash disbursements journal;

(l)    Expense invoices;

(m)    Names of all employees, including job descriptions and salaries;

(n)    List of all bank accounts maintained by Bermaha;

(o)    Bank statements including original cancelled checks for all accounts, including operating, payroll and investment accounts;

A-374

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-4    Filed 08/30/22    Page 17 of 19

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

    (p)    Schedule of legal fees paid by Bermaha, and the lawsuits to which such fees relate;

    (q)    List of vehicles owned by Bermaha, including indications of who uses such vehicles; and

    (r)    Copies of all information pertaining to the bad debt expense in the most recent three years and the related subsequent recovery.

13.    To date, Bermaha has refused, in violation of the law of the State of New York, to allow the inspection of its corporate books and records as demanded by Petitioners. By letter dated February 20, 2004, a copy of which is annexed hereto as Exhibit E, counsel to Bermaha rejected Petitioners' demand for inspection of Bermaha's books and records on the basis that Petitioners "are not entitled to audit or otherwise examine and inspect the books of Bermaha."

**PRAYERS FOR RELIEF**

WHEREFORE, Petitioners respectfully pray for a judgment against Bermaha to compel it to make available to and permit Petitioners, their attorneys and accountants, to inspect, examine and copy, at such times and places as may be designated by the Court, without interference on the part of Respondent, its agents, representatives and employees, the books and records of Bermaha as demanded in the Demand Letter.

Additionally, Petitioners respectfully request the award of attorneys fees and costs incurred in connection with this Petition, together with such other and further relief as this court may deem just and proper.

**A-375**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-4    Filed 08/30/22    Page 18 of 19    RECEIVED NYSCEF: 07/26/2019

Dated: New York, New York
     March 16, 2004

Respectfully submitted,

Julius Berman
Joseph M. Drayton

KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
(212) 836-8000

*Attorneys for Petitioners*
*Bernice Bookhamer and Marcia Toledano*
*Executors for the Estate of Julia Karten*

6

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV   Document 27-4   Filed 08/30/22   Page 19 of 19

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------x

In the Matter of the Application of      :
BERNICE BOOKHAMER and      :
MARCIA TOLEDANO      :
in their capacity as Executors of      :
the Estate of Julia Karten      :

                             :

              Petitioners,    :    **VERIFICATION**

     :

For a Judgment Under Article 78 of the Civil Practice   :    **Index. No.**
and Rules compelling I. Karten - Bermaha   :
Textiles Co., L.L.C. to allow inspection of its Books   :
and Records by Petitioners   :

     :

    ---against---     :

     :

I. Karten - Bermaha Textiles Co., L.L.C.   :

     :

           Respondent.   :

----------------------------------------------------------------x

STATE OF NEW YORK    }
             :   ss.:
COUNTY OF ROCKLAND  )

       BERNICE BOOKHAMER, being duly sworn, states I am a petitioner in the
above-entitled action, and an executor of the Estate of Julia Karten. I have read the Verified
Petition and the annexed exhibits and know that the contents are true to the best of my
knowledge.

                                 *Bernice Bookhamer*

Sworn to before me this
16th day of March, 2004

    *Salman Dar*
Notary Public

           SALMAN BARI DAR
       Notary Public, State of New York
          No. 01DA6078539
       Qualified in Rockland County
     Commission Expires June 24, 20 06

Doc #30845677.WPD

# EXHIBIT A-4

A-378

INDEX NO. 654303/2019

Case 1:22-cv-02407-MKV  Document 27-5  Filed 08/30/22  Page 2 of 4

RECEIVED NYSCEF: 07/26/2019

# Exhibit 4

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV   Document 27-5   Filed 08/30/22   Page 3 of 4



MEISTER SEELIG & FEIN LLP

ATTORNEYS AT LAW
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone (212) 655-3500
Facsimile  (212) 655-3535
www.meisterseelig.com

Howard S. Koh
*Partner*
Direct (212) 655-3587
Fax (646) 539-3687
*hsk@msf-law.com*

August 31, 2018

**BY EMAIL AND FIRST CLASS MAIL**

Mitchell J. Geller, Esq.
Holland & Knight LLP
31 West 52nd Street
New York, New York 10019

Re:     *Interests of Schneider/Schwartz Group in Limited Liability Companies*

Dear Mr. Geller:

I am writing in response to your letter dated August 22, 2018.  To begin, you should not assume that by choosing not to engage with you in a discussion of what the New York Limited Liability Company Law provides, or how a court might apply it in a hypothetical litigation, that I agree with your conclusions. Rather, I do not believe that sharing my views on these subjects is a productive way to spend our time or assist our respective clients in resolving their issues.

Your letter lists ten categories of documents that your clients would like to inspect and copy.  As we have previously written, we are happy to make the books and records of each of the companies in which your clients have an interest available for inspection and copying at the offices of Pine Management, Inc. ("Pine"). Your clients or their attorneys and accountants can designate whatever they like for copying and Pine will arrange to have it copied at your clients' cost. To the extent that the companies have the documents you have requested, they will be provided.  Please propose some prospective dates for such an inspection (the "Inspection") and we will attempt to set a firm date.

We will also take this opportunity to respond to the emails that Jerome Schneider and Marc Schneider recently sent Tom Rohlman.  The answer is no different than our response to your ten categories of requests.  The documents, which contain the answers to the questions, to the extent they exist, will be made available for review at the Inspection.

We believe that the most efficient way to proceed is for the Inspection to occur before your clients ask more questions or seek more information.  If, upon completion of the Inspection, your clients believe there is more to discuss, we can continue this dialogue then. Also, as Tom Rohlman previously wrote, his preference is that all requests or questions your clients may have be submitted in writing and sent from you to me.

CONNECTICUT          NEW JERSEY          CALIFORNIA          MASSACHUSETTS

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 3    Case 1.22-cv-02407-MKV    Document 27-5    Filed 08/30/22    Page 4 of 4    RECEIVED NYSCEF: 07/26/2019



Mitchell J. Geller, Esq.
*August 31, 2018*
*Page 2*

Finally, I note that you have not yet answered the question I posed in my August 3, 2018 letter, namely, what are your clients hoping to achieve? As I wrote in my August 3, 2018 letter, until we understand this, we cannot determine if a meeting will be productive. Until Pine gains some clarity as to your clients' objective any meeting is premature. Accordingly, please let us know your clients' objective and then we can consider if a meeting will be productive.

This letter is without waiver of any of our clients' rights, remedies, claims, or defenses, each of which is expressly reserved.

Very truly yours,

Howard S. Koh

cc: Bob G. Goldberg, Esq.

# EXHIBIT A-5

A-382

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-6 Filed 08/30/22 Page 2 of 5

# Exhibit 5

**A-383**

# Holland & Knight

31 West 52nd Street | New York, NY 10019 | I 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Mitchell J. Geller
(212) 513-3483
mitchell.geller@hklaw.com

BY E-MAIL

September 21, 2018

Howard S. Koh, Esq.
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, New York 10017

Re; Interests of Schneider/Schwartz Group in Limited Liability
Companies; Demand For Inspection Of Books and Records

Dear Mr. Koh;

This is in response to your August 31, 2018 letter in response to our letter dated August 22, 2018.

Although your August 31 letter does not address the many issues raised in our August 22 letter, the August 31 letter states that your clients have agreed to the demand for inspection of the books and records of Rudel Realty LLC, Marni Realty LLC, RIS Realty LLC, Marc Realty LLC, Bar-Mar Realty LLC, SIR Realty LLC, Jeruth Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Zizi Realty LLC (collectively "LLC's") made by Jerome Schneider, Ruth Schneider, Marc Schneider, Marni Schwartz, the Jerome Schneider 2012 Family Trust dated December 10, 2012 and the Ruth Schneider 2012 Family Trust dated December 10, 2012 (collectively the "Schneider/Schwartz Group") pursuant to Limited Liability Company Law § 1102, Section 14.1 of the 2011 Amended and Restated Operating Agreement of eight of the LLC's and the 1996 Operating Agreements of Rudel Realty LLC and Marni Realty LLC.

Your August 31 letter refers to the "ten categories of documents that your clients would like to inspect and copy" and states that "to the extent that the companies have the documents that you have requested, they will be provided." In addition, your August 31 letter states that the Schneider/Schwartz Group or "their attorneys and accountants can designate whatever they like for copying and Pine will arrange to have it copied at your clients' cost."

As set forth in our August 22 letter, the Schneider/Schwartz Group's demand for inspection relates to the following "ten categories of documents" for the last six (6) years (2012-2018):

Anchorage | Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Houston | Jacksonville | Lakeland
Los Angeles | Miami | New York | Orlando | Portland | San Francisco | Stamford | Tallahassee | Tampa | Tysons
Washington, D.C. | West Palm Beach

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-6    Filed 08/30/22    Page 4 of 5    INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

Howard S. Koh, Esq.
September 21, 2018
Page 2

(1) the "separate agreement" between the respective limited liability company and Pine Management for services rendered as the "property manager" and any amendments thereto and documents constituting the approval of such "separate agreement;"

(2) documents showing monies paid to Pine Management as the "Manager" of the respective limited liability company and the approval of monies paid or to be paid to the Manager;

(3) documents showing monies paid to Pine Management as the "Property Manager" of the respective limited liability company, the approval of monies paid or to be paid to the Property Manager and the basis and methodology for the calculation of the "management fee" and "construction management fee;"

(4) documents showing the "financial condition" of the limited liability company, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals and General Ledgers;

(5) documents showing the basis for the calculations for the amount of distributions to the members of the limited liability company;

(6) documents showing the capital improvements to the property and payments relating to such capital improvements;

(7) documents relating to or constituting the basis or methodology on which the Manager or Property Manager is setting reserves for the underlying property, including Pine Management's "guidelines," if any, for such reserve accounts;

(8) documents constituting or relating to renovations to the apartments at the property;

(9) documents concerning or related to payments by the respective limited liability company to persons or entities related or affiliated with Pine Management in any capacity.

(10) written consents, if any, reflecting actions taken by the Manager or Members of the LLC's.

In response to your request for prospective dates for the inspection, we propose the following dates: October 1, 2, 5, 8 or 9. We would like the inspection to start at 9 am or 9:30 am.

A-385

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019

NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 07/26/2019

Howard S. Koh, Esq.
September 21, 2018
Page 3

The Schneider/Schwartz Group reserves all of their rights, remedies and claims.

Sincerely,

*Mitchell J. Geller*

Mitchell J. Geller

cc: Jerome Schneider
    Ruth Schneider
    Marc Schneider
    Marni Schwartz
    Lance Myers, Esq.

#60783046_v1

# EXHIBIT A-6

A-387

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 07/26/2019

# Exhibit 6

**A-388**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-7   Filed 08/30/22   Page 3 of 3   RECEIVED NYSCEF: 07/26/2019



## MEISTER SEELIG & FEIN LLP

ATTORNEYS AT LAW                                             Howard S. Koh
125 Park Avenue, 7th Floor                                         *Partner*
New York, NY 10017                                      Direct (212) 655-3587
Telephone (212) 655-3500                                   Fax (646) 539-3687
Facsimile (212) 655-3535                                   *hsk@msf-law.com*
www.meisterseelig.com

September 28, 2018

### BY EMAIL AND FIRST CLASS MAIL

Mitchell J. Geller, Esq.
Holland & Knight LLP
31 West 52nd Street
New York, New York 10019

     **Re:**    *Interests of Schneider/Schwartz Group in Limited Liability Companies*

Dear Mr. Geller:

I am writing in response to your letter dated September 21, 2018.

Pine Management, Inc. ("Pine Management") will make all of the documents you have requested, to the extent such documents exist, available for inspection and copying by your clients, or their attorneys or accountants, at my office. We will have a conference room available in which you can conduct your review.

Given the large number of documents you have requested, Pine Management needs time to gather the documents and cannot make them available until October 23-26, 2018. Please select one of those dates for the review and let me know who will be attending.

This letter is without waiver of any of our clients' rights, remedies, claims, or defenses, each of which is expressly reserved.

Very truly yours,

Howard S. Koh

cc: Bob G. Goldberg, Esq.

# EXHIBIT A-7

**A-390**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 07/26/2019

# Exhibit 7

# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Mitchell J. Geller
(212) 513-3483
mitchell.geller@hklaw.com

November 20, 2018

**BY E-MAIL**

Howard S. Koh, Esq.
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, New York 10017

      Re:    Interests of Schneider/Schwartz Group in Limited Liability
             Companies; Deficiencies in Production Of Books and Records

Dear Mr. Koh;

      We write to inform you that the documents made available during the document inspection of October 25, 2018 are largely unresponsive to the ten categories of documents requested in our two letters dated July 17 and August 22, 2018. As such, the production of the documents of the ten (10) limited liability companies is materially defective.

      On October 25, 2018 Marc Schneider, Jerome Schneider and Madelaine Harrington of Holland & Knight LLP went to your offices to inspect the documents requested pursuant to the July 17 and August 22, 2018 letters. You made available three bankers boxes that contained the books and records of Rudel Realty LLC, Marni Realty LLC, RIS Realty LLC, Marc Realty LLC, Bar-Mar Realty LLC, SIR Realty LLC, Jeruth Realty LLC, Bren-El Realty LLC, JHJ Realty LLC and Zizi Realty LLC (collectively the "LLCs"). Incredibly, you stated that the documents in these bankers boxes were the **only** books and records for the LLCs.[1]

      There were several sets of documents affixed with sticky notes within the bankers boxes that appeared to be intended to correspond to several of the categories of documents requested in our July 17 and August 22, 2018 letters, but which in fact were incomplete and largely unresponsive. Pine Management's failure to produce many of the documents requested further demonstrates Pine Management's breach of its fiduciary duties as "Manager," breach of its duty

---

[1] Although our September 29, 2018 letter stated "[g]iven the large number of documents you have requested, Pine Management needs time to gather the documents and cannot make them available until October 23-26, 2018," only three bankers boxes were produced.

**A-392**

Howard S. Koh, Esq.
November 20, 2018
Page 2

to give the Schneider/Schwartz Group complete access to documents relating to the LLCs and breach of its duty to provide material facts to the members of the LLCs.

The following paragraphs set forth the ten original categories of documents requested, the documents you provided and the deficiencies in such document production.

**Document Deficiencies**

(1) We requested the "separate agreement" between the respective limited liability company ("LLC") and Pine Management for services rendered as the "property manager" and any amendments thereto and documents constituting the approval of such "separate agreement." You provided a set of documents affixed with a note reading "1. Operating Agreements." The Schneider/Schwartz Group[2] already has a copy of these operating agreements.

However, you produced no "separate agreement" between any of the LLCs and Pine Management as "property manager." <u>Pine Management's failure to produce a "property manager" agreement means that no written "property manager" agreement exists between any of the LLCs and Pine Management and that Pine Management was never authorized by any of the LLCs to serve as "property manager."</u>

(2) We requested documents showing monies <u>paid to Pine Management as the "Manager"</u> of the respective limited liability company and the approval of monies paid or to be paid to the Manager. You provided two schedules of documents, identified as "P320" and "P330" respectively, that were affixed with a note reading "2. Monies to Pine Management." These schedules show thousands of payments made to "Pine Management, Inc." <u>but do not show the basis for the payment or explain the distinction between P320 or P330.</u> Moreover, these numbers do not match up with the figures on the LLCs summary of receipts and disbursements. Additionally, the documents produced contained other "codes" used for various line items, including numerous numeric codes under the column marked "ITEM". Therefore, we require further information to understand the figures listed on these documents identified as "P320" and "P330" and the other "codes" used for various line items.

(3) We requested documents showing monies <u>paid to Pine Management as the "Property Manager"</u> of the respective limited liability company, the approval of monies paid or to be paid to the Property Manager

---

[2] Unless otherwise stated, all capitalized terms are defined in the letter to Meister, Seelig & Fein LLP dated August 22, 2018 (the "August 22, 2018 letter")

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-8   Filed 08/30/22   Page 5 of 8   RECEIVED NYSCEF: 07/26/2019

Howard S. Koh, Esq.
November 20, 2018
Page 3

and the basis and methodology for the calculation of the "management fee" and "construction management fee." You provided a set of schedules for the years 2012-2017 affixed with a note reading "3. Annual Mgt. Fee Adjustments + Construction Mgt. Fees."

These schedules are deficient or unresponsive in several respects: <u>First</u>, it is unclear whether these fee schedules represent fees paid to Pine Management as "Property Manager" (as requested) or fees paid to Pine Management as the "Manager" of the respective LLC. <u>Second</u>, although the schedules list a "Management Fee" of 7%, they do not contain the basis or methodology for calculating such fee. <u>Third</u>, there is no documentation of any "construction management fee." <u>Fourth</u>, the fees listed on the schedule do not match management fees listed on the summary of receipts and disbursements for the respective LLC. Therefore, we require further information to understand these documents.

(4) We requested documents showing the "financial condition" of the LLCs, including any Profit and Loss Statements, Balance Sheets, Accounts Receivable Journals, Accounts Payable Journals and General Ledgers. You provided (1) summaries of receipts and disbursements for each of the ten LLCs for the years 2012-17, affixed with a note reading "Financials," (2) tax returns for each of the ten LLCs for the years 2012-2017, and (3) a "Cumulative GL" for each of the LLCs for the years 2012-2017. However, you did not produce documents relating to loans to the LLCs, including, but not limited to, loans made to the LLCs by members of such LLCs, including the Pine/Rohlman Group. Since the Schneider/Schwartz Group is aware of some of the loans, we request that you produce all documents concerning any loans to the LLC's, including loans made to the LLCs by members of such LLCs, including the Pine/Rohlman Group.

(5) We requested documents showing the basis for the calculations for the amount of distributions to the members of the LLCs. <u>Significantly, you did not provide any documents responsive to this request.</u> We therefore conclude that such documents do not exist or that you are withholding such documents.

(6) We requested documents showing the capital improvements to the properties owned by the LLCs and payments relating to such capital improvements. You provided a schedule of documents with a note reading "6. GL's." This schedule is merely a list of payments made to various subcontractors. These documents fail to show (a) what improvements were made, (b) for which properties, or (c) the total cost of improvements per year. Moreover, like the documents labeled "Monies to Pine Management," you did not provide an explanation of the codes listed under the columns marked

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV   Document 27-8   Filed 08/30/22   Page 6 of 8 NYSCEF: 07/26/2019

Howard S. Koh, Esq.
November 20, 2018
Page 4

"ITEM" or "VEND." This schedule is therefore useless to help us understand the amount that the respective limited liability company is spending on each apartment per year. Therefore, we require further information to understand these documents.

(7) We requested documents relating to or constituting the basis or methodology on which the Manager or Property Manager is setting reserves for the underlying property owned by the LLCs, including Pine Management's "guidelines," if any, for such reserve accounts. You provided a schedule affixed with a note reading "7. Money Market." This schedule is merely a spreadsheet that calculates the reserves. Notably, you did not provide any documentation that reflects or relates to the "guidelines" for setting the reserves, notwithstanding Brenda Rohlman's statement in her March 3, 2018 e-mail that "over 35 years, Pine Management Inc has developed guidelines as to how much money to hold in each building's reserve account." We therefore conclude that documents setting forth the "guidelines" for the properties' reserve accounts do not exist or that you are withholding such documents.

(8) We requested documents constituting or relating to renovations to the apartments at the properties owned by the LLCs. You provided nothing specific in response to this request. The most relevant document would appear to be that provided in response to category (6), which is merely a schedule of fees paid to subcontractors. We are unable to determine from this document what renovations, if any, were made to the properties and the total cost of each specific renovation per year. Therefore, we require further information to understand these documents.

(9) We requested documents concerning or related to payments by the respective limited liability company to persons or entities related or affiliated with Pine Management in any capacity. Significantly, you did not provide any documents responsive to this request. We therefore conclude that these documents do not exist or that you are withholding such documents.

(10) We requested written consents, if any, reflecting actions taken by the Manager or Members of the LLCs. You provided only two Consents of Members, from Marni Realty LLC and Rudel Realty LLC, respectively, that (a) agree to the transfer of the 50% membership interest held by Herald Pine to Lloyd J. Pine and Brenda Rohlman, as Trustees of the Harold Pine Family Trust and (b) agree that the Harold Pine 2009 Family Trust shall be treated as a member of the Marni Realty LLC and Rudel Realty LLC, respectively. These two Consents of the Members do not authorize any Member or Manager to operate outside the ordinary course of business or to

Howard S. Koh, Esq.
November 20, 2018
Page 5

borrow money from any of the LLCs. We therefore conclude that there are
no other written consents or that you are withholding such documents.

