# 23-624

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

———— ◆◆ ————

PINE MANAGEMENT, INC.,

*Plaintiff-Counter-Defendant-Appellant,*

—against—

COLONY INSURANCE COMPANY,

*Defendant-Counter-Claimant-Appellee.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**APPENDIX
VOLUME III OF III
(Pages A-530 to A-806)**

---

AMANDA GRINER
FRANK M. MISITI
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Attorneys for Defendant-Counter-
Claimant-Appellee*

DENNIS J. NOLAN
JOHN M. LEONARD
ANDERSON KILL P.C.
1251 Avenue of the Americas,
42nd Floor
New York, New York 10020
(212) 278-1000

*Attorneys for Plaintiff-Counter-
Defendant-Appellant*

# TABLE OF CONTENTS

PAGE

District Docket Court Entries .......................................... A-1

Complaint and Jury Trial Demand, dated March 24, 2022 ............... A-8

    Exhibit 1 to Complaint—
    Argo Pro Policy ............................................... A-21

    Exhibit 2 to Complaint—
    Verified Complaint, dated July 26, 2019
    (*Schneider, et al. v. Pine Management, Inc. et al.*) ................ A-50

Defendant's Answer, Affirmative Defenses and Counterclaims,
    dated May 31, 2022 .......................................... A-117

    Exhibit A to Answer—
    Letter from Mitchell J. Geller to Bob G. Goldberg,
    dated July 17, 2018 .......................................... A-136

    Exhibit B to Answer—
    Argo Pro Policy .............................................. A-151

Plaintiff's Answer to Counterclaims, dated June 21, 2022 ............. A-180

Stipulation, dated August 5, 2022 ................................... A-195

Defendant's Notice of Motion for Judgment on Pleadings,
    dated August 9, 2022 ........................................ A-197

Declaration of M. Paul Gorfinkel, for Defendant, in Support
    of Motion for Judgment on Pleadings, dated August 9, 2022 ...... A-198

    Exhibit A to Gorfinkel Declaration—
    Letter from Mitchell J. Geller to Bob G. Goldberg,
    dated July 17, 2018 .......................................... A-199

ii

                                                                    PAGE

Defendant's Memorandum of Law in Support of Motion for Judgment
        on Pleadings, dated August 9, 2022 ............................ A-212

Plaintiff's Memorandum of Law in Opposition to Motion
        for Judgment on Pleadings, dated August 30, 2022 .............. A-238

Declaration of Dennis J. Nolan, for Plaintiff, in Opposition to Motion
        for Judgment on Pleadings, dated August 30, 2022 .............. A-268

    Exhibit A to Nolan Declaration—
    Verified Complaint, dated July 26, 2019
    (*Schneider, et al. v. Pine Management, Inc. et al.*) ................ A-272

    Exhibit A-1 to Nolan Declaration—
    Letter from Mitchell J. Geller to Bob G. Goldberg,
    dated July 17, 2018 ............................................... A-339

    Exhibit A-2 to Nolan Declaration—
    Letter from Howard S. Koh to Mitchell J. Geller,
    dated August 3, 2018 ............................................. A-354

    Exhibit A-3 to Nolan Declaration—
    Letter from Mitchell J. Geller to Howard S. Koh,
    dated August 22, 2018 ............................................ A-358

    Exhibit A-4 to Nolan Declaration—
    Letter from Howard S. Koh to Mitchell J. Geller,
    dated August 31, 2018 ............................................ A-377

    Exhibit A-5 to Nolan Declaration—
    Letter from Mitchell J. Geller to Howard S. Koh,
    dated September 21, 2018 .......................................... A-381

    Exhibit A-6 to Nolan Declaration—
    Letter from Howard S. Koh to Mitchell J. Geller,
    dated September 28, 2018 .......................................... A-386

    Exhibit A-7 to Nolan Declaration—
    Letter from Mitchell J. Geller to Howard S. Koh,
    dated November 20, 2018 .......................................... A-389

iii

PAGE

Exhibit A-8 to Nolan Declaration—
Letter from Howard S. Koh to Mitchell J. Geller,
dated December 7, 2018......................................... A-397

Exhibit A-9 to Nolan Declaration—
Operating Agreement of Rudel Realty LLC,
dated October 17, 1996 ......................................... A-401

Exhibit A-10 to Nolan Declaration—
Operating Agreement of Marni Realty LLC,
dated October 17, 1996 ......................................... A-413

Exhibit A-11 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Jeruth Realty LLC .......................................... A-425

Exhibit A-12 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of JHJ Realty LLC.............................................. A-462

Exhibit A-13 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Bar-Mar Realty LLC ......................................... A-497

Exhibit A-14 to Nolan Declaration—
Second Amended and Restated Operating Agreement
of Bren-El Realty LLC.......................................... A-530

Exhibit A-15 to Nolan Declaration—
Second Amended and Restated Operating Agreement
of Sir Realty LLC .............................................. A-565

Exhibit A-16 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Marc Realty LLC ............................................ A-600

Exhibit A-17 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of RIS Realty LLC.............................................. A-635

iv

PAGE

Exhibit A-18 to Nolan Declaration—
Amendment and Restatement of Operating Agreement
of Zizi Realty LLC ............................................ A-674

Exhibit A-19 to Nolan Declaration—
Email from Bob G. Goldberg to Marc Schneider,
dated February 19, 2018 ........................................ A-712

Exhibit A-20 to Nolan Declaration—
Email from Brenda Rohlman to Marc Schneider,
dated March 3, 2018 ........................................... A-716

Exhibit B to Nolan Declaration—
Argo Pro Policy ............................................... A-719

Defendant's Reply Memorandum of Law in Further Support
of Motion for Judgment on Pleadings, dated September 6, 2022 ... A-748

Memorandum Opinion and Order of the Honorable Mary Kay
Vyskocil, dated March 20, 2023 ................................ A-761

Entry of Judgment, dated March 21, 2023 ........................... A-771

Notice of Appeal, dated April 17, 2023 ............................. A-782

# EXHIBIT A-14

A-531

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-15 Filed 08/30/22 Page 2 of 35 RECEIVED NYSCEF: 07/26/2019

# Exhibit 14

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019

NYSCEF DOC. NO. 3&ase 1:22-cv-02407-MKV   Document 27-15   Filed 08/30/22   Page 3 of 35
                                                          RECEIVED NYSCEF: 07/26/2019

# SECOND AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# BREN-EL REALTY LLC

## (a New York limited liability company)

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW JERSEY 07602-0800
(201) 489-3000

46067/0001-8726391v1

A-533

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

## TABLE OF CONTENTS

**Page**

Section 1. - Formation and Name ............................................................. 1
Section 2. - Office .................................................................................. 2
Section 3. - Definitions .......................................................................... 2
Section 4. - Purposes ............................................................................. 4
Section 5. - Capital Contributions and Capital Accounts ........................ 4
Section 6. - Admission of Additional Members ...................................... 6
Section 7. - Allocations and Distributions .............................................. 7
Section 8. - Management ........................................................................ 9
Section 9. - Restrictions on the Transfer of a Member's Interest ........... 13
Section 10. - Determination of Value ...................................................... 18
Section 11. - Termination of a Member .................................................. 19
Section 12. - Term of the Company ........................................................ 19
Section 13. - Fiscal Year and Accounting Method .................................. 19
Section 14. - Books and Records ............................................................ 19
Section 15. - Other Activities of Members ............................................. 20
Section 16. - Resignation of a Member ................................................... 20
Section 17. - Indemnification ................................................................. 20
Section 18. - Limitation on Liability ....................................................... 21
Section 19. - Amendment ....................................................................... 21
Section 20. - Miscellaneous ................................................................... 21

i

46067/0001-8726391v1

A-534

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 3

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

# SECOND AMENDED AND RESTATED

## OPERATING AGREEMENT

### OF

### BREN-EL REALTY LLC

### (a New York limited liability company)

**THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT,** made as of the 1st day of August , 2012, by and between Lloyd Pine and Brenda Rohlman, not individually but solely as co-trustees of the Harold Pine 2009 Family Trust, dated November 5, 2009 ("Harold's Trust"), Lloyd Pine and Brenda Rohlman, not individually but solely as co-trustees of the Sydell Pine 2009 Family Trust, dated November 5, 2009 ("Sydell's Trust") and Jerome Schneider ("Jerome") (Harold's Trust, Sydell's Trust and Jerome shall hereinafter, at times, be referred to together as the "Members" or individually as a "Member").

### W I T N E S S E T H:

**WHEREAS,** Bren-El Realty LLC entered into an operating agreement, effective as of October 10, 1996, and which is binding upon the Members; and

**WHEREAS,** the Members amended and restated said operating agreement effective as of October 4, 2010; and

**WHEREAS,** pursuant to Section 19 of the operating agreement, the Class A Members can amend the operating agreement by a majority vote; and

**WHEREAS,** the Members desire to amend and restate said operating agreement as hereinafter provided for the purposes hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

### Section 1. - Formation and Name

The Members heretofore have associated themselves into a limited liability company pursuant to the provisions of the New York Limited Liability Company Act. The Company shall be governed by the terms and conditions set forth herein. The limited liability company's name is Bren-El Realty LLC.

46057/0001-8726391v1

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-15   Filed 08/30/22   Page 6 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

## Section 2. - Office

The Secretary of State is designated as agent of the Company upon whom process against it may be served. The post office address to which the Secretary of State of the State of New York shall mail a copy of any process against the Company served upon him or her is c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025. Such office and agent may be changed, from time to time, as the Manager shall determine. The Company's principal place of business shall be located at c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025 and/or such other location or locations as, from time to time, the Manager shall select.

## Section 3. - Definitions

3.1  "Agreement" means this Operating Agreement, as originally executed and as amended from time to time, which supersedes any prior operating agreement, and the terms "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

3.2  "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon: (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member; (iv) the filing of a petition in an involuntary bankruptcy case, which petition remains undismissed or suspended for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

3.3  "Capital Account" means, with respect to any Member or assignee, the Capital Account maintained in accordance with the provisions set forth in Section 5.3 hereof.

3.4  "Capital Contribution" means, with respect to any Member or assignee, the amount of money and the fair market value of any property (other than money)

2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV   Document 27-15   Filed 08/30/22   Page 7 of 35 RECEIVED NYSCEF: 07/26/2019

contributed to the Company with respect to the Interest in the Company held by such Member or assignee.

3.5     "Class A Members" means all of the voting Members in the Company. See Exhibit B attached hereto for a list of the Company's Class A Members.

3.6     "Class B Members" means all of the non-voting Members in the Company. See Exhibit B attached hereto for a list of Company's Class B Members. The Class B Members shall have no right to vote in decisions of the Members.

3.7     "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

3.8     "Company" shall refer to Bren-El Realty LLC.

3.9     "Deficit Capital Account" means with respect to any Member or assignee, the deficit balance, if any, in such Member's or assignee's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a)     Credit to such Capital Account any amount which such Member or assignee is obligated to restore under Regulation Section 1.704-1(b)(2)(ii)*(c)*, as well as any addition thereto pursuant to the next to last sentence of Regulation Section 1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Regulation Section 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Regulation Section 1.704-2(i)(3)); and

(b)     Debit to such Capital Account the items described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* and *(6)*.

The definition of Deficit Capital Account is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)*(d)* and 1.704-2, and will be interpreted consistently with those provisions.

3.10     "Interest" means a Member's entire interest in the Company including the Member's right to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, and the right to participate in the management of the Company's business and affairs, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the New York Act.

3.11     "Manager" or "Managers" means one or more Persons (individually and collectively) selected by the Members, to whom are delegated all or part of the management duties of the Company's business as provided in Section 8 hereof.

3

A-537

3.12    "New York Act" means the New York Limited Liability Company Act, as the same may be amended from time to time.

3.13    "Percentage Interest" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof. Other than by application of Section 6, the Percentage Interests of the Members may not be adjusted without the unanimous consent of the Members.

3.14    "Person" means an individual, association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

3.15    "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, credit, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations.

3.16    "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## Section 4. – Purposes

The Company was originally formed for the purpose of acquiring, owning and managing the real property commonly known as 108 West 81st Street, New York, New York. The character and purposes for which the Company was formed, in general, is to own, manage, acquire, invest in real estate; and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement. The Company may also engage in such other business, activity or purpose permitted by law, as the Manager may determine.

## Section 5. – Capital Contributions and Capital Accounts

5.1    Members' Capital Contributions. Each Member has made an initial Capital Contribution to the Company, which has been reflected in the Members' Capital Accounts. No interest shall be paid on any initial or subsequent Capital Contribution.

5.2    Additional Contributions. Except as set forth in Section 5.1 above, no Member shall be required to make any Capital Contributions. In order to obtain

4

**A-538**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-15    Filed 08/30/22    Page 9 of 35    RECEIVED NYSCEF: 07/26/2019

additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of the Manager.

     5.3    <u>Capital Accounts</u>.  A separate Capital Account will be maintained for each Member.

    (a)    Each Member's Capital Account will be increased by:

    (i)    The amount of money contributed by the Member to the Company;

    (ii)    The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

    (iii)    Allocations to the Member of Profits; and

    (iv)    Allocations to the Member of income or gain as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

    (b)    Each Member's Capital Account will be decreased by:

    (i)    The amount of money distributed to the Member by the Company;

    (ii)    The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code);

    (iii)    Allocations to the Member of Losses; and

    (iv)    Allocations to the Member of deduction or expense as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

    (c)    In the event of a permitted sale or exchange of an Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Regulation Section 1.704-1(b)(2)(iv).

    (d)    The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Section

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-15   Filed 08/30/22   Page 10 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

704(b) of the Code and the Regulations promulgated thereunder. If in the Manager's opinion, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified to comply with Section 704(b) of the Code and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, than any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(e)     Except as otherwise required in the New York Act (and subject to Sections 5.1 and 5.2 above), no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

5.4     <u>Withdrawal or Reduction of Members' Contributions to Capital</u>. A Member shall not receive any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains Company property sufficient to pay them, as determined by the Manager in its sole discretion. A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

5.5     <u>Advances by the Members</u>. A Member may from time to time, with the consent of the Manager, advance additional monies to or for the Company's benefit, and each such advance shall be treated as a Capital Contribution to the Company or as a loan to the Company, as determined by the Manager. Any advance which is treated as a loan shall be evidenced by a promissory note executed and delivered by the Company to the Member.

5.6     <u>Transactions Between Member and/or Manager and the Company</u>. Except as otherwise provided in this Agreement, a Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide collateral for, and transact other business with the Company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager as set forth in the New York Act.

## Section 6. - Admission of Additional Members

Additional Members may be admitted to the Company upon the affirmative vote of a majority in interest of the Class A Members. Such new Members shall be allocated Profit and Loss by such method as may be provided in this Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

46067/0001-8726391v1

**A-540**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-15   Filed 08/30/22   Page 11 of 35

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

## Section 7. - Allocations and Distributions

7.1     Allocations of Profits and Losses. Profits and Losses for any fiscal year shall be allocated to the Members in proportion to their Percentage Interests.

7.2     Special Allocations. Notwithstanding the provisions of Section 7.1:

(a)     Minimum Gain. Notwithstanding any other provision of this Section 7.2, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 7.2(a) is intended to comply with the minimum gain chargeback requirement of Regulation Section 1.704-2 and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

(b)     Qualified Income Offset. If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* or *(6)*, which create or increase a Deficit Capital Account of the Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 7.2(b) be interpreted to comply with the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)*(d)*.

(c)     Deficit Balance. If any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that the Member is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)*(c)* and the Member's share of minimum gain as defined in Regulation Section 1.704-2(g)(1) (which is also treated as an obligation to restore in accordance with Regulation Section 1.704-1(b)(2)(ii)*(d)*), the Capital Account of the Member shall he specially credited with items of Company income (including gross income) and gain in the amount of the excess as quickly as possible.

(d)     Nonrecourse Deductions. Items of Losses, deduction, and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse

7

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.  Case 1:22-cv-02407-MKV  Document 27-15  Filed 08/30/22  Page 12 of 35  RECEIVED NYSCEF: 07/26/2019

deductions under Regulation Section 1.704-2(i) shall be allocated to the Members' Capital Accounts in accordance with said Regulation Section 1.704-2(i). Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Regulation Section 1.704-2(b)) those deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company Profit or Loss for that period.

(e) <u>Section 704(c)</u>. In accordance with Section 704(c)(1)(A) of the Code and Regulation Section 1.704-1(b)(2)(iv)*(d)(3)*, if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for property shall, solely for Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

(f) <u>Curative Allocations</u>. Any credit or charge to the Members' Capital Accounts pursuant to Sections 7.2(a) through 7.2(d) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 7.1 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 7.1 and 7.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Section 7 if the special allocations required by Sections 7.2(a) through 7.2(d) had not occurred.

7.3 <u>Distributions</u>.

(a) The Company shall make distributions to the Members (other than upon liquidation) according to their respective Percentage Interests in the Company at such times as the Manager shall determine. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Agreement by a Member whose interest is liquidated (either upon the withdrawal of a Member or the liquidation of the Company) against the amount otherwise distributable to the Member. Upon the Company's liquidation, the Company's assets shall be distributed in the following order of priority:

(i) The claims of creditors, other than Members, first shall be satisfied and adequate reserves established (as determined by the Manager);

(ii) All outstanding loans from Members shall be repaid in the same proportion which the outstanding loans from any Member shall bear to the outstanding loans of all Members;

8

**A-542**

(iii) The Members shall receive the balance in proportion to their relative Capital Accounts determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.

(b) The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the Company's assets, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

(c) Subject to the terms and conditions of Section 7.3(d), a Member who receives a distribution in violation of Section 7.3(b), and who knew at the time of the distribution that the distribution violated Section 7.3(b), shall be liable to the Company for the amount of the distribution. A Member who receives a distribution in violation of Section 7.3(b), and who did not know at the time of the distribution that the distribution violated Section 7.3(b), shall not be liable for the amount of the distribution.

(d) Unless otherwise agreed upon by the Manager, a Member who receives a distribution from the Company in violation of Section 7.3(b) shall have no liability under the New York Act or other applicable law for the amount of the distribution after the expiration of three (3) years from the date of the distribution unless an action to recover the distribution from the Member is commenced prior to the expiration of the three (3) year period and an adjudication of liability against the Member is made in the said action.

### Section 8. – Management

8.1 Management.

(a) The Company's business and affairs shall be managed by the Manager. The Manager shall participate in the direction, management and control of the Company's business to the best of its ability.

(b) If there is more than one (1) Manager designated to serve hereunder, the Managers shall in all cases act as a group, with a majority vote of the Managers required to take action. Each Manager shall have one (1) vote.

(c) The Company's Manager shall be Pine Management, Inc. Pine Management, Inc. may be paid for services rendered in its role as property manager pursuant to a separate agreement with the Company.

9

A-543

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-15    Filed 08/30/22    Page 14 of 35    RECEIVED NYSCEF: 07/26/2019

(d)     Except as expressly provided in this Agreement, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

8.2    Number, Tenure and Qualifications.  The number of Managers of the Company shall be fixed from time to time by the affirmative vote of a majority in interest of the Class A Members, but in no instance shall there be less than one (1) Manager. Each Manager shall hold office until his or her successor shall have been elected and qualified.  Managers shall be elected by the affirmative vote of a majority in interest of the Class A Members.  Managers need not be residents of the State of New York or Members of the Company.

8.3    Certain Powers of Managers.  Without limiting the generality of Section 8.1, the Manager shall have power and authority, on the Company's behalf:

(a)     To acquire personal property for use in the ordinary course of the Company's business from any Person as the Manager may determine.  The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

(b)     To purchase liability and other insurance to protect the Company property and the Company's business;

(c)     To hold and own any Company real and/or personal properties in the Company's name;

(d)     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(e)     To execute on the Company's behalf all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the Manager's opinion, to the Company's business;

(f)     To employ accountants, legal counsel, or other experts to perform services for the Company and to compensate them from Company funds;

(g)     To enter into any and all other agreements on the Company's behalf, with any other Person that are necessary or appropriate to the conduct of the Company's business and which are upon customary terms and conditions; and

10

46067/0001-8726391v1

**A-544**

(h)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

The Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company, shall be made by the affirmative vote of a majority in interest of the Class A Members.

8.4    <u>Liability for Certain Acts</u>.  The Manager shall exercise its business judgment in participating in the management of the Company's business, operations and affairs.  Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by the Manager in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members.  The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company's operations.  The Manager shall not be responsible to any Members because of a loss of their investments or a loss in operations, unless the loss shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager proved as set forth in this Section 8.4.  Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

8.5    <u>The Manager Has No Exclusive Duty to Company</u>.  The Manager shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

8.6    <u>Bank Accounts</u>.  The Manager may open bank accounts in the Company's name.  The Company's funds shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager.  The Manager shall use such funds solely for the Company's business.  Funds shall be withdrawn from the Company's bank accounts only upon a Manager's signature.

8.7    <u>Resignation</u>.  A Manager may resign at any time by giving written notice to the Members.  A Manager's resignation shall take effect upon receipt of notice thereof or

11

46067/0001-8726391v1

**A-545**

at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

8.8    Removal.  Any Manager may be removed at any time, with or without cause, by the affirmative vote of a majority in interest of the Class A Members.

8.9    Vacancies.  Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of a majority in interest of the Class A Members.  Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of a majority in interest of the Class A Members.  A Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until its earlier death, resignation or removal.  A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next meeting of Members and until its successor shall be elected and shall qualify, or until his or her earlier death, resignation or removal.

8.10    Compensation.  The guaranteed payments and other compensation of the Manager, if any, shall be paid in such manner as shall be fixed from time to time by the affirmative vote of a majority in interest of the Class A Members, and no Manager shall be prevented from receiving any such compensation, if any, by reason of the fact that he or she is also a Member of the Company.

8.11    Manager's Representations.  Every contract, deed, mortgage, lease and other instrument executed by any Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof:  (i) the Company was in existence; (ii) neither this Agreement nor the Certificate of Formation had been amended in any manner so as to restrict the delegation of authority to the Manager; and (iii) the execution and delivery of such instrument was duly authorized by the Manager.  Any Person may always rely on a certificate addressed to him or her and signed by a Manager:

       (a)    as to who are the Members and Manager hereunder;

       (b)    as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or Manager or in any other manner germane to the Company's affairs;

       (c)    as to who is authorized to execute and deliver any instrument or document of the Company;

12

**A-546**

(d)      as to the authenticity of any copy of the Certificate of Formation, this Agreement, amendments thereto and any other document relating to the conduct of the Company's affairs; or

(e)      as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Manager or any Member in the capacity as a Member or Manager of the Company.

8.12    <u>Limitations on Members.</u>

(a)      Except as is expressly provided in this Section, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

(b)      Unless authorized to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

<u>Section 9. - Restrictions on the Transfer of a Member's Interest</u>

9.1      <u>Lifetime Restrictions on Transfers</u>.  Except as otherwise provided herein, a Member shall not sell, transfer, pledge, encumber or otherwise dispose of all or any part of his or her Interest to any Person other than a Permitted Transferee, as hereinafter defined, unless the Member desiring to make the transfer or encumbrance (hereinafter referred to as the "Selling Member") shall have first made the offer to sell to the Company and the remaining Members and such offer shall not have been accepted.

(a)      <u>Notice of Offer</u>.  The offer which shall be given to the Company and the remaining Members and shall consist of an offer to sell all of the Interest owned by the Selling Member, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lienor, the Percentage Interest involved in any such proposed transfer or encumbrance, and the price and terms of any such transfer or encumbrance ("Bona Fide Offer"), in accordance with the provisions of Section 9.1(b) hereof.

(b)      <u>Bona Fide Third Party Offer</u>.  If the Selling Member has received a bona fide written offer to purchase all of his or her Interest in the Company which he or she wishes to accept, or a bona fide written offer to receive a loan or an advance of money, which loan or advance involves an encumbrance upon said Interest to secure the loan or advance as referred to in Section 9.1(a) above, the Selling Member shall submit to the Company and the remaining Members, within fourteen (14) days after receipt of such Bona Fide Offer, a written notice including a copy of such Bona Fide Offer, as required under Section 9.1(a) above, together with the name and address of the principal or

13

A-547

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-15 Filed 08/30/22 Page 18 of 35 RECEIVED NYSCEF: 07/26/2019

principals if the offer is made through an agent (hereinafter collectively referred to as the "Bona Fide Offerors"), and sufficient facts concerning the Bona Fide Offerors to enable the Company and the remaining Members to arrive at an informed judgment as to the bona fides of such offer. The Selling Member shall then offer, or be deemed to have offered, in writing to sell to the Company all of the Interest in the Company held by the Selling Member for an amount equal to the lesser of: (i) fifty (50%) percent of the Value of the Selling Member's Interest, which is determined under Section 10 hereof; or (ii) the purchase price set forth in the Bona Fide Offer, or, if an encumbrance, the lesser of the amount set forth in item (i) above and the amount of the debt involved in such encumbrance (the lesser of (i) and (ii) shall be referred to as the "Lifetime Purchase Price"), and upon the terms and conditions as hereinafter set forth; provided, however, that the Selling Member has complied with all of the procedural conditions hereof. Within thirty (30) days after receipt by the Company of the Bona Fide Offer, the Company may elect to purchase all of the Selling Member's Interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the receipt by the Company of the Bona Fide Offer, elect to purchase all of the Selling Member's interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price, and upon the terms and conditions as hereinafter set forth. The remaining Members shall purchase the Selling Member's Interest in relative proportion to their ownership of Interests in the Company; provided, however, that the remaining Members may arrange among themselves for the purchase of the Selling Member's Interest in proportions which differ from the proportions of their respective holdings.

A potential purchaser or purchasers shall exercise its or their election to purchase by giving written notice thereof to the Selling Member and the other potential purchasers upon the terms and conditions as hereinafter set forth.

(c) <u>Terms of Payment</u>. If the Company or the remaining Members exercises its or their right to purchase the Interest of the Selling Member in accordance with the terms of Section 9.1(b) hereof, then the purchaser(s) shall pay the Lifetime Purchase Price either: (i) in accordance with the terms and conditions set forth in the Bona Fide Offer; or (ii) by executing and delivering a negotiable promissory note or notes (in a form mutually acceptable by the purchaser(s) and the Selling Member) made payable to the order of the Selling Member, whichever the purchaser(s) chooses. Said promissory note(s) shall require successive equal monthly installments over a period of ten (10) years, with interest being imposed at the annual rate equal to the lowest rate of interest which allows for the avoidance of any imputed or unstated interest for Federal income tax purposes existing at and fixed as of the date of closing (the "Installment Method"). The first monthly installment shall be due at the time of closing with one hundred nineteen (119) additional monthly payments being made thereafter on the monthly anniversary date of the first payment until said obligation has been paid in full. The promissory note shall provide for acceleration of any unpaid balance, together with

14

**A-548**

all accrued interest, upon written notice to the purchaser(s) of a default in the payment of any one (1) monthly installment, which default remains uncured for a period of thirty (30) days after receipt of such notice. The promissory note shall provide for the unrestricted right to prepay all or any part of the unpaid balance, without premium or penalty, and with interest only to the date of prepayment.

(d)    Release from Restriction. If the offer to sell as provided for in Section 9.1(b) is not accepted by the Company or the remaining Members as set forth herein, the Selling Member may make a bona fide transfer or encumbrance to the prospective purchaser or lienor named in the statement attached to the Bona Fide Offer, with such sale or encumbrance to be made only in strict accordance with the terms therein stated. The Company and the remaining Members shall be given full access to all closing documents relating to such sale or encumbrance to the Bona Fide Offerors, so that adherence to the terms and conditions of the Bona Fide Offer can be demonstrated. However, if the Selling Member shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the election to purchase by the Company and the remaining Members in accordance with this Section, or if there is any modification in price or any of the terms and conditions of the Bona Fide Offer, such Interest shall again become subject to all the restrictions of this Agreement, and the Selling Member shall not have the right to complete the proposed sale or encumbrance without again offering the Interest, in writing, anew to the Company pursuant to the procedures set forth in this Section. Notwithstanding anything in this Agreement to the contrary, all Interests purchased by the Bona Fide Offerors from a Selling Member shall be acquired subject to the terms and conditions of this Agreement and the Bona Fide Offerors shall not sell, assign, pledge, encumber, hypothecate, mortgage, or in any other manner transfer the whole or any part of the Interest purchased, or any other Interest thereafter held or owned, without the prior written consent of the Company, except as specifically provided in this Agreement. It shall be the affirmative obligation of the Selling Member to notify the Bona Fide Offerors that the Interest proposed to be sold by the Selling Member and purchased by the Bona Fide Offerors will remain subject to the terms and provisions of this Agreement following the proposed sale and purchase.

9.2    Sale in Violation of Agreement. In the event of any attempted sale, assignment, transfer, hypothecation, pledge, encumbrance or disposition ("Attempted Transfer") of the Interest of a Member, not in accordance with the terms of this Agreement, such Attempted Transfer shall be deemed to be an offer by such Member to sell his or her Interest pursuant to Section 9.1(b) hereof, to be deemed made as of the date of discovery of such Attempted Transfer, and at a price equal to the lesser of: (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Attempted Transfer. The payment terms shall be in accordance with the Installment Method or such Attempted Transfer, whichever the purchaser chooses.

15

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-15 Filed 08/30/22 Page 20 of 35

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

9.3     Involuntary Transfers.  In the event of any involuntary transfer ("Involuntary Transfer") or attempted involuntary transfer ("Attempted Involuntary Transfer") of an Interest owned by a Member due to certain events, including, but not limited to, a Member's bankruptcy or divorce, such Member shall be deemed to have made an offer to sell his or her Interest as of the date of discovery of such Involuntary Transfer or Attempted Involuntary Transfer, pursuant to Section 9.1(b) hereof, and at a price equal to the lesser of:  (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Involuntary Transfer or Attempted Involuntary Transfer.  The payment terms shall be in accordance with the Installment Method, such Involuntary Transfer or Attempted Involuntary Transfer, whichever the purchaser chooses.

9.4     Consent Required for Transfer and Assignment of a Member's Interest. Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, pledge, encumber or in any way alienate all or any part of his or her interest in the Company as a Member except with the prior written consent of a majority in interest of the Class A Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the New York Act), as the non-transferring Class A Members may determine in their sole discretion.  Transfers in violation of this Section 9.4 shall only be effective to the extent set forth in Section 9.7.

9.5     Further Restrictions on Transfer.  No Member shall assign, convey, sell, encumber or in any way alienate all or any part of his or her Interest in the Company if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the Company's termination under Section 708 of the Code.

9.6     Substitute Members.  An Assignee shall have the right to become a Substitute Member if:  (i) the requirements of Sections 9.4 and 9.5 are met; (ii) such Person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (iii) such Person pays any reasonable expenses in connection with its admission as a Substitute Member.

9.7     Effect of Transfer.

(a)     Any permitted transfer of all or any portion of a Member's Interest in the Company shall take effect on the date of transfer.

(b)     Any Assignee of an Interest in the Company shall take subject to the restrictions on transfer imposed by this Agreement.

(c)     Upon any transfer of a Member's Interest in the Company, unless the Assignee is admitted as a Substituted Member pursuant to Section 9.6 herein, the Assignee shall have no right to participate in the management of the business and affairs

16

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-15 Filed 08/30/22 Page 21 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

of the Company or to become a Member, but shall only be entitled to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, to which the transferor was entitled, and the extent transferred.

(d)    A Member ceases to be a Member and to have the power to exercise any rights or powers of a Member upon the assignment of all of its Interest.

9.8    Permitted Transferees.   Notwithstanding any other provisions of this Agreement (including Section 6) , each Member, during his or her lifetime or upon his or her death, may give, sell, or otherwise assign all or any part of his, her or its Membership Interest to the following, which shall be referred to as the "Permitted Transferees":

(a)    any descendent or ascendant of any Member by inter vivos or testamentary transfer;

(b)    another Member;

(c)    a Member's spouse, or a trust for the primary benefit of a Member's spouse;

(d)    a custodian or guardian of a minor descendent;

(e)    a trust of which all of the primary beneficiaries are Members or Permitted Transferees;

(f)    a beneficiary of a trust that is also a Member; and/or

(g)    a legal entity controlled and managed by Members or Permitted Transferees.

9.9    Death of a Member.

(a)    Except as otherwise provided herein, upon the death of a Member (the "Decedent"), the Company may elect to purchase all of the Decedent's Interest from the legal representatives of the Decedent's estate (except to the extent the Decedent's Interest passes to a Permitted Transferee, as defined hereinafter in Section 9.8), in which event the legal representatives of the Decedent's estate shall then be obligated to sell the Decedent's Interest to the Company, at a purchase price equal to Fifty (50%) percent of the Value of the Decedent's Interest, as determined under Section 10 hereof (the "Death Purchase Price"), and upon the terms and conditions set forth herein.  The Company shall notify, in writing, the legal representatives of the Decedent's estate of its acceptance or rejection to purchase all of the Decedent's Interest within thirty (30) days after the appointment of the legal representatives of the Decedent's estate, provided that a failure to notify said legal representatives of its acceptance within said thirty (30) days shall

17

**A-551**

constitute an election not to purchase all of the Decedent's Interest. The notice shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the appointment of the legal representatives of the Decedent's estate, elect to purchase the Decedent's interest which does not pass to a Permitted Transferee, for the Death Purchase Price and upon the terms and conditions as hereinafter set forth.

       (b)    The closing of the purchase and sale of the Decedent's Interest to the Company or the remaining Members shall take place at the Company's principal office, or at such other place as agreed to by the parties on a date mutually agreed to by said parties which shall be within one hundred twenty (120) days following the qualification of the legal representatives of the Decedent's estate.

       (c)    At the closing, the Company or the remaining Members shall execute a promissory note made payable to the legal representatives of the Decedent's estate for the Death Purchase Price. The terms of the promissory note shall be in accordance with the Installment Method as set forth in Section 9.1(c) herein.

## Section 10. - Determination of Value

       Upon any sale of a Member's Interest pursuant to this Agreement, the total value of the Company ("Company Value") shall be the last dated amount set forth on the Certificate of Agreed Value, attached hereto as Exhibit C and made a part hereof, executed by the Class A Members. The Class A Members shall exercise best efforts to meet not less than once per year for the purpose of considering a new Value but their failure to meet or to determine a Value shall not invalidate the most recently executed Certificate of Agreed Value setting forth the Value then in effect. If the Class A Members fail to agree on a revaluation as described above for more than two (2) years, the Value shall be the then Fair Market Value of the Company, as hereinafter defined. For purposes of this Agreement, the "Fair Market Value of the Company" shall be the fair market value of the Company assets, less Company liabilities. The Fair Market Value of the Company's real estate shall be determined by an MAI appraisal selected by the Company. If the Selling Member disputes such appraisal, such party shall obtain an MAI appraisal, and the average of the two (2) MAI appraisals shall determine the Fair Market Value; provided, however, that the higher value is within ten (10%) percent of the lower value. If such values are not within ten (10%) percent of each other, then the two (2) MAI appraisers shall select a third MAI appraiser, whose valuation shall be final and binding. The Company shall pay for its appraiser, the Selling Member shall pay for its appraiser, and the third appraiser, if any, shall be paid fifty (50%) percent by the Company and fifty (50%) percent by the Selling Member. The Fair Market Value of all the other assets of the Company, other than its real estate, shall be determined by the certified public accountant employed by the Company applying generally accepted

18

A-552

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-15   Filed 08/30/22   Page 23 of 35   RECEIVED NYSCEF: 07/26/2019

accounting principles.  In calculating the Fair Market Value, the Company's accountant shall take into consideration all relevant discounts.

The Value of a Member's Membership Interest shall be an amount equal to the Company Value, multiplied by the Percentage Interest in the Company being purchased.

## Section 11. - Termination of a Member

The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which would terminate a Member's interest as a Member in the Company shall not dissolve the Company and shall not require the consent of the remaining Members to continue the Company.

## Section 12. - Term of the Company

The Company shall commence as of the date its Certificate of Formation is filed with the New York Secretary of State or such later date specified therein, and shall terminate upon the occurrence of any of the following events:

12.1    The mutual agreement in writing of a majority in interest of the Class A Members on the date of such agreement to terminate;

12.2    At such earlier time as may be provided by applicable law;

12.3    The sale, disposal, conveyance or distribution of all or substantially all of the assets in which the Company shall have an interest;

12.4    The entry of a decree of judicial dissolution in accordance with the New York Act.

## Section 13. - Fiscal Year and Accounting Method

For income tax purposes, the Company's fiscal year shall be as determined by the Manager, and the Company's books shall be kept on the cash or accrual method of accounting as determined by the Manager.  Such method when so adopted shall be consistently followed by the Company, subject, however to the Company's right to change its method of accounting for income tax purposes as allowed by law.  The accounting for Company purposes shall be made in accordance with generally accepted accounting principles.

## Section 14. - Books and Records

14.1    The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly

19

A-553

authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.

14.2   The Company's books shall be closed at such intervals as the Manager shall determine but not less frequently than annually as of the end of each calendar year by the certified public accountants then regularly retained by the Company.  Such certified public accountants for the Company may be changed at any time and from time to time by the Manager.  Such accountants shall prepare the Federal income tax returns for the Company together with a report for each Member for Federal income tax purposes indicating the portion of each Member of the Company's profits and losses for such year. The Members shall each receive a copy of the appropriate report within a reasonable period of time after the close of each fiscal year and promptly after its receipt by the Company and approval by the Manager.

14.3   A Member or Manager of the Company shall be fully protected in relying in good faith upon the Company's records and upon such information, opinions, reports or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other Person, as to matters the Member or Manager reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

### Section 15. - Other Activities of Members

Any Member may engage in other business ventures of every nature, including, without limitation by specification, the ownership of another business similar to that operated by this Company.  Neither the Company nor any of the other Members shall have any right or interest in any such independent ventures or to the income and profits derived therefrom.

### Section 16. - Resignation of a Member

Pursuant to the New York Act, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

### Section 17. - Indemnification

17.1   The Members and Manager shall not be liable to the Company or any Member or Manager for any liability, loss, damage, cost or expense which may arise out of or in connection with any act or conduct on the part of the Members or Manager without fraud or willful misconduct, including, but not limited to, the failure to perform

20

A-554

its obligations hereunder due to restrictions or prohibitions imposed by law, rule, regulation or demand of any governmental agency, or from any other cause beyond the control of the Members or Manager.

17.2    Notwithstanding anything otherwise herein contained to the contrary, no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.

## Section 18. - Limitation on Liability

Except as otherwise provided by the New York Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member, Manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, or acting as a Manager, employee or agent of the Company.  No Member shall be required to loan any funds to the Company.  Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

## Section 19. - Amendment

This Agreement may be amended only by the affirmative vote of a majority in interest of the Class A Members.

## Section 20. - Miscellaneous

20.1    Organizational Fees.  The Company shall pay all expenses incurred in the organization of the Company.

20.2    Company Property.  Title or interest to any or all Company property may be acquired and/or held for the Company purposes set forth in this Agreement in the Company name and/or in the name of any nominee as the Manager may designate.  The Manager shall have the right to enter into nominee agreements with any such nominee on the Company's behalf and such agreements may provide for indemnifying such nominee from all claims, damages, costs, expenses or liabilities arising therefrom other than as may be due to or result from the willful misconduct of such nominee.

20.3    Notices.  All notices or writings required to be given hereunder or deemed necessary or desirable by any party hereto shall be given in writing addressed to the Company at its principal business office and to each Member and Manager at the address

21

46067/0001-8726391v1

**A-555**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-15   Filed 08/30/22   Page 26 of 35

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

set forth on the books and records of the Company which address may be changed by notice forwarded to the Company, in accordance herewith, and shall be delivered either: personally; by deposit in the United States Post Office Box, postage pre-paid, by certified or registered mail, return receipt requested; by a postal or private form of expedited delivery service; or by facsimile transmission.

20.4   Failure of Member to Comply with Terms of this Agreement.  If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that all other Members bound by this Agreement will have no adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement or to specifically enforce the provisions hereof.

20.5   Failure of a Manager to Comply with Terms of this Agreement.  A Manager shall not be personally liable for failure to perform in accordance with, or to comply with the terms and conditions of this Agreement or for any other reason unless such failure to perform or comply or such other reason constitutes gross negligence or willful misconduct by the Manager.

20.6   Applicable Law.  This Agreement shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York (without regard to its conflicts of laws provisions).  Any proceedings brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York.

20.7   Severability.  If any provision of this Agreement shall be declared invalid, cause the Company not to be treated for income tax purposes as a partnership, then and in any of such events, such provision(s) shall be deemed to be invalid, and notwithstanding any such invalidity, the remaining provisions of this Agreement shall remain in full force and effect as if such invalid provisions(s) had not been a part hereof.

20.8   Benefit.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and to their respective heirs, executors, administrators and assigns; provided however, that none of the provisions of this Agreement shall be for the benefit of nor shall they be enforceable by any creditor of the Company or of any Member.

20.9   Construction.  As used in this Agreement, the masculine gender shall include the feminine or neuter gender and the neuter gender shall include the masculine or feminine gender, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

20.10   Execution.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original.  The signature by any

46067/0001-8726391v1

**A-556**

Member on any one of the counterparts shall bind such Member at such time as each of the Members has signed and delivered to the Company at least one (1) counterpart.

     20.11  <u>Headings</u>.  The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

     20.12  <u>Partnership</u>.  It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

23

**A-557**

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                          **MEMBERS:**

HAROLD PINE 2009 FAMILY TRUST

_____           _____
                                  LLOYD PINE, Trustee

_____           _____
                                  BRENDA ROHLMAN, Trustee

                                  SYDELL PINE 2009 FAMILY TRUST

_____           _____
                                  LLOYD PINE, Trustee

_____           _____
                                  BRENDA ROHLMAN, Trustee

_____           _____
                                  JEROME SCHNEIDER

                                  **MANAGER:**

                                  PINE MANAGEMENT, INC.

_____           _____
                                  By: THOMAS ROHLMAN, President

24

46067/0001-8726391v1

**A-558**

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                        **MEMBERS:**

                                                    HAROLD PINE 2009 FAMILY TRUST

_____                                     _____
                                                    LLOYD PINE, Trustee

_____
                                                    BRENDA ROHLMAN, Trustee


                                                    SYDELL PINE 2009 FAMILY TRUST

_____                                     _____
                                                    LLOYD PINE, Trustee

_____
                                                    BRENDA ROHLMAN, Trustee


_____                                     _____
                                                    JEROME SCHNEIDER


                                                    **MANAGER:**

                                                    PINE MANAGEMENT, INC

_____                                     _____
                                                    By: THOMAS ROHLMAN, President


24

46067/0001-8726391v1

**A-559**

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**

**MEMBERS:**

HAROLD PINE 2009 FAMILY TRUST

_____

LLOYD PINE, Trustee

_____

BRENDA ROHLMAN, Trustee


SYDELL PINE 2009 FAMILY TRUST

_____

LLOYD PINE, Trustee

_____

BRENDA ROHLMAN, Trustee

_____

JEROME SCHNEIDER


**MANAGER:**

PINE MANAGEMENT, INC.

_____

By: THOMAS ROHLMAN, President

24

A-560

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-15   Filed 08/30/22   Page 31 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

## EXHIBIT A

### Capital Contributions and Percentage Interests

| | Member | Initial Capital Contributions | Percentage Interests |
|---|---|---|---|
| 1. | HAROLD PINE 2009 FAMILY TRUST | $ | 50% |
| 2. | SYDELL PINE 2009 FAMILY TRUST | $ | 25% |
| 3. | JEROME SCHNEIDER | $ | 25% |

25

46067/0001-8726391v1

A-561

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Case 1:22-cv-02407-MKV   Document 27-15   Filed 08/30/22   Page 32 of 35

## EXHIBIT B

| Class A Members | Membership Interest |
|---|---|
| HAROLD PINE 2009 FAMILY TRUST | 0.50% |
| SYDELL PINE 2009 FAMILY TRUST | 0.25% |
| JEROME SCHNEIDER | 0.25% |

| Class B Members | Membership Interest |
|---|---|
| HAROLD PINE 2009 FAMILY TRUST | 49.50% |
| SYDELL PINE 2009 FAMILY TRUST | 24.75% |
| JEROME SCHNEIDER | 24.75% |

26

**A-562**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-15 Filed 08/30/22 Page 33 of 35 RECEIVED NYSCEF: 07/26/2019

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold's Trust, Sydell's Trust and Jerome are also set forth.

| Date | Value of Company |
|---|---|
| | $1,400,000 |

**WITNESS:**     **MEMBERS:**

**HAROLD PINE 2009 FAMILY TRUST**

LLOYD PINE, Trustee

BRENDA ROHLMAN, Trustee

**SYDELL PINE 2009 FAMILY TRUST**

LLOYD PINE, Trustee

BRENDA ROHLMAN, Trustee

JEROME SCHNEIDER

27

46067/0001-8726391v1

**A-563**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-15 Filed 08/30/22 Page 34 of 35
RECEIVED NYSCEF: 07/26/2019

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold's Trust, Sydell's Trust and Jerome are also set forth.

| Date | Value of Company |
|---|---|
| | $1,400,000 |

**WITNESS:**

**MEMBERS:**

HAROLD PINE 2009 FAMILY TRUST

LLOYD PINE, Trustee

BRENDA ROHLMAN, Trustee

SYDELL PINE 2009 FAMILY TRUST

LLOYD PINE, Trustee

BRENDA ROHLMAN, Trustee

JEROME SCHNEIDER

27

46067/0001-8726391v1

**A-564**

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold's Trust, Sydell's Trust and Jerome are also set forth.

| Date | Value of Company |
|------|------------------|
|      | $1,400,000       |

WITNESS:                          MEMBERS:

HAROLD PINE 2009 FAMILY TRUST

_____          _____
                                 LLOYD PINE, Trustee

_____          _____
                                 BRENDA ROHLMAN, Trustee


SYDELL PINE 2009 FAMILY TRUST

_____          _____
                                 LLOYD PINE, Trustee

_____          _____
                                 BRENDA ROHLMAN, Trustee

_____          _____
                                 JEROME SCHNEIDER

27

46067/0001-8726391v1

# EXHIBIT A-15

A-566

INDEX NO. 654303/2019

Case 1:22-cv-02407-MKV   Document 27-16   Filed 08/30/22   Page 2 of 35

RECEIVED NYSCEF: 07/26/2019

# Exhibit 15

A-567

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-16 Filed 08/30/22 Page 3 of 35 RECEIVED NYSCEF: 07/26/2019

# SECOND AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# SIR REALTY LLC

# (a New York limited liability company)

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW JERSEY 07602-0800
(201) 489-3000

46067/0001-8726463v1

A-568

## TABLE OF CONTENTS

**Page**

Section 1. Formation and Name ............................................................... 1
Section 2. Office ..................................................................................... 2
Section 3. Definitions ............................................................................ 2
Section 4. Purposes ............................................................................... 4
Section 5. Capital Contributions and Capital Accounts .......................... 5
Section 6. Admission of Additional Members ........................................ 7
Section 7. Allocations and Distributions ............................................... 7
Section 8. Management .......................................................................... 10
Section 9. Restrictions on the Transfer of a Member's Interest ............. 13
Section 10. Determination of Value ....................................................... 19
Section 11. Termination of a Member .................................................... 19
Section 12. Term of the Company .......................................................... 19
Section 13. Fiscal Year and Accounting Method .................................... 20
Section 14. Books and Records .............................................................. 20
Section 15. Other Activities of Members ............................................... 21
Section 16. Resignation of a Member ..................................................... 21
Section 17. Indemnification .................................................................... 21
Section 18. Limitation on Liability ........................................................ 21
Section 19. Amendment .......................................................................... 22
Section 20. Miscellaneous ...................................................................... 22

46067/0001-8726463v1

**A-569**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3
Case 1:22-cv-02407-MKV    Document 27-16    Filed 08/30/22    Page 5 of 35

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

# SECOND AMENDED AND RESTATED

## OPERATING AGREEMENT

### OF

### SIR REALTY LLC

### (a New York limited liability company)

**THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT,** made as of the 1st day of August , 2012, by and between Jerome Schneider ("Jerome") and Lloyd Pine and Brenda Rohlman, not individually but solely as co-trustees of the Sydell Pine 2009 Family Trust, dated November 5, 2009 ("Sydell's Trust") (Jerome and Sydell's Trust shall hereinafter, at times, be referred to together as the "Members" or individually as a "Member").

### W I T N E S S E T H:

**WHEREAS,** Sir Realty LLC entered into an operating agreement, effective as of October 10, 1996, and which is binding upon the Members; and

**WHEREAS,** the Members amended and restated said operating agreement effective as of October 4, 2010; and

**WHEREAS,** pursuant to Section 19 of the operating agreement, the Class A Members can amend the operating agreement by a majority vote; and

**WHEREAS,** the Members desire to amend and restate said operating agreement as hereinafter provided for the purposes hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

### Section 1. Formation and Name

The Members heretofore have associated themselves into a limited liability company pursuant to the provisions of the New York Limited Liability Company Act. The Company shall be governed by the terms and conditions set forth herein. The limited liability company's name is Sir Realty LLC.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-16   Filed 08/30/22   Page 6 of 35   RECEIVED NYSCEF: 07/26/2019

## Section 2. Office

The Secretary of State is designated as agent of the Company upon whom process against it may be served. The post office address to which the Secretary of State of the State of New York shall mail a copy of any process against the Company served upon him or her is c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025. Such office and agent may be changed, from time to time, as the Manager shall determine. The Company's principal place of business shall be located at c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025 and/or such other location or locations as, from time to time, the Manager shall select.

## Section 3. Definitions

3.1    "Agreement" means this Operating Agreement, as originally executed and as amended from time to time, which supersedes any prior operating agreement, and the terms "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

3.2    "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon: (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member; (iv) the filing of a petition in an involuntary bankruptcy case, which petition remains undismissed or suspended for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

3.3    "Capital Account" means, with respect to any Member or assignee, the Capital Account maintained in accordance with the provisions set forth in Section 5.3 hereof.

2

46067/0001-8726463v1

**A-571**
FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-16 Filed 08/30/22 Page 7 of 35 RECEIVED NYSCEF: 07/26/2019

3.4 "Capital Contribution" means, with respect to any Member or assignee, the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by such Member or assignee.

3.5 "Class A Members" means all of the voting Members in the Company. See Exhibit B attached hereto for a list of the Company's Class A Members.

3.6 "Class B Members" means all of the non-voting Members in the Company. See Exhibit B attached hereto for a list of Company's Class B Members. The Class B Members shall have no right to vote in decisions of the Members.

3.7 "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

3.8 "Company" shall refer to Sir Realty LLC.

3.9 "Deficit Capital Account" means with respect to any Member or assignee, the deficit balance, if any, in such Member's or assignee's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a) Credit to such Capital Account any amount which such Member or assignee is obligated to restore under Regulation Section 1.704-1(b)(2)(ii)*(c),* as well as any addition thereto pursuant to the next to last sentence of Regulation Section 1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Regulation Section 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Regulation Section 1.704-2(i)(3)); and

(b) Debit to such Capital Account the items described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* and *(6).*

The definition of Deficit Capital Account is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)*(d)* and 1.704-2, and will be interpreted consistently with those provisions.

3.10 "Interest" means a Member's entire interest in the Company including the Member's right to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, and the right to participate in the management of the Company's business and affairs, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the New York Act.

3

**A-572**

3.11   "Manager" or "Managers" means one or more Persons (individually and collectively) selected by the Members, to whom are delegated all or part of the management duties of the Company's business as provided in Section 8 hereof.

3.12   "New York Act" means the New York Limited Liability Company Act, as the same may be amended from time to time.

3.13   "Percentage Interest" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof.  Other than by application of Section 6, the Percentage Interests of the Members may not be adjusted without the unanimous consent of the Members.

3.14   "Person" means an individual, association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

3.15   "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, credit, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations.

3.16   "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## Section 4. Purposes

The Company was originally formed for the purpose of acquiring, owning and managing the real property commonly known as 112 West 80th Street, New York, New York.  The character and purposes for which the Company was formed, in general, is to own, manage, acquire, invest in real estate; and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement.  The Company may also engage in such other business, activity or purpose permitted by law, as the Manager may determine.

4

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-16 Filed 08/30/22 Page 9 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

## Section 5. Capital Contributions and Capital Accounts

5.1    Members' Capital Contributions.  Each Member has made an initial Capital Contribution to the Company, which has been reflected in the Members' Capital Accounts.  No interest shall be paid on any initial or subsequent Capital Contribution.

5.2    Additional Contributions.  Except as set forth in Section 5.1 above, no Member shall be required to make any Capital Contributions.  In order to obtain additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of the Manager.

5.3    Capital Accounts.  A separate Capital Account will be maintained for each Member.

(a)    Each Member's Capital Account will be increased by:

(i)    The amount of money contributed by the Member to the Company;

(ii)    The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

(iii)    Allocations to the Member of Profits; and

(iv)    Allocations to the Member of income or gain as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(b)    Each Member's Capital Account will be decreased by:

(i)    The amount of money distributed to the Member by the Company;

(ii)    The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code);

(iii)    Allocations to the Member of Losses; and

5

**A-574**

      (iv)    Allocations to the Member of deduction or expense as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

      (c)    In the event of a permitted sale or exchange of an Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Regulation Section 1.704-1(b)(2)(iv).

      (d)    The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder. If in the Manager's opinion, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified to comply with Section 704(b) of the Code and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, than any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

      (e)    Except as otherwise required in the New York Act (and subject to Sections 5.1 and 5.2 above), no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

    5.4    <u>Withdrawal or Reduction of Members' Contributions to Capital</u>. A Member shall not receive any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains Company property sufficient to pay them, as determined by the Manager in its sole discretion. A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

    5.5    <u>Advances by the Members</u>. A Member may from time to time, with the consent of the Manager, advance additional monies to or for the Company's benefit, and each such advance shall be treated as a Capital Contribution to the Company or as a loan to the Company, as determined by the Manager. Any advance which is treated as a loan shall be evidenced by a promissory note executed and delivered by the Company to the Member.

    5.6    <u>Transactions Between Member and/or Manager and the Company</u>. Except as otherwise provided in this Agreement, a Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide collateral for, and transact other business with the

6

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV  Document 27-16  Filed 08/30/22  Page 11 of 35 RECEIVED NYSCEF: 07/26/2019

Company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager as set forth in the New York Act.

### Section 6. Admission of Additional Members

Additional Members may be admitted to the Company upon the affirmative vote of a majority in interest of the Class A Members. Such new Members shall be allocated Profit and Loss by such method as may be provided in this Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

### Section 7. Allocations and Distributions

7.1    Allocations of Profits and Losses.  Profits and Losses for any fiscal year shall be allocated to the Members in proportion to their Percentage Interests.

7.2    Special Allocations.  Notwithstanding the provisions of Section 7.1:

(a)    Minimum Gain.  Notwithstanding any other provision of this Section 7.2, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain.  This Section 7.2(a) is intended to comply with the minimum gain chargeback requirement of Regulation Section 1.704-2 and shall be interpreted consistently therewith.  If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

(b)    Qualified Income Offset.  If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), which create or increase a Deficit Capital Account of the Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible.  It is the intent that this Section 7.2(b) be interpreted to comply with the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)(d).

7

  (c) <u>Deficit Balance</u>.  If any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that the Member is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)*(c)* and the Member's share of minimum gain as defined in Regulation Section 1.704-2(g)(1) (which is also treated as an obligation to restore in accordance with Regulation Section 1.704-1(b)(2)(ii)*(d)*), the Capital Account of the Member shall be specially credited with items of Company income (including gross income) and gain in the amount of the excess as quickly as possible.

  (d) <u>Nonrecourse Deductions</u>.  Items of Losses, deduction, and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Regulation Section 1.704-2(i) shall be allocated to the Members' Capital Accounts in accordance with said Regulation Section 1.704-2(i).  Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Regulation Section 1.704-2(b)) those deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company Profit or Loss for that period.

  (e) <u>Section 704(c)</u>.  In accordance with Section 704(c)(1)(A) of the Code and Regulation Section 1.704-1(b)(2)(iv)*(d)(3),* if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for the property shall, solely for Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

  (f) <u>Curative Allocations</u>.  Any credit or charge to the Members' Capital Accounts pursuant to Sections 7.2(a) through 7.2(d) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 7.1 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 7.1 and 7.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Section 7 if the special allocations required by Sections 7.2(a) through 7.2(d) had not occurred.

 7.3 <u>Distributions</u>.

  (a) The Company shall make distributions to the Members (other than upon liquidation) according to their respective Percentage Interests in the Company at such times as the Manager shall determine.  Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation).  The Company may offset damages for

8

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV   Document 27-16   Filed 08/30/22   Page 13 of 35
                                                                             RECEIVED NYSCEF: 07/26/2019

breach of this Agreement by a Member whose interest is liquidated (either upon the withdrawal of a Member or the liquidation of the Company) against the amount otherwise distributable to the Member.  Upon the Company's liquidation, the Company's assets shall be distributed in the following order of priority:

       (i)     The claims of creditors, other than Members, first shall be satisfied and adequate reserves established (as determined by the Manager);

       (ii)     All outstanding loans from Members shall be repaid in the same proportion which the outstanding loans from any Member shall bear to the outstanding loans of all Members;

       (iii)    The Members shall receive the balance in proportion to their relative Capital Accounts determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.

       (b)     The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the Company's assets, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

       (c)     Subject to the terms and conditions of Section 7.3(d), a Member who receives a distribution in violation of Section 7.3(b), and who knew at the time of the distribution that the distribution violated Section 7.3(b), shall be liable to the Company for the amount of the distribution.  A Member who receives a distribution in violation of Section 7.3(b), and who did not know at the time of the distribution that the distribution violated Section 7.3(b), shall not be liable for the amount of the distribution.

       (d)     Unless otherwise agreed upon by the Manager, a Member who receives a distribution from the Company in violation of Section 7.3(b) shall have no liability under the New York Act or other applicable law for the amount of the distribution after the expiration of three (3) years from the date of the distribution unless an action to recover the distribution from the Member is commenced prior to the expiration of the three (3) year period and an adjudication of liability against the Member is made in the said action.

46067/0001-8726463v1

A-578

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-16   Filed 08/30/22   Page 14 of 35
                                                            RECEIVED NYSCEF: 07/26/2019

## Section 8. Management

8.1     Management.

(a)     The Company's business and affairs shall be managed by the Manager. The Manager shall participate in the direction, management and control of the Company's business to the best of its ability.

(b)     If there is more than one (1) Manager designated to serve hereunder, the Managers shall in all cases act as a group, with a majority vote of the Managers required to take action. Each Manager shall have one (1) vote.

(c)     The Company's Manager shall be Pine Management, Inc. Pine Management, Inc. may be paid for services rendered in its role as property manager pursuant to a separate agreement with the Company.

(d)     Except as expressly provided in this Agreement, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

8.2     Number, Tenure and Qualifications. The number of Managers of the Company shall be fixed from time to time by the affirmative vote of a majority in interest of the Class A Members, but in no instance shall there be less than one (1) Manager. Each Manager shall hold office until his or her successor shall have been elected and qualified. Managers shall be elected by the affirmative vote of a majority in interest of the Class A Members. Managers need not be residents of the State of New York or Members of the Company.

8.3     Certain Powers of Managers. Without limiting the generality of Section 8.1, the Manager shall have power and authority, on the Company's behalf:

(a)     To acquire personal property for use in the ordinary course of the Company's business from any Person as the Manager may determine. The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

(b)     To purchase liability and other insurance to protect the Company property and the Company's business;

(c)     To hold and own any Company real and/or personal properties in the Company's name;

46067/0001-8726463v1

**A-579**

(d)    To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(e)    To execute on the Company's behalf all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the Manager's opinion, to the Company's business;

(f)    To employ accountants, legal counsel, or other experts to perform services for the Company and to compensate them from Company funds;

(g)    To enter into any and all other agreements on the Company's behalf, with any other Person that are necessary or appropriate to the conduct of the Company's business and which are upon customary terms and conditions; and

(h)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

The Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company, shall be made by the affirmative vote of a majority in interest of the Class A Members.

8.4    <u>Liability for Certain Acts</u>.  The Manager shall exercise its business judgment in participating in the management of the Company's business, operations and affairs.  Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by the Manager in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members.  The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company's operations.  The Manager shall not be responsible to any Members because of a loss of their investments or a loss in operations, unless the loss shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager proved as set forth in this Section 8.4.  Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable

11

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-16    Filed 08/30/22    Page 16 of 35    RECEIVED NYSCEF: 07/26/2019

court order, judgment, decree or decision, the Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

8.5    _The Manager Has No Exclusive Duty to Company._  The Manager shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

8.6    _Bank Accounts._  The Manager may open bank accounts in the Company's name. The Company's funds shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager. The Manager shall use such funds solely for the Company's business. Funds shall be withdrawn from the Company's bank accounts only upon a Manager's signature.

8.7    _Resignation._  A Manager may resign at any time by giving written notice to the Members. A Manager's resignation shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

8.8    _Removal._  Any Manager may be removed at any time, with or without cause, by the affirmative vote of a majority in interest of the Class A Members.

8.9    _Vacancies._  Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of a majority in interest of the Class A Members. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of a majority in interest of the Class A Members. A Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until its earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next meeting of Members and until its successor shall be elected and shall qualify, or until his or her earlier death, resignation or removal.

8.10    _Compensation._  The guaranteed payments and other compensation of the Manager, if any, shall be paid in such manner as shall be fixed from time to time by the affirmative vote of a majority in interest of the Class A Members, and no Manager shall be prevented from receiving any such compensation, if any, by reason of the fact that he or she is also a Member of the Company.

12

**A-581**

8.11    Manager's Representations. Every contract, deed, mortgage, lease and other instrument executed by any Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof: (i) the Company was in existence; (ii) neither this Agreement nor the Certificate of Formation had been amended in any manner so as to restrict the delegation of authority to the Manager; and (iii) the execution and delivery of such instrument was duly authorized by the Manager. Any Person may always rely on a certificate addressed to him or her and signed by a Manager:

(a)    as to who are the Members and Manager hereunder;

(b)    as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or Manager or in any other manner germane to the Company's affairs;

(c)    as to who is authorized to execute and deliver any instrument or document of the Company;

(d)    as to the authenticity of any copy of the Certificate of Formation, this Agreement, amendments thereto and any other document relating to the conduct of the Company's affairs; or

(e)    as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Manager or any Member in the capacity as a Member or Manager of the Company.

8.12    Limitations on Members.

(a)    Except as is expressly provided in this Section, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

(b)    Unless authorized to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

## Section 9. Restrictions on the Transfer of a Member's Interest

9.1    Lifetime Restrictions on Transfers. Except as otherwise provided herein, a Member shall not sell, transfer, pledge, encumber or otherwise dispose of all or any part of his or her Interest to any Person other than a Permitted Transferee, as hereinafter defined, unless the Member desiring to make the transfer or encumbrance (hereinafter

13

**A-582**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-16 Filed 08/30/22 Page 18 of 35 RECEIVED NYSCEF: 07/26/2019

referred to as the "Selling Member") shall have first made the offer to sell to the Company and the remaining Members and such offer shall not have been accepted.

(a)      Notice of Offer.  The offer which shall be given to the Company and the remaining Members and shall consist of an offer to sell all of the Interest owned by the Selling Member, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lienor, the Percentage Interest involved in any such proposed transfer or encumbrance, and the price and terms of any such transfer or encumbrance ("Bona Fide Offer"), in accordance with the provisions of Section 9.1(b) hereof.

(b)      Bona Fide Third Party Offer.  If the Selling Member has received a bona fide written offer to purchase all of his or her Interest in the Company which he or she wishes to accept, or a bona fide written offer to receive a loan or an advance of money, which loan or advance involves an encumbrance upon said Interest to secure the loan or advance as referred to in Section 9.1(a) above, the Selling Member shall submit to the Company and the remaining Members, within fourteen (14) days after receipt of such Bona Fide Offer, a written notice including a copy of such Bona Fide Offer, as required under Section 9.1(a) above, together with the name and address of the principal or principals if the offer is made through an agent (hereinafter collectively referred to as the "Bona Fide Offerors"), and sufficient facts concerning the Bona Fide Offerors to enable the Company and the remaining Members to arrive at an informed judgment as to the bona fides of such offer.  The Selling Member shall then offer, or be deemed to have offered, in writing to sell to the Company all of the Interest in the Company held by the Selling Member for an amount equal to the lesser of:  (i) fifty (50%) percent of the Value of the Selling Member's Interest, which is determined under Section 10 hereof; or (ii) the purchase price set forth in the Bona Fide Offer, or, if an encumbrance, the lesser of the amount set forth in item (i) above and the amount of the debt involved in such encumbrance (the lesser of (i) and (ii) shall be referred to as the "Lifetime Purchase Price"), and upon the terms and conditions as hereinafter set forth; provided, however, that the Selling Member has complied with all of the procedural conditions hereof. Within thirty (30) days after receipt by the Company of the Bona Fide Offer, the Company may elect to purchase all of·the Selling Member's Interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price.  If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the receipt by the Company of the Bona Fide Offer, elect to purchase all of the Selling Member's interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price, and upon the terms and conditions as hereinafter set forth.  The remaining Members shall purchase the Selling Member's Interest in relative proportion to their ownership of Interests in the Company; provided, however, that the remaining Members may arrange among themselves for the purchase of the Selling Member's Interest in proportions which differ from the proportions of their respective holdings.

46067/0001-8726463v1

**A-583**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-16    Filed 08/30/22    Page 19 of 35
RECEIVED NYSCEF: 07/26/2019

A potential purchaser or purchasers shall exercise its or their election to purchase by giving written notice thereof to the Selling Member and the other potential purchasers upon the terms and conditions as hereinafter set forth.

(c)    Terms of Payment.  If the Company or the remaining Members exercises its or their right to purchase the Interest of the Selling Member in accordance with the terms of Section 9.1(b) hereof, then the purchaser(s) shall pay the Lifetime Purchase Price either: (i) in accordance with the terms and conditions set forth in the Bona Fide Offer; or (ii) by executing and delivering a negotiable promissory note or notes (in a form mutually acceptable by the purchaser(s) and the Selling Member) made payable to the order of the Selling Member, whichever the purchaser(s) chooses.  Said promissory note(s) shall require successive equal monthly installments over a period of ten (10) years, with interest being imposed at the annual rate equal to the lowest rate of interest which allows for the avoidance of any imputed or unstated interest for Federal income tax purposes existing at and fixed as of the date of closing (the "Installment Method").  The first monthly installment shall be due at the time of closing with one hundred nineteen (119) additional monthly payments being made thereafter on the monthly anniversary date of the first payment until said obligation has been paid in full.  The promissory note shall provide for acceleration of any unpaid balance, together with all accrued interest, upon written notice to the purchaser(s) of a default in the payment of any one (1) monthly installment, which default remains uncured for a period of thirty (30) days after receipt of such notice.  The promissory note shall provide for the unrestricted right to prepay all or any part of the unpaid balance, without premium or penalty, and with interest only to the date of prepayment.

(d)    Release from Restriction.  If the offer to sell as provided for in Section 9.1(b) is not accepted by the Company or the remaining Members as set forth herein, the Selling Member may make a bona fide transfer or encumbrance to the prospective purchaser or lienor named in the statement attached to the Bona Fide Offer, with such sale or encumbrance to be made only in strict accordance with the terms therein stated.  The Company and the remaining Members shall be given full access to all closing documents relating to such sale or encumbrance to the Bona Fide Offerors, so that adherence to the terms and conditions of the Bona Fide Offer can be demonstrated.  However, if the Selling Member shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the election to purchase by the Company and the remaining Members in accordance with this Section, or if there is any modification in price or any of the terms and conditions of the Bona Fide Offer, such Interest shall again become subject to all the restrictions of this Agreement, and the Selling Member shall not have the right to complete the proposed sale or encumbrance without again offering the Interest, in writing, anew to the Company pursuant to the procedures set forth in this Section.  Notwithstanding anything in this Agreement to the contrary, all Interests purchased by the Bona Fide Offerors from a

15

**A-584**

Selling Member shall be acquired subject to the terms and conditions of this Agreement and the Bona Fide Offerors shall not sell, assign, pledge, encumber, hypothecate, mortgage, or in any other manner transfer the whole or any part of the Interest purchased, or any other Interest thereafter held or owned, without the prior written consent of the Company, except as specifically provided in this Agreement. It shall be the affirmative obligation of the Selling Member to notify the Bona Fide Offerors that the Interest proposed to be sold by the Selling Member and purchased by the Bona Fide Offerors will remain subject to the terms and provisions of this Agreement following the proposed sale and purchase.

9.2     Sale in Violation of Agreement.  In the event of any attempted sale, assignment, transfer, hypothecation, pledge, encumbrance or disposition ("Attempted Transfer") of the Interest of a Member, not in accordance with the terms of this Agreement, such Attempted Transfer shall be deemed to be an offer by such Member to sell his or her Interest pursuant to Section 9.1(b) hereof, to be deemed made as of the date of discovery of such Attempted Transfer, and at a price equal to the lesser of: (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Attempted Transfer. The payment terms shall be in accordance with the Installment Method or such Attempted Transfer, whichever the purchaser chooses.

9.3     Involuntary Transfers.  In the event of any involuntary transfer ("Involuntary Transfer") or attempted involuntary transfer ("Attempted Involuntary Transfer") of an Interest owned by a Member due to certain events, including, but not limited to, a Member's bankruptcy or divorce, such Member shall be deemed to have made an offer to sell his or her Interest as of the date of discovery of such Involuntary Transfer or Attempted Involuntary Transfer, pursuant to Section 9.1(b) hereof, and at a price equal to the lesser of:  (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Involuntary Transfer or Attempted Involuntary Transfer. The payment terms shall be in accordance with the Installment Method, such Involuntary Transfer or Attempted Involuntary Transfer, whichever the purchaser chooses.

9.4     Consent Required for Transfer and Assignment of a Member's Interest.  Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, pledge, encumber or in any way alienate all or any part of his or her interest in the Company as a Member except with the prior written consent of a majority in interest of the Class A Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the New York Act), as the non-transferring Class A Members may determine in their sole discretion.  Transfers in violation of this Section 9.4 shall only be effective to the extent set forth in Section 9.7.

46067/0001-8726463v1

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-16   Filed 08/30/22   Page 21 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

9.5     Further Restrictions on Transfer.  No Member shall assign, convey, sell, encumber or in any way alienate all or any part of his or her Interest in the Company if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the Company's termination under Section 708 of the Code.

9.6     Substitute Members.  An Assignee shall have the right to become a Substitute Member if:  (i) the requirements of Sections 9.4 and 9.5 are met; (ii) such Person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (iii) such Person pays any reasonable expenses in connection with its admission as a Substitute Member.

9.7     Effect of Transfer.

(a)     Any permitted transfer of all or any portion of a Member's Interest in the Company shall take effect on the date of transfer.

(b)     Any Assignee of an Interest in the Company shall take subject to the restrictions on transfer imposed by this Agreement.

(c)     Upon any transfer of a Member's Interest in the Company, unless the Assignee is admitted as a Substituted Member pursuant to Section 9.6 herein, the Assignee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but shall only be entitled to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, to which the transferor was entitled, and the extent transferred.

(d)     A Member ceases to be a Member and to have the power to exercise any rights or powers of a Member upon the assignment of all of its Interest.

9.8     Permitted Transferees.  Notwithstanding any other provisions of this Agreement (including Section 6) , each Member, during his or her lifetime or upon his or her death, may give, sell, or otherwise assign all or any part of his, her or its Membership Interest to the following, which shall be referred to as the "Permitted Transferees":

(a)     any descendent or ascendant of any Member by inter vivos or testamentary transfer;

(b)     another Member;

(c)     a Member's spouse, or a trust for the primary benefit of a Member's spouse;

17

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM      INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-16   Filed 08/30/22   Page 22 of 35   RECEIVED NYSCEF: 07/26/2019

       (d)     a custodian or guardian of a minor descendent;

       (e)     a trust of which all of the primary beneficiaries are Members or Permitted Transferees;

       (f)     a beneficiary of a trust that is also a Member; and/or

       (g)     a legal entity controlled and managed by Members or Permitted Transferees.

       9.9    <u>Death of a Member</u>.

       (a)     Except as otherwise provided herein, upon the death of a Member (the "Decedent"), the Company may elect to purchase all of the Decedent's Interest from the legal representatives of the Decedent's estate (except to the extent the Decedent's Interest passes to a Permitted Transferee, as defined hereinafter in Section 9.8), in which event the legal representatives of the Decedent's estate shall then be obligated to sell the Decedent's Interest to the Company, at a purchase price equal to Fifty (50%) percent of the Value of the Decedent's Interest, as determined under Section 10 hereof (the "Death Purchase Price"), and upon the terms and conditions set forth herein. The Company shall notify, in writing, the legal representatives of the Decedent's estate of its acceptance or rejection to purchase all of the Decedent's Interest within thirty (30) days after the appointment of the legal representatives of the Decedent's estate, provided that a failure to notify said legal representatives of its acceptance within said thirty (30) days shall constitute an election not to purchase all of the Decedent's Interest. The notice shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the appointment of the legal representatives of the Decedent's estate, elect to purchase the Decedent's interest which does not pass to a Permitted Transferee, for the Death Purchase Price and upon the terms and conditions as hereinafter set forth.

       (b)     The closing of the purchase and sale of the Decedent's Interest to the Company or the remaining Members shall take place at the Company's principal office, or at such other place as agreed to by the parties on a date mutually agreed to by said parties which shall be within one hundred twenty (120) days following the qualification of the legal representatives of the Decedent's estate.

       (c)     At the closing, the Company or the remaining Members shall execute a promissory note made payable to the legal representatives of the Decedent's estate for the Death Purchase Price. The terms of the promissory note shall be in accordance with the Installment Method as set forth in Section 9.1(c) herein.

18

**A-587**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM   INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-16   Filed 08/30/22   Page 23 of 35   RECEIVED NYSCEF: 07/26/2019

## Section 10. Determination of Value

Upon any sale of a Member's Interest pursuant to this Agreement, the total value of the Company ("Company Value") shall be the last dated amount set forth on the Certificate of Agreed Value, attached hereto as Exhibit C and made a part hereof, executed by the Class A Members. The Class A Members shall exercise best efforts to meet not less than once per year for the purpose of considering a new Value but their failure to meet or to determine a Value shall not invalidate the most recently executed Certificate of Agreed Value setting forth the Value then in effect. If the Class A Members fail to agree on a revaluation as described above for more than two (2) years, the Value shall be the then Fair Market Value of the Company, as hereinafter defined. For purposes of this Agreement, the "Fair Market Value of the Company" shall be the fair market value of the Company assets, less Company liabilities. The Fair Market Value of the Company's real estate shall be determined by an MAI appraisal selected by the Company. If the Selling Member disputes such appraisal, such party shall obtain an MAI appraisal, and the average of the two (2) MAI appraisals shall determine the Fair Market Value; provided, however, that the higher value is within ten (10%) percent of the lower value. If such values are not within ten (10%) percent of each other, then the two (2) MAI appraisers shall select a third MAI appraiser, whose valuation shall be final and binding. The Company shall pay for its appraiser, the Selling Member shall pay for its appraiser, and the third appraiser, if any, shall be paid fifty (50%) percent by the Company and fifty (50%) percent by the Selling Member. The Fair Market Value of all the other assets of the Company, other than its real estate, shall be determined by the certified public accountant employed by the Company applying generally accepted accounting principles. In calculating the Fair Market Value, the Company's accountant shall take into consideration all relevant discounts.

The Value of a Member's Membership Interest shall be an amount equal to the Company Value, multiplied by the Percentage Interest in the Company being purchased.

## Section 11. Termination of a Member

The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which would terminate a Member's interest as a Member in the Company shall not dissolve the Company and shall not require the consent of the remaining Members to continue the Company.

## Section 12. Term of the Company

The Company shall commence as of the date its Certificate of Formation is filed with the New York Secretary of State or such later date specified therein, and shall terminate upon the occurrence of any of the following events:

19

A-588

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-16   Filed 08/30/22   Page 24 of 35   RECEIVED NYSCEF: 07/26/2019

INDEX NO. 654303/2019

12.1   The mutual agreement in writing of a majority in interest of the Class A Members on the date of such agreement to terminate;

12.2   At such earlier time as may be provided by applicable law;

12.3   The sale, disposal, conveyance or distribution of all or substantially all of the assets in which the Company shall have an interest;

12.4   The entry of a decree of judicial dissolution in accordance with the New York Act.

### Section 13. Fiscal Year and Accounting Method

For income tax purposes, the Company's fiscal year shall be as determined by the Manager, and the Company's books shall be kept on the cash or accrual method of accounting as determined by the Manager. Such method when so adopted shall be consistently followed by the Company, subject, however to the Company's right to change its method of accounting for income tax purposes as allowed by law. The accounting for Company purposes shall be made in accordance with generally accepted accounting principles.

### Section 14. Books and Records

14.1   The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.

14.2   The Company's books shall be closed at such intervals as the Manager shall determine but not less frequently than annually as of the end of each calendar year by the certified public accountants then regularly retained by the Company. Such certified public accountants for the Company may be changed at any time and from time to time by the Manager. Such accountants shall prepare the Federal income tax returns for the Company together with a report for each Member for Federal income tax purposes indicating the portion of each Member of the Company's profits and losses for such year. The Members shall each receive a copy of the appropriate report within a reasonable period of time after the close of each fiscal year and promptly after its receipt by the Company and approval by the Manager.

14.3   A Member or Manager of the Company shall be fully protected in relying in good faith upon the Company's records and upon such information, opinions, reports or statements presented to the Company by any of its other Managers, Members, officers,

20

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.  Case 1:22-cv-02407-MKV  Document 27-16  Filed 08/30/22  RECEIVED NYSCEF: 07/26/2019
                                                                          Page 25 of 35

employees, or committees of the Company, or by any other Person, as to matters the Member or Manager reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

## Section 15. Other Activities of Members

Any Member may engage in other business ventures of every nature, including, without limitation by specification, the ownership of another business similar to that operated by this Company. Neither the Company nor any of the other Members shall have any right or interest in any such independent ventures or to the income and profits derived therefrom.

## Section 16. Resignation of a Member

Pursuant to the New York Act, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

## Section 17. Indemnification

17.1    The Members and Manager shall not be liable to the Company or any Member or Manager for any liability, loss, damage, cost or expense which may arise out of or in connection with any act or conduct on the part of the Members or Manager without fraud or willful misconduct, including, but not limited to, the failure to perform its obligations hereunder due to restrictions or prohibitions imposed by law, rule, regulation or demand of any governmental agency, or from any other cause beyond the control of the Members or Manager.

17.2    Notwithstanding anything otherwise herein contained to the contrary, no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.

## Section 18. Limitation on Liability

Except as otherwise provided by the New York Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member, Manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, or

21

**A-590**

acting as a Manager, employee or agent of the Company. No Member shall be required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

### Section 19. Amendment

This Agreement may be amended only by the affirmative vote of a majority in interest of the Class A Members.

### Section 20. Miscellaneous

20.1    <u>Organizational Fees</u>. The Company shall pay all expenses incurred in the organization of the Company.

20.2    <u>Company Property</u>. Title or interest to any or all Company property may be acquired and/or held for the Company purposes set forth in this Agreement in the Company name and/or in the name of any nominee as the Manager may designate. The Manager shall have the right to enter into nominee agreements with any such nominee on the Company's behalf and such agreements may provide for indemnifying such nominee from all claims, damages, costs, expenses or liabilities arising therefrom other than as may be due to or result from the willful misconduct of such nominee.

20.3    <u>Notices</u>. All notices or writings required to be given hereunder or deemed necessary or desirable by any party hereto shall be given in writing addressed to the Company at its principal business office and to each Member and Manager at the address set forth on the books and records of the Company which address may be changed by notice forwarded to the Company, in accordance herewith, and shall be delivered either: personally; by deposit in the United States Post Office Box, postage pre-paid, by certified or registered mail, return receipt requested; by a postal or private form of expedited delivery service; or by facsimile transmission.

20.4    <u>Failure of Member to Comply with Terms of this Agreement</u>. If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that all other Members bound by this Agreement will have no adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement or to specifically enforce the provisions hereof.

20.5    <u>Failure of a Manager to Comply with Terms of this Agreement</u>. A Manager shall not be personally liable for failure to perform in accordance with, or to

22

**A-591**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-16 Filed 08/30/22 Page 27 of 35 RECEIVED NYSCEF: 07/26/2019

comply with the terms and conditions of this Agreement or for any other reason unless such failure to perform or comply or such other reason constitutes gross negligence or willful misconduct by the Manager.

20.6 <u>Applicable Law</u>. This Agreement shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York (without regard to its conflicts of laws provisions). Any proceedings brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York.

20.7 <u>Severability</u>. If any provision of this Agreement shall be declared invalid, cause the Company not to be treated for income tax purposes as a partnership, then and in any of such events, such provision(s) shall be deemed to be invalid, and notwithstanding any such invalidity, the remaining provisions of this Agreement shall remain in full force and effect as if such invalid provisions(s) had not been a part hereof.

20.8 <u>Benefit</u>. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and to their respective heirs, executors, administrators and assigns; provided however, that none of the provisions of this Agreement shall be for the benefit of nor shall they be enforceable by any creditor of the Company or of any Member.

20.9 <u>Construction</u>. As used in this Agreement, the masculine gender shall include the feminine or neuter gender and the neuter gender shall include the masculine or feminine gender, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

20.10 <u>Execution</u>. This Agreement may be executed in any number of counterparts, each of which shall be considered an original. The signature by any Member on any one of the counterparts shall bind such Member at such time as each of the Members has signed and delivered to the Company at least one (1) counterpart.

20.11 <u>Headings</u>. The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12 <u>Partnership</u>. It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

46067/0001-8726463v1

**A-592**

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

WITNESS:

MEMBERS:

JEROME SCHNEIDER

SYDELL PINE 2009 FAMILY TRUST

LLOYD PINE, Trustee

BRENDA ROHLMAN, Trustee

**MANAGER:**

PINE MANAGEMENT, INC.

By: THOMAS ROHLMAN, President

24

46067/0001-8726463v1

**A-593**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-16 Filed 08/30/22 Page 29 of 35 RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

WITNESS:                                           MEMBERS:

_____                    _____
                                                   JEROME SCHNEIDER

_____                    SYDELL PINE 2009 FAMILY TRUST

                                                   _____
                                                   LLOYD PINE, Trustee

_____                    _____
                                                   BRENDA ROHLMAN, Trustee


                                                   MANAGER:

                                                   PINE MANAGEMENT, INC.

_____                    _____
                                                   By: THOMAS ROHLMAN, President

24

46067/0001-8726463v1

**A-594**

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

WITNESS:                                    MEMBERS:

_____          _____
                                                  JEROME SCHNEIDER

                                                  SYDELL PINE 2009 FAMILY TRUST

_____          _____
                                                  LLOYD PINE, Trustee

_____          _____
                                                  BRENDA ROHLMAN, Trustee

                                                  MANAGER:

                                                  PINE MANAGEMENT, INC.

_____          _____
                                                  By: THOMAS ROHLMAN, President

24

A-595

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 3        Case 1:22-cv-02407-MKV   Document 27-16   Filed 08/30/22   Page 31 of 35

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

.

## EXHIBIT A

### Capital Contributions and Percentage Interests

| Member | Initial Capital Contributions | Percentage Interests |
|---|---|---|
| 1. JEROME SCHNEIDER | $ | 25% |
| 2. SYDELL PINE 2009 FAMILY TRUST | $ | 75% |

46067/0001-8726463v1

**A-596**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM        INDEX NO. 654303/2019

NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-16   Filed 08/30/22   Page 32 of 35   RECEIVED NYSCEF: 07/26/2019

## EXHIBIT B

| Class A Members | Membership Interest |
|---|---|
| JEROME SCHNEIDER | 0.25% |
| SYDELL PINE 2009 FAMILY TRUST | 0.75% |

| Class B Members | Membership Interest |
|---|---|
| JEROME SCHNEIDER | 24.75% |
| SYDELL PINE 2009 FAMILY TRUST | 74.25% |

26

A-597

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Jerome and Sydell's Trust are also set forth.

| Date | Value of Company |
|------|------------------|
| | $1,700,000 |

WITNESS:

MEMBERS:

JEROME SCHNEIDER

SYDELL PINE 2009 FAMILY TRUST

LLOYD PINE, Trustee

BRENDA ROHLMAN, Trustee

27

A-598

**EXHIBIT C**

**Certificate Of Agreed Value**

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Jerome and Sydell's Trust are also set forth.

| Date | Value of Company |
|---|---|
| | $1,700,000 |

**WITNESS:**                              **MEMBERS:**

_____          _____
                                         JEROME SCHNEIDER


                                         SYDELL PINE 2009 FAMILY TRUST

_[signature]_                            _[signature]_
                                         LLOYD PINE, Trustee


_____          _____
                                         BRENDA ROHLMAN, Trustee

27

46067/0001-8726453v1

**A-599**

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Jerome and Sydell's Trust are also set forth.

   __Date__                               __Value of Company__

                                          $1,700,000

**WITNESS:**                           **MEMBERS:**

JEROME SCHNEIDER

SYDELL PINE 2009 FAMILY TRUST

LLOYD PINE, Trustee

BRENDA ROHLMAN, Trustee

46067/0001-8726463v1

# EXHIBIT A-16

**A-601**

# Exhibit 16

A-602

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 3 of 35 RECEIVED NYSCEF: 07/26/2019

# AMENDMENT AND RESTATEMENT OF

# OPERATING AGREEMENT

# OF

# MARC REALTY LLC

## (a New York limited liability company)

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW JERSEY 07602-0800
(201) 489-3000

46067/0001-6135142v4

A-603

## TABLE OF CONTENTS

**Page**

Section 1. Formation and Name .................................................................. 1
Section 2. Office ............................................................................................. 2
Section 3. Definitions .................................................................................... 2
Section 4. Purposes....................................................................................... 4
Section 5. Capital Contributions and Capital Accounts ......................... 4
Section 6. Admission of Additional Members .......................................... 6
Section 7. Allocations and Distributions .................................................. 7
Section 8. Management ................................................................................. 9
Section 9. Restrictions on the Transfer of a Member's Interest ......... 13
Section 10. Determination of Value .......................................................... 18
Section 11. Termination of a Member....................................................... 19
Section 12. Term of the Company ............................................................. 19
Section 13. Fiscal Year and Accounting Method ................................... 20
Section 14. Books and Records ................................................................. 20
Section 15. Other Activities of Members ................................................. 20
Section 16. Resignation of a Member ....................................................... 21
Section 17. Indemnification......................................................................... 21
Section 18. Limitation on Liability ........................................................... 21
Section 19. Amendment ............................................................................... 21
Section 20. Miscellaneous .......................................................................... 22

46067/0001-5135142v4

**A-604**

# AMENDMENT AND RESTATEMENT OF

## OPERATING AGREEMENT

### OF

### MARC REALTY LLC

#### (a New York limited liability company)

**THIS AMENDMENT AND RESTATEMENT OF OPERATING AGREEMENT,** made effective as of the 27th day of July, 2011, by and between Harold Pine ("Harold"), Jerome Schneider ("Jerome"), Lloyd Pine ("Lloyd"), Brenda Rohlman ("Brenda"), Marc Schneider ("Marc") and Marni Schwartz ("Marni") (Harold, Jerome, Lloyd, Brenda, Marc and Marni shall hereinafter, at times, be referred to collectively as the "Members" or individually as a "Member").

### W I T N E S S E T H:

**WHEREAS**, the Members of Marc Realty LLC entered into an operating agreement, effective as of October 17, 1996, and which is binding upon the Members; and

**WHEREAS**, the Members may amend said operating agreement with the written consent of the Members including two-thirds or more of the percentage interests then held by the Members, pursuant to Section 15.4 of said operating agreement; and

**WHEREAS**, the Members desire to amend and restate said operating agreement as hereinafter provided for the purposes hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

### Section 1. Formation and Name

The Members heretofore have associated themselves into a limited liability company pursuant to the provisions of the New York Limited Liability Company Act. The Company shall be governed by the terms and conditions set forth herein. The limited liability company's name is Marc Realty LLC.

46067/0001-6135142v4

**A-605**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 6 of 35 RECEIVED NYSCEF: 07/26/2019

## Section 2. Office

The Secretary of State is designated as agent of the Company upon whom process against it may be served. The post office address to which the Secretary of State of the State of New York shall mail a copy of any process against the Company served upon him or her is c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025. Such office and agent may be changed, from time to time, as the Manager shall determine. The Company's principal place of business shall be located at c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025 and/or such other location or locations as, from time to time, the Manager shall select.

## Section 3. Definitions

3.1    "Agreement" means this Operating Agreement, as originally executed and as amended from time to time, which supersedes any prior operating agreement, and the terms "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

3.2    "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon: (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member; (iv) the filing of a petition in an involuntary bankruptcy case, which petition remains undismissed or suspended for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

3.3    "Capital Account" means, with respect to any Member or assignee, the Capital Account maintained in accordance with the provisions set forth in Section 5.3 hereof.

2

46067/0001-6135142v4

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 7 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

3.4    "Capital Contribution" means, with respect to any Member or assignee, the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by such Member or assignee.

3.5    "Code" means the Internal Revenue Code of 1986, as amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

3.6    "Company" shall refer to Marc Realty LLC.

3.7    "Deficit Capital Account" means with respect to any Member or assignee, the deficit balance, if any, in such Member's or assignee's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amount which such Member or assignee is obligated to restore under Regulation Section 1.704-1(b)(2)(ii)*(c)*, as well as any addition thereto pursuant to the next to last sentence of Regulation Section 1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Regulation Section 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Regulation Section 1.704-2(i)(3)); and

(b)    Debit to such Capital Account the items described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* and *(6)*.

The definition of Deficit Capital Account is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)*(d)* and 1.704-2, and will be interpreted consistently with those provisions.

3.8    "Interest" means a Member's entire interest in the Company including the Member's right to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, and the right to participate in the management of the Company's business and affairs, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the New York Act.

3.9    "Manager" or "Managers" means one or more Persons (individually and collectively) selected by the Members, to whom are delegated all or part of the management duties of the Company's business as provided in Section 8 hereof.

3.10    "Members" means all of the Members in the Company.  See Exhibit B attached hereto for a list of the Company's Members.

**A-607**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-17 Filed 08/30/22 Page 8 of 35
RECEIVED NYSCEF: 07/26/2019

3.11 "New York Act" means the New York Limited Liability Company Act, as the same may be amended from time to time.

3.12 "Percentage Interest" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof. Other than by application of Section 6, the Percentage Interests of the Members may not be adjusted without the unanimous consent of the Members.

3.13 "Person" means an individual, association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

3.14 "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, credit, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations.

3.15 "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## Section 4. Purposes

The Company was originally formed for the purpose of acquiring, owning and managing the real property commonly known as 56 West 106th Street, New York, New York. The character and purposes for which the Company was formed, in general, is to own, manage, acquire, invest in real estate; and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement. The Company may also engage in such other business, activity or purpose permitted by law, as the Manager may determine.

## Section 5. Capital Contributions and Capital Accounts

5.1 Members' Capital Contributions. Each Member has made an initial Capital Contribution to the Company, which has been reflected in the Members' Capital Accounts. No interest shall be paid on any initial or subsequent Capital Contribution.

4

A-608

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM | INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-17    Filed 08/30/22    Page 9 of 35    RECEIVED NYSCEF: 07/26/2019

5.2    Additional Contributions. Except as set forth in Section 5.1 above, no Member shall be required to make any Capital Contributions. In order to obtain additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of the Manager.

5.3    Capital Accounts. A separate Capital Account will be maintained for each Member.

(a)    Each Member's Capital Account will be increased by:

(i)    The amount of money contributed by the Member to the Company;

(ii)    The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

(iii)    Allocations to the Member of Profits; and

(iv)    Allocations to the Member of income or gain as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(b)    Each Member's Capital Account will be decreased by:

(i)    The amount of money distributed to the Member by the Company;

(ii)    The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code);

(iii)    Allocations to the Member of Losses; and

(iv)    Allocations to the Member of deduction or expense as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(c)    In the event of a permitted sale or exchange of an Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Regulation Section 1.704-1(b)(2)(iv).

46067/0001-6135142v4

**A-609**

(d)     The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder. If in the Manager's opinion, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified to comply with Section 704(b) of the Code and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, than any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(e)     Except as otherwise required in the New York Act (and subject to Sections 5.1 and 5.2 above), no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

5.4     Withdrawal or Reduction of Members' Contributions to Capital. A Member shall not receive any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains Company property sufficient to pay them, as determined by the Manager in its sole discretion. A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

5.5     Advances by the Members. A Member may from time to time, with the consent of the Manager, advance additional monies to or for the Company's benefit, and each such advance shall be treated as a Capital Contribution to the Company or as a loan to the Company, as determined by the Manager. Any advance which is treated as a loan shall be evidenced by a promissory note executed and delivered by the Company to the Member.

5.6     Transactions Between Member and/or Manager and the Company. Except as otherwise provided in this Agreement, a Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide collateral for, and transact other business with the Company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager as set forth in the New York Act.

## Section 6. Admission of Additional Members

Additional Members may be admitted to the Company upon the affirmative vote of a majority in interest of the Members. Such new Members shall be allocated Profit

6

**A-610**

and Loss by such method as may be provided in this Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

## Section 7. Allocations and Distributions

7.1  <u>Allocations of Profits and Losses</u>.  Profits and Losses for any fiscal year shall be allocated to the Members in proportion to their Percentage Interests.

7.2  <u>Special Allocations</u>.  Notwithstanding the provisions of Section 7.1:

(a)  <u>Minimum Gain</u>.  Notwithstanding any other provision of this Section 7.2, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 7.2(a) is intended to comply with the minimum gain chargeback requirement of Regulation Section 1.704-2 and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

(b)  <u>Qualified Income Offset</u>.  If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* or *(6)*, which create or increase a Deficit Capital Account of the Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 7.2(b) be interpreted to comply with the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)*(d)*.

(c)  <u>Deficit Balance</u>.  If any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that the Member is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)*(c)* and the Member's share of minimum gain as defined in Regulation Section 1.704-2(g)(1) (which is also treated as an obligation to restore in accordance with Regulation Section 1.704-1(b)(2)(ii)*(d)*), the Capital Account of the Member shall be specially credited with items of Company income (including gross income) and gain in the amount of the excess as quickly as possible.

7

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-17 Filed 08/30/22 RECEIVED NYSCEF: 07/26/2019

                                  Page 12 of 35

(d)    <u>Nonrecourse Deductions</u>. Items of Losses, deduction, and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Regulation Section 1.704-2(i) shall be allocated to the Members' Capital Accounts in accordance with said Regulation Section 1.704-2(i). Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Regulation Section 1.704-2(b)) those deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company Profit or Loss for that period.

(e)    <u>Section 704(c)</u>. In accordance with Section 704(c)(1)(A) of the Code and Regulation Section 1.704-1(b)(2)(iv)*(d)(3),* if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for the property shall, solely for Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

(f)    <u>Curative Allocations</u>. Any credit or charge to the Members' Capital Accounts pursuant to Sections 7.2(a) through 7.2(d) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 7.1 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 7.1 and 7.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Section 7 if the special allocations required by Sections 7.2(a) through 7.2(d) had not occurred.

7.3    <u>Distributions</u>.

(a)    The Company shall make distributions to the Members (other than upon liquidation) according to their respective Percentage Interests in the Company at such times as the Manager shall determine. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Agreement by a Member whose interest is liquidated (either upon the withdrawal of a Member or the liquidation of the Company) against the amount otherwise distributable to the Member. Upon the Company's liquidation, the Company's assets shall be distributed in the following order of priority:

(i)    The claims of creditors, other than Members, first shall be satisfied and adequate reserves established (as determined by the Manager);

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 13 of 35   RECEIVED NYSCEF: 07/26/2019

        (ii)     All outstanding loans from Members shall be repaid in the same proportion which the outstanding loans from any Member shall bear to the outstanding loans of all Members;

        (iii)     The Members shall receive the balance in proportion to their relative Capital Accounts determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.

        (b)     The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the Company's assets, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

        (c)     Subject to the terms and conditions of Section 7.3(d), a Member who receives a distribution in violation of Section 7.3(b), and who knew at the time of the distribution that the distribution violated Section 7.3(b), shall be liable to the Company for the amount of the distribution. A Member who receives a distribution in violation of Section 7.3(b), and who did not know at the time of the distribution that the distribution violated Section 7.3(b), shall not be liable for the amount of the distribution.

        (d)     Unless otherwise agreed upon by the Manager, a Member who receives a distribution from the Company in violation of Section 7.3(b) shall have no liability under the New York Act or other applicable law for the amount of the distribution after the expiration of three (3) years from the date of the distribution unless an action to recover the distribution from the Member is commenced prior to the expiration of the three (3) year period and an adjudication of liability against the Member is made in the said action.

### Section 8. Management

8.1    Management.

        (a)     The Company's business and affairs shall be managed by the Manager. The Manager shall participate in the direction, management and control of the Company's business to the best of its ability.

9

**A-613**

   (b) If there is more than one (1) Manager designated to serve hereunder, the Managers shall in all cases act as a group, with a majority vote of the Managers required to take action. Each Manager shall have one (1) vote.

   (c) The Company's initial Manager shall be Pine Management, Inc. Pine Management, Inc. may be paid for services rendered in its role as property manager pursuant to a separate agreement with the Company.

   (d) Except as expressly provided in this Agreement, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

  8.2 <u>Number, Tenure and Qualifications</u>.  The number of Managers of the Company shall be fixed from time to time by the affirmative vote of a majority in interest of the Members, but in no instance shall there be less than one (1) Manager. Each Manager shall hold office until his or her successor shall have been elected and qualified. Managers shall be elected by the affirmative vote of a majority in interest of the Members. Managers need not be residents of the State of New York or Members of the Company.

  8.3 <u>Certain Powers of Managers</u>.  Without limiting the generality of Section 8.1, the Manager shall have power and authority, on the Company's behalf:

   (a) To acquire personal property for use in the ordinary course of the Company's business from any Person as the Manager may determine. The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

   (b) To purchase liability and other insurance to protect the Company property and the Company's business;

   (c) To hold and own any Company real and/or personal properties in the Company's name;

   (d) To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

   (e) To execute on the Company's behalf all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the Manager's opinion, to the Company's business;

46067/0001-6135142v4

**A-614**

(f)     To employ accountants, legal counsel, or other experts to perform services for the Company and to compensate them from Company funds;

(g)     To enter into any and all other agreements on the Company's behalf, with any other Person that are necessary or appropriate to the conduct of the Company's business and which are upon customary terms and conditions; and

(h)     To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

The Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company, shall be made by the affirmative vote of a majority in interest of the Members.

8.4     <u>Liability for Certain Acts</u>. The Manager shall exercise its business judgment in participating in the management of the Company's business, operations and affairs. Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by the Manager in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company's operations. The Manager shall not be responsible to any Members because of a loss of their investments or a loss in operations, unless the loss shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager proved as set forth in this Section 8.4. Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

8.5     <u>The Manager Has No Exclusive Duty to Company</u>. The Manager shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

46067/0001-6135142v4

**A-615**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 16 of 35 RECEIVED NYSCEF: 07/26/2019

8.6    <u>Bank Accounts</u>. The Manager may open bank accounts in the Company's name. The Company's funds shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager. The Manager shall use such funds solely for the Company's business. Funds shall be withdrawn from the Company's bank accounts only upon a Manager's signature.

8.7    <u>Resignation</u>. A Manager may resign at any time by giving written notice to the Members. A Manager's resignation shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

8.8    <u>Removal</u>. Any Manager may be removed at any time, with or without cause, by the affirmative vote of a majority in interest of the Members.

8.9    <u>Vacancies</u>. Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of a majority in interest of the Members. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of a majority in interest of the Members. A Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until its earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next meeting of Members and until its successor shall be elected and shall qualify, or until his or her earlier death, resignation or removal.

8.10    <u>Compensation</u>. The guaranteed payments and other compensation of the Manager, if any, shall be paid in such manner as shall be fixed from time to time by the affirmative vote of a majority in interest of the Members, and no Manager shall be prevented from receiving any such compensation, if any, by reason of the fact that he or she is also a Member of the Company. The Managing Agent shall be entitled to receive payment for services rendered to the Company as the property manager.

8.11    <u>Manager's Representations</u>. Every contract, deed, mortgage, lease and other instrument executed by any Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof: (i) the Company was in existence; (ii) neither this Agreement nor the Certificate of Formation had been amended in any manner so as to restrict the delegation of authority to the Manager; and (iii) the execution and delivery of such instrument was duly authorized by the Manager. Any Person may always rely on a certificate addressed to him or her and signed by a Manager:

     (a)    as to who are the Members and Manager hereunder;

46067/0001-6135142v4

**A-616**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 17 of 35
RECEIVED NYSCEF: 07/26/2019

(b)     as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or Manager or in any other manner germane to the Company's affairs;

(c)     as to who is authorized to execute and deliver any instrument or document of the Company;

(d)     as to the authenticity of any copy of the Certificate of Formation, this Agreement, amendments thereto and any other document relating to the conduct of the Company's affairs; or

(e)     as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Manager or any Member in the capacity as a Member or Manager of the Company.

8.12   <u>Limitations on Members</u>.

(a)     Except as is expressly provided in this Section, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

(b)     Unless authorized to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

## Section 9. <u>Restrictions on the Transfer of a Member's Interest</u>

9.1    <u>Lifetime Restrictions on Transfers</u>.  Except as otherwise provided herein, a Member shall not sell, transfer, pledge, encumber or otherwise dispose of all or any part of his or her Interest to any Person other than a Permitted Transferee, as hereinafter defined, unless the Member desiring to make the transfer or encumbrance (hereinafter referred to as the "Selling Member") shall have first made the offer to sell to the Company and the remaining Members and such offer shall not have been accepted.

(a)     <u>Notice of Offer</u>.  The offer which shall be given to the Company and the remaining Members and shall consist of an offer to sell all of the Interest owned by the Selling Member, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lienor, the Percentage Interest involved in any such proposed transfer or encumbrance, and the price and terms of any such transfer or encumbrance ("Bona Fide Offer"), in accordance with the provisions of Section 9.1(b) hereof.

13

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM       INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 18 of 35   RECEIVED NYSCEF: 07/26/2019

(b)   <u>Bona Fide Third Party Offer</u>.  If the Selling Member has received a bona fide written offer to purchase all of his or her Interest in the Company which he or she wishes to accept, or a bona fide written offer to receive a loan or an advance of money, which loan or advance involves an encumbrance upon said Interest to secure the loan or advance as referred to in Section 9.1(a) above, the Selling Member shall submit to the Company and the remaining Members, within fourteen (14) days after receipt of such Bona Fide Offer, a written notice including a copy of such Bona Fide Offer, as required under Section 9.1(a) above, together with the name and address of the principal or principals if the offer is made through an agent (hereinafter collectively referred to as the "Bona Fide Offerors"), and sufficient facts concerning the Bona Fide Offerors to enable the Company and the remaining Members to arrive at an informed judgment as to the bona fides of such offer.  The Selling Member shall then offer, or be deemed to have offered, in writing to sell to the Company all of the Interest in the Company held by the Selling Member for an amount equal to the lesser of:  (i) fifty (50%) percent of the Value of the Selling Member's Interest, which is determined under Section 10 hereof; or (ii) the purchase price set forth in the Bona Fide Offer, or, if an encumbrance, the lesser of the amount set forth in item (i) above and the amount of the debt involved in such encumbrance (the lesser of (i) and (ii) shall be referred to as the "Lifetime Purchase Price"), and upon the terms and conditions as hereinafter set forth; provided, however, that the Selling Member has complied with all of the procedural conditions hereof. Within thirty (30) days after receipt by the Company of the Bona Fide Offer, the Company may elect to purchase all of the Selling Member's Interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price.  If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the receipt by the Company of the Bona Fide Offer, elect to purchase all of the Selling Member's interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price, and upon the terms and conditions as hereinafter set forth.  The remaining Members shall purchase the Selling Member's Interest in relative proportion to their ownership of Interests in the Company; provided, however, that the remaining Members may arrange among themselves for the purchase of the Selling Member's Interest in proportions which differ from the proportions of their respective holdings.

A potential purchaser or purchasers shall exercise its or their election to purchase by giving written notice thereof to the Selling Member and the other potential purchasers upon the terms and conditions as hereinafter set forth.

(c)   <u>Terms of Payment</u>.  If the Company or the remaining Members exercises its or their right to purchase the Interest of the Selling Member in accordance with the terms of Section 9.1(b) hereof, then the purchaser(s) shall pay the Lifetime Purchase Price either: (i) in accordance with the terms and conditions set forth in the Bona Fide Offer; or (ii) by executing and delivering a negotiable promissory note or notes (in a form mutually acceptable by the purchaser(s) and the Selling Member) made

14

**A-618**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 19 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

payable to the order of the Selling Member, whichever the purchaser(s) chooses. Said promissory note(s) shall require successive equal monthly installments over a period of ten (10) years, with interest being imposed at the annual rate equal to the lowest rate of interest which allows for the avoidance of any imputed or unstated interest for Federal income tax purposes existing at and fixed as of the date of closing (the "Installment Method"). The first monthly installment shall be due at the time of closing with one hundred nineteen (119) additional monthly payments being made thereafter on the monthly anniversary date of the first payment until said obligation has been paid in full. The promissory note shall provide for acceleration of any unpaid balance, together with all accrued interest, upon written notice to the purchaser(s) of a default in the payment of any one (1) monthly installment, which default remains uncured for a period of thirty (30) days after receipt of such notice. The promissory note shall provide for the unrestricted right to prepay all or any part of the unpaid balance, without premium or penalty, and with interest only to the date of prepayment.

      (d)    Release from Restriction. If the offer to sell as provided for in Section 9.1(b) is not accepted by the Company or the remaining Members as set forth herein, the Selling Member may make a bona fide transfer or encumbrance to the prospective purchaser or lienor named in the statement attached to the Bona Fide Offer, with such sale or encumbrance to be made only in strict accordance with the terms therein stated. The Company and the remaining Members shall be given full access to all closing documents relating to such sale or encumbrance to the Bona Fide Offerors, so that adherence to the terms and conditions of the Bona Fide Offer can be demonstrated. However, if the Selling Member shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the election to purchase by the Company and the remaining Members in accordance with this Section, or if there is any modification in price or any of the terms and conditions of the Bona Fide Offer, such Interest shall again become subject to all the restrictions of this Agreement, and the Selling Member shall not have the right to complete the proposed sale or encumbrance without again offering the Interest, in writing, anew to the Company pursuant to the procedures set forth in this Section. Notwithstanding anything in this Agreement to the contrary, all Interests purchased by the Bona Fide Offerors from a Selling Member shall be acquired subject to the terms and conditions of this Agreement and the Bona Fide Offerors shall not sell, assign, pledge, encumber, hypothecate, mortgage, or in any other manner transfer the whole or any part of the Interest purchased, or any other Interest thereafter held or owned, without the prior written consent of the Company, except as specifically provided in this Agreement. It shall be the affirmative obligation of the Selling Member to notify the Bona Fide Offerors that the Interest proposed to be sold by the Selling Member and purchased by the Bona Fide Offerors will remain subject to the terms and provisions of this Agreement following the proposed sale and purchase.

46067/0001-6135142v4

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 20 of 35   RECEIVED NYSCEF: 07/26/2019

9.2     Sale in Violation of Agreement.  In the event of any attempted sale, assignment, transfer, hypothecation, pledge, encumbrance or disposition ("Attempted Transfer") of the Interest of a Member, not in accordance with the terms of this Agreement, such Attempted Transfer shall be deemed to be an offer by such Member to sell his or her Interest pursuant to Section 9.1(b) hereof, to be deemed made as of the date of discovery of such Attempted Transfer, and at a price equal to the lesser of:  (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Attempted Transfer.  The payment terms shall be in accordance with the Installment Method or such Attempted Transfer, whichever the purchaser chooses.

9.3     Involuntary Transfers.  In the event of any involuntary transfer ("Involuntary Transfer") or attempted involuntary transfer ("Attempted Involuntary Transfer") of an Interest owned by a Member due to certain events, including, but not limited to, a Member's bankruptcy or divorce, such Member shall be deemed to have made an offer to sell his or her Interest as of the date of discovery of such Involuntary Transfer or Attempted Involuntary Transfer, pursuant to Section 9.1(b) hereof, and at a price equal to the lesser of:  (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Involuntary Transfer or Attempted Involuntary Transfer.  The payment terms shall be in accordance with the Installment Method, such Involuntary Transfer or Attempted Involuntary Transfer, whichever the purchaser chooses.

9.4     Consent Required for Transfer and Assignment of a Member's Interest.  Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, pledge, encumber or in any way alienate all or any part of his or her interest in the Company as a Member except with the prior written consent of a majority in interest of the Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the New York Act), as the non-transferring Members may determine in their sole discretion.  Transfers in violation of this Section 9.4 shall only be effective to the extent set forth in Section 9.7.

9.5     Further Restrictions on Transfer.  No Member shall assign, convey, sell, encumber or in any way alienate all or any part of his or her Interest in the Company if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the Company's termination under Section 708 of the Code.

9.6     Substitute Members.  An Assignee shall have the right to become a Substitute Member if:  (i) the requirements of Sections 9.4 and 9.5 are met; (ii) such Person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (iii) such Person pays any reasonable expenses in connection with its admission as a Substitute Member.

16

**A-620**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-17 Filed 08/30/22 Page 21 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

9.7 <u>Effect of Transfer</u>.

    (a)    Any permitted transfer of all or any portion of a Member's Interest in the Company shall take effect on the date of transfer.

    (b)    Any Assignee of an Interest in the Company shall take subject to the restrictions on transfer imposed by this Agreement.

    (c)    Upon any transfer of a Member's Interest in the Company, unless the Assignee is admitted as a Substituted Member pursuant to Section 9.6 herein, the Assignee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but shall only be entitled to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, to which the transferor was entitled, and the extent transferred.

    (d)    A Member ceases to be a Member and to have the power to exercise any rights or powers of a Member upon the assignment of all of its Interest.

9.8 <u>Permitted Transferees</u>. Notwithstanding any other provisions of this Agreement (including Section 6), each Member, during his or her lifetime or upon his or her death, may give, sell, or otherwise assign all or any part of his, her or its Membership Interest to the following, which shall be referred to as the "Permitted Transferees":

    (a)    any descendent or ascendant of any Member by inter vivos or testamentary transfer;

    (b)    another Member;

    (c)    a Member's spouse, or a trust for the primary benefit of a Member's spouse;

    (d)    a custodian or guardian of a minor descendent;

    (e)    a trust of which all of the primary beneficiaries are Members or Permitted Transferees;

    (f)    a beneficiary of a trust that is also a Member; and/or

    (g)    a legal entity controlled and managed by Members or Permitted Transferees.

17

**A-621**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-17    Filed 08/30/22    Page 22 of 35

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

9.9    Death of a Member.

(a)    Except as otherwise provided herein, upon the death of a Member (the "Decedent"), the Company may elect to purchase all of the Decedent's Interest from the legal representatives of the Decedent's estate (except to the extent the Decedent's Interest passes to a Permitted Transferee, as defined hereinafter in Section 9.8), in which event the legal representatives of the Decedent's estate shall then be obligated to sell the Decedent's Interest to the Company, at a purchase price equal to Fifty (50%) percent of the Value of the Decedent's Interest, as determined under Section 10 hereof (the "Death Purchase Price"), and upon the terms and conditions set forth herein. The Company shall notify, in writing, the legal representatives of the Decedent's estate of its acceptance or rejection to purchase all of the Decedent's Interest within thirty (30) days after the appointment of the legal representatives of the Decedent's estate, provided that a failure to notify said legal representatives of its acceptance within said thirty (30) days shall constitute an election not to purchase all of the Decedent's Interest. The notice shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the appointment of the legal representatives of the Decedent's estate, elect to purchase the Decedent's interest which does not pass to a Permitted Transferee, for the Death Purchase Price and upon the terms and conditions as hereinafter set forth.

(b)    The closing of the purchase and sale of the Decedent's Interest to the Company or the remaining Members shall take place at the Company's principal office, or at such other place as agreed to by the parties on a date mutually agreed to by said parties which shall be within one hundred twenty (120) days following the qualification of the legal representatives of the Decedent's estate.

(c)    At the closing, the Company or the remaining Members shall execute a promissory note made payable to the legal representatives of the Decedent's estate for the Death Purchase Price. The terms of the promissory note shall be in accordance with the Installment Method as set forth in Section 9.1(c) herein.

## Section 10. Determination of Value

Upon any sale of a Member's Interest pursuant to this Agreement, the total value of the Company ("Company Value") shall be the last dated amount set forth on the Certificate of Agreed Value, attached hereto as Exhibit C and made a part hereof, executed by the Members. The Members shall exercise best efforts to meet not less than once per year for the purpose of considering a new Value but their failure to meet or to determine a Value shall not invalidate the most recently executed Certificate of Agreed Value setting forth the Value then in effect. If the Members fail to agree on a revaluation as described above for more than two (2) years, the Value shall be the then Fair Market

18

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO.
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 23 of 35

Value of the Company, as hereinafter defined. For purposes of this Agreement, the "Fair Market Value of the Company" shall be the fair market value of the Company assets, less Company liabilities. The Fair Market Value of the Company's real estate shall be determined by an MAI appraisal selected by the Company. If the Selling Member disputes such appraisal, such party shall obtain an MAI appraisal, and the average of the two (2) MAI appraisals shall determine the Fair Market Value; provided, however, that the higher value is within ten (10%) percent of the lower value. If such values are not within ten (10%) percent of each other, then the two (2) MAI appraisers shall select a third MAI appraiser, whose valuation shall be final and binding. The Company shall pay for its appraiser, the Selling Member shall pay for its appraiser, and the third appraiser, if any, shall be paid fifty (50%) percent by the Company and fifty (50%) percent by the Selling Member. The Fair Market Value of all the other assets of the Company, other than its real estate, shall be determined by the certified public accountant employed by the Company applying generally accepted accounting principles. In calculating the Fair Market Value, the Company's accountant shall take into consideration all relevant discounts.

The Value of a Member's Membership Interest shall be an amount equal to the Company Value, multiplied by the Percentage Interest in the Company being purchased.

### Section 11. Termination of a Member

The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which would terminate a Member's interest as a Member in the Company shall not dissolve the Company and shall not require the consent of the remaining Members to continue the Company.

### Section 12. Term of the Company

The Company shall commence as of the date its Certificate of Formation is filed with the New York Secretary of State or such later date specified therein, and shall terminate upon the occurrence of any of the following events:

12.1   The mutual agreement in writing of a majority in interest of the Members on the date of such agreement to terminate;

12.2   At such earlier time as may be provided by applicable law;

12.3   The sale, disposal, conveyance or distribution of all or substantially all of the assets in which the Company shall have an interest;

12.4   The entry of a decree of judicial dissolution in accordance with the New York Act.

46067/0001-6135142.v4

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 24 of 35
RECEIVED NYSCEF: 07/26/2019

### Section 13. Fiscal Year and Accounting Method

For income tax purposes, the Company's fiscal year shall be as determined by the Manager, and the Company's books shall be kept on the cash or accrual method of accounting as determined by the Manager. Such method when so adopted shall be consistently followed by the Company, subject, however to the Company's right to change its method of accounting for income tax purposes as allowed by law. The accounting for Company purposes shall be made in accordance with generally accepted accounting principles.

### Section 14. Books and Records

14.1   The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.

14.2   The Company's books shall be closed at such intervals as the Manager shall determine but not less frequently than annually as of the end of each calendar year by the certified public accountants then regularly retained by the Company. Such certified public accountants for the Company may be changed at any time and from time to time by the Manager. Such accountants shall prepare the Federal income tax returns for the Company together with a report for each Member for Federal income tax purposes indicating the portion of each Member of the Company's profits and losses for such year. The Members shall each receive a copy of the appropriate report within a reasonable period of time after the close of each fiscal year and promptly after its receipt by the Company and approval by the Manager.

14.3   A Member or Manager of the Company shall be fully protected in relying in good faith upon the Company's records and upon such information, opinions, reports or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other Person, as to matters the Member or Manager reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

### Section 15. Other Activities of Members

Any Member may engage in other business ventures of every nature, including, without limitation by specification, the ownership of another business similar to that

20

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 9  Case 1:22-cv-02407-MKV  Document 27-17  Filed 08/30/22  Page 25 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

operated by this Company. Neither the Company nor any of the other Members shall have any right or interest in any such independent ventures or to the income and profits derived therefrom.

### Section 16. Resignation of a Member

Pursuant to the New York Act, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

### Section 17. Indemnification

17.1   The Members and Manager shall not be liable to the Company or any Member or Manager for any liability, loss, damage, cost or expense which may arise out of or in connection with any act or conduct on the part of the Members or Manager without fraud or willful misconduct, including, but not limited to, the failure to perform its obligations hereunder due to restrictions or prohibitions imposed by law, rule, regulation or demand of any governmental agency, or from any other cause beyond the control of the Members or Manager.

17.2   Notwithstanding anything otherwise herein contained to the contrary, no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.

### Section 18. Limitation on Liability

Except as otherwise provided by the New York Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member, Manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, or acting as a Manager, employee or agent of the Company. No Member shall be required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

### Section 19. Amendment

This Agreement may be amended only by the affirmative vote of a majority in interest of the Members.

46067/0001-6135142v4

**A-625**

## Section 20. Miscellaneous

20.1 <u>Organizational Fees</u>. The Company shall pay all expenses incurred in the organization of the Company.

20.2 <u>Company Property</u>. Title or interest to any or all Company property may be acquired and/or held for the Company purposes set forth in this Agreement in the Company name and/or in the name of any nominee as the Manager may designate. The Manager shall have the right to enter into nominee agreements with any such nominee on the Company's behalf and such agreements may provide for indemnifying such nominee from all claims, damages, costs, expenses or liabilities arising therefrom other than as may be due to or result from the willful misconduct of such nominee.

20.3 <u>Notices</u>. All notices or writings required to be given hereunder or deemed necessary or desirable by any party hereto shall be given in writing addressed to the Company at its principal business office and to each Member and Manager at the address set forth on the books and records of the Company which address may be changed by notice forwarded to the Company, in accordance herewith, and shall be delivered either: personally; by deposit in the United States Post Office Box, postage pre-paid, by certified or registered mail, return receipt requested; by a postal or private form of expedited delivery service; or by facsimile transmission.

20.4 <u>Failure of Member to Comply with Terms of this Agreement</u>. If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that all other Members bound by this Agreement will have no adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement or to specifically enforce the provisions hereof.

20.5 <u>Failure of a Manager to Comply with Terms of this Agreement</u>. A Manager shall not be personally liable for failure to perform in accordance with, or to comply with the terms and conditions of this Agreement or for any other reason unless such failure to perform or comply or such other reason constitutes gross negligence or willful misconduct by the Manager.

20.6 <u>Applicable Law</u>. This Agreement shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York (without regard to its conflicts of laws provisions). Any proceedings brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York.

20.7 <u>Severability</u>. If any provision of this Agreement shall be declared invalid, cause the Company not to be treated for income tax purposes as a partnership, then and in

22

46067/0001-6135142v4

A-626

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 27 of 35

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

any of such events, such provision(s) shall be deemed to be invalid, and notwithstanding any such invalidity, the remaining provisions of this Agreement shall remain in full force and effect as if such invalid provisions(s) had not been a part hereof.

20.8    Benefit.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and to their respective heirs, executors, administrators and assigns; provided however, that none of the provisions of this Agreement shall be for the benefit of nor shall they be enforceable by any creditor of the Company or of any Member.

20.9    Construction.  As used in this Agreement, the masculine gender shall include the feminine or neuter gender and the neuter gender shall include the masculine or feminine gender, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

20.10   Execution.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original.  The signature by any Member on any one of the counterparts shall bind such Member at such time as each of the Members has signed and delivered to the Company at least one (1) counterpart.

20.11   Headings.  The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12   Partnership.  It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

46067/0001-6135142v4

**A-627**

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-17 Filed 08/30/22 Page 28 of 35 RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                              **MEMBERS:**

_____                    _____
                                                              HAROLD PINE

_____                    _____
                                                              JEROME SCHNEIDER

_____                    _____
                                                              LLOYD PINE

_____                    _____
                                                              BRENDA ROHLMAN

_____                    _____
                                                              MARC SCHNEIDER

_____                    _____
                                                              MARNI SCHWARTZ

**ATTEST:**                                                **MANAGER:**
_____                    PINE MANAGEMENT, INC.

                                                              _____
                                                              By:  THOMAS ROHLMAN, President

24

**A-628**

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                          **MEMBERS:**

_____                     _____
                                                            HAROLD PINE

_____                     _____
                                                            JEROME SCHNEIDER

_____                     _____
                                                            LLOYD PINE

_____                     _____
                                                            BRENDA ROHLMAN

_____                     _____
                                                            MARC SCHNEIDER

_____                     _____
                                                            MARNI SCHWARTZ

**ATTEST:**                                            **MANAGER:**

_____                     PINE MANAGEMENT, INC.


                                                            _____
                                                            By: THOMAS ROHLMAN, President

24

**A-629**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 30 of 35    RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**      **MEMBERS:**

_____      _____

                                   HAROLD PINE

_____      _____

                                   JEROME SCHNEIDER

_____      _____

                                   LLOYD PINE

_____      _____

                                   BRENDA ROHLMAN

_____      _____

                                   MARC SCHNEIDER

_____      _____

                                   MARNI SCHWARTZ

**ATTEST:**      **MANAGER:**

                                   PINE MANAGEMENT, INC.

_____

                                   _____

                                   By: THOMAS ROHLMAN, President

24

4606710001_6135142v4

A-630

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-17 Filed 08/30/22 Page 31 of 35 RECEIVED NYSCEF: 07/26/2019

## EXHIBIT A

### Capital Contributions and Percentage Interests

| | Member | Initial Capital Contributions | Percentage Interests |
|---|---|---|---|
| 1. | HAROLD PINE | $ | 33.34% |
| 2. | JEROME SCHNEIDER | $ | 33.33% |
| 3. | LLOYD PINE | $ | 8.33% |
| 4. | BRENDA ROHLMAN | $ | 8.33% |
| 5. | MARC SCHNEIDER | $ | 8.33% |
| 6. | MARNI SCHWARTZ | $ | 8.34% |

25

46067/0001-6135142v1

**A-631**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM     INDEX NO. 654303/2019

NYSCEF DOC. NO. 3     Case 1:22-cv-02407-MKV     Document 27-17     Filed 08/30/22     Page 32 of 35     RECEIVED NYSCEF: 07/26/2019

**EXHIBIT B**

| Members | Membership Interest |
|---|---|
| HAROLD PINE | 33.34% |
| JEROME SCHNEIDER | 33.33% |
| LLOYD PINE | 8.33% |
| BRENDA ROHLMAN | 8.33% |
| MARC SCHNEIDER | 8.33% |
| MARNI SCHWARTZ | 8.34% |

26

46067/0001-6135142v4

**A-632**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-17   Filed 08/30/22   Page 33 of 35
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

EXHIBIT C

Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Jerome Schneider, Lloyd Pine, Brenda Rohlman, Marc Schneider and Marni Schwartz are also set forth.

| Date | Value of Company |
|------|------------------|
|      | $1,600,000       |

WITNESS:                         MEMBERS:

_____          _____
                                 HAROLD PINE

                                 _____
                                 JEROME SCHNEIDER

_____          _____
                                 LLOYD PINE

_____          _____
                                 BRENDA ROHLMAN

_____          _____
                                 MARC SCHNEIDER

_____          _____
                                 MARNI SCHWARTZ

27

46067/0001-6135142v4

**A-633**

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Jerome Schneider, Lloyd Pine, Brenda Rohlman, Marc Schneider and Marni Schwartz are also set forth.

| Date | Value of Company |
|------|------------------|
|      | $1,600,000       |

**WITNESS:**        **MEMBERS:**

_____     HAROLD PINE

_____     JEROME SCHNEIDER

_____     LLOYD PINE

_____     BRENDA ROHLMAN

_____     MARC SCHNEIDER

_____     MARNI SCHWARTZ

27

46067/0001-6135142v4

**A-634**

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Jerome Schneider, Lloyd Pine, Brenda Rohlman, Marc Schneider and Marni Schwartz are also set forth.

Date                                   Value of Company

                                          $1,600,000

WITNESS:                               MEMBERS:

_____                        _____
                                       HAROLD PINE

_____                        _____
                                       JEROME SCHNEIDER

_____                        _____
                                       LLOYD PINE

_____                        _____
                                       BRENDA ROHLMAN

_____                        _____
                                       MARC SCHNEIDER

_____                        _____
                                       MARNI SCHWARTZ

27

4600/0001-613514204

# EXHIBIT A-17

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3

Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 2 of 39

RECEIVED NYSCEF: 07/26/2019

# Exhibit 17

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019

NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 3 of 39   RECEIVED NYSCEF: 07/26/2019

# AMENDMENT AND RESTATEMENT OF

# OPERATING AGREEMENT

# OF

# RIS REALTY LLC

## (a New York limited liability company)

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW JERSEY 07602-0800
(201) 489-3000

46067/0001-7760410v2

**A-638**

## TABLE OF CONTENTS

**Page**

Section 1. - Formation and Name ........................................................................ 1

Section 2. - Office ............................................................................................... 2

Section 3. - Definitions ...................................................................................... 2

Section 4. - Purposes ......................................................................................... 4

Section 5. - Capital Contributions and Capital Accounts ................................. 4

Section 6. - Admission of Additional Members ................................................. 6

Section 7. - Allocations and Distributions ........................................................ 7

Section 8. - Management .................................................................................... 9

Section 9. - Restrictions on the Transfer of a Member's Interest .................... 13

Section 10. - Determination of Value ............................................................... 18

Section 11. - Termination of a Member ............................................................ 19

Section 12. - Term of the Company .................................................................. 19

Section 13. - Fiscal Year and Accounting Method ........................................... 20

Section 14. - Books and Records ...................................................................... 20

Section 15. - Other Activities of Members ....................................................... 20

Section 16. - Resignation of a Member ............................................................ 21

Section 17. - Indemnification ........................................................................... 21

Section 18. - Limitation on Liability ................................................................ 21

Section 19. - Amendment .................................................................................. 21

Section 20. - Miscellaneous .............................................................................. 22

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 5 of 39
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

# AMENDMENT AND RESTATEMENT OF

# OPERATING AGREEMENT

# OF

# RIS REALTY LLC

### (a New York limited liability company)

**THIS AMENDMENT AND RESTATEMENT OF OPERATING AGREEMENT,** made as of the 27th day of July, 2011, by and between Harold Pine ("Harold"), Lloyd Pine ("Lloyd"), Ruth Schneider ("Ruth"), Sydell Pine ("Sydell"), Brenda Rohlman ("Brenda"), Jerome Schneider ("Jerome"), Marc Schneider ("Marc") and Marni Schwartz ("Marni") (Harold, Lloyd, Ruth, Sydell, Brenda, Jerome, Marc and Marni shall hereinafter, at times, be referred to collectively as the "Members" or individually as a "Member").

### W I T N E S S E T H :

**WHEREAS,** the Members of RIS Realty LLC entered into an operating agreement, effective as of October 14, 1996, and which is binding upon the Members; and

**WHEREAS,** the Members may amend said operating agreement with the unanimous written consent of the Members, pursuant to Paragraph 3 of Article VII of said operating agreement; and

**WHEREAS,** the Members desire to amend and restate said operating agreement as hereinafter provided for the purposes hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

### Section 1. - Formation and Name

The Members heretofore have associated themselves into a limited liability company pursuant to the provisions of the New York Limited Liability Company Act. The Company shall be governed by the terms and conditions set forth herein. The limited liability company's name is RIS Realty LLC.

**A-640**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-18    Filed 08/30/22    Page 6 of 39
                                                                RECEIVED NYSCEF: 07/26/2019

## Section 2. - Office

The Secretary of State is designated as agent of the Company upon whom process against it may be served. The post office address to which the Secretary of State of the State of New York shall mail a copy of any process against the Company served upon him or her is c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025. Such office and agent may be changed, from time to time, as the Manager shall determine. The Company's principal place of business shall be located at c/o Pine Management, Inc., 78 Manhattan Avenue, New York, NY 10025 and/or such other location or locations as, from time to time, the Manager shall select.

## Section 3. - Definitions

3.1     "Agreement" means this Operating Agreement, as originally executed and as amended from time to time, which supersedes any prior operating agreement, and the terms "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

3.2     "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon:  (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member; (iv) the filing of a petition in an involuntary bankruptcy case, which petition remains undismissed or suspended for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

3.3     "Capital Account" means, with respect to any Member or assignee, the Capital Account maintained in accordance with the provisions set forth in Section 5.3 hereof.

2

**A-641**

3.4     "Capital Contribution" means, with respect to any Member or assignee, the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by such Member or assignee.

3.5     "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

3.6     "Company" shall refer to RIS Realty LLC.

3.7     "Deficit Capital Account" means with respect to any Member or assignee, the deficit balance, if any, in such Member's or assignee's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a)     Credit to such Capital Account any amount which such Member or assignee is obligated to restore under Regulation Section 1.704-1(b)(2)(ii)*(c)*, as well as any addition thereto pursuant to the next to last sentence of Regulation Section 1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Regulation Section 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Regulation Section 1.704-2(i)(3)); and

(b)     Debit to such Capital Account the items described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* and *(6)*.

The definition of Deficit Capital Account is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)*(d)* and 1.704-2, and will be interpreted consistently with those provisions.

3.8     "Interest" means a Member's entire interest in the Company including the Member's right to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, and the right to participate in the management of the Company's business and affairs, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the New York Act.

3.9     "Manager" or "Managers" means one or more Persons (individually and collectively) selected by the Members, to whom are delegated all or part of the management duties of the Company's business as provided in Section 8 hereof.

3.10    "Members" means all of the Members in the Company. See Exhibit B attached hereto for a list of the Company's Members.

46067/0001-77604 10v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.          Case 1:22-cv-02407-MKV     Document 27-18     Filed 08/30/22     Page 8 of 39     RECEIVED NYSCEF: 07/26/2019

3.11    "New York Act" means the New York Limited Liability Company Act, as the same may be amended from time to time.

3.12    "Percentage Interest" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof. Other than by application of Section 6, the Percentage Interests of the Members may not be adjusted without the unanimous consent of the Members.

3.13    "Person" means an individual, association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

3.14    "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, credit, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations.

3.15    "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## Section 4. - Purposes

The Company was originally formed for the purpose of acquiring, owning and managing the real property commonly known as 141 West 80th Street, New York, New York. The character and purposes for which the Company was formed, in general, is to own, manage, acquire, invest in real estate; and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement. The Company may also engage in such other business, activity or purpose permitted by law, as the Manager may determine.

## Section 5. - Capital Contributions and Capital Accounts

5.1    Members' Capital Contributions. Each Member has made an initial Capital Contribution to the Company, which has been reflected in the Members' Capital Accounts. No interest shall be paid on any initial or subsequent Capital Contribution.

46067/0001-7760410v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 9 of 39 RECEIVED NYSCEF: 07/26/2019

    5.2    <u>Additional Contributions</u>. Except as set forth in Section 5.1 above, no Member shall be required to make any Capital Contributions. In order to obtain additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of the Manager.

    5.3    <u>Capital Accounts</u>. A separate Capital Account will be maintained for each Member.

    (a)    Each Member's Capital Account will be increased by:

    (i)    The amount of money contributed by the Member to the Company;

    (ii)    The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

    (iii)    Allocations to the Member of Profits; and

    (iv)    Allocations to the Member of income or gain as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

    (b)    Each Member's Capital Account will be decreased by:

    (i)    The amount of money distributed to the Member by the Company;

    (ii)    The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code);

    (iii)    Allocations to the Member of Losses; and

    (iv)    Allocations to the Member of deduction or expense as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

    (c)    In the event of a permitted sale or exchange of an Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Regulation Section 1.704-1(b)(2)(iv).

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO.

(d)     The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder. If in the Manager's opinion, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified to comply with Section 704(b) of the Code and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, than any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(e)     Except as otherwise required in the New York Act (and subject to Sections 5.1 and 5.2 above), no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

5.4     <u>Withdrawal or Reduction of Members' Contributions to Capital</u>. A Member shall not receive any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains Company property sufficient to pay them, as determined by the Manager in its sole discretion. A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

5.5     <u>Advances by the Members</u>. A Member may from time to time, with the consent of the Manager, advance additional monies to or for the Company's benefit, and each such advance shall be treated as a Capital Contribution to the Company or as a loan to the Company, as determined by the Manager. Any advance which is treated as a loan shall be evidenced by a promissory note executed and delivered by the Company to the Member.

5.6     <u>Transactions Between Member and/or Manager and the Company</u>. Except as otherwise provided in this Agreement, a Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide collateral for, and transact other business with the Company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager as set forth in the New York Act.

## Section 6. - Admission of Additional Members

Additional Members may be admitted to the Company upon the affirmative vote of a majority in interest of the Members. Such new Members shall be allocated Profit

6

**A-645**
FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 11 of 39
RECEIVED NYSCEF: 07/26/2019

and Loss by such method as may be provided in this Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

## Section 7. - Allocations and Distributions

7.1     <u>Allocations of Profits and Losses</u>.  Profits and Losses for any fiscal year shall be allocated to the Members in proportion to their Percentage Interests.

7.2     <u>Special Allocations</u>.  Notwithstanding the provisions of Section 7.1:

(a)     <u>Minimum Gain</u>.  Notwithstanding any other provision of this Section 7.2, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain.  This Section 7.2(a) is intended to comply with the minimum gain chargeback requirement of Regulation Section 1.704-2 and shall be interpreted consistently therewith.  If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

(b)     <u>Qualified Income Offset</u>.  If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4)*, *(5)* or *(6)*, which create or increase a Deficit Capital Account of the Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible.  It is the intent that this Section 7.2(b) be interpreted to comply with the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)*(d)*.

(c)     <u>Deficit Balance</u>.  If any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that the Member is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)*(c)* and the Member's share of minimum gain as defined in Regulation Section 1.704-2(g)(1) (which is also treated as an obligation to restore in accordance with Regulation Section 1.704-1(b)(2)(ii)*(d)*), the Capital Account of the Member shall be specially credited with items of Company income (including gross income) and gain in the amount of the excess as quickly as possible.

7

**A-646**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 12 of 39
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

(d) <u>Nonrecourse Deductions</u>. Items of Losses, deduction, and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Regulation Section 1.704-2(i) shall be allocated to the Members' Capital Accounts in accordance with said Regulation Section 1.704-2(i). Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Regulation Section 1.704-2(b)) those deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company Profit or Loss for that period.

(e) <u>Section 704(c)</u>. In accordance with Section 704(c)(1)(A) of the Code and Regulation Section 1.704-1(b)(2)(iv)*(d)(3)*, if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for the property shall, solely for Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

(f) <u>Curative Allocations</u>. Any credit or charge to the Members' Capital Accounts pursuant to Sections 7.2(a) through 7.2(d) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 7.1 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 7.1 and 7.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Section 7 if the special allocations required by Sections 7.2(a) through 7.2(d) had not occurred.

7.3   <u>Distributions</u>.

(a) The Company shall make distributions to the Members (other than upon liquidation) according to their respective Percentage Interests in the Company at such times as the Manager shall determine. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Agreement by a Member whose interest is liquidated (either upon the withdrawal of a Member or the liquidation of the Company) against the amount otherwise distributable to the Member. Upon the Company's liquidation, the Company's assets shall be distributed in the following order of priority:

(i) The claims of creditors, other than Members, first shall be satisfied and adequate reserves established (as determined by the Manager);

8

**A-647**

     (ii)     All outstanding loans from Members shall be repaid in the same proportion which the outstanding loans from any Member shall bear to the outstanding loans of all Members;

     (iii)     The Members shall receive the balance in proportion to their relative Capital Accounts determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.

     (b)     The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the Company's assets, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

     (c)     Subject to the terms and conditions of Section 7.3(d), a Member who receives a distribution in violation of Section 7.3(b), and who knew at the time of the distribution that the distribution violated Section 7.3(b), shall be liable to the Company for the amount of the distribution.  A Member who receives a distribution in violation of Section 7.3(b), and who did not know at the time of the distribution that the distribution violated Section 7.3(b), shall not be liable for the amount of the distribution.

     (d)     Unless otherwise agreed upon by the Manager, a Member who receives a distribution from the Company in violation of Section 7.3(b) shall have no liability under the New York Act or other applicable law for the amount of the distribution after the expiration of three (3) years from the date of the distribution unless an action to recover the distribution from the Member is commenced prior to the expiration of the three (3) year period and an adjudication of liability against the Member is made in the said action.

### Section 8. - Management

8.1    <u>Management</u>.

     (a)     The Company's business and affairs shall be managed by the Manager.  The Manager shall participate in the direction, management and control of the Company's business to the best of its ability.

**A-648**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 14 of 39 RECEIVED NYSCEF: 07/26/2019

      (b)    If there is more than one (1) Manager designated to serve hereunder, the Managers shall in all cases act as a group, with a majority vote of the Managers required to take action. Each Manager shall have one (1) vote.

      (c)    The Company's initial Manager shall be Pine Management, Inc. Pine Management, Inc. may be paid for services rendered in its role as property manager pursuant to a separate agreement with the Company.

      (d)    Except as expressly provided in this Agreement, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

    8.2    <u>Number, Tenure and Qualifications</u>. The number of Managers of the Company shall be fixed from time to time by the affirmative vote of a majority in interest of the Members, but in no instance shall there be less than one (1) Manager. Each Manager shall hold office until his or her successor shall have been elected and qualified. Managers shall be elected by the affirmative vote of a majority in interest of the Members. Managers need not be residents of the State of New York or Members of the Company.

    8.3    <u>Certain Powers of Managers</u>. Without limiting the generality of Section 8.1, the Manager shall have power and authority, on the Company's behalf:

      (a)    To acquire personal property for use in the ordinary course of the Company's business from any Person as the Manager may determine. The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

      (b)    To purchase liability and other insurance to protect the Company property and the Company's business;

      (c)    To hold and own any Company real and/or personal properties in the Company's name;

      (d)    To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

      (e)    To execute on the Company's behalf all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the Manager's opinion, to the Company's business;

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 15 of 39 RECEIVED NYSCEF: 07/26/2019

      (f)     To employ accountants, legal counsel, or other experts to perform services for the Company and to compensate them from Company funds;

      (g)     To enter into any and all other agreements on the Company's behalf, with any other Person that are necessary or appropriate to the conduct of the Company's business and which are upon customary terms and conditions; and

      (h)     To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

The Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business; provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company, shall be made by the affirmative vote of a majority in interest of the Members.

8.4    <u>Liability for Certain Acts</u>.  The Manager shall exercise its business judgment in participating in the management of the Company's business, operations and affairs.  Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by the Manager in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members.  The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company's operations.  The Manager shall not be responsible to any Members because of a loss of their investments or a loss in operations, unless the loss shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager proved as set forth in this Section 8.4.  Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

8.5    <u>The Manager Has No Exclusive Duty to Company</u>.  The Manager shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-18    Filed 08/30/22    Page 16 of 39

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

8.6    Bank Accounts. The Manager may open bank accounts in the Company's name. The Company's funds shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager. The Manager shall use such funds solely for the Company's business. Funds shall be withdrawn from the Company's bank accounts only upon a Manager's signature.

8.7    Resignation. A Manager may resign at any time by giving written notice to the Members. A Manager's resignation shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

8.8    Removal. Any Manager may be removed at any time, with or without cause, by the affirmative vote of a majority in interest of the Members.

8.9    Vacancies. Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of a majority in interest of the Members. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of a majority in interest of the Members. A Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until its earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next meeting of Members and until its successor shall be elected and shall qualify, or until his or her earlier death, resignation or removal.

8.10    Compensation. The guaranteed payments and other compensation of the Manager, if any, shall be paid in such manner as shall be fixed from time to time by the affirmative vote of a majority in interest of the Members, and no Manager shall be prevented from receiving any such compensation, if any, by reason of the fact that he or she is also a Member of the Company.

8.11    Manager's Representations. Every contract, deed, mortgage, lease and other instrument executed by any Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof: (i) the Company was in existence; (ii) neither this Agreement nor the Certificate of Formation had been amended in any manner so as to restrict the delegation of authority to the Manager; and (iii) the execution and delivery of such instrument was duly authorized by the Manager. Any Person may always rely on a certificate addressed to him or her and signed by a Manager:

(a)    as to who are the Members and Manager hereunder;

**A-651**

      (b)     as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or Manager or in any other manner germane to the Company's affairs;

      (c)     as to who is authorized to execute and deliver any instrument or document of the Company;

      (d)     as to the authenticity of any copy of the Certificate of Formation, this Agreement, amendments thereto and any other document relating to the conduct of the Company's affairs; or

      (e)     as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Manager or any Member in the capacity as a Member or Manager of the Company.

8.12   <u>Limitations on Members</u>.

      (a)     Except as is expressly provided in this Section, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

      (b)     Unless authorized to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

## Section 9. - Restrictions on the Transfer of a Member's Interest

9.1   <u>Lifetime Restrictions on Transfers</u>. Except as otherwise provided herein, a Member shall not sell, transfer, pledge, encumber or otherwise dispose of all or any part of his or her Interest to any Person other than a Permitted Transferee, as hereinafter defined, unless the Member desiring to make the transfer or encumbrance (hereinafter referred to as the "Selling Member") shall have first made the offer to sell to the Company and the remaining Members and such offer shall not have been accepted.

      (a)     <u>Notice of Offer</u>. The offer which shall be given to the Company and the remaining Members and shall consist of an offer to sell all of the Interest owned by the Selling Member, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lienor, the Percentage Interest involved in any such proposed transfer or encumbrance, and the price and terms of any such transfer or encumbrance ("Bona Fide Offer"), in accordance with the provisions of Section 9.1(b) hereof.

13

**A-652**

    (b)   <u>Bona Fide Third Party Offer</u>. If the Selling Member has received a bona fide written offer to purchase all of his or her Interest in the Company which he or she wishes to accept, or a bona fide written offer to receive a loan or an advance of money, which loan or advance involves an encumbrance upon said Interest to secure the loan or advance as referred to in Section 9.1(a) above, the Selling Member shall submit to the Company and the remaining Members, within fourteen (14) days after receipt of such Bona Fide Offer, a written notice including a copy of such Bona Fide Offer, as required under Section 9.1(a) above, together with the name and address of the principal or principals if the offer is made through an agent (hereinafter collectively referred to as the "Bona Fide Offerors"), and sufficient facts concerning the Bona Fide Offerors to enable the Company and the remaining Members to arrive at an informed judgment as to the bona fides of such offer. The Selling Member shall then offer, or be deemed to have offered, in writing to sell to the Company all of the Interest in the Company held by the Selling Member for an amount equal to the lesser of: (i) fifty (50%) percent of the Value of the Selling Member's Interest, which is determined under Section 10 hereof; or (ii) the purchase price set forth in the Bona Fide Offer, or, if an encumbrance, the lesser of the amount set forth in item (i) above and the amount of the debt involved in such encumbrance (the lesser of (i) and (ii) shall be referred to as the "Lifetime Purchase Price"), and upon the terms and conditions as hereinafter set forth; provided, however, that the Selling Member has complied with all of the procedural conditions hereof. Within thirty (30) days after receipt by the Company of the Bona Fide Offer, the Company may elect to purchase all of the Selling Member's Interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the receipt by the Company of the Bona Fide Offer, elect to purchase all of the Selling Member's interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price, and upon the terms and conditions as hereinafter set forth. The remaining Members shall purchase the Selling Member's Interest in relative proportion to their ownership of Interests in the Company; provided, however, that the remaining Members may arrange among themselves for the purchase of the Selling Member's Interest in proportions which differ from the proportions of their respective holdings.

    A potential purchaser or purchasers shall exercise its or their election to purchase by giving written notice thereof to the Selling Member and the other potential purchasers upon the terms and conditions as hereinafter set forth.

    (c)   <u>Terms of Payment</u>. If the Company or the remaining Members exercises its or their right to purchase the Interest of the Selling Member in accordance with the terms of Section 9.1(b) hereof, then the purchaser(s) shall pay the Lifetime Purchase Price either: (i) in accordance with the terms and conditions set forth in the Bona Fide Offer; or (ii) by executing and delivering a negotiable promissory note or notes (in a form mutually acceptable by the purchaser(s) and the Selling Member) made

14

A-653

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 19 of 39 RECEIVED NYSCEF: 07/26/2019

payable to the order of the Selling Member, whichever the purchaser(s) chooses. Said promissory note(s) shall require successive equal monthly installments over a period of ten (10) years, with interest being imposed at the annual rate equal to the lowest rate of interest which allows for the avoidance of any imputed or unstated interest for Federal income tax purposes existing at and fixed as of the date of closing (the "Installment Method"). The first monthly installment shall be due at the time of closing with one hundred nineteen (119) additional monthly payments being made thereafter on the monthly anniversary date of the first payment until said obligation has been paid in full. The promissory note shall provide for acceleration of any unpaid balance, together with all accrued interest, upon written notice to the purchaser(s) of a default in the payment of any one (1) monthly installment, which default remains uncured for a period of thirty (30) days after receipt of such notice. The promissory note shall provide for the unrestricted right to prepay all or any part of the unpaid balance, without premium or penalty, and with interest only to the date of prepayment.

(d) <u>Release from Restriction</u>. If the offer to sell as provided for in Section 9.1(b) is not accepted by the Company or the remaining Members as set forth herein, the Selling Member may make a bona fide transfer or encumbrance to the prospective purchaser or lienor named in the statement attached to the Bona Fide Offer, with such sale or encumbrance to be made only in strict accordance with the terms therein stated. The Company and the remaining Members shall be given full access to all closing documents relating to such sale or encumbrance to the Bona Fide Offerors, so that adherence to the terms and conditions of the Bona Fide Offer can be demonstrated. However, if the Selling Member shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the election to purchase by the Company and the remaining Members in accordance with this Section, or if there is any modification in price or any of the terms and conditions of the Bona Fide Offer, such Interest shall again become subject to all the restrictions of this Agreement, and the Selling Member shall not have the right to complete the proposed sale or encumbrance without again offering the Interest, in writing, anew to the Company pursuant to the procedures set forth in this Section. Notwithstanding anything in this Agreement to the contrary, all Interests purchased by the Bona Fide Offerors from a Selling Member shall be acquired subject to the terms and conditions of this Agreement and the Bona Fide Offerors shall not sell, assign, pledge, encumber, hypothecate, mortgage, or in any other manner transfer the whole or any part of the Interest purchased, or any other Interest thereafter held or owned, without the prior written consent of the Company, except as specifically provided in this Agreement. It shall be the affirmative obligation of the Selling Member to notify the Bona Fide Offerors that the Interest proposed to be sold by the Selling Member and purchased by the Bona Fide Offerors will remain subject to the terms and provisions of this Agreement following the proposed sale and purchase.

46067/0001-7760410v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-18 Filed 08/30/22 Page 20 of 39

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

9.2     <u>Sale in Violation of Agreement</u>.  In the event of any attempted sale, assignment, transfer, hypothecation, pledge, encumbrance or disposition ("Attempted Transfer") of the Interest of a Member, not in accordance with the terms of this Agreement, such Attempted Transfer shall be deemed to be an offer by such Member to sell his or her Interest pursuant to Section 9.1(b) hereof, to be deemed made as of the date of discovery of such Attempted Transfer, and at a price equal to the lesser of: (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Attempted Transfer.  The payment terms shall be in accordance with the Installment Method or such Attempted Transfer, whichever the purchaser chooses.

9.3     <u>Involuntary Transfers</u>.  In the event of any involuntary transfer ("Involuntary Transfer") or attempted involuntary transfer ("Attempted Involuntary Transfer") of an Interest owned by a Member due to certain events, including, but not limited to, a Member's bankruptcy or divorce, such Member shall be deemed to have made an offer to sell his or her Interest as of the date of discovery of such Involuntary Transfer or Attempted Involuntary Transfer, pursuant to Section 9.1(b) hereof, and at a price equal to the lesser of:  (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Involuntary Transfer or Attempted Involuntary Transfer.  The payment terms shall be in accordance with the Installment Method, such Involuntary Transfer or Attempted Involuntary Transfer, whichever the purchaser chooses.

9.4     <u>Consent Required for Transfer and Assignment of a Member's Interest</u>. Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, pledge, encumber or in any way alienate all or any part of his or her interest in the Company as a Member except with the prior written consent of a majority in interest of the Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the New York Act), as the non-transferring Members may determine in their sole discretion.  Transfers in violation of this Section 9.4 shall only be effective to the extent set forth in Section 9.7.

9.5     <u>Further Restrictions on Transfer</u>.  No Member shall assign, convey, sell, encumber or in any way alienate all or any part of his or her Interest in the Company if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the Company's termination under Section 708 of the Code.

9.6     <u>Substitute Members</u>.  An Assignee shall have the right to become a Substitute Member if:  (i) the requirements of Sections 9.4 and 9.5 are met; (ii) such Person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (iii) such Person pays any reasonable expenses in connection with its admission as a Substitute Member.

16

**A-655**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.  Case 1:22-cv-02407-MKV  Document 27-18  Filed 08/30/22  Page 21 of 39  RECEIVED NYSCEF: 07/26/2019

9.7    Effect of Transfer.

(a)    Any permitted transfer of all or any portion of a Member's Interest in the Company shall take effect on the date of transfer.

(b)    Any Assignee of an Interest in the Company shall take subject to the restrictions on transfer imposed by this Agreement.

(c)    Upon any transfer of a Member's Interest in the Company, unless the Assignee is admitted as a Substituted Member pursuant to Section 9.6 herein, the Assignee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but shall only be entitled to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, to which the transferor was entitled, and the extent transferred.

(d)    A Member ceases to be a Member and to have the power to exercise any rights or powers of a Member upon the assignment of all of its Interest.

9.8    Permitted Transferees.   Notwithstanding any other provisions of this Agreement (including Section 6), each Member, during his or her lifetime or upon his or her death, may give, sell, or otherwise assign all or any part of his, her or its Membership Interest to the following, which shall be referred to as the "Permitted Transferees":

(a)    any descendent or ascendant of any Member by inter vivos or testamentary transfer;

(b)    another Member;

(c)    a Member's spouse, or a trust for the primary benefit of a Member's spouse;

(d)    a custodian or guardian of a minor descendent;

(e)    a trust of which all of the primary beneficiaries are Members or Permitted Transferees;

(f)    a beneficiary of a trust that is also a Member; and/or

(g)    a legal entity controlled and managed by Members or Permitted Transferees.

17

46067/0001-7760410v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM     INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV  Document 27-18  Filed 08/30/22  Page 22 of 39   RECEIVED NYSCEF: 07/26/2019

**9.9**    Death of a Member.

(a)    Except as otherwise provided herein, upon the death of a Member (the "Decedent"), the Company may elect to purchase all of the Decedent's Interest from the legal representatives of the Decedent's estate (except to the extent the Decedent's Interest passes to a Permitted Transferee, as defined hereinafter in Section 9.8), in which event the legal representatives of the Decedent's estate shall then be obligated to sell the Decedent's Interest to the Company, at a purchase price equal to Fifty (50%) percent of the Value of the Decedent's Interest, as determined under Section 10 hereof (the "Death Purchase Price"), and upon the terms and conditions set forth herein. The Company shall notify, in writing, the legal representatives of the Decedent's estate of its acceptance or rejection to purchase all of the Decedent's Interest within thirty (30) days after the appointment of the legal representatives of the Decedent's estate, provided that a failure to notify said legal representatives of its acceptance within said thirty (30) days shall constitute an election not to purchase all of the Decedent's Interest. The notice shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the appointment of the legal representatives of the Decedent's estate, elect to purchase the Decedent's interest which does not pass to a Permitted Transferee, for the Death Purchase Price and upon the terms and conditions as hereinafter set forth.

(b)    The closing of the purchase and sale of the Decedent's Interest to the Company or the remaining Members shall take place at the Company's principal office, or at such other place as agreed to by the parties on a date mutually agreed to by said parties which shall be within one hundred twenty (120) days following the qualification of the legal representatives of the Decedent's estate.

(c)    At the closing, the Company or the remaining Members shall execute a promissory note made payable to the legal representatives of the Decedent's estate for the Death Purchase Price. The terms of the promissory note shall be in accordance with the Installment Method as set forth in Section 9.1(c) herein.

## Section 10. - Determination of Value

Upon any sale of a Member's Interest pursuant to this Agreement, the total value of the Company ("Company Value") shall be the last dated amount set forth on the Certificate of Agreed Value, attached hereto as Exhibit C and made a part hereof, executed by the Members. The Members shall exercise best efforts to meet not less than once per year for the purpose of considering a new Value but their failure to meet or to determine a Value shall not invalidate the most recently executed Certificate of Agreed Value setting forth the Value then in effect. If the Members fail to agree on a revaluation as described above for more than two (2) years, the Value shall be the then Fair Market

**A-657**

Value of the Company, as hereinafter defined. For purposes of this Agreement, the "Fair Market Value of the Company" shall be the fair market value of the Company assets, less Company liabilities. The Fair Market Value of the Company's real estate shall be determined by an MAI appraisal selected by the Company. If the Selling Member disputes such appraisal, such party shall obtain an MAI appraisal, and the average of the two (2) MAI appraisals shall determine the Fair Market Value; provided, however, that the higher value is within ten (10%) percent of the lower value. If such values are not within ten (10%) percent of each other, then the two (2) MAI appraisers shall select a third MAI appraiser, whose valuation shall be final and binding. The Company shall pay for its appraiser, the Selling Member shall pay for its appraiser, and the third appraiser, if any, shall be paid fifty (50%) percent by the Company and fifty (50%) percent by the Selling Member. The Fair Market Value of all the other assets of the Company, other than its real estate, shall be determined by the certified public accountant employed by the Company applying generally accepted accounting principles. In calculating the Fair Market Value, the Company's accountant shall take into consideration all relevant discounts.

The Value of a Member's Membership Interest shall be an amount equal to the Company Value, multiplied by the Percentage Interest in the Company being purchased.

### Section 11. - Termination of a Member

The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which would terminate a Member's interest as a Member in the Company shall not dissolve the Company and shall not require the consent of the remaining Members to continue the Company.

### Section 12. - Term of the Company

The Company shall commence as of the date its Certificate of Formation is filed with the New York Secretary of State or such later date specified therein, and shall terminate upon the occurrence of any of the following events:

12.1   The mutual agreement in writing of a majority in interest of the Members on the date of such agreement to terminate;

12.2   At such earlier time as may be provided by applicable law;

12.3   The sale, disposal, conveyance or distribution of all or substantially all of the assets in which the Company shall have an interest;

12.4   The entry of a decree of judicial dissolution in accordance with the New York Act.

19

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019

NYSCEF DOC. NO.
Case 1:22-cv-02407-MKV  Document 27-18  Filed 08/30/22  Page 24 of 39
RECEIVED NYSCEF: 07/26/2019

## Section 13. - Fiscal Year and Accounting Method

For income tax purposes, the Company's fiscal year shall be as determined by the Manager, and the Company's books shall be kept on the cash or accrual method of accounting as determined by the Manager. Such method when so adopted shall be consistently followed by the Company, subject, however to the Company's right to change its method of accounting for income tax purposes as allowed by law. The accounting for Company purposes shall be made in accordance with generally accepted accounting principles.

## Section 14. - Books and Records

14.1   The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member, Manager or their duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.

14.2   The Company's books shall be closed at such intervals as the Manager shall determine but not less frequently than annually as of the end of each calendar year by the certified public accountants then regularly retained by the Company. Such certified public accountants for the Company may be changed at any time and from time to time by the Manager. Such accountants shall prepare the Federal income tax returns for the Company together with a report for each Member for Federal income tax purposes indicating the portion of each Member of the Company's profits and losses for such year. The Members shall each receive a copy of the appropriate report within a reasonable period of time after the close of each fiscal year and promptly after its receipt by the Company and approval by the Manager.

14.3   A Member or Manager of the Company shall be fully protected in relying in good faith upon the Company's records and upon such information, opinions, reports or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other Person, as to matters the Member or Manager reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

## Section 15. - Other Activities of Members

Any Member may engage in other business ventures of every nature, including, without limitation by specification, the ownership of another business similar to that

20

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-18    Filed 08/30/22    Page 25 of 39

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

operated by this Company. Neither the Company nor any of the other Members shall have any right or interest in any such independent ventures or to the income and profits derived therefrom.

### Section 16. - Resignation of a Member

Pursuant to the New York Act, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

### Section 17. - Indemnification

17.1    The Members and Manager shall not be liable to the Company or any Member or Manager for any liability, loss, damage, cost or expense which may arise out of or in connection with any act or conduct on the part of the Members or Manager without fraud or willful misconduct, including, but not limited to, the failure to perform its obligations hereunder due to restrictions or prohibitions imposed by law, rule, regulation or demand of any governmental agency, or from any other cause beyond the control of the Members or Manager.

17.2    Notwithstanding anything otherwise herein contained to the contrary, no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.

### Section 18. - Limitation on Liability

Except as otherwise provided by the New York Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member, Manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, or acting as a Manager, employee or agent of the Company. No Member shall be required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

### Section 19. - Amendment

This Agreement may be amended only by the affirmative vote of a majority in interest of the Members.

21

46067/0001-7760410v2

A-660

## Section 20. - Miscellaneous

20.1    <u>Organizational Fees</u>.  The Company shall pay all expenses incurred in the organization of the Company.

20.2    <u>Company Property</u>.  Title or interest to any or all Company property may be acquired and/or held for the Company purposes set forth in this Agreement in the Company name and/or in the name of any nominee as the Manager may designate.  The Manager shall have the right to enter into nominee agreements with any such nominee on the Company's behalf and such agreements may provide for indemnifying such nominee from all claims, damages, costs, expenses or liabilities arising therefrom other than as may be due to or result from the willful misconduct of such nominee.

20.3    <u>Notices</u>.  All notices or writings required to be given hereunder or deemed necessary or desirable by any party hereto shall be given in writing addressed to the Company at its principal business office and to each Member and Manager at the address set forth on the books and records of the Company which address may be changed by notice forwarded to the Company, in accordance herewith, and shall be delivered either: personally; by deposit in the United States Post Office Box, postage pre-paid, by certified or registered mail, return receipt requested; by a postal or private form of expedited delivery service; or by facsimile transmission.

20.4    <u>Failure of Member to Comply with Terms of this Agreement</u>.  If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that all other Members bound by this Agreement will have no adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement or to specifically enforce the provisions hereof.

20.5    <u>Failure of a Manager to Comply with Terms of this Agreement</u>.  A Manager shall not be personally liable for failure to perform in accordance with, or to comply with the terms and conditions of this Agreement or for any other reason unless such failure to perform or comply or such other reason constitutes gross negligence or willful misconduct by the Manager.

20.6    <u>Applicable Law</u>.  This Agreement shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York (without regard to its conflicts of laws provisions).  Any proceedings brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York.

20.7    <u>Severability</u>.  If any provision of this Agreement shall he declared invalid, cause the Company not to be treated for income tax purposes as a partnership, then and in

22

**A-661**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM                    INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-18    Filed 08/30/22    Page 27 of 39  RECEIVED NYSCEF: 07/26/2019

any of such events, such provision(s) shall be deemed to be invalid, and notwithstanding any such invalidity, the remaining provisions of this Agreement shall remain in full force and effect as if such invalid provisions(s) had not been a part hereof.

20.8    Benefit.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and to their respective heirs, executors, administrators and assigns; provided however, that none of the provisions of this Agreement shall be for the benefit of nor shall they be enforceable by any creditor of the Company or of any Member.

20.9    Construction.  As used in this Agreement, the masculine gender shall include the feminine or neuter gender and the neuter gender shall include the masculine or feminine gender, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

20.10  Execution.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original.  The signature by any Member on any one of the counterparts shall bind such Member at such time as each of the Members has signed and delivered to the Company at least one (1) counterpart.

20.11  Headings.  The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12  Partnership.  It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

46067/0001-7760410v2

**A-662**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 28 of 39   RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                    **MEMBERS:**

_____                    _____
                                             HAROLD PINE

_____                    _____
                                             LLOYD PINE

_____                    _____
                                             RUTH SCHNEIDER

_____                    _____
                                             SYDELL PINE

_____                    _____
                                             BRENDA ROHLMAN

_____                    _____
                                             JEROME SCHNEIDER

_____                    _____
                                             MARC SCHNEIDER

_____                    _____
                                             MARNI SCHWARTZ

24

46067/0001-7760410v2

**A-663**

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                          **MEMBERS:**

_____              _____
                                                     HAROLD PINE

_____              _____
                                                     LLOYD PINE

_____              _____
                                                     RUTH SCHNEIDER

_____              _____
                                                     SYDELL PINE

_____              _____
                                                     BRENDA ROHLMAN

_____              _____
                                                     JEROME SCHNEIDER

_____              _____
                                                     MARC SCHNEIDER

_____              _____
                                                     MARNI SCHWARTZ

24

46067/0001-7760410v2

**A-664**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 30 of 39

RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                **MEMBERS:**

_____          _____
                                            HAROLD PINE

_____          _____
                                            LLOYD PINE

_____          _____
                                            RUTH SCHNEIDER

_____          _____
                                            SYDELL PINE

_____          _____
                                            BRENDA ROHLMAN

_____          _____
                                            JEROME SCHNEIDER

_____          _____
                                            MARC SCHNEIDER

_____          _____
                                            MARNI SCHWARTZ

24

46067/0001-7760410v2

A-665

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-18    Filed 08/30/22    Page 31 of 39    RECEIVED NYSCEF: 07/26/2019

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                    **MEMBERS:**

_____          _____
                                                 HAROLD PINE

_____          _____
                                                 LLOYD PINE

_____          _____
                                                 RUTH SCHNEIDER

_____          _____
                                                 SYDELL PINE

_____          _____
                                                 BRENDA ROHLMAN

_____          _____
                                                 JEROME SCHNEIDER

_____          _____
                                                 MARC SCHNEIDER

_____          _____
                                                 MARNI SCHWARTZ

24

4606/0001-7760410v2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-18    Filed 08/30/22    Page 32 of 39    RECEIVED NYSCEF: 07/26/2019

**ATTEST:**

**MANAGER:**

PINE MANAGEMENT, INC.

By: THOMAS ROHLMAN, President

25

46067/0001-7760410v2

**A-667**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM   INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 33 of 39   RECEIVED NYSCEF: 07/26/2019

**EXHIBIT A**

**Capital Contributions and Percentage Interests**

| | Member | Initial Capital Contributions | Percentage Interests |
|---|---|---|---|
| 1. | HAROLD PINE | $ | 12% |
| 2. | LLOYD PINE | $ | 13% |
| 3. | RUTH SCHNEIDER | $ | 12% |
| 4. | SYDELL PINE | $ | 12% |
| 5. | BRENDA ROHLMAN | $ | 13% |
| 6. | JEROME SCHNEIDER | $ | 12% |
| 7. | MARC SCHNEIDER | $ | 13% |
| 8. | MARNI SCHWARTZ | $ | 13% |

A-1

A-668

**EXHIBIT B**

| Members | Membership Interest |
|---|---|
| HAROLD PINE | 12% |
| LLOYD PINE | 13% |
| RUTH SCHNEIDER | 12% |
| SYDELL PINE | 12% |
| BRENDA ROHLMAN | 13% |
| JEROME SCHNEIDER | 12% |
| MARC SCHNEIDER | 13% |
| MARNI SCHWARTZ | 13% |

B-1

46067/0001-7760410v2

A-669

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM   INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 35 of 39   RECEIVED NYSCEF: 07/26/2019

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Ruth Schneider, Sydell Pine, Brenda Rohlman, Jerome Schneider, Marc Schneider and Marni Schwartz are also set forth.

**Date**                                          **Value of Company**

                                                  $1,100,000

**WITNESS:**                                      **MEMBERS:**

_____                         _____
                                                  HAROLD PINE

_____                         _____
                                                  LLOYD PINE


_____                         _____
                                                  RUTH SCHNEIDER

_____                         _____
                                                  SYDELL PINE

_____                         _____
                                                  BRENDA ROHLMAN


_____                         _____
                                                  JEROME SCHNEIDER

C-1

46067/0001-7760410v2

**A-670**

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-18 Filed 08/30/22 Page 36 of 39
RECEIVED NYSCEF: 07/26/2019

### EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Ruth Schneider, Sydell Pine, Brenda Rohlman, Jerome Schneider, Marc Schneider and Marni Schwartz are also set forth.

Date                                          Value of Company

                                              $1,100,000

WITNESS:                                      MEMBERS:

_____                       _____
                                              HAROLD PINE

_____                       _____
                                              LLOYD PINE

_____                       _____
                                              RUTH SCHNEIDER

_____                       _____
                                              SYDELL PINE

_____                       _____
                                              BRENDA ROHLMAN

_____                       _____
                                              JEROME SCHNEIDER

C-1

46067/0001-7760410v2

**A-671**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-18    Filed 08/30/22    Page 37 of 39

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Ruth Schneider, Sydell Pine, Brenda Rohlman, Jerome Schneider, Marc Schneider and Marni Schwartz are also set forth.

<u>Date</u>

<u>Value of Company</u>

$1,100,000

**WITNESS:**

**MEMBERS:**

_____

_____
HAROLD PINE

_____

_____
LLOYD PINE

_____

_____
RUTH SCHNEIDER

_____

_____
SYDELL PINE

_____
BRENDA ROHLMAN

_____
JEROME SCHNEIDER

C-1

46067/0001-7760410v2

A-672

_____         MARC SCHNEIDER

_____         MARNI SCHWARTZ

C-2

46067/0001-7760410v2

**A-673**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-18    Filed 08/30/22    Page 39 of 39
RECEIVED NYSCEF: 07/26/2019

_____

MARNI SCHWARTZ

460670001-7760410v2

# EXHIBIT A-18

A-675

# Exhibit 18

A-676

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 3 of 38
RECEIVED NYSCEF: 07/26/2019

# AMENDMENT AND RESTATEMENT OF

## OPERATING AGREEMENT

## OF

## ZIZI REALTY LLC

### (a New York limited liability company)

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW JERSEY 07602-0800
(201) 489-3000

A-677

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 4 of 38   RECEIVED NYSCEF: 07/26/2019

## TABLE OF CONTENTS

**Page**

Section 1. - Formation and Name ................................................................ 1

Section 2. - Office ................................................................................... 1

Section 3. - Definitions ............................................................................ 2

Section 4. - Purposes .............................................................................. 4

Section 5. - Capital Contributions and Capital Accounts ............................... 4

Section 6. - Admission of Additional Members ........................................... 6

Section 7. - Allocations and Distributions .................................................. 6

Section 8. - Management .......................................................................... 9

Section 9. - Restrictions on the Transfer of a Member's Interest .................. 13

Section 10. - Determination of Value ........................................................ 18

Section 11. - Termination of a Member ..................................................... 19

Section 12. - Term of the Company .......................................................... 19

Section 13. - Fiscal Year and Accounting Method ....................................... 19

Section 14. - Books and Records .............................................................. 19

Section 15. - Other Activities of Members ................................................. 20

Section 16. - Resignation of a Member ...................................................... 20

Section 17. - Indemnification ................................................................... 20

Section 18. - Limitation on Liability ......................................................... 21

Section 19. - Amendment ........................................................................ 21

Section 20. - Miscellaneous ..................................................................... 21

i

46067/0001-6135115v5

A-678

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM    INDEX NO. 654303/2019
NYSCEF DOC. NO.    Case 1:22-cv-02407-MKV    Document 27-19    Filed 08/30/22    Page 5 of 38    RECEIVED NYSCEF: 07/26/2019

## AMENDMENT AND RESTATEMENT OF

## OPERATING AGREEMENT

## OF

## ZIZI REALTY LLC

### (a New York limited liability company)

**THIS AMENDMENT AND RESTATEMENT OF OPERATING AGREEMENT,** made as of the 1st day of November, 2012, by and between Harold Pine ("Harold"), Lloyd Pine ("Lloyd"), Brenda Rohlman ("Brenda"), Thomas Rohlman ("Thomas") and Jerome Schneider ("Jerome") (Harold, Lloyd, Brenda, Thomas and Jerome shall hereinafter, at times, be referred to collectively as the "Members" or individually as a "Member").

### W I T N E S S E T H:

**WHEREAS,** the Members of Zizi Realty LLC entered into an operating agreement, effective as of September 26, 1996, and which is binding upon the Members; and

**WHEREAS,** the Members may amend said operating agreement with the written consent of the Members including two-thirds or more of the percentage interests then held by the Members, pursuant to Section 15.4 of said operating agreement; and

**WHEREAS,** the Members desire to amend and restate said operating agreement as hereinafter provided for the purposes hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

### Section 1. - Formation and Name

The Members heretofore have associated themselves into a limited liability company pursuant to the provisions of the New York Limited Liability Company Act. The Company shall be governed by the terms and conditions set forth herein. The limited liability company's name is Zizi Realty LLC.

### Section 2. - Office

The Secretary of State is designated as agent of the Company upon whom process against it may be served. The post office address to which the Secretary of State of the

46067/0001-6135115v5

**A-679**

State of New York shall mail a copy of any process against the Company served upon him or her is c/o Pine Management, Inc., 610-618 West 164th Street, New York, NY 10025. Such office and agent may be changed, from time to time, as the Manager shall determine. The Company's principal place of business shall be located at c/o Pine Management, Inc., 610-618 West 164th Street, New York, NY 10025 and/or such other location or locations as, from time to time, the Manager shall select.

### Section 3. - Definitions

3.1 "Agreement" means this Operating Agreement, as originally executed and as amended from time to time, which supersedes any prior operating agreement, and the terms "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

3.2 "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon: (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member; (iv) the filing of a petition in an involuntary bankruptcy case, which petition remains undismissed or suspended for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

3.3 "Capital Account" means, with respect to any Member or assignee, the Capital Account maintained in accordance with the provisions set forth in Section 5.3 hereof.

3.4 "Capital Contribution" means, with respect to any Member or assignee, the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by such Member or assignee.

2

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM        INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 7 of 38   RECEIVED NYSCEF: 07/26/2019

3.5    "Class A Members" means all of the voting Members in the Company. See Exhibit B attached hereto for a list of the Company's Class A Members.

3.6    "Class B Members" means all of the non-voting Members in the Company. See Exhibit B attached hereto for a list of Company's Class B Members. The Class B Members shall have no right to vote in decisions of the Members.

3.7    "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

3.8    "Company" shall refer to Zizi Realty LLC.

3.9    "Deficit Capital Account" means with respect to any Member or assignee, the deficit balance, if any, in such Member's or assignee's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amount which such Member or assignee is obligated to restore under Regulation Section 1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the next to last sentence of Regulation Section 1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Regulation Section 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Regulation Section 1.704-2(i)(3)); and

(b)    Debit to such Capital Account the items described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The definition of Deficit Capital Account is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

3.10    "Interest" means a Member's entire interest in the Company including the Member's right to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, and the right to participate in the management of the Company's business and affairs, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the New York Act.

3.11    "Manager" or "Managers" means one or more Persons (individually and collectively) selected by the Members, to whom are delegated all or part of the management duties of the Company's business as provided in Section 8 hereof.

3.12    "New York Act" means the New York Limited Liability Company Act, as the same may be amended from time to time.

3

46067/0001-6135115v5

A-681

3.13   "Percentage Interest" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof.  Other than by application of Section 6, the Percentage Interests of the Members may not be adjusted without the unanimous consent of the Members.

3.14   "Person" means an individual, association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

3.15   "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, credit, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations.

3.16   "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## Section 4. - Purposes

The Company was originally formed for the purpose of acquiring, owning and managing the real property commonly known as 610-618 West 164th Street, New York, New York.  The character and purposes for which the Company was formed, in general, is to own, manage, acquire, invest in real estate; and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement.  The Company may also engage in such other business, activity or purpose permitted by law, as the Manager may determine.

## Section 5. - Capital Contributions and Capital Accounts

5.1   Members' Capital Contributions.  Each Member has made an initial Capital Contribution to the Company, which has been reflected in the Members' Capital Accounts.  No interest shall be paid on any initial or subsequent Capital Contribution.

5.2   Additional Contributions.  Except as set forth in Section 5.1 above, no Member shall be required to make any Capital Contributions.  In order to obtain additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of the Manager.

4

**A-682**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 9 of 38   RECEIVED NYSCEF: 07/26/2019

5.3   <u>Capital Accounts</u>.  A separate Capital Account will be maintained for each Member.

(a)   Each Member's Capital Account will be increased by:

(i)   The amount of money contributed by the Member to the Company;

(ii)   The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

(iii)   Allocations to the Member of Profits; and

(iv)   Allocations to the Member of income or gain as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(b)   Each Member's Capital Account will be decreased by:

(i)   The amount of money distributed to the Member by the Company;

(ii)   The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code);

(iii)   Allocations to the Member of Losses; and

(iv)   Allocations to the Member of deduction or expense as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(c)   In the event of a permitted sale or exchange of an Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Regulation Section 1.704-1(b)(2)(iv).

(d)   The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder.  If in the Manager's opinion, the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 5.3 should be modified to comply with Section

5

**A-683**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 10 of 38
RECEIVED NYSCEF: 07/26/2019

704(b) of the Code and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, than any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(e)   Except as otherwise required in the New York Act (and subject to Sections 5.1 and 5.2 above), no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

5.4   <u>Withdrawal or Reduction of Members' Contributions to Capital</u>.  A Member shall not receive any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains Company property sufficient to pay them, as determined by the Manager in its sole discretion.  A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

5.5   <u>Advances by the Members</u>.  A Member may from time to time, with the consent of the Manager, advance additional monies to or for the Company's benefit, and each such advance shall be treated as a Capital Contribution to the Company or as a loan to the Company, as determined by the Manager.  Any advance which is treated as a loan shall be evidenced by a promissory note executed and delivered by the Company to the Member.

5.6   <u>Transactions Between Member and/or Manager and the Company</u>.  Except as otherwise provided in this Agreement, a Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide collateral for, and transact other business with the Company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager as set forth in the New York Act.

### Section 6. - Admission of Additional Members

Additional Members may be admitted to the Company upon the affirmative vote of a majority in interest of the Class A Members.  Such new Members shall be allocated Profit and Loss by such method as may be provided in this Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

### Section 7. - Allocations and Distributions

7.1   <u>Allocations of Profits and Losses</u>.  Profits and Losses for any fiscal year shall be allocated to the Members in proportion to their Percentage Interests.

6

46057/0001-6135115v5

**A-684**
FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-19    Filed 08/30/22    Page 11 of 38    RECEIVED NYSCEF: 07/26/2019

     7.2    <u>Special Allocations</u>.  Notwithstanding the provisions of Section 7.1:

     (a)    <u>Minimum Gain</u>.  Notwithstanding any other provision of this Section 7.2, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain.  This Section 7.2(a) is intended to comply with the minimum gain chargeback requirement of Regulation Section 1.704-2 and shall be interpreted consistently therewith.  If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

     (b)    <u>Qualified Income Offset</u>.  If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)*(d)(4), (5)* or *(6),* which create or increase a Deficit Capital Account of the Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible.  It is the intent that this Section 7.2(b) be interpreted to comply with the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)*(d)*.

     (c)    <u>Deficit Balance</u>.  If any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that the Member is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)*(c)* and the Member's share of minimum gain as defined in Regulation Section 1.704-2(g)(1) (which is also treated as an obligation to restore in accordance with Regulation Section 1.704-1(b)(2)(ii)*(d)*), the Capital Account of the Member shall be specially credited with items of Company income (including gross income) and gain in the amount of the excess as quickly as possible.

     (d)    <u>Nonrecourse Deductions</u>.  Items of Losses, deduction, and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Regulation Section 1.704-2(i) shall be allocated to the Members' Capital Accounts in accordance with said Regulation Section 1.704-2(i).  Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Regulation Section 1.704-2(b)) those deductions shall be allocated to the

46067/0001-6135115v5

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 12 of 38

Members in accordance with, and as a part of, the allocations of Company Profit or Loss for that period.

(e)      Section 704(c).  In accordance with Section 704(c)(1)(A) of the Code and Regulation Section 1.704-1(b)(2)(iv)(d)(3), if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for the property shall, solely for Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

(f)      Curative Allocations.  Any credit or charge to the Members' Capital Accounts pursuant to Sections 7.2(a) through 7.2(d) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 7.1 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 7.1 and 7.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Section 7 if the special allocations required by Sections 7.2(a) through 7.2(d) had not occurred.

7.3      Distributions.

(a)      The Company shall make distributions to the Members (other than upon liquidation) according to their respective Percentage Interests in the Company at such times as the Manager shall determine.  Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation).  The Company may offset damages for breach of this Agreement by a Member whose interest is liquidated (either upon the withdrawal of a Member or the liquidation of the Company) against the amount otherwise distributable to the Member.  Upon the Company's liquidation, the Company's assets shall be distributed in the following order of priority:

(i)      The claims of creditors, other than Members, first shall be satisfied and adequate reserves established (as determined by the Manager);

(ii)      All outstanding loans from Members shall be repaid in the same proportion which the outstanding loans from any Member shall bear to the outstanding loans of all Members;

(iii)      The Members shall receive the balance in proportion to their relative Capital Accounts determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.

8

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM     INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 13 of 38 RECEIVED NYSCEF: 07/26/2019

(b)   The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the Company's assets, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

(c)   Subject to the terms and conditions of Section 7.3(d), a Member who receives a distribution in violation of Section 7.3(b), and who knew at the time of the distribution that the distribution violated Section 7.3(b), shall be liable to the Company for the amount of the distribution.  A Member who receives a distribution in violation of Section 7.3(b), and who did not know at the time of the distribution that the distribution violated Section 7.3(b), shall not be liable for the amount of the distribution.

(d)   Unless otherwise agreed upon by the Manager, a Member who receives a distribution from the Company in violation of Section 7.3(b) shall have no liability under the New York Act or other applicable law for the amount of the distribution after the expiration of three (3) years from the date of the distribution unless an action to recover the distribution from the Member is commenced prior to the expiration of the three (3) year period and an adjudication of liability against the Member is made in the said action.

### Section 8. - Management

8.1   Management.

(a)   The Company's business and affairs shall be managed by the Manager.  The Manager shall participate in the direction, management and control of the Company's business to the best of its ability.

(b)   If there is more than one (1) Manager designated to serve hereunder, the Managers shall in all cases act as a group, with a majority vote of the Managers required to take action.  Each Manager shall have one (1) vote.

(c)   The Company's Manager shall be Pine Management, Inc.  Pine Management, Inc. may be paid for services rendered in its role as property manager pursuant to a separate agreement with the Company.

(d)   Except as expressly provided in this Agreement, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

9

46067/0001-6135115v5

A-687

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-19 Filed 08/30/22 Page 14 of 38 RECEIVED NYSCEF: 07/26/2019

8.2     <u>Number, Tenure and Qualifications</u>.  The number of Managers of the Company shall be fixed from time to time by the affirmative vote of a majority in interest of the Class A Members, but in no instance shall there be less than one (1) Manager.  Each Manager shall hold office until his or her successor shall have been elected and qualified.  Managers shall be elected by the affirmative vote of a majority in interest of the Class A Members.  Managers need not be residents of the State of New York or Members of the Company.

8.3     <u>Certain Powers of Managers</u>.  Without limiting the generality of Section 8.1, the Manager shall have power and authority, on the Company's behalf:

(a)     To acquire personal property for use in the ordinary course of the Company's business from any Person as the Manager may determine.  The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

(b)     To purchase liability and other insurance to protect the Company property and the Company's business;

(c)     To hold and own any Company real and/or personal properties in the Company's name;

(d)     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(e)     To execute on the Company's behalf all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the Manager's opinion, to the Company's business;

(f)     To employ accountants, legal counsel, or other experts to perform services for the Company and to compensate them from Company funds;

(g)     To enter into any and all other agreements on the Company's behalf, with any other Person that are necessary or appropriate to the conduct of the Company's business and which are upon customary terms and conditions; and

(h)     To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

The Manager shall be responsible for supervision and general management of the business and day-to-day operations of the Company in the ordinary course of business;

10

A-688

provided, however, that decisions which are outside the ordinary course of business, including but not limited to decisions to finance or refinance any real estate owned by the Company, acquire new or additional real estate, or sell any real estate owned by the Company, shall be made by the affirmative vote of a majority in interest of the Class A Members.

8.4     Liability for Certain Acts.  The Manager shall exercise its business judgment in participating in the management of the Company's business, operations and affairs.  Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by the Manager in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members.  The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company's operations.  The Manager shall not be responsible to any Members because of a loss of their investments or a loss in operations, unless the loss shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager proved as set forth in this Section 8.4.  Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

8.5     The Manager Has No Exclusive Duty to Company.  The Manager shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

8.6     Bank Accounts.  The Manager may open bank accounts in the Company's name.  The Company's funds shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager.  The Manager shall use such funds solely for the Company's business.  Funds shall be withdrawn from the Company's bank accounts only upon a Manager's signature.

8.7     Resignation.  A Manager may resign at any time by giving written notice to the Members.  A Manager's resignation shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

8.8     Removal.  Any Manager may be removed at any time, with or without cause, by the affirmative vote of a majority in interest of the Class A Members.

11

**A-689**

8.9     Vacancies.  Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of a majority in interest of the Class A Members. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of a majority in interest of the Class A Members. A Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until its earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next meeting of Members and until its successor shall be elected and shall qualify, or until his or her earlier death, resignation or removal.

8.10     Compensation.  The guaranteed payments and other compensation of the Manager, if any, shall be paid in such manner as shall be fixed from time to time by the affirmative vote of a majority in interest of the Class A Members, and no Manager shall be prevented from receiving any such compensation, if any, by reason of the fact that he or she is also a Member of the Company.

8.11     Manager's Representations.  Every contract, deed, mortgage, lease and other instrument executed by any Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof:  (i) the Company was in existence; (ii) neither this Agreement nor the Certificate of Formation had been amended in any manner so as to restrict the delegation of authority to the Manager; and (iii) the execution and delivery of such instrument was duly authorized by the Manager. Any Person may always rely on a certificate addressed to him or her and signed by a Manager:

(a)     as to who are the Members and Manager hereunder;

(b)     as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or Manager or in any other manner germane to the Company's affairs;

(c)     as to who is authorized to execute and deliver any instrument or document of the Company;

(d)     as to the authenticity of any copy of the Certificate of Formation, this Agreement, amendments thereto and any other document relating to the conduct of the Company's affairs; or

(e)     as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Manager or any Member in the capacity as a Member or Manager of the Company.

12

**A-690**

8.12    Limitations on Members.

(a)    Except as is expressly provided in this Section, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

(b)    Unless authorized to do so by this Agreement or by the Manager, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

## Section 9. - Restrictions on the Transfer of a Member's Interest

9.1    Lifetime Restrictions on Transfers.  Except as otherwise provided herein, a Member shall not sell, transfer, pledge, encumber or otherwise dispose of all or any part of his or her Interest to any Person other than a Permitted Transferee, as hereinafter defined, unless the Member desiring to make the transfer or encumbrance (hereinafter referred to as the "Selling Member") shall have first made the offer to sell to the Company and the remaining Members and such offer shall not have been accepted.

(a)    Notice of Offer.  The offer which shall be given to the Company and the remaining Members and shall consist of an offer to sell all of the Interest owned by the Selling Member, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lienor, the Percentage Interest involved in any such proposed transfer or encumbrance, and the price and terms of any such transfer or encumbrance ("Bona Fide Offer"), in accordance with the provisions of Section 9.1(b) hereof.

(b)    Bona Fide Third Party Offer.  If the Selling Member has received a bona fide written offer to purchase all of his or her Interest in the Company which he or she wishes to accept, or a bona fide written offer to receive a loan or an advance of money, which loan or advance involves an encumbrance upon said Interest to secure the loan or advance as referred to in Section 9.1(a) above, the Selling Member shall submit to the Company and the remaining Members, within fourteen (14) days after receipt of such Bona Fide Offer, a written notice including a copy of such Bona Fide Offer, as required under Section 9.1(a) above, together with the name and address of the principal or principals if the offer is made through an agent (hereinafter collectively referred to as the "Bona Fide Offerors"), and sufficient facts concerning the Bona Fide Offerors to enable the Company and the remaining Members to arrive at an informed judgment as to the bona fides of such offer.  The Selling Member shall then offer, or be deemed to have offered, in writing to sell to the Company all of the Interest in the Company held by the Selling Member for an amount equal to the lesser of:  (i) fifty (50%) percent of the Value of the Selling Member's Interest, which is determined under Section 10 hereof; or (ii) the purchase price set forth in the Bona Fide Offer, or, if an encumbrance, the lesser of the

13

A-691

amount set forth in item (i) above and the amount of the debt involved in such encumbrance (the lesser of (i) and (ii) shall be referred to as the "Lifetime Purchase Price"), and upon the terms and conditions as hereinafter set forth; provided, however, that the Selling Member has complied with all of the procedural conditions hereof. Within thirty (30) days after receipt by the Company of the Bona Fide Offer, the Company may elect to purchase all of the Selling Member's Interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price. If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the receipt by the Company of the Bona Fide Offer, elect to purchase all of the Selling Member's interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price, and upon the terms and conditions as hereinafter set forth. The remaining Members shall purchase the Selling Member's Interest in relative proportion to their ownership of Interests in the Company; provided, however, that the remaining Members may arrange among themselves for the purchase of the Selling Member's Interest in proportions which differ from the proportions of their respective holdings.

A potential purchaser or purchasers shall exercise its or their election to purchase by giving written notice thereof to the Selling Member and the other potential purchasers upon the terms and conditions as hereinafter set forth.

(c)    Terms of Payment. If the Company or the remaining Members exercises its or their right to purchase the Interest of the Selling Member in accordance with the terms of Section 9.1(b) hereof, then the purchaser(s) shall pay the Lifetime Purchase Price either: (i) in accordance with the terms and conditions set forth in the Bona Fide Offer; or (ii) by executing and delivering a negotiable promissory note or notes (in a form mutually acceptable by the purchaser(s) and the Selling Member) made payable to the order of the Selling Member, whichever the purchaser(s) chooses. Said promissory note(s) shall require successive equal monthly installments over a period of ten (10) years, with interest being imposed at the annual rate equal to the lowest rate of interest which allows for the avoidance of any imputed or unstated interest for Federal income tax purposes existing at and fixed as of the date of closing (the "Installment Method"). The first monthly installment shall be due at the time of closing with one hundred nineteen (119) additional monthly payments being made thereafter on the monthly anniversary date of the first payment until said obligation has been paid in full. The promissory note shall provide for acceleration of any unpaid balance, together with all accrued interest, upon written notice to the purchaser(s) of a default in the payment of any one (1) monthly installment, which default remains uncured for a period of thirty (30) days after receipt of such notice. The promissory note shall provide for the unrestricted right to prepay all or any part of the unpaid balance, without premium or penalty, and with interest only to the date of prepayment.

(d)    Release from Restriction. If the offer to sell as provided for in Section 9.1(b) is not accepted by the Company or the remaining Members as set forth

14

**A-692**

INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV    Document 27-19    Filed 08/30/22    Page 19 of 38
RECEIVED NYSCEF: 07/26/2019

herein, the Selling Member may make a bona fide transfer or encumbrance to the prospective purchaser or lienor named in the statement attached to the Bona Fide Offer, with such sale or encumbrance to be made only in strict accordance with the terms therein stated. The Company and the remaining Members shall be given full access to all closing documents relating to such sale or encumbrance to the Bona Fide Offerors, so that adherence to the terms and conditions of the Bona Fide Offer can be demonstrated. However, if the Selling Member shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the election to purchase by the Company and the remaining Members in accordance with this Section, or if there is any modification in price or any of the terms and conditions of the Bona Fide Offer, such Interest shall again become subject to all the restrictions of this Agreement, and the Selling Member shall not have the right to complete the proposed sale or encumbrance without again offering the Interest, in writing, anew to the Company pursuant to the procedures set forth in this Section. Notwithstanding anything in this Agreement to the contrary, all Interests purchased by the Bona Fide Offerors from a Selling Member shall be acquired subject to the terms and conditions of this Agreement and the Bona Fide Offerors shall not sell, assign, pledge, encumber, hypothecate, mortgage, or in any other manner transfer the whole or any part of the Interest purchased, or any other Interest thereafter held or owned, without the prior written consent of the Company, except as specifically provided in this Agreement. It shall be the affirmative obligation of the Selling Member to notify the Bona Fide Offerors that the Interest proposed to be sold by the Selling Member and purchased by the Bona Fide Offerors will remain subject to the terms and provisions of this Agreement following the proposed sale and purchase.

9.2    Sale in Violation of Agreement. In the event of any attempted sale, assignment, transfer, hypothecation, pledge, encumbrance or disposition ("Attempted Transfer") of the Interest of a Member, not in accordance with the terms of this Agreement, such Attempted Transfer shall be deemed to be an offer by such Member to sell his or her Interest pursuant to Section 9.1(b) hereof, to be deemed made as of the date of discovery of such Attempted Transfer, and at a price equal to the lesser of: (i) fifty (50%) percent of the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Attempted Transfer. The payment terms shall be in accordance with the Installment Method or such Attempted Transfer, whichever the purchaser chooses.

9.3    Involuntary Transfers. In the event of any involuntary transfer ("Involuntary Transfer") or attempted involuntary transfer ("Attempted Involuntary Transfer") of an Interest owned by a Member due to certain events, including, but not limited to, a Member's bankruptcy or divorce, such Member shall be deemed to have made an offer to sell his or her Interest as of the date of discovery of such Involuntary Transfer or Attempted Involuntary Transfer, pursuant to Section 9.1(b) hereof, and at a price equal to the lesser of: (i) fifty (50%) percent of the Value of the Member's Interest

15

46067/0001-6135115v5

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 20 of 38

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Involuntary Transfer or Attempted Involuntary Transfer. The payment terms shall be in accordance with the Installment Method, such Involuntary Transfer or Attempted Involuntary Transfer, whichever the purchaser chooses.

9.4    Consent Required for Transfer and Assignment of a Member's Interest. Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, pledge, encumber or in any way alienate all or any part of his or her interest in the Company as a Member except with the prior written consent of a majority in interest of the Class A Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the New York Act), as the non-transferring Class A Members may determine in their sole discretion. Transfers in violation of this Section 9.4 shall only be effective to the extent set forth in Section 9.7.

9.5    Further Restrictions on Transfer. No Member shall assign, convey, sell, encumber or in any way alienate all or any part of his or her Interest in the Company if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the Company's termination under Section 708 of the Code.

9.6    Substitute Members. An Assignee shall have the right to become a Substitute Member if: (i) the requirements of Sections 9.4 and 9.5 are met; (ii) such Person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (iii) such Person pays any reasonable expenses in connection with its admission as a Substitute Member.

9.7    Effect of Transfer.

(a)    Any permitted transfer of all or any portion of a Member's Interest in the Company shall take effect on the date of transfer.

(b)    Any Assignee of an Interest in the Company shall take subject to the restrictions on transfer imposed by this Agreement.

(c)    Upon any transfer of a Member's Interest in the Company, unless the Assignee is admitted as a Substituted Member pursuant to Section 9.6 herein, the Assignee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but shall only be entitled to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, to which the transferor was entitled, and the extent transferred.

(d)    A Member ceases to be a Member and to have the power to exercise any rights or powers of a Member upon the assignment of all of its Interest.

16

**A-694**

     9.8    Permitted Transferees.  Notwithstanding any other provisions of this Agreement (including Section 6) , each Member, during his or her lifetime or upon his or her death, may give, sell, or otherwise assign all or any part of his, her or its Membership Interest to the following, which shall be referred to as the "Permitted Transferees":

     (a)    any descendent or ascendant of any Member by inter vivos or testamentary transfer;

     (b)    another Member;

     (c)    a Member's spouse, or a trust for the primary benefit of a Member's spouse;

     (d)    a custodian or guardian of a minor descendent;

     (e)    a trust of which all of the primary beneficiaries are Members or Permitted Transferees;

     (f)    a beneficiary of a trust that is also a Member; and/or

     (g)    a legal entity controlled and managed by Members or Permitted Transferees.

     9.9    Death of a Member.

     (a)    Except as otherwise provided herein, upon the death of a Member (the "Decedent"), the Company may elect to purchase all of the Decedent's Interest from the legal representatives of the Decedent's estate (except to the extent the Decedent's Interest passes to a Permitted Transferee, as defined hereinafter in Section 9.8), in which event the legal representatives of the Decedent's estate shall then be obligated to sell the Decedent's Interest to the Company, at a purchase price equal to Fifty (50%) percent of the Value of the Decedent's Interest, as determined under Section 10 hereof (the "Death Purchase Price"), and upon the terms and conditions set forth herein.  The Company shall notify, in writing, the legal representatives of the Decedent's estate of its acceptance or rejection to purchase all of the Decedent's Interest within thirty (30) days after the appointment of the legal representatives of the Decedent's estate, provided that a failure to notify said legal representatives of its acceptance within said thirty (30) days shall constitute an election not to purchase all of the Decedent's Interest.  The notice shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance.  If such offer is not accepted by the Company, the remaining Members may, within forty-five (45) days after the appointment of the legal representatives of the Decedent's estate, elect to purchase the Decedent's interest which does not pass to a Permitted Transferee, for the Death Purchase Price and upon the terms and conditions as hereinafter set forth.

46067/0001-6135115v5

**A-695**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 22 of 38   RECEIVED NYSCEF: 07/26/2019

(b)    The closing of the purchase and sale of the Decedent's Interest to the Company or the remaining Members shall take place at the Company's principal office, or at such other place as agreed to by the parties on a date mutually agreed to by said parties which shall be within one hundred twenty (120) days following the qualification of the legal representatives of the Decedent's estate.

(c)    At the closing, the Company or the remaining Members shall execute a promissory note made payable to the legal representatives of the Decedent's estate for the Death Purchase Price.  The terms of the promissory note shall be in accordance with the Installment Method as set forth in Section 9.1(c) herein.

### Section 10. – Determination of Value

Upon any sale of a Member's Interest pursuant to this Agreement, the total value of the Company ("Company Value") shall be the last dated amount set forth on the Certificate of Agreed Value, attached hereto as Exhibit C and made a part hereof, executed by the Class A Members.  The Class A Members shall exercise best efforts to meet not less than once per year for the purpose of considering a new Value but their failure to meet or to determine a Value shall not invalidate the most recently executed Certificate of Agreed Value setting forth the Value then in effect.  If the Class A Members fail to agree on a revaluation as described above for more than two (2) years, the Value shall be the then Fair Market Value of the Company, as hereinafter defined. For purposes of this Agreement, the "Fair Market Value of the Company" shall be the fair market value of the Company assets, less Company liabilities.  The Fair Market Value of the Company's real estate shall be determined by an MAI appraisal selected by the Company.  If the Selling Member disputes such appraisal, such party shall obtain an MAI appraisal, and the average of the two (2) MAI appraisals shall determine the Fair Market Value; provided, however, that the higher value is within ten (10%) percent of the lower value.  If such values are not within ten (10%) percent of each other, then the two (2) MAI appraisers shall select a third MAI appraiser, whose valuation shall be final and binding.  The Company shall pay for its appraiser, the Selling Member shall pay for its appraiser, and the third appraiser, if any, shall be paid fifty (50%) percent by the Company and fifty (50%) percent by the Selling Member.  The Fair Market Value of all the other assets of the Company, other than its real estate, shall be determined by the certified public accountant employed by the Company applying generally accepted accounting principles.  In calculating the Fair Market Value, the Company's accountant shall take into consideration all relevant discounts.

The Value of a Member's Membership Interest shall be an amount equal to the Company Value, multiplied by the Percentage Interest in the Company being purchased.

A-696

## Section 11. – Termination of a Member

The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which would terminate a Member's interest as a Member in the Company shall not dissolve the Company and shall not require the consent of the remaining Members to continue the Company.

## Section 12. – Term of the Company

The Company shall commence as of the date its Certificate of Formation is filed with the New York Secretary of State or such later date specified therein, and shall terminate upon the occurrence of any of the following events:

12.1   The mutual agreement in writing of a majority in interest of the Class A Members on the date of such agreement to terminate;

12.2   At such earlier time as may be provided by applicable law;

12.3   The sale, disposal, conveyance or distribution of all or substantially all of the assets in which the Company shall have an interest;

12.4   The entry of a decree of judicial dissolution in accordance with the New York Act.

## Section 13. – Fiscal Year and Accounting Method

For income tax purposes, the Company's fiscal year shall be as determined by the Manager, and the Company's books shall be kept on the cash or accrual method of accounting as determined by the Manager.  Such method when so adopted shall be consistently followed by the Company, subject, however to the Company's right to change its method of accounting for income tax purposes as allowed by law.  The accounting for Company purposes shall be made in accordance with generally accepted accounting principles.

## Section 14. – Books and Records

14.1   The Manager shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office.  Each Member, Manager or their duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.

14.2   The Company's books shall be closed at such intervals as the Manager shall determine but not less frequently than annually as of the end of each calendar year by the

19

A-697

certified public accountants then regularly retained by the Company. Such certified public accountants for the Company may be changed at any time and from time to time by the Manager. Such accountants shall prepare the Federal income tax returns for the Company together with a report for each Member for Federal income tax purposes indicating the portion of each Member of the Company's profits and losses for such year. The Members shall each receive a copy of the appropriate report within a reasonable period of time after the close of each fiscal year and promptly after its receipt by the Company and approval by the Manager.

14.3    A Member or Manager of the Company shall be fully protected in relying in good faith upon the Company's records and upon such information, opinions, reports or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other Person, as to matters the Member or Manager reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

## Section 15. - Other Activities of Members

Any Member may engage in other business ventures of every nature, including, without limitation by specification, the ownership of another business similar to that operated by this Company. Neither the Company nor any of the other Members shall have any right or interest in any such independent ventures or to the income and profits derived therefrom.

## Section 16. - Resignation of a Member

Pursuant to the New York Act, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

## Section 17. - Indemnification

17.1    The Members and Manager shall not be liable to the Company or any Member or Manager for any liability, loss, damage, cost or expense which may arise out of or in connection with any act or conduct on the part of the Members or Manager without fraud or willful misconduct, including, but not limited to, the failure to perform its obligations hereunder due to restrictions or prohibitions imposed by law, rule, regulation or demand of any governmental agency, or from any other cause beyond the control of the Members or Manager.

46067/0001-6135115v5

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-19 Filed 08/30/22 Page 25 of 38 RECEIVED NYSCEF: 07/26/2019

17.2    Notwithstanding anything otherwise herein contained to the contrary, no provision set forth in this Agreement shall negate the fiduciary obligation and duty owed by the Manager to the Members.

## Section 18. – Limitation on Liability

Except as otherwise provided by the New York Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member, Manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, or acting as a Manager, employee or agent of the Company. No Member shall be required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

## Section 19. – Amendment

This Agreement may be amended only by the affirmative vote of a majority in interest of the Class A Members.

## Section 20. – Miscellaneous

20.1    <u>Organizational Fees</u>. The Company shall pay all expenses incurred in the organization of the Company.

20.2    <u>Company Property</u>. Title or interest to any or all Company property may be acquired and/or held for the Company purposes set forth in this Agreement in the Company name and/or in the name of any nominee as the Manager may designate. The Manager shall have the right to enter into nominee agreements with any such nominee on the Company's behalf and such agreements may provide for indemnifying such nominee from all claims, damages, costs, expenses or liabilities arising therefrom other than as may be due to or result from the willful misconduct of such nominee.

20.3    <u>Notices</u>. All notices or writings required to be given hereunder or deemed necessary or desirable by any party hereto shall be given in writing addressed to the Company at its principal business office and to each Member and Manager at the address set forth on the books and records of the Company which address may be changed by notice forwarded to the Company, in accordance herewith, and shall be delivered either: personally; by deposit in the United States Post Office Box, postage pre-paid, by certified

46067/0001-6135115v5

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO.   Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 26 of 38   RECEIVED NYSCEF: 07/26/2019

or registered mail, return receipt requested; by a postal or private form of expedited delivery service; or by facsimile transmission.

20.4   Failure of Member to Comply with Terms of this Agreement.  If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that all other Members bound by this Agreement will have no adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement or to specifically enforce the provisions hereof.

20.5   Failure of a Manager to Comply with Terms of this Agreement.  A Manager shall not be personally liable for failure to perform in accordance with, or to comply with the terms and conditions of this Agreement or for any other reason unless such failure to perform or comply or such other reason constitutes gross negligence or willful misconduct by the Manager.

20.6   Applicable Law.  This Agreement shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York (without regard to its conflicts of laws provisions).  Any proceedings brought by any Member relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York.

20.7   Severability.  If any provision of this Agreement shall be declared invalid, cause the Company not to be treated for income tax purposes as a partnership, then and in any of such events, such provision(s) shall be deemed to be invalid, and notwithstanding any such invalidity, the remaining provisions of this Agreement shall remain in full force and effect as if such invalid provisions(s) had not been a part hereof.

20.8   Benefit.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and to their respective heirs, executors, administrators and assigns; provided however, that none of the provisions of this Agreement shall be for the benefit of nor shall they be enforceable by any creditor of the Company or of any Member.

20.9   Construction.  As used in this Agreement, the masculine gender shall include the feminine or neuter gender and the neuter gender shall include the masculine or feminine gender, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

20.10   Execution.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original.  The signature by any Member on any one of the counterparts shall bind such Member at such time as each of the Members has signed and delivered to the Company at least one (1) counterpart.

A-700

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

20.11 <u>Headings</u>.  The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12 <u>Partnership</u>.  It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                           **MEMBERS:**

_____                          _____
                                                                  HAROLD PINE

_____                          _____
                                                                  LLOYD PINE

_____                          _____
                                                                  BRENDA ROHLMAN

_____                          _____
                                                                  THOMAS ROHLMAN

_____                          _____
                                                                  JEROME SCHNEIDER

**ATTEST:**                                            **MANAGER:**

                                                                  PINE MANAGEMENT, INC.

_____                          _____
                                                                  By:  THOMAS ROHLMAN, President

23

46067/0001-6135115v5

**A-701**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
INDEX NO. 654303/2019
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-19 Filed 08/30/22 Page 28 of 38 RECEIVED NYSCEF: 07/26/2019
p.1

Dec 01 12 06:53a
ColeSchotz-NJ          11/30/2012 10:43:47 AM  PAGE  2/006  Fax Server

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

WITNESS:                          MEMBERS:

Antoinette Anderio    Harold Pine
                                  HAROLD PINE

                                  JEROME SCHNEIDER

                                  LLOYD PINE

                                  BRENDA ROHLMAN

                                  THOMAS ROHLMAN

                                  MANAGER:

                                  THOMAS ROHLMAN

24

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM INDEX NO. 654303/2019

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-19 Filed 08/30/22 Page 29 of 38 RECEIVED NYSCEF: 07/26/2019

20.11 <u>Headings</u>. The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12 <u>Partnership</u>. It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                              **MEMBERS:**

_____              _____
                                                              HAROLD PINE

_____              _____
                                                              LLOYD PINE

_____              _____
                                                              BRENDA ROHLMAN

_____              _____
                                                              THOMAS ROHLMAN

_____              _____
                                                              JEROME SCHNEIDER

**ATTEST:**                                                **MANAGER:**

                                                              PINE MANAGEMENT, INC.

_____              _____
                                                              By: THOMAS ROHLMAN, President

23

46067/0001-6135115v5

**A-703**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM
NYSCEF DOC. NO. Case 1:22-cv-02407-MKV Document 27-19 Filed 08/30/22 Page 30 of 38

INDEX NO. 654303/2019
RECEIVED NYSCEF: 07/26/2019

20.11 <u>Headings</u>. The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12 <u>Partnership</u>. It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**          **MEMBERS:**

_____     _____
                                     HAROLD PINE

_____     _____
                                     LLOYD PINE

_____     _____
                                     BRENDA ROHLMAN

_____     _____
                                     THOMAS ROHLMAN

_____     _____
                                     JEROME SCHNEIDER

**ATTEST:**          **MANAGER:**

                                     PINE MANAGEMENT, INC.

_____     _____
                                 By: THOMAS ROHLMAN, President

23

46067/0001-6135115v5

A-704

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 12

Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 31 of 38

SCHNEIDER

RECEIVED NYSCEF: 07/26/2019

20.11 Headings. The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

20.12 Partnership. It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

**IN WITNESS WHEREOF,** the Members and Manager have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

**WITNESS:**                                    **MEMBERS:**

_____          _____
                                                HAROLD PINE

_____          _____
                                                LLOYD PINE

_____          _____
                                                BRENDA ROHLMAN

_____          _____
                                                THOMAS ROHLMAN

_____          _____
                                                JEROME SCHNEIDER

**ATTEST:**                                     **MANAGER:**

                                                PINE MANAGEMENT, INC.

_____          _____
                                                By:  THOMAS ROHLMAN, President

23

**A-705**

Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 32 of 38

## EXHIBIT A

### Capital Contributions and Percentage Interests

| | Member | Initial Capital Contributions | Percentage Interests |
|---|---|---|---|
| 1. | HAROLD PINE | $ | 30% |
| 2. | LLOYD PINE | $ | 30% |
| 3. | BRENDA ROHLMAN | $ | 5% |
| 4. | THOMAS ROHLMAN | $ | 5% |
| 5. | JEROME SCHNEIDER | $ | 30% |

A-1

A-706

### EXHIBIT B

| Class A Members | Membership Interest |
|---|---|
| HAROLD PINE | 0.3% |
| LLOYD PINE | 0.3% |
| BRENDA ROHLMAN | 0.05% |
| THOMAS ROHLMAN | 0.05% |
| JEROME SCHNEIDER | 0.3% |

| Class B Members | Membership Interest |
|---|---|
| HAROLD PINE | 29.7% |
| LLOYD PINE | 29.7% |
| BRENDA ROHLMAN | 4.95% |
| THOMAS ROHLMAN | 4.95% |
| JEROME SCHNEIDER | 29.7% |

B-1

**A-707**

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Brenda Rohlman, Thomas Rohlman and Jerome Schneider are also set forth.

<u>Date</u>                                                            <u>Value of Company</u>

$6,000,000

**WITNESS:**                                                **CLASS A MEMBERS:**

_____                 _____
                                                              HAROLD PINE

_____                 _____
                                                              LLOYD PINE

_____                 _____
                                                              BRENDA ROHLMAN

_____                 _____
                                                              THOMAS ROHLMAN

_____                 _____
                                                              JEROME SCHNEIDER

2

**A-708**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. Case 1:22-cv-02407-MKV   Document 27-19   Filed 08/30/22   Page 35 of 38

INDEX NO. 654303/2019

RECEIVED NYSCEF: 07/26/2019

Dec 01 12 06:53a

ColeSchotz-NJ        11/30/2012 10:43:47 AM   PAGE   3/006   Fax Server

p.2

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Jerome Schneider, Lloyd Pine, Brenda Rohlman and Thomas Rohlman are also set forth.

| Date | Value of Company |
|------|------------------|
|      | $ 6,000,000      |

WITNESS:                         MEMBERS:

_____          _____
                                 HAROLD PINE

_____          _____
                                 JEROME SCHNEIDER

_____          _____
                                 LLOYD PINE

_____          _____
                                 BRENDA ROHLMAN

_____          _____
                                 THOMAS ROHLMAN

27

46067/0001-61351 15v3

**A-709**

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Brenda Rohlman, Thomas Rohlman and Jerome Schneider are also set forth.

Date                                    Value of Company

                                         $6,000,000

WITNESS:                                 CLASS A MEMBERS:

_____                  _____
                                         HAROLD PINE

_____                  _____
                                         LLOYD PINE

_____                  _____
                                         BRENDA ROHLMAN

_____                  _____
                                         THOMAS ROHLMAN

_____                  _____
                                         JEROME SCHNEIDER

2

**A-710**

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3    Case 1:22-cv-02407-MKV    Document 27-19    Filed 08/30/22    Page 37 of 38

RECEIVED NYSCEF: 07/26/2019

## EXHIBIT C

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Brenda Rohlman, Thomas Rohlman and Jerome Schneider are also set forth.

Date                                        Value of Company

                                            $6,000,000

WITNESS:                                    CLASS A MEMBERS:

_____                         _____
                                            HAROLD PINE

_____                         _____
                                            LLOYD PINE

_____                         _____
                                            BRENDA ROHLMAN

_____                         _____
                                            THOMAS ROHLMAN

_____                         _____
                                            JEROME SCHNEIDER

2

46067/0001-6135115v5

**A-711**

Case 1:22-cv-02407-MKV   Document 27-18   Filed 08/30/22   Page 38 of 38
SCHNEIDER     PAGE 072

**EXHIBIT C**

**Certificate Of Agreed Value**

        Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit C, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Harold Pine, Lloyd Pine, Brenda Rohlman, Thomas Rohlman and Jerome Schneider are also set forth.

<u>Date</u>                         <u>Value of Company</u>

                               $6,000,000

**WITNESS:**                    **CLASS A MEMBERS:**

_____         _____
                                       HAROLD PINE

_____         _____
                                       LLOYD PINE

_____         _____
                                       BRENDA ROHLMAN

_____         THOMAS ROHLMAN
                                       _____
                                       JEROME SCHNEIDER

2

# EXHIBIT A-19

A-713

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM          INDEX NO. 654303/2019
NYSCEF DOC. NO. 3   Case 1:22-cv-02407-MKV   Document 27-20   Filed 08/30/22   Page 2 of 4   RECEIVED NYSCEF: 07/26/2019

# Exhibit 19

**A-714**

**Harrington, Madelaine J (NYC - X73374)**

| | |
|---|---|
| From: | Bob G. Goldberg <bgg@msf-law.com> |
| Sent: | Monday, February 19, 2018 8:29 AM |
| To: | Marc Schneider |
| Cc: | marnischw@aol.com |
| Subject: | Investments |

Dear Mr. Schneider --

We are counsel to Pine Management, Inc. and to members of the Pine and Rohlman families. We have reviewed several e-mails concerning ten limited liability companies in which your family members have an interest. These LLCs are:

1. Zizi Realty LLC
2. Jeruth Realty LLC
3. Marni Realty LLC
4. Rudel Realty LLC
5. Marc Realty LLC
6. JHJ Realty LLC
7. Bren-El Realty LLC
8. SIR Realty LLC
9. RIS Realty LLC,
10. Bar-Mar Realty LLC

We have also reviewed the operating agreements for each of these LLCs. Except for Marni Realty LLC and Rudel Realty LLC, the operating agreement of each of the other eight entities was amended and restated during 2011 and 2012.

You have requested the LLCs make changes in certain aspects of the management and operation of the LLCs and the properties they own.

As I am sure you know, each of the amended and restated operating agreements provides that Pine Management, Inc. has been designated as the sole manager with full responsibility for supervision and general management of the business and day-to-day operations in the ordinary course of business of each of the respective companies. (Section 8.3 of each agreement contains a non-exclusive representative list of the various powers and authority.) The only limitation provided in these agreements is that decisions to finance or refinance any real estate owned by an LLC, acquire new or additional real estate, or sell any real estate owned by a LLC requires the affirmative vote of a majority in interest of the voting members or the affected LLC.

Additionally, each of the amended and restated operating agreements provide that each LLC shall cause complete and accurate books to kept and made available for inspection by members, managers or duly authorized representatives. Each company must also provide its members with a report for federal income tax purposes indicating the portion of each such member's share of the applicable company's profit and loss for each year (i.e., a K-1).

For years, these amended and restated operating agreements reflect the understandings of each of the parties and have formed the foundation for the successful operation of the various properties and entities. Hence, the Pine and Rohlman families believe that it is in the best interests of the various companies to maintain all agreements in their present form, without modification.

1

A-715

INDEX NO. 654303/2019

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV   Document 27-20   Filed 08/30/22   Page 4 of 4 RECEIVED NYSCEF: 07/26/2019

Of course, Pine Management, Inc. and the members of the Pine and Rohlman families will continue to honor their legal and contractual obligations to all members and companies and are available to discuss the business and properties at a mutually acceptable time.

Please contact us should you have any questions or would like to discuss.

Thank you.



MEISTER SEELIG & FEIN LLP

**Bob G. Goldberg**
Partner
125 Park Avenue | 7th Floor | New York, NY | 10017
Direct 212.655.3526 | Firm 212.655.3500 | Fax 646.233.2762 | bgg@msf-law.com
**New York** | **New Jersey** | **Connecticut** | **Massachusetts** | **California**
bio | website

Legal Secretary: Rosalind R. Trines | 212.655.3542 | rrt@msf-law.com

IMPORTANT NOTICES: NOTICE UNDER E-SIGN ACT: Unless specifically set forth herein, the transmission of this communication is not intended to be a legally binding electronic signature, and no offer, commitment or assent on behalf of the sender or its client is expressed or implied by the sending of this email, or any attachments hereto. NOTICE OF ATTORNEY'S CONFIDENTIALITY: The material submitted herewith contains, and is intended to be a confidential transmission of information or documents from MEISTER SEELIG & FEIN LLP which is legally privileged. The materials or information enclosed are intended only for the use of the individual or entity named in this transmission. If you are not the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of this transmission is strictly prohibited. If you have received this email transmission in error, please notify us by telephone immediately, so that we can arrange for the return of the original documents to us at our cost.

# EXHIBIT A-20

FILED: NEW YORK COUNTY CLERK 07/26/2019 06:42 PM

NYSCEF DOC. NO. 3 Case 1:22-cv-02407-MKV Document 27-21 Filed 08/30/22 Page 2 of 3 RECEIVED NYSCEF: 07/26/2019

# Exhibit 20

A-718

INDEX NO. 654303/2019
NYSCEF DOC. NO. 1 Case 1:22-cv-02407-MKV   Document 27-21   Filed 08/30/22   Page 3 of 3 RECEIVED NYSCEF: 07/26/2019

**Harrington, Madelaine J (NYC - X73374)**

| | |
|---|---|
| **From:** | Brenda Rohlman <brenda@pinemanagement.com> |
| **Sent:** | Saturday, March 03, 2018 1:07 PM |
| **To:** | Marc Schneider; Jerome N. Schneider; Marni Schwartz |
| **Cc:** | Lloyd Pine; Tom Rohlman |
| **Subject:** | DDA |
| **Attachments:** | MMA & DDA.xlsx; ATT00001.htm |

Attached please find the DDA balances. Over 35 years, Pine Management Inc. has developed guidelines as to how much money to hold in each building's reserve accounts. We apply these guidelines on a portfolio wide basis. The amounts have increased over time due to the increased costs of renovations, capital improvements, contingencies and compliance. As you know, there are no capital calls to the members. We do not look to hold anything more than what we feel is prudent. As to the email you sent regarding capital expenditures over the past five years for each apartment in the buildings you and your family has a membership interest in, Pine Management Inc. is not spending the time to go backwards over the past five years to complete this list. We feel it is a better use of our time to proceed with all the current work we have. We are moving forward to maximize the value of the properties your family has a membership in and the entire portfolio. You can use the Operating and Expense reports and prior appraisals to gain the knowledge you are looking for. We believe the response sent to you from our attorney answers these questions.

Love,
Bren

# EXHIBIT B



# Real Estate Developers PROtect℠
# Professional Liability Insurance with Cyber Coverage
# Declarations

**NOTICE: THIS IS CLAIMS MADE AND REPORTED COVERAGE.
PLEASE READ THE POLICY CAREFULLY.**

| | | | |
|---|---|---|---|
| **Insurer:** | Colony Insurance Company<br>8720 Stony Point Parkway, Suite 400<br>Richmond, VA  23235 | **Producer**: | Swett & Crawford<br>50 California St, Suite 2000<br>San Francisco, CA  94111 |

**Policy Number:** RE4202378-0

Renewal of Policy Number: Newline

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS AND CONDITIONS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

ITEM 1.    **NAMED INSURED** (Name and Mailing Address):
Pine Management Inc
78 Manhattan Avenue
New York, NY  10025

ITEM 2.    **POLICY PERIOD:**    (a)  Inception Date:  08/01/2018    (b)  Expiration Date: 12/01/2019

Both dates at 12:01 a.m. at the Named Insured's Mailing Address shown  in ITEM 1 above.

ITEM 3.    **COVERED REAL ESTATE DEVELOPMENT SERVICE**

providing asset management, property management, development consulting, and those services as defined in the   Real Estate Developers PROtect? Professional Liability Insurance with Cyber Coverage Form, with respect to both acquired and non-acquired p

ITEM 4.    **LIMIT OF LIABILITY AND DEDUCTIBLE:** INSURING AGREEMENTS

| Limit of Liability:<br>Each **Claim** | Limit of Liability:<br>Aggregate for all **Claims** | Deductible:<br>Each **Claim** | Deductible:<br>Aggregate |
|---|---|---|---|
| $1,000,000 | $1,000,000 | $25,000 | $N/A |

ITEM 5.    **LIMITS OF LIABILITY AND DEDUCTIBLES:** SUPPLEMENTAL EXPENSES

| Expense Event | Limit of Liability: Each **Expense Event** | Limit of Liability: Aggregate | Deductible: Each **Expense Event** |
|---|---|---|---|
| **Crisis Management Expenses** | $100,000 | $100,000 | $0 |
| Appearance at Proceedings | $10,000 | $50,000 | $0 |
| **Disciplinary Proceedings** | $25,000 | $100,000 | $0 |
| Subpoena Assistance | $15,000 | $25,000 | $0 |
| ADA,FHA and OSHA Legal Expense Reimbursement | $25,000 | $25,000 | $0 |
| Supplementary **Cleanup Costs** Coverage | $25,000 | $25,000 | $0 |

ITEM 6.    **PREMIUM:** $33,168

ITEM 7.    **EXTENDED REPORTING PERIOD OPTION(S):**

12 months at 100% of Full Annual Premium    24 months at 185% of Full Annual Premium

36 months at 200% of Full Annual Premium    48 months at 225% of Full Annual Premium

60 months at 250% of Full Annual Premium    72 months at 275% of Full Annual Premium

ITEM 8.    **RETROACTIVE DATE:** 3/1/2016

ITEM 9.    **NOTICE TO THE INSURER:**

| CLAIMS OR POTENTIAL CLAIMS SEND TO: | ALL OTHER NOTICES SEND TO: |
|---|---|
| ARGO PRO US Professional Liability - Claims 413 W. 14th Street New York, NY  10014 855-225-7204 Argoproclaims@argogroupus.com | ARGO PRO US Professional Liability - Underwriting 413 W. 14th Street New York, NY  10014 |

ITEM 10.    **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:**

Please see Schedule of Forms and Endorsements, DECSCH, for a complete list of forms.

**THESE DECLARATIONS, TOGETHER WITH THE PROFESSIONAL LIABILITY POLICY COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

**A-722**

DECSCH-0117                                                                    Page 1

# SCHEDULE OF FORMS AND ENDORSEMENTS

Insured:  Pine Management Inc
Policy Number:  RE4202378-0

Forms and Endorsements applying to and made part of this policy at the time of issuance:

| NUMBER | TITLE |
|---|---|
| PRRE1000DEC-0517 | Real Estate Developers PROTect Professional Liability Policy Declarations |
| DECSCH-0117 | Schedule Of Forms And Endorsements |
| PRRE1001-0617 | Real Estate Developers PROTect Professional Liability Policy |
| U094-0415 | Service Of Suit |
| PR2006-0117 | Professional Services Endorsement |
| PR2017-0117 | Retroactive Date For Specific Coverage |
| ILP001-0104 | U.S. Treasury Department's Office Of Foreign Assets Control (OFAC) Advisory |
| PrivacyNotice-0415 | Privacy Policy |
| SIGCIC-1013 | Signature Page |

# Real Estate Developers PROtect<sup>SM</sup> Professional Liability Insurance with Cyber Coverage

**THIS IS CLAIMS MADE AND REPORTED COVERAGE.**
**PLEASE READ THIS POLICY CAREFULLY.**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Words and phrases that appear in bold are defined and may be used in the singular or plural, as appropriate; please refer to Section III – Definitions.

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the **Insurer**, and subject to all of the terms and conditions of this policy (including **all** endorsements hereto), the **Insurer** agrees with the **Insured** to provide insurance as stated in this policy.

SECTION I - COVERAGES

A. Insuring Agreements:

1. Professional Liability

   The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended reporting Period, if applicable, arising out of a **Wrongful Act** committed before the end of the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

2. Cyber Liability

   The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended Reporting Period, if applicable, arising out of a **Privacy Breach**, **Security Event** or **Social Engineering Incident** taking place before the end of the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

3. Contractors Pollution Liability

   The **Insurer** agrees to pay on behalf of the **Insured**, **Loss** in excess of the Deductible amount and up to the Limits of Liability shown in Item 4 of the Declarations; provided that such **Loss** results from a **Claim** first made and reported in writing during the **Policy Period** or Extended reporting Period, if applicable, arising out of a **Pollution Incident** first discovered during the **Policy Period** and on or after the Retroactive Date, if any, shown in Item 8 of the Declarations.

B. Supplemental Payments

   These supplemental payments will be paid up to the amount shown in Item 5 of the Declarations and in addition to the applicable Limit of Liability shown in Item 4 of the Declarations.

   1. **Crisis Management Expenses**

      The **Insurer** will reimburse the **Insureds**, in excess of the applicable Deductible shown in Item 5 of the Declarations, **Crisis Management Expenses** resulting directly from any **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident** that takes place during the **Policy Period**.

2. Appearance at Proceedings

The **Insurer** will pay for loss of earnings for the **Insured's** attendance, at the **Insurer's** written request, at a trial, hearing, arbitration or mediation proceeding involving a **Claim** against any **Insured**. The maximum amount the **Insurer** will pay for any one or series of trials, hearings, mediation or arbitration proceedings arising out of the same **Claim** will not exceed $500 per individual **Insured** for each day, or part thereof.

3. **Disciplinary Proceedings**

   a. If, during the **Policy Period**, a **Disciplinary Proceeding** is first brought against any **Insured**, the **Insurer** will reimburse the **Insureds** for reasonable and necessary legal fees and expenses that the **Insured** incurs in the defense of such matter. Such legal fees and expenses do not include any fines, penalties or restitution paid by the **Insured** as part of or to resolve a **Disciplinary Proceeding**.

   b. The **Insurer** will have no duty to defend the **Insured** in any such **Disciplinary Proceeding**.

   c. Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

4. Subpoena Assistance

   a. If, during the **Policy Period**, an **Insured** first receives a subpoena for documents or testimony arising out of **Real Estate Development Services** performed by any **Insured**, and the **Insured** requests the **Insurer's** assistance in responding to such subpoena, the **Insurer** will reimburse the **Insured** for reasonable and necessary: legal fees and expenses incurred to provide the **Insured** advice regarding the production of documents; costs incurred by the **Insured** to produce any documents in response to the subpoena; and legal fees and expenses to prepare the **Insured** for sworn testimony and to represent the **Insured** at the **Insured's** depositions;

   provided that:

   (1) the subpoena arises out of a lawsuit to which the **Insured's** are not a party; and

   (2) the **Insureds** have not been engaged to provide advice or testimony in connection with the lawsuit and the **Insureds** have not provided such advice or testimony in the past.

   b. The **Insurer** has no duty to defend the **Insured** in connection with any such subpoena assistance. Compliance with a subpoena will not be considered a **Claim** or **Disciplinary Proceeding** under the policy and the coverage for any Subpoena Assistance is limited to that provided under this section.

   c. Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

5. ADA, FHA and OSHA Legal Expense Reimbursement

   The **Insurer** will reimburse the **Insured** for legal fees and expenses up to the amount shown in Item 5 of the Declarations per **Policy Period** in responding to each regulatory or administrative action brought directly against the **Insured** by a government agency under the Americans with Disabilities Act of 1990 (ADA), the Fair Housing Act (FHA) or the Occupational Safety and Health Act (OSHA) provided that regulatory or administrative action:

   a. is first commenced during the **Policy Period**; and

   b. arises out of the performance of **Real Estate Development Services** rendered on or after the Retroactive Date shown in Item 8 of the Declarations.

   After the **Insurer** has paid up to the amount shown in Item 5 of the Declarations under this provision, any additional amounts the **Insurer** agrees to pay will be treated as **Defense Costs** and will be subject to the deductible for the **Policy Period** in which the action was first commenced.

The **Insurer** will not be responsible for the payment of any fines or penalties assessed.

Any notice given to the **Insurer** by any **Insured** under this subsection will be deemed notice of **Potential Claim**.

## SECTION II – LIMITS OF LIABILITY AND DEDUCTIBLE

A. Limits of Liability: Insuring Agreements A.1 Professional Liability, A.2 Cyber Liability and A.3 Pollution Liability

   1. Limit of Liability, each **Claim** under Insuring Agreements A.1, A.2 and A.3:  The most the **Insurer** will pay for any **Loss** for each **Claim** covered by this policy under Insuring Agreements A.1,  A.2 and A.3 is the amount shown for Limit of Liability in Item 4 of the Declarations.

   2. Limit of Liability, aggregate for all **Claims** under Insuring Agreements A.1, A.2 and A.3: The most the **Insurer** will pay for all **Loss** for **all Claims** in the Aggregate covered by this policy under Insuring Agreements A.1,  A.2 and A.3 is the amount shown in Item 4 of the Declarations.

   3. **Defense Costs** are part of and not in addition to the Limits of Liability.  Payment of **Defense Costs** by the **Insurer** will reduce, and may exhaust, the Limits of Liability.

B. Limits of Liability: Supplementary Coverages

   Supplemental payments under Insuring Agreement B will be paid in addition to the policy Aggregate Limit of Liability shown in Item 4 of the Declarations.

   1. Limits of Liability: **Crisis Management Expenses** – The most this **Insurer** will pay for costs for **Crisis Management Expenses** covered under Insuring Agreement B.1 of this policy during the **Policy Period** from each **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident** and in the Aggregate are the amounts shown for **Crisis Management Expenses** in Item 5 of the Declarations.

   2. Limits of Liability: Appearance at Proceedings: The most the **Insurer** will pay for costs for each such Appearance at a proceeding and in the Aggregate under Insuring Agreement B.2 during the **Policy Period** are the amounts shown in Item 5 of the Declarations.

   3. Limits of Liability: Each **Disciplinary Proceeding**: The most the **Insurer** will pay for costs for each such **Disciplinary Proceeding** and in the Aggregate under Insuring Agreement B.3 during the **Policy Period** are the amounts shown in Item 5 of the Declarations.

   4. Limits of Liability: Subpoena Assistance: The most the **Insurer** will pay for costs for each such subpoena and in the Aggregate under Insuring Agreement B.4 of this policy are the amounts shown in Item 5 of the Declarations.

   5. Limits of Liability: ADA, FHA and OSHA Legal Expense Reimbursement: The most the **Insurer** will pay for costs for ADA, FHA and OSHA Legal Expense Reimbursement under Insuring Agreement B.5 during the **Policy Period** is the amount shown in Item 5 of the Declarations.

   6. Limits of Liability: Supplementary **Cleanup Costs** Coverage: The most the **Insurer** will pay for costs for Supplementary **Cleanup Costs** Coverage Insuring Agreement B.6 during the **Policy Period** is the amount shown in Item 5 of the Declarations.

C. Deductible

   1. Regarding the coverage provided by this policy under Insuring Agreements A.1 Professional Liability, A.2, Cyber Liability, and A.3. Pollution Liability, the Each Claim Deductible shown in Item 4 of the Declarations applies to each **Claim** and will be paid by the **Insured** as a condition precedent to payment of any **Loss** by the **Insurer**.  The **Insured** must pay the applicable deductible for each **Claim** within 30 days of the **Insurer's** written request regardless of the number of **Claims** covered by this policy. Any Aggregate Deductible amount shown in Item 4 of the Declarations is the most the **Insured** will pay as a deductible for all **Claims** covered by this policy.

2. Regarding the coverage provided by this policy under Insuring Agreement B. Supplemental Coverages, the Each **Expense Event** Deductible shown in Item 5 of the Declarations applies respectively to each **Crisis Management Expense**, Appearance at Proceeding, **Disciplinary Proceeding**, Subpoena, ADA, FHA, OSHA Legal Expense or Supplementary **Cleanup Costs** Coverage event and will be paid by the **Insured** as a condition precedent to payment of any **Loss** by the **Insurer**. The **Insured** must pay the applicable deductible for each **Claim** within 30 days of the **Insurer's** written request regardless of the number of **Claims** covered by this policy. Any Aggregate Deductible amount shown in Item 4 of the Declarations is the most the **Insured** will pay for all **Claims** covered by this policy.

3. The **Insured's** Deductible obligation for each **Claim** will be reduced by 50%, subject to a maximum aggregate reduction of all Deductibles for all **Claims** of $25,000 if the **Insurer** agrees and the **Insured** consents to the final settlement of a **Claim** during a voluntary mediation. This reduction does not apply to any **Claim** resolved through court-mandated mediation or voluntary or involuntary arbitration.

SECTION III - DEFINITIONS

A. **Bodily Injury** means physical injury, sickness, disease or death of any person, and any resulting mental injury, mental anguish, emotional distress, suffering, shock, or humiliation.

B. **Claim** means any of the following arising from a **Wrongful Act**:

1. a written demand received by any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations;

2. a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

3. the institution of an arbitration, mediation, or other alternate dispute resolution proceeding against any **Insured**; or

4. as respects Insuring Agreement A.2, a **Privacy Regulatory Action**.

C. **Cleanup Costs** means expenses incurred in the investigation, evaluation, monitoring, testing, removal, containment, treatment, response, disposal, remediation, detoxification or neutralization of smoke, soot, fumes, acids, alkalis, toxic chemicals, asbestos, liquids or gases, waste materials or other irritants, contaminants or pollutants as a direct result of a **Pollution Incident**. Except as provided in Extensions of Coverage 1 Emergency Remediation Costs, coverage for **Cleanup Costs** under this Policy is conditioned upon prior approval of the **Insurer**.

**Cleanup Costs** do not include any expenses detailed in the preceding paragraph incurred after the cleanup is deemed to be complete upon final approval from the supervising governmental authority.

D. **Crisis Management Expenses** means reasonable and necessary expenses, including legal fees, approved by the **Insurer** in its sole discretion, to engage a public relations firm after an **Insured's** **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**.

E. **Defense Costs** means:

1. reasonable and necessary fees, costs and expenses charged by any lawyer consented to or designated by the **Insurer** to defend any **Insured** against a **Claim**;

2. all other reasonable and necessary fees, costs and expenses resulting from the investigation, discovery, defense, settlement or appeal of a **Claim** as authorized by the **Insurer**; and

3. the cost of a bond or appeal bond, required as a result of a **Claim**, including bonds to release attachments, but only for bond amounts not exceeding the applicable Limit of Liability; however, the **Insurer** has no obligation to apply for, guarantee or furnish any such bond.

**Defense Costs** do not include the remuneration, salaries, overhead, fees or expenses of either the **Insured's** or the **Insurer's** regular employees or officials or any fees or expenses incurred prior to the time that a **Claim** is first made against any **Insured** and reported to the **Insurer**. **Defense Costs** will be paid first and will reduce, and may exhaust, the Limits of Liability shown in Items 4 and 5 of the Declarations.

F. **Disciplinary Proceeding** means a proceeding before a disciplinary board or similar entity or official to determine violations of disciplinary rules or rules of professional conduct, professional misconduct or other matters relating to licensing and discipline. **Disciplinary Proceeding** does not include charges, investigations or actions filed with a regulatory agency or official, including, without limitation, the Securities and Exchange Commission, the U.S. Patent & Trademark Office or the Internal Revenue Service.

G. **Expense Event** means any appearance at a proceeding, **Disciplinary Proceeding**, subpoena, regulatory or administrative action, or corporate reputation damage or Supplementary **Cleanup Costs** event that triggers coverage under Insuring Agreements B.1, B2, B.3, B.4, or B.5.

H. **Information Custodian** means any third party that possesses **Non-public Personal Information** or **Proprietary Business Information** on behalf of the **Named Insured** and which is required to maintain the confidentiality and integrity of that information by a written contract with the **Named Insured**.

I   **Information System** means any electronic device, electronic and paper storage media, as well as any communications networks, including cloud or other multi-tenant storage models.

J. **Insured** means:

  1. the **Named Insured** and any **Subsidiary**;

  2. any past,  present or future owner, principal, officer, director, partner, stockholder, shareholder, member, manager or employee of the **Named Insured** or any **Subsidiary** for **Real Estate Development Services** rendered on behalf of the **Named Insured** or any **Subsidiary**;

  3. the estate, heirs, executors, administrators, assigns and legal representatives of each of the **Insureds** in the event of the **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this policy;

  4. any **Insured's** legal spouse, including any natural person qualifying as a domestic partner under the provisions of any applicable state, federal or local law in the United States, but only with respect to **Loss**  resulting from  **Real Estate Development Services** of the **Named Insured**;

  5. all joint ventures entered into, but only for liability arising out of **Real Estate Development Services** performed by any **Insured** as a participant in a joint venture project; or,

  6. any employee, intern, volunteer or independent contractor of the **Named Insured** or any **Subsidiary**, but only as respects **Real Estate Development Services** rendered on behalf of the **Named Insured** or **Subsidiary**.

K. **Insurer** means the insurance company issuing this policy as shown in the Declarations.

L. **Loss** means a monetary judgment or settlement that an **Insured** becomes legally obligated to pay as a result of a **Claim**, including punitive or exemplary damages where insurable under applicable law.

  1. **Loss** includes:

    a. **Defense Costs**; and

    b. **Rectification Costs**; and

    c. pre and post judgement interest on the entire amount of any judgment which accrues after the entry of the judgment and before the **Insurer** has paid or tendered or deposited in the Court that part of the judgment that does not exceed the policy limit.

    d. As regards the coverage provided under SECTION I – COVERAGES, Insuring Agreement A.2

Cyber Liability, **Loss** includes the following for which an **Insured** becomes legally obligated to pay as the result of a **Claim** to which this insurance applies:

(1) **Regulatory Fines And Penalties** if, and to the extent that, such amounts are insurable under the law of the jurisdiction most favorable to the insurability of such **Regulatory Fines And Penalties** provided such jurisdiction has a substantial relationship to the relevant **Insureds**, the **Insurer**, or the **Claim**; and

(2) **Regulatory Restitution**.

e. As regards coverage provided under SECTION I – COVERAGES, Insuring Agreement A.3. Contractor Pollution Liability, **Loss** includes **Cleanup Costs** for which the **Insured** becomes legally obligated to pay as the result of a **Claim** for which this insurance applies.

2. **Loss** does not include:

a. any fines, penalties, taxes or sanctions, whether imposed by law or otherwise (except as provided above with respect to punitive or exemplary damages or **Regulatory Fines and Penalties**);

b. the return, reduction or restitution of fees or expenses (except as provided above with respect to **Regulatory Restitution**);

c. amounts which are uninsurable under applicable law; or

d. the cost of complying with any injunctive, declaratory or administrative relief.

M. **Named Insured** means the person or entity designated in Item 1 of the Declarations and any **Predecessor** of such entity.

N. **Non-public Personal Information** means any of the following information, if not already publicly available:

1. social security number, driver's license or government issued identification number;

2. credit, debit, bank, credit union or brokerage account numbers, balances or account histories;

3. telephone numbers or telephone records;

4. medical records, health insurance identification numbers or other protected health information; or

5. any other non-public information that can be used to identify that individual as specified by a **Privacy Regulation**.

O. **Personal Injury Offense** means:

1. false arrest, humiliation, mental anguish, emotional distress, unlawful detention, false imprisonment, wrongful entry, eviction or other invasion of private occupancy, abusive litigation, abuse of process or malicious prosecution;

2. the publication or utterance of a libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of any individual's right to privacy; or

3. misrepresentation in advertising, infringement of copyright, trademark, service mark, trade dress or trade name.

P. **Policy Period** means the period from the inception date of this policy to the expiration date of this policy, as shown in Item 2 of the Declarations, or its earlier termination date, if any.

Any extension of the **Policy Period** will not result in an increase or reinstatement of the Limit of Liability.

Q. **Pollution Incident** means an alleged or actual discharge, dispersal, release, seepage, migration or escape of smoke, soot, fumes, acids, alkalis, toxic chemicals, asbestos, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any

watercourse or body of water taking place on or after the Retroactive Date, if any, shown in the Declarations:

1.  arising from a **Wrongful Act**, or

2.  occurring at any location at which the **Insured** is performing **Real Estate Development Services** <<this added with the intent to provide contractors pollution coverage>>

that causes **Bodily Injury**, **Property Damage** or financial loss.

R.  **Potential Claim** means:

1.  any **Wrongful Act** which might reasonably be expected to give rise to a **Claim** against any **Insured** under the policy;

2.  any breach of duty to a client or third party, which has not resulted in a **Claim** against any of the **Insureds**; or

3.  receipt of notice of a **Disciplinary Proceeding** or subpoena.

S.  **Predecessor** means an individual or entity engaged in **Real Estate Development Services** whose financial assets and liabilities the **Named Insured** is the majority successor in interest.

T.  **Privacy Breach** means any of the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

1.  the alleged unauthorized alteration, collection, copying, disclosure, dissemination or viewing of **Non-public Personal Information** or **Proprietary Business Information** in any form, from any source, because of an Insured's failure to protect such information from unauthorized access or unauthorized use;

2.  the alleged accidental release or loss of **Non-public Personal Information** or **Proprietary Business Information**;

3.  the alleged wrongful collection, use or sale of **Non-public Personal Information** in any form; and

4.  an **Insured's** alleged failure to correct the **Non-public Personal Information** of a third party that is stored on the **Named Insured's Information System** once notified by the affected individual or that individual's legal counsel.

**Privacy Breach** includes the **Named Insured's** vicarious liability for the privacy breach of **Non-public Personal Information** or **Proprietary Business Information** in the care, custody and control of an **Information Custodian** to whom the **Named Insured** entrusted that information.

U.  **Privacy Regulation** means any current or future statute or regulation applying to the collection, dissemination or storage of **Non-public Personal Information** promulgated by a **Privacy Regulator** including, but not limited to, state breach notice laws, HIPAA, the Hi-Tech Act, the Federal Trade Commission (FTC) Red Flag rules, Gramm-Leach Bliley or the European Union (EU) Data Protection Act.

V.  **Privacy Regulator** means any local, state or federal government of the United States, any provincial or federal government in Canada, the European Union or a member state of the European Union.

W.  **Privacy Regulatory Action** means the institution of an investigation, an administrative hearing or civil charges by a **Privacy Regulator** under a **Privacy Regulation** arising out of an actual or alleged **Privacy Breach**.

X.  **Real Estate Development Services** means the following services performed by or on behalf of any **Insured** in the course of improvement of real property acquired by the **Insured**, whether alone or as part of a partnership, joint venture, syndication, or other arrangement :

1   the construction or renovation of buildings or other structures on such real property, including: conceptual land planning; requesting and securing zoning changes; performing

environmental studies; construction of horizontal infrastructure such as roads and utilities; property tear-down or re-development; creating capital expenditure projections; performing financial management and reporting; obtaining necessary capital, including giving market condition projections, promotion and advertising; determining surface and subsurface conditions; determining cultural and historic conditions; projecting LEED ratings; preparation, transmittal, and awarding of design and construction bid packages; management, coordination, and supervision of design and construction; and identification and obtaining of applicable permits, variances, consents, easements, and other rights;

2. services performed while acting as a real estate agent, title agent, notary public, mortgage broker, property manager, construction manager, or general contractor, if performed as part of the services as a real estate developer for the same improvement of real property; and

3. any other services identified as **Real Estate Development Services** listed in Item 3 of the Declarations.

It is further understood that, regarding the coverage provided in this policy under Insuring Agreement A.2, **Professional Service** includes **Technology Services**.

Y. **Property Damage** means physical injury to tangible property, including all resulting loss of use of that property.

Z. **Proprietary Business Information** means business records, customer lists, trade secrets or any other non-public information entrusted to an **Insured** under a written contract to protect its confidentiality.

AA **Rectification Costs** means those expenses incurred by the **Insured** in excess of the deductible to rectify a design defect in any part of the construction works or engineering works for any project for which the **Insured** is responsible for both design and construction, providing:

1. the **Insured** demonstrates that the actual and necessary costs and expenses arise out of the **Insured's** performance of **Real Estate Development Services**, and

2. the **Insured** first sought recovery for any **Rectification Costs** from any Professional Liability Coverage that may apply to the entity responsible for the design defect.

BB **Regulatory Fines And Penalties** means those sums any **Insured** is required to pay as part of the settlement or judgment of a **Privacy Regulatory Action** to which this insurance applies.

CC. **Regulatory Restitution** means sums deposited into a fund for the purpose of providing compensation to individuals affected by a **Privacy Breach** as part of a settlement or judgment resulting from a **Privacy Regulatory Action**.

DD. **Security Event** means any of the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

1. the **Insured's** inadvertent transmission of malicious computer code to a third party;

2. the failure to prevent the use of the **Named Insured's Information System** to harm a third party's **Information System** including the failure to prevent the use of the **Named Insured's Information System** to launch a denial of service attack;

3. the inability of the **Named Insured** or third party to access the **Named Insured's Information System** due to the failure to prevent a denial of service attack, damage from malicious computer code, unauthorized access to or unauthorized use of the **Named Insured's Information System**; or

4. the corruption, destruction or loss of electronic data held within the **Named Insured's Information System** as the direct result of malicious computer code, a denial of service attack or from unauthorized access to, or unauthorized use of, the **Named Insured's Information System**.

EE. **Social Engineering Incident** means the following arising from a **Wrongful Act** taking place on or after the Retroactive Date, if any, shown in Item 8 of the Declarations:

> An **Insured** having transferred, paid or delivered funds or data as a direct result of a fraudulent written instruction, electronic instruction (including e-mail or web-based instruction) or telephone instruction which is intended to mislead an Insured through misrepresentation of a material fact that is relied upon in good faith by such **Insured**.

FF. **Subsidiary** means:

1. any entity in which more than 50% of the outstanding voting securities or voting rights representing the present right to vote for election of directors, officers, any **Insured**, or any equivalent executives, is owned or controlled by the **Named Insured**, either directly or indirectly on or before the effective date of this policy;

2. any entity after the effective date of this policy by reason of being created or acquired by the **Named Insured** after such date, if the gross revenues of the created or acquired entity for the prior year are equal to or greater than 50% of the annual gross revenues of the **Named Insured** as reflected in the **Named Insured's** most recent audited consolidated financial statement prior to such creation or acquisition; or

3. any entity after the effective date of this policy by reason of being created or acquired by the **Named Insured** after such date, other than as described in subsection 2. above, but such entity will be a **Subsidiary** only for either (i) a period of 30 days from the date such entity was created or acquired by the **Named Insured**; or (ii) until the end of the **Policy Period**, whichever occurs first.

Provided, however, that **Subsidiary** will not mean any entity which is a financial institution, including but not limited to any bank, insurance company, insurance agent/broker, securities broker/dealer, investment advisor, mutual fund or hedge fund.

**Subsidiary** also means any foundation or charitable trust controlled or directly sponsored by the **Named Insured**.

Provided, however, this policy will only apply to **Wrongful Acts** committed or allegedly committed after the effective date an entity becomes a **Subsidiary** and prior to the effective date such entity ceases to be a **Subsidiary**.

GG. **Technology Products** means computer or telecommunications hardware or software, or related electronic product that you develop, create, manufacture, distribute, license, lease or sell to your clients and for whom **Real Estate Development Services** are rendered.

HH. **Technology Services** means:

1. information technology consulting;

2. the administration, analysis, design, engineering, installation, integration, maintenance, management and programming of information systems or networks;

3. the analysis, development, delivery, design and support of business application software;

4. the design, hosting, maintenance, or programming of websites;

5. the distributing, installing, maintaining, marketing, selling and training in the use of electronic or computer related hardware or software; and

6. the assembly, design, development, distribution, installation, licensing, leasing, maintenance, manufacturing, ore repair of the **Insured's Technology Products**.

II. **Wrongful Act** means any actual or alleged act, error, omission or breach of duty by any **Insured** in the rendering of or failure to render **Real Estate Development Services**. **Wrongful Act** also means an actual or alleged **Personal Injury Offense** by any **Insured** in the rendering of or failure to render **Real Estate Development Services**.

SECTION IV - EXCLUSIONS

This policy does not apply to any **Claim** or **Expense Event**:

A. arising out of a **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident**, **Pollution Incident**  or **Expense Event** occurring prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured** and continuously renewed and maintained in effect prior to the **Policy Period**:

1. any **Insured** gave notice to any prior insurer of any such **Claim**, (including any **Potential Claim** that might lead to such **Claim**), **Wrongful Act**, **Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**; or

2. any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**, violated a disciplinary rule, or engaged in professional misconduct.

B. arising out of any actual or alleged intentional, criminal, dishonest, malicious or fraudulent act, error or omission by any **Insured**.

This Exclusion does not apply to:

1. any **Personal Injury Offense** that results from any **Insured's** rendering or failing to render **Real Estate Development Services**; or

2. any of the **Insureds**, unless such intentional criminal, dishonest, malicious or fraudulent act, error or omission is established by a final adjudication of the **Claim** or a final adjudication in any judicial, administrative or alternative dispute resolution proceeding.

For purposes of this Exclusion, no such act of one of the **Insureds** will be imputed to any of the **Insureds** who were not aware of and did not participate in such act.

C. arising out of any **Insured's** services or capacity as an officer, director, partner, owner, member, manager or employee of any corporation, partnership, association or any other business enterprise or charitable organization of any kind or nature other than:

1. the **Named Insured**;

2. any entity other than the **Named Insured**:
   a. that is managed, or controlled by any **Insured**;
   b. in which any **Insured,** individually or collectively, has an ownership interest in excess of 49%; or
   c. which wholly or partly owns, operates or manages the **Named Insured**.

D. arising out of any actual or alleged violation or breach by any **Insured** of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, Telephone Consumer Protection Act (TCPA), Securities Act of 1933, Securities Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act 18 USC Sections 1961 et seq., the Controlling the Assault of Non-Solicited Pornography and Marketing ACT (CAN-SPAM) of 2003, the Fair Credit Reporting Act (FCRA), Fair and Accurate Credit Transactions Act (FACTA),  or amendments thereto of any of these, or any similar provision of any federal, state or local statute, regulation, ordinance or common law.

This Exclusion does not apply if any **Insured** is deemed to be a fiduciary solely by reason of **Real Estate Development Services** rendered with respect to any employee benefit plan.

E. arising out of **Bodily Injury** or **Property Damage**.

This Exclusion does not apply to **Bodily Injury** resulting from a **Personal Injury Offense** or to the extent that any such **Bodily Injury** or **Property Damage** results from any **Insured's** rendering of or failure to render **Real Estate Development Services**.

F. arising out of

1. any **Insured's** actual or alleged liability under any oral or written contract or agreement, including but not limited to express warranties or guarantees; or

2. any actual or alleged liability of others that any **Insured** assumes under any oral or written contract or agreement.

However, this exclusion will not apply to the **Insured's** liability that exists in the absence of such contract or agreement.

In a foreign jurisdiction where the **Insured's** liability to a client is predicated only on contractual liability, item F.1 of this Exclusion does not apply except to the extent that the **Insured** has agreed to pay consequential or liquidated damages.

This exclusion does not apply to liability assumed by the **Insured** in a client contract.

G. made by any **Insured** against any other **Insured**.

H. However, this exclusion does not apply to claims brought by investors who have ownership in the developed property on which a **claim** is brought against the **Insured**.

H. arising out of infringement of patent or misappropriation of trade secret, resulting in unfair competition or restraint of trade law, rule or regulation.

I. arising out of an actual or alleged violation of any anti-trust or price-fixing rule or regulation.

J. arising out of the design or manufacture of any goods or products which are sold or supplied by any **Insured** or by others under license from any **Insured**.  This exclusion does not apply to software sold or supplied by the **Insured** to its client in connection with the **Insured's** provision of other **Real Estate Development Services** for that client.

K. arising out of any **Insured's** employment obligations, decisions, practices or policies as an employer, including but not limited to any **Claim** under worker's compensation, unemployment compensation, employee benefits, or disability benefits law or similar laws.

L. arising out of any actual or alleged discrimination, humiliation, harassment or misconduct, including but not limited to that which is based on an individual's race, religion, color, gender, sexual orientation, national origin, age, disability, or marital status.   This exclusion does not apply to otherwise covered **Claims** brought under the Americans with Disabilities Act, the Fair Housing Act, or any similar state or local law or ordinance.

M. arising out of any actual or alleged failure to procure and/or maintain adequate insurance or bonds

However, this exclusion will not apply to the insured's services in the performance of property management.

N. arising out of any **Insured's** making any payment:

1. without prior receipt of an architect's certificate, where such certificate is required as a condition of payment, or

2. without prior receipt of appropriate waivers or releases of lien from the subcontractors involved, where work or materials have been provided by said subcontractors.

O. arising out of the actual or alleged theft, misappropriation, commingling, or conversion of any funds, monies, assets, or property.

P. arising out of the acquisition of property for resale or other arrangements to obtain monetary gain without making improvements to said property in the course of the Insured's Real Estate Development Services.

SECTION V – COVERAGE EXTENSIONS

1. EMERGENCY REMEDIATION COVERAGE

The **Insurer** will reimburse the **Insured** up to $250,000 for reasonable and necessary **Cleanup Costs** the **Insured** incurs to take immediate action without the prior consent of the **Insurer** in order to abate and/or respond to an imminent and substantial threat in connection with an actual or potential **Pollution Incident**, provided:

a. the **Pollution Incident** results from the **Insured's** performance of or failure to perform **Real Estate Development Services** taking place on or after the Retroactive Date; and

b. the **Pollution Incident** is first discovered by the **Insured** during the policy period and is reported to the **Insurer** in writing as soon as is possible after such discovery, but in any event no later than 10 business days after the **Insured** first discovers such **Pollution Incident**, or the end of the policy period, whichever is earliest.

The **Insurer** will only reimburse the **Insured** for **Cleanup Costs** under this Coverage Extension the **Insurer** deems reasonable and necessary to mitigate the **Pollution Incident** on an emergency basis.

The **Insured** must pay the deductible stated in the Declarations in connection with any payments the insurer makes under this subsection.

Covered **Cleanup Costs** incurred in excess of the $250,000 sublimit noted in this Section shall be treated in the same manner as other covered **Loss**. In any event, **Cleanup Costs** shall be part of, and not in addition to, the Limit of Liability of this Policy.

Any notice given to the **Insurer** under this subsection shall be deemed notice of a **Potential Claim**.

2. EXTENDED REPORTING PERIODS

In the event this policy is cancelled or non-renewed by either the **Named Insured** or the **Insurer**, an **Insured** is entitled to the extensions of coverage shown in this Section.

A. Automatic Extended Reporting Period

An Extended Reporting Period is automatically provided to the **Named Insured** without additional charge. This period starts at the end of the **Policy Period** and lasts for 60 days, or the date another policy for professional liability insurance applicable to the **Named Insured** takes effect, whichever occurs first.

1. There will be no entitlement to this Automatic Extended Reporting Period if cancellation or non-renewal is due to any **Insured's** non-payment of premium or deductible due, or failure to comply with the terms and conditions of the policy, or if the Policy was issued based upon a misrepresentation by any **Insured**.

2. This Automatic Extended Reporting Period will be subject to all the terms and conditions of this policy and will apply to **Claims** first made against any **Insured** and reported to the **Insurer** during the Automatic Extended Reporting Period and that arise out of any **Wrongful Act** that occurred or is alleged to have occurred subsequent to the Retroactive Date, if any, and before the end of the **Policy Period**.

3. The fact that the period during which **Claims** may be reported to the **Insurer** under this policy by way of this Automatic Extended Reporting Period does not in any way increase the Limits of Insurance of this policy.

4. If any other policy of insurance in effect would apply to any **Claims** first made against the **Insured** during the Automatic Extended Reporting Period, then coverage provided under this Automatic Extended Reporting Period will apply in excess of such other insurance.

B. An Optional Extended Reporting Period is available to the **Named Insured**, but only by an endorsement and for an extra premium charge as shown in Item **7** of the Declarations.

1. The **Named Insured** must give the **Insurer** a written request for the endorsement and pay any premium due within 60 days after the end of the **Policy Period**.  The Optional Extended Reporting Period will not go into effect unless the **Named Insured** pays the additional premium promptly when due.

2. The Optional Extended Reporting Period is non-cancellable and starts upon the expiration of the **Policy Period**.

3. All premiums paid for the Optional Extended Reporting Period will be deemed fully earned and non-refundable as of the first day of the Optional Extended Reporting Period.

4. There will be no entitlement to this Optional Extended Reporting Period if cancellation or non-renewal is due to any **Insured's** non-payment of premium or deductible due, or failure to comply with the terms and conditions of the policy, or if the policy was issued based on a misrepresentation by any **Insured**.

5. This Optional Extended Reporting Period will be subject to all the terms and conditions of this policy and will apply to **Claims** first made against any **Insured** and reported to the **Insurer** during the Automatic Extended Reporting Period and that arise out of any **Wrongful Act** that occurred or is alleged to have occurred subsequent to the Retroactive Date, if any, and before the end of the **Policy Period**.

6. The fact that the period during which **Claims** may be reported to the **Insurer** under this extension does not in any way increase the Limits of Insurance of this policy.

C. Nonpracticing Extended Reporting Period

If, during this **Policy Period**, any **Insured** permanently and totally retires or otherwise voluntarily ceases the practice of providing the **Real Estate Development Services** insured by this policy, and has been insured by a Professional Liability Insurance policy issued by the **Insurer** for at least the 7 consecutive years immediately preceding, and the **Insured** is at least 55 years of age, the **Insurer** will, subject to the provisions of paragraphs A. and B. above, issue a Nonpracticing Extended Reporting Period endorsement.

1. This Nonpracticing Extended Reporting Period is provided until such **Insured** resumes the **Real Estate Development Services** insured by this policy, or until the death of such **Insured** in which case paragraph D.1 below, will apply.

2. No additional premium will be charged for this coverage, nor will any premium be refunded.

D. Death or Disability Extended Reporting Period

If during the **Policy Period,** any **Insured** dies from a cause other than suicide or becomes totally and permanently disabled, an extended reporting period is provided until the executor or administrator is discharged or until the disability ends. However, the Death or Disability Extended Reporting Period will never be longer than seven years from the date of death or disability. No additional premium will be charged for this coverage, nor will any premium be refunded.

1. In the event of death, the **Insured's** estate must, no later than 60 days after the end of this **Policy Period**, provide the **Insurer** with written notice that the extended reporting period is desired.  This notice must include written proof of the date of death.

2. In the event the **Insured** becomes totally and permanently disabled, the **Insured** or the **Insured's** legal guardian must, no later than 60 days after the end of this **Policy Period**, provide the **Insurer** with written notice that the extended reporting period is desired. This notice must include written proof that the **Insured** is totally and permanently disabled, including the date the disability began, certified by the attending physician.  The **Insured** agrees to submit to medical examination(s) by any physician(s) designated by the **Insurer**, if requested.

This extended reporting period is subject to the conditions set forth in paragraphs A. and B. above.

SECTION VI – GENERAL CONDITIONS

A. Defense, Settlement And Cooperation

1. The **Insurer** has the right and duty to defend any **Insured** against any **Claim**, even if the allegations of such **Claim** are groundless, false or fraudulent. The **Insurer** will designate, or, at the **Insurer's** sole discretion, approve counsel chosen by the **Insured** to defend the **Claim**. However, the **Insurer** has no duty to defend any **Insured** against any **Claim** to which this insurance does not apply.

   This policy has provisions whereby the **Insurer** will pay on the **Insured's** behalf certain costs incurred as a result of defending a **Disciplinary Proceeding** or responding to a subpoena for documents or testimony; however the **Insurer** has no duty to defend the **Insured** in any such **Disciplinary Proceeding** or in connection with any such subpoena assistance as shown in SECTION I – COVERAGES, B. Supplemental Payments, item 5. of this policy.

2. The **Insurer** has the right to make any investigation the **Insurer** deems necessary and, with the **Insured's** consent, make any settlement of any **Claim** covered by the terms of this policy.

3. The **Insured** will not, except at the **Insured's** own cost, make any payment, admit any liability, settle any **Claim**, assume any obligation or incur any expense, without the **Insurer's** prior written consent, such consent not to be unreasonably withheld.

4. If the applicable Limit of Liability shown in Items 4 and 5 of the Declarations are exhausted by the payment of **Loss**, then all of the **Insurer's** obligations under this policy will be completely fulfilled and exhausted, and the **Insurer** will have no further obligations of any kind or nature whatsoever under this policy. If the applicable Limit of Liability shown in the Declarations is exhausted prior to settlement or judgment of any **Claim**, the **Insurer** will have the right to withdraw from further investigation or defense by tendering control of such investigation or defense to the **Insured**, and the **Insured** agrees, as a condition to the issuance of this policy, to accept such tender.

5. The **Insured** must cooperate with the **Insurer** and assist the **Insurer** in investigating and defending any **Claim** or **Potential Claim** or investigating any event resulting in coverage under Insuring Agreement B: Supplemental Payments. Upon the **Insurer's** request, the **Insured** must submit to examination and interrogation by the **Insurer's** representatives, under oath if required, and the **Insured** must attend hearings, depositions and trials, and assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to the **Insurer's** representatives including investigating and coverage counsel, and meeting with such representatives for the purpose of investigating and defense, including the investigation of coverage issues or defense. The **Insured** must further cooperate with the **Insurer** and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment which the **Insured** may have.

B. Reporting And Notice

1. Reporting of **Claims**

   If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** is first made against any **Insured**, as a condition precedent to the **Insured's** right to coverage under this policy, the **Insured** must give the **Insurer** written notice of such **Claim** as soon as practicable, but in no event later than the later of 60 days after the expiration date or earlier termination date of this policy, or the expiration of any Extended Reporting Period, if applicable.

   Timely and sufficient notice of a **Claim** by one of the **Insureds** will be deemed timely and sufficient notice for all of the **Insureds** involved in the **Claim**. Such notice must give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act**; the identity of the **Insured** and all potential claimants involved; a description of the injury or damages

that resulted from such **Wrongful Act**; information on the time, place and nature of the **Wrongful Act**; and the manner in which the **Insured** first became aware of the **Claim**.

2.  Reporting of **Potential Claims**

    If, during the **Policy Period**, any **Insured** first becomes aware of any **Potential Claim,** the **Insured** will give the **Insurer** written notice of such **Potential Claim** with full particulars as soon as practicable thereafter, but in any event before the end of the Policy Period. If such **Potential Claim** later becomes a **Claim** not otherwise excluded by this policy, such **Claim** will be treated as if the **Claim** had been first made during the **Policy Period**. Full particulars include, but are not limited to: a description of the **Potential Claim**; the identity of the **Insured** and all potential claimants involved; information on the time, place and nature of the **Potential Claim**; the manner in which the **Insured** first became aware of such **Potential Claim**; and the reasons the **Insured** believe the **Potential Claim** is likely to result in a **Claim**.

3.  Notice regarding **Crisis Management Expenses**

    If, during the **Policy Period**, a **Wrongful Act, Privacy Breach**, **Security Event**, **Social Engineering Incident** or **Pollution Incident**  occurs, then as a condition precedent to the **Insured's** right to coverage under this policy for **Crisis Management Expenses**, the **Insured** must give the **Insurer** written notice of such **Wrongful Act, Privacy Breach, Security Event** or **Social Engineering Incident** as soon as practicable, but in no event later than the expiration date or earlier termination date of this policy.

    Such notice must give full particulars of the **Wrongful Act, Privacy Breach, Security Event, Social Engineering Incident** or **Pollution Incident**, including, but not limited to: a description of the **Privacy Breach** or **Security Event**; the identity of the **Insured** and all potential claimants involved; and the manner in which the **Insured** first became aware of such **Wrongful Act, Privacy Breach, Security Event, Social Engineering Incident** or **Pollution Incident**.

4.  Notice of **Disciplinary Proceedings** and Subpoenas

    If, during the **Policy Period**:

    a.  a **Disciplinary Proceeding** is first initiated against any **Insured** and covered by SECTION I – COVERAGES, B. Supplemental Payments, 3. Disciplinary Proceedings; or,

    b.  any **Insured** first receives a subpoena covered by SECTION I – COVERAGES, B. Supplemental Payments, 4. Subpoena Assistance;

    then as a condition precedent to the **Insured's** right to coverage under this policy, the **Insured** must give the **Insurer** written notice of such **Disciplinary Proceeding** or subpoena as soon as practicable, but in no event later than the end of the **Policy Period**.

    Such notice must give full particulars of the **Disciplinary Proceeding** or subpoena, including, but not limited to: a description of the **Disciplinary Proceeding** or subpoena; the identity of the **Insured** and all potential claimants involved; and the manner in which the **Insured** first became aware of such Disciplinary Proceeding or subpoena.

5.  Notice required for Emergence Remediation Coverage

    If, during the **Policy Period**, a **Pollution Incident** occurs, then as a condition precedent to the **Insured's** right to coverage under this policy for Emergency Remediation Coverage for **Cleanup Costs** under SECTION IV – COVERAGE EXTENSIONS 1. Emergency Remediation Coverage, the **Insured** must immediately:

    a.  record the specifics of the **Pollution Incident**, including how and when it took place, as well as details regarding the **Real Estate Development Service** provided;

    b.  record a detailed description of the nature, scope and estimated amount of the **Cleanup Costs**; and

    c.  notify the **Insurer** in writing as soon as practicable but in no event after the **Policy Period**.

6. Notices

All written notices required herein must be sent to the **Insurer** at the **Insurer's** physical address or e-mail address shown in Item 9 of the Declarations.

C.  Multiple Wrongful Acts, **Claims** or Claimants

Two or more **Claims** arising out of a single **Wrongful Act**, or any series of related **Wrongful Acts**, will be considered a single **Claim**.  Each **Wrongful Act**, in a series of related **Wrongful Acts**, will be deemed to have occurred on the date of the first such **Wrongful Act.**

D.  Organizational Changes

1.  If, during the **Policy Period**:

a.  the **Named Insured** or any **Subsidiary** are merged with, consolidated into or acquired by or with another entity such that the **Named Insured** is not the surviving entity; or

b.  a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official is appointed for or with respect to the **Named Insured** or any **Subsidiary**; then

coverage under this policy will continue in full force and effect with respect to **Real Estate Development Services** rendered before such event, but coverage will cease with respect to **Real Estate Development Services** committed after such event.  After any such event, this policy may not be canceled by the **Named Insured** and the entire premium for this policy will be deemed fully earned.

2.  If, during the **Policy Period**, the **Named Insured** or any **Subsidiary** merges, consolidates or acquires an entity whose gross revenues for the prior year are equal to or greater than 50% of the annual gross revenues of the **Named Insured** as reflected in the **Named Insured's** most recent consolidated financial statement prior to such merger, consolidation or acquisition, then no coverage will be afforded under this policy for any **Claim** involving such assets or entity unless the following conditions are met:

a.  The **Named Insured** provides written notice of such merger, consolidation creation, or acquisition to the **Insurer** within 60 days after the effective date of such merger, consolidation, creation or acquisition, or by the end of the **Policy Period**, whichever is earliest;

b.  The **Named Insured** provides the **Insurer** with such information as the **Insurer** may deem necessary;

c.  The **Named Insured** accepts any special terms, conditions, exclusions or additional premium charge as may be required; and

d.  The **Insurer**, at the **Insurer's** sole discretion, agrees to provide such coverage.

E.  Other Insurance

This insurance will apply only as excess of the applicable Deductible amount shown in Items 4 and 5 of the Declarations and the amount of any other valid and collectible insurance available to any **Insured** whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is specifically written as excess insurance over the Limits of Liability provided in this policy.

F.  Cancellation and Non-Renewal

1.  Cancellation

a.  The **Named Insured** may cancel this policy by mailing or delivering advance written notice to the **Insurer** at the **Insurer's** address shown in Item 9 of the Declarations, stating when cancellation will be effective.  If the **Insured** cancels this policy, the **Insurer** will retain the customary short rate portion of the premium.

b. The **Insurer** may cancel this policy by mailing written notice to the first **Named Insured** shown in Item 1 of the Declarations stating when, not less than 30 days thereafter (or such longer period of time as required by applicable law), such cancellation will be effective.

c. However, if the **Insurer** cancels this policy because the **Named Insured** has failed to pay a premium or Deductible when due, the **Insurer** may cancel this policy by mailing written notice of cancellation to the first **Named Insured** shown in Item 1 of the Declarations stating when, not less than 10 days thereafter (or such longer period of time as required by applicable law), such cancellation will be effective. Such notice will apply to all of the **Insureds**. If cancelled by the **Insurer**, earned premium will be computed pro rata.

2. Non-renewal

If the **Insurer** elects not to renew this policy, the **Insurer** will mail to the first **Named Insured** shown in Item 1 of the Declarations written notice of non-renewal at least 60 days prior to the expiration date of this policy. If the notice is not given at least 60 days prior to the expiration date, the policy will continue in force until 60 days after the notice of intent not to renew is received by the **Insured**.

Notice of non-renewal will not be required if the **Named Insured** has obtained replacement coverage or have requested or agreed to non-renewal.

G. Subrogation

In the event of any payment under this policy, the **Insurer** will be subrogated to all the **Insured's** rights of recovery against any person or organization; provided that the **Insurer** will not exercise any rights of subrogation against any of the **Insureds** who did not commit the wrongdoing.

The **Insured** will execute and deliver instruments, papers, and do whatever else is necessary to secure such rights, and do nothing to prejudice such rights.

Any amount recovered upon the exercise of such rights of subrogation will be applied as follows: first, to the repayment of expenses incurred in recovery by exercise of such subrogation rights; second, to **Loss** paid by the **Insured** in excess of the limits of liability; third, to **Loss** paid by the **Insurer**; fourth, to **Loss** paid by the **Insured** in excess of the deductible amount; and last, to the repayment of any deductible amount paid by the **Insured**.

Notwithstanding the above, the **Insurer** hereby waives such subrogation rights against any **Insured** under this policy, and also against any client of the **Insured**, to the extent that the **Insured** had, prior to any **Claim** or circumstance that might reasonably be expected to be the basis of a **Claim**, a written agreement to waive such rights, provided that prior to such writing no **Insured** had a basis to believe that any matter asserted in such **Claim** or circumstance might reasonably be expected to be the basis of a **Claim**. In no event will any **Insured** waive any of its rights of subrogation after it has become aware of any **Claim**, or any circumstances that may give rise to a **Claim**, against any **Insured**.

H. Bankruptcy or Insolvency

Bankruptcy or insolvency of any **Insured** or of any **Insured's** estate will not relieve the **Insurer** of any of the **Insurer's** obligations or deprive the **Insurer** of any of the **Insurer's** rights under this policy.

I. Policy Territory

This policy applies to **Wrongful Acts** occurring anywhere in the world where legally permissible; however, no coverage will be available under this policy for any **Claim** brought, or occurring in any country with which the United States of America does not have active diplomatic relations at the time such **Claim** is made.

All premiums, Limits of Liability, deductibles and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this policy is stated in a currency other than United States Dollars, payment under this policy will be made in United States Dollars at the rate of

exchange on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

J.   Assignment

Neither this policy nor any **Insured's** interest in this policy may be assigned without the **Insurer's** written consent.

K.   Liberalization

If the **Insurer** adopts any revision to this form that would broaden coverage under this policy without additional premium at any time during the **Policy Period**, the broadened coverage will immediately apply to this policy, except that it will not apply to **Claims** that were first made against any **Insured** prior to the effective date of such revision.

L.   Policy Changes

Notice to or knowledge possessed by any broker or other person acting on the **Insured's** behalf will not effect a waiver or change in any part of this policy or prevent or estop the **Insurer** from asserting any right(s) under this policy.   This policy can only be altered, waived or changed by written endorsement or agreed to in writing by an authorized representative of the **Insurer**.

M.   Action Against the **Insurer**

No action can be brought against the **Insurer** unless, as a condition precedent, the **Insured** has fully complied with all the terms and conditions of this policy.   Nothing contained in this policy gives any person or organization the right to join the **Insurer** as a party to any **Claim** to determine the **Insured's** liability.

N.   Waiver

The **Insurer's** failure to insist on strict compliance with any of the terms or conditions of this policy or the failure to exercise any right or privilege will not operate or be construed as a waiver of any subsequent breach or a waiver of any other terms, conditions, privileges or rights.

O.   Representations

By accepting this policy, all **Insureds** agree that all statements made and information furnished to the **Insurer** are true, accurate and complete, and that this policy has been issued in reliance upon the truth and accuracy of those representations, subject to all of the terms and conditions of this policy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT

If service of process is to be made upon the Company by way of hand delivery or courier service, delivery should be made to the Company's principal place of business:

Claims Manager
  Colony Insurance Company,
  Colony Specialty Insurance Company, or
  Peleus Insurance Company
  8720 Stony Point Parkway, Suite 400
  Richmond, Virginia 23235

If service of process is to be made upon the Company by way of the U.S. Postal Service, the following mailing address should be used:

General Counsel
  Colony Insurance Company,
  Colony Specialty Insurance Company, or
  Peleus Insurance Company
  P.O. Box 469011
  San Antonio, Texas 78246

Where required by statute, regulation, or other regulatory directive, the Company appoints the Commissioner of Insurance, or other designee specified for that purpose, as its attorney for acceptance of service of all legal process in the state in any action or proceeding arising out of this insurance.

The Commissioner or other designee is requested to forward process to the Company as shown above, or if required in his/her particular state, to a designated resident agent for service of process.


ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROFESSIONAL SERVICES ENDORSEMENT

This endorsement modifies insurance provided under the following:

   PROFESSIONAL LIABILITY COVERAGE

The definition of **Professional Services**, within SECTION III – DEFINITIONS, is amended by the addition of the following:

   providing asset management, property management, development consulting, and those services as defined in the  Real Estate Developers PROtect? Professional Liability Insurance with Cyber Coverage Form, with respect to both acquired and non-acquired properties as well as owned and non-owned properties

   ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**A-743**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RETROACTIVE DATE FOR SPECIFIC COVERAGE

This endorsement modifies insurance provided under the following:

> PROFESSIONAL LIABILITY COVERAGE

ITEM 8. Retroactive Date, as shown in the Declarations, is deleted and replaced with the following:

ITEM 8. RETROACTIVE DATE

| COVERAGE | RETROACTIVE DATE |
|---|---|
| **A. Real Estate Development services & General Construction services** | **8/1/2018** |

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics Iraffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC. this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



# Privacy Policy

Argo Group US, Inc. ("Argo Group") recognizes the importance of maintaining the privacy of our customers and the confidentiality of each individual's nonpublic personal information, including Social Security numbers.  We take seriously the responsibility that accompanies our collection of nonpublic personal information, including Social Security numbers.  Accordingly, Argo's corporate policy is to protect the privacy and confidentiality of our consumers and their nonpublic personal information as required by law.

## Information Collection and Use

In order to conveniently and effectively provide and service the insurance products we sell, we may collect and use Social Security numbers and other nonpublic personal information.  As such, this policy does not prohibit the collection or use of Social Security numbers and nonpublic personal information where legally authorized and/or required.  This policy complies with the requirements of the Gramm-Leach-Bliley Act (GLBA) and applicable federal and state laws and regulations implementing the act.  Such laws impose certain obligations upon third persons and organizations with which we share nonpublic personal information of our consumers, customers, former customers, or claimants. Accordingly, we prohibit the unauthorized disclosure of Social Security numbers and other protected nonpublic personal information, except as legally required or authorized.

## Information Sharing and Disclosure

Argo Group does not rent, sell or share your personally identifiable information with nonaffiliated third parties. Argo Group may, however, share personally identifiable information with third-party contractors. These third-party contractors are prohibited from using the information for purposes other than performing services for Argo Group.  Argo Group may disclose your information to third parties when obligated to do so by law and to investigate, prevent, or take action regarding suspected or actual prohibited activities, including but not limited to fraud and situations involving the security of our operations and employees.

Finally, Argo Group may transfer information, including any personally identifiable information, to a successor entity in connection with a corporate merger, consolidation, sale of all or a portion of its assets, bankruptcy, or other corporate change.

## Security

In order to protect your nonpublic personal information, we limit access to nonpublic personal information by only allowing authorized personnel to have access to such information. Furthermore, we maintain physical, electronic and procedural security protections to safeguard the nonpublic personal information in our records.  Documents that contain an individual's protected information are destroyed before disposal; this destruction process includes the shredding of print and disposable media and deletion of electronic media.  Argo Group has security measures in place to protect the loss, misuse and alteration of the information under our control. Our hardware infrastructure is housed in a controlled access facility that restricts access to authorized individuals. The network infrastructure is protected by a firewall and traffic is monitored and logged both on the firewall and servers. Sensitive administrative activities are carried out over secure, encrypted links between our offices and hosting facility. Administrative

access is limited not only to authorized employees but also to specific remote administration protocols and IP addresses. All employees with access to personally identifiable information have been advised of Argo Group's security policies and practices. Argo Group will continue to conduct internal audits of its security systems and make all necessary enhancements to ensure the safety of the website and its users. No method of transmission over the Internet or method of electronic storage is 100% secure; therefore, while Argo Group uses commercially acceptable means to protect your information, we cannot guarantee absolute security.

Any Argo Group employee who becomes aware of the inappropriate use or disclosure of Social Security numbers and other protected nonpublic personal information is expected to immediately report such behavior to the General Counsel for further action.

**Corrected/Updated Information**

This policy applies to certain insureds of Argo Group, including but not limited to worker's compensation claimants.  If you have any questions about this Privacy Policy, please contact:

General Counsel
Argo Group US, Inc.
P.O. Box 469011
San Antonio, Texas 78246
(210) 321-8400

*Note: Argo Group is the parent of Argonaut Insurance Company; Argonaut-Southwest Insurance Company; Argonaut-Midwest Insurance Company; Argonaut Great Central Insurance Company; Argonaut Limited Risk Insurance Company; ARIS Title Insurance Corporation; Select Markets Insurance Company; Colony Insurance Company; Colony Specialty Insurance Company; Peleus Insurance Company (fka Colony National Insurance Company); Rockwood Casualty Insurance Company; Somerset Casualty Insurance Company; Grocers Insurance Agency, Inc.; Central Insurance Management, Inc.; Alteris Insurance Services, Inc.; Trident Insurance Services, LLC; Commercial Deposit Insurance Agency, Inc.; Sonoma Risk Management, LLC; John Sutak Insurance Brokers, Inc.; Colony Management Services, Inc.; Argonaut Management Services, Inc.; and Argonaut Claims Management, LLC.  This Privacy Policy applies to all companies and business produced or underwritten within Argo Group.

# SIGNATURE PAGE

IN WITNESS WHEREOF, the company issuing this policy has caused this policy to be signed by its President and its Secretary and countersigned (if required) on the Declarations page by a duly authorized representative of the company. This endorsement is executed by the company stated in the Declarations.

Colony Insurance Company

**President**                              **Secretary**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 -----------------------------------------------------------------X

PINE MANAGEMENT, INC.,                                      Docket No.: 22-cv-02407 (MKV)
                                                            (BCM)

                                         Plaintiff(s),

                    -against-

COLONY INSURANCE COMPANY,

                                         Defendant(s).
 -----------------------------------------------------------------X


**DEFENDANT'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR JUDGMENT
<u>ON THE PLEADINGS</u>**

RIVKIN RADLER LLP

M. Paul Gorfinkel, Esq. (MPG 2069)
paul.gorfinkel@rivkin.com
Amanda R. Griner, Esq. (ARG 7625)
amanda.griner@rivkin.com
926 RXR Plaza
Uniondale, New York 11556-0926
Phone: (516) 357-3000
Fax: (516) 357-3333

Attorneys for Defendant
Colony Insurance Company

Dated:  Uniondale, New York
             September 6, 2022

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES............................................................................................. ii

FIRST DISPOSITIVE COVERAGE DEFENSE:  CLAIM PRIOR
TO THE POLICY PERIOD ........................................................................................... 2

SECOND DISPOSITIVE COVERAGE DEFENSE:  PRIOR
KNOWLEDGE OF WRONGFUL ACT....................................................................... 4

THIRD DISPOSITIVE COVERAGE DEFENSE:  "WRONGFUL
ACTS" PRIOR TO THE RETROACTIVE DATE....................................................... 8

CONCLUSION.............................................................................................................. 10

### TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ambassador Group Litig.*,
  830 F. Supp. 147 (E.D.N.Y. 1993) ...........................................................3

*Evanston Ins. Co. v. GAB Business Services*,
  132 A.D.2d 180, 521 N.Y.S.2d 692 (1st Dep't 1987) ...............................3

*High Point Design v. LM Ins. Corp.*,
  911 F.3d 89 (2nd Cir. 2018)......................................................................9

*McCabe v. St. Paul Fire & Marine Ins. Co.*,
  79 A.D.3d 1612, 914 N.Y.S.2d 814 (4th Dep't 2010) ..............................2

*Nomura Holding America v. Federal Ins. Co.*,
  629 Fed. Appx. 38 (2nd Cir. 2015)...........................................................9

*North River Insurance Co. v. Leifer*,
  2022 U.S. Dist. LEXIS 75134 (S.D.N.Y. Apr. 25, 2022).....................6, 8

*OneBeacon Insurance Co. v. T. Wade Welch & Assoc.*,
  841 F.3d 669 (5th Cir. 2016) ....................................................................7

*Purcigliotti v. Risk Enter. Mgmt.*,
  240 A.D.2d 205, 658 N.Y.S.2d 296 (1st Dept' 1997) ..............................3

*Quanta Lines Ins. Co. v. Investors Capital Corp.*,
  2009 U.S. Dist. LEXIS 117689 (S.D.N.Y. 2009) .....................................5

*Schlather, Stumbar, Parks & Salk v. One Beacon Ins. Co.*,
  2011 U.S. Dist. LEXIS 147931 (N.D.N.Y. Dec. 22, 2011).......................7

*Seneca Insurance Co. v. Kemper Ins. Co.*,
  133 Fed. Appx. 770 (2d Cir. 2005), *aff'g* 2004 U.S. Dist. LEXIS 9159
  (S.D.N.Y. 2004) ..................................................................................2, 4, 8

*Stout Risius Ross, v. Aspen Specialty Insurance Company*,
  21 Civ. 4412 (S.D.N.Y. March 18, 2022)...............................................4, 5

**Other Authorities**

Federal Rule of Civil Procedure 12(c) ...........................................................1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

PINE MANAGEMENT, INC.,                                    Docket No.: 22-cv-02407 (MKV)

                                           Plaintiff(s),
                         -against-

COLONY INSURANCE COMPANY,

                                           Defendant(s).
-------------------------------------------------------------------X

**DEFENDANT'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR JUDGMENT
ON THE PLEADINGS**

      Defendant, Colony Insurance Company ("Colony") respectfully submits this reply memorandum of law in further support of its motion, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings.

      In its brief, Pine struggles mightily to avoid the plain meaning of the Colony policy, and to manufacture ambiguities or questions of fact where there are none.  The fact remains, however, that the Policy does not cover the Schneider lawsuit because:

1. The H&K Letter is a "Claim" prior to the policy period.

2. Pine was aware, prior to the policy period, that it had committed "Wrongful Acts."

3. The "Wrongful Acts" are deemed all to have been committed prior to the Retroactive Date.

      Any one of these three arguments is sufficient, by itself, to require judgment on Colony's behalf.  By contrast, in order to defeat this motion, Pine must rebut each one of them.  Pine has not done so, and cannot do so.

1

**FIRST DISPOSITIVE COVERAGE DEFENSE:  CLAIM PRIOR TO THE POLICY PERIOD**

There is coverage under the Colony policy only if a Claim is first made during the policy period, that is, between August 1, 2018 and December 1, 2019.  The H&K Letter was forwarded to Pine on July 17, 2018, before policy inception.  That Letter is a "Claim."  Therefore, there is no coverage.

It is not necessary that the H&K Letter expressly demand monetary, non-monetary or injunctive relief.  The cases that Colony cites in its main brief make it clear that the existence of a claim does not depend on the presence of "magic words" like "we demand that you pay…" or the like.  Even in the absence of such words, if the import of a claimant's language can admit of no interpretation other than that it is a demand for relief, then it is a "Claim."  As Colony noted, the Second Circuit, affirming a decision from this District "for the reasons stated by the District Court," held that a letter is a claim because

> although counsel did not specifically state that the purpose of the
> meeting was to demand money damages or other relief, the
> implication is that counsel requested the meeting for this reason.

*Seneca Insurance Co. v. Kemper Ins. Co.,* 133 Fed. Appx. 770 (2d Cir. 2005), *aff'g* 2004 U.S. Dist. LEXIS 9159 (S.D.N.Y. 2004)*.*  Likewise, the Fourth Department found that a letter was a claim because

> Although plaintiffs did not specifically request monetary damages
> in that letter, they demanded that Fretz rectify their problem.

*McCabe v. St. Paul Fire & Marine Ins. Co.,* 79 A.D.3d 1612, 1614, 914 N.Y.S.2d 814, 816 (4th Dep't 2010).

As Colony demonstrated in its main brief, the H&K Letter can be understood as nothing other than the Schneider entities' demand for fees, an accounting, and so forth.  Pine is wrong in arguing that it did not believe that the Schneider entities were really making a claim, and that it

did not think the Schneider entities intended to sue.  Pine's subjective understanding of what the

H&K Letter meant is beside the point.  The point is whether or not the H&K Letter is a claim.

That depends on what the Schneider entities were requesting – not what Pine believed that they

were requesting.

Pine's contention (p. 6 of its brief) that the H&K Letter does not demand an accounting,

but rather, that it merely requests a review of financial documents, is simply wrong.  Page 5 of

the H&K Letter is headed "D. Claim For An Accounting," and it goes on to state

> New York law holds that a member of a limited liability company
> has the right to an equitable accounting under common law [citing
> cases].

Mitchell Geller, the author of this letter, was not engaged in simply citing abstract principles of

law.  The only reason he would have written "Claim For An Accounting," and then noted that his

clients have a right to an accounting, is if his clients were demanding an accounting.

Pine cites *In re Ambassador Group Litig.*, 830 F. Supp. 147 (E.D.N.Y. 1993), but that

case is of little help to Pine.  The policy there (unlike the Policy here) did not define "claim," so

the court ruled that "a claim is a demand for specific relief owed because of alleged

wrongdoing."  830 F. Supp. at 155.  The H&K Letter is just that; it is a demand for specific kinds

of relief, e.g., "Claim for an Accounting" and a refund of fees, because of Pine's alleged

wrongdoing.  Similarly, Pine's citation to *Evanston Ins. Co. v. GAB Business Services*, 132

A.D.2d 180**,** 521 N.Y.S.2d 692 (1st Dep't 1987), does not advance its case; the court wrote that

"the parties intended that a claim must relate to an assertion of legally cognizable damage, and

must be a type of demand that can be defended, settled and paid by the insurer," 132 A.S.2d at

185.  The H&K Letter is exactly that.  And *Purcigliotti v. Risk Enter. Mgmt.*, 240 A.D.2d 205**,**

658 N.Y.S.2d 296  (1st Dept' 1997), is the same.

Mr. Geller would not have authored a 15-page accusatory tome if he were doing nothing more than telling a story. The H&K Letter would be essentially pointless unless it is understood as an adversarial "demand for monetary, non-monetary or injunctive relief," within the Policy's definition of "Claim." *See Seneca Insurance Co. v. Kemper Ins. Co, supra.* The H&K Letter of July 17, 2018 is a "Claim," and it was made against Pine prior to the Colony policy period. The Schneider Action is not covered.

### SECOND DISPOSITIVE COVERAGE DEFENSE:  PRIOR KNOWLEDGE OF WRONGFUL ACT

Colony's argument on this point is simple, straightforward, and undeniable.

Pursuant to SECTION IV – EXCLUSIONS, Section A, the Colony Policy does not apply to any Claim:

> A…….arising out of a **Wrongful Act**… occurring prior to the **Policy Period** if, prior to the effective date of the [Policy]…
>
> 2. Any **Insured** had a reasonable basis to believe that the **Insured** had committed a **Wrongful Act**…

Pursuant to Section III – Definitions, a "Wrongful Act" means:

> … any actual or alleged act, error, omission, or breach of duty by any Insured in the rendering or of failure to render Real Estate Development Services…

Therefore, if the definition of "Wrongful Act" is super-imposed into the exclusion, then there is no coverage if, before the policy period,

> Any **Insured** had a reasonable basis to believe that the **Insured** had committed any actual or alleged act, error, omission, or breach of duty…

There is no ambiguity here. *Stout Risius Ross, v. Aspen Specialty Insurance Company*, 21 Civ. 4412 (S.D.N.Y. March 18, 2022). If Pine had a reasonable belief, before the Policy incepted, that it had committed an *alleged* error, omission, or breach of duty, there is no

coverage.  The H&K Letter *alleges* errors, omissions, or breaches of duty.  Whether or not those allegations are true, they are *alleged* errors, omissions, and breaches of duty.  And that Letter predated the policy period.

Colony understands that Pine's belief must be both subjective and objective.  But that test is satisfied.  A Wrongful Act includes an "alleged" error, omission or breach of duty.  If, before Policy inception, Pine believed, both objectively and subjectively, that it had committed an *alleged* error, omission or breach of duty, the court's inquiry is at an end: there is no coverage.

As soon as Pine received the H&K Letter (which it did prior to Policy inception), it knew subjectively that it had committed an "*alleged* error, omission or breach of duty."  Pine read, in that Letter, that the Schneider entities were alleging that it had breached its duties in numerous ways, set out over 15 pages.  It may have been prepared to deny each and every one of those allegations - but it knew subjectively that it had committed *alleged* errors, omissions or breaches of duty.

By the same token, upon its receipt of the H&K Letter, Pine had objective knowledge that it had committed *alleged* errors, omissions or breaches of duty.  Any reasonable person reading that Letter could have no understanding other than that it had *allegedly* committed errors, omissions or breaches of duty.  And it also objectively obvious, from a reading of that Letter, that a lawsuit might result; Mr. Geller's expressed desire for an amicable resolution leaves no doubt that the consequences of a failure to reach such a resolution would indeed be a lawsuit.  As is clear from a decision from this District from earlier this year*, Stout Risius Ross, v. Aspen Specialty Insurance Company, supra*, an objective belief that a suit *might* be filed is all that is needed.

And that is why, in *Quanta Lines Ins. Co. v. Investors Capital Corp.,* 2009 U.S. Dist. LEXIS 117689 (S.D.N.Y. 2009), cited in Colony's main brief, an exclusion similar to the one under discussion was applied.  The accusation against the insured, from before the policy incepted, was withdrawn.  It would obviously never develop into an "actual" wrongful act.  But the court nevertheless concluded that the erroneous letter was a "claim" because it set forth an "alleged," albeit non-meritorious, wrongful act.

It is very understandable that an insurer might wish to exclude coverage where an insured has prior knowledge of not just an actual error, omission or breach of duty, but also an alleged one.  An insurer might reasonably wish to avoid a potential insured learning that an allegation has been made against it, and then rushing to purchase coverage before anything further transpires.  After all, an insurance policy insures against risks, not expected claims.  Once an insured is aware that there is an allegation of a wrongful act against it, the element of fortuity is lost, and an insurer might very reasonably wish to exclude coverage for any claim that subsequently results therefrom.

In its main brief, Colony discussed at some length the very recent decision from this District in *North River Insurance Co. v. Leifer*, 2022 U.S. Dist. LEXIS 75134 (S.D.N.Y. Apr. 25, 2022).  That decision illustrates how judgment on the pleadings is warranted where the insured knew, prior to the policy period, of even a possible claim against him.  As this Court ruled, in words that are directly applicable to this case,

> … the subjective test does not require the insured to believe that a claim is likely [quoting *Quanta Lines*, *supra*].  This prong simply requires that the insured know the facts underlying the eventual malpractice claim.

But that decision is pertinent for another reason, as well.  Pine has argued that since the Schneider parties and the principals of Pine are related, there was less reason for Pine to suspect

6

that a lawsuit would be filed.  Even assuming that there is a familial relationship,[1] the *Leifer*

decision disposes of this argument.  In that case, the fact that the insured and the claimant in that

case were friends did not affect the insured's subjective expectation of a claim being made.

Pine cites the decision in *OneBeacon Insurance Co. v. T. Wade Welch & Assoc.*, 841 F.3d

669, 677 (5th Cir. 2016), as follows:

> The district court could not apply the literal policy language because of
> the extreme overbreadth of the wrongful action definition used in the
> exclusion: "any actual or alleged act, error, omission or breach of duty
> arising out of the rendering or the failure to render professional legal
> services."  On its face, this covers every single thing an attorney does or
> does not do, wrongful or not.  As written, then, the exclusion renders the
> coverage illusory and is facially absurd.

The Court's concern does not apply in this case.  The exclusion in the Policy does not cover

"every single thing an attorney does or does not do, wrongful or not."  It applies only when

something the attorney did or did not do has resulted in an "actual or alleged" wrongful act.

There must be an allegation of wrongdoing.  Thus, the Court's concern is not applicable to this

case.[2]

Pine cites *Schlather, Stumbar, Parks & Salk v. One Beacon Ins. Co.*, 2011 U.S. Dist.

LEXIS 147931 (N.D.N.Y. Dec. 22, 2011), but the reason the court there found that the Known

Claims Exclusion did not apply to the duty to defend was that

> it was not "clear" that the Known Claims Exclusion applied as the
> applicability of the exclusion required determining whether a
> reasonable attorney could expect a claim to arise.

---

[1] It is to be noted that the record does not support that there is a familial relationship between the Schneider parties
and the principals of Pine.  Pine mentions the familial relationship on page 16 of its brief, but the support that Pine
brings for this assertion, namely, Nolan Decl., Ex. A- 20, does not actually support it.

[2] For the same reason, the court's concern in *OneBeacon* is somewhat difficult to understand.

Here, by contrast, Pine knew, as a matter of law, that it had committed an "alleged" error, omission or breach of duty, and the likelihood of litigation was real. *Cf. North River Insurance Co. v. Leifer, supra,* where the exclusion applied to the duty to defend.

Upon its receipt of the H&K Letter, Pine was aware, both objectively and subjectively, that it had committed a "Wrongful Act" as the term is defined in the Policy.  Accordingly, the Prior Knowledge Exclusion is applicable, and precludes coverage for Pine in connection with the Schneider Action.

### THIRD DISPOSITIVE COVERAGE DEFENSE:  "WRONGFUL ACTS" PRIOR TO THE RETROACTIVE DATE

Coverage under the Policy is possible only if a Wrongful Act was committed between the Retroactive Date and the end of the policy period.  Thus, there is no coverage for any Wrongful Act committed before March 1, 2016.  And given that

> Two or more Claims arising out of a single Wrongful Act, or any series of related Wrongful Acts, will be considered a single Claim. Each Wrongful Act, in a series of related Wrongful Acts, will be deemed to have occurred on the date of the first such Wrongful Act,

it follows that if even a single related Wrongful Act was committed prior to March 1, 2016, then there is no coverage for any related Wrongful Act.

Colony showed, in its main brief, that the Schneider Complaint contains multiple allegations of Wrongful Acts committed prior to March 1, 2016.  Since all of the Wrongful Acts that are alleged in the Schneider Complaint are "related," they all relate back to those early Wrongful Acts, and thus, none of them are covered.

Pine engages in speculation that a trier of fact could determine that if Pine committed any Wrongful Acts, they were all committed after the Retroactive Date.  But that could also have happened in *Seneca Insurance Co. v. Kemper Ins. Co., supra,* 133 Fed. Appx. 770 (2d Cir.

2005), *aff'g* 2004 U.S. Dist. LEXIS 9159 (S.D.N.Y. 2004), which Colony discussed in its main

brief.  A trier of fact might have concluded that Gallagher's antitrust claim lacked merit, but that

that of JES was meritorious.  If so, only the post-Retroactive Date Wrongful Act would have

been valid.  But the court still found no duty to defend, because the first related claim predated

the Retroactive Date.

 If it should indeed happen that all claims based on pre-Retroactive Date Wrongful Acts

are rejected, then the duty to defend might commence at the time that happens.  The Second

Circuit in *High Point Design v. LM Ins. Corp.*, 911 F.3d 89 (2nd Cir. 2018), triggered a duty to

defend mid-case, when the evidence first showed that a covered claim existed.  If this should

happen here, Pine would be free to re-tender this claim to Colony, so that Colony could

determine whether it had a duty to defend as of the time when the last claim based on a pre-

Retroactive Date Wrongful Act was rejected.

 Pine argues (page 24 of its brief) that two specific allegations are not "tethered" to any

pre-Retroactive Date Wrongful Act.  But they, like all the other claims against Pine, are related

to its real estate management of the related LLC's.  As Colony showed in its main brief, the

Second Circuit declared in *Nomura Holding America v. Federal Ins. Co.,* 629 Fed. Appx. 38, 39

(2nd Cir. 2015), that the relevant inquiry is:

> …whether the underlying claims are based upon, arising from, or
> in consequence of the same or related facts, circumstances,
> situations, transactions or events or the same or related series of
> facts, circumstances, situations, transactions or events…

 The Wrongful Acts against Pine all arose from Pine's alleged wrongful conduct in

providing Real Estate Development Services to the plaintiffs.  The Wrongful Acts all center on

allegedly unauthorized fees, allegedly unauthorized capital expenditures and loans, violations of

the operating agreements, failure to allow inspection of documents, inadequate distributions to

9

the LLC's, etc.  And they span the time period from 2012 (four years before the Retroactive

Date) to 2019.  Thus, all of the Wrongful Acts are related, and they must all be deemed to have

been committed prior to the Retroactive Date of the Colony policy.

As a final note, Colony did not contend in its main brief that the duty to defend should be

measured by the same rules as the duty to indemnify.  It raised the issue of indemnity in its main

brief solely to state that if there is no duty to defend, then there is also no duty to indemnify.  But

given Pine's representation that it has incurred $1 million (the Policy limit) in defense costs, the

duty to indemnify will not be at issue here.

### <u>CONCLUSION</u>

For each of the three independent and sufficient reasons argued above, the Colony Policy

does not cover the Schneider Action.  Colony respectfully submits that it is entitled to judgment

on the pleadings, and it asks this Court to enter judgment in its favor.

Respectfully submitted,


RIVKIN RADLER LLP


By: *s/Paul Gorfinkle*
      M. Paul Gorfinkel, Esq. (MPG 2069)
      paul.gorfinkel@rivkin.com
      Amanda R. Griner, Esq. (ARG 7625)
      amanda.griner@rivkin.com
      926 RXR Plaza
      Uniondale, New York 11556-0926
      Phone: (516) 357-3000
      Fax: (516) 357-3333

      Attorneys for Defendant
      Colony Insurance Company

Dated:  Uniondale, New York
      September 6, 2022

5964733 v2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/20/2023

PINE MANAGEMENT, INC.,

                    Plaintiff,

          -against-

COLONY INSURANCE COMPANY,

                    Defendant.

1:22-cv-02407 (MKV)

**MEMORANDUM OPINION
AND ORDER GRANTING
MOTION FOR JUDGMENT
ON THE PLEADINGS**

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Pine Management, Inc. ("Pine") seeks coverage from Defendant Colony Insurance Company ("Colony") under a professional liability insurance policy for an underlying lawsuit against Pine. Colony moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), contending that the underlying lawsuit falls entirely outside of the scope of coverage provided by the Colony Policy. For the following reasons, the motion is GRANTED.

## BACKGROUND[1]

### I.     The Underlying Litigation

Pine manages, develops, and acquires rental apartment buildings. Complaint ¶ 2 ("Compl.") [ECF No. 1]. On July 26, 2019, Jerome Schneider filed a complaint ("the Schneider Complaint") in New York state court on behalf of the members of ten Limited Liability Companies ("LLCs") managed by Pine, asserting claims against Pine and others ("the Schneider Action"). Compl. ¶¶ 28, 29. The Schneider Complaint alleges ten causes of action, including breach of contract, breach of fiduciary duty, inspection of books and records, and an accounting. *See* Compl.

---

[1] The facts are taken from the Complaint, and for purposes of this motion, are accepted as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

¶ 29; Compl. Exhibit 2 ("Schneider Compl.") [ECF No. 1-2].  The Schneider Complaint seeks

damages, in addition to injunctive and declaratory relief.  *See* Schneider Compl.

The first exhibit attached to the Schneider Complaint is a July 17, 2018 letter from Michael

Geller of the law firm Holland & Knight ("HK Letter").  *See* Answer Exhibit 1 ("HK Letter")

[ECF No. 11-1].[2]  The HK Letter "advise[d] [Pine] of claims by the Schneider/Schwartz Group

against Pine."  *See* HK Letter 1.

## II.   The Colony Policy

Pine provided notice of the Schneider Complaint to Colony under a Real Estate Developers

PROtect Professional Liability Insurance policy ("the Colony Policy" or "the Policy"), with a

Policy Period of August 1, 2018 to December 1, 2019, and a Retroactive Date of March 1, 2016.

Compl. ¶¶ 1, 14, 25; Complaint Exhibit 1 ("Policy") [ECF No. 1-1].  The Colony Policy provides

coverage for claims in connection with "Real Estate Development Service[s]."[3]  Policy Item 3.

The Policy states that Colony "agrees to pay on behalf of [Pine], Loss in excess of the

Deductible amount and up to the Limits of Liability . . . provided that such Loss results from a

Claim first made and reported in writing during the Policy Period . . . [and] aris[es] out of a

Wrongful Act committed . . . on or after the Retroactive Date" and "before the end of the Policy

Period."  Compl. ¶ 15; Policy I.A.1.  The Policy defines a "Claim" as "a written demand received

by [Pine] for monetary, non-monetary or injunctive relief."  Compl. ¶ 16; Policy III.B.1.  It also

states that "[t]wo or more Claims arising out of a single Wrongful Act, or any series of related

---

[2] The parties have stipulated that the Complaint in this action shall be deemed to include the Schneider Complaint and all exhibits that were attached to it, including the HK Letter.  *See* Proposed Stipulation and Order ¶ 3 [ECF No. 21].  Accordingly, the Court may consider the HK Letter in evaluating this Rule 12(c) motion.

[3] For purposes of this motion, Colony does not dispute that the Schneider Complaint alleges claims based on Pine's "Real Estate Development Services."  Memorandum of Law in Support [ECF No. 25] at 2 n.3.

Wrongful Acts, will be considered a single Claim" and each Wrongful Act "will be deemed to have occurred on the date of the first such Wrongful Act." Policy VI.C.

Finally, a "Wrongful Act" is defined as "any actual or alleged act, error or omission, or breach of duty by [Pine] in the rendering or failure to render Real Estate Development Services." Compl. ¶ 17; Policy III.II. The Colony Policy expressly *excludes* from coverage any Claim "arising out of a Wrongful Act . . . occurring prior to the Policy Period if, prior to the effective date . . . [Pine] had a reasonable basis to believe that [it] had committed a Wrongful Act." Compl. ¶ 21; Policy IV.A.2.

### III.    Pine's Claim for Coverage

Colony disclaimed any obligation of defense or indemnity for the Schneider Action. Compl. ¶ 46. Pine then filed this Complaint against Colony in March 2022, alleging breach of contract. Compl. ¶¶ 64–78. Pine seeks damages and a declaration that Colony has a duty to defend and to indemnify in the Schneider Action. Compl. ¶¶ 54–63, 78.

Colony moves for judgment on the pleadings under Rule 12(c). *See* Motion for Judgment on the Pleadings [ECF No. 23]; Memorandum of Law in Support [ECF No. 25] ("Def. Mem."). Pine opposed. *See* Memorandum of Law in Opposition [ECF No. 26] ("Pl. Opp."). Colony replied. *See* Reply Memorandum of Law in Support [ECF No. 28].

### LEGAL STANDARD

The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is identical to the Rule 12(b)(6) standard. *See Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). The Complaint therefore "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.* While the Court "must accept as true all of the allegations

contained in a complaint," this "tenet . . . is inapplicable to legal conclusions" and "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Id.* On a Rule 12(c) motion, the Court "considers the complaint, the answer, any written

documents attached to them, and any matter of which the court can take judicial notice for the

factual background of the case." *Sarikaputar v. Veratip Corp.*, 371 F. Supp. 3d 101, 104 (S.D.N.Y.

2019) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

<u>**ANALYSIS**</u>

The Policy provides Pine with both defense and indemnity coverage. Colony raises three,

independently sufficient reasons, for why there is no possibility of coverage here. Although a

motion for judgment on the pleadings is "an unusual procedural posture for a duty to defend case,"

the Court agrees that the express provisions of the Colony Policy preclude any coverage, defense,

or indemnity, in connection with the Schneider Complaint. *Suez Treatment Sols., Inc. v. ACE Am.*

*Ins. Co.*, No. 1:20-CV-06082 (MKV), 2022 WL 954601, at *1 (S.D.N.Y. Mar. 30, 2022). As such,

there is no duty to defend or to indemnify. *See EAD Metallurgical, Inc. v. Aetna Cas. & Sur. Co.*,

905 F.2d 8, 11 (2d Cir. 1990).

**I.      The Claim Was Not Made and Reported During the Policy Period**

The Colony Policy provides coverage for "Claims first made and reported in writing during

the Policy Period." Compl. ¶ 15; Policy I.A.1. Colony argues that the Schneider Action is outside

the scope of coverage because the HK Letter, which was sent on July 7, 2018, constitutes a "Claim"

that was first made *before* the policy incepted on August 1, 2018. Def. Mem. 8–12.

a.      <u>*The HK Letter is a "Claim"*</u>

A "Claim" is defined by the Policy as "a written demand received by [Pine] for monetary,

nonmonetary, or injunctive relief." Compl. ¶ 16; Policy III.B.1. The HK Letter plainly meets this

definition of a "Claim."  In the letter, Schneider's counsel "advise[d] [Pine] of claims by the

Schneider/Schwartz Group against Pine."  *See* HK Letter 1.  Counsel contends that "there are many

serious issues arising from Pine's management . . . and such claims should survive a motion to

dismiss and a motion for summary judgment."  HK Letter 2.  Counsel then detailed a number of

allegations, including that Pine "breached its fiduciary dut[ies], "ha[d] not acted in good faith,"

"breached provisions of the governing Operating Agreements," "failed to disclose material facts,"

was "involved in related party transactions," and "failed to provide key documents."  HK Letter 1.

The HK Letter also alleges that Pine was paid $622,742 in fees in 2017, despite the fact that Pine

had "no authority to pay itself fees."  HK Letter 7.  The HK Letter requests non-monetary relief in

the form of an accounting and demands ten categories of documents for inspection.  *See* HK Letter

5, 11.  Finally, counsel "suggest[s] that a meeting be scheduled to resolve the Schneider/Schwartz

Group's concerns," in an effort to "bring about a mutually satisfactory resolution of these claims

without having to commence litigation that would be costly to all parties involved."  HK Letter 2,

13.

   Pine provides several theories for why the HK Letter is not a "Claim."  None succeeds.

First, Pine contends that the HK Letter simply "recite[s] . . . point[s] of law" and "requests to

review documents."  Pl. Opp. 6.  However, Second Circuit precedent indicates that a letter

"set[ting] forth [a] request under a claim of right, including [an] entitlement to the documents

identified" is sufficient to put an insured "on notice of the legal consequences of any failure to

comply."  *Weaver v. Axis Surplus Ins. Co.*, 639 F. App'x 764, 766–67 (2d Cir. 2016).  Moreover,

even where monetary damages are not "specifically request[ed]," a "demand[] that [an insured]

rectify [a] problem" can be sufficient to constitute a claim.  *McCabe v. St. Paul Fire & Marine

Ins. Co.*, 79 A.D.3d 1612, 1614, 914 N.Y.S.2d 814, 816 (4th Dep't 2010).  Here, the HK Letter

alleged misconduct, cited theories of liability, referenced legal authority, demanded specific

documents, requested an accounting, and suggested a meeting.  That is sufficient under New York law to constitute a claim.

Pine next attempts to characterize the HK Letter as using "precatory language," which failed to put Pine "on notice of the drastic legal repercussions that could result from noncompliance."  Pl. Opp. 7 (citing *Gil Enters., Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996)). But this assertion is contradicted by the plain language of the Letter, which explicitly mentions litigation and hypothesizes that the claims should survive pre-trial motion practice.

Finally, Pine attempts to manufacture a dispute of fact by asserting that what the requested meeting might "entail goes unstated in the [HK] letter."  Pl. Opp. 8.  But no such statement is necessary.  "Although counsel did not *specifically* state that the purpose of [the requested] meeting was to demand monetary damages or other relief, the implication" of the HK Letter "is that counsel requested the meeting for this reason."  *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02 CIV. 10088 (PKL), 2004 WL 1145830 (S.D.N.Y. May 21, 2004), *aff'd*, 133 F. App'x 770 (2d Cir. 2005).

> b.    *The Schneider Action and the HK Letter Are a Single*
>        *"Claim" That Was Not Made During the Policy Period*

Pine does not contest that the HK Letter was a predicate of the Schneider Action, which also indisputably is a Claim.  Under the Policy, "[t]wo or more Claims arising out of a single Wrongful Act, or any series of related Wrongful Acts, will be considered a single Claim."  Policy VI.C.  The Schneider Complaint involves largely the same facts, circumstances, and alleged violations as the HK Letter.  *Compare* HK Letter, *with* Schneider Compl.  Indeed, the Schneider Complaint itself explains that the HK Letter "discussed in great detail . . . [the] Plaintiffs' claims" against Pine.  Schneider Compl. ¶ 19.  As such, the Schneider Complaint and HK Letter are "considered a single Claim."  That Claim was made *before* the Policy Period—on the date the HK Letter was sent (July 17, 2018).  Because the Letter *predated* the Policy Period, the Schneider

Action is not covered by the Colony Policy.  This finding is independently sufficient to grant judgment on the pleadings.

## II.    Pine Had Knowledge of an Alleged "Wrongful Act" Prior to the Policy Period

Colony next contends that coverage is precluded because Pine was aware that it had committed a "Wrongful Act" prior to the effective date of the Policy.  The Colony Policy expressly excludes from coverage any Claim "arising out of a Wrongful Act . . . occurring prior to the Policy Period if, prior to the effective date . . . [Pine] had a reasonable basis to believe that [it] had committed a Wrongful Act."  Compl. ¶ 21; Policy IV.A.2.  A "Wrongful Act" is "any actual or *alleged* act, error or omission, or breach of duty by [Pine]."  Compl. ¶ 17; Policy III.II (emphasis added).

Under New York law, Pine must have *both* objective *and* subjective knowledge that it had committed a Wrongful Act.  *See Liberty Ins. Underwriters, Inc. v. Corpina Piergrossi Overzat & Klar LLP*, 78 A.D.3d 602, 604, 913 N.Y.S.2d 31, 33 (1st Dep't 2010).  More particularly, the subjective prong requires *Pine's* knowledge of the relevant facts prior to the effective date of the Policy, while the objective prong requires a showing that *a reasonable insured* might expect such facts to be the basis of a claim.  *Id.* at 604–05, 33.

After receiving the HK Letter, Pine was *subjectively* aware that it had committed a "Wrongful Act."  As described above, the HK Letter accused Pine of a variety of improper acts and breaches of duty.  Those allegations of misconduct—*regardless* of whether they were true or false—put Pine on notice of an *alleged* act, error, omission, or breach of duty.  Although Pine argues that the HK Letter did not "provide Pine with a reasonable basis to believe it *actually had committed* an alleged wrongdoing," Pl. Opp. 14–15 (emphasis added), no such showing is necessary where, as here, the Policy defines a "Wrongful Act" as including *alleged* acts.  Moreover, the subjective prong "simply requires that the insured know the facts underlying the

eventual . . . claim." *N. River Ins. Co. v. Leifer*, No. 21-CV-7775, 2022 WL 1210847, at *2 (S.D.N.Y. Apr. 25, 2022). The subjective prong is therefore satisfied.

For the same reason, the contents of the HK Letter would have informed a reasonable insured that it had committed an *alleged* Wrongful Act. Again, even assuming the allegations were false, a reasonable insured would have been put on notice by the allegations included in the HK Letter and therefore would have "*some* basis to anticipate a claim, regardless of whether the claim [was] likely to be filed or likely to succeed." *Leifer*, 2022 WL 1210847, at *3 (emphasis in original). Pine fundamentally misunderstands the objective prong, providing a smattering of different theories that, it alleges, might "impact a reasonable person's belief" that allegations in the HK Letter "would manifest in[to] a claim." Pl. Opp. 15, 16 (quotations omitted). But whether the claims were *actually pursued* is immaterial—the question is simply whether there was "*some* basis to anticipate a claim." *Leifer*, 2022 WL 1210847, at *3. Because there was "*some* basis" here, the objective prong is satisfied. *Id.*

Pine was subjectively and objectively aware that it had committed a "Wrongful Act" prior to the effective date of the Policy. The Schneider Complaint and HK Letter, which are treated as a single "Claim," are therefore not covered by the Colony Policy. This conclusion, too, is independently sufficient to grant judgment on the pleadings.

### III.   The Alleged "Wrongful Acts" Predate the Retroactive Date

Finally, the Policy only provides coverage for a "Claim . . . [that] aris[es] out of a Wrongful Act committed . . . on or after the Retroactive Date" and "before the end of the Policy Period." Compl. ¶ 15; Policy I.A.1. The Policy deems "[e]ach Wrongful Act, in a series of related Wrongful Acts" to "have occurred on the date of the *first* such Wrongful Act." Policy VI.C (emphasis added). Therefore, Colony argues that if even a *single* related Wrongful Act alleged in the

Schneider Complaint was committed *before* March 1, 2016, there is no coverage for *any* related Wrongful Act—even those committed *after* March 1, 2016.

In determining whether two acts are related, the relevant inquiry is "whether the underlying claims are based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." *Nomura Holding America, Inc. v. Fed. Ins. Co.*, 629 F. App'x 38, 40 (2d Cir. 2015) (citation omitted).

The Schneider Complaint alleges a long history of mismanagement by Pine and includes a number of allegations pre-dating March 1, 2016. For instance, it alleges that Pine "breach[ed] the Operating Agreements" by approving loans "outside the ordinary course of business" from September 2015 to June 2019, that Pine "paid management fees and construction management fees to itself" without approval "for the years 2012 through the first six months of 2019," and that, commencing in 2012, Pine dramatically increased cash reserves and reduced distributions to members without approval. Schneider Compl. ¶¶ 13, 16, 132 (internal quotation marks omitted).

In all, the Schneider Complaint alleges a history of business mismanagement by the same entity (Pine) in its operation of the same business (Real Estate Development Services) with the same parties (the Schneider Plaintiffs). Accordingly, the Court concludes that all of the allegations in the Schneider Complaint are "related" because they "are based upon . . . [a] related series of facts, circumstances, situations, transactions or events." *Nomura*, 629 F. App'x at 40.

In response, Pine vaguely contends, without legal authority, that the "trier of fact in the Schneider Action might determine that if Pine committed any Wrongful Act, it was committed after the Retroactive Date." Pl. Opp. 24. That point is irrelevant to the question of whether acts alleged *after* the retroactive date are related to acts that allegedly occurred *before* it.

Lastly, Pine identifies two allegations in the Schneider Complaint that it contends are "not tethered to any other alleged pre-Retroactive Date Wrongful Act." Pl. Opp. at 24. Not so. One allegation addresses Pine's refusal to provide records or to permit inspection of documents in March 2018, but the Complaint alleges a prior history of withholding similar information. *See* Schneider Compl. ¶¶ 406–16. The other allegation—that Pine attempted to amend the Operating Agreements to allow Pine to act as the manager in perpetuity—appears similarly related to the alleged history of Pine's self-aggrandizement and self-dealing. Because all of the Wrongful Acts contained in the Schneider Complaint either precede the Retroactive Date or relate to Wrongful Acts that do, the Colony Policy provides no coverage.

For these three independently sufficient reasons, the Court finds no possibility of coverage under the Colony Policy. Accordingly, Colony has no duty to defend or to indemnify Pine and judgment on the pleadings for Colony is appropriate.

## **CONCLUSION**

For the foregoing reasons, the motion for judgment on the pleadings is GRANTED. The Clerk of Court is respectfully requested to enter judgment for Colony dismissing the case, terminate docket entry 23, and close this case.

**SO ORDERED.**

Date:  **March 20, 2023**
         **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**

10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
PINE MANAGEMENT, INC.,

                           Plaintiff,

          -against-                                     22 **CIVIL** 2407 (MKV)

                                                        **JUDGMENT**

COLONY INSURANCE COMPANY,

                           Defendant.
-----------------------------------------------------------X

          It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Memorandum Opinion and Order dated March 20, 2023, Defendant's

motion for judgment on the pleadings is GRANTED. Judgment is entered for Colony dismissing

the case; accordingly, the case is closed.

**Dated:**  New York, New York

          March 21, 2023


                                                        **RUBY J. KRAJICK**

                                                        _____
                                                               **Clerk of Court**

                                          **BY:**        *K. mango*

                                                        _____
                                                               **Deputy Clerk**



**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted*. If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/.**

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)                    _____CV_____ (     )(     )

-against-

**NOTICE OF APPEAL**

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

Notice is hereby given that the following parties: _____

_____
(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the      ☐ judgment   ☐ order    entered on: _____
                                                                                        (date that judgment or order was entered on docket)

that: _____

_____
(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____            _____
Dated                                                     Signature*

_____
Name (Last, First, MI)

_____
Address                          City                          State                          Zip Code

_____            _____
Telephone Number                                     E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____                    _____CV_____ (      )(      )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

                                                    **MOTION FOR EXTENSION**
        -against-                                   **OF TIME TO FILE NOTICE**
                                                    **OF APPEAL**
_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)


I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appeal within the required
                                  date

time period because:

_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)


_____          _____
Dated:                                    Signature

                                          _____
                                          Name (Last, First, MI)

_____          _____
Address              City                 State                    Zip Code

_____          _____
Telephone Number                          E-mail Address (if available)


Rev. 3/27/15

**A-775**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (     )(     )

**MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma pauperis* on appeal. This motion is supported by the attached affidavit.

_____
Dated

_____
Name (Last, First, MI)

_____
Address          City

_____
Telephone Number

_____
Signature

_____
State          Zip Code

_____
E-mail Address (if available)

Rev. 12/23/13

**A-776**

## Application to Appeal In Forma Pauperis

_____**v.** _____     Appeal No. _____

District Court or Agency No. _____

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br>Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br>Date: _____ |

My issues on appeal are: (<u>required</u>):

1. *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

**A-777**

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | $ 0 | $ 0 | $ 0 | $ 0 |

2.    *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.    *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

- 2 -

**A-778**

4.      *How much cash do you and your spouse have? $_____*

*Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

**If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts.  If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.**

5.      *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
|  |  | Make and year: |
|  |  | Model: |
|  |  | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: |  |  |
| Model: |  |  |
| Registration #: |  |  |

6.      *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |

7.      *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

8.      *Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>    Are real estate taxes included? ☐ Yes ☐ No<br>    Is property insurance included? ☐ Yes ☐ No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

- 4 -

**A-780**

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
|     Homeowner's or renter's: | $ | $ |
|     Life: | $ | $ |
|     Health: | $ | $ |
|     Motor vehicle: | $ | $ |
|     Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
|     Motor Vehicle: | $ | $ |
|     Credit card (name): | $ | $ |
|     Department store (name): | $ | $ |
|     Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | $ 0 | $ 0 |

9.    *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

    ☐ Yes    ☐ No    If yes, describe on an attached sheet.

10.    *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* ☐ Yes ☐ No

    *If yes, how much?* $ _____

**A-781**

11.     *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.     *Identify the city and state of your legal residence.*

City _____   State _____

Your daytime phone number: _____

Your age: _____   Your years of schooling: _____

Last four digits of your social-security number: _____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PINE MANAGEMENT, INC., | Docket No.: 22-cv-02407 (MKV) (BCM) |
| Plaintiff, | |
| -against- | **NOTICE OF APPEAL** |
| COLONY INSURANCE COMPANY, | |
| Defendant. | |

Notice is hereby given that Pine Management, Inc., Plaintiff in the above-referenced proceeding, hereby appeals to the United States Court of Appeals for the Second Circuit from the Opinion and Order of the Honorable Mary Kay Vyskocil (ECF No. 36) entered in this action on the 20th day of March 2023 (the "Order") granting Defendant's motion for judgment on the pleadings and the Judgment entered by the Clerk of Court on the 21st day of March 2023 (ECF No. 37) (the "Judgment").  A true and correct copy of the Order (ECF No. 36) and Judgment (ECF No. 37) are attached hereto as **Exhibits A and B**, respectively.  Plaintiff appeals from each and every part of the Order and Judgment by which it was aggrieved.

Dated:  April 17, 2023          ANDERSON KILL, P.C.

By: */s/ Dennis J. Nolan*
Dennis J. Nolan, Esq.
John M. Leonard, Esq.
Regan E. Samson, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel.: (212) 278-1000
Fax: (212) 278-1733
Email: dnolan@andersonkill.com
Email: jleonard@andersonkill.com
Email: rsamson@andersonkill.com
*Attorneys for Plaintiff Pine Management, Inc*

docs-100588365.2

## CERTIFICATE OF SERVICE

On April 17, 2023, I, Dennis J. Nolan, served the foregoing document, with referenced

Exhibit A, by uploading the same with the Court's CM/ECF system which caused the same to be

served on all interested parties registered with the system, including counsel listed below:

M. Paul Gorfinkel, Esq.
paul.gorfinkel@rivkin.com
Amanda R. Griner, Esq.
amanda.griner@rivkin.com
926 RXR Plaza
Uniondale, New York 11556-0926
Phone: (516) 357-3000
Fax: (516) 357-3333

*Attorneys for Defendant*
*Colony Insurance Company*

/s/ Dennis J. Nolan
Dennis J. Nolan

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/20/2023

---

PINE MANAGEMENT, INC.,

        Plaintiff,

        -against-

COLONY INSURANCE COMPANY,

        Defendant.

---

1:22-cv-02407 (MKV)

**MEMORANDUM OPINION
AND ORDER GRANTING
MOTION FOR JUDGMENT
ON THE PLEADINGS**

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Pine Management, Inc. ("Pine") seeks coverage from Defendant Colony Insurance Company ("Colony") under a professional liability insurance policy for an underlying lawsuit against Pine. Colony moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), contending that the underlying lawsuit falls entirely outside of the scope of coverage provided by the Colony Policy. For the following reasons, the motion is GRANTED.

## BACKGROUND[1]

### I.    The Underlying Litigation

Pine manages, develops, and acquires rental apartment buildings. Complaint ¶ 2 ("Compl.") [ECF No. 1]. On July 26, 2019, Jerome Schneider filed a complaint ("the Schneider Complaint") in New York state court on behalf of the members of ten Limited Liability Companies ("LLCs") managed by Pine, asserting claims against Pine and others ("the Schneider Action"). Compl. ¶¶ 28, 29. The Schneider Complaint alleges ten causes of action, including breach of contract, breach of fiduciary duty, inspection of books and records, and an accounting. *See* Compl.

---

[1] The facts are taken from the Complaint, and for purposes of this motion, are accepted as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

¶ 29; Compl. Exhibit 2 ("Schneider Compl.") [ECF No. 1-2]. The Schneider Complaint seeks

damages, in addition to injunctive and declaratory relief. *See* Schneider Compl.

The first exhibit attached to the Schneider Complaint is a July 17, 2018 letter from Michael

Geller of the law firm Holland & Knight ("HK Letter"). *See* Answer Exhibit 1 ("HK Letter")

[ECF No. 11-1].[2] The HK Letter "advise[d] [Pine] of claims by the Schneider/Schwartz Group

against Pine." *See* HK Letter 1.

## II.      The Colony Policy

Pine provided notice of the Schneider Complaint to Colony under a Real Estate Developers

PROtect Professional Liability Insurance policy ("the Colony Policy" or "the Policy"), with a

Policy Period of August 1, 2018 to December 1, 2019, and a Retroactive Date of March 1, 2016.

Compl. ¶¶ 1, 14, 25; Complaint Exhibit 1 ("Policy") [ECF No. 1-1]. The Colony Policy provides

coverage for claims in connection with "Real Estate Development Service[s]."[3] Policy Item 3.

The Policy states that Colony "agrees to pay on behalf of [Pine], Loss in excess of the

Deductible amount and up to the Limits of Liability . . . provided that such Loss results from a

Claim first made and reported in writing during the Policy Period . . . [and] aris[es] out of a

Wrongful Act committed . . . on or after the Retroactive Date" and "before the end of the Policy

Period." Compl. ¶ 15; Policy I.A.1. The Policy defines a "Claim" as "a written demand received

by [Pine] for monetary, non-monetary or injunctive relief." Compl. ¶ 16; Policy III.B.1. It also

states that "[t]wo or more Claims arising out of a single Wrongful Act, or any series of related

---

[2] The parties have stipulated that the Complaint in this action shall be deemed to include the Schneider Complaint and all exhibits that were attached to it, including the HK Letter. *See* Proposed Stipulation and Order ¶ 3 [ECF No. 21]. Accordingly, the Court may consider the HK Letter in evaluating this Rule 12(c) motion.

[3] For purposes of this motion, Colony does not dispute that the Schneider Complaint alleges claims based on Pine's "Real Estate Development Services." Memorandum of Law in Support [ECF No. 25] at 2 n.3.

Wrongful Acts, will be considered a single Claim" and each Wrongful Act "will be deemed to have occurred on the date of the first such Wrongful Act." Policy VI.C.

Finally, a "Wrongful Act" is defined as "any actual or alleged act, error or omission, or breach of duty by [Pine] in the rendering or failure to render Real Estate Development Services." Compl. ¶ 17; Policy III.II. The Colony Policy expressly *excludes* from coverage any Claim "arising out of a Wrongful Act . . . occurring prior to the Policy Period if, prior to the effective date . . . [Pine] had a reasonable basis to believe that [it] had committed a Wrongful Act." Compl. ¶ 21; Policy IV.A.2.

### III.    Pine's Claim for Coverage

Colony disclaimed any obligation of defense or indemnity for the Schneider Action. Compl. ¶ 46. Pine then filed this Complaint against Colony in March 2022, alleging breach of contract. Compl. ¶¶ 64–78. Pine seeks damages and a declaration that Colony has a duty to defend and to indemnify in the Schneider Action. Compl. ¶¶ 54–63, 78.

Colony moves for judgment on the pleadings under Rule 12(c). *See* Motion for Judgment on the Pleadings [ECF No. 23]; Memorandum of Law in Support [ECF No. 25] ("Def. Mem."). Pine opposed. *See* Memorandum of Law in Opposition [ECF No. 26] ("Pl. Opp."). Colony replied. *See* Reply Memorandum of Law in Support [ECF No. 28].

### LEGAL STANDARD

The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is identical to the Rule 12(b)(6) standard. *See Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). The Complaint therefore "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.* While the Court "must accept as true all of the allegations

contained in a complaint," this "tenet . . . is inapplicable to legal conclusions" and "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Id.* On a Rule 12(c) motion, the Court "considers the complaint, the answer, any written

documents attached to them, and any matter of which the court can take judicial notice for the

factual background of the case." *Sarikaputar v. Veratip Corp.*, 371 F. Supp. 3d 101, 104 (S.D.N.Y.

2019) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

<u>ANALYSIS</u>

The Policy provides Pine with both defense and indemnity coverage. Colony raises three,

independently sufficient reasons, for why there is no possibility of coverage here. Although a

motion for judgment on the pleadings is "an unusual procedural posture for a duty to defend case,"

the Court agrees that the express provisions of the Colony Policy preclude any coverage, defense,

or indemnity, in connection with the Schneider Complaint. *Suez Treatment Sols., Inc. v. ACE Am.

Ins. Co.*, No. 1:20-CV-06082 (MKV), 2022 WL 954601, at *1 (S.D.N.Y. Mar. 30, 2022). As such,

there is no duty to defend or to indemnify. *See EAD Metallurgical, Inc. v. Aetna Cas. & Sur. Co.*,

905 F.2d 8, 11 (2d Cir. 1990).

### I.     The Claim Was Not Made and Reported During the Policy Period

The Colony Policy provides coverage for "Claims first made and reported in writing during

the Policy Period." Compl. ¶ 15; Policy I.A.1. Colony argues that the Schneider Action is outside

the scope of coverage because the HK Letter, which was sent on July 7, 2018, constitutes a "Claim"

that was first made *before* the policy incepted on August 1, 2018. Def. Mem. 8–12.

a.     *The HK Letter is a "Claim"*

A "Claim" is defined by the Policy as "a written demand received by [Pine] for monetary,

nonmonetary, or injunctive relief." Compl. ¶ 16; Policy III.B.1. The HK Letter plainly meets this

4

definition of a "Claim." In the letter, Schneider's counsel "advise[d] [Pine] of claims by the Schneider/Schwartz Group against Pine." *See* HK Letter 1. Counsel contends that "there are many serious issues arising from Pine's management . . . and such claims should survive a motion to dismiss and a motion for summary judgment." HK Letter 2. Counsel then detailed a number of allegations, including that Pine "breached its fiduciary dut[ies], "ha[d] not acted in good faith," "breached provisions of the governing Operating Agreements," "failed to disclose material facts," was "involved in related party transactions," and "failed to provide key documents." HK Letter 1. The HK Letter also alleges that Pine was paid $622,742 in fees in 2017, despite the fact that Pine had "no authority to pay itself fees." HK Letter 7. The HK Letter requests non-monetary relief in the form of an accounting and demands ten categories of documents for inspection. *See* HK Letter 5, 11. Finally, counsel "suggest[s] that a meeting be scheduled to resolve the Schneider/Schwartz Group's concerns," in an effort to "bring about a mutually satisfactory resolution of these claims without having to commence litigation that would be costly to all parties involved." HK Letter 2, 13.

Pine provides several theories for why the HK Letter is not a "Claim." None succeeds. First, Pine contends that the HK Letter simply "recite[s] . . . point[s] of law" and "requests to review documents." Pl. Opp. 6. However, Second Circuit precedent indicates that a letter "set[ting] forth [a] request under a claim of right, including [an] entitlement to the documents identified" is sufficient to put an insured "on notice of the legal consequences of any failure to comply." *Weaver v. Axis Surplus Ins. Co.*, 639 F. App'x 764, 766–67 (2d Cir. 2016). Moreover, even where monetary damages are not "specifically request[ed]," a "demand[] that [an insured] rectify [a] problem" can be sufficient to constitute a claim. *McCabe v. St. Paul Fire & Marine Ins. Co.*, 79 A.D.3d 1612, 1614, 914 N.Y.S.2d 814, 816 (4th Dep't 2010). Here, the HK Letter alleged misconduct, cited theories of liability, referenced legal authority, demanded specific

documents, requested an accounting, and suggested a meeting. That is sufficient under New York law to constitute a claim.

Pine next attempts to characterize the HK Letter as using "precatory language," which failed to put Pine "on notice of the drastic legal repercussions that could result from noncompliance." Pl. Opp. 7 (citing *Gil Enters., Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996)). But this assertion is contradicted by the plain language of the Letter, which explicitly mentions litigation and hypothesizes that the claims should survive pre-trial motion practice.

Finally, Pine attempts to manufacture a dispute of fact by asserting that what the requested meeting might "entail goes unstated in the [HK] letter." Pl. Opp. 8. But no such statement is necessary. "Although counsel did not *specifically* state that the purpose of [the requested] meeting was to demand monetary damages or other relief, the implication" of the HK Letter "is that counsel requested the meeting for this reason." *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02 CIV. 10088 (PKL), 2004 WL 1145830 (S.D.N.Y. May 21, 2004), *aff'd*, 133 F. App'x 770 (2d Cir. 2005).

    b.    <u>The Schneider Action and the HK Letter Are a Single
             "Claim" That Was Not Made During the Policy Period</u>

Pine does not contest that the HK Letter was a predicate of the Schneider Action, which also indisputably is a Claim. Under the Policy, "[t]wo or more Claims arising out of a single Wrongful Act, or any series of related Wrongful Acts, will be considered a single Claim." Policy VI.C. The Schneider Complaint involves largely the same facts, circumstances, and alleged violations as the HK Letter. *Compare* HK Letter, *with* Schneider Compl. Indeed, the Schneider Complaint itself explains that the HK Letter "discussed in great detail . . . [the] Plaintiffs' claims" against Pine. Schneider Compl. ¶ 19. As such, the Schneider Complaint and HK Letter are "considered a single Claim." That Claim was made *before* the Policy Period—on the date the HK Letter was sent (July 17, 2018). Because the Letter *predated* the Policy Period, the Schneider

Action is not covered by the Colony Policy. This finding is independently sufficient to grant judgment on the pleadings.

## II. Pine Had Knowledge of an Alleged "Wrongful Act" Prior to the Policy Period

Colony next contends that coverage is precluded because Pine was aware that it had committed a "Wrongful Act" prior to the effective date of the Policy. The Colony Policy expressly excludes from coverage any Claim "arising out of a Wrongful Act . . . occurring prior to the Policy Period if, prior to the effective date . . . [Pine] had a reasonable basis to believe that [it] had committed a Wrongful Act." Compl. ¶ 21; Policy IV.A.2. A "Wrongful Act" is "any actual or *alleged* act, error or omission, or breach of duty by [Pine]." Compl. ¶ 17; Policy III.II (emphasis added).

Under New York law, Pine must have *both* objective *and* subjective knowledge that it had committed a Wrongful Act. *See Liberty Ins. Underwriters, Inc. v. Corpina Piergrossi Overzat & Klar LLP*, 78 A.D.3d 602, 604, 913 N.Y.S.2d 31, 33 (1st Dep't 2010). More particularly, the subjective prong requires *Pine's* knowledge of the relevant facts prior to the effective date of the Policy, while the objective prong requires a showing that *a reasonable insured* might expect such facts to be the basis of a claim. *Id.* at 604–05, 33.

After receiving the HK Letter, Pine was *subjectively* aware that it had committed a "Wrongful Act." As described above, the HK Letter accused Pine of a variety of improper acts and breaches of duty. Those allegations of misconduct—*regardless* of whether they were true or false—put Pine on notice of an *alleged* act, error, omission, or breach of duty. Although Pine argues that the HK Letter did not "provide Pine with a reasonable basis to believe it *actually had committed* an alleged wrongdoing," Pl. Opp. 14–15 (emphasis added), no such showing is necessary where, as here, the Policy defines a "Wrongful Act" as including *alleged* acts. Moreover, the subjective prong "simply requires that the insured know the facts underlying the

eventual . . . claim." *N. River Ins. Co. v. Leifer*, No. 21-CV-7775, 2022 WL 1210847, at *2 (S.D.N.Y. Apr. 25, 2022). The subjective prong is therefore satisfied.

For the same reason, the contents of the HK Letter would have informed a reasonable insured that it had committed an *alleged* Wrongful Act. Again, even assuming the allegations were false, a reasonable insured would have been put on notice by the allegations included in the HK Letter and therefore would have "*some* basis to anticipate a claim, regardless of whether the claim [was] likely to be filed or likely to succeed." *Leifer*, 2022 WL 1210847, at *3 (emphasis in original). Pine fundamentally misunderstands the objective prong, providing a smattering of different theories that, it alleges, might "impact a reasonable person's belief" that allegations in the HK Letter "would manifest in[to] a claim." Pl. Opp. 15, 16 (quotations omitted). But whether the claims were *actually pursued* is immaterial—the question is simply whether there was "*some* basis to anticipate a claim." *Leifer*, 2022 WL 1210847, at *3. Because there was "*some* basis" here, the objective prong is satisfied. *Id.*

Pine was subjectively and objectively aware that it had committed a "Wrongful Act" prior to the effective date of the Policy. The Schneider Complaint and HK Letter, which are treated as a single "Claim," are therefore not covered by the Colony Policy. This conclusion, too, is independently sufficient to grant judgment on the pleadings.

### III. The Alleged "Wrongful Acts" Predate the Retroactive Date

Finally, the Policy only provides coverage for a "Claim . . . [that] aris[es] out of a Wrongful Act committed . . . on or after the Retroactive Date" and "before the end of the Policy Period." Compl. ¶ 15; Policy I.A.1. The Policy deems "[e]ach Wrongful Act, in a series of related Wrongful Acts" to "have occurred on the date of the *first* such Wrongful Act." Policy VI.C (emphasis added). Therefore, Colony argues that if even a *single* related Wrongful Act alleged in the

Schneider Complaint was committed *before* March 1, 2016, there is no coverage for *any* related Wrongful Act—even those committed *after* March 1, 2016.

In determining whether two acts are related, the relevant inquiry is "whether the underlying claims are based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." *Nomura Holding America, Inc. v. Fed. Ins. Co.*, 629 F. App'x 38, 40 (2d Cir. 2015) (citation omitted).

The Schneider Complaint alleges a long history of mismanagement by Pine and includes a number of allegations pre-dating March 1, 2016. For instance, it alleges that Pine "breach[ed] the Operating Agreements" by approving loans "outside the ordinary course of business" from September 2015 to June 2019, that Pine "paid management fees and construction management fees to itself" without approval "for the years 2012 through the first six months of 2019," and that, commencing in 2012, Pine dramatically increased cash reserves and reduced distributions to members without approval. Schneider Compl. ¶¶ 13, 16, 132 (internal quotation marks omitted).

In all, the Schneider Complaint alleges a history of business mismanagement by the same entity (Pine) in its operation of the same business (Real Estate Development Services) with the same parties (the Schneider Plaintiffs). Accordingly, the Court concludes that all of the allegations in the Schneider Complaint are "related" because they "are based upon . . . [a] related series of facts, circumstances, situations, transactions or events." *Nomura*, 629 F. App'x at 40.

In response, Pine vaguely contends, without legal authority, that the "trier of fact in the Schneider Action might determine that if Pine committed any Wrongful Act, it was committed after the Retroactive Date." Pl. Opp. 24. That point is irrelevant to the question of whether acts alleged *after* the retroactive date are related to acts that allegedly occurred *before* it.

9

Lastly, Pine identifies two allegations in the Schneider Complaint that it contends are "not tethered to any other alleged pre-Retroactive Date Wrongful Act." Pl. Opp. at 24. Not so. One allegation addresses Pine's refusal to provide records or to permit inspection of documents in March 2018, but the Complaint alleges a prior history of withholding similar information. *See* Schneider Compl. ¶¶ 406–16. The other allegation—that Pine attempted to amend the Operating Agreements to allow Pine to act as the manager in perpetuity—appears similarly related to the alleged history of Pine's self-aggrandizement and self-dealing. Because all of the Wrongful Acts contained in the Schneider Complaint either precede the Retroactive Date or relate to Wrongful Acts that do, the Colony Policy provides no coverage.

For these three independently sufficient reasons, the Court finds no possibility of coverage under the Colony Policy. Accordingly, Colony has no duty to defend or to indemnify Pine and judgment on the pleadings for Colony is appropriate.

## CONCLUSION

For the foregoing reasons, the motion for judgment on the pleadings is GRANTED. The Clerk of Court is respectfully requested to enter judgment for Colony dismissing the case, terminate docket entry 23, and close this case.

**SO ORDERED.**

Date: **March 20, 2023**
       **New York, NY**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**

10

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
PINE MANAGEMENT, INC.,

                               Plaintiff,

                    -against-                                           22 **CIVIL** 2407 (MKV)

                                                                        <u>**JUDGMENT**</u>

COLONY INSURANCE COMPANY,

                               Defendant.
----------------------------------------------------------X

         It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Memorandum Opinion and Order dated March 20, 2023, Defendant's

motion for judgment on the pleadings is GRANTED. Judgment is entered for Colony dismissing

the case; accordingly, the case is closed.

**Dated:**  New York, New York

         March 21, 2023


                                                          **RUBY J. KRAJICK**

                                        _____
                                                          **Clerk of Court**

                              **BY:**        *K. Mango*
                                        _____
                                                          **Deputy Clerk**



**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted*. If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/.**

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____CV_____ (      )(      )

**NOTICE OF APPEAL**

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

Notice is hereby given that the following parties: _____

_____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the       ☐ judgment     ☐ order     entered on: _____

(date that judgment or order was entered on docket)

that: _____

_____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____          _____

Dated                                        Signature*

_____

Name (Last, First, MI)

_____

Address                        City                State                Zip Code

_____          _____

Telephone Number                          E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____         _____CV_____ (        )(        )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-         **MOTION FOR EXTENSION
OF TIME TO FILE NOTICE
OF APPEAL**

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)


I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appeal within the required
                                    date

time period because:

_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)


_____         _____
Dated:                                  Signature

_____
Name (Last, First, MI)

_____
Address                 City             State              Zip Code

_____         _____
Telephone Number                        E-mail Address (if available)


Rev. 3/27/15

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____          _____CV_____ (        )(        )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                                          **MOTION FOR LEAVE TO**
                                                   **PROCEED IN FORMA**
                                                   **PAUPERIS ON APPEAL**
_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)


I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma*

*pauperis* on appeal. This motion is supported by the attached affidavit.


_____          _____
Dated                                     Signature

_____
Name (Last, First, MI)

_____
Address                    City           State              Zip Code

_____          _____
Telephone Number                          E-mail Address (if available)

**A-801**

## Application to Appeal In Forma Pauperis

_____**v.** _____       Appeal No. _____

District Court or Agency No. _____

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br>  Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br>  Date: _____ |

My issues on appeal are: (<u>required</u>):

1.     *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

12/01/2013 SCC

| Interest and dividends | $ | $ | $ | $ |
|---|---|---|---|---|
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | $ 0 | $ 0 | $ 0 | $ 0 |

2.      List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.      List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

4.      *How much cash do you and your spouse have? $_____*

        *Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5.      *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
|  |  | Make and year: |
|  |  | Model: |
|  |  | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: |  |  |
| Model: |  |  |
| Registration #: |  |  |

- 3 -

**A-804**

6.      *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7.      *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
| | | |
| | | |
| | | |

8.      *Estimate the average monthly expenses of you and your family. Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>   Are real estate taxes included? ☐ Yes ☐ No<br>   Is property insurance included? ☐ Yes ☐ No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
|     Homeowner's or renter's: | $ | $ |
|     Life: | $ | $ |
|     Health: | $ | $ |
|     Motor vehicle: | $ | $ |
|     Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
|     Motor Vehicle: | $ | $ |
|     Credit card (name): | $ | $ |
|     Department store (name): | $ | $ |
|     Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | $ 0 | $ 0 |

9. *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

☐ Yes      ☐ No      If yes, describe on an attached sheet.

10. *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* ☐ Yes ☐ No

*If yes, how much?* $ _____

11.   *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.   *Identify the city and state of your legal residence.*

City _____   State _____

Your daytime phone number: _____

Your age: _____   Your years of schooling: _____

Last four digits of your social-security number: _____