**Response to Deficiencies**

Based on the foregoing, we, on behalf of the Schneider/Schwartz Group, request the
following from you:

1.    Confirm that the documents requested but not provided do not exist or, if they exist,
that you will promptly produce them. These include:

- The "separate agreement" between the respective LLC and Pine Management for
  services rendered as property manager, as set forth in category (1);
- Documents showing the basis for the calculations for the amount of distributions to the
  members of each LLC, as set forth in category (4);
- Documents setting for the "guidelines" for setting reserves for the property owned by
  each LLC, as set forth in category (5);
- Documents setting forth specific renovations for each of the properties owned by the
  LLCs and the amounts of money paid for the same, as set forth in category (7);
- Documents concerning or related to payments by the respective limited liability
  company to persons or entities related or affiliated with Pine Management in any
  capacity, as set forth in category (9); and
- Any additional written consents reflecting actions taken by the Manager or Members
  of the LLCs, as set forth in category (10).

2.    Provide us with additional documentation to understand the documents provided in
response to categories (2), (3), (6), and (8), including an explanation of the "codes" listed on the
documents labeled "2. Monies to Pine Management" and "6. GL's". The Schneider/Schwartz
Group requests that you provide this additional information in Excel format to the extent they
relate to various line items from the ledgers and the receipts and disbursements.

Based on the documents we have reviewed, the terms of the 2011 Amended Operating
Agreements and the 1996 Operating Agreement of the LLCs and Pine Management's refusal to
produce all the documents requested by our July 17 and August 22, 2018 letters, we believe that
the Schneider/Schwartz Group has several claims against Pine Management arising from Pine
Management's management of the LLCs, including but not limited to the following: (a) Pine
Management has breached its fiduciary duty to the Schneider/Schwartz Group and has not acted
in good faith; (b) Pine Management has breached provisions of the governing Operating
Agreements; (c) Pine Management has failed to disclose material facts to the Schneider/Schwartz
Group; (d) Pine Management has been involved in related party transactions; and (e) Pine
Management has failed to provide key documents concerning the management and operations of
the LLC's to the Schneider/Schwartz Group. In short, Pine Management (and the Pine/Rohlman
Group) have taken and continue to take actions that have prevented the Schneider/Schwartz Group

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3  Case 1:22-cv-02407-MKV  Document 27-8  Filed 08/30/22  Page 8 of 8
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Howard S. Koh, Esq.
November 20, 2018
Page 6

from exercising their rights as members under the 2011 Amended Operating Agreements, the 1996 Operating Agreement and the Limited Liability Company Law.

As stated in prior letters, we suggest that a meeting be scheduled to resolve the Schneider/Schwartz Group's concerns. This meeting must take place in December. We continue to believe that a mutually satisfactory resolution of the issues is preferable to a costly and unnecessary litigation.

Sincerely,

*Mitchell J. Geller*

Mitchell J. Geller

cc: Jerome Schneider
    Ruth Schneider
    Marc Schneider
    Marni Schwartz
    Lance Myers, Esq.
    Madelaine Harrington, Esq.

6177856 v2

# EXHIBIT A-8

**A-398**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM                INDEX NO. 654303/2019

NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-9   Filed 08/30/22   Page 2 of 4   RECEIVED NYSCEF: 07/26/2019

# Exhibit 8

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-9   Filed 08/30/22   Page 3 of 4   RECEIVED NYSCEF: 07/26/2019



MSF
Meister Seelig & Fein LLP

Howard S. Koh
*Partner*
Direct (212) 655-3587
Fax (646) 539-3687
*hsk@msf-law.com*

December 7, 2018

**BY EMAIL AND FIRST CLASS MAIL**

Mitchell J. Geller, Esq.
Holland & Knight LLP
31 West 52nd Street
New York, New York 10019

    *Re:   Interests of Schneider/Schwartz Group in Limited Liability Companies*

Dear Mr. Geller:

I am writing in response to your letter dated November 20, 2018.

As an initial matter, we categorically reject your allegations that Pine Management, Inc, ("Pine Management") breached its fiduciary duty to your clients, breached provisions of the governing operating agreements, failed to disclose material facts to your clients, engaged in unlawful related party transactions, failed to provide your clients with key documents, or that Pine Management was never authorized by any of the LLCs to serve as property manager. To the contrary, Pine Management has always reasonably and efficiently responded to your clients' requests, provided the various documents and responses you have sought, and has met all of its obligations to your clients. Further, I reject your allegation that I stated, "that the documents in these bankers boxes were the **only** books and records for the LLCs".

Page 5 of your November 20th letter, in the section headed "Response to Deficiencies" makes several demands. We respond as follows:

- There is no separate written agreement between the respective LLCs and Pine Management for services rendered as property manager.

- Distributions are a relative function of revenue, expenses, reserve balances, debt, etc. When distributions are issued, they are distributed based on each respective members percentage interest in the LLC. There are no other documents showing the basis upon which distribution amounts are computed.

- Pine Management's current general "guidelines" for setting reserves for the property owned by each LLC are as follows: $200,000 baseline per building plus an additional

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM     INDEX NO. 654303/2019
NYSCEF DOC. NO. 3  Case 1:22-cv-02407-MKV   Document 27-9   Filed 08/30/22   Page 4 of 4  RECEIVED NYSCEF: 07/26/2019

*Mitchell J. Geller, Esq.*
*December 7, 2018*
*Page 2*

$7,500 per unit. These are minimum general guidelines and actual reserve amounts can vary based on a variety of conditions, including but not limited to, market conditions, the physical condition of the property, the need or desirability for capital improvements, debt maturity dates, etc. This information was previously provided during your document inspection on October 25, 2018.

- Pine Management will provide copies of the renovation files for each apartment renovation at each of the properties owned by the LLCs since 2012. These files contain the relevant contracts, change orders, and invoices that show what was paid on each of the renovations and to whom. Pine Management will provide these files at a date to be mutually arranged in January 2019. Year end business planning and the upcoming holidays prevent Pine Management from producing these files in advance of the above referenced date.

- The list of relevant account codes for each of the accounts on the general ledger can be found on the cumulative general ledgers that were previously provided during your document inspection on October 25, 2018.

- Pine Management has previously provided all written consents of members in our records.

- Although not included in your "Response to Deficiencies" list, your November 20th letter, at page 3, seeks all documents concerning loans made to the LLCs, including loans made by members of the "Pine/Rohlman Group". We enclose the promissory notes evidencing those loans. To my knowledge, many, if not all, of these promissory notes have been previously provided.

If, after reviewing this information, your clients have additional requests, please advise us of such. If your clients are entitled to the information, it will be provided, as it always has been historically. Insofar as your request for a meeting is concerned, we have repeatedly inquired about the proposed agenda for the meeting. To date, we still have yet to receive any response regarding same.

Very truly yours,

Howard S. Koh

Meister Seelig & Fein LLP

125 Park Avenue, 7th Floor, New York, NY 10017 | Phone (212) 655-3500 | Fax (212) 655-3535 | meisterseelig.com

# EXHIBIT A-9

**A-402**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-10 Filed 08/30/22 Page 2 of 12 RECEIVED NYSCEF: 07/26/2019

# Exhibit 9

**A-403**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-10    Filed 08/30/22    Page 3 of 12

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

## OPERATING AGREEMENT

## OF

## RUDEL REALTY LLC

This Operating Agreement (this "Agreement") of **RUDEL REALTY LLC** is entered into between **HAROLD PINE** and **JEROME SCHNEIDER**, as members (the "Members").

The Members hereby form a Limited Liability Company pursuant to and in accordance with the Limited Liability Company Law of the State of New York, as amended from time to time (the "LLCL"), and hereby agree as follows:

1.     <u>Name</u>.  The name of the Limited Liability Company formed hereby is **RUDEL REALTY LLC**, (the "Company").

2.     <u>Term</u>.  The Members have been affiliated as partners of **RUDEL REALTY CO**, and each holds an interest therein (the "Partnership Interests").  They shall continue their relationship as Members of the Company, the term of which shall commence on the date of acceptance of The Articles of Organization by the New York Department of State.  The Company shall continue until December 31, 2030 unless dissolved before such date in accordance with the LLCL.

3.     <u>Purpose</u>.  The Company is formed for the purpose of engaging in any lawful act or activity for which Limited Liability Companies may be formed under the LLCL and engaging in any and all activities necessary or incidental to the foregoing.

- 1 -

**A-404**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-10 Filed 08/30/22 Page 4 of 12
RECEIVED NYSCEF: 07/26/2019

4. <u>Members</u>. The name and the business, residence, or mailing address of the Members are as follows:

| <u>Name</u> | <u>Address</u> |
|---|---|
| HAROLD PINE | 252 Cornwall Road<br>Glen Rock, New Jersey 07452 |
| JEROME SCHNEIDER | 78 Elm Road<br>Briarcliff Manor, NY 10510-2225 |

5. <u>Powers</u>.

5.1. <u>Management by Members</u>. The business and affairs of the Company shall be managed by the Members. The Members shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Members under the LLCL.

5.2. <u>Authorized Persons</u>. In accordance with LLCL §102(c), **THOMAS ROHLMAN**, **BRENDA ROHLMAN** and **HAROLD PINE** are hereby designated and authorized to act as the Authorized Persons on behalf of the Company. The Authorized Persons, acting singly, are each hereby authorized to execute any and all documents required to be executed by the Company, except the sale or mortgaging of Company real property, which will require unanimity.

5.3. <u>Powers</u>. No other person shall have any right or authority to act for or bind the Company except as permitted in this Agreement or as required by law. No person dealing with the Authorized Persons need inquire into the validity or propriety of any document or instrument executed in the name of the Company by the Authorized Persons, or as to the authority of the Authorized Persons in executing the same.

**A-405**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-10   Filed 08/30/22   Page 5 of 12

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

5.4. <u>Limitation on Authority of Members</u>. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member. This Section 5 supersedes any authority granted the Members pursuant to Section 412 of the LLCL. Any Member who takes any action or binds the Company in violation of this Section 5 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

5.5. <u>Liability and Indemnification</u>. The Authorized Persons shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Authorized Persons within the scope of the authority conferred on the Authorized Persons by this Agreement, except for fraud, bad faith, gross negligence, or an intentional breach of this Agreement. The Company shall indemnify the Authorized Persons for any act performed by the Authorized Persons within the scope of the authority conferred on the Authorized Persons by this Agreement, except for fraud, bad faith, gross negligence, or an intentional breach of this Agreement.

6. <u>Capital Contributions</u>. Each Member contributes his/her Partnership Interest in **RUDEL REALTY CO.**

7. <u>Additional Contributions</u>. No Member is required to make any additional capital contribution to the Company.

8. <u>Allocation of Profits and Losses</u>. The company's profits and losses shall be allocated as follows:

| | |
|---|---|
| HAROLD PINE | 50% |
| JEROME SCHNEIDER | 50% |

- 3 -

**A-406**

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

9.     Distributions.  Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Members.  Such distributions shall be allocated among the Members in the same proportion as the allocation of profits and losses.

10.     Assignments.    A Member may not assign in whole or in part his Limited Liability Company interest.

11.     Withdrawal of a Member.     A Member may withdraw from the Company in accordance with the LLCL.

12.     Admission of Additional Members.     One (1) or more additional Members of the Company may be admitted to the Company with the consent of a majority of the Members.

13.     Liability of Members.  The Members shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the LLCL.

14.     Events of Dissolution. The Company shall be dissolved upon the happening of any of the following events:

14.1  When the period fixed for its duration in Section 2 has expired.

14.2  Upon the unanimous written agreement of the Members.

14.3  Upon the death, retirement, resignation, expulsion or bankruptcy of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company, unless the remaining Members, within

**A-407**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-10   Filed 08/30/22   Page 7 of 12 RECEIVED NYSCEF: 07/26/2019

ninety (90) days after the event or occurrence, unanimously elected to continue the business of the Company pursuant to the terms of this Agreement.

15.  <u>General Provisions</u>.

**15.1.**  <u>Assurances</u>.  Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

**15.2.**  <u>Notifications</u>.  Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested or by facsimile transmission, provided receipt is actually acknowledged by the Member of Member's agent.  A notice must be address to a Member at the Member's last known address on the records of the Company.  A notice to the Company must be address to the Company's principal office.  A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered.  A notice that is sent by mail will be deemed given three (3) business days after it is mailed.  Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.  A notice sent by facsimile is deemed given when receipt is acknowledged.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.  Case 1:22-cv-02407-MKV   Document 27-10   Filed 08/30/22   Page 8 of 12   RECEIVED NYSCEF: 07/26/2019

15.3.  <u>Specific Performance</u>.  The parties recognized that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury.  Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, the Company as well as any party who may be injured (in addition to any other remedies which may be available to the Company or that party) shall be entitled to one or more preliminary or permanent orders: (i) restraining and enjoining any act which would constitute a breach; or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

15.4.  <u>Complete Agreement</u>.  This Agreement constitutes the complete and exclusive statement of the agreement along with the Members with respect to the subject matter thereof.  It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.  Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of the Members including two-thirds (2/3rds) or more of the percentages then held by Members.

15.5.  <u>Applicable Law</u>.  All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of New York.

15.6.  <u>Article and Section Titles</u>.  The headings herein are inserted as a matter of convenience only and do not define, limit, or described the scope of this Agreement or the intent of the provisions hereof.

15.7.  <u>Binding Provisions</u>.  This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors,

**A-409**

administrators, personal and legal representatives, successors, and permitted assigns.

15.8. <u>Exclusive Jurisdiction and Venue</u>. Any suit involving any dispute or matter arising under this Agreement may only be brought in a United States District Court located in the State of New York or any New York State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such Court with respect to any such proceeding.

15.9. <u>Terms</u>. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the person may in the context require.

15.10. <u>Separability of Provisions</u>. Each provision of this Agreement shall be considered separate; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

15.11. <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

15.12. <u>Estoppel Certificate</u>. Each Member shall, within ten (10) days after written request by the General Manager [or Members holding twenty-five (25%) percent or more of Percentage Interests], deliver to the requesting person(s)

**A-410**

a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by an instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting person, or if there is a default, the nature and extent thereof.

*IN WITNESS WHEREOF*, the undersigned, intending to be legally bound hereby, have duly executed this Operating Agreement as of the _17_ day of _October_, 1996.

HAROLD PINE

JEROME SCHNEIDER

Retail Operating Agmt.

- 8 -

**A-411**

STATE OF NEW YORK   )
COUNTY OF NEW YORK)  ss.:

On ____10/17____, 1996, before me personally came HAROLD PINE, to me known and known to me to be the individual described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

NEIL GEVIRTZ
Notary Public, State of New York
No. 4925636
Qualified in Rockland County
Commission Expires April 4, 1998

_____
NOTARY PUBLIC

STATE OF NEW YORK   )
COUNTY OF NEW YORK)  ss.:

On ____10/17____, 1996, before me personally came JEROME SCHNEIDER, to me known and known to me to be the individual described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

NEIL GEVIRTZ
Notary Public, State of New York
No. 4925636
Qualified in Rockland County
Commission Expires April 4, 1998

_____
NOTARY PUBLIC

- 9 -

**A-412**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 07/26/2019

# OPERATING AGREEMENT

## OF

## RUDEL REALTY LLC

# EXHIBIT A-10

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV   Document 27-11   Filed 08/30/22   Page 2 of 12    RECEIVED NYSCEF: 07/26/2019

# Exhibit 10

A-415

# OPERATING AGREEMENT

## OF

## MARNI REALTY LLC

This Operating Agreement (this "Agreement") of **MARNI REALTY LLC** is entered into between **HAROLD PINE** and **JEROME SCHNEIDER**, as members (the "Members").

The Members hereby form a Limited Liability Company pursuant to and in accordance with the Limited Liability Company Law of the State of New York, as amended from time to time (the "LLCL"), and hereby agree as follows:

1.    <u>Name</u>. The name of the Limited Liability Company formed hereby is **MARNI REALTY LLC**, (the "Company").

2.    <u>Term</u>. The Members have been affiliated as partners of **MARNI REALTY CO.** and each holds an interest therein (the "Partnership Interests"). They shall continue their relationship as Members of the Company, the term of which shall commence on the date of acceptance of The Articles of Organization by the New York Department of State. The Company shall continue until December 31, 2030 unless dissolved before such date in accordance with the LLCL.

3.    <u>Purpose</u>. The Company is formed for the purpose of engaging in any lawful act or activity for which Limited Liability Companies may be formed under the LLCL and engaging in any and all activities necessary or incidental to the foregoing.

- 1 -

**A-416**

4.    Members.  The name and the business, residence, or mailing address of the Members are as follows:

| Name | Address |
|------|---------|
| HAROLD PINE | 252 Cornwall Road<br>Glen Rock, New Jersey 07452 |
| JEROME SCHNEIDER | 78 Elm Road<br>Briarcliff Manor, NY 10510-2225 |

5.    Powers.

5.1.  Management by Members.  The business and affairs of the Company shall be managed by the Members.  The Members shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by Members under the LLCL.

5.2.  Authorized Persons.  In accordance with LLCL §102(c), **THOMAS ROHLMAN**, **BRENDA ROHLMAN** and **HAROLD PINE** are hereby designated and authorized to act as the Authorized Persons on behalf of the Company.  The Authorized Persons, acting singly, are each hereby authorized to execute any and all documents required to be executed by the Company, except the sale or mortgaging of Company real property, which will require unanimity.

5.3. Powers.  No other person shall have any right or authority to act for or bind the Company except as permitted in this Agreement or as required by law.  No person dealing with the Authorized Persons need inquire into the validity or propriety of any document or instrument executed in the name of the Company by the Authorized Persons, or as to the authority of the Authorized Persons in executing the same.

- 2 -

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-11 Filed 08/30/22 Page 5 of 12

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

5.4. <u>Limitation on Authority of Members</u>. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member. This Section 5 supersedes any authority granted the Members pursuant to Section 412 of the LLCL. Any Member who takes any action or binds the Company in violation of this Section 5 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

5.5. <u>Liability and Indemnification</u>. The Authorized Persons shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Authorized Persons within the scope of the authority conferred on the Authorized Persons by this Agreement, except for fraud, bad faith, gross negligence, or an intentional breach of this Agreement. The Company shall indemnify the Authorized Persons for any act performed by the Authorized Persons within the scope of the authority conferred on the Authorized Persons by this Agreement, except for fraud, bad faith, gross negligence, or an intentional breach of this Agreement.

6. <u>Capital Contributions</u>. Each Member contributes his/her Partnership Interest in **MARNI REALTY CO.**

7. <u>Additional Contributions</u>. No Member is required to make any additional capital contribution to the Company.

8. <u>Allocation of Profits and Losses</u>. The company's profits and losses shall be allocated as follows:

HAROLD PINE 50%
JEROME SCHNEIDER 50%

- 3 -

**A-418**

9.      <u>Distributions</u>.  Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Members.  Such distributions shall be allocated among the Members in the same proportion as the allocation of profits and losses.

10.     <u>Assignments</u>.   A Member may not assign in whole or in part his Limited Liability Company interest.

11.     <u>Withdrawal of a Member</u>.   A Member may withdraw from the Company in accordance with the LLCL.

12.     <u>Admission of Additional Members</u>.   One (1) or more additional Members of the Company may be admitted to the Company with the consent of a majority of the Members.

13.     <u>Liability of Members</u>.  The Members shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the LLCL.

14.     <u>Events of Dissolution</u>.  The Company shall be dissolved upon the happening of any of the following events:

14.1  When the period fixed for its duration in Section 2 has expired.

14.2  Upon the unanimous written agreement of the Members.

14.3  Upon the death, retirement, resignation, expulsion or bankruptcy of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company, unless the remaining Members, within

- 4 -

**A-419**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-11 Filed 08/30/22 RECEIVED NYSCEF: 07/26/2019

ninety (90) days after the event or occurrence, unanimously elected to continue the business of the Company pursuant to the terms of this Agreement.

15.   <u>General Provisions</u>.

15.1.   <u>Assurances</u>.  Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

15.2.   <u>Notifications</u>.  Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested or by facsimile transmission, provided receipt is actually acknowledged by the Member of Member's agent.  A notice must be address to a Member at the Member's last known address on the records of the Company.  A notice to the Company must be address to the Company's principal office.  A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered.  A notice that is sent by mail will be deemed given three (3) business days after it is mailed.  Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.  A notice sent by facsimile is deemed given when receipt is acknowledged.

**A-420**

15.3. <u>Specific Performance</u>. The parties recognized that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, the Company as well as any party who may be injured (in addition to any other remedies which may be available to the Company or that party) shall be entitled to one or more preliminary or permanent orders: (i) restraining and enjoining any act which would constitute a breach; or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

15.4. <u>Complete Agreement</u>. This Agreement constitutes the complete and exclusive statement of the agreement along with the Members with respect to the subject matter thereof. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of the Members including two-thirds (2/3rds) or more of the percentages then held by Members.

15.5. <u>Applicable Law</u>. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of New York.

15.6. <u>Article and Section Titles</u>. The headings herein are inserted as a matter of convenience only and do not define, limit, or described the scope of this Agreement or the intent of the provisions hereof.

15.7. <u>Binding Provisions</u>. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors,

- 6 -

**A-421**

administrators, personal and legal representatives, successors, and permitted assigns.

15.8. Exclusive Jurisdiction and Venue. Any suit involving any dispute or matter arising under this Agreement may only be brought in a United States District Court located in the State of New York or any New York State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such Court with respect to any such proceeding.

15.9. Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the person may in the context require.

15.10. Separability of Provisions. Each provision of this Agreement shall be considered separate; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

15.11. Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

15.12. Estoppel Certificate. Each Member shall, within ten (10) days after written request by the General Manager [or Members holding twenty-five (25%) percent or more of Percentage Interests], deliver to the requesting person(s)

**A-422**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-11 Filed 08/30/22 Page 10 of 12 RECEIVED NYSCEF: 07/26/2019

a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by an instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting person, or if there is a default, the nature and extent thereof.

*IN WITNESS WHEREOF*, the undersigned, intending to be legally bound hereby, have duly executed this Operating Agreement as of the _17_ day of _October_ , 1996.

HAROLD PINE

JEROME SCHNEIDER

**A-423**

STATE OF NEW YORK   )
COUNTY OF NEW YORK) **ss.:**


On ___10/17___, 1996, before me personally came HAROLD PINE, to me known and known to me to be the individual described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.


NOTARY PUBLIC


STATE OF NEW YORK   )
COUNTY OF NEW YORK) **ss.:**


On ___10/17___, 1996, before me personally came JEROME SCHNEIDER, to me known and known to me to be the individual described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.


NOTARY PUBLIC

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3

Case 1:22-cv-02407-MKV   Document 27-11   Filed 08/30/22   Page 12 of 12

RECEIVED NYSCEF: 07/26/2019

# OPERATING AGREEMENT

## OF

## MARNI REALTY LLC

# EXHIBIT A-11

A-426

Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 2 of 37

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 07/26/2019

# Exhibit 11

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 3 of 37    RECEIVED NYSCEF: 07/26/2019

# AMENDMENT AND RESTATEMENT OF

# OPERATING AGREEMENT

# OF

# JERUTH REALTY LLC

## (a New York limited liability company)

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW JERSEY 07602-0800
(201) 489-3000

46067/0001-8631922v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019

NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-12    Filed 08/30/22    Page 4 of 37    RECEIVED NYSCEF: 07/26/2019

# **TABLE OF CONTENTS**

**Page**

Section 1. - Formation and Name ........................................................... 1
Section 2. - Office ................................................................................... 1
Section 3. - Definitions .......................................................................... 2
Section 4. - Purposes ............................................................................. 4
Section 5. - Capital Contributions and Capital Accounts ....................... 4
Section 6. - Admission of Additional Members ...................................... 6
Section 7. - Allocations and Distributions .............................................. 6
Section 8. - Management ......................................................................... 9
Section 9. - Restrictions on the Transfer of a Member's Interest .......... 13
Section 10. - Determination of Value .................................................... 18
Section 11. - Termination of a Member ................................................. 19
Section 12. - Term of the Company ....................................................... 19
Section 13. - Fiscal Year and Accounting Method ................................. 19
Section 14. - Books and Records ........................................................... 19
Section 15. - Other Activities of Members ............................................ 20
Section 16. - Resignation of a Member ................................................. 20
Section 17. - Indemnification ................................................................ 20
Section 18. - Limitation on Liability ...................................................... 21
Section 19. - Amendment ...................................................................... 21
Section 20. - Miscellaneous .................................................................. 21

i

46067/0001-8631922v2

**A-429**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-12    Filed 08/30/22    Page 5 of 37

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

# AMENDMENT AND RESTATEMENT OF

## OPERATING AGREEMENT

### OF

### JERUTH REALTY LLC

### (a New York limited liability company)

**THIS AMENDMENT AND RESTATEMENT OF OPERATING AGREEMENT,** made as of the ___1st___ day of ___August___, 2012, by and between Harold Pine ("Harold"), Lloyd Pine ("Lloyd"), Brenda Rohlman ("Brenda"), Thomas Rohlman ("Thomas") and Jerome Schneider ("Jerome") (Harold, Lloyd, Brenda, Thomas and Jerome shall hereinafter, at times, be referred to collectively as the "Members" or individually as a "Member").

## W I T N E S S E T H :

**WHEREAS,** the Members of Jeruth Realty LLC entered into an operating agreement, effective as of October 17, 1996, and which is binding upon the Members; and

**WHEREAS,** the Members may amend said operating agreement with the written consent of the Members including two-thirds or more of the percentage interests then held by the Members, pursuant to Section 15.4 of said operating agreement; and

**WHEREAS,** the Members desire to amend and restate said operating agreement as hereinafter provided for the purposes hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

## Section 1. - Formation and Name

The Members heretofore have associated themselves into a limited liability company pursuant to the provisions of the New York Limited Liability Company Act. The Company shall be governed by the terms and conditions set forth herein. The limited liability company's name is Jeruth Realty LLC.

## Section 2. - Office

The Secretary of State is designated as agent of the Company upon whom process against it may be served. The post office address to which the Secretary of State of the

46067/0001-8631922v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM        INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-12    Filed 08/30/22    Page 6 of 37    RECEIVED NYSCEF: 07/26/2019

State of New York shall mail a copy of any process against the Company served upon him or her is c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025. Such office and agent may be changed, from time to time, as the Manager shall determine. The Company's principal place of business shall be located at c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025 and/or such other location or locations as, from time to time, the Manager shall select.

### Section 3. - Definitions

3.1    "Agreement" means this Operating Agreement, as originally executed and as amended from time to time, which supersedes any prior operating agreement, and the terms "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

3.2    "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon: (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member; (iv) the filing of a petition in an involuntary bankruptcy case, which petition remains undismissed or suspended for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

3.3    "Capital Account" means, with respect to any Member or assignee, the Capital Account maintained in accordance with the provisions set forth in Section 5.3 hereof.

3.4    "Capital Contribution" means, with respect to any Member or assignee, the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by such Member or assignee.

2

3.5    "Class A Members" means all of the voting Members in the Company.  See Exhibit B attached hereto for a list of the Company's Class A Members.

3.6    "Class B Members" means all of the non-voting Members in the Company.  See Exhibit B attached hereto for a list of Company's Class B Members.  The Class B Members shall have no right to vote in decisions of the Members.

3.7    "Code" means the Internal Revenue Code of 1986, as amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

3.8    "Company" shall refer to Jeruth Realty LLC.

3.9    "Deficit Capital Account" means with respect to any Member or assignee, the deficit balance, if any, in such Member's or assignee's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amount which such Member or assignee is obligated to restore under Regulation Section 1.704-1(b)(2)(ii)*(c)*, as well as any addition thereto pursuant to the next to last sentence of Regulation Section 1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Regulation Section 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Regulation Section 1.704-2(i)(3)); and

(b)    Debit to such Capital Account the items described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* and *(6)*.

The definition of Deficit Capital Account is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)*(d)* and 1.704-2, and will be interpreted consistently with those provisions.

3.10    "Interest" means a Member's entire interest in the Company including the Member's right to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, and the right to participate in the management of the Company's business and affairs, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the New York Act.

3.11    "Manager" or "Managers" means one or more Persons (individually and collectively) selected by the Members, to whom are delegated all or part of the management duties of the Company's business as provided in Section 8 hereof.

3.12    "New York Act" means the New York Limited Liability Company Act, as the same may be amended from time to time.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM  INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV  Document 27-12  Filed 08/30/22  Page 8 of 37 RECEIVED NYSCEF: 07/26/2019

3.13    "Percentage Interest" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof.  Other than by application of Section 6, the Percentage Interests of the Members may not be adjusted without the unanimous consent of the Members.

3.14    "Person" means an individual, association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

3.15    "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, credit, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations.

3.16    "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

### Section 4. - Purposes

The Company was originally formed for the purpose of acquiring, owning and managing the real property commonly known as 139 West 80th Street, New York, New York.  The character and purposes for which the Company was formed, in general, is to own, manage, acquire, invest in real estate; and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement.  The Company may also engage in such other business, activity or purpose permitted by law, as the Manager may determine.

### Section 5. - Capital Contributions and Capital Accounts

5.1    Members' Capital Contributions.  Each Member has made an initial Capital Contribution to the Company, which has been reflected in the Members' Capital Accounts.  No interest shall be paid on any initial or subsequent Capital Contribution.

5.2    Additional Contributions.  Except as set forth in Section 5.1 above, no Member shall be required to make any Capital Contributions.  In order to obtain additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of the Manager.

4

**A-433**
FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 9 of 37
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

    5.3    <u>Capital Accounts</u>.  A separate Capital Account will be maintained for each Member.

    (a)    Each Member's Capital Account will be increased by:

    (i)    The amount of money contributed by the Member to the Company;

    (ii)    The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

    (iii)    Allocations to the Member of Profits; and

    (iv)    Allocations to the Member of income or gain as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

    (b)    Each Member's Capital Account will be decreased by:

    (i)    The amount of money distributed to the Member by the Company;

    (ii)    The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code);

    (iii)    Allocations to the Member of Losses; and

    (iv)    Allocations to the Member of deduction or expense as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

    (c)    In the event of a permitted sale or exchange of an Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Regulation Section 1.704-1(b)(2)(iv).

    (d)    The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder.  If in the Manager's opinion, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified to comply with Section

46067/0001-8631922v2

**A-434**

704(b) of the Code and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, than any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(e)     Except as otherwise required in the New York Act (and subject to Sections 5.1 and 5.2 above), no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

5.4     <u>Withdrawal or Reduction of Members' Contributions to Capital</u>.  A Member shall not receive any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains Company property sufficient to pay them, as determined by the Manager in its sole discretion.  A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

5.5     <u>Advances by the Members</u>.  A Member may from time to time, with the consent of the Manager, advance additional monies to or for the Company's benefit, and each such advance shall be treated as a Capital Contribution to the Company or as a loan to the Company, as determined by the Manager.  Any advance which is treated as a loan shall be evidenced by a promissory note executed and delivered by the Company to the Member.

5.6     <u>Transactions Between Member and/or Manager and the Company</u>.  Except as otherwise provided in this Agreement, a Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide collateral for, and transact other business with the Company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager as set forth in the New York Act.

## Section 6. – Admission of Additional Members

Additional Members may be admitted to the Company upon the affirmative vote of a majority in interest of the Class A Members.  Such new Members shall be allocated Profit and Loss by such method as may be provided in this Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

## Section 7. - Allocations and Distributions

7.1     <u>Allocations of Profits and Losses</u>.  Profits and Losses for any fiscal year shall be allocated to the Members in proportion to their Percentage Interests.

6

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM | INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   RECEIVED NYSCEF: 07/26/2019   Page 11 of 37

7.2     Special Allocations.  Notwithstanding the provisions of Section 7.1:

(a)     Minimum Gain.  Notwithstanding any other provision of this Section 7.2, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain.  This Section 7.2(a) is intended to comply with the minimum gain chargeback requirement of Regulation Section 1.704-2 and shall be interpreted consistently therewith.  If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

(b)     Qualified Income Offset.  If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* or *(6),* which create or increase a Deficit Capital Account of the Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible.  It is the intent that this Section 7.2(b) be interpreted to comply with the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)*(d)*.

(c)     Deficit Balance.  If any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that the Member is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)*(c)* and the Member's share of minimum gain as defined in Regulation Section 1.704-2(g)(1) (which is also treated as an obligation to restore in accordance with Regulation Section 1.704-1(b)(2)(ii)*(d)*), the Capital Account of the Member shall be specially credited with items of Company income (including gross income) and gain in the amount of the excess as quickly as possible.

(d)     Nonrecourse Deductions.  Items of Losses, deduction, and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Regulation Section 1.704-2(i) shall be allocated to the Members' Capital Accounts in accordance with said Regulation Section 1.704-2(i).  Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Regulation Section 1.704-2(b)) those deductions shall be allocated to the

46067/0001-8631922v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-12    Filed 08/30/22    RECEIVED NYSCEF: 07/26/2019    Page 12 of 37

Members in accordance with, and as a part of, the allocations of Company Profit or Loss for that period.

      (e)    Section 704(c). In accordance with Section 704(c)(1)(A) of the Code and Regulation Section 1.704-1(b)(2)(iv)(d)(3), if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for the property shall, solely for Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

      (f)    Curative Allocations. Any credit or charge to the Members' Capital Accounts pursuant to Sections 7.2(a) through 7.2(d) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 7.1 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 7.1 and 7.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Section 7 if the special allocations required by Sections 7.2(a) through 7.2(d) had not occurred.

    7.3    Distributions.

      (a)    The Company shall make distributions to the Members (other than upon liquidation) according to their respective Percentage Interests in the Company at such times as the Manager shall determine. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Agreement by a Member whose interest is liquidated (either upon the withdrawal of a Member or the liquidation of the Company) against the amount otherwise distributable to the Member. Upon the Company's liquidation, the Company's assets shall be distributed in the following order of priority:

        (i)    The claims of creditors, other than Members, first shall be satisfied and adequate reserves established (as determined by the Manager);

        (ii)    All outstanding loans from Members shall be repaid in the same proportion which the outstanding loans from any Member shall bear to the outstanding loans of all Members;

        (iii)    The Members shall receive the balance in proportion to their relative Capital Accounts determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 13 of 37   RECEIVED NYSCEF: 07/26/2019

    (b)    The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the Company's assets, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

    (c)    Subject to the terms and conditions of Section 7.3(d), a Member who receives a distribution in violation of Section 7.3(b), and who knew at the time of the distribution that the distribution violated Section 7.3(b), shall be liable to the Company for the amount of the distribution. A Member who receives a distribution in violation of Section 7.3(b), and who did not know at the time of the distribution that the distribution violated Section 7.3(b), shall not be liable for the amount of the distribution.

    (d)    Unless otherwise agreed upon by the Manager, a Member who receives a distribution from the Company in violation of Section 7.3(b) shall have no liability under the New York Act or other applicable law for the amount of the distribution after the expiration of three (3) years from the date of the distribution unless an action to recover the distribution from the Member is commenced prior to the expiration of the three (3) year period and an adjudication of liability against the Member is made in the said action.

### Section 8. - Management

8.1    <u>Management</u>.

    (a)    The Company's business and affairs shall be managed by the Manager. The Manager shall participate in the direction, management and control of the Company's business to the best of its ability.

    (b)    If there is more than one (1) Manager designated to serve hereunder, the Managers shall in all cases act as a group, with a majority vote of the Managers required to take action. Each Manager shall have one (1) vote.

    (c)    The Company's Manager shall be Pine Management, Inc. Pine Management, Inc. may be paid for services rendered in its role as property manager pursuant to a separate agreement with the Company.

    (d)    Except as expressly provided in this Agreement, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

9

**A-438**

8.2     Number, Tenure and Qualifications.  The number of Managers of the Company shall be fixed from time to time by the affirmative vote of a majority in interest of the Class A Members, but in no instance shall there be less than one (1) Manager. Each Manager shall hold office until his or her successor shall have been elected and qualified.  Managers shall be elected by the affirmative vote of a majority in interest of the Class A Members.  Managers need not be residents of the State of New York or Members of the Company.

8.3     Certain Powers of Managers.  Without limiting the generality of Section 8.1, the Manager shall have power and authority, on the Company's behalf:

(a)     To acquire personal property for use in the ordinary course of the Company's business from any Person as the Manager may determine.  The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

(b)     To purchase liability and other insurance to protect the Company property and the Company's business;

(c)     To hold and own any Company real and/or personal properties in the Company's name;

(d)     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(e)     To execute on the Company's behalf all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the Manager's opinion, to the Company's business;

(f)     To employ accountants, legal counsel, or other experts to perform services for the Company and to compensate them from Company funds;

(g)     To enter into any and all other agreements on the Company's behalf, with any other Person that are necessary or appropriate to the conduct of the Company's business and which are upon customary terms and conditions; and

(h)     To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

The Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business;

10

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 15 of 37

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company, shall be made by the affirmative vote of a majority in interest of the Class A Members.

8.4     <u>Liability for Certain Acts</u>. The Manager shall exercise its business judgment in participating in the management of the Company's business, operations and affairs. Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by the Manager in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company's operations. The Manager shall not be responsible to any Members because of a loss of their investments or a loss in operations, unless the loss shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager proved as set forth in this Section 8.4. Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

8.5     <u>The Manager Has No Exclusive Duty to Company</u>. The Manager shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

8.6     <u>Bank Accounts</u>. The Manager may open bank accounts in the Company's name. The Company's funds shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager. The Manager shall use such funds solely for the Company's business. Funds shall be withdrawn from the Company's bank accounts only upon a Manager's signature.

8.7     <u>Resignation</u>. A Manager may resign at any time by giving written notice to the Members. A Manager's resignation shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

8.8     <u>Removal</u>. Any Manager may be removed at any time, with or without cause, by the affirmative vote of a majority in interest of the Class A Members.

11

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 16 of 37   RECEIVED NYSCEF: 07/26/2019

8.9    <u>Vacancies</u>.  Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of a majority in interest of the Class A Members.  Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of a majority in interest of the Class A Members.  A Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until its earlier death, resignation or removal.  A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next meeting of Members and until its successor shall be elected and shall qualify, or until his or her earlier death, resignation or removal.

8.10   <u>Compensation</u>.  The guaranteed payments and other compensation of the Manager, if any, shall be paid in such manner as shall be fixed from time to time by the affirmative vote of a majority in interest of the Class A Members, and no Manager shall be prevented from receiving any such compensation, if any, by reason of the fact that he or she is also a Member of the Company.

8.11   <u>Manager's Representations</u>.  Every contract, deed, mortgage, lease and other instrument executed by any Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof:  (i) the Company was in existence; (ii) neither this Agreement nor the Certificate of Formation had been amended in any manner so as to restrict the delegation of authority to the Manager; and (iii) the execution and delivery of such instrument was duly authorized by the Manager.  Any Person may always rely on a certificate addressed to him or her and signed by a Manager:

(a)    as to who are the Members and Manager hereunder;

(b)    as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or Manager or in any other manner germane to the Company's affairs;

(c)    as to who is authorized to execute and deliver any instrument or document of the Company;

(d)    as to the authenticity of any copy of the Certificate of Formation, this Agreement, amendments thereto and any other document relating to the conduct of the Company's affairs; or

(e)    as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Manager or any Member in the capacity as a Member or Manager of the Company.

46067/0001-8631922v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-12 Filed 08/30/22 Page 17 of 37

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

8.12 <u>Limitations on Members</u>.

(a) Except as is expressly provided in this Section, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

(b) Unless authorized to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

## <u>Section 9. - Restrictions on the Transfer of a Member's Interest</u>

9.1 <u>Lifetime Restrictions on Transfers</u>. Except as otherwise provided herein, a Member shall not sell, transfer, pledge, encumber or otherwise dispose of all or any part of his or her Interest to any Person other than a Permitted Transferee, as hereinafter defined, unless the Member desiring to make the transfer or encumbrance (hereinafter referred to as the "Selling Member") shall have first made the offer to sell to the Company and the remaining Members and such offer shall not have been accepted.

(a) <u>Notice of Offer</u>. The offer which shall be given to the Company and the remaining Members and shall consist of an offer to sell all of the Interest owned by the Selling Member, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lienor, the Percentage Interest involved in any such proposed transfer or encumbrance, and the price and terms of any such transfer or encumbrance ("Bona Fide Offer"), in accordance with the provisions of Section 9.1(b) hereof.

(b) <u>Bona Fide Third Party Offer</u>. If the Selling Member has received a bona fide written offer to purchase all of his or her Interest in the Company which he or she wishes to accept, or a bona fide written offer to receive a loan or an advance of money, which loan or advance involves an encumbrance upon said Interest to secure the loan or advance as referred to in Section 9.1(a) above, the Selling Member shall submit to the Company and the remaining Members, within fourteen (14) days after receipt of such Bona Fide Offer, a written notice including a copy of such Bona Fide Offer, as required under Section 9.1(a) above, together with the name and address of the principal or principals if the offer is made through an agent (hereinafter collectively referred to as the "Bona Fide Offerors"), and sufficient facts concerning the Bona Fide Offerors to enable the Company and the remaining Members to arrive at an informed judgment as to the bona fides of such offer. The Selling Member shall then offer, or be deemed to have offered, in writing to sell to the Company all of the Interest in the Company held by the Selling Member for an amount equal to the lesser of: (i) fifty (50%) percent of the Value of the Selling Member's Interest, which is determined under Section 10 hereof; or (ii) the purchase price set forth in the Bona Fide Offer, or, if an encumbrance, the lesser of the

13

amount set forth in item (i) above and the amount of the debt involved in such encumbrance (the lesser of (i) and (ii) shall be referred to as the "Lifetime Purchase Price"), and upon the terms and conditions as hereinafter set forth; provided, however, that the Selling Member has complied with all of the procedural conditions hereof. Within thirty (30) days after receipt by the Company of the Bona Fide Offer, the Company may elect to purchase all of the Selling Member's Interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the receipt by the Company of the Bona Fide Offer, elect to purchase all of the Selling Member's interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price, and upon the terms and conditions as hereinafter set forth. The remaining Members shall purchase the Selling Member's Interest in relative proportion to their ownership of Interests in the Company; provided, however, that the remaining Members may arrange among themselves for the purchase of the Selling Member's Interest in proportions which differ from the proportions of their respective holdings.

A potential purchaser or purchasers shall exercise its or their election to purchase by giving written notice thereof to the Selling Member and the other potential purchasers upon the terms and conditions as hereinafter set forth.

(c)     <u>Terms of Payment</u>. If the Company or the remaining Members exercises its or their right to purchase the Interest of the Selling Member in accordance with the terms of Section 9.1(b) hereof, then the purchaser(s) shall pay the Lifetime Purchase Price either: (i) in accordance with the terms and conditions set forth in the Bona Fide Offer; or (ii) by executing and delivering a negotiable promissory note or notes (in a form mutually acceptable by the purchaser(s) and the Selling Member) made payable to the order of the Selling Member, whichever the purchaser(s) chooses. Said promissory note(s) shall require successive equal monthly installments over a period of ten (10) years, with interest being imposed at the annual rate equal to the lowest rate of interest which allows for the avoidance of any imputed or unstated interest for Federal income tax purposes existing at and fixed as of the date of closing (the "Installment Method"). The first monthly installment shall be due at the time of closing with one hundred nineteen (119) additional monthly payments being made thereafter on the monthly anniversary date of the first payment until said obligation has been paid in full. The promissory note shall provide for acceleration of any unpaid balance, together with all accrued interest, upon written notice to the purchaser(s) of a default in the payment of any one (1) monthly installment, which default remains uncured for a period of thirty (30) days after receipt of such notice. The promissory note shall provide for the unrestricted right to prepay all or any part of the unpaid balance, without premium or penalty, and with interest only to the date of prepayment.

(d)     <u>Release from Restriction</u>. If the offer to sell as provided for in Section 9.1(b) is not accepted by the Company or the remaining Members as set forth

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 19 of 37

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

herein, the Selling Member may make a bona fide transfer or encumbrance to the prospective purchaser or lienor named in the statement attached to the Bona Fide Offer, with such sale or encumbrance to be made only in strict accordance with the terms therein stated. The Company and the remaining Members shall be given full access to all closing documents relating to such sale or encumbrance to the Bona Fide Offerors, so that adherence to the terms and conditions of the Bona Fide Offer can be demonstrated. However, if the Selling Member shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the election to purchase by the Company and the remaining Members in accordance with this Section, or if there is any modification in price or any of the terms and conditions of the Bona Fide Offer, such Interest shall again become subject to all the restrictions of this Agreement, and the Selling Member shall not have the right to complete the proposed sale or encumbrance without again offering the Interest, in writing, anew to the Company pursuant to the procedures set forth in this Section. Notwithstanding anything in this Agreement to the contrary, all Interests purchased by the Bona Fide Offerors from a Selling Member shall be acquired subject to the terms and conditions of this Agreement and the Bona Fide Offerors shall not sell, assign, pledge, encumber, hypothecate, mortgage, or in any other manner transfer the whole or any part of the Interest purchased, or any other Interest thereafter held or owned, without the prior written consent of the Company, except as specifically provided in this Agreement. It shall be the affirmative obligation of the Selling Member to notify the Bona Fide Offerors that the Interest proposed to be sold by the Selling Member and purchased by the Bona Fide Offerors will remain subject to the terms and provisions of this Agreement following the proposed sale and purchase.

9.2    Sale in Violation of Agreement. In the event of any attempted sale, assignment, transfer, hypothecation, pledge, encumbrance or disposition ("Attempted Transfer") of the Interest of a Member, not in accordance with the terms of this Agreement, such Attempted Transfer shall be deemed to be an offer by such Member to sell his or her Interest pursuant to Section 9.1(b) hereof, to be deemed made as of the date of discovery of such Attempted Transfer, and at a price equal to the lesser of: (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Attempted Transfer. The payment terms shall be in accordance with the Installment Method or such Attempted Transfer, whichever the purchaser chooses.

9.3    Involuntary Transfers. In the event of any involuntary transfer ("Involuntary Transfer") or attempted involuntary transfer ("Attempted Involuntary Transfer") of an Interest owned by a Member due to certain events, including, but not limited to, a Member's bankruptcy or divorce, such Member shall be deemed to have made an offer to sell his or her Interest as of the date of discovery of such Involuntary Transfer or Attempted Involuntary Transfer, pursuant to Section 9.1(b) hereof, and at a price equal to the lesser of: (i) fifty (50%) percent of the Value of the Member's Interest

46067/0001-8631922v2

**A-444**
FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-12 Filed 08/30/22 Page 20 of 37 RECEIVED NYSCEF: 07/26/2019

as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Involuntary Transfer or Attempted Involuntary Transfer. The payment terms shall be in accordance with the Installment Method, such Involuntary Transfer or Attempted Involuntary Transfer, whichever the purchaser chooses.

9.4 <u>Consent Required for Transfer and Assignment of a Member's Interest</u>. Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, pledge, encumber or in any way alienate all or any part of his or her interest in the Company as a Member except with the prior written consent of a majority in interest of the Class A Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the New York Act), as the non-transferring Class A Members may determine in their sole discretion. Transfers in violation of this Section 9.4 shall only be effective to the extent set forth in Section 9.7.

9.5 <u>Further Restrictions on Transfer</u>. No Member shall assign, convey, sell, encumber or in any way alienate all or any part of his or her Interest in the Company if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the Company's termination under Section 708 of the Code.

9.6 <u>Substitute Members</u>. An Assignee shall have the right to become a Substitute Member if: (i) the requirements of Sections 9.4 and 9.5 are met; (ii) such Person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (iii) such Person pays any reasonable expenses in connection with its admission as a Substitute Member.

9.7 <u>Effect of Transfer</u>.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company shall take effect on the date of transfer.

(b) Any Assignee of an Interest in the Company shall take subject to the restrictions on transfer imposed by this Agreement.

(c) Upon any transfer of a Member's Interest in the Company, unless the Assignee is admitted as a Substituted Member pursuant to Section 9.6 herein, the Assignee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but shall only be entitled to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, to which the transferor was entitled, and the extent transferred.

(d) A Member ceases to be a Member and to have the power to exercise any rights or powers of a Member upon the assignment of all of its Interest.

46067/0001-8631922v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 21 of 37   RECEIVED NYSCEF: 07/26/2019

9.8     Permitted Transferees.   Notwithstanding any other provisions of this Agreement (including Section 6) , each Member, during his or her lifetime or upon his or her death, may give, sell, or otherwise assign all or any part of his, her or its Membership Interest to the following, which shall be referred to as the "Permitted Transferees":

(a)     any descendent or ascendant of any Member by inter vivos or testamentary transfer;

(b)     another Member;

(c)     a Member's spouse, or a trust for the primary benefit of a Member's spouse;

(d)     a custodian or guardian of a minor descendent;

(e)     a trust of which all of the primary beneficiaries are Members or Permitted Transferees;

(f)     a beneficiary of a trust that is also a Member; and/or

(g)     a legal entity controlled and managed by Members or Permitted Transferees.

9.9     Death of a Member.

(a)     Except as otherwise provided herein, upon the death of a Member (the "Decedent"), the Company may elect to purchase all of the Decedent's Interest from the legal representatives of the Decedent's estate (except to the extent the Decedent's Interest passes to a Permitted Transferee, as defined hereinafter in Section 9.8), in which event the legal representatives of the Decedent's estate shall then be obligated to sell the Decedent's Interest to the Company, at a purchase price equal to Fifty (50%) percent of the Value of the Decedent's Interest, as determined under Section 10 hereof (the "Death Purchase Price"), and upon the terms and conditions set forth herein.  The Company shall notify, in writing, the legal representatives of the Decedent's estate of its acceptance or rejection to purchase all of the Decedent's Interest within thirty (30) days after the appointment of the legal representatives of the Decedent's estate, provided that a failure to notify said legal representatives of its acceptance within said thirty (30) days shall constitute an election not to purchase all of the Decedent's Interest.  The notice shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance.  If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the appointment of the legal representatives of the Decedent's estate, elect to purchase the Decedent's interest which does not pass to a Permitted Transferee, for the Death Purchase Price and upon the terms and conditions as hereinafter set forth.

46067/0001-8631922v2

**A-446**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-12 Filed 08/30/22 Page 22 of 37 RECEIVED NYSCEF: 07/26/2019

(b)  The closing of the purchase and sale of the Decedent's Interest to the Company or the remaining Members shall take place at the Company's principal office, or at such other place as agreed to by the parties on a date mutually agreed to by said parties which shall be within one hundred twenty (120) days following the qualification of the legal representatives of the Decedent's estate.

(c)  At the closing, the Company or the remaining Members shall execute a promissory note made payable to the legal representatives of the Decedent's estate for the Death Purchase Price. The terms of the promissory note shall be in accordance with the Installment Method as set forth in Section 9.1(c) herein.

## Section 10. - Determination of Value

Upon any sale of a Member's Interest pursuant to this Agreement, the total value of the Company ("Company Value") shall be the last dated amount set forth on the Certificate of Agreed Value, attached hereto as Exhibit C and made a part hereof, executed by the Class A Members. The Class A Members shall exercise best efforts to meet not less than once per year for the purpose of considering a new Value but their failure to meet or to determine a Value shall not invalidate the most recently executed Certificate of Agreed Value setting forth the Value then in effect. If the Class A Members fail to agree on a revaluation as described above for more than two (2) years, the Value shall be the then Fair Market Value of the Company, as hereinafter defined. For purposes of this Agreement, the "Fair Market Value of the Company" shall be the fair market value of the Company assets, less Company liabilities. The Fair Market Value of the Company's real estate shall be determined by an MAI appraisal selected by the Company. If the Selling Member disputes such appraisal, such party shall obtain an MAI appraisal, and the average of the two (2) MAI appraisals shall determine the Fair Market Value; provided, however, that the higher value is within ten (10%) percent of the lower value. If such values are not within ten (10%) percent of each other, then the two (2) MAI appraisers shall select a third MAI appraiser, whose valuation shall be final and binding. The Company shall pay for its appraiser, the Selling Member shall pay for its appraiser, and the third appraiser, if any, shall be paid fifty (50%) percent by the Company and fifty (50%) percent by the Selling Member. The Fair Market Value of all the other assets of the Company, other than its real estate, shall be determined by the certified public accountant employed by the Company applying generally accepted accounting principles. In calculating the Fair Market Value, the Company's accountant shall take into consideration all relevant discounts.

The Value of a Member's Membership Interest shall be an amount equal to the Company Value, multiplied by the Percentage Interest in the Company being purchased.

18

A-447

### Section 11. - Termination of a Member

The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which would terminate a Member's interest as a Member in the Company shall not dissolve the Company and shall not require the consent of the remaining Members to continue the Company.

### Section 12. - Term of the Company

The Company shall commence as of the date its Certificate of Formation is filed with the New York Secretary of State or such later date specified therein, and shall terminate upon the occurrence of any of the following events:

12.1   The mutual agreement in writing of a majority in interest of the Class A Members on the date of such agreement to terminate;

12.2   At such earlier time as may be provided by applicable law;

12.3   The sale, disposal, conveyance or distribution of all or substantially all of the assets in which the Company shall have an interest;

12.4   The entry of a decree of judicial dissolution in accordance with the New York Act.

### Section 13. - Fiscal Year and Accounting Method

For income tax purposes, the Company's fiscal year shall be as determined by the Manager, and the Company's books shall be kept on the cash or accrual method of accounting as determined by the Manager. Such method when so adopted shall be consistently followed by the Company, subject, however to the Company's right to change its method of accounting for income tax purposes as allowed by law. The accounting for Company purposes shall be made in accordance with generally accepted accounting principles.

### Section 14. - Books and Records

14.1   The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.

14.2   The Company's books shall be closed at such intervals as the Manager shall determine but not less frequently than annually as of the end of each calendar year by the

19

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-12 Filed 08/30/22 Page 24 of 37 RECEIVED NYSCEF: 07/26/2019

certified public accountants then regularly retained by the Company. Such certified public accountants for the Company may be changed at any time and from time to time by the Manager. Such accountants shall prepare the Federal income tax returns for the Company together with a report for each Member for Federal income tax purposes indicating the portion of each Member of the Company's profits and losses for such year. The Members shall each receive a copy of the appropriate report within a reasonable period of time after the close of each fiscal year and promptly after its receipt by the Company and approval by the Manager.

14.3  A Member or Manager of the Company shall be fully protected in relying in good faith upon the Company's records and upon such information, opinions, reports or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other Person, as to matters the Member or Manager reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

## Section 15. - Other Activities of Members

Any Member may engage in other business ventures of every nature, including, without limitation by specification, the ownership of another business similar to that operated by this Company. Neither the Company nor any of the other Members shall have any right or interest in any such independent ventures or to the income and profits derived therefrom.

## Section 16. - Resignation of a Member

Pursuant to the New York Act, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

## Section 17. - Indemnification

17.1  The Members and Manager shall not be liable to the Company or any Member or Manager for any liability, loss, damage, cost or expense which may arise out of or in connection with any act or conduct on the part of the Members or Manager without fraud or willful misconduct, including, but not limited to, the failure to perform its obligations hereunder due to restrictions or prohibitions imposed by law, rule, regulation or demand of any governmental agency, or from any other cause beyond the control of the Members or Manager.

20

46067/0001-8631922v2

**A-449**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-12 Filed 08/30/22 Page 25 of 37 RECEIVED NYSCEF: 07/26/2019

17.2   Notwithstanding anything otherwise herein contained to the contrary, no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.

## Section 18. - Limitation on Liability

Except as otherwise provided by the New York Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member, Manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, or acting as a Manager, employee or agent of the Company.  No Member shall be required to loan any funds to the Company.  Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

## Section 19. - Amendment

This Agreement may be amended only by the affirmative vote of a majority in interest of the Class A Members.

## Section 20. - Miscellaneous

20.1   <u>Organizational Fees</u>.  The Company shall pay all expenses incurred in the organization of the Company.

20.2   <u>Company Property</u>.  Title or interest to any or all Company property may be acquired and/or held for the Company purposes set forth in this Agreement in the Company name and/or in the name of any nominee as the Manager may designate.  The Manager shall have the right to enter into nominee agreements with any such nominee on the Company's behalf and such agreements may provide for indemnifying such nominee from all claims, damages, costs, expenses or liabilities arising therefrom other than as may be due to or result from the willful misconduct of such nominee.

20.3   <u>Notices</u>.  All notices or writings required to be given hereunder or deemed necessary or desirable by any party hereto shall be given in writing addressed to the Company at its principal business office and to each Member and Manager at the address set forth on the books and records of the Company which address may be changed by notice forwarded to the Company, in accordance herewith, and shall be delivered either: personally; by deposit in the United States Post Office Box, postage pre-paid, by certified

21

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 26 of 37   RECEIVED NYSCEF: 07/26/2019

or registered mail, return receipt requested; by a postal or private form of expedited delivery service; or by facsimile transmission.

20.4   <u>Failure of Member to Comply with Terms of this Agreement</u>. If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that all other Members bound by this Agreement will have no adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement or to specifically enforce the provisions hereof.

20.5   <u>Failure of a Manager to Comply with Terms of this Agreement</u>. A Manager shall not be personally liable for failure to perform in accordance with, or to comply with the terms and conditions of this Agreement or for any other reason unless such failure to perform or comply or such other reason constitutes gross negligence or willful misconduct by the Manager.

20.6   <u>Applicable Law</u>. This Agreement shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York (without regard to its conflicts of laws provisions). Any proceedings brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York.

20.7   <u>Severability</u>. If any provision of this Agreement shall be declared invalid, cause the Company not to be treated for income tax purposes as a partnership, then and in any of such events, such provision(s) shall be deemed to be invalid, and notwithstanding any such invalidity, the remaining provisions of this Agreement shall remain in full force and effect as if such invalid provisions(s) had not been a part hereof.

20.8   <u>Benefit</u>. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and to their respective heirs, executors, administrators and assigns; provided however, that none of the provisions of this Agreement shall be for the benefit of nor shall they be enforceable by any creditor of the Company or of any Member.

20.9   <u>Construction</u>. As used in this Agreement, the masculine gender shall include the feminine or neuter gender and the neuter gender shall include the masculine or feminine gender, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

20.10   <u>Execution</u>. This Agreement may be executed in any number of counterparts, each of which shall be considered an original. The signature by any Member on any one of the counterparts shall bind such Member at such time as each of the Members has signed and delivered to the Company at least one (1) counterpart.

46067/0001-8631922v2

**A-451**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 27 of 37
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

20.11 <u>Headings</u>.  The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12 <u>Partnership</u>.  It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                       **MEMBERS:**

_____                _____
                                                          HAROLD PINE

_____                _____
                                                          LLOYD PINE

_____                _____
                                                          BRENDA ROHLMAN

_____                _____
                                                          THOMAS ROHLMAN

_____                _____
                                                          JEROME SCHNEIDER

**ATTEST:**                                          **MANAGER:**

                                                          PINE MANAGEMENT, INC.

_____                _____
                                                          By:  THOMAS ROHLMAN, President

23

46067/0001-8631922v2

**A-452**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 83  Case 1:22-cv-02407-MKV  Document 27-12  Filed 08/30/22  Page 28 of 37  p.3
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

ColeSchotz-NJ          11/30/2012 10:43:47 AM   PAGE   4/006   Fax Server

20.11 Headings. The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12 Partnership. It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

IN WITNESS WHEREOF, the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

WITNESS:                          MEMBERS:

_____         _____
                                  HAROLD PINE

_____         _____
                                  LLOYD PINE

_____         _____
                                  BRENDA ROHLMAN

_____         _____
                                  THOMAS ROHLMAN

                                  _____
                                  JEROME SCHNEIDER

ATTEST:                           MANAGER:

                                  PINE MANAGEMENT, INC.

_____         _____
                                  By: THOMAS ROHLMAN, President

23

46067/0001-8631922v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM     INDEX NO. 654303/2019
NYSCEF DOC. NO. 2     Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 29 of 37   RECEIVED NYSCEF: 07/26/2019
Dec 01 12 06:53a

ColeSchotz-NJ          11/30/2012 10:43:47 AM   PAGE   5/006    Fax Server

WITNESS:                          MEMBERS:

_____         _____
                                  HAROLD PINE

_____         _____
                                  LLOYD PINE

_____
                                  BRENDA ROHLMAN

_____
                                  THOMAS ROHLMAN

_____
                                  JEROME SCHNEIDER

ATTEST:                           MANAGER:

                                  PINE MANAGEMENT, INC.

_____
                                  By: THOMAS ROHLMAN, President

24

4686700001-863 (9092v2

A-454

**WITNESS:**                                    **MEMBERS:**

_____                        _____
                                               HAROLD PINE

                                               _____
                                               LLOYD PINE

_____                        _____
                                               BRENDA ROHLMAN

_____                        _____
                                               THOMAS ROHLMAN

_____                        _____
                                               JEROME SCHNEIDER

**ATTEST:**                                     **MANAGER:**

                                               PINE MANAGEMENT, INC.

_____                        _____
                                               By: THOMAS ROHLMAN, President

24

**A-455**

20.11  Headings.  The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12  Partnership.  It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                    **MEMBERS:**

_____            _____
                                                      HAROLD PINE

_____            _____
                                                      LLOYD PINE

_____            _____
                                                      BRENDA ROHLMAN

_____            _____
                                                      THOMAS ROHLMAN

_____            _____
                                                      JEROME SCHNEIDER

**ATTEST:**                                      **MANAGER:**

                                                      PINE MANAGEMENT, INC.

_____            _____
                                                      By:  THOMAS ROHLMAN, President

23

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM         INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 32 of 37   RECEIVED NYSCEF: 07/26/2019

## EXHIBIT A

### Capital Contributions and Percentage Interests

| | Member | Initial Capital Contributions | Percentage Interests |
|---|---|---|---|
| 1. | HAROLD PINE | $ | 10% |
| 2. | LLOYD PINE | $ | 20% |
| 3. | BRENDA ROHLMAN | $ | 10% |
| 4. | THOMAS ROHLMAN | $ | 10% |
| 5. | JEROME SCHNEIDER | $ | 50% |

A-1

**A-457**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV   Document 27-12   Filed 08/30/22   Page 33 of 37   RECEIVED NYSCEF: 07/26/2019

## EXHIBIT B

| Class A Members | Membership Interest |
|---|---|
| HAROLD PINE | 0.1% |
| LLOYD PINE | 0.2% |
| BRENDA ROHLMAN | 0.1% |
| THOMAS ROHLMAN | 0.1% |
| JEROME SCHNEIDER | 0.5% |

| Class B Members | Membership Interest |
|---|---|
| HAROLD PINE | 9.9% |
| LLOYD PINE | 19.8% |
| BRENDA ROHLMAN | 9.9% |
| THOMAS ROHLMAN | 9.9% |
| JEROME SCHNEIDER | 49.5% |

B-1

**A-458**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3  Case 1:22-cv-02407-MKV  Document 27-12  Filed 08/30/22  Page 34 of 37
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Brenda Rohlman, Thomas Rohlman and Jerome Schneider are also set forth.

Date         Value of Company

           $1,700,000

WITNESS:        CLASS A MEMBERS:

_____   _____
           HAROLD PINE

_____   _____
           LLOYD PINE

_____   _____
           BRENDA ROHLMAN

_____   _____
           THOMAS ROHLMAN

_____   _____
           JEROME SCHNEIDER

46067/0001-8631922v2

**A-459**

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Brenda Rohlman, Thomas Rohlman and Jerome Schneider are also set forth.

<u>Date</u>

<u>Value of Company</u>

$1,700,000

**WITNESS:**

**CLASS A MEMBERS:**

_____

HAROLD PINE

_____

LLOYD PINE

_____

BRENDA ROHLMAN

_____

THOMAS ROHLMAN

_____

JEROME SCHNEIDER

C-1

**A-460**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 53
Case 1:22-cv-02407-MKV    Document 27-12    Filed 08/30/22    Page 36 of 37    p.5
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019
Dec 04 12 06:53a
ColeSchotz-NJ          11/30/2012 10:43:47 AM    PAGE    6/006    Fax Server

EXHIBIT C

Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Brenda Rohlman, Thomas Rohlman and Jerome Schneider are also set forth.

Date                          Value of Company

                              $1,700,000

WITNESS:                      CLASS A MEMBERS:

_____     _____
                              HAROLD PINE

_____     _____
                              LLOYD PINE

                              _____
                              BRENDA ROHLMAN

                              _____
                              THOMAS ROHLMAN

                              _____
                              JEROME SCHNEIDER

C-I

**A-461**

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Brenda Rohlman, Thomas Rohlman and Jerome Schneider are also set forth.

Date                                    Value of Company

                                        $1,700,000

WITNESS:                                CLASS A MEMBERS:

_____                     _____
                                        HAROLD PINE

_____                     _____
                                        LLOYD PINE

_____                     _____
                                        BRENDA ROHLMAN

_____                     _____
                                        THOMAS ROHLMAN

_____                     _____
                                        JEROME SCHNEIDER

C-1

# EXHIBIT A-12

A-463

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 07/26/2019

# Exhibit 12

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM | INDEX NO. 654303/2019
NYSCEF DOC. NO. 3 | Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 3 of 35 | RECEIVED NYSCEF: 07/26/2019

# AMENDMENT AND RESTATEMENT OF

# OPERATING AGREEMENT

# OF

# JHJ REALTY LLC

## (a New York limited liability company)

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW JERSEY 07602-0800
(201) 489-3000

46067/0001-7760303v3

A-465

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 4 of 35   RECEIVED NYSCEF: 07/26/2019

# TABLE OF CONTENTS

**Page**

Section 1. - Formation and Name ............................................................................ 1

Section 2. - Office ................................................................................................... 1

Section 3. - Definitions .......................................................................................... 2

Section 4. - Purposes ............................................................................................. 4

Section 5. - Capital Contributions and Capital Accounts ...................................... 4

Section 6. - Admission of Additional Members ..................................................... 6

Section 7. - Allocations and Distributions ............................................................. 7

Section 8. - Management ........................................................................................ 9

Section 9. - Restrictions on the Transfer of a Member's Interest ........................ 13

Section 10. - Determination of Value .................................................................. 18

Section 11. - Termination of a Member ............................................................... 19

Section 12. - Term of the Company ..................................................................... 19

Section 13. - Fiscal Year and Accounting Method ............................................... 20

Section 14. - Books and Records ......................................................................... 20

Section 15. - Other Activities of Members .......................................................... 20

Section 16. - Resignation of a Member ................................................................ 21

Section 17. - Indemnification ............................................................................... 21

Section 18. - Limitation on Liability .................................................................... 21

Section 19. - Amendment ..................................................................................... 21

Section 20. - Miscellaneous ................................................................................. 22

i

46067/0001-7760303v3

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 5 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

# AMENDMENT AND RESTATEMENT OF

## OPERATING AGREEMENT

### OF

### JHJ REALTY LLC

#### (a New York limited liability company)

**THIS AMENDMENT AND RESTATEMENT OF AN OPERATING AGREEMENT,** made effective as of the first day of October, 2011, by and between Harold Pine ("Harold"), Sandra Ternares ("Sandra") and Jerome Schneider ("Jerome") (Harold, Sandra and Jerome shall hereinafter, at times, be referred to collectively as the "Members" or individually as a "Member").

### W I T N E S S E T H :

WHEREAS, the Members of JHJ Realty LLC entered into an operating agreement, effective as of October 17, 1996, and which is binding upon the Members; and

WHEREAS, the Members may amend said operating agreement with the unanimous written consent of the Members, pursuant to Section 15.4 of said operating agreement; and

WHEREAS, the Members desire to amend and restate said operating agreement as hereinafter provided for the purposes hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

#### Section 1. - Formation and Name

The Members heretofore have associated themselves into a limited liability company pursuant to the provisions of the New York Limited Liability Company Act. The Company shall be governed by the terms and conditions set forth herein. The limited liability company's name is JHJ Realty LLC.

#### Section 2. - Office

The Secretary of State is designated as agent of the Company upon whom process against it may be served. The post office address to which the Secretary of State of the

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM        INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 6 of 35
                                                                    RECEIVED NYSCEF: 07/26/2019

State of New York shall mail a copy of any process against the Company served upon him or her is c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025. Such office and agent may be changed, from time to time, as the Manager shall determine. The Company's principal place of business shall be located at c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025 and/or such other location or locations as, from time to time, the Manager shall select.

## Section 3. - Definitions

3.1    "Agreement" means this Operating Agreement, as originally executed and as amended from time to time, which supersedes any prior operating agreement, and the terms "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

3.2    "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon: (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member; (iv) the filing of a petition in an involuntary bankruptcy case, which petition remains undismissed or suspended for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

3.3    "Capital Account" means, with respect to any Member or assignee, the Capital Account maintained in accordance with the provisions set forth in Section 5.3 hereof.

3.4    "Capital Contribution" means, with respect to any Member or assignee, the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by such Member or assignee.

2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM   INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 7 of 35 NYSCEF: 07/26/2019

3.5    "Class A Members" means all of the voting Members in the Company.  See Exhibit B attached hereto for a list of the Company's Class A Members.

3.6    "Class B Members" means all of the non-voting Members in the Company. See Exhibit B attached hereto for a list of Company's Class B Members.  The Class B Members shall have no right to vote in decisions of the Members.

3.7    "Code" means the Internal Revenue Code of 1986, as amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

3.8    "Company" shall refer to JHJ Realty LLC.

3.9    "Deficit Capital Account" means with respect to any Member or assignee, the deficit balance, if any, in such Member's or assignee's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amount which such Member or assignee is obligated to restore under Regulation Section 1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the next to last sentence of Regulation Section 1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Regulation Section 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Regulation Section 1.704-2(i)(3)); and

(b)    Debit to such Capital Account the items described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The definition of Deficit Capital Account is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

3.10    "Interest" means a Member's entire interest in the Company including the Member's right to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, and the right to participate in the management of the Company's business and affairs, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the New York Act.

3.11    "Manager" or "Managers" means one or more Persons (individually and collectively) selected by the Members, to whom are delegated all or part of the management duties of the Company's business as provided in Section 8 hereof.

46067/0001-7760303v3

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 8 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

3.12   "New York Act" means the New York Limited Liability Company Act, as the same may be amended from time to time.

3.13   "Percentage Interest" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof. Other than by application of Section 6, the Percentage Interests of the Members may not be adjusted without the unanimous consent of the Members.

3.14   "Person" means an individual, association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

3.15   "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, credit, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations.

3.16   "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## Section 4. - Purposes

The Company was originally formed for the purpose of acquiring, owning and managing the real property commonly known as 53-55 West 105th Street, New York, New York. The character and purposes for which the Company was formed, in general, is to own, manage, acquire, invest in real estate; and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement. The Company may also engage in such other business, activity or purpose permitted by law, as the Manager may determine.

## Section 5. - Capital Contributions and Capital Accounts

5.1   Members' Capital Contributions. Each Member has made an initial Capital Contribution to the Company, which has been reflected in the Members' Capital Accounts. No interest shall be paid on any initial or subsequent Capital Contribution.

4

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 5    Case 1:22-cv-02407-MKV    Document 27-13    Filed 08/30/22    RECEIVED NYSCEF: 07/26/2019
                                                                                  Page 9 of 35

5.2    <u>Additional Contributions</u>. Except as set forth in Section 5.1 above, no Member shall be required to make any Capital Contributions. In order to obtain additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of the Manager.

5.3    <u>Capital Accounts</u>. A separate Capital Account will be maintained for each Member.

(a)    Each Member's Capital Account will be increased by:

(i)    The amount of money contributed by the Member to the Company;

(ii)    The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

(iii)    Allocations to the Member of Profits; and

(iv)    Allocations to the Member of income or gain as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(b)    Each Member's Capital Account will be decreased by:

(i)    The amount of money distributed to the Member by the Company;

(ii)    The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code);

(iii)    Allocations to the Member of Losses; and

(iv)    Allocations to the Member of deduction or expense as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(c)    In the event of a permitted sale or exchange of an Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Regulation Section 1.704-1(b)(2)(iv).

46067/0001-7760303v3

**A-471**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 10 of 35

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

(d)    The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder. If in the Manager's opinion, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified to comply with Section 704(b) of the Code and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, than any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(e)    Except as otherwise required in the New York Act (and subject to Sections 5.1 and 5.2 above), no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

5.4    <u>Withdrawal or Reduction of Members' Contributions to Capital</u>.  A Member shall not receive any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains Company property sufficient to pay them, as determined by the Manager in its sole discretion.  A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

5.5    <u>Advances by the Members</u>.  A Member may from time to time, with the consent of the Manager, advance additional monies to or for the Company's benefit, and each such advance shall be treated as a Capital Contribution to the Company or as a loan to the Company, as determined by the Manager.  Any advance which is treated as a loan shall be evidenced by a promissory note executed and delivered by the Company to the Member.

5.6    <u>Transactions Between Member and/or Manager and the Company</u>.  Except as otherwise provided in this Agreement, a Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide collateral for, and transact other business with the Company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager as set forth in the New York Act.

### Section 6. - Admission of Additional Members

Additional Members may be admitted to the Company upon the affirmative vote of a majority in interest of the Class A Members.  Such new Members shall be allocated

6

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 11 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Profit and Loss by such method as may be provided in this Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

## Section 7. - Allocations and Distributions

 7.1 *Allocations of Profits and Losses.* Profits and Losses for any fiscal year shall be allocated to the Members in proportion to their Percentage Interests.

 7.2 *Special Allocations.* Notwithstanding the provisions of Section 7.1:

 (a) *Minimum Gain.* Notwithstanding any other provision of this Section 7.2, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 7.2(a) is intended to comply with the minimum gain chargeback requirement of Regulation Section 1.704-2 and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

 (b) *Qualified Income Offset.* If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* or *(6)*, which create or increase a Deficit Capital Account of the Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 7.2(b) be interpreted to comply with the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)*(d)*.

 (c) *Deficit Balance.* If any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that the Member is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)*(c)* and the Member's share of minimum gain as defined in Regulation Section 1.704-2(g)(1) (which is also treated as an obligation to restore in accordance with Regulation Section 1.704-1(b)(2)(ii)*(d)*), the Capital Account of the Member shall be specially credited with items of Company income (including gross income) and gain in the amount of the excess as quickly as possible.

7

**A-473**

       (d)    Nonrecourse Deductions. Items of Losses, deduction, and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Regulation Section 1.704-2(i) shall be allocated to the Members' Capital Accounts in accordance with said Regulation Section 1.704-2(i). Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Regulation Section 1.704-2(b)) those deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company Profit or Loss for that period.

       (e)    Section 704(c). In accordance with Section 704(c)(1)(A) of the Code and Regulation Section 1.704-1(b)(2)(iv)*(d)(3)*, if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for the property shall, solely for Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

       (f)    Curative Allocations. Any credit or charge to the Members' Capital Accounts pursuant to Sections 7.2(a) through 7.2(d) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 7.1 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 7.1 and 7.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Section 7 if the special allocations required by Sections 7.2(a) through 7.2(d) had not occurred.

   7.3    Distributions.

       (a)    The Company shall make distributions to the Members (other than upon liquidation) according to their respective Percentage Interests in the Company at such times as the Manager shall determine. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Agreement by a Member whose interest is liquidated (either upon the withdrawal of a Member or the liquidation of the Company) against the amount otherwise distributable to the Member. Upon the Company's liquidation, the Company's assets shall be distributed in the following order of priority:

       (i)    The claims of creditors, other than Members, first shall be satisfied and adequate reserves established (as determined by the Manager);

**A-474**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 13 of 35   RECEIVED NYSCEF: 07/26/2019

(ii)    All outstanding loans from Members shall be repaid in the same proportion which the outstanding loans from any Member shall bear to the outstanding loans of all Members;

(iii)    The Members shall receive the balance in proportion to their relative Capital Accounts determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.

(b)    The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the Company's assets, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

(c)    Subject to the terms and conditions of Section 7.3(d), a Member who receives a distribution in violation of Section 7.3(b), and who knew at the time of the distribution that the distribution violated Section 7.3(b), shall be liable to the Company for the amount of the distribution. A Member who receives a distribution in violation of Section 7.3(b), and who did not know at the time of the distribution that the distribution violated Section 7.3(b), shall not be liable for the amount of the distribution.

(d)    Unless otherwise agreed upon by the Manager, a Member who receives a distribution from the Company in violation of Section 7.3(b) shall have no liability under the New York Act or other applicable law for the amount of the distribution after the expiration of three (3) years from the date of the distribution unless an action to recover the distribution from the Member is commenced prior to the expiration of the three (3) year period and an adjudication of liability against the Member is made in the said action.

## Section 8. - Management

8.1    Management.

(a)    The Company's business and affairs shall be managed by the Manager. The Manager shall participate in the direction, management and control of the Company's business to the best of its ability.

(b)     If there is more than one (1) Manager designated to serve hereunder, the Managers shall in all cases act as a group, with a majority vote of the Managers required to take action. Each Manager shall have one (1) vote.

(c)     The Company's initial Manager shall be Pine Management, Inc. Pine Management, Inc. may be paid for services rendered in its role as property manager pursuant to a separate agreement with the Company.

(d)     Except as expressly provided in this Agreement, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

8.2     <u>Number, Tenure and Qualifications</u>.  The number of Managers of the Company shall be fixed from time to time by the affirmative vote of a majority in interest of the Class A Members, but in no instance shall there be less than one (1) Manager. Each Manager shall hold office until his or her successor shall have been elected and qualified.  Managers shall be elected by the affirmative vote of a majority in interest of the Class A Members.  Managers need not be residents of the State of New York or Members of the Company.

8.3     <u>Certain Powers of Managers</u>.  Without limiting the generality of Section 8.1, the Manager shall have power and authority, on the Company's behalf:

(a)     To acquire personal property for use in the ordinary course of the Company's business from any Person as the Manager may determine. The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

(b)     To purchase liability and other insurance to protect the Company property and the Company's business;

(c)     To hold and own any Company real and/or personal properties in the Company's name;

(d)     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(e)     To execute on the Company's behalf all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the Manager's opinion, to the Company's business;

10

46067/0001-7760303v3

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 15 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

     (f)    To employ accountants, legal counsel, or other experts to perform services for the Company and to compensate them from Company funds;

     (g)    To enter into any and all other agreements on the Company's behalf, with any other Person that are necessary or appropriate to the conduct of the Company's business and which are upon customary terms and conditions; and

     (h)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

     The Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company, shall be made by the affirmative vote of a majority in interest of the Class A Members.

     8.4    <u>Liability for Certain Acts</u>. The Manager shall exercise its business judgment in participating in the management of the Company's business, operations and affairs. Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by the Manager in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company's operations. The Manager shall not be responsible to any Members because of a loss of their investments or a loss in operations, unless the loss shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager proved as set forth in this Section 8.4. Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

     8.5    <u>The Manager Has No Exclusive Duty to Company</u>. The Manager shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

46067/0001-7760303v3

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-13 Filed 08/30/22 Page 16 of 35 RECEIVED NYSCEF: 07/26/2019

     8.6    <u>Bank Accounts</u>. The Manager may open bank accounts in the Company's name. The Company's funds shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager. The Manager shall use such funds solely for the Company's business. Funds shall be withdrawn from the Company's bank accounts only upon a Manager's signature.

     8.7    <u>Resignation</u>. A Manager may resign at any time by giving written notice to the Members. A Manager's resignation shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

     8.8    <u>Removal</u>. Any Manager may be removed at any time, with or without cause, by the affirmative vote of a majority in interest of the Class A Members.

     8.9    <u>Vacancies</u>. Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of a majority in interest of the Class A Members. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of a majority in interest of the Class A Members. A Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until its earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next meeting of Members and until its successor shall be elected and shall qualify, or until his or her earlier death, resignation or removal.

     8.10    <u>Compensation</u>. The guaranteed payments and other compensation of the Manager, if any, shall be paid in such manner as shall be fixed from time to time by the affirmative vote of a majority in interest of the Class A Members, and no Manager shall be prevented from receiving any such compensation, if any, by reason of the fact that he or she is also a Member of the Company.

     8.11    <u>Manager's Representations</u>. Every contract, deed, mortgage, lease and other instrument executed by any Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof: (i) the Company was in existence; (ii) neither this Agreement nor the Certificate of Formation had been amended in any manner so as to restrict the delegation of authority to the Manager; and (iii) the execution and delivery of such instrument was duly authorized by the Manager. Any Person may always rely on a certificate addressed to him or her and signed by a Manager:

         (a)    as to who are the Members and Manager hereunder;

46067/0001-7760303v5

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. RECEIVED NYSCEF: 07/26/2019

(b)     as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or Manager or in any other manner germane to the Company's affairs;

(c)     as to who is authorized to execute and deliver any instrument or document of the Company;

(d)     as to the authenticity of any copy of the Certificate of Formation, this Agreement, amendments thereto and any other document relating to the conduct of the Company's affairs; or

(e)     as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Manager or any Member in the capacity as a Member or Manager of the Company.

8.12    <u>Limitations on Members</u>.

(a)     Except as is expressly provided in this Section, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

(b)     Unless authorized to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

## <u>Section 9. - Restrictions on the Transfer of a Member's Interest</u>

9.1    <u>Lifetime Restrictions on Transfers</u>.  Except as otherwise provided herein, a Member shall not sell, transfer, pledge, encumber or otherwise dispose of all or any part of his or her Interest to any Person other than a Permitted Transferee, as hereinafter defined, unless the Member desiring to make the transfer or encumbrance (hereinafter referred to as the "Selling Member") shall have first made the offer to sell to the Company and the remaining Members and such offer shall not have been accepted.

(a)     <u>Notice of Offer</u>.  The offer which shall be given to the Company and the remaining Members and shall consist of an offer to sell all of the Interest owned by the Selling Member, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lienor, the Percentage Interest involved in any such proposed transfer or encumbrance, and the price and terms of any such transfer or encumbrance ("Bona Fide Offer"), in accordance with the provisions of Section 9.1(b) hereof.

13

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-13    Filed 08/30/22    Page 18 of 35    RECEIVED NYSCEF: 07/26/2019

(b)    **Bona Fide Third Party Offer**.  If the Selling Member has received a bona fide written offer to purchase all of his or her Interest in the Company which he or she wishes to accept, or a bona fide written offer to receive a loan or an advance of money, which loan or advance involves an encumbrance upon said Interest to secure the loan or advance as referred to in Section 9.1(a) above, the Selling Member shall submit to the Company and the remaining Members, within fourteen (14) days after receipt of such Bona Fide Offer, a written notice including a copy of such Bona Fide Offer, as required under Section 9.1(a) above, together with the name and address of the principal or principals if the offer is made through an agent (hereinafter collectively referred to as the "Bona Fide Offerors"), and sufficient facts concerning the Bona Fide Offerors to enable the Company and the remaining Members to arrive at an informed judgment as to the bona fides of such offer.  The Selling Member shall then offer, or be deemed to have offered, in writing to sell to the Company all of the Interest in the Company held by the Selling Member for an amount equal to the lesser of: (i) fifty (50%) percent of the Value of the Selling Member's Interest, which is determined under Section 10 hereof; or (ii) the purchase price set forth in the Bona Fide Offer, or, if an encumbrance, the lesser of the amount set forth in item (i) above and the amount of the debt involved in such encumbrance (the lesser of (i) and (ii) shall be referred to as the "Lifetime Purchase Price"), and upon the terms and conditions as hereinafter set forth; provided, however, that the Selling Member has complied with all of the procedural conditions hereof.  Within thirty (30) days after receipt by the Company of the Bona Fide Offer, the Company may elect to purchase all of the Selling Member's Interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price.  If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the receipt by the Company of the Bona Fide Offer, elect to purchase all of the Selling Member's interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price, and upon the terms and conditions as hereinafter set forth.  The remaining Members shall purchase the Selling Member's Interest in relative proportion to their ownership of Interests in the Company; provided, however, that the remaining Members may arrange among themselves for the purchase of the Selling Member's Interest in proportions which differ from the proportions of their respective holdings.

A potential purchaser or purchasers shall exercise its or their election to purchase by giving written notice thereof to the Selling Member and the other potential purchasers upon the terms and conditions as hereinafter set forth.

(c)    **Terms of Payment**.  If the Company or the remaining Members exercises its or their right to purchase the Interest of the Selling Member in accordance with the terms of Section 9.1(b) hereof, then the purchaser(s) shall pay the Lifetime Purchase Price either: (i) in accordance with the terms and conditions set forth in the Bona Fide Offer; or (ii) by executing and delivering a negotiable promissory note or notes (in a form mutually acceptable by the purchaser(s) and the Selling Member) made

46067/0001-7760303v3

**A-480**

payable to the order of the Selling Member, whichever the purchaser(s) chooses. Said promissory note(s) shall require successive equal monthly installments over a period of ten (10) years, with interest being imposed at the annual rate equal to the lowest rate of interest which allows for the avoidance of any imputed or unstated interest for Federal income tax purposes existing at and fixed as of the date of closing (the "Installment Method"). The first monthly installment shall be due at the time of closing with one hundred nineteen (119) additional monthly payments being made thereafter on the monthly anniversary date of the first payment until said obligation has been paid in full. The promissory note shall provide for acceleration of any unpaid balance, together with all accrued interest, upon written notice to the purchaser(s) of a default in the payment of any one (1) monthly installment, which default remains uncured for a period of thirty (30) days after receipt of such notice. The promissory note shall provide for the unrestricted right to prepay all or any part of the unpaid balance, without premium or penalty, and with interest only to the date of prepayment.

        (d)    <u>Release from Restriction</u>. If the offer to sell as provided for in Section 9.1(b) is not accepted by the Company or the remaining Members as set forth herein, the Selling Member may make a bona fide transfer or encumbrance to the prospective purchaser or lienor named in the statement attached to the Bona Fide Offer, with such sale or encumbrance to be made only in strict accordance with the terms therein stated. The Company and the remaining Members shall be given full access to all closing documents relating to such sale or encumbrance to the Bona Fide Offerors, so that adherence to the terms and conditions of the Bona Fide Offer can be demonstrated. However, if the Selling Member shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the election to purchase by the Company and the remaining Members in accordance with this Section, or if there is any modification in price or any of the terms and conditions of the Bona Fide Offer, such Interest shall again become subject to all the restrictions of this Agreement, and the Selling Member shall not have the right to complete the proposed sale or encumbrance without again offering the Interest, in writing, anew to the Company pursuant to the procedures set forth in this Section. Notwithstanding anything in this Agreement to the contrary, all Interests purchased by the Bona Fide Offerors from a Selling Member shall be acquired subject to the terms and conditions of this Agreement and the Bona Fide Offerors shall not sell, assign, pledge, encumber, hypothecate, mortgage, or in any other manner transfer the whole or any part of the Interest purchased, or any other Interest thereafter held or owned, without the prior written consent of the Company, except as specifically provided in this Agreement. It shall be the affirmative obligation of the Selling Member to notify the Bona Fide Offerors that the Interest proposed to be sold by the Selling Member and purchased by the Bona Fide Offerors will remain subject to the terms and provisions of this Agreement following the proposed sale and purchase.

46067/0001-7760303v3

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 20 of 35   RECEIVED NYSCEF: 07/26/2019

9.2    Sale in Violation of Agreement.  In the event of any attempted sale, assignment, transfer, hypothecation, pledge, encumbrance or disposition ("Attempted Transfer") of the Interest of a Member, not in accordance with the terms of this Agreement, such Attempted Transfer shall be deemed to be an offer by such Member to sell his or her Interest pursuant to Section 9.1(b) hereof, to be deemed made as of the date of discovery of such Attempted Transfer, and at a price equal to the lesser of: (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Attempted Transfer.  The payment terms shall be in accordance with the Installment Method or such Attempted Transfer, whichever the purchaser chooses.

9.3    Involuntary Transfers.  In the event of any involuntary transfer ("Involuntary Transfer") or attempted involuntary transfer ("Attempted Involuntary Transfer") of an Interest owned by a Member due to certain events, including, but not limited to, a Member's bankruptcy or divorce, such Member shall be deemed to have made an offer to sell his or her Interest as of the date of discovery of such Involuntary Transfer or Attempted Involuntary Transfer, pursuant to Section 9.1(b) hereof, and at a price equal to the lesser of:  (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Involuntary Transfer or Attempted Involuntary Transfer.  The payment terms shall be in accordance with the Installment Method, such Involuntary Transfer or Attempted Involuntary Transfer, whichever the purchaser chooses.

9.4    Consent Required for Transfer and Assignment of a Member's Interest.  Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, pledge, encumber or in any way alienate all or any part of his or her interest in the Company as a Member except with the prior written consent of a majority in interest of the Class A Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the New York Act), as the non-transferring Class A Members may determine in their sole discretion.  Transfers in violation of this Section 9.4 shall only be effective to the extent set forth in Section 9.7.

9.5    Further Restrictions on Transfer.  No Member shall assign, convey, sell, encumber or in any way alienate all or any part of his or her Interest in the Company if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the Company's termination under Section 708 of the Code.

9.6    Substitute Members.  An Assignee shall have the right to become a Substitute Member if:  (i) the requirements of Sections 9.4 and 9.5 are met; (ii) such Person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (iii) such Person pays any reasonable expenses in connection with its admission as a Substitute Member.

16

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 21 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

9.7     Effect of Transfer.

(a)     Any permitted transfer of all or any portion of a Member's Interest in the Company shall take effect on the date of transfer.

(b)     Any Assignee of an Interest in the Company shall take subject to the restrictions on transfer imposed by this Agreement.

(c)     Upon any transfer of a Member's Interest in the Company, unless the Assignee is admitted as a Substituted Member pursuant to Section 9.6 herein, the Assignee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but shall only be entitled to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, to which the transferor was entitled, and the extent transferred.

(d)     A Member ceases to be a Member and to have the power to exercise any rights or powers of a Member upon the assignment of all of its Interest.

9.8     Permitted Transferees.   Notwithstanding any other provisions of this Agreement (including Section 6), each Member, during his or her lifetime or upon his or her death, may give, sell, or otherwise assign all or any part of his, her or its Membership Interest to the following, which shall be referred to as the "Permitted Transferees":

(a)     any descendent or ascendant of any Member by inter vivos or testamentary transfer;

(b)     another Member;

(c)     a Member's spouse, or a trust for the primary benefit of a Member's spouse;

(d)     a custodian or guardian of a minor descendent;

(e)     a trust of which all of the primary beneficiaries are Members or Permitted Transferees;

(f)     a beneficiary of a trust that is also a Member; and/or

(g)     a legal entity controlled and managed by Members or Permitted Transferees.

17

**A-483**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-13 Filed 08/30/22 Page 22 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

9.9    Death of a Member.

(a)    Except as otherwise provided herein, upon the death of a Member (the "Decedent"), the Company may elect to purchase all of the Decedent's Interest from the legal representatives of the Decedent's estate (except to the extent the Decedent's Interest passes to a Permitted Transferee, as defined hereinafter in Section 9.8), in which event the legal representatives of the Decedent's estate shall then be obligated to sell the Decedent's Interest to the Company, at a purchase price equal to Fifty (50%) percent of the Value of the Decedent's Interest, as determined under Section 10 hereof (the "Death Purchase Price"), and upon the terms and conditions set forth herein. The Company shall notify, in writing, the legal representatives of the Decedent's estate of its acceptance or rejection to purchase all of the Decedent's Interest within thirty (30) days after the appointment of the legal representatives of the Decedent's estate, provided that a failure to notify said legal representatives of its acceptance within said thirty (30) days shall constitute an election not to purchase all of the Decedent's Interest. The notice shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the appointment of the legal representatives of the Decedent's estate, elect to purchase the Decedent's interest which does not pass to a Permitted Transferee, for the Death Purchase Price and upon the terms and conditions as hereinafter set forth.

(b)    The closing of the purchase and sale of the Decedent's Interest to the Company or the remaining Members shall take place at the Company's principal office, or at such other place as agreed to by the parties on a date mutually agreed to by said parties which shall be within one hundred twenty (120) days following the qualification of the legal representatives of the Decedent's estate.

(c)    At the closing, the Company or the remaining Members shall execute a promissory note made payable to the legal representatives of the Decedent's estate for the Death Purchase Price. The terms of the promissory note shall be in accordance with the Installment Method as set forth in Section 9.1(c) herein.

## Section 10. - Determination of Value

Upon any sale of a Member's Interest pursuant to this Agreement, the total value of the Company ("Company Value") shall be the last dated amount set forth on the Certificate of Agreed Value, attached hereto as Exhibit C and made a part hereof, executed by the Class A Members. The Class A Members shall exercise best efforts to meet not less than once per year for the purpose of considering a new Value but their failure to meet or to determine a Value shall not invalidate the most recently executed Certificate of Agreed Value setting forth the Value then in effect. If the Class A Members fail to agree on a revaluation as described above for more than two (2) years,

18

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 23 of 35   RECEIVED NYSCEF: 07/26/2019

the Value shall be the then Fair Market Value of the Company, as hereinafter defined. For purposes of this Agreement, the "Fair Market Value of the Company" shall be the fair market value of the Company assets, less Company liabilities. The Fair Market Value of the Company's real estate shall be determined by an MAI appraisal selected by the Company. If the Selling Member disputes such appraisal, such party shall obtain an MAI appraisal, and the average of the two (2) MAI appraisals shall determine the Fair Market Value; provided, however, that the higher value is within ten (10%) percent of the lower value. If such values are not within ten (10%) percent of each other, then the two (2) MAI appraisers shall select a third MAI appraiser, whose valuation shall be final and binding. The Company shall pay for its appraiser, the Selling Member shall pay for its appraiser, and the third appraiser, if any, shall be paid fifty (50%) percent by the Company and fifty (50%) percent by the Selling Member. The Fair Market Value of all the other assets of the Company, other than its real estate, shall be determined by the certified public accountant employed by the Company applying generally accepted accounting principles. In calculating the Fair Market Value, the Company's accountant shall take into consideration all relevant discounts.

The Value of a Member's Membership Interest shall be an amount equal to the Company Value, multiplied by the Percentage Interest in the Company being purchased.

## Section 11. - Termination of a Member

The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which would terminate a Member's interest as a Member in the Company shall not dissolve the Company and shall not require the consent of the remaining Members to continue the Company.

## Section 12. - Term of the Company

The Company shall commence as of the date its Certificate of Formation is filed with the New York Secretary of State or such later date specified therein, and shall terminate upon the occurrence of any of the following events:

12.1    The mutual agreement in writing of a majority in interest of the Class A Members on the date of such agreement to terminate;

12.2    At such earlier time as may be provided by applicable law;

12.3    The sale, disposal, conveyance or distribution of all or substantially all of the assets in which the Company shall have an interest;

12.4    The entry of a decree of judicial dissolution in accordance with the New York Act.

19

**A-485**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM     INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 24 of 35   RECEIVED NYSCEF: 07/26/2019

## Section 13. - Fiscal Year and Accounting Method

For income tax purposes, the Company's fiscal year shall be as determined by the Manager, and the Company's books shall be kept on the cash or accrual method of accounting as determined by the Manager. Such method when so adopted shall be consistently followed by the Company, subject, however to the Company's right to change its method of accounting for income tax purposes as allowed by law. The accounting for Company purposes shall be made in accordance with generally accepted accounting principles.

## Section 14. - Books and Records

14.1   The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.

14.2   The Company's books shall be closed at such intervals as the Manager shall determine but not less frequently than annually as of the end of each calendar year by the certified public accountants then regularly retained by the Company. Such certified public accountants for the Company may be changed at any time and from time to time by the Manager. Such accountants shall prepare the Federal income tax returns for the Company together with a report for each Member for Federal income tax purposes indicating the portion of each Member of the Company's profits and losses for such year. The Members shall each receive a copy of the appropriate report within a reasonable period of time after the close of each fiscal year and promptly after its receipt by the Company and approval by the Manager.

14.3   A Member or Manager of the Company shall be fully protected in relying in good faith upon the Company's records and upon such information, opinions, reports or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other Person, as to matters the Member or Manager reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

## Section 15. - Other Activities of Members

Any Member may engage in other business ventures of every nature, including, without limitation by specification, the ownership of another business similar to that

20

A-486

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-13 Filed 08/30/22 Page 25 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

operated by this Company. Neither the Company nor any of the other Members shall have any right or interest in any such independent ventures or to the income and profits derived therefrom.

### Section 16. - Resignation of a Member

Pursuant to the New York Act, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

### Section 17. - Indemnification

17.1 The Members and Manager shall not be liable to the Company or any Member or Manager for any liability, loss, damage, cost or expense which may arise out of or in connection with any act or conduct on the part of the Members or Manager without fraud or willful misconduct, including, but not limited to, the failure to perform its obligations hereunder due to restrictions or prohibitions imposed by law, rule, regulation or demand of any governmental agency, or from any other cause beyond the control of the Members or Manager.

17.2 Notwithstanding anything otherwise herein contained to the contrary, no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.

### Section 18. - Limitation on Liability

Except as otherwise provided by the New York Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member, Manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, or acting as a Manager, employee or agent of the Company. No Member shall be required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

### Section 19. - Amendment

This Agreement may be amended only by the affirmative vote of a majority in interest of the Class A Members.

21

**A-487**

## Section 20. · Miscellaneous

20.1     <u>Organizational Fees</u>.  The Company shall pay all expenses incurred in the organization of the Company.

20.2     <u>Company Property</u>.  Title or interest to any or all Company property may be acquired and/or held for the Company purposes set forth in this Agreement in the Company name and/or in the name of any nominee as the Manager may designate.  The Manager shall have the right to enter into nominee agreements with any such nominee on the Company's behalf and such agreements may provide for indemnifying such nominee from all claims, damages, costs, expenses or liabilities arising therefrom other than as may be due to or result from the willful misconduct of such nominee.

20.3     <u>Notices</u>.  All notices or writings required to be given hereunder or deemed necessary or desirable by any party hereto shall be given in writing addressed to the Company at its principal business office and to each Member and Manager at the address set forth on the books and records of the Company which address may be changed by notice forwarded to the Company, in accordance herewith, and shall be delivered either: personally; by deposit in the United States Post Office Box, postage pre-paid, by certified or registered mail, return receipt requested; by a postal or private form of expedited delivery service; or by facsimile transmission.

20.4     <u>Failure of Member to Comply with Terms of this Agreement</u>.  If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that all other Members bound by this Agreement will have no adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement or to specifically enforce the provisions hereof.

20.5     <u>Failure of a Manager to Comply with Terms of this Agreement</u>.  A Manager shall not be personally liable for failure to perform in accordance with, or to comply with the terms and conditions of this Agreement or for any other reason unless such failure to perform or comply or such other reason constitutes gross negligence or willful misconduct by the Manager.

20.6     <u>Applicable Law</u>.  This Agreement shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York (without regard to its conflicts of laws provisions).  Any proceedings brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York.

20.7     <u>Severability</u>.  If any provision of this Agreement shall be declared invalid, cause the Company not to be treated for income tax purposes as a partnership, then and in

46067/0001-7760303v3

**A-488**

INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-13 Filed 08/30/22 Page 27 of 35 RECEIVED NYSCEF: 07/26/2019

any of such events, such provision(s) shall be deemed to be invalid, and notwithstanding any such invalidity, the remaining provisions of this Agreement shall remain in full force and effect as if such invalid provisions(s) had not been a part hereof.

20.8   Benefit.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and to their respective heirs, executors, administrators and assigns; provided however, that none of the provisions of this Agreement shall be for the benefit of nor shall they be enforceable by any creditor of the Company or of any Member.

20.9   Construction.  As used in this Agreement, the masculine gender shall include the feminine or neuter gender and the neuter gender shall include the masculine or feminine gender, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

20.10  Execution.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original.  The signature by any Member on any one of the counterparts shall bind such Member at such time as each of the Members has signed and delivered to the Company at least one (1) counterpart.

20.11  Headings.  The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12  Partnership.  It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

23

**A-489**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3  Case 1:22-cv-02407-MKV  Document 27-13  Filed 08/30/22  Page 28 of 35

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**

_____

**MEMBERS:**

_____
HAROLD PINE

_____

_____
SANDRA TEMARES

_____

_____
JEROME SCHNEIDER

**ATTEST:**

_____

**MANAGER:**

PINE MANAGEMENT, INC.

_____
By: THOMAS ROHLMAN, President

24

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-13 Filed 08/30/22 Page 29 of 35 RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                    **MEMBERS:**

_____              _____
                                                         HAROLD PINE

_____              _____
                                                         SANDRA TEMARES

_____              _____
                                                         JEROME SCHNEIDER

**ATTEST:**                                      **MANAGER:**

                                                         PINE MANAGEMENT, INC.

_____              _____
                                                         By: THOMAS ROHLMAN, President

24

46067/0001-7760303v3

**A-491**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 30 of 35 RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

WITNESS:                                    MEMBERS:

_____                     _____
                                            HAROLD PINE


_____                     _____
                                            SANDRA TEMARES

_____                     _____
                                            JEROME SCHNEIDER

ATTEST:                                     MANAGER:

                                            PINE MANAGEMENT, INC.

_____                     _____
                                            By: THOMAS ROHLMAN, President

24

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV   Document 27-13   Filed 08/30/22   Page 31 of 35    RECEIVED NYSCEF: 07/26/2019

## EXHIBIT A

### Capital Contributions and Percentage Interests

| | Member | Initial Capital Contributions | Percentage Interests |
|---|---|---|---|
| 1. | HAROLD PINE | $ | 33.34% |
| 2. | SANDRA TEMARES | $ | 33.33% |
| 3. | JEROME SCHNEIDER | $ | 33.33% |

A-1

A-493

## EXHIBIT B

| Class A Members | Membership Interest |
|---|---|
| HAROLD PINE | 0.34% |
| SANDRA TEMARES | 0.33% |
| JEROME SCHNEIDER | 0.33% |

| Class B Members | Membership Interest |
|---|---|
| HAROLD PINE | 33% |
| SANDRA TEMARES | 33% |
| JEROME SCHNEIDER | 33% |

B-1

**A-494**

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Sandra Temares and Jerome Schneider are also set forth.

<u>Date</u>                                      <u>Value of Company</u>

$3,700,000

**WITNESS:**                                  **MEMBERS:**

_____                    _____
                                           HAROLD PINE

_____                    _____
                                           SANDRA TEMARES

_____                    _____
                                           JEROME SCHNEIDER

C-1

**A-495**

## EXHIBIT C

## Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Sandra Temares and Jerome Schneider are also set forth.

Date                                    Value of Company

                                         $3,700,000

WITNESS:                                 MEMBERS:

_____                 _____
                                         HAROLD PINE

_____                 _____
                                         SANDRA TEMARES

_____                 _____
                                         JEROME SCHNEIDER

C-1

A-496

INDEX NO. 654303/2019

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Sandra Temares and Jerome Schneider are also set forth.

Date                                    Value of Company

                                        $3,700,000

WITNESS:                                MEMBERS:

_____                       _____
                                        HAROLD PINE

_____                       _____
                                        SANDRA TEMARES

_____                       _____
                                        JEROME SCHNEIDER

C-1

46067/0001-7760303v3

# EXHIBIT A-13

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019

NYSCEF DOC. NO. 3
Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 2 of 33
RECEIVED NYSCEF: 07/26/2019

# Exhibit 13

A-499

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 3 of 33   RECEIVED NYSCEF: 07/26/2019

# AMENDMENT AND RESTATEMENT OF

# OPERATING AGREEMENT

# OF

# BAR-MAR REALTY LLC

## (a New York limited liability company)

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW JERSEY 07602-0800
(201) 489-3000

46067/0001-7760320v2

A-500

## TABLE OF CONTENTS

**Page**

Section 1. - Formation and Name ............................................................... 1

Section 2. - Office ..................................................................................... 2

Section 3. - Definitions ............................................................................. 2

Section 4. - Purposes ................................................................................ 4

Section 5. - Capital Contributions and Capital Accounts .......................... 4

Section 6. - Admission of Additional Members ......................................... 6

Section 7. - Allocations and Distributions ................................................. 7

Section 8. - Management ........................................................................... 9

Section 9. - Restrictions on the Transfer of a Member's Interest .............. 13

Section 10. - Determination of Value ........................................................ 18

Section 11. - Termination of a Member ..................................................... 19

Section 12. - Term of the Company ........................................................... 19

Section 13. - Fiscal Year and Accounting Method ..................................... 20

Section 14. - Books and Records ............................................................... 20

Section 15. - Other Activities of Members ................................................ 20

Section 16. - Resignation of a Member ..................................................... 21

Section 17. - Indemnification .................................................................... 21

Section 18. - Limitation on Liability ......................................................... 21

Section 19. - Amendment .......................................................................... 21

Section 20. - Miscellaneous ...................................................................... 22

i

**A-501**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019

NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-14    Filed 08/30/22    Page 5 of 33    RECEIVED NYSCEF: 07/26/2019

## AMENDMENT AND RESTATEMENT OF

## OPERATING AGREEMENT

## OF

## BAR-MAR REALTY LLC

### (a New York limited liability company)

**THIS AMENDMENT AND RESTATEMENT OF OPERATING AGREEMENT,** made as of the 27th day of July, 2011, by and between Harold Pine ("Harold"), Lloyd Pine ("Lloyd"), Brenda Rohlman ("Brenda"), Marc Schneider ("Marc") and Marni Schwartz ("Marni") (Harold, Lloyd, Brenda, Marc and Marni shall hereinafter, at times, be referred to collectively as the "Members" or individually as a "Member").

### W I T N E S S E T H:

**WHEREAS,** the Members of Bar-Mar Realty LLC entered into an operating agreement, effective as of October 17, 1996, and which is binding upon the Members; and

**WHEREAS,** the Members may amend said operating agreement with the written consent of the Members including two-thirds or more of the percentage interests then held by the Members, pursuant to Section 15.4 of said operating agreement; and

**WHEREAS,** the Members desire to amend and restate said operating agreement as hereinafter provided for the purposes hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

### Section 1. - Formation and Name

The Members heretofore have associated themselves into a limited liability company pursuant to the provisions of the New York Limited Liability Company Act. The Company shall be governed by the terms and conditions set forth herein. The limited liability company's name is Bar-Mar Realty LLC.

46067/0001-7760320v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM   INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 6 of 33   RECEIVED NYSCEF: 07/26/2019

## Section 2. - Office

The Secretary of State is designated as agent of the Company upon whom process against it may be served. The post office address to which the Secretary of State of the State of New York shall mail a copy of any process against the Company served upon him or her is c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025. Such office and agent may be changed, from time to time, as the Manager shall determine. The Company's principal place of business shall be located at c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025 and/or such other location or locations as, from time to time, the Manager shall select.

## Section 3. - Definitions

3.1    "Agreement" means this Operating Agreement, as originally executed and as amended from time to time, which supersedes any prior operating agreement, and the terms "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

3.2    "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon: (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member; (iv) the filing of a petition in an involuntary bankruptcy case, which petition remains undismissed or suspended for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

3.3    "Capital Account" means, with respect to any Member or assignee, the Capital Account maintained in accordance with the provisions set forth in Section 5.3 hereof.

2

46067/0001-7760320v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 7 of 33
RECEIVED NYSCEF: 07/26/2019

3.4    "Capital Contribution" means, with respect to any Member or assignee, the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by such Member or assignee.

3.5    "Code" means the Internal Revenue Code of 1986, as amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

3.6    "Company" shall refer to Bar-Mar Realty LLC.

3.7    "Deficit Capital Account" means with respect to any Member or assignee, the deficit balance, if any, in such Member's or assignee's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amount which such Member or assignee is obligated to restore under Regulation Section 1.704-1(b)(2)(ii)*(c)*, as well as any addition thereto pursuant to the next to last sentence of Regulation Section 1.704-2(g)(1) and (i)(5), after taking into account thereunder  any changes during such year in partnership minimum gain (as determined in accordance with Regulation Section 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Regulation Section 1.704-2(i)(3)); and

(b)    Debit to such Capital Account the items described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* and *(6)*.

The definition of Deficit Capital Account is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)*(d)* and 1.704-2, and will be interpreted consistently with those provisions.

3.8    "Interest" means a Member's entire interest in the Company including the Member's right to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, and the right to participate in the management of the Company's business and affairs, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the New York Act.

3.9    "Manager" or "Managers" means one or more Persons (individually and collectively) selected by the Members, to whom are delegated all or part of the management duties of the Company's business as provided in Section 8 hereof.

3.10    "Members" means all of the Members in the Company.  See Exhibit B attached hereto for a list of the Company's Members.

**A-504**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-14    Filed 08/30/22    Page 8 of 33 RECEIVED NYSCEF: 07/26/2019

3.11  "New York Act" means the New York Limited Liability Company Act, as the same may be amended from time to time.

3.12  "Percentage Interest" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof. Other than by application of Section 6, the Percentage Interests of the Members may not be adjusted without the unanimous consent of the Members.

3.13  "Person" means an individual, association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

3.14  "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, credit, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations.

3.15  "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

### Section 4. - Purposes

The Company was originally formed for the purpose of acquiring, owning and managing the real property commonly known as 24 West 88th Street, New York, New York. The character and purposes for which the Company was formed, in general, is to own, manage, acquire, invest in real estate; and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement. The Company may also engage in such other business, activity or purpose permitted by law, as the Manager may determine.

### Section 5. - Capital Contributions and Capital Accounts

5.1  Members' Capital Contributions.  Each Member has made an initial Capital Contribution to the Company, which has been reflected in the Members' Capital Accounts. No interest shall be paid on any initial or subsequent Capital Contribution.

4

**A-505**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   RECEIVED NYSCEF: 07/26/2019
                                                                                    Page 9 of 33

5.2     Additional Contributions.  Except as set forth in Section 5.1 above, no Member shall be required to make any Capital Contributions.  In order to obtain additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of the Manager.

5.3     Capital Accounts.  A separate Capital Account will be maintained for each Member.

(a)     Each Member's Capital Account will be increased by:

(i)     The amount of money contributed by the Member to the Company;

(ii)     The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

(iii)     Allocations to the Member of Profits; and

(iv)     Allocations to the Member of income or gain as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(b)     Each Member's Capital Account will be decreased by:

(i)     The amount of money distributed to the Member by the Company;

(ii)     The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code);

(iii)     Allocations to the Member of Losses; and

(iv)     Allocations to the Member of deduction or expense as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(c)     In the event of a permitted sale or exchange of an Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Regulation Section 1.704-1(b)(2)(iv).

5

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.  Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 10 of 33   RECEIVED NYSCEF: 07/26/2019

(d)     The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder.  If in the Manager's opinion, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified to comply with Section 704(b) of the Code and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, than any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(e)     Except as otherwise required in the New York Act (and subject to Sections 5.1 and 5.2 above), no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

5.4     <u>Withdrawal or Reduction of Members' Contributions to Capital</u>.  A Member shall not receive any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains Company property sufficient to pay them, as determined by the Manager in its sole discretion.  A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

5.5     <u>Advances by the Members</u>.  A Member may from time to time, with the consent of the Manager, advance additional monies to or for the Company's benefit, and each such advance shall be treated as a Capital Contribution to the Company or as a loan to the Company, as determined by the Manager.  Any advance which is treated as a loan shall be evidenced by a promissory note executed and delivered by the Company to the Member.

5.6     <u>Transactions Between Member and/or Manager and the Company</u>.  Except as otherwise provided in this Agreement, a Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide collateral for, and transact other business with the Company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager as set forth in the New York Act.

<u>Section 6. - Admission of Additional Members</u>

Additional Members may be admitted to the Company upon the affirmative vote of a majority in interest of the Members.  Such new Members shall be allocated Profit

46057/0001-7760320v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 11 of 33   RECEIVED NYSCEF: 07/26/2019

and Loss by such method as may be provided in this Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

## Section 7. - Allocations and Distributions

    7.1    <u>Allocations of Profits and Losses</u>.  Profits and Losses for any fiscal year shall be allocated to the Members in proportion to their Percentage Interests.

    7.2    <u>Special Allocations</u>.  Notwithstanding the provisions of Section 7.1:

        (a)    <u>Minimum Gain</u>.  Notwithstanding any other provision of this Section 7.2, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain.  This Section 7.2(a) is intended to comply with the minimum gain chargeback requirement of Regulation Section 1.704-2 and shall be interpreted consistently therewith.  If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

        (b)    <u>Qualified Income Offset</u>.  If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4)*, *(5)* or *(6)*, which create or increase a Deficit Capital Account of the Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible.  It is the intent that this Section 7.2(b) be interpreted to comply with the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)*(d)*.

        (c)    <u>Deficit Balance</u>.  If any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that the Member is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)*(c)* and the Member's share of minimum gain as defined in Regulation Section 1.704-2(g)(1) (which is also treated as an obligation to restore in accordance with Regulation Section 1.704-1(b)(2)(ii)*(d)*), the Capital Account of the Member shall be specially credited with items of Company income (including gross income) and gain in the amount of the excess as quickly as possible.

7

**A-508**

(d)    Nonrecourse Deductions.  Items of Losses, deduction, and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Regulation Section 1.704-2(i) shall be allocated to the Members' Capital Accounts in accordance with said Regulation Section 1.704-2(i).  Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Regulation Section 1.704-2(b)) those deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company Profit or Loss for that period.

(e)    Section 704(c).  In accordance with Section 704(c)(1)(A) of the Code and Regulation Section 1.704-1(b)(2)(iv)*(d)(3)*, if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for the property shall, solely for Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

(f)    Curative Allocations.  Any credit or charge to the Members' Capital Accounts pursuant to Sections 7.2(a) through 7.2(d) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 7.1 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 7.1 and 7.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Section 7 if the special allocations required by Sections 7.2(a) through 7.2(d) had not occurred.

7.3    Distributions.

(a)    The Company shall make distributions to the Members (other than upon liquidation) according to their respective Percentage Interests in the Company at such times as the Manager shall determine.  Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation).  The Company may offset damages for breach of this Agreement by a Member whose interest is liquidated (either upon the withdrawal of a Member or the liquidation of the Company) against the amount otherwise distributable to the Member.  Upon the Company's liquidation, the Company's assets shall be distributed in the following order of priority:

(i)    The claims of creditors, other than Members, first shall be satisfied and adequate reserves established (as determined by the Manager);

8

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-14 Filed 08/30/22 Page 13 of 33 RECEIVED NYSCEF: 07/26/2019

     (ii)    All outstanding loans from Members shall be repaid in the same proportion which the outstanding loans from any Member shall bear to the outstanding loans of all Members;

     (iii)    The Members shall receive the balance in proportion to their relative Capital Accounts determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.

     (b)    The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the Company's assets, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

     (c)    Subject to the terms and conditions of Section 7.3(d), a Member who receives a distribution in violation of Section 7.3(b), and who knew at the time of the distribution that the distribution violated Section 7.3(b), shall be liable to the Company for the amount of the distribution. A Member who receives a distribution in violation of Section 7.3(b), and who did not know at the time of the distribution that the distribution violated Section 7.3(b), shall not be liable for the amount of the distribution.

     (d)    Unless otherwise agreed upon by the Manager, a Member who receives a distribution from the Company in violation of Section 7.3(b) shall have no liability under the New York Act or other applicable law for the amount of the distribution after the expiration of three (3) years from the date of the distribution unless an action to recover the distribution from the Member is commenced prior to the expiration of the three (3) year period and an adjudication of liability against the Member is made in the said action.

## Section 8. - Management

8.1   Management.

     (a)    The Company's business and affairs shall be managed by the Manager. The Manager shall participate in the direction, management and control of the Company's business to the best of its ability.

46067/0001-7760320v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 14 of 33   RECEIVED NYSCEF: 07/26/2019

(b)     If there is more than one (1) Manager designated to serve hereunder, the Managers shall in all cases act as a group, with a majority vote of the Managers required to take action. Each Manager shall have one (1) vote.

(c)     The Company's initial Manager shall be Pine Management, Inc. Pine Management, Inc. may be paid for services rendered in its role as property manager pursuant to a separate agreement with the Company.

(d)     Except as expressly provided in this Agreement, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

8.2     Number, Tenure and Qualifications. The number of Managers of the Company shall be fixed from time to time by the affirmative vote of a majority in interest of the Members, but in no instance shall there be less than one (1) Manager. Each Manager shall hold office until his or her successor shall have been elected and qualified. Managers shall be elected by the affirmative vote of a majority in interest of the Members. Managers need not be residents of the State of New York or Members of the Company.

8.3     Certain Powers of Managers. Without limiting the generality of Section 8.1, the Manager shall have power and authority, on the Company's behalf:

(a)     To acquire personal property for use in the ordinary course of the Company's business from any Person as the Manager may determine. The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

(b)     To purchase liability and other insurance to protect the Company property and the Company's business;

(c)     To hold and own any Company real and/or personal properties in the Company's name;

(d)     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(e)     To execute on the Company's behalf all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the Manager's opinion, to the Company's business;

10

46067/0001-7760320v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 15 of 33   RECEIVED NYSCEF: 07/26/2019

(f)     To employ accountants, legal counsel, or other experts to perform services for the Company and to compensate them from Company funds;

(g)     To enter into any and all other agreements on the Company's behalf, with any other Person that are necessary or appropriate to the conduct of the Company's business and which are upon customary terms and conditions; and

(h)     To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

The Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company, shall be made by the affirmative vote of a majority in interest of the Members.

8.4     Liability for Certain Acts. The Manager shall exercise its business judgment in participating in the management of the Company's business, operations and affairs. Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by the Manager in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company's operations. The Manager shall not be responsible to any Members because of a loss of their investments or a loss in operations, unless the loss shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager proved as set forth in this Section 8.4. Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

8.5     The Manager Has No Exclusive Duty to Company. The Manager shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

46067/0001-7760320v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 16 of 33
                                                                 RECEIVED NYSCEF: 07/26/2019

8.6    Bank Accounts. The Manager may open bank accounts in the Company's name. The Company's funds shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager. The Manager shall use such funds solely for the Company's business. Funds shall be withdrawn from the Company's bank accounts only upon a Manager's signature.

8.7    Resignation. A Manager may resign at any time by giving written notice to the Members. A Manager's resignation shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

8.8    Removal. Any Manager may be removed at any time, with or without cause, by the affirmative vote of a majority in interest of the Members.

8.9    Vacancies. Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of a majority in interest of the Members. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of a majority in interest of the Members. A Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until its earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next meeting of Members and until its successor shall be elected and shall qualify, or until his or her earlier death, resignation or removal.

8.10   Compensation. The guaranteed payments and other compensation of the Manager, if any, shall be paid in such manner as shall be fixed from time to time by the affirmative vote of a majority in interest of the Members, and no Manager shall be prevented from receiving any such compensation, if any, by reason of the fact that he or she is also a Member of the Company.

8.11   Manager's Representations. Every contract, deed, mortgage, lease and other instrument executed by any Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof: (i) the Company was in existence; (ii) neither this Agreement nor the Certificate of Formation had been amended in any manner so as to restrict the delegation of authority to the Manager; and (iii) the execution and delivery of such instrument was duly authorized by the Manager. Any Person may always rely on a certificate addressed to him or her and signed by a Manager:

(a)    as to who are the Members and Manager hereunder;

46067/0001-7760320v2

**A-513**

(b)     as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or Manager or in any other manner germane to the Company's affairs;

(c)     as to who is authorized to execute and deliver any instrument or document of the Company;

(d)     as to the authenticity of any copy of the Certificate of Formation, this Agreement, amendments thereto and any other document relating to the conduct of the Company's affairs; or

(e)     as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Manager or any Member in the capacity as a Member or Manager of the Company.

8.12   Limitations on Members.

(a)     Except as is expressly provided in this Section, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

(b)     Unless authorized to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

## Section 9. - Restrictions on the Transfer of a Member's Interest

9.1   Lifetime Restrictions on Transfers.  Except as otherwise provided herein, a Member shall not sell, transfer, pledge, encumber or otherwise dispose of all or any part of his or her Interest to any Person other than a Permitted Transferee, as hereinafter defined, unless the Member desiring to make the transfer or encumbrance (hereinafter referred to as the "Selling Member") shall have first made the offer to sell to the Company and the remaining Members and such offer shall not have been accepted.

(a)     Notice of Offer.  The offer which shall be given to the Company and the remaining Members and shall consist of an offer to sell all of the Interest owned by the Selling Member, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lienor, the Percentage Interest involved in any such proposed transfer or encumbrance, and the price and terms of any such transfer or encumbrance ("Bona Fide Offer"), in accordance with the provisions of Section 9.1(b) hereof.

13

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 18 of 33   RECEIVED NYSCEF: 07/26/2019

    (b)    <u>Bona Fide Third Party Offer</u>. If the Selling Member has received a bona fide written offer to purchase all of his or her Interest in the Company which he or she wishes to accept, or a bona fide written offer to receive a loan or an advance of money, which loan or advance involves an encumbrance upon said Interest to secure the loan or advance as referred to in Section 9.1(a) above, the Selling Member shall submit to the Company and the remaining Members, within fourteen (14) days after receipt of such Bona Fide Offer, a written notice including a copy of such Bona Fide Offer, as required under Section 9.1(a) above, together with the name and address of the principal or principals if the offer is made through an agent (hereinafter collectively referred to as the "Bona Fide Offerors"), and sufficient facts concerning the Bona Fide Offerors to enable the Company and the remaining Members to arrive at an informed judgment as to the bona fides of such offer. The Selling Member shall then offer, or be deemed to have offered, in writing to sell to the Company all of the Interest in the Company held by the Selling Member for an amount equal to the lesser of: (i) fifty (50%) percent of the Value of the Selling Member's Interest, which is determined under Section 10 hereof; or (ii) the purchase price set forth in the Bona Fide Offer, or, if an encumbrance, the lesser of the amount set forth in item (i) above and the amount of the debt involved in such encumbrance (the lesser of (i) and (ii) shall be referred to as the "Lifetime Purchase Price"), and upon the terms and conditions as hereinafter set forth; provided, however, that the Selling Member has complied with all of the procedural conditions hereof. Within thirty (30) days after receipt by the Company of the Bona Fide Offer, the Company may elect to purchase all of the Selling Member's Interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the receipt by the Company of the Bona Fide Offer, elect to purchase all of the Selling Member's interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price, and upon the terms and conditions as hereinafter set forth. The remaining Members shall purchase the Selling Member's Interest in relative proportion to their ownership of Interests in the Company; provided, however, that the remaining Members may arrange among themselves for the purchase of the Selling Member's Interest in proportions which differ from the proportions of their respective holdings.

    A potential purchaser or purchasers shall exercise its or their election to purchase by giving written notice thereof to the Selling Member and the other potential purchasers upon the terms and conditions as hereinafter set forth.

    (c)    <u>Terms of Payment</u>. If the Company or the remaining Members exercises its or their right to purchase the Interest of the Selling Member in accordance with the terms of Section 9.1(b) hereof, then the purchaser(s) shall pay the Lifetime Purchase Price either: (i) in accordance with the terms and conditions set forth in the Bona Fide Offer; or (ii) by executing and delivering a negotiable promissory note or notes (in a form mutually acceptable by the purchaser(s) and the Selling Member) made

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM                INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 19 of 33   RECEIVED NYSCEF: 07/26/2019

payable to the order of the Selling Member, whichever the purchaser(s) chooses. Said promissory note(s) shall require successive equal monthly installments over a period of ten (10) years, with interest being imposed at the annual rate equal to the lowest rate of interest which allows for the avoidance of any imputed or unstated interest for Federal income tax purposes existing at and fixed as of the date of closing (the "Installment Method"). The first monthly installment shall be due at the time of closing with one hundred nineteen (119) additional monthly payments being made thereafter on the monthly anniversary date of the first payment until said obligation has been paid in full. The promissory note shall provide for acceleration of any unpaid balance, together with all accrued interest, upon written notice to the purchaser(s) of a default in the payment of any one (1) monthly installment, which default remains uncured for a period of thirty (30) days after receipt of such notice. The promissory note shall provide for the unrestricted right to prepay all or any part of the unpaid balance, without premium or penalty, and with interest only to the date of prepayment.

(d)    Release from Restriction. If the offer to sell as provided for in Section 9.1(b) is not accepted by the Company or the remaining Members as set forth herein, the Selling Member may make a bona fide transfer or encumbrance to the prospective purchaser or lienor named in the statement attached to the Bona Fide Offer, with such sale or encumbrance to be made only in strict accordance with the terms therein stated. The Company and the remaining Members shall be given full access to all closing documents relating to such sale or encumbrance to the Bona Fide Offerors, so that adherence to the terms and conditions of the Bona Fide Offer can be demonstrated. However, if the Selling Member shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the election to purchase by the Company and the remaining Members in accordance with this Section, or if there is any modification in price or any of the terms and conditions of the Bona Fide Offer, such Interest shall again become subject to all the restrictions of this Agreement, and the Selling Member shall not have the right to complete the proposed sale or encumbrance without again offering the Interest, in writing, anew to the Company pursuant to the procedures set forth in this Section. Notwithstanding anything in this Agreement to the contrary, all Interests purchased by the Bona Fide Offerors from a Selling Member shall be acquired subject to the terms and conditions of this Agreement and the Bona Fide Offerors shall not sell, assign, pledge, encumber, hypothecate, mortgage, or in any other manner transfer the whole or any part of the Interest purchased, or any other Interest thereafter held or owned, without the prior written consent of the Company, except as specifically provided in this Agreement. It shall be the affirmative obligation of the Selling Member to notify the Bona Fide Offerors that the Interest proposed to be sold by the Selling Member and purchased by the Bona Fide Offerors will remain subject to the terms and provisions of this Agreement following the proposed sale and purchase.

15

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO.

9.2    <u>Sale in Violation of Agreement</u>.  In the event of any attempted sale, assignment, transfer, hypothecation, pledge, encumbrance or disposition ("Attempted Transfer") of the Interest of a Member, not in accordance with the terms of this Agreement, such Attempted Transfer shall be deemed to be an offer by such Member to sell his or her Interest pursuant to Section 9.1(b) hereof, to be deemed made as of the date of discovery of such Attempted Transfer, and at a price equal to the lesser of:  (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Attempted Transfer.  The payment terms shall be in accordance with the Installment Method or such Attempted Transfer, whichever the purchaser chooses.

9.3    <u>Involuntary Transfers</u>.  In the event of any involuntary transfer ("Involuntary Transfer") or attempted involuntary transfer ("Attempted Involuntary Transfer") of an Interest owned by a Member due to certain events, including, but not limited to, a Member's bankruptcy or divorce, such Member shall be deemed to have made an offer to sell his or her Interest as of the date of discovery of such Involuntary Transfer or Attempted Involuntary Transfer, pursuant to Section 9.1(b) hereof, and at a price equal to the lesser of:  (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Involuntary Transfer or Attempted Involuntary Transfer.  The payment terms shall be in accordance with the Installment Method, such Involuntary Transfer or Attempted Involuntary Transfer, whichever the purchaser chooses.

9.4    <u>Consent Required for Transfer and Assignment of a Member's Interest</u>. Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, pledge, encumber or in any way alienate all or any part of his or her interest in the Company as a Member except with the prior written consent of a majority in interest of the Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the New York Act), as the non-transferring Members may determine in their sole discretion.  Transfers in violation of this Section 9.4 shall only be effective to the extent set forth in Section 9.7.

9.5    <u>Further Restrictions on Transfer</u>.  No Member shall assign, convey, sell, encumber or in any way alienate all or any part of his or her Interest in the Company if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the Company's termination under Section 708 of the Code.

9.6    <u>Substitute Members</u>.  An Assignee shall have the right to become a Substitute Member if:  (i) the requirements of Sections 9.4 and 9.5 are met; (ii) such Person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (iii) such Person pays any reasonable expenses in connection with its admission as a Substitute Member.

46067/0001-7760320v2

**A-517**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-14 Filed 08/30/22 Page 21 of 33

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

9.7    Effect of Transfer.

(a)    Any permitted transfer of all or any portion of a Member's Interest in the Company shall take effect on the date of transfer.

(b)    Any Assignee of an Interest in the Company shall take subject to the restrictions on transfer imposed by this Agreement.

(c)    Upon any transfer of a Member's Interest in the Company, unless the Assignee is admitted as a Substituted Member pursuant to Section 9.6 herein, the Assignee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but shall only be entitled to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, to which the transferor was entitled, and the extent transferred.

(d)    A Member ceases to be a Member and to have the power to exercise any rights or powers of a Member upon the assignment of all of its Interest.

9.8    Permitted Transferees.   Notwithstanding any other provisions of this Agreement (including Section 6), each Member, during his or her lifetime or upon his or her death, may give, sell, or otherwise assign all or any part of his, her or its Membership Interest to the following, which shall be referred to as the "Permitted Transferees":

(a)    any descendent or ascendant of any Member by inter vivos or testamentary transfer;

(b)    another Member;

(c)    a Member's spouse, or a trust for the primary benefit of a Member's spouse;

(d)    a custodian or guardian of a minor descendent;

(e)    a trust of which all of the primary beneficiaries are Members or Permitted Transferees;

(f)    a beneficiary of a trust that is also a Member; and/or

(g)    a legal entity controlled and managed by Members or Permitted Transferees.

17

46067/0001-7760320v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 22 of 33 RECEIVED NYSCEF: 07/26/2019

9.9   Death of a Member.

(a)   Except as otherwise provided herein, upon the death of a Member (the "Decedent"), the Company may elect to purchase all of the Decedent's Interest from the legal representatives of the Decedent's estate (except to the extent the Decedent's Interest passes to a Permitted Transferee, as defined hereinafter in Section 9.8), in which event the legal representatives of the Decedent's estate shall then be obligated to sell the Decedent's Interest to the Company, at a purchase price equal to Fifty (50%) percent of the Value of the Decedent's Interest, as determined under Section 10 hereof (the "Death Purchase Price"), and upon the terms and conditions set forth herein. The Company shall notify, in writing, the legal representatives of the Decedent's estate of its acceptance or rejection to purchase all of the Decedent's Interest within thirty (30) days after the appointment of the legal representatives of the Decedent's estate, provided that a failure to notify said legal representatives of its acceptance within said thirty (30) days shall constitute an election not to purchase all of the Decedent's Interest. The notice shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the appointment of the legal representatives of the Decedent's estate, elect to purchase the Decedent's interest which does not pass to a Permitted Transferee, for the Death Purchase Price and upon the terms and conditions as hereinafter set forth.

(b)   The closing of the purchase and sale of the Decedent's Interest to the Company or the remaining Members shall take place at the Company's principal office, or at such other place as agreed to by the parties on a date mutually agreed to by said parties which shall be within one hundred twenty (120) days following the qualification of the legal representatives of the Decedent's estate.

(c)   At the closing, the Company or the remaining Members shall execute a promissory note made payable to the legal representatives of the Decedent's estate for the Death Purchase Price. The terms of the promissory note shall be in accordance with the Installment Method as set forth in Section 9.1(c) herein.

**Section 10. - Determination of Value**

Upon any sale of a Member's Interest pursuant to this Agreement, the total value of the Company ("Company Value") shall be the last dated amount set forth on the Certificate of Agreed Value, attached hereto as Exhibit C and made a part hereof, executed by the Members. The Members shall exercise best efforts to meet not less than once per year for the purpose of considering a new Value but their failure to meet or to determine a Value shall not invalidate the most recently executed Certificate of Agreed Value setting forth the Value then in effect. If the Members fail to agree on a revaluation as described above for more than two (2) years, the Value shall be the then Fair Market

46067/0001-7760320v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.  Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 23 of 33  RECEIVED NYSCEF: 07/26/2019

Value of the Company, as hereinafter defined. For purposes of this Agreement, the "Fair Market Value of the Company" shall be the fair market value of the Company assets, less Company liabilities. The Fair Market Value of the Company's real estate shall be determined by an MAI appraisal selected by the Company. If the Selling Member disputes such appraisal, such party shall obtain an MAI appraisal, and the average of the two (2) MAI appraisals shall determine the Fair Market Value; provided, however, that the higher value is within ten (10%) percent of the lower value. If such values are not within ten (10%) percent of each other, then the two (2) MAI appraisers shall select a third MAI appraiser, whose valuation shall be final and binding. The Company shall pay for its appraiser, the Selling Member shall pay for its appraiser, and the third appraiser, if any, shall be paid fifty (50%) percent by the Company and fifty (50%) percent by the Selling Member. The Fair Market Value of all the other assets of the Company, other than its real estate, shall be determined by the certified public accountant employed by the Company applying generally accepted accounting principles. In calculating the Fair Market Value, the Company's accountant shall take into consideration all relevant discounts.

The Value of a Member's Membership Interest shall be an amount equal to the Company Value, multiplied by the Percentage Interest in the Company being purchased.

### Section 11. - Termination of a Member

The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which would terminate a Member's interest as a Member in the Company shall not dissolve the Company and shall not require the consent of the remaining Members to continue the Company.

### Section 12. - Term of the Company

The Company shall commence as of the date its Certificate of Formation is filed with the New York Secretary of State or such later date specified therein, and shall terminate upon the occurrence of any of the following events:

12.1 The mutual agreement in writing of a majority in interest of the Members on the date of such agreement to terminate;

12.2 At such earlier time as may be provided by applicable law;

12.3 The sale, disposal, conveyance or distribution of all or substantially all of the assets in which the Company shall have an interest;

12.4 The entry of a decree of judicial dissolution in accordance with the New York Act.

46067/0001-7760320v2

**A-520**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. RECEIVED NYSCEF: 07/26/2019

## Section 13. - Fiscal Year and Accounting Method

For income tax purposes, the Company's fiscal year shall be as determined by the Manager, and the Company's books shall be kept on the cash or accrual method of accounting as determined by the Manager. Such method when so adopted shall be consistently followed by the Company, subject, however to the Company's right to change its method of accounting for income tax purposes as allowed by law. The accounting for Company purposes shall be made in accordance with generally accepted accounting principles.

## Section 14. - Books and Records

14.1    The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.

14.2    The Company's books shall be closed at such intervals as the Manager shall determine but not less frequently than annually as of the end of each calendar year by the certified public accountants then regularly retained by the Company. Such certified public accountants for the Company may be changed at any time and from time to time by the Manager. Such accountants shall prepare the Federal income tax returns for the Company together with a report for each Member for Federal income tax purposes indicating the portion of each Member of the Company's profits and losses for such year. The Members shall each receive a copy of the appropriate report within a reasonable period of time after the close of each fiscal year and promptly after its receipt by the Company and approval by the Manager.

14.3    A Member or Manager of the Company shall be fully protected in relying in good faith upon the Company's records and upon such information, opinions, reports or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other Person, as to matters the Member or Manager reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

## Section 15. - Other Activities of Members

Any Member may engage in other business ventures of every nature, including, without limitation by specification, the ownership of another business similar to that

46067/0001-7760320v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.  Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 25 of 33   RECEIVED NYSCEF: 07/26/2019

operated by this Company. Neither the Company nor any of the other Members shall have any right or interest in any such independent ventures or to the income and profits derived therefrom.

### Section 16. - Resignation of a Member

Pursuant to the New York Act, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

### Section 17. - Indemnification

17.1   The Members and Manager shall not be liable to the Company or any Member or Manager for any liability, loss, damage, cost or expense which may arise out of or in connection with any act or conduct on the part of the Members or Manager without fraud or willful misconduct, including, but not limited to, the failure to perform its obligations hereunder due to restrictions or prohibitions imposed by law, rule, regulation or demand of any governmental agency, or from any other cause beyond the control of the Members or Manager.

17.2   Notwithstanding anything otherwise herein contained to the contrary, no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.

### Section 18. - Limitation on Liability

Except as otherwise provided by the New York Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member, Manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, or acting as a Manager, employee or agent of the Company. No Member shall be required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

### Section 19. - Amendment

This Agreement may be amended only by the affirmative vote of a majority in interest of the Members.

21

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM   INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 26 of 33   RECEIVED NYSCEF: 07/26/2019

## Section 20. - Miscellaneous

20.1   <u>Organizational Fees</u>.  The Company shall pay all expenses incurred in the organization of the Company.

20.2   <u>Company Property</u>.  Title or interest to any or all Company property may be acquired and/or held for the Company purposes set forth in this Agreement in the Company name and/or in the name of any nominee as the Manager may designate.  The Manager shall have the right to enter into nominee agreements with any such nominee on the Company's behalf and such agreements may provide for indemnifying such nominee from all claims, damages, costs, expenses or liabilities arising therefrom other than as may be due to or result from the willful misconduct of such nominee.

20.3   <u>Notices</u>.  All notices or writings required to be given hereunder or deemed necessary or desirable by any party hereto shall be given in writing addressed to the Company at its principal business office and to each Member and Manager at the address set forth on the books and records of the Company which address may be changed by notice forwarded to the Company, in accordance herewith, and shall be delivered either: personally; by deposit in the United States Post Office Box, postage pre-paid, by certified or registered mail, return receipt requested; by a postal or private form of expedited delivery service; or by facsimile transmission.

20.4   <u>Failure of Member to Comply with Terms of this Agreement</u>.  If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that all other Members bound by this Agreement will have no adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement or to specifically enforce the provisions hereof.

20.5   <u>Failure of a Manager to Comply with Terms of this Agreement</u>.  A Manager shall not be personally liable for failure to perform in accordance with, or to comply with the terms and conditions of this Agreement or for any other reason unless such failure to perform or comply or such other reason constitutes gross negligence or willful misconduct by the Manager.

20.6   <u>Applicable Law</u>.  This Agreement shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York (without regard to its conflicts of laws provisions).  Any proceedings brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York.

20.7   <u>Severability</u>.  If any provision of this Agreement shall be declared invalid, cause the Company not to be treated for income tax purposes as a partnership, then and in

46067/0001-7760320v2

A-523

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 27 of 33

RECEIVED NYSCEF: 07/26/2019

any of such events, such provision(s) shall be deemed to be invalid, and notwithstanding any such invalidity, the remaining provisions of this Agreement shall remain in full force and effect as if such invalid provisions(s) had not been a part hereof.

20.8   Benefit.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and to their respective heirs, executors, administrators and assigns; provided however, that none of the provisions of this Agreement shall be for the benefit of nor shall they be enforceable by any creditor of the Company or of any Member.

20.9   Construction.  As used in this Agreement, the masculine gender shall include the feminine or neuter gender and the neuter gender shall include the masculine or feminine gender, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

20.10   Execution.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original.  The signature by any Member on any one of the counterparts shall bind such Member at such time as each of the Members has signed and delivered to the Company at least one (1) counterpart.

20.11   Headings.  The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12   Partnership.  It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

23

**A-524**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-14    Filed 08/30/22    Page 28 of 33    RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                    **MEMBERS:**

_____            _____
                                 HAROLD PINE

_____            _____
                                 LLOYD PINE

_____            _____
                                 BRENDA ROHLMAN

_____            _____
                                 MARC SCHNEIDER

_____            _____
                                 MARNI SCHWARTZ

**ATTEST:**                      **MANAGER:**

                                 PINE MANAGEMENT, INC.

_____            _____
                                 By: THOMAS ROHLMAN, President

24

46067/0001-7760320v2

**A-525**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-14    Filed 08/30/22    Page 29 of 33    RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                    **MEMBERS:**

_____          _____
                                               HAROLD PINE

_____          _____
                                               LLOYD PINE

_____          _____
                                               BRENDA ROHLMAN

_____          _____
                                               MARC SCHNEIDER

_____          _____
                                               MARNI SCHWARTZ

**ATTEST:**                                     **MANAGER:**

                                               PINE MANAGEMENT, INC.

_____          _____
                                               By: THOMAS ROHLMAN, President

24

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-14 Filed 08/30/22 Page 30 of 33 RECEIVED NYSCEF: 07/26/2019

## EXHIBIT A

### Capital Contributions and Percentage Interests

| | Member | Initial Capital Contributions | Percentage Interests |
|---|---|---|---|
| 1. | HAROLD PINE | $ | 33.34% |
| 2. | LLOYD PINE | $ | 20.83% |
| 3. | BRENDA ROHLMAN | $ | 20.83% |
| 4. | MARC SCHNEIDER | $ | 12.5% |
| 5. | MARNI SCHWARTZ | $ | 12.5% |

A-1

**A-527**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 07/26/2019

## EXHIBIT B

| Members | Membership Interest |
|---|---|
| HAROLD PINE | 33.34% |
| LLOYD PINE | 20.83% |
| BRENDA ROHLMAN | 20.83% |
| MARC SCHNEIDER | 12.5% |
| MARNI SCHNEIDER | 12.5% |

B-1

**A-528**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-14   Filed 08/30/22   Page 32 of 33

RECEIVED NYSCEF: 07/26/2019

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Brenda Rohlman, Marc Schneider and Marni Schwartz are also set forth.

Date                                        Value of Company

                                            $1,000,000

WITNESS:                                    MEMBERS:

_____                    _____
                                           HAROLD PINE

_____                    _____
                                           LLOYD PINE

_____                    _____
                                           BRENDA ROHLMAN

_____                    _____
                                           MARC SCHNEIDER

_____                    _____
                                           MARNI SCHWARTZ

C-1

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-14 Filed 08/30/22 Page 33 of 33 RECEIVED NYSCEF: 07/26/2019

**EXHIBIT C**

**Certificate Of Agreed Value**

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Brenda Rohlman, Marc Schneider and Marni Schwartz are also set forth.

Date                                           Value of Company

                                                    $1,000,000

WITNESS:                                       MEMBERS:

_____                       _____
                                                    HAROLD PINE

_____                       _____
                                                    LLOYD PINE

_____                       _____
                                                    BRENDA ROHLMAN

_____                       _____
                                                    MARC SCHNEIDER

_____                       _____
                                                    MARNI SCHWARTZ

C-1